# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## GOLDEN CORRAL CORP.; GOLDEN CORRAL FRANCHISING SYSTEMS, INC.

*Plaintiffs – Appellants*

v.

## ILLINOIS UNION INSURANCE COMPANY, INC.

*Defendant -- Appellee*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA

-------------------------------

### JOINT APPENDIX

### VOLUME I OF I

-------------------------------

Gregg E. McDougal
William R. Hartzell
McDougal Hartzell, PLLC
2626 Glenwood Avenue, Suite 485
Raleigh, North Carolina 27608
919-893-9500

*Counsel for Appellants*

Ted Smyth
Steven Bader
Cranfill Sumner LLP
5440 Wade Park Blvd, Suite 300
Raleigh, North Carolina 27607
919-828-5100

*Counsel for Appellee*

<u>TABLE OF CONTENTS</u>

VOLUME I OF I

Docket Report……………………………………………………………….. JA001

Notice of Removal, with exhibits (DE 1)………………………………….JA007

    <u>Exhibits:</u>

    A. State Court Summons and Complaint (DE 1-1)………………... JA015
    B. State Court Notice of Removal (DE 1-2)……………………… JA034
    C. Civil Cover Sheet (DE 1-3)…………………………………… JA036
    D. Supplemental Removal Cover Sheet (DE 1-4)………………….JA038

Amended Complaint (DE 15)…………………………………………… JA042

Answer to Amended Complaint, with exhibit (DE 17)………………….... JA059

    <u>Exhibit:</u>

    A. Illinois Union Ins. Co. Policy No. D4226555A 001 (DE 17-1)... JA090

Def. Motion for Judgment on the Pleadings (DE 24)………………….. JA024

Memo. of Law in Support of Mot. for Judgment on the Pleadings………. JA210
    with exhibits (DE 25)

    <u>Exhibits</u>

    A. Order of The Honorable Orlando F. Hudson, Jr. (DE 25-1)……. JA241
    B. Plaintiff's Reply Memo. of Law in Support of Application……. JA251
        for a Preliminary Injunction (DE 25-2)
    C. Transcript of Teleconference before The Honorable…………… JA264
        Valerie E. Caproni Re: Order to Show Cause (DE 25-3)
    D. Order of The Honorable Joyce Draganchuk (DE 25-4)…………JA284
    E. Order of The Honorable Lydia M. Villareal (DE 25-5)…………JA311
    F. Order of The Honorable Bryan Chapman (DE 25-6)…………...JA336
    G. Opinion of The Honorable Steven J. Polansky (DE 25-7)……... JA377
    H. Order of The Honorable Stephen R. Bough (DE 25-8)…………JA397
    I. Transcript of Motion Hering in *Optical Services et al v.*..............JA400

*Franklin Mutual* (DE 25-9) …

    J.  Memorandum and Order of the Honorable Catherine…………..JA432
        D. Perry (DE 25-10) …

Response in Opposition to Motion to Stay Discovery (DE 30)…………....JA437

Response in Opposition to Def.'s Mot. for Judgment on…………………JA448
    on the Pleadings, with exhibit (DE 31)

    <u>Exhibit</u>

    A. Defendant Illinois Union Ins. Co.'s Mot to Dismiss in *London*…JA476
       *Bridge Resort, LLC v. Illinois Union Ins Co.* (DE 31-1)

Reply Memorandum of Law in Support of Motion for Judgment………...JA492
    on the Pleadings (DE 32)

Order of The Honorable James C. Dever III Granting Defendant's……… JA505
    Motion for Judgment on the Pleadings (DE 39)

Judgment in a Civil Case 5:20-CV-349-D (DE 40)………………………. JA528

Notice of Appeal, filed Oct. 6, 2021 (DE 41)……………………………... JA529

Plaintiffs' Rule 60(b)(6) Motion (DE 50)………………………………… JA531

Memo. in Support of Plaintiffs' Rule 60(b)(6) Motion,…………………...JA533
    with exhibits (DE 51)

    <u>Exhibits</u>

    A. FRAP 28(j) Letter (DE 51-1)……………………………………JA555
    B. Reply in Support of Defendant Illinois Union Ins. Co.'s………. JA558
       Motion to Dismiss Complaint in *London Bridge*
       *Resort, LLC v. Illinois Union Ins. Co.* (DE 51-2)
    C. Defendant Illinois Union Ins. Co.'s Motion to Dismiss………... JA571
       Plaintiff's Complaint Pursuant to FRCP 12(B)(6) in
       *London Bridge Resort, LLC v. Illinois Union Ins. Co.*
       (DE 51-3)

Response of Illinois Union to Plaintiffs' Rule 60(b)(6)…………………... JA630
    Motion (DE 53)

Plaintiffs' Reply Brief in Support of its Rule 60(b)(6) Motion (DE 55)…..JA652

Order of The Honorable James C. Dever III Denying Plaintiffs'………… JA660
    Rule 60(b)(6) Motion (DE 56)

Judgment in a Civil Case No. 5:20-CV-349-D (DE 57)…………………….. JA666

Notice of Appeal (DE 58)………………………………………………… JA667

# U.S. District Court
## EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
## CIVIL DOCKET FOR CASE #: 5:20−cv−00349−D

Golden Corral Corp. et al v. Illinois Union Insurance Company
Assigned to: District Judge James C. Dever, III
Demand: $75,000,000
Case in other court:  Wake County Superior Court, 20CVS5667
     4CCA, 21−02119
     USCA, 25−01682
Cause: 28:1332 Diversity−Injunctive & Declaratory Relief

Date Filed: 07/02/2020
Date Terminated: 09/08/2021
Jury Demand: Plaintiff
Nature of Suit: 110 Insurance
Jurisdiction: Diversity

**Plaintiff**

| | | |
|---|---|---|
| **Golden Corral Corp.** | represented by | **Gregg E. McDougal** |

The McDougal Law Firm, PLLC
316 W. Edenton Street, Suite 100
Raleigh, NC 27603
919−893−9500
Fax: 919−893−9510
Email: gregg@themcdougallawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Henry Denton Worrell**
McDougal Worrell LLP
316 W. Edenton Street, Suite 100
Raleigh, NC 27603
919−893−9500
Fax: 919−893−9510
Email: denton@mcdougalworrell.com
*TERMINATED: 09/16/2020*

**Lawrence Russell Duke**
The McDougal Law Firm, PLLC
316 W. Edenton Street, Suite 100
Raleigh, NC 27603
919−893−3504
Fax: 919−893−9510
Email: LRDuke@protonmail.com
*ATTORNEY TO BE NOTICED*

**William R. Hartzell**
The McDougal Law Firm, PLLC
316 W. Edenton Street, Suite 100
Raleigh, NC 27603
919−893−9500
Fax: 919−893−9510
Email: will@themcdougallawfirm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Golden Corral Franchising Systems, Inc.** | represented by | **Gregg E. McDougal** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Henry Denton Worrell**
(See above for address)
*TERMINATED: 09/16/2020*

**Lawrence Russell Duke**

(See above for address)
*ATTORNEY TO BE NOTICED*

**William R. Hartzell**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Illinois Union Insurance Company**    represented by    **James M. Bauer**
Clyde & Co US LLP
271 17th Street NW, Suite 1720
Atlanta, GA 30363
404–410–3150
Fax: 404–410–3151
Email: james.bauer@clydeco.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert W. Fisher**
Clyde & Co US LLP
271 17th Street NW, Suite 1720
Atlanta, GA 30363
404–410–3150
Fax: 404–410–3151
Email: robert.fisher@clydeco.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Andrew Bader**
Cranfill Sumner & Hartzog LLP
5420 Wade Park Blvd, Suite 300
Raleigh, NC 27607
919–863–8750
Fax: 919–865–7921
Email: sbader@cshlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Welch**
Cranfill Sumner & Hartzog LLP
P.O. Box 27808
Raleigh, NC 27611
919–863–8739
Fax: 919–828–2277
Email: jwelch@cshlaw.com
*ATTORNEY TO BE NOTICED*

**Theodore B. Smyth**
Cranfill Sumner & Hartzog LLP
P.O. Box 27808
Raleigh, NC 27611
919–828–5100
Fax: 919–828–2277
Email: tsmyth@cshlaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/02/2020 | 1 | NOTICE OF REMOVAL by Illinois Union Insurance Company from Wake County Superior Court, case number 20CVS5667. ( Filing fee $ 400 receipt number 0417–5500136), filed by Illinois Union Insurance Company. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Exhibit A – State Court Summons & Complaint, # 2 Exhibit B – State Court Notice of Removal, # 3 Civil Cover Sheet, # 4 Civil Cover Sheet – Supplemental) (Smyth, Theodore) (Entered: 07/02/2020) |
| 07/02/2020 | 2 | Financial Disclosure Statement by Illinois Union Insurance Company identifying Corporate Parent Chubb Limited for Illinois Union Insurance Company. (Smyth, Theodore) (Entered: 07/02/2020) |
| 07/02/2020 | 3 | Notice of Appearance filed by Theodore B. Smyth on behalf of Illinois Union Insurance Company. (Smyth, Theodore) (Entered: 07/02/2020) |
| 07/02/2020 | 4 | Notice of Appearance filed by Jennifer A. Welch on behalf of Illinois Union Insurance Company. (Welch, Jennifer) (Entered: 07/02/2020) |
| 07/06/2020 | 5 | Notice regarding 1 Notice of Removal and requirement to file Notice of Appearance. Sent to Gregg McDougal, Esq., H. Denton Worrell, Esq., and Lawrence R. Duke, Esq. at McDOUGAL WORRELL LLP 316 West Edenton Street, Suite 100 Raleigh, North Carolina 27603 via US Mail. (Sellers, N.) (Entered: 07/06/2020) |
| 07/07/2020 | 6 | Consent MOTION for Extension of Time to File Answer regarding 1 Notice of Removal, filed by Illinois Union Insurance Company. (Attachments: # 1 Text of Proposed Order) (Smyth, Theodore) (Entered: 07/07/2020) |
| 07/07/2020 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 6 Consent MOTION for Extension of Time to File Answer regarding 1 Notice of Removal. (Sellers, N.) (Entered: 07/07/2020) |
| 07/08/2020 | 7 | ORDER granting 6 Motion for Extension of Time to Answer. Illinois Union Insurance Company answer due 8/10/2020. Signed by Peter A. Moore, Jr., Clerk of Court on 7/8/2020. Sent to Gregg McDougal, Esq., H. Denton Worrell, Esq., Lawrence R. Duke, Esq. at McDOUGAL WORRELL LLP 316 West Edenton Street, Suite 100 Raleigh, North Carolina 27603 via US Mail. (Sellers, N.) (Entered: 07/08/2020) |
| 07/15/2020 | 8 | Notice of Appearance filed by Gregg E. McDougal on behalf of All Plaintiffs. (McDougal, Gregg) (Entered: 07/15/2020) |
| 07/15/2020 | 9 | Notice of Appearance filed by Henry Denton Worrell on behalf of All Plaintiffs. (Worrell, Henry) (Entered: 07/15/2020) |
| 07/15/2020 | 10 | Notice of Appearance filed by Lawrence Russell Duke on behalf of All Plaintiffs. (Duke, Lawrence) (Entered: 07/15/2020) |
| 07/15/2020 | 11 | Financial Disclosure Statement by Golden Corral Corp. identifying Corporate Parent Investors Management Corporation for Golden Corral Corp.. (Worrell, Henry) (Entered: 07/15/2020) |
| 07/15/2020 | 12 | Financial Disclosure Statement by Golden Corral Franchising Systems, Inc. identifying Corporate Parent Golden Corral Corp. for Golden Corral Franchising Systems, Inc.. (Worrell, Henry) (Entered: 07/15/2020) |
| 08/10/2020 | 13 | ANSWER to Complaint by Illinois Union Insurance Company. (Attachments: # 1 Exhibit A – Policy # D4226555A 002) (Smyth, Theodore) (Entered: 08/10/2020) |
| 08/12/2020 | 14 | ORDER FOR DISCOVERY PLAN sent to all parties. Signed by Peter A. Moore, Jr., Clerk of Court on 8/12/2020. (Stouch, L.) (Entered: 08/12/2020) |
| 08/28/2020 | 15 | AMENDED COMPLAINT against All Defendants, filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc.. (McDougal, Gregg) (Entered: 08/28/2020) |
| 09/09/2020 | 16 | Notice of Appearance filed by William R. Hartzell on behalf of All Plaintiffs. (Hartzell, William) (Entered: 09/09/2020) |
| 09/11/2020 | 17 | ANSWER to 15 Amended Complaint by Illinois Union Insurance Company. (Attachments: # 1 Exhibit A – IL Union Ins. Co. Policy D4226555A 001) (Smyth, Theodore) (Entered: 09/11/2020) |
| 09/16/2020 | 18 | MOTION to Withdraw as Attorney filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc.. (Attachments: # 1 Text of Proposed Order Prop. Order Allowing Withdrawal) (Worrell, Henry) (Entered: 09/16/2020) |

| | | |
|---|---|---|
| 09/16/2020 | 19 | ORDER granting 18 Motion to Withdraw as Attorney. Attorney Henry Denton Worrell terminated. Signed by District Judge James C. Dever, III on 9/16/2020. (Stouch, L.) (Entered: 09/16/2020) |
| 09/23/2020 | 20 | Rule 26(f) Report (joint) filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc.. (Duke, Lawrence) (Entered: 09/23/2020) |
| 10/20/2020 | 21 | SCHEDULING ORDER: Discovery due by 6/18/2021. Motions due by 7/16/2021. This matter will be set for trial by separate order. Counsel should read the order in its entirety for critical deadlines and information. Signed by District Judge James C. Dever, III on 10/20/2020. (Attachments: # 1 Consent to Magistrate Judge Jurisdiction Form) (Stouch, L.) (Entered: 10/20/2020) |
| 01/28/2021 | 22 | Notice of Special Appearance for non–district by James M. Bauer on behalf of Illinois Union Insurance Company. (Bauer, James) (Entered: 01/28/2021) |
| 01/28/2021 | 23 | Notice of Special Appearance for non–district by Robert W. Fisher on behalf of Illinois Union Insurance Company. (Fisher, Robert) (Entered: 01/28/2021) |
| 02/01/2021 | 24 | MOTION for Judgment on the Pleadings filed by Illinois Union Insurance Company. (Welch, Jennifer) (Entered: 02/01/2021) |
| 02/01/2021 | 25 | Memorandum in Support regarding 24 MOTION for Judgment on the Pleadings filed by Illinois Union Insurance Company. (Attachments: # 1 Exhibit A – North State Deli – Order Granting MSJ, # 2 Exhibit B – Sentinel – Memorandum of Law, # 3 Exhibit C – Sentinel – Transcript, # 4 Exhibit D – Gavrilides – Order & Transcript, # 5 Exhibit E – Inns by Sea – Order & Transcript, # 6 Exhibit F – Its Nice – Order & Transcript, # 7 Exhibit G – Mac Property – Opinion, # 8 Exhibit H – KC Hopps – Order, # 9 Exhibit I – Optical Services – Transcript, # 10 Exhibit J – Mehl – Memo & Order) (Welch, Jennifer) (Entered: 02/01/2021) |
| 02/02/2021 | 26 | MOTION to Stay *Discovery* filed by Illinois Union Insurance Company. (Welch, Jennifer) (Entered: 02/02/2021) |
| 02/02/2021 | 27 | **DISREGARD. Amended and re–filed at 28 .** Memorandum in Support regarding 26 MOTION to Stay *Discovery* filed by Illinois Union Insurance Company. (Attachments: # 1 Exhibit A – National Coatings Order) (Welch, Jennifer) Modified on 2/3/2021 (Sellers, N.). (Entered: 02/02/2021) |
| 02/02/2021 | 28 | AMENDED Memorandum in Support by Illinois Union Insurance Company. Amendment to 27 Memorandum in Support *of Motion to Stay Discovery* (Attachments: # 1 Exhibit A – National Coatings Order) (Welch, Jennifer) (Entered: 02/02/2021) |
| 02/03/2021 | | Notice to Counsel regarding: 26 Motion to Stay. Pursuant to Local Civil Rule 7.1(b)(3) and Section V(I)(3) of the CM/ECF Policy and Procedures Manual and Judge Dever's practice preferences, parties must file a proposed order with any non–dispositive motion. Please file a proposed order using the event 'Proposed Order' in the Responses and Replies category and link it back to the motion to which it corresponds. (Sellers, N.) (Entered: 02/03/2021) |
| 02/03/2021 | 29 | Proposed Order regarding 26 MOTION to Stay *Discovery* filed by Illinois Union Insurance Company. (Welch, Jennifer) (Entered: 02/03/2021) |
| 02/16/2021 | 30 | RESPONSE in Opposition regarding 26 MOTION to Stay *Discovery* filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc.. (Hartzell, William) (Entered: 02/16/2021) |
| 02/22/2021 | 31 | RESPONSE in Opposition regarding 24 MOTION for Judgment on the Pleadings filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc.. (Attachments: # 1 Exhibit A – Defendant Illinois Union Insurance Companys Motion to Dismiss Plaintiffs Complaint Pursuant to FRCP 12(B)(6), London Bridge Resort, LLC v. Illinois Union Insurance Company, Inc., Case No. 3:20–cv–08109 (D. Az. July 2, 2020)) (Hartzell, William) (Entered: 02/22/2021) |
| 03/08/2021 | 32 | REPLY to Response to Motion regarding 24 MOTION for Judgment on the Pleadings filed by Illinois Union Insurance Company. (Welch, Jennifer) (Entered: 03/08/2021) |

| 03/10/2021 | | Motion Submitted to District Judge James C. Dever III regarding 24 MOTION for Judgment on the Pleadings, 26 MOTION to Stay *Discovery*. (Sellers, N.) (Entered: 03/10/2021) |
|---|---|---|
| 04/14/2021 | 33 | Consent MOTION to Modify Scheduling Order regarding 21 Scheduling Order, filed by Illinois Union Insurance Company. (Attachments: # 1 Text of Proposed Order) (Smyth, Theodore) (Entered: 04/14/2021) |
| 04/14/2021 | | Motion Submitted to District Judge James C. Dever III regarding 33 Consent MOTION to Modify Scheduling Order regarding 21 Scheduling Order. (Sellers, N.) (Entered: 04/14/2021) |
| 04/14/2021 | 34 | ORDER granting 33 Motion to Modify Scheduling Order. The deadline for reports from retained experts shall be April 30, 2021. The deadline for reports from rebuttal experts shall be May 28, 2021. Signed by District Judge James C. Dever III on 4/14/2021. (Sellers, N.) (Entered: 04/15/2021) |
| 06/08/2021 | 35 | MOTION for Extension of Time to Complete Discovery filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc.. (Attachments: # 1 Text of Proposed Order) (Hartzell, William) (Entered: 06/08/2021) |
| 06/09/2021 | | Motion Submitted to District Judge James C. Dever III regarding 35 MOTION for Extension of Time to Complete Discovery. (Sellers, N.) (Entered: 06/09/2021) |
| 06/10/2021 | 36 | ORDER granting 35 Motion for Extension of Time to Complete Discovery. All discovery shall be completed by September 16, 2021; and All potentially dispositive motions shall be filed by October 14, 2021. Signed by District Judge James C. Dever III on 6/10/2021. (Sellers, N.) (Entered: 06/11/2021) |
| 08/23/2021 | 37 | Second MOTION Consent Motion to Modify Scheduling Order regarding 21 Scheduling Order, filed by Illinois Union Insurance Company. (Attachments: # 1 Text of Proposed Order) (Welch, Jennifer) (Entered: 08/23/2021) |
| 08/23/2021 | 38 | ORDER granting 37 Motion Consent Motion to Modify Scheduling Order. Counsel should read the order in its entirety for critical deadlines and information. Signed by District Judge James C. Dever III on 8/23/2021. (Sellers, N.) (Entered: 08/23/2021) |
| 09/08/2021 | 39 | ORDER granting 24 Motion for Judgment on the Pleadings; denying as moot 26 Motion to Stay. Signed by District Judge James C. Dever III on 9/8/2021. (Sellers, N.) (Entered: 09/08/2021) |
| 09/08/2021 | 40 | JUDGMENT – IT IS ORDERED, ADJUDGED, AND DECREED that the court GRANTS Illinois Union's motion for judgment on the pleadings [D.E. 24] and DISMISSES WITH PREJUDICE Golden Corral's amended complaint [D.E. 15]. Additional amendments would be futile. The court DENIES as moot defendant's motion to stay discovery [D.E. 26]. Signed by Peter A. Moore, Jr., Clerk of Court on 9/8/2021. (Sellers, N.) (Entered: 09/08/2021) |
| 10/06/2021 | 41 | Notice of Appeal filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc. as to 40 Judgment,. Filing fee, receipt number 0417−6263390. (Hartzell, William) (Entered: 10/06/2021) |
| 10/06/2021 | 42 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 41 Notice of Appeal. (Foell, S.) (Entered: 10/06/2021) |
| 10/08/2021 | 43 | US Court of Appeals Case Number 21−2119 (Cathi Bennett, Case Manager) as to 41 Notice of Appeal filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc.. (Foell, S.) (Entered: 10/08/2021) |
| 02/08/2022 | 44 | ORDER of US Court of Appeals granting Lawrence Duke's Motion to Withdraw as counsel for plaintiffs as to 41 Notice of Appeal filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc.. (Foell, S.) (Entered: 02/09/2022) |
| 08/11/2022 | 45 | Unpublished Opinion from Fourth Circuit Court of Appeals. Affirmed. (Foell, S.) (Entered: 08/11/2022) |
| 08/11/2022 | 46 | US Court of Appeals Judgment as to 41 Notice of Appeal filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc.. (Foell, S.) (Entered: 08/11/2022) |

| 08/26/2022 | 47 | Temporary Stay of Mandate regarding 41 Notice of Appeal. (Foell, S.) (Entered: 08/26/2022) |
|---|---|---|
| 09/09/2022 | 48 | ORDER of US Court of Appeals as to 41 Notice of Appeal filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc. The court denies the petition for rehearing and rehearing en banc. (Foell, S.) (Entered: 09/09/2022) |
| 09/19/2022 | 49 | MANDATE of US Court of Appeals as to 41 Notice of Appeal filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc. (Foell, S.) (Entered: 09/19/2022) |
| 01/31/2025 | 50 | MOTION to Set Aside Judgment filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc.. (Hartzell, William) (Entered: 01/31/2025) |
| 01/31/2025 | 51 | Memorandum in Support regarding 50 MOTION to Set Aside Judgment filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc.. (Attachments: # 1 Exhibit A – Illinois Union Notice of Subsequent Authority, # 2 Exhibit B – Illinois Union Reply Brief ISO MTD in London Bridge, # 3 Exhibit C – Illinois Union Motion to Dismiss in London Bridge) (Hartzell, William) (Entered: 01/31/2025) |
| 02/21/2025 | 52 | Notice of Appearance filed by Steven Andrew Bader on behalf of Illinois Union Insurance Company. (Bader, Steven) (Entered: 02/21/2025) |
| 02/21/2025 | 53 | RESPONSE in Opposition regarding 50 MOTION to Set Aside Judgment filed by Illinois Union Insurance Company. (Smyth, Theodore) (Entered: 02/21/2025) |
| 02/25/2025 | 54 | Consent MOTION for Extension of Time to File Response/Reply as to 50 MOTION to Set Aside Judgment filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc. (Attachments: # 1 Text of Proposed Order) (Hartzell, William) Modified on 2/26/2025 to change related document (Mann, Stephanie). (Entered: 02/25/2025) |
| 02/26/2025 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 54 Consent MOTION for Extension of Time to File Reply as to 50 MOTION to Set Aside Judgment. (Mann, Stephanie) (Entered: 02/26/2025) |
| 02/27/2025 | | TEXT ORDER granting Plaintiffs' Motion for Extension of Time 54 . For good cause shown, it is ordered that Plaintiffs have up to and including March 21, 2025, within which to file a reply in support of the Motion to Set Aside Judgment 50 . Signed by Peter A. Moore, Jr., Clerk of Court on 2/27/2025. (Hockaday, A.) (Entered: 02/27/2025) |
| 03/21/2025 | 55 | REPLY to Response to Motion regarding 50 MOTION to Set Aside Judgment filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc.. (Hartzell, William) (Entered: 03/21/2025) |
| 03/24/2025 | | Motion Submitted to District Judge James C. Dever III regarding 50 MOTION to Set Aside Judgment. (Mann, Stephanie) (Entered: 03/24/2025) |
| 05/14/2025 | 56 | ORDER – The court DENIES plaintiffs' motion for relief from judgment D.E. 50 . Signed by District Judge James C. Dever III on 5/14/2025. (Mann, Stephanie) (Entered: 05/14/2025) |
| 05/14/2025 | 57 | JUDGMENT. Signed by Peter A. Moore, Jr., Clerk of Court on 5/14/2025. (Mann, Stephanie) (Entered: 05/14/2025) |
| 06/11/2025 | 58 | Notice of Appeal filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc. as to 57 Judgment. Filing fee, receipt number ANCEDC–8153750. (Hartzell, William) (Entered: 06/11/2025) |
| 06/13/2025 | 59 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 58 Notice of Appeal. (Foell, S.) (Entered: 06/13/2025) |
| 06/16/2025 | 60 | US Court of Appeals Case Number 25–1682 (Taylor Barton, Case Manager) as to 58 Notice of Appeal filed by Golden Corral Corp., Golden Corral Franchising Systems, Inc.. (Foell, S.) (Entered: 06/17/2025) |

GOLDEN CORRAL CORP. and )
GOLDEN CORRAL FRANCHISING )
SYSTEMS, INC., )
          )
     Plaintiffs, )
          )
v. )          **NOTICE OF REMOVAL**
          )
ILLINOIS UNION INSURANCE )
COMPANY, )
          )
     Defendant. )
_____ )

TO THE CLERK OF THE ABOVE-TITLED COURT, AND TO ALL PARTIES AND THEIR
COUNSEL OF RECORD:

     PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446,
Defendant Illinois Union Insurance Company ("Illinois Union") removes this Action from the
Superior Court of the State of North Carolina for Wake County, where it is pending as Case No.
20 CVS 5667, to the United States District Court for the Eastern District of North Carolina.

     This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because there
is complete diversity of citizenship between Illinois Union and Plaintiffs Golden Corral Corp.
("GCC") and Golden Corral Franchising Systems, Inc. ("GCFS"), and the amount in controversy
exceeds $75,000, exclusive of interest and costs. Grounds for removal are set forth in more detail
below.

## I. BACKGROUND

     1.    Plaintiffs commenced this action on May 14, 2020, in the Superior Court of the
State of North Carolina for Wake County, which is within the district and division to which this
case is removed. As required under 28 U.S.C. § 1446(a), a copy of all process, pleadings, and

1

JA007

orders served upon Illinois Union in the underlying state court action are attached hereto as Exhibit A.

2. Plaintiffs allege that an insurance policy issued by Illinois Union bearing policy number D4226555A 001 (the "Policy") provides coverage for the alleged loss of business income Plaintiffs have sustained. These losses, Plaintiffs allege, have been caused by North Carolina Governor Roy Cooper's March 27, 2020 Executive Order 121 and various other orders across the country relating to the COVID-19 pandemic. These orders, the Plaintiffs allege, have "impaired" or "eliminated" "access to . . . Golden Corral corporate-owned and franchise locations. Compl. ¶¶ 30-35. In addition, the Complaint alleges the presence of COVID-19 within five miles of "Golden Corral's corporate and franchise locations." *Id.* ¶ 29. In sum, Plaintiffs allege that their "normal business operations have been interrupted," resulting in "substantial losses to revenues from its corporate-owned locations, losses of royalties from its franchise locations, and losses of rental income . . . and losses of payments from equipment financing . . . . " *Id.* ¶ 34.

3. The Complaint seeks declaratory judgment on at least three insurance-coverage issues, contending that the Policy provides business interruption coverage: (1) under the Policy's coverage for "Interruption by Civil or Military Authority" coverage, "during the period that civil authority orders have impaired access to [Plaintiffs'] corporate-owned and francise locations as a result of imminent loss due to COVID-19"; (2) under the Policy's "Loss of Ingress or Egress" coverage, during the period that ingress to and egress from Golden Corral's corporate-owned and franchise locations have been impaired as a result of damage due to COVID-19; and (3) under the Policy's "Business Interruption section" for "loss caused by physical loss, damage, or destruction of insured property due to COVID-19." Compl. ¶¶ 42-44.

4.     Illinois Union's statutory agent, pursuant to N.C. Gen. Stat. § 58-16-30, was served with the Summons and Complaint on May 22, 2020, and Illinois Union received the Summons and Complaint from its statutory agent on June 3, 2020. This Notice is timely filed under 28 U.S.C. § 1446(b).

5.     Upon filing this Notice of Removal, Illinois Union will furnish written notice to Plaintiffs' counsel, and will file and serve a copy of the Notice of Removal attached hereto as Exhibit B with the Clerk of the Superior Court of the State of North Carolina for Wake County, pursuant to 28 U.S.C. § 1446(d).

## II. THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO 28 U.S.C. § 1332

6.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between GCC and GCFS, on the one hand, and Illinois Union on the other, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

### A.   There Is Complete Diversity of Citizenship Between Plaintiffs and Illinois Union

7.     Plaintiff GCC is a citizen of North Carolina for purposes of diversity jurisdiction because it is incorporated in North Carolina and has its principal place of business in Raleigh, North Carolina. Compl. ¶ 2. *See* 28 U.S.C. § 1332 (c)(1); *Hertz Corp. v. Friend*, 559 U.S. 77, 78 (2010) ("the phrase 'principal place of business' in § 1332(c)(1) refers to the place where a corporation's high level officers direct, control, and coordinate the corporation's activities").

8.     Plaintiff GCFS is a citizen of Delaware and North Carolina for purposes of diversity jurisdiction. It is incorporated in Delaware, and its principal place of business is in Raleigh, North Carolina. Compl. ¶ 3. *See* 28 U.S.C. § 1332 (c)(1); *Hertz*, 559 U.S. at 78.

3

JA009

9.     Illinois Union is a citizen of Illinois and Pennsylvania for purposes of diversity jurisdiction because it is incorporated in Illinois and its principal place of business is located in Pennsylvania. Compl. ¶ 4. *See* 28 U.S.C. § 1332 (c)(1); *Hertz*, 559 U.S. at 78.

10.     Because the Plaintiffs are citizens of North Carolina and Delaware and the Defendant is a citizen of Illinois and Pennsylvania, complete diversity exists. *See Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 81 (2005) (holding that defendants may remove an action on the basis of diversity of citizenship if there is complete diversity between all named plaintiffs and all named defendants, and no defendant is a citizen of the forum state).

**B.  The Amount in Controversy Exceeds $75,000.**

11.     Under 28 U.S.C. § 1332(a), diversity jurisdiction requires that the matter in controversy "exceed[] the sum or value of $75,000, exclusive of interest and costs." This requirement is met here.

12.     A notice of removal "need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold," *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014), and if contested, a court will determine whether the threshold is met by a preponderance of the evidence. *Id.* at 88; *see also Scott v. Cricket Commc'ns, LLC*, 865 F.3d 189, 194 (4th Cir. 2017)). In a declaratory relief action, "the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Advert. Comm'n.*, 432 U.S. 333, 347 (1977). In *ISCO Indus., LLC v. Erdle*, this Court observed that it is well established that in actions seeking declaratory or injunctive relief, the amount in controversy is measured by the value of the object of the litigation. No. 5:11-CV-552-F, 2011 WL 6293788, *4 (Dec. 15, 2011 E.D.N.C.). The Fourth Circuit has historically applied the "either-viewpoint" rule in determining the value of the object of the litigation. *Gonzalez v. Fairgale Props. Co.*, N.V., 241 F.Supp.2d

512, 517 (D.Md. 2002). Under this rule, the amount in controversy requirement is satisfied if either the gain to the plaintiff or the cost to the defendant is greater than $75,000. *Id.*; *Government Employees Ins. Co. v. Lally*, 327 F.2d 568, 569 (4th Cir. 1964). More specifically, the jurisdictional amount in controversy requirement is satisfied if either "the 'direct pecuniary value' of the right the plaintiff seeks to enforce, or the cost to the defendant of complying with any prospective equitable relief exceeds $75,000," *Lee v. Citimortgage, Inc.*, 739 F. Supp. 2d 940, 946 (E.D. Va. 2010) (quoting *Lee School Lofts, L.L.C. v. Amtax Holdings LLC*, No. 3:08cv427, 2008 WL 4936479, at *3 (E.D. Va. Oct. 29, 2008)). *ISCO Indus., LLC v. Erdle*, No. 5:11-CV-552-F, 2011 WL 6293788, at *4 (E.D.N.C. 2011).

13.     Here, the Complaint makes clear that GCC's and/or GCFS's business revenues put at least $75,000 in controversy.

(a)     First, the Complaint seeks a declaration that Illinois Union's insurance coverage extends to business income lost by GCC and GCFS. The Complaint alleges that there are 483 Golden Corral restaurants nationwide, 35 of which are corporate-owned and 448 of which are franchise locations. Compl. ¶ 13. Plaintiffs allege that "[v]arious civil authorities . . . have issued orders impairing (and even eliminating) access to . . . Golden Corral corporate-owned and franchise locations." *Id.* ¶ 30. According to Plaintiffs, these civil authority orders include North Carolina Governor Roy Cooper's executive order on March 17, 2020 that "limit[ed] access to facilities that sell food and beverage." *Id.* ¶ 31. Plaintiffs maintain that this limited "ingress to and egress from Golden Corral's corporate-owned and franchise locations[.]" *Id.* ¶ 32. They further allege that Golden Corral was "forced to suspend operations for all of its corporate-owned locations, *which has resulted in substantial losses of Golden Corral's business income*." *Id.* ¶ 33 (emphasis

added). "Golden Corral franchisees have followed suit, which has significantly reduced or eliminated the royalties paid to Golden Corral[,] and "franchise locations have also had to suspend payments on their leases . . . ." *Id.* ¶ 34. In sum, Plaintiffs allege that their "normal business operations have been interrupted," resulting in "substantial losses to revenues from its corporate-owned locations, losses of royalties from its franchise locations, and losses of rental income . . . and losses of payments from equipment financing . . . . " *Id.* ¶ 34. All of this, Plaintiffs allege (and Illinois Union disputes), is covered under the Policy. There can be no legitimate dispute that the value of Plaintiffs' claimed losses exceed $75,000 given the scope of Plaintiffs' businesses.

(b)     Second, the Court may consider the limits under the Policy as a proxy for the amount in controversy of the declaratory relief sought. *See, e.g.*, *First Mercury Ins. Co. v. Excellent Computing Distributors, Inc.*, 648 F. App'x 861, 865 (11th Cir. 2016) ("[W]hen an insurer seeks a judgment declaring the absence of liability under a policy, the value of the declaratory relief to the plaintiff-insurer is the amount of potential liability under its policy."); *Stonewall Ins. Co. v. Lopez*, 544 F.2d 198, 199 (5th Cir. 1976). Subject to the Policy's terms and conditions, it provides an overall limit of insurance well in excess of $75,000, of which Illinois Union potentially provides up to 50% of that coverage. And subject to Illinois Union's 50% participation, the Policy's limit of liability for interruption by civil or military authority, which Plaintiffs are claiming here, is 120 consecutive days when, as a result of physical loss, damage or destruction by a peril insured by this Policy within five miles of an insured "location," normal business operations are interrupted or reduced because access to that "location" is impaired by

order of civil or military authority. Likewise, the Policy's coverage for loss of ingress or egress from a "location" also potentially extends up to 120 consecutive days.

14.     Therefore, while Illinois Union does not concede that GCC or GCFS is entitled to any relief, a fair reading of the Complaint and the Policy indicates an amount in controversy exceeding the jurisdictional minimum.

### III. VENUE

15.     This action was originally filed in the Superior Court of the State of North Carolina for Wake County, which sits in this federal judicial district and division, rendering venue proper. 28 U.S.C. § 84(c); *see also* 28 U.S.C. § 1441(a).

### IV. CONCLUSION

16.     For the foregoing reasons, Illinois Union respectfully states that this action, previously pending in the Superior Court of the State of North Carolina for Wake County is properly removed to this Court.


Respectfully submitted, this 2nd day of July, 2020.

**CRANFILL SUMNER & HARTZOG, LLP**

*/s/* Theodore B. Smyth
Theodore B. Smyth
N.C. State Bar No. 10045
Jennifer A. Welch
N.C. State Bar No. 31360
Post Office Box 27808
Raleigh, NC 276111-7808
Phone: 919-828-5100
Fax: 919-828-227
Email: tsmyth@cshlaw.com
Email: jwelch@cshlaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**CIVIL ACTION FILE NO.: 5:20-cv-349**

| | | |
|---|---|---|
| GOLDEN CORRAL CORP. and<br>GOLDEN CORRAL FRANCHISING<br>SYSTEMS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **CERTIFICATE OF SERVICE** |
| ILLINOIS UNION INSURANCE<br>COMPANY, | ) ) ) | |
| Defendant. | ) ) ) | |

I hereby certify that on July 2, 2020, I electronically filed the foregoing **NOTICE OF REMOVAL** with the Clerk of Court using the CM/ECF system and served a copy on the following parties to this action by depositing a copy of the same in the United States Mail, postage prepaid, and addressed to:

Gregg McDougal, Esq.
H. Denton Worrell, Esq.
Lawrence R. Duke, Esq.
McDOUGAL WORRELL LLP
316 West Edenton Street, Suite 100
Raleigh, North Carolina 27603


**CRANFILL SUMNER & HARTZOG, LLP**

/s/ Theodore B. Smyth
Theodore B. Smyth
N.C. State Bar No. 10045
Jennifer A. Welch
N.C. State Bar No. 31360
Post Office Box 27808
Raleigh, NC 276111-7808
Phone: 919-828-5100
Fax: 919-828-227
Email: tsmyth@cshlaw.com
Email: jwelch@cshlaw.com

8

CHUBB

---

Attached please find Chubb mail received
June 03, 2020.

If you need to collect your physical
document, it will be held in Philadelphia for
30 days once regular business activities
resume.

Mail not collected after 30 days will be
destroyed.

---

PHL20200603- *08853*

**EXHIBIT A**



NC DEPARTMENT OF
★ INSURANCE
1201 Mail Service Center
Raleigh, NC 27699-1201

CERTIFIED

7016 0660 0000 8759 3967

Illinois Union Insurance Company
436 Walnut St.
Philadelphia, PA 19106

U.S. POSTAGE
$08.00

May 29, 2020

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Illinois Union Insurance Company
436 Walnut Street
Philadelphia, PA  19106

      Re:    Golden Corral Corp.; Golden Corral Franchising Systems, Inc.
                       vs.
          Illinois Union Insurance Company

Dear Corporate Secretary:

Enclosed herewith are documents entitled **Civil Summons and Complaint**, which this Department received through the mail on May 22, 2020.

                    MIKE CAUSEY
                    Commissioner of Insurance

                    Courtney H Ethridge
                    Special Deputy for
                    Service of Process

Enclosures

Case 5:20-cv-00349-D   Document 1-1   Filed 07/02/20   Page 3 of 19
1201 MAIL SERVICE CENTER | RALEIGH, NC 27699-1201 | WWW.NCDOI.COM

JA017



Wake Co. File No. 20 CVS 05667

Golden Corral Corp.; Golden Corral Franchising Systems, Inc.

    vs.

Illinois Union Insurance Company

     I, Courtney H Ethridge, a Special Deputy duly appointed for the purpose, do hereby accept service of the **Civil Summons** of Plaintiff's Golden Corral Corp.; Golden Corral Franchising Systems, Inc. and adding Illinois Union Insurance Company as a Defendant, and acknowledge receipt of a copy of the same, together with a copy of the **Complaint**, under the provision of the North Carolina General Statute Section 58-16-30 as process agent for Illinois Union Insurance Company.

     This the 22nd day of May, 2020.

                        MIKE CAUSEY
                        Commissioner of Insurance

                        Courtney H Ethridge
                        Special Deputy for
                        Service of Process

Case 5:20-cv-00349-D   Document 1-1   Filed 07/02/20   Page 4 of 19
1201 MAIL SERVICE CENTER | RALEIGH, NC 27699-1201 | WWW.NCDOI.COM

JA018

# STATE OF NORTH CAROLINA

_____ WAKE _____ County

**File No.**
20CV 05667

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>Golden Corral Corp.; Golden Corral Franchising Systems, Inc.<br>*Address*<br>c/o Gregg McDougal, 316 W. Edenton St., Suite 100<br>*City, State, Zip*<br>Raleigh　　　　　　　NC　　27603 | **CIVIL SUMMONS**<br>☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)** |

**VERSUS**

G.S. 1A-1, Rules 3 and 4

| | |
|---|---|
| *Name Of Defendant(s)*<br>Illinois Union Insurance Company | *Date Original Summons Issued*<br>　　　　　　　05/14/2020<br>*Date(s) Subsequent Summons(es) Issued* |

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1*<br>Illinois Union Insurance Company<br>c/o Mike Causey, Commissioner, NC Dept. of Insurance<br>1201 Mail Service Center<br>Raleigh　　　　　　　NC　　27699-1201 | *Name And Address Of Defendant 2* |
|---|---|

⚠️ **IMPORTANT! You have been sued!** These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra!** Estos papeles son documentos legales. ¡NO TIRE estos papeles!
Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)*<br>Gregg E. McDougal<br>McDougal Worrell LLP<br>316 W. Edenton Street, Suite 100<br>Raleigh　　　　　　　NC　　27603 | *Date Issued*<br>05/14/2020 | *Time*<br>　　　　☐ AM ☑ PM |
|---|---|---|
| | *Signature*<br>（signature） | |
| | ☑ *Deputy CSC* ☐ *Assistant CSC* ☐ *Clerk Of Superior Court* | |

| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time*<br>☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ *Deputy CSC* ☐ *Assistant CSC* ☐ *Clerk Of Superior Court* | |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 4/18
© 2018 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM  ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM  ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 4/18
© 2018 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

_____WAKE_____ County

File No.

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| **Name Of Plaintiff**<br>Golden Corral Corp.; Golden Corral Franchising Systems, Inc.<br>**Address**<br>c/o Gregg McDougal, 316 W. Edenton St., Suite 100<br>**City, State, Zip**<br>Raleigh          NC     27603 | **CIVIL SUMMONS**<br>☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**<br><br>G.S. 1A-1, Rules 3 and 4 |
| **VERSUS** | |
| **Name Of Defendant(s)**<br>Illinois Union Insurance Company | **Date Original Summons Issued**<br>05/14/2020<br>**Date(s) Subsequent Summons(es) Issued** |

**To Each Of The Defendant(s) Named Below:**

| | |
|---|---|
| **Name And Address Of Defendant 1**<br>Illinois Union Insurance Company<br>c/o Mike Causey, Commissioner, NC Dept. of Insurance<br>1201 Mail Service Center<br>Raleigh         NC  27699-1201 | **Name And Address Of Defendant 2** |

⚠️ **IMPORTANT! You have been sued!** These papers are legal documents, DO NOT throw these papers out!
You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales.**
**¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| | | | |
|---|---|---|---|
| **Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)**<br>Gregg E. McDougal<br>McDougal Worrell LLP<br>316 W. Edenton Street, Suite 100<br>Raleigh      NC    27603 | **Date Issued**<br>05/14/2020<br>**Signature** | **Time**<br>☐ AM ☐ PM | |
| | ☐ Deputy CSC | ☐ Assistant CSC | ☐ Clerk Of Superior Court |

| | | |
|---|---|---|
| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | **Date Of Endorsement**<br>**Signature** | **Time**<br>☐ AM ☐ PM |
| | ☐ Deputy CSC ☐ Assistant CSC | ☐ Clerk Of Superior Court |

**NOTE TO PARTIES:** _Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed._

(Over)

AOC-CV-100, Rev. 4/18
© 2018 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| | | ☐ AM  ☐ PM | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| | | ☐ AM  ☐ PM | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 4/18
© 2018 Administrative Office of the Courts

STATE OF NORTH CAROLINA       THE GENERAL COURT OF JUSTICE

FILE SUPERIOR COURT DIVISION

COUNTY OF WAKE       20 CVS _____

2020 MAY 14 P 1:37

GOLDEN CORRAL CORP. and
GOLDEN CORRAL FRANCHISING   WAKE CO., C.S.C.
SYSTEMS, INC.,

BY

|  |  |  |
|---|---|---|
| Plaintiffs, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | |
| ILLINOIS UNION INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

NOW COMES Plaintiff Golden Corral Corporation and Plaintiff Golden Corral Franchising Systems, Inc. (collectively "Plaintiffs"), and complaining of Defendant Illinois Union Insurance Company ("Defendant"), alleges and says as follows:

## INTRODUCTION

1. This is a civil action by Plaintiffs for a declaratory judgment arising from the recent COVID-19 outbreak and its detrimental effects on Plaintiffs' business. Plaintiffs timely submitted claims for business interruption related to COVID-19 and seeking to recover damages under their insurance policy issued by Defendant. Though the insurance policy provides coverage for Plaintiffs' claims, Defendant has yet to accept coverage for the claims, which has and is causing injury to Plaintiffs. Accordingly, Plaintiffs seek a declaration of the rights, duties, and obligations of the parties under the insurance policy with respect to Plaintiffs' underlying claims for coverage.

1

## PARTIES

2.  Plaintiff Golden Corral Corporation ("Golden Corral") is a North Carolina corporation with its principal office located in Raleigh, Wake County, North Carolina.

3.  Plaintiff Golden Corral Franchising Systems, Inc. ("GCFS") is a Delaware corporation doing business in North Carolina as Golden Corral Franchising Systems, Inc., with its principal office located in Raleigh, Wake County, North Carolina.

4.  Defendant Illinois Union Insurance Company ("Illinois Union" or "Defendant") is an Illinois corporation with its principal office located in Philadelphia, Pennsylvania, upon information and belief. Defendant markets itself under the "CHUBB Group of Insurance Companies," upon information and belief.

5.  Upon information and belief, throughout the period relevant to this action, Illinois Union is or has been licensed under Chapter 58 of the North Carolina General Statutes and is authorized to conduct business in North Carolina; is or has been engaged in the business of insuring risks located in North Carolina, pursuant to N.C. Gen. Stat. § 58-21-1 *et seq.*; and is or has been transacting such business on a surplus lines or non-admitted basis.

6.  Defendant Illinois Union will be served with legal process by service upon its registered agent in North Carolina, upon its agent expressly designated in the insurance policy, and/or upon the North Carolina Insurance Commissioner pursuant to N.C. Gen. Stat. §§ 58-16-30 & 58-21-100.

2

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over the subject matter of this action pursuant to N.C. Gen. Stat. § 1-253 and N.C. Gen. Stat. § 7A-243.

8.    This Court has personal jurisdiction over Defendant because, within the time period relevant herein, Defendant has been licensed to transact insurance business in North Carolina, has in fact transacted business in North Carolina, or has maintained a substantial presence in North Carolina, upon information and belief.

9.    Venue in Wake County is proper pursuant to, *inter alia*, N.C. Gen. Stat. §§ 1-79 and 1-82, because Plaintiffs have their principal places of business in Raleigh, Wake County, North Carolina.

10.    All conditions precedent as to Plaintiffs set forth in the applicable insurance contract have been performed.

## FACTUAL BACKGROUND

11.    Founded in 1973 and based in Raleigh, North Carolina, Golden Corral is the nation's largest grill-buffet restaurant chain with restaurants operating in forty states. Golden Corral strives to make pleasurable dining affordable for families across America. Some of the restaurants are corporate-owned by Golden Corral, and others are franchise locations.

12.    Golden Corral has granted GCFS the non-exclusive right to franchise others to operate restaurants using systems developed and owned by Golden Corral. The franchisees pay certain royalties based on a percentage of their gross revenues to GCFS, which are in turn paid to Golden Corral.

3

13.     There are approximately four hundred and eighty three (483) Golden Corral restaurant locations throughout the United States; thirty five (35) of the locations are corporate-owned by Golden Corral and four hundred and forty eight (448) are franchise locations.

14.     Approximately sixty one (61) of the franchise restaurant locations are structured under leases with Golden Corral.

15.     Approximately fifteen (15) of the franchisees also financed the purchase of certain equipment from Golden Corral.

### The Policy

16.     On or about March 31, 2019, Defendant issued Golden Corral a commercial insurance policy, number D4226555A 001 (the "Policy"), for the period of March 31, 2019 to March 31, 2020, which was applied for, signed, and delivered in North Carolina. The Policy is marketed under "Westchester," "A Chubb Company."

17.     The Policy insures "all real and personal property of every kind and description" at an insured location or within 1000 feet thereof, and the Policy provides coverage for business interruption and for the losses to gross revenues, royalties, rental income, and extra expenses related thereto.

18.     The Policy provides a maximum Limit of Liability of Fifty Million Dollars and 00/100 ($50,000,000.00), and states that, should an occurrence commence prior to the expiration of the Policy and extend beyond the expiration date of the Policy, the Policy will pay for the losses occurring during such period as if they fell entirely within the term of the Policy.

4

19. The Policy is an "all-risks" policy, insofar as it provides that a peril insured under the Policy means loss or damage not otherwise excluded.

20. The Policy includes an Endorsement for "Interruption by Civil or Military Authority," which covers the actual loss of business income sustained when, as a result of "imminent loss" within five miles of an insured location, the insured's business operations are "interrupted or reduced" because "access" is "impaired by order of civil or military authority."

21. The Endorsement also includes "Loss of Ingress or Egress," which covers the actual loss of business income sustained when, as a result of "direct physical loss, damage, or destruction by a peril insured" within five miles of an insured location, business operations are "interrupted or reduced" because "ingress to or egress from" that location is "impaired."

22. The Policy also includes a section for "Business Interruption," which covers the actual loss of business income resulting from the reduction of business operations caused by physical loss, damage, or destruction of property insured.

23. The Policy defines the actual loss sustained by the insured as the reduction in gross earnings less charges and expenses that do not necessarily continue during the interruption or reduction of the business operations.

24. "Royalties" are included for business interruption and described in part as "revenue under royalty, licensing fees or commission agreements between the Insured and another party."

5

25.    Lost rent is included for business interruption and is described in part under "Rental Value," which covers the loss sustained by the insured resulting from untenantability caused by physical loss, damage, or destruction of property insured.

26.    "Extra Expense" is also included for business interruption, which includes costs to "continue as nearly normal as practicable the conduct of the Insured's business" during the interruption.

### COVID-19 Outbreak

27.    On or about January 21, 2020, the United States experienced its first reported case of the virus COVID-19, upon information and belief. Since then the virus has now reached the level of a global pandemic.

28.    The Centers for Disease Control and Prevention ("CDC") and studies have concluded that COVID-19 survives and remains infectious on surfaces and objects for days. Thus a person can get COVID-19 by touching a surface or object that has the virus on it and, as such, COVID-19 physically affects and damages all with which it comes in contact.

29.    COVID-19 has quickly spread around the country, including areas located within five miles of Golden Corral's corporate and franchise locations.

30.    Various civil authorities have recognized the presence of COVID-19 and its life-threatening danger and have issued orders impairing (and even eliminating) access to restaurants, including Golden Corral corporate-owned and franchise locations.

6

31.     For example, in North Carolina, Governor Cooper issued an executive order regarding COVID-19 to, *inter alia*, "limit access to facilities that sell food and beverage." N.C. Exec. Order No. 118 (Mar. 17, 2020).

32.     Given the presence of COVID-19, ingress to and egress from Golden Corral's corporate-owned and franchise locations has also been impaired, as set forth in the Policy.

33.     As a result, on or about March 20, 2020, Golden Corral was forced to suspend operations for all of its corporate-owned locations, which has resulted in substantial losses of Golden Corral's business income.

34.     Golden Corral franchisees have followed suit, which has significantly reduced or eliminated the royalties paid to Golden Corral. Certain franchise locations have also had to suspend payments on their leases to Golden Corral, as well as their payments on their equipment financing to Golden Corral.

35.     As a result of the above, Golden Corral's normal business operations have been interrupted, and Golden Corral has experienced and is experiencing substantial losses to revenues from its corporate-owned locations, losses of royalties from its franchise locations, and losses of rental income from leases and losses of payments from equipment financing from certain of its franchise locations, all of which are insured and covered under the Policy.

36.     In accordance with the terms of the Policy, Plaintiffs timely submitted notice of their business interruption and insurance claims, and have complied with the conditions precedent to liability as set forth in the Policy.

7

37.     Though the Policy provides coverage for Plaintiffs' claims related to COVID-19, Defendant has yet to accept or approve Plaintiffs' claims. Given the very substantial and timely nature of Plaintiffs' claims, Defendant's failure to accept or approve Plaintiffs' claims has and is causing injury to Plaintiffs, and thus Plaintiffs seek immediate relief as set forth below.

## DECLARATORY JUDGMENT

38.     Plaintiffs re-allege and incorporate all paragraphs herein by reference.

39.     Under N.C. Gen. Stat. § 1-253 *et seq.*, the Court may declare rights, status, and other legal relations in order to settle and to afford relief from uncertainty and insecurity with respect thereto, whether or not further relief is or could be claimed.

40.     An actual controversy exists between Plaintiffs and Defendant regarding the parties' respective rights, duties, and obligations concerning the Policy.

41.     Plaintiffs contend, *inter alia*, that the Policy provides insurance coverage for Plaintiffs' insurance claims, and that Illinois Union is required to cover the claims.

42.     In particular, Plaintiffs contend that the Policy provides business interruption coverage here under the Endorsement for "Interruption by Civil or Military Authority" during the period that civil authority orders have impaired access to their corporate-owned and franchise locations as a result of imminent loss due to COVID-19.

43.     Plaintiffs contend that the Policy also provides business interruption coverage here under the Endorsement for "Loss of Ingress or Egress" during the period that ingress to and egress from Golden Corral's corporate-owned and franchise locations have been impaired as a result of damage due to COVID-19.

8

44.     Plaintiffs contend that the Policy also provides business interruption coverage here under the "Business Interruption" section for loss caused by physical loss, damage, or destruction of insured property due to COVID-19.

45.     As a result of the above, Golden Corral has experienced substantial losses to revenues from its corporate-owned locations, losses of royalties from its franchise locations, and losses of rental income from leases and losses of payments from equipment financing from certain of its franchise locations, all of which Plaintiffs contend are insured and covered under the Policy.

46.     Though Plaintiffs have complied with conditions precedent in the Policy and have submitted notice of their claims, Illinois Union has yet to accept or approve of Plaintiffs' claims.

47.     Upon information and belief, Defendant disputes that coverage is afforded under the Policy, as set forth above.

48.     A declaratory judgment will resolve the above disputes and will determine the parties' respective rights, duties, and obligations in this matter, and will alleviate the parties' uncertainty regarding Defendant's liability and Plaintiffs' rights under the Policy.

49.     Resolution of the duties, responsibilities, and obligations of the parties is necessary as no adequate remedy at law exists and a declaration of the Court is needed to resolve the dispute and controversy.

50.     Therefore, pursuant to N.C. Gen. Stat. § 1-253 *et seq.*, Plaintiffs are entitled to a declaration that the Policy provides coverage for Plaintiffs' claims.

9

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court award the following relief:

1.    Judgment declaring that, pursuant to the Policy, Defendant, as a matter of law, must provide coverage for Plaintiffs' claims as set forth herein;

2.    A jury trial on all issues so triable; and

3.    Such other and further relief as the Court deems just and proper.

This the 14th day of May, 2020.

MCDOUGAL WORRELL LLP

By:    _____

Gregg E. McDougal, NCSB # 27290
H. Denton Worrell, NCSB # 49750
Lawrence R. Duke, NCSB #49726
316 W. Edenton Street, Suite 100
Raleigh, North Carolina 27603
Telephone: (919) 893-9500
Facsimile: (919) 893-9510
gregg@mcdougalworrell.com
denton@mcdougalworrell.com
lawrence@mcdougalworrell.com
*Attorneys for Plaintiffs*

10

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Plaintiff's Complaint and Civil Summons was filed the <u>14th</u> day of May, 2020 with the Clerk of Court of Wake County, North Carolina. I have also mailed a copy to the Commissioner of the NC Department of Insurance, and have mailed a copy to counsel via U.S. Mail as follows:

> North Carolina Department of Insurance
> c/o Mr. Mike Causey, Commissioner
> Attn: Courtney Ethridge, Special Deputy for Service of Process
> Albemarle Building
> 325 N. Salisbury Street
> Raleigh, NC 27603-5926

This the <u>14th</u> day of May, 2020.

McDOUGAL WORRELL LLP

By: *Lawrence R. Duke*
Gregg McDougal, NCSB # 27290
H. Denton Worrell, NCSB # 49750
Lawrence R. Duke, NCSB # 49726
316 West Edenton Street, Suite 100
Raleigh, North Carolina 27603
Telephone: (919) 893-9500
gregg@mcdougalworrell.com
denton@mcdougalworrell.com
lawrence@mcdougalworrell.com
*Attorneys for Plaintiff*

NORTH CAROLINA
WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 5667

GOLDEN CORRAL CORP. and
GOLDEN CORRAL FRANCHISING
SYSTEMS, INC.,

     Plaintiffs,

v.

ILLINOIS UNION INSURANCE
COMPANY,

     Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

**NOTICE OF FILING NOTICE OF
REMOVAL**

**TO THE CLERK OF THE COURT:**

Kindly file the attached Notice of Removal of Defendant, Illinois Union Insurance

Company, to the United States District Court for the Eastern District of North Carolina, in the

above-captioned matter.

Pursuant to 28 U.S.C. 1446(d), "the State court shall proceed no further unless and until

the case is remanded."

Respectfully submitted, this 2nd day of July, 2020.

CRANFILL SUMNER & HARTZOG, LLP

*Theodore B. Smyth*

Theodore B. Smyth
N.C. State Bar No. 10045
Jennifer A. Welch
N.C. State Bar No. 31360
Post Office Box 27808
Raleigh, NC 276111-7808
Phone: 919-828-5100
Fax: 919-828-227
Email: tsmyth@cshlaw.com
     jwelch@cshlaw.com

1

**EXHIBIT B**

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a copy of the foregoing was served on the following parties to this action by: ( ) Federal Express ( ) hand delivery (X) by depositing a copy of the same in the United States Mail postage prepaid and addressed to:

Gregg McDougal, Esq.
H. Denton Worrell, Esq.
Lawrence R. Duke, Esq.
McDOUGAL WORRELL LLP
316 West Edenton Street, Suite 100
Raleigh, North Carolina 27603

This the 2nd day of July, 2020.

CRANFILL SUMNER & HARTZOG, LLP

Theodore B. Smyth
N.C. State Bar No. 10045
Jennifer A. Welch
N.C. State Bar No. 31360
Post Office Box 27808
Raleigh, NC 276111-7808
Phone: 919-828-5100
Fax: 919-828-227
Email: tsmyth@cshlaw.com
jwelch@cshlaw.com

2

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Golden Corral Corp. and Golden Corral Franchising Systems, Inc. | Illinois Union Insurance Company |

**(b)** County of Residence of First Listed Plaintiff   Wake
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Gregg McDougal, H. Denton Worrell, & Lawrence R. Duke, McDougal Worrell LLP, 316 W. Edenton St., Ste 100, Raleigh, NC 27603

Attorneys *(If Known)*
Theodore B. Smyth & Jennifer A. Welch, Cranfill Sumner & Hartzog LLP, PO Box 27808, Raleigh, NC 27611-7808

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ❏ 3  Federal Question (*U.S. Government Not a Party*)
- ❏ 2  U.S. Government Defendant
- ☒ 4  Diversity (*Indicate Citizenship of Parties in Item III*)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury – Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ❏ 835 Patent – Abbreviated New Drug Application | ❏ 460 Deportation |
| | | | | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ❏ 480 Consumer Credit (15 USC 1681 or 1692) |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 710 Fair Labor Standards Act | ❏ 861 HIA (1395ff) | ❏ 485 Telephone Consumer Protection Act |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 720 Labor/Management Relations | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 195 Contract Product Liability | | ❏ 385 Property Damage Product Liability | ❏ 740 Railway Labor Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 196 Franchise | ❏ 362 Personal Injury – Medical Malpractice | | ❏ 751 Family and Medical Leave Act | ❏ 864 SSID Title XVI | |
| | | | ❏ 790 Other Labor Litigation | ❏ 865 RSI (405(g)) | ❏ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ❏ 891 Agricultural Acts |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 895 Freedom of Information Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | | ❏ 896 Arbitration |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 950 Constitutionality of State Statutes |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ❏ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from Another District (specify)
- ❏ 6 Multidistrict Litigation - Transfer
- ❏ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 1332, 1441, and 1446

Brief description of cause:
declaratory judgment on at least three insurance coverage issues

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $  75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ❏ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____   DOCKET NUMBER _____

DATE  07/02/2020

SIGNATURE OF ATTORNEY OF RECORD
/s/ Theodore B. Smyth

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Case 5:20-cv-00349-D   Document 1-3   Filed 07/02/20   Page 1 of 2

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

 **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

 **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN        DIVISION
No. 5:20-cv-349

| | | |
|---|---|---|
| Golden Corral Corp. and Golden Corral Franchising Systems, Inc. | ) ) ) | |
| Plaintiff(s), | ) ) ) | |
| v. | ) ) | **SUPPLEMENTAL REMOVAL COVER SHEET** |
| Illinois Union Insurance Company | ) ) | |
| Defendant(s). | ) ) ) | |

The removing party must complete this Supplemental Removal Cover Sheet and comply with Local Civil Rule 5.3. Attach separate sheets as necessary to provide complete responses.

<u>Section A—Plaintiffs</u>

List the full name of each plaintiff from the state court action and indicate whether the plaintiff is pending (i.e., in case currently), dismissed, or otherwise terminated at the time of removal. If dismissed or terminated, indicate the date of dismissal/termination.

| Full Name of Plaintiff | Pending at time of removal – Yes/No? | Dismissed or terminated? Yes/No? | Date of Dismissal or Termination |
|---|---|---|---|
| Golden Corral Corp. | yes | no | |
| Golden Corral Franchising Systems, Inc. | yes | no | |
| | | | |
| | | | |
| | | | |

JA038

## Section B—Defendants

List the full name of each defendant from the state court action and indicate whether the defendant is pending, dismissed or otherwise terminated at the time of removal. If dismissed or terminated, indicate the date of dismissal/termination. If known, indicate if and when each defendant was served with process and whether the defendant joins in the removal.

| Full Name of Defendant | Pending at time of removal? Yes/No? | Dismissed or terminated? Yes/No? (If yes, state date of termination) | Has defendant been served with process? Yes/No/Unknown? | If served with process, date of service? | Does the defendant join in removal? Yes/No? |
|---|---|---|---|---|---|
| Illinois Union Insurance Company | yes | no | yes | 05/22/2020 | yes |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## Section C—Removal pursuant to 28 U.S.C. § 1442(d)(1)

Is only part of the state court action being removed pursuant to 28 U.S.C. § 1442(d)(1)?
Yes ☐     No ☑

If "Yes," specify what portion of the state court action is being removed, and then proceed to the signature page. If "No," proceed to Section D.

_____

_____

_____

<u>**Section D—Pending State Court Motions as of Date of Removal**</u>

Is there currently a temporary restraining order or preliminary injunction in place in this action from state court? Yes [ ]    No [✓]

List every known motion pending at the time of removal. Indicate the name of the filer, the date of filing, whether the motion has a supporting memorandum, and whether the motion is time sensitive, such as a motion for preliminary injunction.

| Title of Pending Motion | Name of Filer | Date of Filing | Memorandum-- Yes/No? | Time sensitive? Yes/No? |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

<u>**Section E—Scheduled State Court Hearings as of Date of Removal**</u>

| Date and Time of Hearing | Hearing Type | Assigned State Court Judge |
|---|---|---|
| | | |
| | | |
| | | |

3

Date: _July 2, 2020_____          /s/ Theodore B. Smyth
                                           _____
                                           Signature of Attorney for Removing Party or
                                           Unrepresented Removing Party

                                           Printed Name _Theodore  B. Smyth_____

                                           Law Firm _Cranfill Sumner & Hartzog LLP_____

                                           Address _PO Box 27808_____

                                           _Raleigh, NC  27611-7808_____

                                           Telephone Number _919-828-5100_____

                                           Fax Number _919-828-2277_____

                                           Email Address: _tsmyth@cshlaw.com_____

                                           State Bar No. _10045_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-00349-D

| | | |
|---|---|---|
| GOLDEN CORRAL CORP. and | ) | |
| GOLDEN CORRAL FRANCHISING | ) | |
| SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | **AMENDED COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| ILLINOIS UNION INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

NOW COMES Plaintiff Golden Corral Corporation and Plaintiff Golden Corral Franchising Systems, Inc. (collectively "Plaintiffs"), and complaining of Defendant Illinois Union Insurance Company ("Defendant"), alleges and says as follows:

## INTRODUCTION

1.     This is a civil action by Plaintiffs seeking coverage under their business interruption insurance policy and related damages arising from the recent COVID-19 outbreak and its detrimental effects on Plaintiffs' business.  Plaintiffs timely submitted claims for business interruption related to COVID-19 and seeking to recover damages under their insurance policy issued by Defendant.  Though the insurance policy provides coverage for Plaintiffs' claims, Defendant has wrongfully denied coverage, violating its policy obligations, legal duties, and applicable law.

1

## PARTIES

2.      Plaintiff Golden Corral Corporation ("Golden Corral") is a North Carolina corporation with its principal office located in Raleigh, Wake County, North Carolina.

3.      Plaintiff Golden Corral Franchising Systems, Inc. ("GCFS") is a Delaware corporation doing business in North Carolina as Golden Corral Franchising Systems, Inc., with its principal office located in Raleigh, Wake County, North Carolina.

4.      Defendant Illinois Union Insurance Company ("Illinois Union" or "Defendant") is an Illinois corporation with its principal office located in Philadelphia, Pennsylvania, upon information and belief.  Defendant markets itself under the "CHUBB Group of Insurance Companies."

5.      Upon information and belief, throughout the period relevant to this action, Illinois Union is or has been licensed under Chapter 58 of the North Carolina General Statutes and is authorized to conduct business in North Carolina; is or has been engaged in the business of insuring risks located in North Carolina, pursuant to N.C. Gen. Stat. § 58-21-1 *et seq.*; and is or has been transacting such business on a surplus lines or non-admitted basis.

6.      Defendant Illinois Union has been served with legal process by service upon its registered agent in North Carolina, upon its agent expressly designated in the insurance policy, and/or upon the North Carolina Insurance Commissioner pursuant to N.C. Gen. Stat. §§ 58-16-30 & 58-21-100.

2

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to, *inter alia*, N.C. Gen. Stat. § 1-253.

8.      This Court has personal jurisdiction over Defendant because, within the time period relevant herein, Defendant has been licensed to transact insurance business in North Carolina, has in fact transacted business in North Carolina, or has maintained a substantial presence in North Carolina, upon information and belief.

9.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred and/or a substantial part of property that is the subject of the action is situated in this judicial district as set forth herein, and Plaintiffs' principal places of business are located in Raleigh, Wake County, North Carolina.

10.     All conditions precedent as to Plaintiffs set forth in the applicable insurance contract have been performed.

## FACTUAL BACKGROUND

11.     Founded in 1973 and based in Raleigh, North Carolina, Golden Corral is the nation's largest grill-buffet restaurant chain with restaurants operating in forty states. Golden Corral strives to make pleasurable dining affordable for families across America. Some of the restaurants are corporate-owned by Golden Corral, and others are franchise locations.

12.     Golden Corral has granted GCFS the non-exclusive right to franchise others to operate restaurants using systems developed and owned by Golden Corral.   The

3

franchisees pay certain royalties based on a percentage of their gross revenues to GCFS, which are in turn paid to Golden Corral.

13. There are approximately four hundred and eighty three (483) Golden Corral restaurant locations throughout the United States; thirty five (35) of the locations are corporate-owned by Golden Corral and four hundred and forty eight (448) are franchise locations.

14. Approximately sixty one (61) of the franchise restaurant locations are structured under leases with Golden Corral.

15. Approximately fifteen (15) of the franchisees also financed the purchase of certain equipment from Golden Corral.

**The Policy**

16. On or about March 31, 2019, Defendant issued Golden Corral a commercial insurance policy, number D4226555A 001 (the "Policy"), for the period of March 31, 2019 to March 31, 2020, which was applied for, signed, and delivered in North Carolina. The Policy is marketed under "Westchester," "A Chubb Company."

17. The Policy insures "all real and personal property of every kind and description" at an insured location or within 1000 feet thereof, and the Policy provides coverage for business interruption and for the losses to gross revenues, royalties, rental income, and extra expenses related thereto.

18. The Policy provides a maximum Limit of Liability of Fifty Million Dollars and 00/100 ($50,000,000.00), and states that, should an occurrence commence prior to the expiration of the Policy and extend beyond the expiration date of the Policy, the Policy will

4

pay for the losses occurring during such period as if they fell entirely within the term of the Policy.

19.    The Policy is an "all-risks" policy, insofar as it provides that a peril insured under the Policy means loss or damage not otherwise excluded.

20.    The Policy includes an Endorsement for "Interruption by Civil or Military Authority," which covers the actual loss of business income sustained when, as a result of "direct physical loss, damage or destruction **or imminent loss**" (emphasis added) within five miles of an insured location, the insured's business operations are "interrupted or reduced" because "access" is "impaired by order of civil or military authority."

21.    The Endorsement also includes "Loss of Ingress or Egress," which covers the actual loss of business income sustained when, as a result of "direct physical loss, damage, or destruction by a peril insured" within five miles of an insured location, business operations are "interrupted or reduced" because "ingress to or egress from" that location is "impaired."

22.    The Policy also includes a section for "Business Interruption," which covers the actual loss of business income resulting from the reduction of business operations caused by physical loss, damage, or destruction by a peril insured by the Policy of property insured.

23.    The Policy defines the actual loss sustained by the insured as the reduction in gross earnings less charges and expenses that do not necessarily continue during the interruption or reduction of the business operations.

5

24.     "Royalties" are included for business interruption and described in part as "revenue under royalty, licensing fees or commission agreements between the Insured and another party."

25.     Lost rent is included for business interruption and is described in part under "Rental Value," which covers the loss sustained by the insured resulting from untenantability caused by physical loss, damage, or destruction of property insured.

26.     "Extra Expense" is also included for business interruption, which includes costs to "continue as nearly normal as practicable the conduct of the Insured's business" during the interruption.

27.     "Claims Preparation Expenses" are also included for business interruption, which includes the "[e]xpenses incurred by the Insured or by the Insured's representatives including Accountants, Appraisers, Auditors, Consultants, Engineers, or other such professionals in order to arrive at the loss payable under this Policy in the event of a claim."

**COVID-19 Outbreak**

28.     On or about January 21, 2020, the United States experienced its first reported case of the virus COVID-19, upon information and belief.  Since then the virus has now reached the level of a global pandemic.

29.     The Centers for Disease Control and Prevention ("CDC") and studies have concluded that COVID-19 survives and remains infectious on surfaces and objects for days.  Thus a person can get COVID-19 by touching a surface or object that has the virus on it and, as such, COVID-19 physically affects and damages all with which it comes in contact.

6

30.     COVID-19 has quickly spread around the country, including areas located within five miles of Golden Corral's corporate and franchise locations.

31.     The CDC tracks and provides data on the progression and instances of COVID-19 across the country, including the counties in North Carolina, which is compiled on its website database as "Coronavirus Disease 2019 (COVID-19)," "Cases and Deaths by County."

32.     Various civil authorities have recognized the presence and loss or damage to property and people by COVID-19 and the life-threatening dangers its has caused and have issued orders impairing (and even eliminating) access to restaurants, including Golden Corral corporate-owned and franchise locations.

33.     For example, in North Carolina, the Governor issued an executive order declaring that COVID-19 had caused a "State of Emergency," which is defined as "an occurrence or immediate threat of severe damage, injury, or loss of life or property" *See* N.C. Exec. Order No. 116 (Mar. 10, 2020) (emphasis added) (citing N.C. Gen. Stat. § 166A-19.3(6) (2019)).  The Order defined the "emergency area" as the entire State of North Carolina.  *Id.*

34.     Governor Cooper issued an executive order regarding COVID-19 to, *inter alia*, "limit access to facilities that sell food and beverage,"  N.C. Exec. Order No. 118 (Mar. 17, 2020), and that closed in-dining restaurants.

35.     Executive Order No. 118 states that it was issued in part due to "an immediate threat of serious physical injury" due to COVID-19, and that, if an "imminent hazard" exists, the Secretary for the North Carolina Department of Health and Human Services

7

("NCDHHS") may "order the owner, lessee, operator, or other person in control of property abate the imminent hazard."

36.     The NCDHHS issued an "Order of Abatement of Imminent Hazard" that classified the COVID-19 outbreak and its effects on restaurants as an "imminent hazard," and directed that "[a]ll owners, lessees, operators, or other persons in control of a restaurant shall close all restaurant seating areas immediately," which included "cafeterias" and "food halls".  Order, NCDHHS (Mar. 17, 2020).

37.     For another example, on March 27, 2020, North Carolina Governor Cooper issued Executive Order No. 121 requiring individuals to stay at home and prohibiting non-essential travel.

38.     Executive Order No. 121 states that, in response to "documented 763 cases of COVID-19 across 60 counties," it was issued "to assure adequate protection of lives and property of North Carolinians."  (Emphasis added.)

39.     As another example, Mecklenburg County, North Carolina issued a "Joint Order and Declaration," effective on March 26, 2020, that "restricted access and travel upon public streets, alley, roadway or upon any other public property" in order to "protect" "property."

40.     As another example, in Pennsylvania, the Governor issued an executive order "to control ingress and egress" throughout the state, declaring that COVID-19 had caused a "disaster emergency."  *See* Pa. Exec. Order (Mar. 19, 2020).  The "disaster emergency" is a "natural disaster," defined as a catastrophe which resulted in, *inter alia*, "substantial damage to property."  35 Pa. C.S. § 7102 (2019) (emphasis added).

41.     Given the presence of COVID-19, ingress to and egress from Golden Corral's corporate-owned and franchise locations has also been impaired, as set forth in the Policy.

42.     As a result, on or about March 20, 2020, Golden Corral was forced to suspend operations for all of its corporate-owned locations, which has resulted in substantial losses of Golden Corral's business income.

43.     Golden Corral franchisees have followed suit, which has significantly reduced or eliminated the royalties paid to Golden Corral.  Certain franchise locations have also had to suspend payments on their leases to Golden Corral, as well as their payments on their equipment financing to Golden Corral.

44.     As a result of the above, Golden Corral's normal business operations have been interrupted, and Golden Corral has experienced and is experiencing substantial losses to revenues from its corporate-owned locations, losses of royalties from its franchise locations, and losses of rental income from leases and losses of payments from equipment financing from certain of its franchise locations, all of which are insured and covered under the Policy.

**Plaintiffs' Insurance Claims to Defendant**

45.     In accordance with the terms of the Policy, on or about May 12, 2020, Plaintiffs timely notified Defendant in writing of their business interruption and insurance claims (the "Claims").

46.     On or about May 13, 2020, Defendant acknowledged receipt of the notice and assigned their "Catastrophic Claim Specialist for the Pacific Region," Ms. Lisa Jones,

9

to handle Plaintiffs' Claims. Ms. Jones emailed Plaintiffs the next day requesting a time to discuss their claims.

47.     Since then, Plaintiffs repeatedly reached out Defendant's Claim Specialist Ms. Jones, who failed to return phone calls and emails, or provide any response.

48.     Thus, Defendant has failed to acknowledge and act reasonably promptly upon communications with respect to claims arising under the insurance policy, as set forth more fully below, in violation of Defendant's legal duties.

49.     Furthermore, Plaintiffs have not received any investigatory requests from Defendant, and thus Defendant has failed to conduct any investigation of Plaintiffs' Claims (much less conduct a "reasonable investigation" of Plaintiffs' Claims) in violation of Defendant's legal duties.

50.     In particular, on or about May 18, 2020, Plaintiffs emailed Ms. Jones with a time to speak, and on or about May 19, 2020, Plaintiffs attempted again to contact Ms. Jones by telephone and left Ms. Jones a message to return the call.

51.     Ms. Jones did not respond to Plaintiffs.

52.     On or about May 27, 2020, Plaintiffs followed up and emailed Ms. Jones again, requesting whether Ms. Jones needed to speak with Plaintiffs regarding their Claims.

53.     Ms. Jones did not respond to Plaintiffs.

54.     On or about June 3, 2020, Plaintiffs followed up and called Ms. Jones again, leaving her a message.

55.     Ms. Jones did not respond to Plaintiffs.

10

56.     Indeed, since the time of Plaintiffs' notice to Defendant regarding their Claims, Plaintiffs have not received any investigatory requests from Defendant regarding their Claims, nor have Plaintiffs received any explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of their Claims.

57.     Though the Policy provides coverage for Plaintiffs' Claims, on or about August 10, 2020, Defendant denied coverage for Plaintiffs' Claims.

## FIRST CLAIM FOR RELIEF -- DECLARATORY JUDGMENT

58.     Plaintiffs re-allege and incorporate all paragraphs herein by reference.

59.     Under N.C. Gen. Stat. § 1-253 *et seq.*, the Court may declare rights, status, and other legal relations in order to settle and to afford relief from uncertainty and insecurity with respect thereto, whether or not further relief is or could be claimed.

60.     An actual controversy exists between Plaintiffs and Defendant regarding the parties' respective rights, duties, and obligations concerning the Policy.

61.     Plaintiffs contend, *inter alia*, that the Policy provides insurance coverage for Plaintiffs' insurance Claims, and that Illinois Union is required to cover the Claims.

62.     In particular, Plaintiffs contend that the Policy provides business interruption coverage here under the Endorsement for "Interruption by Civil or Military Authority" during the period that civil authority orders have impaired access to their corporate-owned and franchise locations as a result of "imminent loss" due to COVID-19.

63.     Plaintiffs contend that the Policy also provides business interruption coverage here under the Endorsement for "Loss of Ingress or Egress" during the period

11

that ingress to and egress from Golden Corral's corporate-owned and franchise locations have been impaired as a result of damage due to COVID-19.

64.     Plaintiffs contend that the Policy also provides business interruption coverage here under the "Business Interruption" section for loss caused by physical loss, damage, or destruction of insured property due to COVID-19.

65.     As a result of the above, Golden Corral has experienced substantial losses to revenues from its corporate-owned locations, losses of royalties from its franchise locations, and losses of rental income from leases and losses of payments from equipment financing from certain of its franchise locations, all of which Plaintiffs contend are insured and covered under the Policy.

66.     Though Plaintiffs have complied with conditions precedent in the Policy and have submitted notice of their Claims, Illinois Union has denied coverage for Plaintiffs' Claims.

67.     Defendant disputes that coverage is afforded under the Policy, as set forth above.

68.     A declaratory judgment will resolve the above disputes and will determine the parties' respective rights, duties, and obligations in this matter, and will alleviate the parties' uncertainty regarding Defendant's liability and Plaintiffs' rights under the Policy.

69.     Resolution of the duties, responsibilities, and obligations of the parties is necessary as no adequate remedy at law exists and a declaration of the Court is needed to resolve the dispute and controversy.

12

70.     Therefore, pursuant to N.C. Gen. Stat. § 1-253 *et seq.*, Plaintiffs are entitled to a declaration that the Policy provides coverage for Plaintiffs' Claims.

## SECOND CLAIM FOR RELIEF – BREACH OF CONTRACT

71.     Plaintiffs incorporate all paragraphs herein by reference.

72.     Plaintiffs and Defendant are parties to the Policy described above.

73.     Plaintiffs have complied with all conditions and obligations under the Policy regarding their right to coverage by Defendant for their Claims.

74.     Defendant denies that it has an obligation to cover Plaintiffs' Claims, thereby breaching its obligations under the Policy and under North Carolina law.

75.     Because Defendant has not provided coverage according to the Policy's terms, Plaintiffs have been forced to bear the costs of loss including, but not limited to, loss of business income and extra expense, not normally incurred with respect to their business.

76.     In particular, Defendant has denied coverage for "Interruption by Civil or Military Authority" for loss of business income sustained by Plaintiffs when, as a result of "imminent loss" within five miles of an insured location, Plaintiffs' business operations were interrupted or reduced because access to Plaintiffs' business locations was impaired by order of civil authority.

77.     Also, Defendant has denied coverage for "Loss of Ingress or Egress" for loss of business income sustained by Plaintiffs when, as a result of direct physical loss, damage or destruction within five miles of an insured location, Plaintiffs' business operations were interrupted or reduced because ingress or egress from Plaintiffs' business locations was impaired.

13

78.     Furthermore, Defendant has denied coverage for "Business Interruption" for loss of business income resulting from the reduction of business operations caused by physical loss, damage, or destruction of property insured.

79.     As a direct result of Defendant's breach of contract, Plaintiffs have been damaged in an amount greater than Seventy-Five Thousand Dollars and 00/100 ($75,000.00), to be determined at trial.

## THIRD CLAIM FOR RELIEF – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

80.     Plaintiffs incorporate all paragraphs herein by reference.

81.     As set forth herein, Defendant is obligated to provide coverage for Plaintiffs' Claims under the terms of the Policy.

82.     Defendant's obligations are not discretionary.

83.     To the extent that Defendant argues or contends that it could exercise discretion in regard to its obligations, however, it has a duty of good faith and fair dealing not to take actions that deny Plaintiffs the ability to receive the benefits to which they are entitled under the Policy.

84.     Defendant has a duty to perform its obligations under the Policy that according to reason and justice it should do in order to carry out the purpose for which the Policy was entered into.

85.     Defendant has not acted reasonably, in good faith, or in a manner consistent with fair play.

86.     In particular, Defendant has failed to acknowledge and act reasonably

14

promptly upon communications with respect to claims arising under the insurance policy.

87.    Plaintiffs contacted Defendant's Claims Specialist numerous times, via telephone and email, and Defendant failed to respond.

88.    Defendant did not even request or seek any investigatory information in order to investigate Plaintiffs' Claims, which insurance carriers are required to do by law.

89.    Instead, without having conducted the requisite investigation, Defendant denied coverage for Plaintiffs' claims *in toto.*

90.    Defendant did not provide an explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of the Claims.

91.    Defendant's actions are designed to avoid coverage that is provided under the Policy for Plaintiffs' Claims.

92.    Defendant's actions are injuring and interfering with Plaintiffs' rights to receive the benefits of the Policy, namely coverage for their Claims.

93.    Defendant's breaches of the implied covenant of good faith and fair dealing have caused and will continue to cause damage to Plaintiffs.

94.    Plaintiffs have incurred and will continue to incur cognizable damages as a result of Defendant's breaches of the implied covenant of good faith and fair dealing and are entitled to recovery of their damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court award the following relief:

1.      Judgment declaring that, pursuant to the Policy, Defendant Illinois Union, as a matter of law, must provide coverage for Plaintiffs' claims as set forth herein;

2.      An award of compensatory, incidental, and/or consequential damages for Plaintiffs against Defendant, in an amount to be determined at trial;

3.      An award of pre- and post-judgment interest;

4.      A jury trial on all issues so triable; and

5.      Such other and further relief as the Court deems just and proper.

This the <u>28th</u> day of August, 2020.

<div align="center"></div>

                                      **MCDOUGAL WORRELL LLP**

By:    */s/ Gregg E. McDougal*
           Gregg E. McDougal NCSB # 27290
           H. Denton Worrell, NCSB # 49750
           Lawrence R. Duke, NCSB #49726
           316 W. Edenton Street, Suite 100
           Raleigh, North Carolina 27603
           Telephone: (919) 893-9500
           Facsimile: (919) 893-9510
           gregg@mcdougalworrell.com
           denton@mcdougalworrell.com
           lawrence@mcdougalworrell.com
           *Attorneys for Plaintiffs*

16

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Amended Complaint** was filed this the 28th day of August, 2020 with the Clerk of Court using the CM/ECF system. Parties may access this filing through the Court's Electronic Filing System. Notice of this filing will be sent to the following counsel of record by operation of the Court's Electronic Filing System:

> Theodore B. Smyth
> Jennifer A. Welch
> Cranfill, Sumner & Hartzog LLP
> Post Office Box 27808
> Raleigh, NC 276111-7808

This the 28th day of August, 2020.

**McDOUGAL WORRELL LLP**

By:    */s/ Gregg E. McDougal*
       Gregg E. McDougal, NCSB # 27290
       H. Denton Worrell, NCSB # 49750
       Lawrence R. Duke, NCSB # 49726
       316 West Edenton Street, Suite 100
       Raleigh, North Carolina 27603
       Telephone: (919) 893-9500
       Facsimile: (919) 893-9510
       gregg@mcdougalworrell.com
       denton@mcdougalworrell.com
       lawrence@mcdougalworrell.com

       *Attorneys for Plaintiff*

17

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### No. 5:20-CV-00349-D

GOLDEN CORRAL CORP. and )
GOLDEN CORRAL FRANCHISING )
SYSTEMS, INC., )
                                   )
     Plaintiffs, )
                                   )      **ANSWER TO AMENDED**
v.                                )          **COMPLAINT**
                                     )
ILLINOIS UNION INSURANCE )
COMPANY, )
                                     )
     Defendant. )

COMES NOW Defendant Illinois Union Insurance Company ("Illinois Union"), by and through its attorneys and files this Answer to Plaintiffs' Amended Complaint dated August 28, 2020 (the "Amended Complaint") and respectfully states as follows:

## INTRODUCTION

1.    Paragraph 1 asserts legal argument to which no response is necessary. By way of further responses, Illinois Union admits that it issued insurance policy no. D4226555A 001 to the named insured Golden Corral Corporation for the period March 31, 2019 to March 31, 2020 (hereafter, the "Illinois Union Policy"). A certified, true, and accurate copy of the Illinois Union Policy is attached hereto

1

as **Exhibit A**. Illinois Union further admits the Amended Complaint seeks coverage under the Illinois Union Policy. However, based on the allegations in the Amended Complaint, Illinois Union denies that Plaintiffs are entitled to coverage under the Illinois Union Policy for the claim(s) Plaintiffs assert in the Amended Complaint in connection with the outbreak of COVID-19 and its alleged effects on their businesses. Illinois Union further responds that Plaintiffs filed the original Complaint in this action just two days after first submitting their claim(s) to Illinois Union; Illinois Union had no obligation to set forth its coverage position for Plaintiffs' claim(s) within two days of receiving first notice. All other allegations in Paragraph 1, including the allegation that the Plaintiffs' claim was "timely submitted," are denied as pleaded.

<div align="center">

**PARTIES**

</div>

2.    Admitted.

3.    Admitted.

4.    Admitted that Illinois Union's principal place of business is in Philadelphia, Pennsylvania and that it is an Illinois corporation. All other allegations in Paragraph 4 are denied.

5.    Illinois Union admits that it is authorized to do business in North Carolina. Illinois Union admits that it has insured certain risks located in North Carolina subject to the terms and conditions of the insurance policies that it has

<div align="center">

2

</div>

issued. Illinois Union also admits that it is an eligible surplus lines insurer in North Carolina. The remaining allegations of Paragraph 5 assert legal conclusions to which no response is required.

6.     Illinois Union admits that it was served with legal process through the North Carolina Department of Insurance pursuant to N.C. Gen. Stat. § 58-16-30. Illinois Union denies knowledge or information sufficient to form a belief about the remaining factual allegations in Paragraph 6, and the same are therefore denied as pleaded. To the extent Paragraph 6 also asserts one or more legal conclusions, no response is required to them.

## JURISDICTION AND VENUE

7.     Now that this action has been removed to the United States District Court for the Eastern District of North Carolina pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Illinois Union denies that the General Court of Justice, Superior Court Division, of the North Carolina County of Wake has subject-matter jurisdiction over this action. To the extent Paragraph 7 also asserts one or more legal conclusions, no response is required. By way of further response, Illinois Union admits that the United States District Court for the Eastern District of North Carolina has subject-matter jurisdiction over this action.

3

8.    Illinois Union admits that the United States District Court for the Eastern District of North Carolina has personal jurisdiction over Illinois Union in this suit.

9.    Illinois Union admits that venue is proper in the United States District Court for the Eastern District of North Carolina.

10.    Denied.

## FACTUAL BACKGROUND

11.    Illinois Union denies knowledge or information sufficient to form a belief about the allegations in Paragraph 11, and the same are therefore denied as pleaded.

12.    Illinois Union denies knowledge or information sufficient to form a belief about the allegations in Paragraph 12, and the same are therefore denied as pleaded.

13.    Illinois Union denies knowledge or information sufficient to form a belief about the allegations in Paragraph 13, and the same are therefore denied as pleaded.

14.    Illinois Union denies knowledge or information sufficient to form a belief about the allegations in Paragraph 14, and the same are therefore denied as pleaded.

4

15.     Illinois Union denies knowledge or information sufficient to form a belief about the allegations in Paragraph 15, and the same are therefore denied as pleaded.

**The Policy**

16.     Illinois Union admits only that it issued the previously defined Illinois Union Policy to the named insured Golden Corral Corp. The terms, conditions, limitations, and exclusions of the Illinois Union Policy are contained therein. To the extent the allegations contained in Paragraph 16 conflict with or alter the terms, conditions, limitations, and exclusions of the Illinois Union Policy, they are denied. Except as so stated, the allegations in Paragraph 16 are denied. By way of further response, Illinois Union, which issued the Illinois Union Policy, admits that the words "Westchester, a Chubb Company" appear in the letterhead of letters transmitting the Illinois Union Policy, which speaks for itself.

17.     Illinois Union admits only that the terms, conditions, limitations, and exclusions of the Illinois Union Policy are contained therein. To the extent the allegations contained in Paragraph 17 conflict with or alter the terms, conditions, limitations, and exclusions of the Illinois Union Policy, they are denied.  Except as so stated, the allegations in Paragraph 17 are denied.

18.     Illinois Union admits only that the terms, conditions, limitations, and exclusions of the Illinois Union Policy are contained therein. To the extent the

5

allegations contained in Paragraph 18 conflict with or alter the terms, conditions, limitations, and exclusions of the Illinois Union Policy, they are denied. Except as so stated, the allegations in Paragraph 18 are denied. Specifically, Illinois Union denies that its potential liability for any covered losses under the Illinois Union Policy exceeds the amount of coverage provided for in the Illinois Union Policy's Endorsement No. 5, Subscription Endorsement.

19. Illinois Union admits only that the terms, conditions, limitations, and exclusions of the Illinois Union Policy are contained therein. To the extent the allegations contained in Paragraph 19 conflict with or alter the terms, conditions, limitations, and exclusions of the Illinois Union Policy, they are denied. Except as so stated, the allegations in Paragraph 19 are denied.

20. Illinois Union admits only that the terms, conditions, limitations, and exclusions of the Illinois Union Policy are contained therein. To the extent the allegations contained in Paragraph 20 conflict with or alter the terms, conditions, limitations, and exclusions of the Illinois Union Policy, they are denied. Except as so stated, the allegations in Paragraph 20 are denied.

21. Illinois Union admits only that the terms, conditions, limitations, and exclusions of the Illinois Union Policy are contained therein. To the extent the allegations contained in Paragraph 21 conflict with or alter the terms, conditions,

4819-6943-3034, v. 1

limitations, and exclusions of the Illinois Union Policy, they are denied.  Except as so stated, the allegations in Paragraph 21 are denied.

22.    Illinois Union admits only that the terms, conditions, limitations, and exclusions of the Illinois Union Policy are contained therein. To the extent the allegations contained in Paragraph 22 conflict with or alter the terms, conditions, limitations, and exclusions of the Illinois Union Policy, they are denied.  Except as so stated, the allegations in Paragraph 22 are denied.

23.    Illinois Union admits only that the terms, conditions, limitations, and exclusions of the Illinois Union Policy are contained therein. To the extent the allegations contained in Paragraph 23 conflict with or alter the terms, conditions, limitations, and exclusions of the Illinois Union Policy, they are denied.  Except as so stated, the allegations in Paragraph 23 are denied.

24.    Illinois Union admits only that the terms, conditions, limitations, and exclusions of the Illinois Union Policy are contained therein. To the extent the allegations contained in Paragraph 24 conflict with or alter the terms, conditions, limitations, and exclusions of the Illinois Union Policy, they are denied.  Except as so stated, the allegations in Paragraph 24 are denied.

25.    Illinois Union admits only that the terms, conditions, limitations, and exclusions of the Illinois Union Policy are contained therein. To the extent the allegations contained in Paragraph 25 conflict with or alter the terms, conditions,

7

limitations, and exclusions of the Illinois Union Policy, they are denied. Except as so stated, the allegations in Paragraph 25 are denied.

26.    Illinois Union admits only that the terms, conditions, limitations, and exclusions of the Illinois Union Policy are contained therein. To the extent the allegations contained in Paragraph 26 conflict with or alter the terms, conditions, limitations, and exclusions of the Illinois Union Policy, they are denied. Except as so stated, the allegations in Paragraph 26 are denied.

27.    Illinois Union admits only that the terms, conditions, limitations, and exclusions of the Illinois Union Policy are contained therein. To the extent the allegations contained in Paragraph 27 conflict with or alter the terms, conditions, limitations, and exclusions of the Illinois Union Policy, they are denied. Except as so stated, the allegations in Paragraph 27 are denied.

### COVID-19 OUTBREAK

28.    Illinois Union admits that COVID-19 has been declared a global pandemic by the World Health Organization. Illinois Union denies knowledge or information sufficient to form a belief about the first reported case of COVID-19 in the United States, and the same are therefore denied as pleaded. Any remaining allegations in Paragraph 28 are denied.

29.    Illinois Union states that any and all "conclu[sions]" of the Centers for Disease Control and "studies" about COVID-19 and the novel coronavirus, SARS-

4819-6943-3034, v. 1

cov-2, speak for themselves. Paragraph 29 also asserts a legal conclusion to which no response is required. All remaining allegations in Paragraph 29 are denied. By way of further response, Illinois Union denies that "COVID-19 physically affects and damages all with which it comes in contact," as alleged in Paragraph 29.

30.    Illinois Union admits that one or more cases of COVID-19 have been reported in every U.S. state and that COVID-19 has spread across major portions of the U.S. Illinois Union denies knowledge or information sufficient to form a belief regarding whether COVID-19 has spread within a five-mile radius of each of Plaintiffs' corporate and franchise locations, and therefore the remaining allegations in Paragraph 30 are denied as pleaded.

31.    Illinois Union denies knowledge or information sufficient to form a belief about the CDC's tracking and data about the progression and instances of COVID-19 across the country, and the same are therefore denied as pleaded. Illinois Union admits that the website referred to in Paragraph 31 speaks for itself. Illinois Union denies knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 31, and the same are therefore denied as pleaded.

32.    The orders referred to in Paragraph 32 speak for themselves. The "[v]arious civil authorities" referred to in Paragraph 32 is vague, and no response about what those "[v]arious civil authorities have recognized" is reasonably

9

possible. Therefore, Illinois Union denies knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 32, and the same are therefore denied as pleaded. By way of further response, Illinois Union denies that any civil authority order can create "loss or damage to property" as a matter of law merely by asserting in the order that it exists.

33.     The Executive Order no. 116 issued by North Carolina Governor Roy Cooper on or about March 10, 2020 speaks for itself. Any remaining allegations in Paragraph 33 are denied.

34.      The Executive Order no. 118 issued by North Carolina Governor Roy Cooper on or about March 17, 2020 speaks for itself. Any remaining allegations in Paragraph 34 are denied.

35.     The Executive Order no. 118 issued by North Carolina Governor Roy Cooper on or about March 17, 2020 speaks for itself. Any remaining allegations in Paragraph 35 are denied.

36.     The Order of Abatement of Imminent Hazard issued by the North Carolina Department of Health and Human Services ("NCDHHS") issued on or about March 17, 2020 speaks for itself. Any remaining allegations in Paragraph 36 are denied.

4819-6943-3034, v. 1

37.     The Executive Order no. 121 issued by North Carolina Governor Roy Cooper on or about March 27, 2020 speaks for itself. Any remaining allegations in Paragraph 37 are denied.

38.     The Executive Order no. 121 issued by North Carolina Governor Roy Cooper on or about March 27, 2020 speaks for itself. Any remaining allegations in Paragraph 38 are denied.

39.     The Joint Order and Declaration issued by Mecklenburg County on or about March 26, 2020 speaks for itself. Any remaining allegations in Paragraph 39 are denied.

40.     The Executive Order issued by the Governor of Pennsylvania on or about March 19, 2020 speaks for itself. The Pennsylvania statute referred to in Paragraph 40 also speaks for itself. Any remaining allegations in Paragraph 40 are denied.

41.     Illinois Union denies knowledge or information sufficient to form a belief about the factual allegations in Paragraph 41, and the same are therefore denied as pleaded. Illinois Union specifically denies that Plaintiffs' claim(s) in connection with the outbreak of COVID-19 and its alleged effects on their businesses is/are covered under the Illinois Union Policy based on the allegations in the Amended Complaint.

4819-6943-3034, v. 1

42.     Illinois Union denies knowledge or information sufficient to form a belief about the factual allegations in Paragraph 42, and the same are therefore denied as pleaded.

43.     Illinois Union denies knowledge or information sufficient to form a belief about the factual allegations in Paragraph 43, and the same are therefore denied as pleaded.

44.     Illinois Union denies knowledge or information sufficient to form a belief about the factual allegations in Paragraph 44 concerning Plaintiffs' alleged business-operation interruptions and losses, and the same are therefore denied as pleaded. Illinois Union denies that these alleged interruptions and/or losses are covered under the Illinois Union Policy based on the allegations of the Amended Complaint.

**Plaintiffs' Insurance Claims to Defendant**

45.     Illinois Union admits that Plaintiffs provided notice of the claim that is the subject of this action in a letter dated May 12, 2020. All remaining allegations in Paragraph 45 are denied as pleaded.

46.     Illinois Union admits that it acknowledged receipt of Plaintiffs' notice in a letter dated May 13, 2020. Illinois Union admits that Ms. Lisa Jones was assigned to Plaintiffs' claim. Illinois Union admits that Ms. Jones contacted Ms.

12

Shelley Wolford, a representative of Golden Corral, by e-mail on or around May 14, 2020. Any remaining allegations in Paragraph 46 are denied as pleaded.

47. Illinois Union denies knowledge or information sufficient to form a belief about the pleaded allegations in Paragraph 47, and the same are therefore denied.

48. Denied.

49. Illinois Union admits that it has not sent requests for information to Plaintiffs. The remaining allegations in Paragraph 49 are denied.

50. Illinois Union admits that Ms. Jones received an e-mail from Ms. Wolford on or around May 18, 2020. Illinois Union denies knowledge or information sufficient to form a belief about the remaining pleaded allegations in Paragraph 50, and therefore same are denied.

51. Denied as pleaded.

52. Illinois Union admits that Ms. Jones received a communication from Ms. Wolford on or around May 27, 2020. The remaining allegations in Paragraph 52 are denied as pleaded.

53. Denied as pleaded.

54. Illinois Union denies knowledge or information sufficient to form a belief about the allegations in Paragraph 54, and therefore the same are denied as pleaded.

13

55.    Denied as pleaded.

56.    Illinois Union admits that it has not sent requests for information to Plaintiffs. The remaining allegations are denied as pleaded.

57.    Denied as pleaded. By way of further response, Illinois Union states that its August 10, 2020 Answer to the original Complaint—filed just two days after Plaintiffs provided first notice of their claim—denied certain allegations in Plaintiffs' original Complaint based on those specific allegations.

## FIRST CLAIM FOR RELIEF - DECLARATORY JUDGMENT

58.    Illinois Union repeats and incorporates by reference its responses to Paragraphs 1-57 of the Amended Complaint as if set forth in full herein.

59.    Paragraph 59 asserts a legal conclusion to which no response is required. To the extent a response is required, Illinois Union admits that the statute cited speaks for itself but denies that that statute applies to this suit now that this matter has been removed to this Court.

60.    Illinois Union admits that an actual controversy of a justiciable nature exists between Plaintiffs and Illinois Union with respect to the Plaintiffs' lack of entitlement to coverage under the Illinois Union Policy for Plaintiffs' claim(s) (as pleaded in the Amended Complaint) in connection with the outbreak of COVID-19 and its alleged effects on their businesses. Any other allegations of Paragraph 60 are denied as stated.

14

61.     Plaintiffs' contentions speak for themselves. Plaintiffs' remaining allegations in Paragraph 61 are denied based on the allegations in the Amended Complaint.

62.     Plaintiffs' contentions speak for themselves. Plaintiffs' remaining allegations in Paragraph 62 are denied based on the allegations in the Amended Complaint.

63.     Plaintiffs' contentions speak for themselves. Plaintiffs' remaining allegations in Paragraph 63 are denied based on the allegations of the Amended Complaint.

64.     Plaintiffs' contentions speak for themselves. Plaintiffs' remaining allegations in Paragraph 64 are denied based on the allegations in the Amended Complaint.

65.     Illinois Union denies knowledge sufficient to form a belief about the alleged "losses" as referred to in Paragraph 65, and the same are therefore denied as pleaded. Plaintiffs' contentions speak for themselves. Any remaining allegations in Paragraph 65 are denied based on the allegations in the Amended Complaint.

66.     Illinois Union denies that "Plaintiffs have complied with conditions precedent" in the Illinois Union Policy. Furthermore, Illinois Union admits that on August 10, 2020, it filed its Answer to Plaintiffs' original Complaint, which set forth, among other things, certain defenses to Plaintiffs' claim based on the

15

allegations in the original Complaint and denied those allegations as they were pleaded.

67.   Illinois Union admits that, based on the allegations in the Amended Complaint, it disputes Plaintiffs' claim(s) for coverage in connection with the outbreak of COVID-19 and its alleged effects on their businesses. By way of further response, based on the allegations as stated in the Amended Complaint, Illinois Union denies that the Illinois Union Policy covers Plaintiffs' claim(s) they assert in connection with the outbreak of COVID-19 and its alleged effects on their businesses.

68.   The allegations in Paragraph 68 are legal conclusions to which no responses are required. To the extent a response is required, Illinois Union admits that a declaratory judgment is capable of declaring the parties' respective rights, duties, and obligations in connection with Plaintiffs' claim(s).

69.   The allegations in Paragraph 69 are legal conclusions to which no responses are required.  To the extent a response is required, Illinois Union admits that this Court has subject-matter and personal jurisdiction over this suit and that it is appropriate for this Court to declare the parties' rights and obligations under the Illinois Union Policy for Plaintiffs' claim(s). The remaining allegations are denied as pleaded.

4819-6943-3034, v. 1

70.     Based on the allegations as stated in the Amended Complaint, denied. Moreover, Illinois Union denies that the statute cited is relevant to this action.

## SECOND CLAIM FOR RELIEF – BREACH OF CONTRACT

71.     Illinois Union repeats and incorporates by reference its responses to Paragraphs 1-70 of the Amended Complaint as if set forth in full herein.

72.     Illinois Union admits only that it issued insurance policy no. D4226555A 001 to the named insured Golden Corral Corporation and that the terms and conditions of that Policy speak for themselves. Any remaining allegations are denied as pleaded.

73.     Denied.

74.     Denied as pleaded.

75.     Illinois Union denies knowledge sufficient to form a belief about the alleged losses referred to in Paragraph 75, and the same are therefore denied as pleaded.

76.     Illinois Union admits only that on August 10, 2020, it filed its Answer to Plaintiffs' original Complaint, which set forth, among other things, certain defenses to Plaintiffs' claim based on the allegations in the original Complaint and denied those allegations as they were pleaded. Illinois Union admits that, based on the allegations in the Amended Complaint, it disputes Plaintiffs' claim(s) in connection with the outbreak of COVID-19 and its alleged effects on their

17

businesses. By way of further response, based on the allegations as stated in the Amended Complaint, Illinois Union denies that the Illinois Union Policy covers Plaintiffs' claim(s) they assert in connection with the outbreak of COVID-19 and its alleged effects on their businesses. Any remaining allegations in Paragraph 76 are denied as pleaded.

77.    Illinois Union admits only that on August 10, 2020, it filed its Answer to Plaintiffs' original Complaint, which set forth, among other things, certain defenses to Plaintiffs' claim based on the allegations in the original Complaint and denied those allegations as they were pleaded. Illinois Union admits that, based on the allegations of the Amended Complaint, it disputes Plaintiffs' claim(s) in connection with the outbreak of COVID-19 and its alleged effects on their businesses. By way of further response, based on the allegations as stated in the Amended Complaint, Illinois Union denies that the Illinois Union Policy covers Plaintiffs' claim(s) they assert in connection with the outbreak of COVID-19 and its alleged effects on their businesses. Any remaining allegations in Paragraph 77 are denied as pleaded.

78.    Illinois Union admits only that on August 10, 2020, it filed its Answer to Plaintiffs' original Complaint, which set forth, among other things, certain defenses to Plaintiffs' claim based on the allegations in the original Complaint and denied those allegations as they were pleaded. Illinois Union admits that, based on

18

the allegations in the Amended Complaint, it disputes Plaintiffs' claim(s) in connection with the outbreak of COVID-19 and its alleged effects on their businesses. By way of further response, based on the allegations as stated in the Amended Complaint, Illinois Union denies that the Illinois Union Policy covers Plaintiffs' claim(s) they assert in connection with the outbreak of COVID-19 and its alleged effects on their businesses. Any remaining allegations in Paragraph 78 are denied as pleaded.

79.     Denied as pleaded. Illinois Union admits, though, that this action presents an amount in controversy sufficient to maintain this Court's jurisdiction.

### THIRD CLAIM FOR RELIEF – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

80.     Illinois Union repeats and incorporates by reference its responses to Paragraphs 1-79 of the Amended Complaint as if set forth in full herein.

81.     Based on the allegations of the Amended Complaint, Illinois Union denies that the Illinois Union Policy covers Plaintiffs' claim(s) they assert in connection with the outbreak of COVID-19 and its alleged effects on their businesses. Any remaining allegations in Paragraph 81 are denied as pleaded.

82.      Paragraph 82 asserts a legal conclusion to which no response is required. To the extent a response is required, Illinois Union denies knowledge or information sufficient to form a belief regarding the allegations in Paragraph 82, and the same are therefore denied as pleaded.

19

83. Paragraph 83 asserts a legal conclusion to which no response is required. To the extent a response is required, Illinois Union denies knowledge or information sufficient to form a belief regarding the allegations in Paragraph 83, and the same are therefore denied as pleaded.

84. Paragraph 84 asserts a legal conclusion to which no response is required. To the extent a response is required, Illinois Union denies knowledge or information sufficient to form a belief regarding the allegations in Paragraph 84, and the same are therefore denied as pleaded.

85. Denied.

86. Denied.

87. Denied as pleaded.

88. Illinois Union admits that it has not sent requests for information to Plaintiffs. The remaining allegations in Paragraph 88 assert one or more legal conclusions to which no response is required. To the extent a response is required, the remaining allegations are denied.

89. Denied as pleaded. Illinois Union's August 10, 2020 Answer to the original Complaint, which was filed within two days of the first notice of loss, responded to the allegations in the original Complaint as pleaded. *See also* Seventeenth Affirmative Defense set forth herein.

4819-6943-3034, v. 1

90.     Denied as pleaded. Illinois Union's August 10, 2020 Answer to the original Complaint, which was filed within two days of the first notice of loss, set forth, among other things, certain defenses to Plaintiffs' claim based on the allegations in the original Complaint and denied those allegations as they were pleaded. *See also* Seventeenth Affirmative Defense set forth herein.

91.     Denied as pleaded.

92.     Denied as pleaded.

93.     Denied as pleaded.

94.     Denied as pleaded.

Furthermore, Illinois Union denies each and every request in Plaintiffs' PRAYER FOR RELIEF. Finally, every allegation asserted in the Amended Complaint that is not explicitly responded to above is denied as pleaded.

## AFFIRMATIVE DEFENSES

To the extent that Plaintiffs satisfy their burden of proving the existence, terms, and conditions of the Illinois Union Policy, the Illinois Union Policy contains terms and conditions that delineate, limit, or exclude coverage for the claim(s) at issue in this case. Accordingly, Illinois Union raises the following Affirmative Defenses:

## FIRST AFFIRMATIVE DEFENSE

The Amended Complaint does not or may not state facts sufficient to state a claim upon which relief can be granted against Illinois Union.

4819-6943-3034, v. 1

## SECOND AFFIRMATIVE DEFENSE

Illinois Union's obligations to Plaintiffs are strictly defined, limited, and controlled by the terms of the Illinois Union Policy, including but not limited to the coverages, deductibles, limits of liability, sublimits of liability, conditions, limitations, and exclusions contained in the Illinois Union Policy, including any endorsements made a part thereof. *See* **Exhibit A** attached hereto.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff Golden Corral Franchising Systems Inc. would qualify as an insured under the Illinois Union Policy only insofar as is provided for in the Illinois Union Policy's Declarations, which provide in part:

> The First Named Insured: Golden Corral Corporation and any owned, controlled, associated or affiliated subsidiary, company, corporation, organization, trust or association as now or may hereinafter be constituted or acquired; the interest of the First Named Insured in any partnership or joint venture, to the extent not otherwise insured; and any entity for which The First Named Insured has agreed to provide insurance, as their respective rights and interests appear and as defined in the Policy wording.

If Golden Corral Franchising Systems, Inc. fails to qualify as an insured under the Illinois Union Policy, its claim is barred for that reason alone.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claim(s) for coverage under the sections of the Illinois Union Policy specified in the Amended Complaint may fail to trigger coverage to the extent that there is no "direct physical loss, damage or destruction or imminent loss

4819-6943-3034, v. 1

by a peril insured by this Policy" or "physical loss, damage or destruction." See, among other examples, Illinois Union Policy Section II. INSURING AGREEMENT, Section V(1) TIME ELEMENT/BUSINESS INTERRUPTION, and GENERAL AMENDATORY ENDORSEMENT.

### FIFTH AFFIRMATIVE DEFENSE

Illinois Union's coverage obligations for "Interruption by Civil or Military Authority" or "Loss of Ingress or Egress" may be limited by the Illinois Union Policy terms and conditions, including the Illinois Union Policy's "General Amendatory Endorsement (Willis Global Property Insurance Policy)" (MS-280806 (06/19)). In part, this Endorsement provides:

> In section **V. TIME ELEMENT**, paragraph **7. PROVISIONS APPLICABLE TO "TIME ELEMENT"**, paragraphs **5. Interruption by Civil or Military Authority** and **6. Loss of Ingress or Egress** are deleted in their entirety and replaced with the following:
>
> **5. Interruption by Civil or Military Authority**
>
> This Policy insures the "Time Element" loss sustained during the period of time when, as a result of direct physical loss, damage or destruction or imminent loss by a peril insured by this Policy within five (5) miles of an insured "location," normal business operations are interrupted or reduced because access to that "location" is prevented or impaired by order of civil or military authority.
>
> **e. Loss of Ingress or Egress**
>
> This Policy insures the "Time Element" loss sustained during the period of time when, as a result of direct physical loss, damage or

23

destruction by a peril insured by this Policy within five (5) miles of an insured "location," normal business operations are interrupted or reduced because ingress to or egress from that "location" is prevented or impaired.

## SIXTH AFFIRMATIVE DEFENSE

Coverage for Plaintiffs' claim(s), if any, may be limited or excluded by the Illinois Union Policy's exclusion for "Pollution, Contamination." This provides in part:

### VI.    Exclusions

This Policy does not insure: . . .

### G.    Pollution, Contamination

Loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of 'contaminants or pollutants,' all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever.

Nevertheless if a peril insured by this Policy arises directly or indirectly from pollution or contamination any loss, damage or destruction of property insured by this Policy arising directly from that peril shall (subject to the terms, conditions and limitations of the Policy) be covered.

Notwithstanding the foregoing, this exclusion shall not apply if pollution or contamination results from direct physical loss, damage or destruction of property insured by this Policy by a peril insured by this Policy. . . .

4819-6943-3034, v. 1

'Contaminants or pollutants' means any material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, bacteria, virus, or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act, or as designated by the U.S. Environmental Protection Agency.

Except as provided in "Decontamination Costs" in PROPERTY INSURED, this Policy does not insure costs arising out of the enforcement of any law, ordinance, regulation or order by civil or judicial authority requiring the removal, disposal, replacement, cleanup, restoration or containment of property insured or costs to monitor or test for the existence or effects of pollutants.

Illinois Union reserves its right to rely on this exclusion to preclude coverage for Plaintiffs' claim(s).

## SEVENTH AFFIRMATIVE DEFENSE

Coverage for Plaintiffs' claim(s), if any, may be limited or excluded by the Illinois Union Policy's exclusion for "Delay or Loss of Market." This provides:

**VI.    Exclusions**

This Policy does not insure: . . .

**L.    Delay or Loss of Market**

Delay or Loss of Market (except as otherwise insured by this Policy)[.]

25

4819-6943-3034, v. 1

Case 5:20-cv-00349-D   Document 17   Filed 09/11/20   Page 25 of 31

JA083

Illinois Union reserves its right to rely on this exclusion to preclude coverage for Plaintiffs' claim(s).

## EIGHTH AFFIRMATIVE DEFENSE

Coverage for Plaintiffs' claim(s), if any, may be limited or excluded by the Illinois Union Policy's Nuclear, Biological, Chemical, Radiological Exclusion Endorsement. This provides in relevant part:

**Nuclear, Biological, Chemical, Radiological Exclusion Endorsement**

This insurance does not apply to:

**A.** Loss or damage arising directly or indirectly from nuclear detonation, reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by, any physical loss or damage insured against by this Policy or Coverage Part, however such nuclear detonation, reaction, nuclear radiation or radioactive contamination may have been caused. This exclusion replaces any other nuclear detonation, nuclear reaction, nuclear radiation or radioactive contamination exclusions found elsewhere in this Policy.

**B.** Loss or damage arising directly or indirectly from the dispersal, application or release of, or exposure to, chemical, radiological, or biological materials or agents, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by, any physical loss or damage insured against by this Policy or Coverage Part, however such dispersal, application, release or exposure may have been caused.

26

Illinois Union reserves its right to rely on this exclusion to preclude coverage for Plaintiffs' claim(s).

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs allege that their claimed losses began before March 31, 2020. Yet Illinois Union only received a first notice of loss from Plaintiffs about their claim(s) on or about May 12, 2020. Under "Notice of Loss," the Illinois Union Policy provides that it is a condition precedent to coverage that:

> As soon as practicable after any physical loss, damage or destruction by a peril insured by this Policy is known to the First Named Insured's Contact identified in Declarations I.A., the Insured shall report such loss, damage or destruction with full particulars to the Insurer at the address set forth in this Policy.

Plaintiffs' claim for coverage may be limited or precluded to the extent that one or both Plaintiffs failed to comply with this condition and that failure prejudiced Illinois Union.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claim(s) are or may be barred in whole or in part to the extent that Plaintiffs failed to perform the obligations, covenants, conditions precedent, and/or conditions subsequent under the Illinois Union Policy.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' request for declaratory relief is barred by the doctrines of waiver, estoppel, and/or unclean hands.

27

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs should not be entitled to recover from Illinois Union their costs, expenses, or attorneys' fees in this action.

## THIRTEENTH AFFIRMATIVE DEFENSE

The burden is on Plaintiffs to prove their damages and the cause of their damages, in accordance with the Illinois Union Policy's terms and conditions and applicable law. To the extent Plaintiffs are unable to do so, no coverage is or may be available for the claim against Illinois Union.

## FOURTEENTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs have failed to mitigate, minimize, or avoid any damages or losses they allegedly sustained, any recovery against Illinois Union must be limited by that amount.

## FIFTEENTH AFFIRMATIVE DEFENSE

Illinois Union's coverage obligations, if any, are limited by the Illinois Union Policy's Endorsement No. 5 Subscription Endorsement, which provides that Illinois Union's limits of insurance are "USD 2,500,000 being 50% part of USD 5,000,000 excess of Policy deductibles[,]" as well as the Illinois Union Policy's Other Insurance General Condition.

## SIXTEENTH AFFIRMATIVE DEFENSE

The Illinois Union Policy provides that any insured owes certain duties in the event of loss or damage, including without limitation that the insured "shall

28

cooperate with [Illinois Union]." Thus, to the extent that either or both Plaintiffs fail or have failed to comply with its/their duties in the event of loss or damage as provided in the Illinois Union Policy, including assistance and cooperation, no coverage is or may be available for the claim against Illinois Union.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiffs failed to act in good faith by filing this lawsuit two days after first placing Illinois Union on notice of their claim, before Illinois Union had any reasonable opportunity to investigate the facts of the claim or formulate a coverage position other than in response to the allegations as set forth in Plaintiffs' complaint(s).

## EIGHTEENTH AFFIRMATIVE DEFENSE

Illinois Union reserves the right to amend and/or supplement this Answer, including by adding and/or modifying Affirmative Defenses.

## NINETEENTH AFFIRMATIVE DEFENSE

Illinois Union asserts any and all other defenses or claims available to it under applicable law or in equity as may later become apparent.

**WHEREFORE**, Illinois Union respectfully seeks judgment as follows:

(a)  Dismissing with prejudice the Amended Complaint filed by Golden Corral Corporation and Colden Corral Franchising Systems;

(b)  Declaring that there is no coverage for Golden Corral Corporation and Colden Corral Franchising Systems for their causes of action as alleged in the Amended Complaint; and

4819-6943-3034, v. 1

(c)    Awarding such other and further relief to Illinois Union, including attorneys' fees and costs, as the Court may deem just and proper.

Respectfully submitted this 11th day of September, 2020.

**CRANFILL SUMNER & HARTZOG, LLP**

*/s/* THEODORE B. SMYTH
Theodore B. Smyth
N.C. State Bar No. 10045
Jennifer A. Welch
N.C. State Bar No. 31360
Post Office Box 27808
Raleigh, NC 276111-7808
Phone:  919-828-5100
Fax:  919-828-227
Email:  tsmyth@cshlaw.com
        jwelch@cshlaw.com

30

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2020, I electronically filed the

foregoing

## ANSWER TO AMENDED COMPLAINT

with the Clerk of Court using the CM/ECF system which will automatically send

email notification of such filing to the following attorneys:

Gregg McDougal, Esq.
H. Denton Worrell, Esq.
Lawrence R. Duke, Esq.
William R. Hartzell, Esq.
McDOUGAL WORRELL LLP
316 West Edenton Street, Suite 100
Raleigh, North Carolina 27603
gregg@mcdougalworrell.com
denton@mcdougalworrell.com
lawrence@mcdougalworrell.com
will@mcdougalworrell.com


**CRANFILL SUMNER & HARTZOG, LLP**

*/s/* THEODORE B. SMYTH
Theodore B. Smyth
N.C. State Bar No. 10045
Jennifer A. Welch
N.C. State Bar No. 31360
Post Office Box 27808
Raleigh, NC 276111-7808
Phone: 919-828-5100
Fax: 919-828-227
Email: tsmyth@cshlaw.com
jwelch@cshlaw.com

31

# EXHIBIT A

# Illinois Union Insurance Company
# Policy number D4226555A 001

CERTIFICATION OF POLICY

The undersigned, as an authorized representative of Illinois Union Insurance Company confirms that the attached is a true and correct copy of Policy number D4226555A 001, issued by the Insurer, including all endorsements and notices thereto as of 8/18/2020.

Authorized Representative:

*Katie Price*

_____

Name: Katie Price

Title: Underwriter, Property



7/12/2019

AMWINS BROKERAGE OF FLORIDA INC
1227 SOUTH PATRICK DRIVE SUITE 101
SATELLITE BEACH, FL 32937

**Attn:** Susan Flemming

RE:      **Insured Name:   Golden Corral Corporation**
         **Policy No.:        D4226555A 001**
         **Company:          Illinois Union Insurance Company**

Enclosed please find the original and copies of the captioned policy.  Please check to see that everything is in order, and let us know if there are any discrepancies or if you have any questions.  Attached to this policy is the U.S Treasury Department's Office Of Foreign Assets Control ("OFAC") Advisory Notice to Policyholder.

During our review and quality control, the following corrections were made in the policy, and therefore these items will differ from the binder:

Added - MS 280806 (06/19) General Amendatory Endorsement
Removed - TBD General Amendatory Endorsement
Added - Golden Corral Corporation Property Insurance Policy
Removed- TBD Willis Global Prperty Insurance Policy Form

Thank you for working with us on the placement of this risk.  We appreciate your support and look forward to working with you in the future.

Regards,

Katie Price

*Please be advised that we do not review Certificates of Insurance issued by you, or by any party, relating to this policy of insurance either for content or accuracy.  Accordingly, we request that you do not provide copies of certificates to us for review or for our records.  Authority is granted to you for the limited purpose of issuing **unmodified ACORD Certificates (ACORD 25-S for Casualty and ACORD 24, Accord 27 or Accord 28 for Property and Inland Marine) only**.  It is your responsibility to see that any Certificate provides an accurate representation of the coverage form and endorsements applicable to this policy at the time the Certificate is issued.  **Any modification of the approved ACORD forms specifically set forth above, or the issuance of a non-approved Certificate of Insurance ACORD or other is prohibited.**  Certificates of Insurance are never recognized as endorsements or policy change requests.  You must submit a separate written request if an endorsement or policy change (including but not limited to adding additional insureds, loss payees and mortgagees and/or alteration of notice requirements for cancellation) is requested.  In the event a policy change is requested, the underwriter will advise if the request is acceptable to the Company.*

*One of the CHUBB Group of Insurance Companies*



# NORTH CAROLINA
## IMPORTANT NOTICE TO POLICYHOLDERS

**WARNING: THIS PROPERTY INSURANCE POLICY DOES NOT PROTECT YOU AGAINST LOSSES FROM:**

(CHECK ALL THAT APPLY)

☐ **FLOODS**                    ☐ **MUDSLIDES**

☐ **EARTHQUAKES**               ☐ **MUDFLOWS**

☐ **LANDSLIDES**                ☐ **WINDSTORM OR HAIL**

**YOU SHOULD CONTACT YOUR INSURANCE COMPANY OR AGENT TO DISCUSS YOUR OPTIONS FOR OBTAINING COVERAGE FOR THESE LOSSES. THIS IS NOT A COMPLETE LISTING OF ALL OF THE CAUSES OF LOSSES NOT COVERED UNDER YOUR POLICY. YOU SHOULD READ YOUR ENTIRE POLICY TO UNDERSTAND WHAT IS COVERED AND WHAT IS NOT COVERED.**

ALL-20696a (12/12)

# *Illinois Union Insurance Company*

525 West Monroe Street
Suite 400
Chicago, IL 60661

# NOTICE

**POLICY NO.** D4226555A 001

**NAME OF INSURED:** Golden Corral Corporation

**ADDRESS:** P O Box 29502
Raleigh, NC 27626

We are pleased to enclose your policy for this account.

Please be advised that by binding this risk with the above referenced Surplus Lines Insurance Company, you agree that as the Surplus Lines Broker responsible for the placement of this insurance policy, it is your obligation to comply with all States Surplus Lines Laws including completion of any declarations/affidavits that must be filed as well as payment of any and all Surplus Lines taxes that must be remitted to the State(s). We will look to you for indemnification if controlling Surplus Lines Laws are violated by you as the Surplus Lines broker responsible for the placement.

You further confirm that any applicable state requirement concerning a diligent search for coverage by admitted carriers has been fulfilled in accordance with state law.

Thank you for this placement and your regulatory compliance.

Date: 7/12/2019

WSG-084 (05/11)

# *Policy Declarations*



| Policy No.  D4226555A 001 | Renewal of:  NEW |
|---|---|

**NAMED INSURED & MAILING ADDRESS**

Golden Corral Corporation
P O Box 29502
Raleigh, NC 27626

**POLICY PERIOD**

When Coverage Begins:  03/31/2019 — 12:01 A. M. Local Time At The Location Of Covered Property

When Coverage Ends:    03/31/2020 — 12:01 A. M. Local Time At The Location Of Covered Property

| INSURING COMPANY | Producer's Name & Address: |
|---|---|
| **Illinois Union Insurance Company** | AMWINS BROKERAGE OF FLORIDA INC<br>1227 SOUTH PATRICK DRIVE SUITE 101<br>SATELLITE BEACH, FL 32937<br><br>Producer No: Z01282 |

**The insurance company with which this coverage has been placed is not licensed by the State of North Carolina and is not subject to its supervision.  In the event of the insolvency of the insurance company, losses under this policy will not be paid by any State insurance guaranty or solvency fund.**

**ATTACHED FORMS**

This policy is completed by the following: BB-5W58a -PA (05/18) and forms and endorsements attached thereto.

**Authorization Information**

Dated:  07/12/2019

JOHN J. LUPICA, President
Authorized Representative

# *Common Policy Declarations*


Westchester
A Chubb Company

Policy Number:  D4226555A 001
Named Insured & Mailing Address:
Golden Corral Corporation
P O Box 29502
Raleigh, NC 27626

Company Name:  Illinois Union Insurance Company
Producer's Name & Address:

AMWINS BROKERAGE OF FLORIDA INC
1227 SOUTH PATRICK DRIVE SUITE 101
SATELLITE BEACH, FL 32937
Z01282

**General Policy Information**

Business Description: Restaurant

When Coverage Begins:  03/31/2019     12:01 A.M. Local Time At The Location Of Covered Property

When Coverage Ends:  03/31/2020     12:01 A.M. Local Time At The Location Of Covered Property

**In return for the payment of premium, and subject to all the terms and conditions of this policy, we agree to provide the insurance as stated in this policy.**

The premium for this policy is indicated below next to the applicable Coverage Form(s).

*Coverage Form*

| | |
|---|---|
| Golden Corral Corporation Property Insurance Policy Form | $ _____ ██ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| **Total Premium:** | $ _____ ██ |
| **Total Assessments, Fees, Surcharges, Taxes:** | $ _____ █ |
| **Total Amount Due:** | $ _____ ██ |
| Minimum Earned Premium: | $ _____ ██ |

**Attached Forms Information**

**\*Subject To Hurricane Minimum Earned Premium Endorsement, whichever is greater
See Forms Schedule CPfs2-PA**

**Authorization Information**

Date: **07/12/2019**

JOHN J. LUPICA, President
Authorized Representative

**Internal Reference Number: 275357**

**These Declarations together with the Coverage Declarations, Common Policy Conditions and Coverage Conditions (if applicable), Coverage Form(s) and Forms and Endorsements, if any, issued to form a part thereof, complete the above numbered policy.**

Case 5:20-cv-00349-D   Document 17-1   Filed 09/11/20   Page 7 of 117



Westchester
11575 Great Oaks Way,
Suite 200
Alpharetta, GA 30022

678 795-4000 *main*
678 795-4190 *fax*

www.chubblimited.com

04/24/2020

AMWINS BROKERAGE OF FLORIDA INC
1227 SOUTH PATRICK DRIVE
SUITE 101
SATELLITE BEACH  FL 32937

**RE:**   **Insured Name:**   **Golden Corral Corporation**
          **Policy No.:**      **D4226555A 001**
          **Company:**         **Illinois Union Insurance Company**

☐   Enclosed please find the original and copies of the captioned policy.  Please check to see that everything is in order, and let us know if there are any discrepancies or if you have any questions.

☐   Attached to this policy is the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholder.

☐   Attached to this policy is the applicable State Surplus Lines Notice.

☐   Please note that you are responsible for obtaining/supplying surplus lines information as shown on Form No. _____.

☒   Enclosed please find the original and copies of Endorsement No(s). **017**  to the captioned policy.

☐   In order to complete our file, please forward :

        ☐   A copy of the primary policy.
        ☐   Underlying Policy No(s). for _____
        ☐   Other: _____

☐   Other: _____

Thank you for working with us on the placement of this risk.  We appreciate your support and look forward to working with you in the future.

Regards,

*Sheila Perkins*
for
Katie Price

*Please be advised that we do not review Certificates of Insurance issued by you, or by any party, relating to this policy of insurance either for content or accuracy.  Accordingly, we request that you do not provide copies of certificates to us for review or for our records.  Authority is granted to you for the limited purpose of issuing **unmodified ACORD Certificates (ACORD 25-S for Casualty and ACORD 24 for Property and Inland Marine) only**.  It is your responsibility to see that any Certificate provides an accurate representation of the coverage form and endorsements applicable to this policy at the time the Certificate is issued.  **Any modification of the approved ACORD forms specifically set forth above, or the issuance of a non-approved Certificate of Insurance ACORD or other is prohibited.**  Certificates of Insurance are never recognized as endorsements or policy change requests.  You must submit a separate written request if an endorsement or policy change (including but not limited to adding additional insureds, loss payees and mortgages and/or alteration of notice requirements for cancellation) is requested.  In the event a policy change is requested, the underwriter will advise if the request is acceptable to the Company.*

*One of the Chubb Group of Insurance Companies*

# General Endorsement

Named Insured: **Golden Corral Corporation**

Policy Symbol: **FS**                    Policy Number: **D4226555A 001**

Endorsement Number: **017**             Effective date of Endorsement: **01/01/2020**

Policy Period: **03/31/2019 to 03/31/2020**

Issued by:           **Illinois Union Insurance Company**
(Name of Insurance Company)

**This Endorsement changes the policy – Please read it carefully**
This endorsement modifies insurance provided under the following:

**GOLDEN CORRAL PROPERTY INS. POLICY FORM**        COVERAGE FORM

**Endorsement Information**

**In accordance with the reporting provisions under this policy, the Insured has reported changes for the 4th Quarterly Reporting Period of 01/01/2020 to 03/31/2020 resulting in an additional premium of** ▮▮▮▮▮

**All other terms and conditions remain unchanged.**

Authorized Agent



Westchester
11575 Great Oaks Way,
Suite 200
Alpharetta, GA 30022

678 795-4000 *main*
678 795-4190 *fax*

www.chubblimited.com

05/01/2020

AMWINS BROKERAGE OF FLORIDA INC
1227 SOUTH PATRICK DRIVE
SUITE 101
SATELLITE BEACH  FL 32937

RE:   **Insured Name:**   **Golden Corral Corporation**
       **Policy No.:**     **D4226555A 001**
       **Company:**     **Illinois Union Insurance Company**

☐   Enclosed please find the original and copies of the captioned policy.  Please check to see that everything is in order, and let us know if there are any discrepancies or if you have any questions.

☐   Attached to this policy is the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholder.

☐   Attached to this policy is the applicable State Surplus Lines Notice.

☐   Please note that you are responsible for obtaining/supplying surplus lines information as shown on Form No. _____.

☒   Enclosed please find the original and copies of Endorsement No(s). **016  Revised** to the captioned policy.

☐   In order to complete our file, please forward :

        ☐   A copy of the primary policy.
        ☐   Underlying Policy No(s). for _____
        ☐   Other: _____

☐   Other: _____

Thank you for working with us on the placement of this risk.  We appreciate your support and look forward to working with you in the future.

Regards,

*Sheila Perkins*
for
Katie Price

*Please be advised that we do not review Certificates of Insurance issued by you, or by any party, relating to this policy of insurance either for content or accuracy.  Accordingly, we request that you do not provide copies of certificates to us for review or for our records.  Authority is granted to you for the limited purpose of issuing* **unmodified ACORD Certificates (ACORD 25-S for Casualty and ACORD 24 for Property and Inland Marine) only**.  *It is your responsibility to see that any Certificate provides an accurate representation of the coverage form and endorsements applicable to this policy at the time the Certificate is issued.* **Any** *modification of the approved ACORD forms specifically set forth above, or the issuance of a non-approved* **Certificate of Insurance ACORD or other is prohibited.**  *Certificates of Insurance are never recognized as endorsements or policy change requests.  You must submit a separate written request if an endorsement or policy change (including but not limited to adding additional insureds, loss payees and mortgages and/or alteration of notice requirements for cancellation) is requested.  In the event a policy change is requested, the underwriter will advise if the request is acceptable to the Company.*

*One of the Chubb Group of Insurance Companies*

# General Endorsement

**General Policy Information**

Named Insured:  **Golden Corral Corporation**

Policy Symbol:  **FS**                         Policy Number: **D4226555A 001**

Endorsement Number:  **016  Revised**          Effective date of Endorsement: **12/01/2019**

Policy Period:  **03/31/2019 to 03/31/2020**

Issued by:                    **Illinois Union Insurance Company**
(Name of Insurance Company)

**This Endorsement changes the policy – Please read it carefully**
This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY**                              COVERAGE FORM

**Endorsement Information**

**In consideration of an additional premium of ▮▮; the Insured has reported changes for the 3rd Quarter Period of $10/01/2019 to $12/31/2019.**

Effective 12/1/2019: Delete GC #550, 617 S Air Depot Blvd, Midwest, OK
(▮▮▮▮ TIV)
**RP:** ▮▮▮

Effective 12/1/2019: Add GC #109, 1501 S Sooner Rd, Del City, OK
(+▮▮▮▮ TIV)
**AP:** ▮▮▮

**All other terms and conditions remain unchanged.**

_Authorized Agent_

CHUBB



Westchester
11575 Great Oaks Way,
Suite 200
Alpharetta, GA 30022

678 795-4000 *main*
678 795-4190 *fax*

www.chubblimited.com

01/17/2020

AMWINS BROKERAGE OF FLORIDA INC
1227 SOUTH PATRICK DRIVE
SUITE 101
SATELLITE BEACH  FL 32937

**RE:**   **Insured Name:**   **Golden Corral Corporation**
     **Policy No.:**   **D4226555A 001**
     **Company:**   **Illinois Union Insurance Company**

☐   Enclosed please find the original and copies of the captioned policy.  Please check to see that everything is in order, and let us know if there are any discrepancies or if you have any questions.

☐   Attached to this policy is the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholder.

☐   Attached to this policy is the applicable State Surplus Lines Notice.

☐   Please note that you are responsible for obtaining/supplying surplus lines information as shown on Form No. _____.

☒   Enclosed please find the original and copies of Endorsement No(s). **016** to the captioned policy.

☐   In order to complete our file, please forward :

     ☐   A copy of the primary policy.
     ☐   Underlying Policy No(s). for _____
     ☐   Other: _____

☐   Other: _____

Thank you for working with us on the placement of this risk.  We appreciate your support and look forward to working with you in the future.

Regards,

*Sheila Perkins*
for
Katie Price

*Please be advised that we do not review Certificates of Insurance issued by you, or by any party, relating to this policy of insurance either for content or accuracy.  Accordingly, we request that you do not provide copies of certificates to us for review or for our records.  Authority is granted to you for the limited purpose of issuing **unmodified ACORD Certificates (ACORD 25-S for Casualty and ACORD 24 for Property and Inland Marine) only**.  It is your responsibility to see that any Certificate provides an accurate representation of the coverage form and endorsements applicable to this policy at the time the Certificate is issued.  **Any modification of the approved ACORD forms specifically set forth above, or the issuance of a non-approved Certificate of Insurance ACORD or other is prohibited.**  Certificates of Insurance are never recognized as endorsements or policy change requests.  You must submit a separate written request if an endorsement or policy change (including but not limited to adding additional insureds, loss payees and mortgages and/or alteration of notice requirements for cancellation) is requested.  In the event a policy change is requested, the underwriter will advise if the request is acceptable to the Company.*

*One of the Chubb Group of Insurance Companies*

# General Endorsement

## General Policy Information

Named Insured: **Golden Corral Corporation**

Policy Symbol: **FS**                    Policy Number: **D4226555A 001**

Endorsement Number: **016**              Effective date of Endorsement: **12/01/2019**

Policy Period: **03/31/2019 to 03/31/2020**

Issued by: **Illinois Union Insurance Company**
(Name of Insurance Company)

**This Endorsement changes the policy – Please read it carefully**
This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY** COVERAGE FORM

## Endorsement Information

**In consideration of a return premium of** ████, **the Insured has reported changes for the 3rd Quarter Period of 10/01/2019 to 12/31/2019.**

Effective 12/1/2019: Delete GC #550, 617 S Air Depot Blvd, Midwest, OK (████ TIV)
**RP:** ███

Effective 12/1/2019: Add GC #109, 1501 S Sooner Rd, Del City, OK (+████ TIV)
**AP:** ███

Effective 12/1/2019: Delete GC #995, 12420 Felch St, Holland, MI (-████)
**RP:** ███

**Revised Total Insurable Values:** ████.

**All other terms and conditions remain unchanged.**

_____
Authorized Agent

CHUBB

# General Endorsement

**General Policy Information**

Named Insured: **Golden Corral Corporation**

Policy Symbol: **FS**                    Policy Number: **D4226555A 001**

Endorsement Number: **014**              Effective date of Endorsement: **05/30/2019**

Policy Period: **03/31/2019 to 03/31/2020**

Issued by:            **Illinois Union Insurance Company**
(Name of Insurance Company)

**This Endorsement changes the policy – Please read it carefully**
This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY**                          COVERAGE FORM

**Endorsement Information**

**In consideration of a return premium of ▮▮▮, the policy is amended as follows:**

**The following location is deleted:**

**GC#940**
**4261 John Ben Sheppard Pkwy.**
**Odessa, TX 79762**
**Equipment Value: $1,010,091.**

**Limit of Liability remains the same.**

**All other terms and conditions remain unchanged.**

Authorized Agent

Page 1 of 1
Form CC-3R19 (7/97)



# General Endorsement

**General Policy Information**

Named Insured: **Golden Corral Corporation**

Policy Symbol: **FS**             Policy Number: **D4226555A 001**

Endorsement Number: **015**      Effective date of Endorsement: **07/01/2019**

Policy Period: **03/31/2019 to 03/31/2020**

Issued by:             **Illinois Union Insurance Company**
(Name of Insurance Company)

**This Endorsement changes the policy – Please read it carefully**
This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY**                          COVERAGE FORM

**Endorsement Information**

**In consideration of a return premium of ██0, the policy is amended as follows:**

**The 2ⁿᵈ Quarter Adjustment for the period of 07/01/2019 to 09/30/2019 is declared.**

**The Total Insurable Values are amended to ██████████ as per Statement of Values on file with the Company.**

**Limit of Liability remains the same.**

**All other terms and conditions remain unchanged.**



Authorized Agent

Page 1 of 1
Form CC-3R19 (7/97)

CHUBB®

Case 5:20-cv-00349-D   Document 17-1   Filed 09/11/20   Page 15 of 117



Westchester
11575 Great Oaks Way,
Suite 200
Alpharetta, GA 30022

678 795-4000 *main*
678 795-4190 *fax*
www.chubblimited.com

01/07/2020

AMWINS BROKERAGE OF FLORIDA INC
1227 SOUTH PATRICK DRIVE
SUITE 101
SATELLITE BEACH FL 32937
**Attn: Kelly Doran**

| RE: | **Insured Name:** | **Golden Corral Corporation** |
|---|---|---|
| | **Policy No.:** | **D4226555A 001** |
| | **Company:** | **Illinois Union Insurance Company** |

☐     Enclosed please find the original and copies of the captioned policy.  Please check to see that everything is in order, and let us know if there are any discrepancies or if you have any questions.

☐     Attached to this policy is the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholder.

☐     Attached to this policy is the applicable State Surplus Lines Notice.

☐     Please note that you are responsible for obtaining/supplying surplus lines information as shown on Form No. _____.

☒     Enclosed please find the original and copies of Endorsement No(s). <u>013</u> to 015  to the captioned policy.

☐     In order to complete our file, please forward :

         ☐   A copy of the primary policy.
         ☐   Underlying Policy No(s). for _____
         ☐   Other: _____

☐     Other: _____

Thank you for working with us on the placement of this risk.  We appreciate your support and look forward to working with you in the future.

Regards,

Alex Sarmiento
for
Katie Price

*Please be advised that we do not review Certificates of Insurance issued by you, or by any party, relating to this policy of insurance either for content or accuracy.  Accordingly, we request that you do not provide copies of certificates to us for review or for our records.  Authority is granted to you for the limited purpose of issuing **unmodified ACORD Certificates (ACORD 25-S for Casualty and ACORD 24 for Property and Inland Marine) only**.  It is your responsibility to see that any Certificate provides an accurate representation of the coverage form and endorsements applicable to this policy at the time the Certificate is issued.  **<u>Any</u> modification of the approved ACORD forms specifically set forth above, or the issuance of a non-approved Certificate of Insurance ACORD or other is prohibited.**  Certificates of Insurance are never recognized as endorsements or policy change requests.  You must submit a separate written request if an endorsement or policy change (including but not limited to adding additional insureds, loss payees and mortgages and/or alteration of notice requirements for cancellation) is requested.  In the event a policy change is requested, the underwriter will advise if the request is acceptable to the Company.*

*One of the Chubb Group of Insurance Companies*

# General Endorsement

## General Policy Information

Named Insured: **Golden Corral Corporation**

Policy Symbol: **FS**    Policy Number: **D4226555A 001**

Endorsement Number: **013**    Effective date of Endorsement: **04/30/2019**

Policy Period: **03/31/2019 to 03/31/2020**

Issued by:    **Illinois Union Insurance Company**
(Name of Insurance Company)

**This Endorsement changes the policy – Please read it carefully**
This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY**    COVERAGE FORM

## Endorsement Information

**In consideration of a return premium of** ▮▮▮ **, the policy is amended as follows:**

**The following location is deleted:**

**GC#671**
**1320 N. Green Street**
**Henderson, KY 42420**
**Total Value: $1,007,361.**

**Limit of Liability remains the same.**

**All other terms and conditions remain unchanged.**

Authorized Agent

Page 1 of 1
Form CC-3R19 (7/97)

CHUBB®



Westchester
11575 Great Oaks Way,
Suite 200
Alpharetta, GA 30022

678 795-4000 *main*
678 795-4190 *fax*

www.chubblimited.com

05/14/2019

AMWINS BROKERAGE OF FLORIDA INC
1227 SOUTH PATRICK DRIVE
SUITE 101
SATELLITE BEACH,  FL 32937

| RE: | Insured Name: | **Golden Corral Corporation** |
|---|---|---|
| | Policy No.: | **D4226555A 001** |
| | Company: | **Illinois Union Insurance Company** |

☐ Enclosed please find the original and copies of the captioned policy.  Please check to see that everything is in order, and let us know if there are any discrepancies or if you have any questions.

☐ Attached to this policy is the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholder.

☐ Attached to this policy is the applicable State Surplus Lines Notice.

☐ Please note that you are responsible for obtaining/supplying surplus lines information as shown on Form No. _____

☒ Enclosed please find the original and copies of Endorsement No(s). 009  to the captioned policy.

☐ In order to complete our file, please forward :

      ☐ A copy of the primary policy.

      ☐ Underlying Policy No(s). for _____

      ☐ Other: _____

☐ Other: _____

Thank you for working with us on the placement of this risk.  We appreciate your support and look forward to working with you in the future.

Regards,

Cindy Bailey

for
Katie Price

*Please be advised that we do not review Certificates of Insurance issued by you, or by any party, relating to this policy of insurance either for content or accuracy.  Accordingly, we request that you do not provide copies of certificates to us for review or for our records.  Authority is granted to you for the limited purpose of issuing **unmodified ACORD Certificates (ACORD 25-S for Casualty and ACORD 24 for Property and Inland Marine) only**.  It is your responsibility to see that any Certificate provides an accurate representation of the coverage form and endorsements applicable to this policy at the time the Certificate is issued.  **Any modification of the approved ACORD forms specifically set forth above, or the issuance of a non-approved Certificate of Insurance ACORD or other is prohibited.**  Certificates of Insurance are never recognized as endorsements or policy change requests.  You must submit a separate written request if an endorsement or policy change (including but not limited to adding additional insureds, loss payees and mortgagees and/or alteration of notice requirements for cancellation) is requested.  In the event a policy change is requested, the underwriter will advise if the request is acceptable to the Company.*

*One of the Chubb Group of Insurance Companies*

# General Endorsement

**General Policy Information**

Named Insured: **Golden Corral Corporation**

Policy Symbol: **FS**                    Policy Number: **D4226555A 001**

Endorsement Number: **009**              Effective date of Endorsement: **04/11/2019**

Policy Period: **03/31/2019 to 03/31/2020**

Issued by:                    **Illinois Union Insurance Company**
(Name of Insurance Company)

**This Endorsement changes the policy – Please read it carefully**
This endorsement modifies insurance provided under the following:

**Commercial Property**                                          COVERAGE FORM

**Endorsement Information**

**In consideration of** ▮▮▮ **Return Premium, the policy is amended as follows:**

**The revised total insured values for 1801 S. Main St, Keller TX is amended to** ▮▮▮▮.

**Revised Total Insured Values** ▮▮▮▮.

**All other terms and conditions remain unchanged.**

_____
Authorized Agent

CHUBB®



Westchester
11575 Great Oaks Way,
Suite 200
Alpharetta, GA 30022

678 795-4000 *main*
678 795-4190 *fax*

www.chubblimited.com

07/19/2019

AMWINS BROKERAGE OF FLORIDA INC
1227 SOUTH PATRICK DRIVE
SUITE 101
SATELLITE BEACH  FL 32937

**RE:** **Insured Name:** **Golden Corral Corporation**
**Policy No.:** **D4226555A 001**
**Company:** **Illinois Union Insurance Company**

☐ Enclosed please find the original and copies of the captioned policy.  Please check to see that everything is in order, and let us know if there are any discrepancies or if you have any questions.

☐ Attached to this policy is the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholder.

☐ Attached to this policy is the applicable State Surplus Lines Notice.

☐ Please note that you are responsible for obtaining/supplying surplus lines information as shown on Form No. _____.

☒ Enclosed please find the original and copies of Endorsement No(s). **010** to the captioned policy.

☐ In order to complete our file, please forward :

    ☐ A copy of the primary policy.

    ☐ Underlying Policy No(s). for _____

    ☐ Other: _____

☐ Other: _____

Thank you for working with us on the placement of this risk.  We appreciate your support and look forward to working with you in the future.

Regards,

*Sheila Perkins*
for
Katie Price

*Please be advised that we do not review Certificates of Insurance issued by you, or by any party, relating to this policy of insurance either for content or accuracy.  Accordingly, we request that you do not provide copies of certificates to us for review or for our records.  Authority is granted to you for the limited purpose of issuing **unmodified ACORD Certificates (ACORD 25-S for Casualty and ACORD 24 for Property and Inland Marine) only**.  It is your responsibility to see that any Certificate provides an accurate representation of the coverage form and endorsements applicable to this policy at the time the Certificate is issued.  **Any modification of the approved ACORD forms specifically set forth above, or the issuance of a non-approved Certificate of Insurance ACORD or other is prohibited.**  Certificates of Insurance are never recognized as endorsements or policy change requests.  You must submit a separate written request if an endorsement or policy change (including but not limited to adding additional insureds, loss payees and mortgages and/or alteration of notice requirements for cancellation) is requested.  In the event a policy change is requested, the underwriter will advise if the request is acceptable to the Company.*

*One of the Chubb Group of Insurance Companies*

# General Endorsement

Named Insured:  **Golden Corral Corporation**

Policy Symbol:  **FS**                    Policy Number: **D4226555A 001**

Endorsement Number:  **010**             Effective date of Endorsement: **04/29/2019**

Policy Period:  **03/31/2019 to 03/31/2020**

Issued by:              **Illinois Union Insurance Company**
(Name of Insurance Company)

**This Endorsement changes the policy – Please read it carefully**
This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY** _____ COVERAGE FORM

**Endorsement
Information**

**In consideration of an additional premium of** ▮▮▮**; the policy is amended as
follows:**

**The following location is added:**

5309 Milan Road
Sandusky, OH 44870
Building: ▮▮▮▮▮
Equipment: ▮▮▮▮
**Total Value:** ▮▮▮▮

**Total Insurable Values is amended to** ▮▮▮▮▮**.**

**All other terms and conditions remain unchanged.**

_____
Authorized Agent

CHUBB



Westchester
11575 Great Oaks Way,
Suite 200
Alpharetta, GA 30022

678 795-4000 *main*
678 795-4190 *fax*

www.chubblimited.com

07/19/2019

AMWINS BROKERAGE OF FLORIDA INC
1227 SOUTH PATRICK DRIVE
SUITE 101
SATELLITE BEACH  FL 32937

**RE:** **Insured Name:** **Golden Corral Corporation**
     **Policy No.:** **D4226555A 001**
     **Company:** **Illinois Union Insurance Company**

☐ Enclosed please find the original and copies of the captioned policy.  Please check to see that everything is in order, and let us know if there are any discrepancies or if you have any questions.

☐ Attached to this policy is the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholder.

☐ Attached to this policy is the applicable State Surplus Lines Notice.

☐ Please note that you are responsible for obtaining/supplying surplus lines information as shown on Form No. _____.

☒ Enclosed please find the original and copies of Endorsement No(s). **011** to the captioned policy.

☐ In order to complete our file, please forward :

     ☐ A copy of the primary policy.
     ☐ Underlying Policy No(s). for _____
     ☐ Other: _____

☐ Other: _____

Thank you for working with us on the placement of this risk.  We appreciate your support and look forward to working with you in the future.

Regards,

*Sheila Perkins*
for
Katie Price

*Please be advised that we do not review Certificates of Insurance issued by you, or by any party, relating to this policy of insurance either for content or accuracy.  Accordingly, we request that you do not provide copies of certificates to us for review or for our records.  Authority is granted to you for the limited purpose of issuing **unmodified ACORD Certificates (ACORD 25-S for Casualty and ACORD 24 for Property and Inland Marine) only.**  It is your responsibility to see that any Certificate provides an accurate representation of the coverage form and endorsements applicable to this policy at the time the Certificate is issued.  **Any modification of the approved ACORD forms specifically set forth above, or the issuance of a non-approved Certificate of Insurance ACORD or other is prohibited.**  Certificates of Insurance are never recognized as endorsements or policy change requests.  You must submit a separate written request if an endorsement or policy change (including but not limited to adding additional insureds, loss payees and mortgages and/or alteration of notice requirements for cancellation) is requested.  In the event a policy change is requested, the underwriter will advise if the request is acceptable to the Company.*

*One of the Chubb Group of Insurance Companies*

# General Endorsement

General Policy
Information

Named Insured: **Golden Corral Corporation**

Policy Symbol: **FS**                    Policy Number: **D4226555A 001**

Endorsement Number: **011**              Effective date of Endorsement: **05/23/2019**

Policy Period: **03/31/2019 to 03/31/2020**

Issued by:                    **Illinois Union Insurance Company**
(Name of Insurance Company)

**This Endorsement changes the policy – Please read it carefully**
This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY**                    COVERAGE FORM

**Endorsement
Information**

**In consideration of a return premium of** ▮▮▮▮**; the policy is amended as follows:**

**The following location is deleted from the schedule:**

GC #991
5335 Distribution Drive
Fort Wayne, IN 46825
**TIV:** ▮▮▮▮▮▮

**Total Insurable Values is amended to** ▮▮▮▮▮▮▮.

**All other terms and conditions remain unchanged.**

Authorized Agent

CHUBB



Westchester
11575 Great Oaks Way,
Suite 200
Alpharetta, GA 30022

678 795-4000 *main*
678 795-4190 *fax*

www.chubblimited.com

09/05/2019

AMWINS BROKERAGE OF FLORIDA INC
1227 SOUTH PATRICK DRIVE
SUITE 101
SATELLITE BEACH FL 32937

RE:   **Insured Name:**   **Golden Corral Corporation**
      **Policy No.:**   **D4226555A 001**
      **Company:**   **Illinois Union Insurance Company**

☐  Enclosed please find the original and copies of the captioned policy.  Please check to see that everything is in order, and let us know if there are any discrepancies or if you have any questions.

☐  Attached to this policy is the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholder.

☐  Attached to this policy is the applicable State Surplus Lines Notice.

☐  Please note that you are responsible for obtaining/supplying surplus lines information as shown on Form No. _____.

☒  Enclosed please find the original and copies of Endorsement No(s). <u>012</u> to the captioned policy.

☐  In order to complete our file, please forward :
        ☐  A copy of the primary policy.
        ☐  Underlying Policy No(s). for _____
        ☐  Other: _____

☐  Other: _____

Thank you for working with us on the placement of this risk.  We appreciate your support and look forward to working with you in the future.

Regards,


Cameron Williams
for
Katie Price

*Please be advised that we do not review Certificates of Insurance issued by you, or by any party, relating to this policy of insurance either for content or accuracy.  Accordingly, we request that you do not provide copies of certificates to us for review or for our records.  Authority is granted to you for the limited purpose of issuing **unmodified ACORD Certificates (ACORD 25-S for Casualty and ACORD 24 for Property and Inland Marine) only**.  It is your responsibility to see that any Certificate provides an accurate representation of the coverage form and endorsements applicable to this policy at the time the Certificate is issued.  **Any modification of the approved ACORD forms specifically set forth above, or the issuance of a non-approved Certificate of Insurance ACORD or other is prohibited.**  Certificates of Insurance are never recognized as endorsements or policy change requests.  You must submit a separate written request if an endorsement or policy change (including but not limited to adding additional insureds, loss payees and mortgages and/or alteration of notice requirements for cancellation) is requested.  In the event a policy change is requested, the underwriter will advise if the request is acceptable to the Company.*

*One of the Chubb Group of Insurance Companies*

# General Endorsement

**General Policy Information**

Named Insured: **Golden Corral Corporation**

Policy Symbol: **FS**          Policy Number: **D4226555A 001**

Endorsement Number: **012**          Effective date of Endorsement: **03/31/2019**

Policy Period: **03/31/2019 to 03/31/2020**

Issued by: **Illinois Union Insurance Company**
(Name of Insurance Company)

**This Endorsement changes the policy – Please read it carefully**
This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY**          COVERAGE FORM

**Endorsement Information**

**In consideration of** ████ **in premium, the policy is amended as follows:**
**Form ACE0668 Claims Adjustment and I. Declarations, 9. Adjustment of Losses**
**are amended as follows:**

| Name of Firm: | MCL Global / Cunningham Lindsey |
|---|---|
| Street Address: | 2000 S. Dairy Ashford, Suite 600 |
| City, State or Province, and Zip/Postal Code: | Houston, TX 77077 |
| Country: | United States |
| Telephone Number: | 281-686-5253 |
| Assigned Adjuster: | Jeannie Barker<br>E-mail: jwbarker@cl-na.com |

**All other terms and conditons remain unchanged.**

JOHN J. LUPICA, President

Authorized Agent



CHUBB®

# *Forms Schedule*

Company: Illinois Union Insurance Company
SYM:   **FS**         Policy ID: **D4226555A 001**

| Policy Period | When Coverage Begins: | **03/31/2019** | 12:01 A.M. Local Time At The Location Of Covered Property |
| | When Coverage Ends: | **03/31/2020** | 12:01 A.M. Local Time At The Location Of Covered Property |

| Applicable to all Coverage Parts | **SLPD-PA (04/18)-Surplus Lines Declarations** <br> **BB-5W58a -PA (05/18)-Common Policy Declarations** <br> **SL-34255a (01/16)-Service of Suit Endorsement** <br> **TRIA24 (01/15)-Policyholder Disclosure Notice of Terrorism Insurance Coverage** <br> **ALL-20887 (10/06)-CHUBB Producer Compensation Practices & Policies** <br> **ALL-21101 (11/06)-Trade or Economic Sanctions Endorsement** <br> **IL P 001 01 04-U.S. Treasury Departments' Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders** <br> **MA-608255p (04/15)-Claims Directory Property and Inland Marine** <br> **LD-5S23j (03/14)-Signature Endorsement** |

| Commercial <br><br> Property | Golden Corral Corporation Property Insurance Policy Form <br> **ACE007 (06/10)-Cancellation Clause** <br> **ACE0210 (01/08)-Nuclear, Biological, Chemical, Radiological Exclusion Endorsement** <br> **ACE0375 (08/13)-Protective Safeguards Endorsement** <br> **ACE0421 (08/09)-Pre-Existing Property Damage Exclusion** <br> **ACE061 (08/18)-Asbestos Material Exclusion (Named Peril Exception)** <br> **ACE0668 (01/15)-Claims Adjustment** <br> **ACE0816 (04/16)-Flood Exclusion** <br> **ACE0908 (01/18)-Loss Control Inspection Compliance Condition** <br> **ACE126 (10/14)-Electronic Data Amendment Endorsement** <br> **ALL-10750 (01/15)-Terrorism Exclusion Endorsement** <br> **ACE0745 (09/12)-Certificate Of Insurance - Automatic Additional Insured And Loss Payee Endorsement** <br> **ACE0766 (10/13)-Products Recall Exclusion** <br> **GO555A1A (03/19)-Hurricane Minimum Earned Premium - Policy Cancellation** <br> **MS-280806 (06/19)-General Amendatory Endorsement (Willis)** |

| Commercial Inland Marine | **Not Covered** |
| Commerical General Liability | **Not Covered** |
| Boiler Machinery | **Included** |

Case 5:20-cv-00349-D   Document 17-1   Filed 09/11/20   Page 26 of 117
JA115

# GOLDEN CORRAL  CORPORATION

## Property Insurance Policy

| Policy Number: | D4226555A 001 |
|---|---|
| Policy Period: | (A)  From:    March 31,  2019<br>        To:       March 31, 2020<br>        at 12:01 a.m. Local Standard time at the<br>        "location" of the property insured.<br>(B)  Any subsequent period as may be mutually<br>        agreed upon and for which Insurers shall accept a<br>        renewal premium. |
| Name of Insurer: | ILLINOIS UNION INSURANCE COMPANY |
| Complete Home Office Mailing Address of the Insurer: | |
| City/State/Zip: | |
| Country: | |

1

# TABLE OF CONTENTS

**I.    DECLARATIONS** ......................................................................... **8**

    A.    The First Named Insured ...............................................8

    B.    Broker ...................................................................................8

    C.    Premium and the Policy Period ..............................8

    D.    Limits of Liability ..........................................................9

    E.    Deductibles .................................................................12

    F.    Waiting Periods ..........................................................15

    G.    Loss Payable ...............................................................15

    H.    Schedule of mortgage holders.........................15

    I.    Adjustment of Losses ..........................................15

    J.    Territory .........................................................................16

    K.    Governing Law and jurisdiction.......................16

    L.    Notice of Loss ............................................................16

    M.    Certificates of Insurance ...................................16

    N.    The First Named Insured's Contact ...............17

    O.    Schedule Of Attachments and Endorsements ........................................17

**II.    INSURING AGREEMENT** .........................................................**17**

**III.    PROPERTY INSURED** ............................................................ **17**

    A.    Real and Personal Property ..............................18

    B.    Additional Coverages...........................................18

**IV.    PROPERTY EXCLUDED** ........................................................**23**

    A.    Growing Crops .........................................................23

    B.    Standing Timber ......................................................23

    C.    Land, Water..................................................................23

2

|     | D. | ANIMALS | 23 |
|     | E. | WATERCRAFT | 23 |
|     | F. | AIRCRAFT | 23 |
|     | G. | MOTOR VEHICLES | 23 |
|     | H. | MINES AND MINING PROPERTY | 23 |
|     | I. | OVERHEAD ELECTRICAL | 23 |
|     | J. | DAMS OR DIKES | 23 |
|     | K. | OFF-SHORE PROPERTY | 24 |
|     | L. | SATELLITES AND SPACECRAFT | 24 |
|     | M. | ACCOUNTS, BILLS, CURRENCY, MONEY, NOTES, SECURITIES, EVIDENCE OF DEBTS | 24 |
|     | N. | PRECIOUS STONES, BULLION, JEWELRY | 24 |

**V.      TIME ELEMENT ................................................................... 24**

|     | A. | BUSINESS INTERRUPTION | 24 |
|     | B. | EXTRA EXPENSE | 26 |
|     | C. | RENTAL VALUE | 26 |
|     | D. | ROYALTIES | 27 |
|     | E. | LEASEHOLD INTEREST | 27 |
|     | F. | SOFT COSTS | 28 |
|     | G. | PROVISIONS APPLICABLE TO "TIME ELEMENT" | 29 |

**VI.     EXCLUSIONS ...................................................................... 32**

|     | A. | FRAUD | 32 |
|     | B. | EMBEZZLEMENT | 32 |
|     | C. | MYSTERIOUS DISAPPEARANCE | 32 |
|     | D. | INVENTORY SHORTAGE | 32 |
|     | E. | FAULTY WORKMANSHIP, MATERIAL, CONSTRUCTION OR DESIGN | 33 |
|     | F. | DETERIORATION, DEPLETION, RUST, CORROSION OR EROSION, WEAR AND TEAR, INHERENT VICE OR LATENT DEFECT | 33 |
|     | G. | POLLUTION, CONTAMINATION | 33 |

3

H.   Settling, Shrinkage or Expansions ........................................... 34

I.   Hostile or Warlike Action/Act of Terrorism ............................. 34

J.   Nuclear Reaction, Radiation or Radioactive Contamination ...................... 35

K.   Mold, Mildew or Fungus ......................................................... 35

L.   Delay or Loss of Market ......................................................... 36

M.   Indirect or Remote Loss ......................................................... 36

N.   Loss from Manufacturing or Processing Operations .............................. 36

O.   Animal, Insect or Vermin Damage ............................................. 36

P.   Electronic Media and Electronic Data ....................................... 36

Q.   Asbestos Material ............................................................... 37

R.   Electronic Data Recognition Exclusion ................................... 38

VII.   VALUATION ................................................................ 38

A.   Replacement Cost ............................................................... 38

B.   Demolition and Increased Cost of Construction ..................................... 39

C.   Finished Stock ............................................................... 40

D.   Stock in Process ............................................................... 40

E.   Raw Stock ............................................................... 40

F.   Fine Arts, Antiques ............................................................... 40

G.   Valuable Papers and Records ............................................... 41

H.   Film, Records, Manuscripts and Drawings ................................. 41

I.   Electronic Media and Electronic Data ....................................... 41

J.   Property of Others ............................................................... 41

K.   Technologically Obsolete ......................................................... 41

L.   Property Sold by the Insured ................................................... 41

VIII.   EXTENSIONS OF INSURANCE COVERAGE ................................ 42

A.   Property in Transit ............................................................... 42

B.   Accounts Receivable ............................................................. 43

C.   Service Charges ............................................................... 43

5

    D.    Preservation of Property ................................................................. 43

    E.    Property in Course of Construction .................................................... 44

    F.    Increased Tax Liability ..................................................................... 44

    G.    Claim Preparation Expenses ............................................................ 44

**IX.**    **GENERAL CONDITIONS** ........................................................**44**

    A.    Other Insurance ............................................................................. 44

    B.    Subrogation ................................................................................... 45

    C.    Salvages and Recoveries ................................................................ 46

    D.    Brands and Labels/Control of Damaged Property................................ 46

    E.    Cancellation ................................................................................... 46

    F.    Notice of Loss ................................................................................ 47

    G.    Proof of Loss .................................................................................. 47

    H.    Payment of Loss ............................................................................. 47

    I.    Appraisal ....................................................................................... 48

    J.    Suit Against the Insurer ................................................................... 48

    K.    Additional Insureds, Loss Payees and Mortgagees ............................ 48

    L.    Audit ............................................................................................. 50

    M.    Required by Law ............................................................................. 50

    N.    Full Waiver ..................................................................................... 50

    O.    Titles of Paragraphs ....................................................................... 50

    P.    Assistance and Cooperation of the Insured......................................... 50

    Q.    Breach of Warranty ........................................................................ 51

    R.    Coinsurance .................................................................................. 51

    S.    Control of Property ......................................................................... 51

    T.    Omissions or Errors ....................................................................... 51

    U.    Extortion........................................................................................ 51

    V.    Right to Inspect ............................................................................. 51

**X.**    **DEFINITIONS**.........................................................................**52**

6

A.   Actual Cash Value ........................................................................ 52

B.   Boiler and Machinery ................................................................... 52

**C.   Earthquake and earthquake "occurrence"** ............................................ 52

D.   Finished Stock .............................................................................. 53

E.   Flood and flood "occurrence" ....................................................... 53

F.   General Average Contribution and Salvage Charges ............................. 54

G.   High Hazard Zones for Earthquake .............................................. 54

H.   Improvements and Betterments ................................................... 54

I.   Insurable Interest of the Insured in Property of Others .......................... 54

J.   Land Improvements .................................................................... 54

K.   Location ....................................................................................... 55

L.   Merchandise ............................................................................... 55

M.   Miscellaneous Unreported Location ............................................ 55

N.   Named Storm and named storm "occurrence" ............................... 55

O.   Net Sales Value of Production ..................................................... 56

P.   Normal ....................................................................................... 56

Q.   Occurrence ................................................................................. 56

R.   Raw Stock ................................................................................... 56

S.   Stock in Process ......................................................................... 56

T.   Storm Surge ............................................................................... 57

U.   tier one zones .............................................................................. 57

V.   Time Element .............................................................................. 58

7

## I.    DECLARATIONS

### 1.    THE FIRST NAMED INSURED

Golden Corral Corporation and any owned, controlled,  associated or affiliated subsidiary, company, corporation, organization, trust or association  as now or may hereinafter be constituted or acquired; the interest of the First Named  Insured in any partnership or joint venture, to the extent not otherwise insured; and any  entity for which The First Named Insured has agreed to provide insurance, as their  respective rights and interests appear and as defined in the Policy wording.

| The First Named Insured's Street Address: | P.O. Box 29502 |
|---|---|
| City, State or Province, and Zip/Postal Code: | Raleigh, North Carolina 27626 |
| The Name of the First Named Insured's Contact: | Jim Laverty |

### 2.    BROKER

| Willis Location Name: | Willis of Tennessee, Inc. |
|---|---|
| Street Address: | 26 Century Boulevard |
| City, State or Province, and Zip/Postal Code: | Nashville, Tennessee  37214 |
| Telephone Number: | 615-872-3831 |
| Facsimile Number: | 615-872-3895 |
| Name of Contact: | Nancy Williams |

### 3.    PREMIUM AND THE POLICY PERIOD

In consideration of the premium negotiated and agreed, this Policy attaches and insures for  a period of one (1) year, from March 31, 2019 to March 31, 2020, beginning and ending at 12:01 AM at the "location" of the property insured.

With respect to Automatic Coverage for Newly Acquired Locations, if the values at a newly acquired "location" of schedule of "locations" exceed USD 10,000,000, the insured shall report these values to the Insurer within one hundred and eighty (180) consecutive days after they become known to the First Named Insured's contact identified in the Declarations

### 4.    LIMITS OF LIABILITY

The Insurer's maximum Limit of Liability in a single "occurrence" regardless of the

8

number of "locations" or coverages involved shall not exceed the Policy Limit of Liability of $50,000,000

When a Limit of Liability for a "location" or other specified property is shown, such Limit shall be the maximum amount payable for any loss or damage arising from physical loss, damage or destruction of the type insured by this Policy at the "location" or involving such other specified property.

Sub-limits stated in the Sub-limits schedule, or elsewhere in this Policy, shall apply as a part of and not in addition to the Policy Limit of Liability. Limits and sub-limits do not include the amount of any applicable Deductibles.

Limits of Liability apply per "occurrence" unless otherwise stated. When a Sub-limit of Liability is shown as applying in the aggregate during any Policy year, the Insurer's maximum Limit of Liability shall not exceed such Limit during any Policy year regardless of the number of "locations" and coverages involved.

**Schedule of 100% Program Sub-limits (all in United States Dollars)**

Property Damage and "Time Element" coverages are subject to the following Sub-limits, unless otherwise stated:

| | |
|---|---|
| $1,000,000 | Accounts Receivable |
| $10,000,000 | Automatic Coverage on Newly Acquired Property, Property Damage and "Time Element" combined not to exceed 180 consecutive days |
| $2,500,000 | Claims Preparation Expenses |
| $2,500,000 | Consequential Loss (Spoilage) |
| $1,000,000 | Contamination Cleanup, land and water, in the aggregate during any Policy year |
| $2,500,000 | Contingent "Time Element" |
| $10,000,000 or 25% of the Property Damage and "Time Element" claim payable under this Policy, whichever is Greater | Debris Removal and Cost of Cleanup |
| $1,000,000 | Decontamination Costs |
| $1,000,000 | Defense Costs even if claim is groundless, false or fraudulent |
| Included | Destruction of Property at the Order of Public Authority |
| $15,000,000 | "Earthquake" in the aggregate during any Policy year, Property Damage and "Time Element" combined on all "locations" but California Earthquake Zones |
| $5,000,000 | "Earthquake" in the aggregate during any Policy year, Property Damage and "Time Element" combined, on "locations" in California Earthquake Zones". This limit is in addition to and not part of the "Earthquake" policy limit of USD15,000,000 |

9

| $5,000,000 | Electronic Media and Electronic Data, Property Damage and "Time Element" combined |
|---|---|
| $1,000,000 | Exhibition Floater |
| Included | Expediting Expense |
| 365 Days | Extended Period of Recovery |
| $10,000,000 | Extra Expense per occurrence |
| $500,000 | "Fine Arts" |
| $10,000,000 | "Flood" in the aggregate during any Policy year, Property Damage and "Time Element" combined on all "locations" contained within Endorsement 1, "Locations in FEMA Flood Zones 'A' and 'V' |
| $25,000,000 | "Flood" in the aggregate during any Policy year, Property Damage and "Time Element" combined with respects to all other Flood Exposure |
| Included | Improvements and Betterments |
| $1,000,000 | Increased Tax Liability (Post Inflation Loss) |
| $1,000,000 | Installation Floater |
| 120 Consecutive Days | Interruption by Civil or Military Authority |
| $1,000,000 | Land Improvements (Outdoor Property – Trees, shrubs, plants, paved surfaces) |
| $5,000,000 | Leasehold Interest |
| 120 Consecutive Days | Loss of Ingress or Egress |
| $5,000,000 | Limited "Fungus," Wet Rot, Dry Rot and Mold Annual Aggregate limit resulting from a covered cause of loss – covered perils |
| $7,500,000 | "Miscellaneous Unreported Locations," Property Damage and "Time Element" combined |
| $5,000,000 | Omissions and Errors |
| $5,000,000 | Operation of Building Laws and Law, Ordinance or Regulation combined Property Damage and "Time Element" combined (Demolition and Increased Cost of Construction) |
| Included | Protection and Preservation of Property |
| $10,000,000 | Property in the Course of Construction and Soft Costs combined, Property Damage and "Time Element" combined |
| $1,000,000 | Property in the Course of Construction - Off Site Storage Property Damage and Time Element Combined |
| $1,000,000 | Transit – including Builder's Risk Transit (owned goods in owned vehicles) |
| Included | Protection Devices (Recharge of Fire Extinguishing Materials) |
| Included | Removal |
| Included | Rental Value |
| $2,000,000 | Royalties |
| Included | Service Charges (Fire Department) |
| $5,000,000 | Service Interruption, Property Damage and "Time Element" combined (Off Premises Power) including T&D lines within 1,000 feet only |
| $1,000,000 | Valuable Papers and Records |

10

| Boiler and Machinery | |
|---|---|
| Included | Per accident subject to the following: |
| Included | Business Interruption |
| $1,000,000 | CFC Refrigerants including but not limited to ammonia contamination |
| $1,000,000 | Perishable Goods/Spoilage including contamination from the release of ammonia |
| $1,000,000 | Hazardous Substances |
| 12 Continuous Hours | Service Interruption Waiting Period |

In the event of a claim, payment shall not exceed the "Time Element" loss incurred during the following Time Limits

| Time Limit | The following shall apply |
|---|---|
| 365 Consecutive days limit | Extended Period of Recovery |
| 180 Consecutive days limit | Automatic Coverage on Newly Acquired Property |
| 120 Consecutive days limit | Interruption by Civil or Military Authority |
| 120 Consecutive days limit | Loss of Ingress or Egress |

Application of Program Sub-limits of Liability
1.  The Program Sub-limits of Liability represent the maximum amount recoverable in respect of the limited coverage over all Underlying, Contributing or Excess Insurance combined.
2.  The Program Sub-limits of Liability shall not increase the Limit of Liability (Sum Insured) of the Policy, unless specified within the Sub-Limit of Liability.

**5. DEDUCTIBLES**

The Insurer shall be liable for each loss separately occurring or for each loss separately occurring or for the sum of all losses arising from the same "occurrence" excess of $100,000 except excess of:

| Office Personal Property, EDP and Transit | $100,000 |
|---|---|
| Boiler and Machinery – Physical Damage and Time Element combined | $100,000 |
| Vacant Locations – water damage resulting from failure to furnish heat to vacant properties | $100,000 |
| Closed/Vacant Locations – Theft, Vandalism & Malicious Mischief | $100,000 |

11

| With respect to any "Earthquake" at "locations" in "High Hazard Earthquake Zones," per Endorsement #3 applied separately per unit of insurance at each "location" for which a claim is made, the Deductible shall be: | Separately: Two percent (2%) of the actual value of the "unit of insurance" for which the Insured is making a claim against per the most recent Statement of Values on file with the Company. The deductible shall apply separately to each "unit of insurance" subject to a minimum of $100,000 Property Damage and "Time Element" combined for all coverage and all "units of insurance" at the locations combined per "Earthquake" |
|---|---|
| With respect to any "Earthquake" at "locations" in California applied separately per unit of insurance at each "location" for which a claim is made, the Deductible shall be: | Separately: Five (5%) percent of the actual value of the "unit of insurance" for which the Insured is making a claim against per the most recent Statement of Values on file with the Company. The deductible shall apply separately to each "unit of insurance" subject to a minimum of $250,000 Property Damage and "Time Element" combined for all coverage and all "units of insurance" at the locations combined per "Earthquake" |
| All Other Earthquake | $100,000 |
| All Other Wind & Hail not including "Named Storm" or resulting damage from "Named Storm" | $100,000 |
| With respect to any "Named Storm" at "locations" within "Tier 1 Zones," per Endorsement #2 applied separately at each "location" for which a claim is made, the Deductible shall be: | Separately: Five (5%) percent of the actual value of the "unit of insurance" for which the Insured is making a claim against per the most recent Statement of Values on file with the Company. The deductible shall apply separately to each "unit of insurance" subject to a minimum of $100,000 Property Damage and "Time Element" combined for all coverage and all "units of Insurance" at the locations combined per "Named Storm" |
| With respect to any "Flood" at "locations" in SFHA Zones with prefixes A and V per Endorsement #1: | $500,000 Combined Property Damage and Time Element per occurrence |
| Flood – All Other "locations" | $100,000 |

1.    If two or more Deductible amounts in this Policy apply to an "occurrence" the Deductibles shall be applied separately but the cumulative deductions so calculated shall not exceed the largest Deductible applicable. For the purposes of this provision, the total amount of the deductibles calculated on "units of insurance" for any one occurrence shall be considered a single deductible.

2.    "Time Element" values shall not be included in the calculation of the "occurrence"

12

Deductible at any "location" for which no "Time Element" claim is made.  Property damage values shall not be included in the calculation of the "occurrence" Deductible at any "location" for which no property damage claim is made.

3.     In the event that the Insured maintains underlying insurance through the National Flood Insurance Program, it is agreed that this policy shall be excess over the recovery under such National Flood Insurance Policy(s).  Should the amount of loss payable under such National Insurance Flood Policy(s) exceed the applicable flood deductible under this program, then no deductible shall apply hereunder.  However, the  amount to be paid under such National Flood Insurance Policy(s) is less than the applicable flood deductible under this policy, then the amount to be deducted hereunder shall not exceed the difference between the amount to be paid under the Insured's National Flood Insurance Policy(s) and the applicable flood deductible under this policy.  Insurance maintained through the National Flood Insurance Program shall be considered Underlying Insurance.

4.     In any occurrence where loss or damage is caused by a peril insured against under this policy, or at more than one location insured under this policy, the Insured shall have the right to separate the loss amount by location and coverage, for the purposes of application of the limits and deductible(s) specified, notwithstanding the above reference to two or more deductibles.

5.     The following shall be considered a separate "unit of insurance" : (a) each separate building or structure per Statement of Values dated 2/11/2019  b)  all personal property at each separate building or structure per Statement of Values dated 3/31/2019  (c) all personal property in the open that sustains loss or damage (d) all other interests not stated in (a) or (b) above, including but not limited to Machinery or  Equipment, Improvements and Betterments, Valuable Papers (e) BUSINESS INTERRUPTION and BUSINESS INTERRUPTION LOSS OF PROFITS for the twelve (12) months immediately following the date of the  direct physical loss, damage or destruction.  As respects extra expense loss, no deductible shall apply except as outlined in (a), (b) (c) and (d) above.

13

6.    As respects "Flood", "Earthquake" and "Named Storm" as defined in this policy,  in the event that the insured maintains underlying insurance through the National Flood Insurance Program, it is agreed that this policy including  shall be excess over the recovery under such National Flood Insurance Policy(s).  Should the amount of loss payable under such National Insurance Flood Policy(s) exceed the applicable "Flood", "Earthquake", or "Named Storm" deductible under this program, then no deductible shall apply hereunder.  However, if the amount to be paid under such National Flood Insurance Policy(s) is less than the applicable "Flood", "Earthquake", or "Named Storm" deductible under this policy, then the amount to be deducted hereunder shall not exceed the difference between the amount to be paid under the Insured's National Flood Insurance Policy(s) and the applicable "Flood", "Earthquake" or "Named Storm" deductible under this policy.  Insurance maintained through the National Flood Insurance Program shall be considered Underlying Insurance.

6.    WAITING PERIODS

| 12 Continuous Hours | Service Interruption as respects Boiler and Machinery Time Element |
|---|---|

The Insurer shall not be liable for any "Time Element" loss to which a Waiting Period applies unless the interruption exceeds the Waiting Period in which case the loss shall be calculated from the commencement of the "occurrence" and the Deductible specified above shall apply.

7.    LOSS PAYABLE

Loss, if any, shall be adjusted with and payable to the Insured (s) or their order, whose receipt shall constitute a release in full of all liability under this Policy with respect to such loss.

8.    SCHEDULE OF MORTGAGE HOLDERS

Per Certificates of Insurance.

9.    ADJUSTMENT OF LOSSES

In the event of loss and subsequent notification thereof, the firm named below, acting on behalf of the Insurers, shall be assigned the responsibility to investigate, properly document, and coordinate in a timely manner, the claims adjustment process, in cooperation with the Insured.

| Name of Firm: | Cunningham International |
|---|---|

14

| Street Address: | 11000 Richmond Ave., Suite 250 |
| City, State or Province, and Zip/Postal Code: | Houston, TX 77042 |
| Country: | United States |
| Telephone Number: | 713-272-3365 office<br>713-206-9162 cell |
| Facsimile Number: | 713-774-1628 |
| Assigned Adjuster: | Roger Sawyer<br>E-mail: RSawyer@cl-na.com |

**10. TERRITORY**

This Policy insures within and between the 50 states of the United States of America, the District of Columbia, Puerto Rico, the United States Virgin Islands and Canada.

**11. GOVERNING LAW AND JURISDICTION**

Any dispute concerning or related to this insurance shall be determined in accordance with the laws of the United States of America in the Jurisdiction of North Carolina, without regard to its conflict of laws principles.

**12. NOTICE OF LOSS**

As soon as practicable after any physical loss, damage or destruction of the type insured by this Policy is known to the First Named Insured's Contact identified in Declarations I.A., the Insured shall report such physical loss, damage or destruction with full particulars to Willis of Tennessee, Inc.

**13. CERTIFICATES OF INSURANCE**

Any certificate of insurance or evidence of property insurance documents issued in connection with this Policy shall be issued solely as a matter of convenience or information for the addressee or holder of said certificate or evidence of insurance, except where any Additional Insured(s), Mortgagee(s) or Loss Payee(s) is named or any waiver of subrogation granted pursuant to the Special Provisions of the certificate of insurance or evidence of property insurance. In the event any Additional Insured(s), Mortgagee(s) or Loss Payee(s) are named, this Policy shall be deemed to have been endorsed accordingly, subject to all other terms, conditions and exclusions stated in this Policy.

Willis may issue such certificates of insurance and evidence of property insurance documents. Permission has been given Willis of Tennessee to issue Certificates using the 2006 Acord 28.

15

**14.** THE FIRST NAMED INSURED'S CONTACT

The First Named Insured may, at any time, change the name of the First Named Insured's Contact identified in Declarations I.A. by notifying the Insurer in writing.

**15.** SCHEDULE OF ATTACHMENTS AND ENDORSEMENTS

| | |
|---|---|
| Endorsement #1 | Scheduled Flood Zone A and V Locations |
| Endorsement #2 | Named Storm: Tier 1 Locations |
| Endorsement #3 | Earthquake Seismic Zone Counties |
| Endorsement #4 | Schedule of Lenders and Mortgagees |
| Endorsement #5 | Subscription Endorsement |
| Endorsement #6 | Contingent Locations Endorsement |
| Endorsement #7 | Schedule of Lenders and Mortgagees |
| Endorsement #8 | Carrier Amendatory Endorsement |

16

II.  **INSURING AGREEMENT**

IN CONSIDERATION OF THE PROVISIONS AND STIPULATIONS IN THIS POLICY OR ADDED HERETO, AND OF THE PREMIUM SPECIFIED in the Declarations, Attachments or in Endorsements made a part of this Policy, the Insurer, for the term specified in the Declarations from inception date shown in the Declarations to expiration date shown in the Declarations, to an amount not exceeding the Limits of Liability specified in the Declarations, does insure the interest of the Insured named in the Declarations and its legal representatives, to the extent more fully described in this Policy, against 'all risks' of direct physical loss, damage or destruction, occurring during the Policy period, except as hereinafter excluded, of the property described and insured in this Policy. 'All risks' includes "Boiler and Machinery," "Flood" and "Earthquake" as more fully defined in DEFINITIONS. Physical loss, damage or destruction includes "general average contributions and salvage charges" and other charges and expenses as more fully described in this Policy. Wherever used in this Policy, 'peril insured' refers to this INSURING AGREEMENT and to EXCLUSIONS in this Policy and 'property insured' refers to PROPERTY INSURED and PROPERTY EXCLUDED in this Policy.

Assignment of this Policy shall not be valid except with the written consent of the Insurer. This Policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated, which are hereby made a part of this Policy, together with such other provisions, stipulations and agreements as may be added hereto, as provided in this Policy.

17

**III.** **PROPERTY INSURED**

Except as hereinafter excluded, this Policy insures:

**1.** **REAL AND PERSONAL PROPERTY**

The insurable interest of the Insured in all real and personal property of every kind and description, at a "location" or within 1000 feet thereof, including the "insurable interest of the Insured in property of others in the care, custody or control of the Insured" and at the option of the Insured, business personal property of officers, directors and employees of the Insured while at a "location" or anywhere within the Policy territory when the officer, director or employee is acting on behalf of the Insured.

**2.** **ADDITIONAL COVERAGES**

1. Debris Removal and Cost of Clean Up

   Notwithstanding the provisions of any exclusion contained herein or any provision respecting pollution and/or contamination, in the event of physical loss, damage or destruction of property insured by a peril insured by this Policy, this Policy (subject otherwise to its terms, conditions, and limitations, including but not limited to any applicable Deductible) insures:

   a. Expenses necessarily and reasonably incurred in removal of debris of such property from the "location" of the insured physical loss, damage or destruction and/or from other premises when blown by wind or carried by water

      and/or

   b. Cost of clean-up at the "location" made necessary as a result of physical loss, damage or destruction of property of the type insured by this Policy by a peril insured by this Policy,

   Provided such expenses are reported to the insurer within 365 days of the date of the direct physical loss, damage or destruction.

   This provision does not insure against the costs of decontamination or removal of water, soil or any substance not insured by this Policy on or under such "location," except as provided for under clause 2. Contamination Cleanup.

   It is a condition precedent to recovery under this provision that the Insurer shall have paid or agreed to pay for physical loss, damage or destruction of property insured unless such payment is precluded solely by the operation of any Deductible.

2. Contamination Cleanup

   Notwithstanding anything in this Policy to the contrary, this Policy insures costs or

18

expenses incurred to clean up and/or remove polluted or contaminated land and/or water from an insured "location" provided the contamination or pollution results directly from physical loss, damage or destruction of property insured by a peril insured by this Policy, and provided such expenses are reported to the insurer within 365 days of the date of the direct physical loss, damage or destruction.

3. Valuable Papers and Records

This Policy insures valuable papers and records of all kinds and descriptions, including plans, drawings, blueprints, photographs, specifications, manuscripts, deeds, notes, evidences of debt or ownership or other documents, against physical loss, damage or destruction by a peril insured by this Policy. 'Valuable paper and records' does not include 'media' as defined and insured below.

4. Decontamination Costs

Notwithstanding the provisions of any exclusion contained herein or any provisions respecting pollution and/or contamination, if property insured is contaminated as a result of physical loss, damage or destruction  by a peril insured by this Policy and there is in force at the time of the loss any law or  ordinance regulating contamination, including but not limited to the presence of  pollutants or contaminants, this Policy insures, as a result of enforcement of such law  or ordinance, the increased cost of decontamination and/or removal of such  contaminated property insured in a manner to satisfy such law or ordinance.  This  provision applies only to that part of property insured contaminated as a result of  insured physical loss, damage or destruction by a peril insured by this Policy.

5. Destruction of Property at the Order of Public Authority

This Policy insures destruction of property insured at the order of public authority at the time of and for the purpose of preventing physical loss, damage, destruction by a peril insured by this Policy.

6. Protection Devices

This Policy insures expenses incurred to recharge or refill fire protection devices provided such is necessitated by an accidental discharge or by an insured loss.

7. Removal

This Policy insures property insured by this Policy while it is being removed to or from and while at a place of safety because of imminent danger of physical loss, damage or destruction by a peril insured by this Policy.

8. Expediting Expenses

In the event of physical loss, damage or destruction of property insured by a peril insured by this Policy, this Policy insures the reasonable extra cost to make temporary repairs, expedite permanent repairs, and expedite permanent replacement of such

19

property.

9. Consequential Loss

This Policy insures:

a. Consequential loss or damage to insured property resulting from a sequence of events, which are caused by a peril not otherwise excluded to other property of the type insured hereunder, without the intervention of any other independent cause, including but not limited to loss or damage to insured property from any change in temperature, humidity or other controlled environment or condition, resulting from insured direct physical loss or damage of the type insured hereunder, including property of any service provider.

b. The reduction in value of undamaged insured articles that are a part of pairs or sets, including components or parts of similar inventory-type property and including merchandise usually sold by lots, sizes, color ranges or other classifications, when such reduction in value results from loss, damage or destruction of other insured articles, components or parts of such property by a peril insured by this Policy;

In the event of such physical loss, damage or destruction, the measure of recovery for such articles shall be, at the Insured's option:

The reduction in value of undamaged insured components or parts of property resulting from physical loss or damage Insured by this Policy to other insured components or parts of such property; or, the full value of the pair or set.

c. Physical loss, damage or destruction of property insured resulting from physical loss, damage or destruction, by a peril insured by this Policy, of property of a supplier of electricity, steam, water, natural gas, refrigeration, telecommunications or sewerage, including poles, towers, and transmission or distribution lines. This provision shall be known as known as 'Service Interruption Property Damage.'

10. Defense Expenses

With respect to the interest of the Insured in property of others in the Insured's care, custody or control, this Policy shall defend any suit against the Insured alleging liability for physical loss, damage or destruction, by a peril insured by this Policy, of the property, even if such suit is groundless, false or fraudulent; but the Insurer may without prejudice, make such investigation, negotiation and settlement of any claim or suit the Insurer deems expedient.

11. Fine Arts and Antiques

This Policy insures paintings, etchings, pictures, tapestries, art glass windows and other bona fide works of art (such as valuable rugs, statuary, marbles, bronzes, antique furniture, rare books, antique silver, porcelain and bric-a-brac) of rarity,

20

historical value, monetary value or artistic merit against physical loss, damage or destruction by a peril insured by this Policy. Additional exclusion applying to fine arts and antiques: This Policy does not insure against physical loss, damage or destruction of fine arts or antiques from any repairing, restoration or retouching process.

12. "Improvements and Betterments"

This Policy insures "improvements and betterments" against physical loss, damage or destruction by a peril insured by this Policy. Insurers agree to accept and consider the Insured as the only and the unconditional owner of improvements and betterments irrespective of any provisions of any contract, lease or agreement to the contrary.

13. Electronic Data Processing Equipment, Media and Data

This Policy insures 'electronic data processing equipment.' Such 'equipment' includes but is not limited to mainframes, servers, workstations and portable computers, personal information managers, wide and local area network hardware, electronic and electromechanical equipment, electronic controls for machinery, electronically programmed memory chips and electronically controlled communication equipment.

Subject to Electronic Media and Electronic Data in EXCLUSIONS, this Policy also insures 'electronic media' meaning any physical device that holds, stores, contains or transfers 'electronic data,' and includes but is not limited to disks, drives, films, tapes, records, drums or cells. This Policy also insures 'electronic data' meaning facts, concepts or information, including compilations thereof, in a form useable or intended for use or processing by electronic data processing equipment or for storage on electronic media. 'Electronic data' includes but is not limited to files, programs, applications, operating systems, and other coded instructions for the processing calculation and storage of facts, concepts and information by electronic data processing equipment.

14. Automatic Coverage on Newly Acquired Property
It is understood and agreed that this policy is automatically extended to insure additional property and interests described herein, that are acquired constructed or otherwise become the responsibility of the Insured during the term of this policy, subject to the details of only those properties and/or interests with values in excess of USD 10,000,000 at any one location being reported not later than one hundred and eighty (180) days from the date that the property and/or interests have become the risk of the Insured. This policy provides coverage automatically for such period of time.

Coverage for the properties and/or interests with values below USD 10,000,000 at any one location that are acquired, constructed or otherwise become the responsibility of the Insured are automatically insured and are not subject to any time limitation or any reporting requirement and are not subject to the Miscellaneous Unnamed Locations limit.

Any property and/or interests with values of USD 10,000,000 or greater at any one location that is not reported to the insurer within one hundred and eighty (180) days

21

from the date of acquisition will be subject to the Miscellaneous Unnamed Locations limt.

15. Operation of Building Laws

This Policy insures the undamaged portion of property insured when, as a result of physical loss, damage or destruction by a peril insured by this Policy to such property insured, any law, ordinance or regulation which is in force at the time of such physical loss, damage or destruction requires the demolition of such undamaged portion of property insured.

However, nothing in the foregoing shall serve to override 'Asbestos Material' in EXCLUSIONS.

16. PROPERTY IN TRANSIT

1. Physical loss, damage or destruction, by a peril insured by this Policy, of shipments within and between the territorial limits of this Policy, including the coastal waters thereof, by any means of conveyance, from the time the property is moved for purpose of loading and continuously thereafter while awaiting and during loading and unloading and in temporary storage, including temporary storage on any conveyance intended for use for any outbound or used for any inbound shipment, including during deviation and delay, until safely delivered and accepted at place of final destination.

2. Physical loss, damage or destruction, by a peril insured by this Policy, of property:

   a. Sold and shipped by the Insured under terms of F.O.B. point of origin or other terms usually regarded as terminating the shipper's responsibility short of points of delivery;

   b. Arising out of any unauthorized person(s) representing themselves to be the proper party(ies) to receive goods for shipment or to accept goods for delivery;

   c. Occasioned by the acceptance by the Insured, by its agents, or by its customers of fraudulent bills of lading, shipping and delivery orders, or similar documents;

   d. At the insured's option, property that is incoming to the Insured.

3. This Policy does not insure export shipments after loading on board an overseas vessel, watercraft, or aircraft, or after ocean marine insurance attaches, whichever occurs first; or import shipments prior to discharge from an overseas vessel, watercraft, or aircraft, or until ocean marine insurance terminates, whichever occurs later.

17. ACCOUNTS RECEIVABLE

22

1. All sums due the Insured from customers, provided the Insured is unable to effect collection thereof as the result of physical loss, damage or destruction of records of accounts receivable by a peril insured by this Policy;

2. Interest charges on any loan to offset impaired collections pending repayment of such sums made uncollectible by such loss or damage;

3. Collection expense in excess of normal collection cost and made necessary because of such loss or damage;

4. Other expenses, when reasonably incurred by the Insured in reestablishing records of accounts receivable following such loss or damage.

For the purpose of this Accounts Receivable insurance, credit card company charge media shall be considered to represent sums due the Insured.

When there is proof that a loss of records of accounts receivable has occurred but the Insured cannot more accurately establish the total amount of accounts receivable outstanding as of the date of such loss, such amount shall be computed as follows:

1. The monthly average of accounts receivable during the last available twelve months shall be adjusted in accordance with the percentage of increase or decrease in the twelve months average of monthly gross revenues which may have occurred in the interim.

2. The monthly amount of accounts receivable thus established shall be further adjusted in accordance with any demonstrable variance from the average for the particular month in which the loss occurred, due consideration also being given to the normal fluctuation s in the amount of accounts receivable within the fiscal month involved.

There shall be deducted from the total amount of accounts receivable, however established, the amount of such accounts evidenced by records not lost or damaged, or otherwise established or collected by the Insured, and an amount to allow for probable bad debts which would normally have been uncollectible by the Insured.

18. **SERVICE CHARGES**

Service charges and expenses including Fire Department, Police, Rescue Squad, and any government or authority charges incurred by the Insured because of an "occurrence" of a peril insured by this Policy.

19. **PRESERVATION OF PROPERTY**

In case of actual or imminent physical loss, damage or destruction by a peril insured by this Policy, the expenses incurred by the Insured in taking reasonable and necessary actions for the temporary protection and preservation of property insured by this Policy shall be added to the total physical loss, damage or destruction, if any, otherwise recoverable under the Policy. No deductible shall apply.

20. **PROPERTY IN COURSE OF CONSTRUCTION**

23

New buildings and structures, and machinery and equipment installed therein, in the course of construction and installation, at both new and existing "locations." This Policy also insures property of contractors and subcontractors at an insured "location" or within 1,000 feet thereof.

21. **INCREASED TAX LIABILITY**

Loss sustained by the Insured in the event that the tax treatment of loss recoveries under any provision of this Policy differs from the tax treatment that would have been experienced by the Insured had no physical loss, damage or destruction by a peril insured by this Policy occurred.

22. **CLAIM PREPARATION EXPENSES**

Expenses incurred by the Insured or by the Insured's representatives including Accountants, Appraisers, Architects, Auditors, Consultants, Engineers, or other such professionals in order to arrive at the loss payable under this Policy in the event of a claim. This provision does not insure expenses incurred for the services of any lawyer or public adjuster.

24

**IV.** **PROPERTY EXCLUDED**

This Policy does not insure:

1. **GROWING CROPS**

   Growing crops. This exclusion shall not apply to "land improvements."

2. **STANDING TIMBER**

   Standing timber. This exclusion shall not apply to "land improvements."

3. **LAND, WATER**

   Except as provided in 'Contamination Cleanup' in PROPERTY INSURED, land or water. This exclusion shall not apply to water that is normally contained within any type of tank, piping system or process equipment, nor shall this exclusion apply to "land improvements."

4. **ANIMALS**

   Animals.

5. **WATERCRAFT**

   Watercraft while waterborne except as provided in 'Off-Shore Property' below.

6. **AIRCRAFT**

   Aircraft.

7. **MOTOR VEHICLES**

   Motor vehicles licensed for highway use except while at an insured "location."

8. **MINES AND MINING PROPERTY**

   Underground mines and mining property located underground.

9. **OVERHEAD ELECTRICAL**

   Overhead electrical transmission or distribution lines owned by the Insured except when at an insured "location" or within 1,000 feet thereof.

10. **DAMS OR DIKES**

25

Dams or dikes.  This exclusion shall not apply to Impounded Water in TIME ELEMENT.

11.    OFF-SHORE PROPERTY

Off-shore property, except structures and their contents extending from land or shore; however, waterborne vessels and their contents and/or floating docks permanently moored  to a dock, river bank or shore shall not to be considered as off-shore property.

In the Gulf of Mexico off Texas and Louisiana, 'off-shore' is to be seaward of the inland edge  of the Lease Block of the Plane Coordinate System, as defined on United States Department of Land Management Leasing Maps.

12.    SATELLITES AND SPACECRAFT

Satellites and spacecraft while on the launch pad or after time of launch.

13.    CURRENCY, MONEY, NOTES and SECURITIES

Currency, Money, Notes and Securities

14.    PRECIOUS STONES, BULLION, JEWELRY

Precious stones, bullion, jewelry.

26

## V.   TIME ELEMENT

### 1.   BUSINESS INTERRUPTION

1.   This Policy insures loss resulting from the necessary interruption or reduction of business operations conducted by the Insured and caused by physical loss, damage  or destruction, by a peril insured by this Policy, of property insured.

2.   If such a loss occurs during the term of this Policy, it shall be adjusted on the basis of  the 'Actual Loss Sustained' by the Insured during the Period of Recovery resulting  from the interruption or reduction of operations.  'Actual Loss Sustained' is defined as  the reduction in 'Gross Earnings' less charges and expenses that do not necessarily  continue during the interruption or reduction of the business operations.

For manufacturing operations, 'Gross Earnings' are defined as the sum of:

a.   The total "net sales value of production,"

b.   The total net sales of "merchandise," and

c.   Other earnings derived from the business.

    LESS THE COST OF:

d.   "'Raw stock" from which such production is derived,

e.   Supplies consumed in the conversion of such "raw stock" into "finished stock" or  in supplying the services sold by the Insured,

f.   "Merchandise" sold including packaging materials, and

g.   Services purchased from outsiders for resale, which do not continue under  contract.

 No other costs shall be deducted in determining 'Gross Earnings' for manufacturers.

For non-manufacturing operations, 'Gross Earnings' are defined as the sum of:

a.  Total net sales, and

b.  Other earnings derived from the operations of the business.

LESS THE COST OF:

c.  "Merchandise sold,

27

    d.  Materials and supplies consumed, and

    e.  Services purchased from outsiders for resale which do not continue under contract.

    f.  No other costs shall be deducted in determining 'Gross Earnings' for non-manufacturing business.

3.  In the event of physical loss, damage or destruction of property insured by a peril insured by this Policy which results in an interruption in research and development activities that in themselves would not have produced income during the Period of Recovery, this Policy insures the actual loss sustained of the continuing fixed charges and expenses, including payroll, attributable to such research and development activities, known as 'Research and Development "Time Element."

4.  Resumption of Operations: If it is reasonably possible for the Insured to reduce the loss resulting from the interruption or reduction of operations,

    a.  By a complete or partial resumption of operations or
    b.  By making use of available "finished stock" or "merchandise,"

Such reduction shall be taken into account in arriving at the amount of loss hereunder.

5.  'Business interruption' does not insure any loss resulting from loss, damage or destruction of "finished stock" nor for the time required to reproduce "finished stock."

**2.  EXTRA EXPENSE**

This Policy insures:

1.  'Extra expense' incurred by the Insured resulting from physical loss, damage or destruction of property insured by a peril insured by this Policy.

2.  'Extra expense' means the reasonable and necessary extra costs incurred by the Insured during the Period of Recovery to temporarily continue as nearly normal as practicable the conduct of the Insured's business and extra costs of temporarily using property of the Insured or others less any value remaining at the end of the Period of Recovery for property obtained in connection with an 'extra expense' loss.

**3.  RENTAL VALUE**

This Policy insures:

1.  'Rental value' loss sustained by the Insured resulting from necessary untenantability caused by physical loss, damage or destruction, by a peril insured by this Policy, of property insured but not exceeding the reduction in rental value less charges and expenses which do not necessarily continue during the Period of Recovery.

28

2. For the purposes of this insurance, 'rental value' is defined as the sum of:

    a. The total anticipated gross rental income from tenant occupancy of the property insured as furnished and equipped by the Insured; and

    b. The amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be obligations of the Insured; and

    c. The fair rental value of any portion of said property that is occupied by the Insured.

3. When the Insured is the lessee, this Policy insures:

The rent the Insured is obligated to pay including ground rents, accrued charges, real estate taxes and interest if the Insured is liable for such, less charges and expenses that do not necessarily continue during the Period of Recovery. However, if the Insured is obligated by the terms of any lease to pay rent and taxes for any time beyond the Period of Recovery of this Policy, this Policy insures such additional payments.

If the Insured is both a lessor and a lessee of the same "location," this Policy insures the loss as defined in V.C.2. above.

**4. ROYALTIES**

This Policy insures:

1. Loss to the Insured, as described in Business Interruption above, of revenue under royalty, licensing fees or commission agreements between the Insured and another party, which is not realizable due to physical loss, damage or destruction, by a peril insured by this Policy, of property of the other party. Such other party shall not be an Insured under this Policy. Coverage under this Clause shall apply to loss experienced by the Insured caused by physical loss, damage or destruction of property of the other party situated within the territorial limits of this Policy.

2. Resumption of Operations: The Insured shall influence, to the extent possible, the party with whom the agreement described in paragraph V.D.1. above has been made to use any other machinery, supplies or locations in order to resume business so as to reduce the amount of loss hereunder and the Insured shall cooperate with that party in every way to effect this, but not financially, unless such expenditures are authorized by the Insurer.

**5. LEASEHOLD INTEREST**

This Policy insures:

1. The pro rata proportion from the date of loss to expiration date of the lease (to be paid without discount) on the Insured's interest in:

29

    a.   The amount of bonus paid by the Insured for the acquisition of the lease not recoverable under the terms of the lease for the unexpired term of the lease;

    b.   Improvements and betterments to real property during the unexpired term of the lease which is not covered under any other provision of this Policy;

    c.   The amount of advance rental paid by the Insured and not recoverable under the terms of the lease for the unexpired term of the lease;

when property of a lessor is rendered wholly or partially untenantable as a result of physical loss, damage or destruction by a peril insured by this Policy and the lease is canceled by the lessor in accordance with the conditions of the lease or by statutory requirements of the appropriate jurisdiction in which the lost, damaged or destroyed property is located; and

2.   Interest of the Insured as Lessee

    a.   The 'Interest of the Insured as Lessee' when property is rendered wholly or partially untenantable by a peril insured by this Policy and the lease is canceled by the lessor in accordance with the conditions of the lease or by statutory requirements of the appropriate jurisdiction in which the damaged or destroyed property is located.

    b.   The 'Interest of the Insured as Lessee' as referred to herein shall be paid for the first three months succeeding the date of the loss and the 'Net Lease Interest' shall be paid for the remaining months of the unexpired lease.

3.   Definitions:

The following terms, wherever used in this Clause, mean:

    a.   The 'Interest of the Insured as Lessee' is defined as:

        i.   The excess of the rental value of similar premises over the actual rental payable by the lessee (including any maintenance or operating charges paid by the lessee) during the unexpired term of the lease.

        ii.   The rental income which would have been earned by the Insured from sublease agreements, to the extent not covered under any other Clause in TIME ELEMENT in this Policy, over and above the rental expenses specified in the lease between the Insured and the lessor.

    b.   'Net Lease Interest' is defined as that sum, which placed at the prime rate of interest plus 6% compounded annually, shall be equivalent to the 'Interest of the Insured as Lessee.'

4.   The Insurer shall not be liable for any increase of loss, which may be occasioned by the suspension, lapse or cancellation of any license or by the Insured exercising an option

30

to cancel the lease.

6. **SOFT COSTS**

This Policy insures 'Soft Costs' loss sustained by the Insured during the Period of Recovery caused by physical loss, damage or destruction of insured property in the course of construction, erection, installation, or assembly by a peril insured by this Policy.

'Soft Costs' means expenses over and above normal expenses consisting of:

1. Additional interest on money borrowed to finance construction or repair.

2. Additional real estate and property taxes.

3. Additional legal and accounting fees.

4. Additional advertising and promotional expenses which become necessary as a result of the loss.

5. Additional architects and engineering fees

6. Additional leasing expenses

7. Additional insurance premiums

8. Refinancing or loan construction charges

9. Additional Operation Expenses

In the event the construction contract for such property contains a penalty clause providing for payments to the Insured for a delay in the completion of the construction, any portion of such penalty inuring to the benefit of the Insured shall be taken into consideration in the settlement of any loss hereunder.

7. **PROVISIONS APPLICABLE TO "TIME ELEMENT"**

1. The Period of Recovery

    a. Applicable to "Time Element" as defined in 'Business Interruption,' 'Extra Expense,' 'Rental Value' and 'Soft Costs' above:

        i. Shall not exceed such length of time required with the exercise of due diligence and dispatch to rebuild, repair, or replace lost, damaged or destroyed property and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the loss, including such time as may be required to restore or recreate lost or destroyed valuable papers and records or electronic media and electronic data.

31

ii.  Shall include an additional length of time, known as an 'Extended Period of Recovery,' not to exceed the time specified in the DECLARATIONS, to restore the Insured's business to the condition that would have existed had no "Time Element" loss occurred.

'Extended Period of Recovery' shall not apply to:

- Interruption by Civil or Military Authority as defined below.

- Loss of Ingress or Egress as defined below.

- Service Interruption as defined below.

b.  Applicable to "Time Element" as defined in Business Interruption and Rental Value above, the Period of Recovery applying to alterations, additions, and property while in the course of testing, commissioning, construction, erection, installation, or assembly, shall be determined as provided in a. above but the length of time shall be applied to the planned level of production or the planned level of business operation.

c.  Applicable to actions taken by the Insured in relation to "Preservation of Property" efforts as insured elsewhere in this Policy, shall commence at the time of initiation of the "Preservation of Property" efforts.

d.  Applicable to "Time Element" resulting from the release and subsequent lack of water supply stored behind dams or in reservoirs at an insured "location" when such water supply is used for any manufacturing purpose, for power or for fire protection and when such release is caused by physical loss, damage or destruction, by a peril insured by this Policy, of such dams or reservoirs or equipment connected thereto, shall be extended for a period not to exceed 30 consecutive days after the damaged dam, reservoir or equipment has been repaired or replaced. This provision is known as 'Impounded Water.'

e.  Except as provided in V.G.I.c above, for all "Time Element," the Period of Recovery shall commence with the date of the loss, damage or destruction of property of the type insured by a peril insured by this Policy and shall not be limited by the date of expiration of this Policy.

2.  Expenses  to Reduce Loss

Except as respects Extra Expense as defined above, this Policy insures expenses necessarily incurred for the purpose of reducing any "Time Element" loss, not to exceed the amount by which such "Time Element" loss is reduced.

3.  Contingent "Time Element" Coverage

Subject to all TIME ELEMENT provisions including Interruption by Civil or Military Authority, Loss of Ingress or Egress and Service Interruption as defined below, this

32

Policy insures the "Time Element" loss resulting from physical loss, damage or destruction, by a peril insured by this Policy, of:

a. Property of the type insured by this Policy of a direct supplier or a direct receiver of the Insured, which prevents the rendering or acceptance of goods and/or services to or from the Insured. Such supplier or receiver must be located within the Policy territory.

b. Property of others of the type insured by this Policy in the vicinity of a "location" of the Insured that attracts customers to the Insured's "location."

c. Property of the type insured at a "location" not owned or operated by the Insured which is within 5 miles of an Insured "location" and attracts business to an insured "location"

Contingent "Time Element" coverage does not apply to any loss or damage insured under Service Interruption as defined below.

4. Interdependent "Time Element"

This Policy insures "Time Element" interdependency loss sustained within and among companies or corporations owned, controlled or which are subsidiaries of the Insured, or joint ventures or partnerships in which the Insured has an interest, caused by physical loss, damage or destruction, by a peril insured by this Policy, of property insured situated within the territorial limits of this Policy.

5. Interruption by Civil or Military Authority

This Policy insures the "Time Element" loss sustained during the period of time when, as a result of physical loss, damage or destruction by a peril insured by this Policy within five miles of an insured "location," normal business operations are interrupted or reduced because access to that "location" is impaired by order of civil or military authority.

6. Loss of Ingress or Egress

This Policy insures the "Time Element" loss sustained during the period of time when, as a result of physical loss, damage or destruction by a peril insured by this Policy within five miles of an insured "location," normal business operations are interrupted or reduced because ingress to or egress from that "location" is impaired.

7. Service Interruption

This Policy insures the "Time Element" loss sustained as a result of physical loss, damage or destruction, by a peril insured by this Policy, of property of a supplier of electricity, steam, water, natural gas (except when natural gas is used as a raw material in which case "Time Element" loss is insured under Contingent "Time Element" as defined above), refrigeration, sewerage or telecommunications, including poles, towers, and transmission or distribution lines.

33

8. Law, Ordinance or Regulation

In the event reconstruction, restoration, repair or use of property insured is regulated or prohibited by the enforcement of any law, ordinance, or regulation that is in force at the time of physical loss, damage or destruction by a peril insured by this Policy, this Policy shall pay for any increase in "Time Element" loss insured by this Policy arising out of the additional time required to bring both the damaged and undamaged property into full compliance with the applicable law, ordinance or regulation.

Notwithstanding the foregoing, this Policy does not insure any increase in "Time Element" loss insured by this Policy arising out of the additional time required by the enforcement of any law, ordinance or regulation regulating asbestos material that has not sustained physical loss, damage or destruction by a Listed Peril as defined in Asbestos Material in EXCLUSIONS, or by any governmental direction or request declaring that asbestos material present in or part of or utilized in any undamaged portion of the Insured's property can no longer be used for the purpose for which it was intended or installed and must be removed or modified.

9. Experience of the Business

In determining the amount of "Time Element" loss payable hereunder, consideration shall be given to the experience of the business before the date of physical loss, damage or destruction and to the probable experience thereafter had no loss occurred, except with respect to any alterations, additions and property while in the course of testing, commissioning, construction, erection, installation, or assembly, insured by this Policy, consideration shall be given to the probable experience of the business on the date business operations would have commenced had no loss occurred.

10. Additional Exclusions Applicable to "Time

Element." This Policy does not insure:

a. The suspension, cancellation or lapse of any lease, contract, license or orders beyond the 'Period of Recovery' or, if applicable, the 'Extended Period of Recovery.'

b. Fines or damages for breach of contract or for late or non-completion of orders.

c. Penalties of any nature.

d. Any other consequential or remote loss not otherwise insured by this Policy.

34

**VI.** **EXCLUSIONS**

This Policy does not insure:

**1.** **FRAUD**

Fraud by the insured.

**B.** **EMBEZZLEMENT**

Embezzlement of the Insured's property by any of the Insured's employees.

**C.** **MYSTERIOUS DISAPPEARANCE**

Mysterious Disappearance.

**D.** **INVENTORY SHORTAGE**

Loss or shortage the only proof of the factual existence of which is inventory records.

If the factual existence of the loss is provable by evidence other than inventory records, this exclusion shall not prohibit using inventory records to prove the amount of the loss.

**E.** **FAULTY WORKMANSHIP, MATERIAL, CONSTRUCTION OR DESIGN**

Physical loss, damage or destruction caused by faulty workmanship, faulty material, faulty construction or faulty design unless physical loss, damage or destruction not excluded by this Policy results, then only that resulting physical loss, damage or destruction is insured.

This exclusion shall not apply to "Boiler and Machinery" as defined in the DEFINITIONS.

**F.** **DETERIORATION, DEPLETION, RUST, CORROSION OR EROSION, WEAR AND TEAR, INHERENT VICE OR LATENT DEFECT**

Physical loss, damage or destruction caused by deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect unless such physical loss, damage or destructions results directly from a peril insured by this policy or unless physical loss, damage or destruction not excluded by this policy results, then only that resulting physical loss, damage or destruction is insured.

This exclusion shall not apply to "Boiler and Machinery" as defined in the DEFINITIONS.

**G.** **POLLUTION, CONTAMINATION**

Loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of 'contaminants or pollutants,' all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever.

35

Nevertheless if a peril insured by this Policy arises directly or indirectly from pollution or contamination any loss, damage or destruction of property insured by this Policy arising directly from that peril shall (subject to the terms, conditions and limitations of the Policy) be covered.

Notwithstanding the foregoing, this exclusion shall not apply if pollution or contamination results from direct physical loss, damage or destruction of property insured by this Policy by a peril insured by this Policy.

It is a condition precedent to recovery that such loss or damage be reported to the Insurer within 365 days of the date of the direct physical loss, damage or destruction.

'Contaminants or pollutants' means any material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, bacteria, virus, or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act, or as designated by the U.S. Environmental Protection Agency.

Except as provided in "Decontamination Costs" in PROPERTY INSURED, this Policy does not insure costs arising out of the enforcement of any law, ordinance, regulation or order by civil or judicial authority requiring the removal, disposal, replacement, cleanup, restoration or containment of property insured or costs to monitor or test for the existence or effects of pollutants.

### H. SETTLING, SHRINKAGE OR EXPANSIONS

Settling, shrinkage, or expansion in foundations, walls, floors or ceilings unless such damage results directly from a peril insured by this Policy, or unless physical loss, damage or destruction by a peril insured by this Policy results, and then this Policy shall insure against that resulting physical loss, damage or destruction.

### I. HOSTILE OR WARLIKE ACTION/ACT OF TERRORISM

1. Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any government or sovereign power (*de jure* or *de facto*) or by any authority maintaining or using military, naval, or air force, or by any agent of any such government, power, authority, or forces; any weapon of war employing atomic fission or radioactive force whether in time of peace or war, insurrection, rebellion, revolution, civil war, usurped power, or action taken by any governmental authority in hindering, combating or defending against any such occurrence, seizure or destruction under quarantine or customs regulations; confiscation or destruction by order of any government or public authority, except as provided in 'Destruction of Property at the Order of Public Authority' in PROPERTY INSURED.

36

2. 'Act of Terrorism'

An 'act of terrorism' means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any sector of the public, in fear.

If the Insurer alleges that by reason of this exclusion, any loss, damage, cost or expense is not covered by this Policy the burden of proving the contrary shall be on the Insured.

In the event any portion of this provision is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

## J. NUCLEAR REACTION, RADIATION OR RADIOACTIVE CONTAMINATION

Nuclear reaction or nuclear radiation or radioactive contamination from any cause; however, if fire or sprinkler leakage ensues, the Insurer shall be liable for physical loss, damage destruction by the ensuing fire or sprinkler leakage.

Notwithstanding the previous sentence, this Policy insures against physical loss, damage or destruction caused by radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted by the Insured provided that at the time of such physical loss, damage or destruction there is neither a nuclear reactor capable of sustaining nuclear fission in a self-supporting chain reaction or any new or used nuclear fuel on the premises of the Insured.

## K. MOLD, MILDEW OR FUNGUS

1. Except as set forth in paragraph VI.K.2. below, this Policy does not insure any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to:

mold, mildew or fungus

This exclusion applies regardless whether there is (a) any physical loss, damage or destruction of property insured; (b) any insured peril or cause, whether or not contributing concurrently or in any sequence; (c) any loss of use, occupancy, or functionality; or (d) any action required, including but not limited to repair, replacement, removal, cleanup, abatement, disposal, relocation, or steps taken to address medical or legal concerns.

2. Notwithstanding the foregoing, this Policy insures physical loss, damage or destruction of property insured by mold, mildew or fungus when directly caused by a peril insured by this Policy  occurring during the Policy period.

This coverage is subject to all the limitations in this Policy and, in addition, to each of

37

the following specific limitations:

a. The property must otherwise be insured under this Policy for physical loss, damage or destruction by a peril insured herein.

b. The Insured must report to the Insurer the existence and cost of the physical loss, damage or destruction by mold, mildew or fungus as soon as practicable, but no later than twelve (12) months after the Listed Peril first caused physical loss, damage or destruction of insured property during the Policy period. This Policy does not insure any physical loss, damage or destruction by mold, mildew or fungus first reported to the Insurer after that twelve (12) month period.

**L.  DELAY OR LOSS OF MARKET**

Delay or Loss of Market (except as otherwise insured by this Policy)

**M.  INDIRECT OR REMOTE LOSS**

Indirect or Remote Loss

**N.  LOSS FROM MANUFACTURING OR PROCESSING OPERATIONS**

Loss attributable to manufacturing or processing operations that result in damage to stock or materials while such stock or materials are being processed, manufactured, tested or otherwise being worked upon, unless physical loss, damage or destruction by a peril insured by this Policy results, and then this Policy shall insure against that resulting physical loss, damage or destruction

**O.  ANIMAL, INSECT OR VERMIN DAMAGE**

Animal, insect or vermin damage, unless physical loss, damage or destruction by a peril insured by this Policy results, and then this Policy shall insure against that resulting physical loss, damage or destruction.

**P.  ELECTRONIC MEDIA AND ELECTRONIC DATA**

Physical loss, damage or destruction of electronic media and electronic data.

However, anything in the foregoing sentence or elsewhere in this Policy to the contrary notwithstanding, this Policy insures physical loss, damage or destruction to electronic media and electronic data directly caused by a peril insured by this Policy occurring during the Policy period.
Physical loss, damage or destruction of electronic media and electronic data shall not include distortion, erasure, corruption, alteration, diminishment in value, or resulting loss of use or usefulness of electronic media and electronic data, by any cause whatsoever other than the perils insured by this Policy, including but not limited to 'computer virus,' regardless of any other cause or event that contributes concurrently or in any sequence to the loss, damage, destruction, distortion, erasure, corruption, alteration, diminishment in

38

value, or loss of use or usefulness of electronic data or electronic media.

'Computer virus' means instructions, code, applications or any software program that has the ability or is suspected to have the ability to damage, destroy, erase, corrupt, alter, or prevent access to electronic media and/or electronic data.

**Q. ASBESTOS MATERIAL**

Asbestos material or the cost of removal or disposal of asbestos material or any sum related thereto.

However, anything in the foregoing sentence or elsewhere in this Policy to the contrary notwithstanding, this Policy insures asbestos physically incorporated in an insured building or structure, but only that part of the asbestos that has been physically damaged during the Policy period by one of the perils insured by this Policy occurring during the Policy period.

This coverage is subject to all limitations in this Policy and, in addition, to each of the following specific limitations:

1.  The insured peril must be the immediate, sole cause of the damage to the asbestos.

2.  The Insured must report to the Insurer the existence and estimated cost of the damage as soon as practicable but no later than twelve (12) months after the peril insured by this Policy first damaged the asbestos. This Policy does not insure any physical loss, damage or destruction to the asbestos first reported to the Insurer after that twelve (12) month period.

3.  Coverage under this Policy in respect of asbestos shall not include any sum relating to:

    a.  any faults in the design, manufacture or installation of the asbestos;

    b.  asbestos not physically damaged by the Listed Peril including any governmental or regulatory authority direction or request of whatsoever nature relating to undamaged asbestos.

**R. ELECTRONIC DATA RECOGNITION EXCLUSION**

Loss, damage, cost, claim or expense, whether preventative, remedial or otherwise, directly or indirectly arising out of or relating to:

1.  the calculation, comparison, differentiation, sequencing or processing of data involving the date change to the year 2000, or any other date change, including leap year calculations, by any computer system, hardware, program or software and/or any microchip, integrated circuit or similar device in computer equipment or non-computer equipment, whether the property of the Insured or not; or

39

2.   any change, alteration or modification involving the date change to the year 2000, or any other date change including leap year calculations, to any such computer system, hardware program or software or any microchip, integrated circuit or similar device in computer equipment or non-computer equipment, whether the property of the Insured or not.

This Clause applies regardless of any other cause or event that contributes concurrently or in any sequence to the loss, damage, cost, claim or expense.

40

**VII.** **VALUATION**

The value of property shall be determined as follows:

1. **REPLACEMENT COST**

   With respect to all property insured (unless specifically addressed elsewhere in the Policy), the payment for loss shall be on a 'replacement cost' basis. 'Replacement Cost' includes all fees, costs, charges and expenses, (including, those of architects, surveyors, lawyers, engineers and consulting engineers and forensic accountants) incurred by or on behalf of the Insured to reassemble, rebuild, reclaim, reconstruct, repair, replace, or restore property insured with due diligence and dispatch with new (or, at the sole option of the Insured, other) items, property or materials of like kind and quality, either at the site of the loss or, at the sole option of the Insured, another site. In the event the Insured decides to rebuild on another site, the liability of the Insurer shall not exceed the cost and expenses which would have been incurred to reassemble, rebuild, reclaim, reconstruct, repair, replace or restore the property lost, damaged or destroyed at the site of the loss.

   If the Insured elects not to rebuild, this Policy shall pay for the cost of demolition and clearing the site of loss of both the damaged and the undamaged property; and the "actual cash value" of both the damaged and the undamaged property.

   Without penalty the Insured may expend the amount of any replacement cost recovery within the normal scope of the Insured's business subject only to the full amount of the recovery actually being expended in acquiring or constructing buildings or structures and/or in acquiring building equipment, plant equipment, machinery, machine parts, office furniture or office equipment within a reasonable time after the date of loss.

   To the extent the Insured provides its own general contracting, engineering, design or construction services for repair or reconstruction, the costs incurred by or on behalf of the Insured shall include:

   1. Overhead charges as defined by the Insured's regular accounting practice in place at the time of loss, and

   2. Payroll charges, appropriate fringe benefit costs and expenses of those employees expending time on the project, the cost of which is not included in item a. and;

   3. The share of home office costs including payroll and expenses of the divisions to which such employees are assigned, and;

   4. The share of corporate general and administrative costs allocated to the divisions involved as prescribed in the Insured's regular accounting practice in place at the time of the loss for determining its costs for providing engineering, procurement and construction management services.

41

**2. DEMOLITION AND INCREASED COST OF CONSTRUCTION**

If as a result of direct physical loss, damage or destruction by a peril insured by this Policy, reconstruction, restoration, repair or use of property insured is regulated, including the limitation of the Insured's ability to rebuild the insured property to the current density, size, use or number of floors provided, or prohibited by the enforcement of any law, ordinance, regulation or government directive which is in force at the time of the direct physical loss, damage or destruction, this Policy shall pay for:

1. The cost of demolition and clearing the site of loss of both the damaged and the undamaged property; and
2. the proportion that the value of the undamaged part of the building bore to the full value of the entire property prior to the loss; and
3. the cost to replace any property that cannot be built to the same density, use, size, or number of floors, and
4. Such additional costs of (re)construction, restoration, or repair as may be incurred to bring both the damaged and the undamaged property into full compliance with any applicable law, ordinance, regulation or government directive;

The Insured has the option to rebuild or reconstruct on the same or another site but recovery hereunder shall be limited to the cost to rebuild or reconstruct on the original site.

However, if the Insured elects not to rebuild, this Policy shall pay for the cost of demolition and clearing the site of loss of both the damaged and the undamaged property; and the "actual cash value" of both the damaged and the undamaged property, except if. any law, ordinance or other governmental restrictions limit the Insured's ability to rebuild the Insured property to the current density, use, size or number of floors, then the Insured may elect not to repair or replace the insured real and/or personal property lost, damaged or destroyed. Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss. As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an Insured Location under this Policy.

Notwithstanding the foregoing, this Policy does not insure such costs when necessitated by the enforcement of any law or ordinance regulating asbestos material that has not sustained direct physical loss, damage or destruction by a peril insured by this Policy or by any governmental direction or request declaring that asbestos material present in or part of or utilized in any undamaged portion of the Insured's property can no longer be used for the purpose for which it was intended or installed and must be removed or modified.

**3. FINISHED STOCK**

On "finished stock", at the Insured's regular cash selling price, less any discounts and unincurred charges to which "finished stock" would have been subject had no loss occurred;

**4. STOCK IN PROCESS**

42

On "stock in process," at the value of "raw stock" and labor expended, plus the proper proportion of overhead charges.

5. RAW STOCK

On "raw stock," supplies and other "merchandise" not manufactured by the Insured, at the replacement cost.

6. FINE ARTS, ANTIQUES

On 'fine arts or antiques,' the total liability shall not exceed the least of:

1. The cost to repair or restore the article to the condition that existed immediately prior to the loss; or

2. The cost to replace the article; or

3. The value designated for the article on the Schedule of Fine Arts or Antiques, if any, on file with the Insurer.

   In the event an insured article is damaged or destroyed and cannot be repaired or restored to the condition that existed immediately prior to the loss or replaced, the Insurer shall be liable for the full amount of the value of the article and the Insured agrees to surrender the article(s) to the Insurer. The Insured may, at its sole option, accept payment by the Insurer for the reduction in value of any fine art or antique caused by damage by a peril insured by this Policy, and retain ownership of the property.

7. VALUABLE PAPERS AND RECORDS

On 'valuable papers and records,' the cost to repair, replace, restore or recreate, including the cost of research, engineering and other costs of repairing, replacing, restoring or recreating 'valuable papers and records' that suffer loss, damage or destruction; if unable to repair, replace, restore or recreate within a reasonable time after the date of the loss, damage or destruction, the value to the Insured of the damaged or destroyed 'valuable papers and records.'

8. FILM, RECORDS, MANUSCRIPTS AND DRAWINGS

On exposed films, records, manuscripts and drawings that are not 'valuable papers and records,' the value blank plus the cost of copying information from back-up or from originals of a previous generation.

9. ELECTRONIC MEDIA AND ELECTRONIC DATA

On 'electronic media' or 'electronic data,' the cost to repair or replace, including the cost of research, engineering and other costs of repairing, replacing, restoring or recreating 'electronic media' or 'electronic data'; if not repaired, replaced, restored or recreated within a

43

reasonable time after the date of the loss, damage or destruction, the blank value.

This Policy does not insure any amount pertaining to the value of such 'electronic data' to the Insured or any other party, if such 'electronic data' cannot be recreated or assembled. If not repaired, replaced or restored 'electronic media' shall be valued at the cost of the blank media.

### 10. PROPERTY OF OTHERS

On property of others in the care, custody or control of the Insured, the greater of the liability of the Insured as stipulated in a contract, lease or agreement, or the replacement cost.

### 11. TECHNOLOGICALLY OBSOLETE

On property that is deemed to be technologically obsolete, or is unavailable because it is no longer in production, the cost of new property that shall perform the same functions as the original property, including any betterment inherent in the design of such property.

### 12. PROPERTY SOLD BY THE INSURED

On property sold by the Insured under a conditional sale or trust agreement or an installment or deferred payment plan:

1. if a total loss occurs, at the amount shown in the Insured's accounting records as due from the dealer or buyer;

2. if a partial loss occurs and the Insured repossesses the property, at the difference, if any, between the amount shown in the Insured's accounting records as due from the dealer or buyer and the realized value of the property.

The amount of the Insurer's liability under this provision shall be reduced by any payments made by the dealer or buyer.

Except as may be otherwise provided above, if the Insured decides not to repair, rebuild, or replace property lost, damaged or destroyed this Policy shall pay for the "actual cash value" of the property.

## VIII. GENERAL CONDITIONS

### 1. OTHER INSURANCE

1. Underlying Insurance

Underlying insurance is insurance on all or any part of the Deductible and against all or any of the perils covered by this Policy including declarations of the value to a carrier for hire. The existence of such underlying insurance shall not prejudice or affect any recovery otherwise payable under this Policy.

44

If the limits of such underlying insurance exceed the Deductible amount, which would apply in the event of loss under this Policy, then that portion which exceeds such a Deductible amount shall be considered 'other insurance.'

2. Excess Insurance

Excess insurance is insurance over the Limit of Liability set forth in this Policy. The existence of such excess insurance shall not prejudice the coverage provided under this Policy nor shall it reduce any liability hereunder.

3. Other Insurance

If there is any other insurance that would apply in the absence of this Policy, this Policy shall apply only after such insurance whether collectible or not. In no event shall this Policy apply as contributing insurance.

The Insured is permitted to have other insurance over any Limits or Sub-limits of Liability specified in this Policy without prejudice to this Policy. The existence of any such insurance shall not reduce any Limit or Sub-limit of Liability in this Policy. Any other insurance that would have provided primary insurance in the absence of this Policy shall not be considered excess.

The Insured is permitted to have other insurance for all, or any part, of any Deductible in this Policy. The existence of such other insurance shall not prejudice recovery under this Policy. If the limits of liability of such other insurance are greater than this Policy's applicable Deductible, this Policy shall apply only after such other insurance has been exhausted.

4. Contributing Insurance

Contributing insurance is insurance written upon identical, terms, conditions, and provisions as those contained in this Policy. This insurance shall contribute in accordance with the conditions of this Policy only with other contributing insurance as defined.

2. **SUBROGATION**

1. In the event of any payment under this Policy, the Insurer, where legally permitted, shall be subrogated to the extent of such payment to all the Insured's rights of recovery in respect thereof. The Insured is required to cooperate, at the request and expense of the Insurer, in any subrogation proceedings. The Insurer may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of the Insurer's payment.

The Insurer shall not acquire any right of recovery that the Insured has expressly waived prior to a loss, nor shall such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Insurer in the proceedings, shall be payable to the Insured in the proportion that the amount of any

45

applicable Deductible and/or any provable uninsured loss, bears to the entire provable amount.

2. The right of subrogation against the Insured, affiliated, subsidiary and associated companies or corporations, or any other corporations or companies associated with the Insured through ownership or management, is waived. At the option of the Insured, subrogation against a tenant of the Insured may be waived.

3. **SALVAGES AND RECOVERIES**

Any recoveries from sale of salvage, after expenses incurred in salvage or recovery are deducted, except recovery through subrogation proceedings, shall accrue entirely to the benefit of the Insurer until the sums paid by the Insurer have been recovered.

4. **BRANDS AND LABELS/CONTROL OF DAMAGED PROPERTY**

1. Brands and Labels: In case of physical loss, damage or destruction, by a peril insured by this Policy, of property bearing a brand or trademark, or the name of the Insured, which in any way carries or implies the guarantee or the responsibility of the manufacturer or the Insured, the salvage value of such damaged property shall be determined after removal in the customary manner of all such brands or trademarks or other identifying characteristics. The cost of such removal shall be included as a part of the claim.

2. Control of Damaged Property: The Insured shall have full right to the possession of all property involved in any claims under this Policy and shall retain control of all lost, damaged or destroyed property. The Insured, exercising a reasonable discretion, shall be the sole judge as to whether the property involved in any loss under this Policy is fit for sale or use. No property so deemed by the Insured to be unfit for sale or use shall be sold or otherwise disposed of except by the Insured or with the Insured's consent, but the Insured shall allow this Insurer any salvage obtained by the Insured on any sale or other disposition of such property.

5. **CANCELLATION**

This insurance may be canceled by the First Named Insured shown in the Declarations at any time by written notice or by surrender of this Policy.

Except as prohibited or regulated by law, this insurance may also be canceled by or on behalf of the Insurer at the Policy anniversary only by delivering to the Insured or by mailing to the Insured, by registered, certified or other first class mail, at the Insured's address as shown in this insurance, written notice stating when, not less than ninety (90) days thereafter, the cancellation shall be effective. Notwithstanding the foregoing in the event of non-payment of premium at any time during the term of this Policy, the Insurer may give ten (10) days written notice of cancellation to the Insured. At any time prior to the effective date of cancellation, any Additional Insured, Loss Payee or Mortgagee may pay the premium due and the notice of cancellation shall be null and void. The mailing of such notice shall be sufficient proof of notice and this insurance shall terminate at the date and hour specified in the notice.

If this insurance is canceled by the Insurer, the Insurer shall retain the pro-rata proportion of the premium earned from the date of inception to the date of cancellation.  If this insurance is canceled by the Insured, the insurer shall retain the pro-rata proportion of the premium earned from the date of inception to the date of cancellation.

Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice is prohibited or made void by any law, the period of limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

In the event of cancellation of this Policy by the Insurer, the cancellation shall not take effect with respect to property in transit until the property has arrived at the place of its final destination.

6.    NOTICE OF LOSS

As soon as practicable after any physical loss, damage or destruction by a peril insured by this Policy is known to the First Named Insured's Contact identified in Declarations I.A., the Insured shall report such loss, damage or destruction with full particulars to the Insurer at the address set forth in this Policy.

7.    PROOF OF LOSS

The Insured shall render a signed and sworn proof of loss to the Insurer or its appointed representative stating: the place and time of the loss, damage or destruction; the interest of the Insured and all others; the value of the property involved in the loss; and the amount of loss, damage, or expense.

8.    PAYMENT OF LOSS

1.  All adjusted claims shall be due and payable no later than 30 days after presentation and acceptance of proof of loss by the Insurer or its appointed representative.

2.  Pending final adjustment of an insured loss, the Insured may collect partial payments by filing a proof of loss for each partial payment.

3.  The full amount of the 'actual cash value' shall be due and payable no later than 30 days after presentation and acceptance of a proof of loss for the 'actual cash value.' Collecting the 'actual cash value' portion of any claim shall not affect the rights of the

47

insured under this Policy to collect amounts in excess of the 'actual cash value' upon presentation and acceptance of proof of loss.

**9.  APPRAISAL**

If the Insured and the Insurer fail to agree on the amount of a claim, each, upon the written demand of the other made within 60 days after receipt of proof of loss by the Insurer, shall select a competent and disinterested appraiser.  The appraisers shall then select a competent and disinterested umpire.  If they should fail for 15 days to agree upon such umpire, then upon the request of the Insured or of the Insurer, such umpire shall be selected by a judge of a court of record in the appropriate jurisdiction in which such appraisal is pending.  Then, at a reasonable time and place, the appraisers shall appraise the loss, stating separately the value and the amount of loss.  If the appraisers fail to agree, they shall submit their differences to the umpire.  An award in writing by any two shall determine the amount of loss.

The Insured and the Insurer shall each pay its chosen appraiser and bear equally the other expenses of the appraisal and umpire.

**10.  SUIT AGAINST THE INSURER**

No suit or action on this Policy for the recovery of any claim shall be sustainable in any court of law or equity unless the Insured has fully complied with all the requirements of this Policy.  The Insurer agrees that any action or proceeding against it for recovery of any loss under this Policy shall not be barred if commenced within the longer of three years or the time prescribed in the statutes of the applicable jurisdiction.

**11.  ADDITIONAL INSUREDS, LOSS PAYEES AND MORTGAGEES**

All third parties having an interest in property insured by this Policy, as required by lease, contract, or agreement, shall automatically be Additional Insureds hereunder.

All other third parties including, but not limited to, Loss Payees and Mortgagees who have an interest in the property insured by this Policy shall be automatically named as Loss Payees or Mortgagees, and loss, if any, under this Policy shall be adjusted with the Insured and payable to the Insured and the Additional Insureds, Loss Payees or Mortgagees according to their respective insurable interests.

1.  The Insurer shall pay for loss, damage or destruction of specified property insured under this Policy to each specified Lender Loss Payee (hereinafter referred to as Lender) to the extent of its insurable interest and to each specified Mortgagee to the extent of its insurable interest, under all present or future mortgages upon such property, in order of precedence of the mortgages.

2.  The Insurable interest of the Lender or Mortgagee (as the case may be) in property insured under this Policy shall not be invalidated by:

48

    a.   any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property.

    b.   foreclosure, notice of sale, or similar proceedings with respect to the property.

    c.   change in the title or ownership of the property.

    d.   change to a more hazardous occupancy.

The Lender or Mortgagee shall notify the Insurer of any known change in ownership, occupancy, or hazard and, within 10 days of written request by the Insurer, may pay the increased premium associated with the change.

3.   If this Policy is cancelled at the request of the Insured or its agent, the coverage for the insurable interest of the Lender or Mortgagee shall terminate 10 days after the Insurer sends to the Lender or Mortgagee written notice of cancellation, unless:

    a.   sooner terminated by authorization, consent, approval, acceptance, or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

    b.   this Policy is replaced by the Insured, with a Policy providing coverage for the insurable interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest shall terminate as of the effective date of the replacement Policy, notwithstanding any other provision of this Policy.

4.   The Insurer may cancel this Policy and/or the interest of the Lender or Mortgagee, whose names and complete mailing addresses are listed on Endorsement #4, under this Policy, by giving the Lender or Mortgagee written notice 90 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment. If the debtor, mortgagor, or owner has failed to pay any premium due under this Policy, the Insurer may cancel this Policy for non-payment, but shall give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation.  The Lender  or Mortgagee may pay the premium due.  If the Lender or Mortgagee fails to pay the  premium due by the specified cancellation date, all coverage under this Policy shall  cease.

5.   If the Insurer pays the Lender or Mortgagee for any loss, and denies payment to the debtor, mortgagor or owner, the Insurer shall, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all securities held as collateral to the debt or mortgage.  No subrogation shall impair the right of the Lender or Mortgagee to sue or recover the full amount of its claim.  At its option, the Insurer may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest.  In this event, all rights and securities shall be assigned and transferred from the Lender or Mortgagee to the Insurer, and the remaining debt or mortgage shall be paid to the Insurer.

6.   If the Insured fails to render proof of loss, the Lender or Mortgagee, upon notice of the Insured's failure to do so, may render proof of loss and shall be subject to the provisions of this Policy relating to appraisal, settlement of claims, and suit against the Insurer.

49

12. **AUDIT**

The Insurer may inspect the books and records of the Insured pertaining to the subject matter of this insurance at any reasonable time during normal business hours during the term of this Policy and for twelve (12) months after the expiration or termination date of the Policy.

13. **REQUIRED BY LAW**

Any provisions required by law to be included in policies issued by the Insurer shall be deemed to have been included in this Policy.

If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy shall be read so as to eliminate such conflict or deemed to include such provisions for insured "locations" within such jurisdictions.

14. **FULL WAIVER**

The terms and conditions of this form and endorsements attached to it are substituted for those of the insurance Policy (including any Standard Fire Insurance Policy required by statute to be included in insurance policies of this type, whether as a Policy form or attached to this Policy by endorsement) or Policy jacket to which it is attached except as respects provisions included in 'Required by Law' above.

15. **TITLES OF PARAGRAPHS**

The titles of the paragraphs of this Policy, this form and of endorsements and supplemental contracts, if any, now or hereafter attached are inserted solely for convenience of reference and shall not limit or affect the provisions to which they relate.

16. **ASSISTANCE AND COOPERATION OF THE INSURED**

The Insured shall cooperate with the Insurer and, upon the Insurer's request and expense, shall submit to examination under oath, attend hearings and trials and assist in effecting settlements, in securing and giving evidence, in obtaining the attendance of witnesses, and in conducting suits.

17. **BREACH OF WARRANTY**

If a breach of any warranty or condition in this Policy or in any endorsement attached to or made a part of this insurance occurs, which breach, by the terms of the warranty or condition, shall operate to suspend or avoid this insurance, the suspension or avoidance due to such breach shall be effective only during the continuance of such breach, and then only as to the building or contents therein or other separate "location" to which the warranty or condition has reference and with respect to which the breach occurs.

50

**18.    COINSURANCE**

No coinsurance shall apply with respect to this insurance.

**19.    CONTROL OF PROPERTY**

This insurance shall not be prejudiced by any act or neglect of the owner of any building if the Insured is not the owner thereof, or by any act or neglect of any occupant (other than the Insured) of any building, when such act or neglect of the owner or occupant is not within the control of the Insured, or by failure of the Insured to comply with any warranty or conditions contained in this Policy of any form or endorsement attached to this Policy with regard to any portion of the premises over which the Insured has no control.

**20.    OMISSIONS OR ERRORS**

Any inadvertent omission or error made by the Insured shall not void or impair the insurance hereunder provided the Insured reports such omission or error as soon as reasonably possible after discovery by the First Named Insured's Contact identified in Declarations I.A..

**21.    EXTORTION**

Recovery under this Policy shall not be affected by the refusal of the Insured to comply with any extortion demand.

**22.    RIGHT TO INSPECT**

The Insurer, at all reasonable times, is permitted, but does not have any duty, to inspect property insured.

The Insurer's

1.    Right to make inspections;

2.    Making of inspections; or

3.    Analysis, advice or inspection report

shall not constitute an undertaking, on behalf of or for the benefit of the Insured or others to determine or warrant that the property insured is safe or healthful.  The Insurer shall have no liability to the Insured or any other person because of any inspection or failure to inspect.

51

**IX.**     **DEFINITIONS**

These definitions shall apply to the terms wherever they appear in this Policy and any addendum and/or endorsement to this Policy.

    **1.**     **ACTUAL CASH VALUE**

       The replacement cost (as defined in VALUATION), less a reasonable allowance for physical deterioration.

    **2.**     **BOILER AND MACHINERY**

       1.    Loss or damage caused by or resulting from explosion in, or of steam boilers, steam turbines, gas turbines, steam engines and steam pipes interconnecting any of the foregoing equipment owned, operated or controlled by the Insured, however;

         This definition shall not apply to loss or damage resulting from an explosion:

         a.    Of gases or fuel within the furnace of a boiler or within the flues or passages therefrom;

         b.    Involving the smelt bed within a furnace of a boiler of the chemical recovery type;

         c.    Outside of any equipment.

       2.    Loss or damage caused by or resulting from rupture, bursting, cracking, bulging, burning or change of temperature of steam boilers, steam turbines, gas turbines, steam engines and pressure vessels, or piping or apparatus attached to any of the foregoing equipment owned, operated or controlled by the Insured, however:

         this definition shall not apply to physical loss or damage resulting from accidental discharge, escape, leakage, backup or overflow to the open of any material from confinement within piping, plumbing systems, tanks or equipment, except from that equipment identified in paragraph 1) above.

       4.    Loss or damage from mechanical or electrical breakdown (except by direct lightning damage) of any equipment, unless such results directly in physical loss, damage or destruction insured by this Policy, in which event, this definition shall not apply to such resulting damage.

    **3.**     **EARTHQUAKE AND EARTHQUAKE "OCCURRENCE"**

       A quaking, trembling, vibratory or undulating movement of a portion of the earth's crust, produced by underground volcanic forces or other pressures that produce a breaking, shifting or other movement of the earth's crust. Wherever used in this Policy, the term "Earthquake" shall be restricted exclusively to the actual, specific cracking, rupturing, shifting, toppling or collapse of property and shall not include loss, damage or destruction, if any, directly resulting from any   ensuing direct physical loss, damage or destruction insured

52

by this policy.  Such ensuing loss shall be construed to have been of the same "occurrence" but of a different proximate cause.

If more than one "Earthquake" occurs within any period of 168 hours during the term of this Policy, such "Earthquakes" shall be deemed to be a single "occurrence" within the meaning of this Policy. The Insured may determine the beginning of such 168-hour period.

Should any "Earthquake" commence prior to the expiration of this Policy and extend beyond the expiration date of this Policy, this Policy shall pay for all such losses occurring during such period as if such period fell entirely within the term of this Policy. But the Insurer shall not be liable for any loss commencing before the effective date and time or commencing after the expiration date and time of this Policy.

**4.     FINISHED STOCK**

Stock manufactured by the Insured, which in the ordinary course of the Insured's business is ready for packing, shipment or sale.

**5.     FLOOD AND FLOOD "OCCURRENCE"**

A general and temporary condition of partial or complete inundation of normally dry land area from (1) the overflow of inland or coastal waters including any tsunami; (2) the unusual and rapid accumulation or run off of surface waters from any source; or (3) the spray from any of them, whether driven by wind or not, and shall not include loss, damage or destruction, if any, resulting from any ensuing direct physical loss, damage or destruction insured by this policy.  Such ensuing loss shall be construed to have been of the same "occurrence" but of a different proximate cause.

If any "Flood" occurs within a period of the continued rising or overflow of any natural or man-made bodies of water and the subsidence of same within their banks or results from any waves including tsunamis, tides, tidal waves or series of tidal waves caused by any one disturbance, all loss, damage or destruction by such "Flood" shall be deemed to be a single "occurrence" within the meaning of this Policy.

Should any "Flood" commence prior to the expiration of this Policy and extend beyond the expiration date of this Policy, this Policy shall pay for all such losses occurring during such period as if such period fell entirely within the term of this Policy. But the Insurer shall not be liable for any loss commencing before the effective date and time or commencing after the expiration date and time of this Policy.

"Flood" under this definition does not include water inundation, storm surge or "Flood", including loss or damage from the destruction or breaching of any levee, dam or dike as a result of actions or effects of a "Named Storm" because this coverage is included under "Named Storm".

**6.     GENERAL AVERAGE CONTRIBUTION AND SALVAGE CHARGES**

Contribution by all of the parties in a sea adventure to make good loss sustained by one of

53

their number on account of sacrifices voluntarily made of part of a ship or cargo to save residue; extraordinary expenses necessarily incurred by one or more of the parties for general benefit of all interests embarked in a general enterprise; expenses and costs incurred in the work of saving and preserving a ship or cargo which was in danger of loss or damage such as would be covered by this Policy.

7.     **HIGH HAZARD ZONES FOR EARTHQUAKE**

| STATE | COUNTIES |
|---|---|
| ALASKA | Entire State except Nome, North Slope, Northwest Artic, Wade Hampton |
| CALIFORNIA | Entire State |
| HAWAII | Entire State |
| PUERTO RICO | Entire Commonwealth |

8.     **IMPROVEMENTS AND BETTERMENTS**

Fixtures, alterations, installations or additions comprising part of a building occupied but not owned by the Insured and acquired or made at the expense of the Insured, which the Insured cannot legally remove.

9.     **INSURABLE INTEREST OF THE INSURED IN PROPERTY OF OTHERS**

1.     liability imposed by law upon the Insured for loss, damage or destruction, by a peril insured by this Policy, of property of another of the type insured by this Policy ; or

2.     liability assumed by the Insured by specific agreement prior to loss for physical loss, damage or destruction by a peril insured by this Policy.

10.     **LAND IMPROVEMENTS**

Any alteration to the natural condition of the land at a "location" by grading, landscaping and additions to such land including landscape gardening, pavements, roadways, or similar works, but excluding golf courses and beaches, and including the cost of reclaiming, restoring or repairing "land improvements."  "Land improvements" shall also include trees, plants and shrubs that are part of the natural condition of the land at a "location" and that form part of the effective placements of buildings or structures, pavements, roadways or similar works, and other alterations to the natural condition of the land.

11.     **LOCATION**

1.     a site listed on a report provided the Insurer at inception; or

2.     if:
       a.     a "Miscellaneous Unreported Location" or
       b.     covered under Automatic Coverage for Newly Acquired Property

54

a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing) bounded on all sides by public streets, clear land space or open waterways, each not less than fifty feet wide.  Any bridge or tunnel crossing such street, space or waterway shall render such separation inoperative for the purpose of this definition.

**12.  MERCHANDISE**

Goods kept for sale by the Insured, which are not "raw stock," "stock in process" or "finished stock."

**13.  MISCELLANEOUS UNREPORTED LOCATION**

Real and/or personal property of the type insured by this Policy at any "location" within the territorial limits of this Policy, which property is at the risk of the Insured at inception of the Policy but has not been listed on a report provided to the Insurer at inception or which becomes at the risk of the Insured after the inception date of this Policy but is not reported to the Insurer within the maximum number of days as shown in the Time Limit for Automatic Coverage for Newly Acquired Property in DECLARATIONS.

**14.  NAMED STORM AND NAMED STORM "OCCURRENCE"**

The term "Named Storm" shall mean a weather condition that has been declared by the National Oceanic and Atmospheric Administration (NOAA), National Hurricane Center, or similar meteorological authority to be a hurricane, typhoon, tropical storm, tropical depression or cyclone that  results in loss or damage to insured property directly or indirectly by:

1.  the force of wind caused by or resulting from a "Named Storm"; or

2.  any material, object or debris that is carried, propelled or in any manner moved by a  "Named Storm"; or

3.  hail, lightning or tornado(es) that are a result of actions or effects of a "Named  Storm"; or

4.  rain or water, whether the rain or water is driven by wind or not, that enters the insured  property through an opening(s) created by the force of wind from a "Named Storm"; or

5.  water inundation, storm surge or "Flood" as defined herein, including loss or damage  from the destruction or breaching of any levee, dam or dike as a result of actions or effects  of a "Named Storm".

When the term "occurrence" applies to "Named Storm", it shall be defined as the sum total of all loss, damage or destruction arising out of or caused by the same atmospheric disturbance during any period of ninety-six (96) consecutive hours.  The Insured shall have the right to elect the moment from which the ninety-six (96) hour period shall be deemed to have commenced, provided that no elected period of ninety-six (96) hours shall commence within the period of any previous occurrence.

55

Notwithstanding whether or not the loss location is situated within a SFHA designated flood zone, the limits and deductibles applicable to "Named Storm" shall apply.

**15.    NET SALES VALUE OF PRODUCTION**

The sum of the net sales of the Insured's product during 'the year' (gross sales less discounts, returns, allowances, bad debts and prepaid freight to the extent included in sales figures), less inventory of "finished stock" at the beginning of 'the year' priced at sales value, plus the inventory of "finished stock" on hand at the end of 'the year' priced at sales value. 'The year' means the 365-day period ending on the date of the loss.

**16.    NORMAL**

The condition that would have existed had no loss occurred.

**17.    OCCURRENCE**

Except as specifically defined under "Earthquake," "Flood" and "Named Storm," all loss, damage or destruction that is attributable to one cause or to one series of similar causes. All such losses shall be added together and the total amount of such losses shall be treated as one "occurrence" irrespective of the period of time or area over which the losses occur.

Should any "occurrence" commence prior to the expiration of this Policy and extend beyond the expiration date of this Policy, this Policy shall pay for all such losses occurring during such period as if such period fell entirely within the term of this Policy. But the Insurer shall not be liable for any loss commencing before the effective date and time or commencing after the expiration date and time of this Policy.

**18.    RAW STOCK**

Material in the state in which the Insured receives it for conversion by the Insured into "stock in process" or "finished stock."

**19.    STOCK IN PROCESS**

"Raw stock" which has undergone any aging, seasoning, mechanical or other process of manufacture but which has not become "finished stock."

**20.    STORM SURGE**

An abnormal rise in sea level accompanying a hurricane or other intense storm, and whose height is the difference between the observed level of the sea surface and the level that would have occurred in the absence of the cyclone. Storm surge is usually estimated by subtracting the normal or astronomic high tide from the observed storm

56

21. **TIER ONE ZONES**

| STATE | COUNTIES AND PARISHES |
|---|---|
| Alabama | Baldwin, Mobile. |
| Florida | Entire State |
| Georgia | Bryan, Camden, Chatham, Glynn, Liberty, McIntosh. |
| Hawaii | Entire State. |
| Louisiana | Cameron, Iberia, Jefferson, Lafourche, Orleans, Plaquemines, St. Bernard, St. Mary, St. Tammany, Terrebonne, Vermillion. |
| Mississippi | Hancock, Harrison, Jackson. |
| North Carolina | Beaufort, Brunswick, Carteret, Chowan, Craven, Currituck, Dare, Hyde, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Tyrrell, Washington. |
| Puerto Rico | Entire Commonwealth. |
| South Carolina | Beaufort, Charleston, Colleton, Georgetown, Horry. |
| Texas | Aransas, Brazoria, Calhoun, Cameron, Chambers, Galveston, Harris, Jackson, Jefferson, Kennedy, Kleberg, Matagorda, Nueces, Orange, Refugio, San Patricio, Willacy. |
| Virginia | Gloucester, Isle of Wight, James City, Lancaster, Mathews, Middlesex, Northampton, Northumberland, Surry, York and including the independent cities of Chesapeake, Hampton, Newport News, Norfolk, Poquoson, Portsmouth, Suffolk, Virginia Beach, Williamsburg. |
| US Virgin Islands | All islands. |

22. **TIME ELEMENT**

Business Interruption, Extra Expense, Rental Value, Royalties and Leasehold Interest, to the extent they are insured by this Policy.

57

# ENDORSEMENT NO. 1 LOCATIONS IN FEMA FLOOD ZONES 'A' AND 'V'

For the purposes of determining which "locations" are in a High Hazard Flood Zone (locations wholly within Special Flood Hazard Areas (SFHA), areas of 100-year flooding as defined by the Federal Emergency Management Agency (FEMA), it is agreed that the flood zone identification contained in the schedule of locations provided to the Insurer at inception of the policy will be used unless otherwise agreed by the Insured and the Insurer.  As respects locations added during the policy period, the zone identified at the time in writing to the Insurer will apply.  If the zone is not identified at that time in writing, then the Insurer will consider these locations to be governed by the designation assigned to them by the Federal Emergency Management Agency (FEMA) for the balance of the policy period.  The terms of this endorsement shall not apply to locations pursuant to the Automatic Coverage, Miscellaneous Unnamed Locations and Errors and Omissions Clauses.

**Locations in Special Flood Hazard Areas (SFHA) of 100-Year Flooding**

| LOC. NO. | ADDRESS | CITY | ST | ZIP |
|---|---|---|---|---|
| 926 | 4940 Watt Avenue | North Highlands | CA | 95660 |
| 952 | 8013 Preston Highway | Louisville | KY | 40219 |
| 937 | 19120 Southwest 7 Highway | Independence | MO | 64057 |
| 9901 | 5151 Glenwood Avenue | Raleigh | NC | 27612 |
| 992 | 1651 Hickory Loop | Las Cruces | NM | 88001 |
| 661 | 190 S. Virginia Avenue | Tifton | GA | 31794 |
| 974 | 3576 Highway 6 South | Houston | TX | 77082 |

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the Policy, except as hereinabove set forth.

_____          _____
For the "Insurer"                                              Date

**All Other Terms and Conditions Unchanged**

58

# ENDORSEMENT #2:  NAMED STORM:  TIER 1 LOCATIONS

| STATE | COUNTIES |
|---|---|
| Alabama | Baldwin, Mobile. |
| Florida | Entire State |
| Georgia | Bryan, Camden, Chatham, Glynn, Liberty, McIntosh. |
| Hawaii | Entire State. |
| Louisiana | Calcasieu, Cameron, Iberia, Jefferson, Lafourche,  Livingston, Orleans, Plaquemines, St. Bernard, St. Charles,  St. James, St. John the Baptist, St. Mary, St. Tammany,  Tangipahoa, Terrebonne, Vermillion. |
| Mississippi | Hancock, Harrison, Jackson. |
| North Carolina | Beaufort, Bertie, Brunswick, Camden, Carteret, Chowan, Columbus, Craven, Currituck,   Dare, Hyde, Jones,  New Hanover, Onslow, Pamlico, Pasquotank, Pender,  Perquimans, Tyrell, Washington |
| Puerto Rico | Entire Commonwealth. |
| South Carolina | Beaufort,  Berkley, Charleston, Colleton, Georgetown, Horry, Jasper |
| Texas | Aransas, Brazoria, Calhoun, Cameron, Chambers, Galveston, Jackson, Jefferson, Harris, Kennedy, Kleberg, Liberty, Matagorda, Newton, Nueces, Orange, Refugio, San Patricio, Victoria, Willacy. |
| Virginia | Accomack, Gloucester, Isle of Wight, James City,  Lancaster, Mathews, Middlesex, Northampton, Northumberland, Surry, York and including the independent cities of  Chesapeake, Hampton, Newport News, Norfolk, Poquoson, Portsmouth, Suffolk, Virginia Beach, Westmoreland,  Williamsburg, York |
| Us Virgin Islands | All islands. |

_____          _____
For the "Insurer"                                            Date


**All Other Terms and Conditions Unchanged**

59

# ENDORSEMENT NO. 3:   EARTHQUAKE SEISMIC ZONE COUNTIES

### NEW MADRID SEISMIC ZONE, APPENDIX A.

| STATE | COUNTIES |
|---|---|
| ARKANSAS | Clay, Craighead, Crittenden, Cross, Greene, Jackson, Lawrence, Mississippi, Poinsett, Sharp |
| ILLINOIS | Alexander, Pulaski, Massac, Union, Williamson, Johnson, Pope, Saline, Jackson, Franklin, Perry, Hardin, Randolph, Monroe, St. Clair, Washington, Clinton, Bond, Madison, Jefferson |
| INDIANA | Posey, Vanderburg, Gibson, Warrick, Pike |
| KENTUCKY | Ballard, Carlisle, Fulton, Graves, Hickman, Livingston, McCracken, Marshall, Calloway |
| MISSISSIPPI | Desoto, Tunica, Marshall, Tate, Coahoma, Bolivar |
| MISSOURI | Bollinger, Butler, Cape Girardeau, Dunklin, Mississippi, New Madrid, Pemiscot, Scott, Stoddard., St. Louis, St. Francois, St. Charles, Jefferson, Franklin, Warren, Washington, Iron, Wayne, Butler, Reynolds, Madison, St. Genevieve and Perry |
| TENNESSEE | Crockett, Dyer, Haywood, Lake, Lauderdale, Obion, Shelby, Tipton, Gibson, Madison, Fayette, Hardeman |

### PACIFIC NORTHWEST EARTHQUAKE ZONE COUNTIES

| STATE | COUNTIES |
|---|---|
| Washington | Clallam, Jefferson, King, Kitsap, Mason, Pierce, San Juan, Skagit, Snohomish, Thurston and Whatcom |

_____          _____
For the "Insurer"                                             Date

**All Other Terms and Conditions Unchanged**

60

# ENDORSEMENT NO. 4: SCHEDULE OF LENDERS AND MORTGAGEES

Schedule of Additional Insureds, Mortgagees and Loss Payees

| Name | Address | City | State | Zip |
|---|---|---|---|---|
| **General Electric Capital Corporation, its successors, assigns and affiliates** | **8377 E Hartford Drive, Suite 200** | **Scottsdale** | **AZ** | **85255** |

_____       _____
For the "Insurer"                                              Date

**All Other Terms and Conditions Unchanged**

61

# ENDORSEMENT NO. 5  SUBSCRIPTION ENDORSEMENT

In consideration of the premium charged, the subscribing Insurer hereto, hereinafter referred to as the "Insurer," does severally, but not jointly, agree to indemnify the Insured for the amount recoverable in accordance with the terms and conditions of this Policy and any Endorsements hereto, provided that:

1.   The collective liability of the subscribing "Insurer" shall not exceed its percentage of the Limit of Liability or any appropriate Sub-limit of Liability or any aggregate Limit of Liability in any Policy Year.

2.   The limit of the subscribing "Insurer" shall not exceed the Limit of the pro-rata percentage of Liability set against its name.

| "Insurer" | ILLINOIS UNION INSURANCE COMPANY |
|---|---|
| "Insurer" Policy Number/Reference | D4226555A 001 |
| "Insurer" Participation | USD 2,500,000 being 50% part of USD 5,000,000 excess of Policy Deductibles |
| "Insurer" Premium | ██████████████████████████████ |

Additional Conditions:  In consideration of the premium charged, it is agreed that the following provisions are added to the Policy as respects the liability of the "Insurer":

1.   Priority of Payments

The amount of loss from any one "occurrence" for which this "Insurer's" liability is excess shall be determined by the combined loss, damage or expense as insured under the underlying insurance.

Any recovery made under the underlying insurance shall be treated as applying first in satisfaction of the perils insured, coverage provided and/or locations not insured by this "Insurer" and thereafter in satisfaction of the perils insured, coverages provided and/or locations insured by this "Insurer."

2.   Step Down

Except with respect to Contamination Clean-up in PROPERTY INSURED, in the event of the reduction or exhaustion of aggregate Limits of Liability, if any, applying to a Policy Year in the underlying insurance, this "Insurer" shall pay excess of the reduced aggregate or, in the event of exhaustion, continue in force as primary insurance, but only for the perils or coverages provided herein and only for property insured by this "Insurer."

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the Policy, except as hereinabove set forth.

_____          _____
For the "Insurer"                                            Date

**All Other Terms and Conditions Unchanged**

62

# ENDORSEMENT NO. 6  CONTINGENT LOCATIONS ENDORSEMENT

**Insured:** Golden Corral Corporation

**Effective Date of Endorsement:** March 31, 2019

**Contingent Location Schedule**

It is hereby agreed and understood, that coverage for the scheduled contingent locations would be  applicable to Section IX.  Item 3 "Other Insurance" provision amended as follows:

3. Other Insurance

If there is any other insurance that would apply in the absence of this Policy, this Policy  shall apply only after such insurance.  In no event shall this Policy apply as contributing  insurance.

The Insured is permitted to have other insurance over any Limits or Sub-limits of Liability  specified in this Policy without prejudice to this Policy.  The existence of any such  insurance shall not reduce any Limit or Sub-limit of Liability in this Policy.  Any other  insurance that would have provided primary insurance in the absence of this Policy shall  not be considered excess.

The Insured is permitted to have other insurance for all, or any part, of any Deductible in  this Policy.  The existence of such other insurance shall not prejudice recovery under this  Policy.  If the limits of liability of such other insurance are greater than this Policy's  applicable Deductible, this Policy shall apply only after such other insurance has been  exhausted.

For all locations with contingent insurance responsibility identified within the most recent schedule of values   on file with the company.

_____  _____
For the "Insurer"                              Date

**All Other Terms and Conditions Unchanged**

# ENDORSEMENT NO. 7: SCHEDULE OF LENDERS AND MORTGAGEES

**Insured:**  Golden Corral Corporation

**Effective Date of Endorsement:**  March 31, 2019

Schedule of Additional Insureds, Mortgagees and Loss Payees

| Name | Address | City | State | Zip |
|---|---|---|---|---|
| **Symetra Life Insurance Company, c/o Interlachen Financial Services, LLC** | **P.O. Box 1916** | **Winter Park** | **FL** | **32790** |

_____          _____

For the "Insurer"                                        Date

**All Other Terms and Conditions Unchanged**

# ENDORSEMENT NO. 8: CARRIER AMENDMENT ENDORSEMENT

**Insured:** Golden Corral Corporation

**Effective Date of Endorsement:** March 31, 2019

It is hereby agreed and understood that the following in consideration of the premium already charged the following changes are incorporated into the policy.

1. VII. Valuation, 2. Demolition and Increased Cost of Construction, the following paragraph is removed,

   Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss. As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an Insured Location under this Policy.

   and replaced with:

   If within ninety (90) days of filing Proof of Loss, the Insured elects not to repair or replace the insured real and/or personal property lost, damaged, or destroyed, Loss Settlement may be elected on a replacement cost basis if the proceeds of such loss settlement are expended on other, not previously budgeted, capital expenditures.

2. VII. Valuation, 1. Replacement Cost, "within a reasonable time after the date of loss." is removed, and replaced with "within 2 years."

_____     _____
For the "Insurer"                              Date

**All Other Terms and Conditions Unchanged**

# CANCELLATION CLAUSE

| Named Insured<br>Golden Corral Corporation | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>FS | Policy Number<br>D4226555A 001 | Policy Period<br>03/31/2019 **to** 03/31/2020 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**COMMERCIAL PROPERTY COVERAGE PART**

This clause supersedes other cancellation clauses made a part of this policy.

CANCELLATION:  This policy may be canceled by the Insured by surrender thereof to the Company or by mailing to the Company written notice stating when thereafter such cancellation shall be effective.  This policy may be canceled by the Company by mailing to the Insured at the mailing address shown in this policy at last known address, written notice, with or without tender of the excess of paid premium above the pro rata earned premium for the expired time, stating when, not less than 90  days thereafter (10 days for non-payment of premium) such cancellation shall be effective.

Proof of mailing of notice as aforesaid shall be sufficient proof of notice.  The effective date and hour of cancellation stated in the notice shall become the end of the policy period.  Delivery of such written notice either by the Insured or this Company shall be equivalent to mailing.

If the Insured cancels, earned premiums due to the Company shall be in accordance with the policy provisions, and shall be computed in accordance with the customary short rate table and procedure. The provisions of the Hurricane Minimum Earned Premium endorsement, if attached to this policy, replace the customary short rate table and procedure.

If the Company cancels, earned premiums shall be computed pro rata. Premium adjustment shall be made as soon as practicable after cancellation becomes effective.

All other terms and conditions remain unchanged

# NUCLEAR, BIOLOGICAL, CHEMICAL, RADIOLOGICAL
## EXCLUSION ENDORSEMENT

| Named Insured<br>Golden Corral Corporation | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>FS | Policy Number<br>D4226555A 001 | Policy Period<br>03/31/2019 **to** 03/31/2020 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

**THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.**

**This endorsement modifies insurance provided under the following:**

**BOILER AND MACHINERY COVERAGE PART**
**COMMERCIAL INLAND MARINE COVERAGE PART**
**COMMERCIAL PROPERTY COVERAGE PART**
**CRIME AND FIDELITY COVERAGE PART**

The following exclusions are added to your Policy or Coverage Part.

This insurance does not apply to:

**A.** Loss or damage arising directly or indirectly from nuclear detonation, reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by, any physical loss or damage insured against by this Policy or Coverage Part, however such nuclear detonation, reaction, nuclear radiation or radioactive contamination may have been caused. This exclusion replaces any other nuclear detonation, nuclear reaction, nuclear radiation or radioactive contamination exclusions found elsewhere in this Policy.

**B.** Loss or damage arising directly or indirectly from the dispersal, application or release of, or exposure to, chemical, radiological, or biological materials or agents, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by, any physical loss or damage insured against by this Policy or Coverage Part, however such dispersal, application, release or exposure may have been caused.

**C.** If this endorsement is attached to a Commercial Inland Marine Policy or Coverage Part, the term loss or damage is changed to Loss.

©Chubb. 2016. All rights reserved.

# PROTECTIVE SAFEGUARDS ENDORSEMENT

| Named Insured | Endorsement Number |
|---|---|
| Golden Corral Corporation | |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| FS | D4226555A 001 | 03/31/2019 **to** 03/31/2020 | |

| Issued By (Name of Insurance Company) | |
|---|---|
| Illinois Union Insurance Company | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**COMMERCIAL PROPERTY COVERAGE PART**

**COMMERCIAL INLAND MARINE COVERAGE PART**

**SCHEDULE**

| Premises Number | Building Number | Protective Safeguards Symbols Applicable |
|---|---|---|
| All | All | "P-1" Per Schedule on file with the Company where such protective safeguard has been reported |
| All | All | "P-5" At all locations where commercial cooking is present |

**Describe Any "P-9":**


Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** The following is added to the Commercial Property **Conditions:**

**Protective Safeguards**

**1.** As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

**2.** The protective safeguards to which this endorsement applies are identified by the following symbols:

**"P-1" Automatic Sprinkler System,** including related supervisory services.

Automatic Sprinkler System means:

**a.** Any automatic fire protective or extinguishing system, including connected:

**(1)** Sprinklers and discharge nozzles;

**(2)** Ducts, pipes, valves and fittings;

**(3)** Tanks, their component parts and supports; and

**(4)** Pumps and private fire protection mains.

**b.** When supplied from an automatic fire protective system:

**(1)** Non-automatic fire protective systems; and

**(2)** Hydrants, standpipes and outlets.

**"P-2" Automatic Fire Alarm,** protecting the entire building, that is:

**a.** Connected to a central station; or

**b.** Reporting to a public or private fire alarm station.

Includes copyrighted material of Insurance Services Office, Inc., with its permission
©Chubb. 2016. All rights reserved.

**"P-3" Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

**"P-4" Service Contract** with a privately owned fire department providing fire protection service to the described premises.

**"P-5" Automatic Commercial Cooking Exhaust And Extinguishing System** installed on cooking appliances and having the following components:

**a.** Hood:

**b.** Grease removal device;

**c.** Duct system; and

**d.** Wet chemical fire extinguishing equipment.

**"P-9",** the protective system described in the Schedule.

**B.** The following **Exclusion** is added:

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

**1.** Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

**2.** Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System or Automatic Commercial Cooking Exhaust And Extinguishing System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

All other terms and conditions remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc., with its permission

©Chubb. 2016. All rights reserved.

# PRE-EXISTING PROPERTY DAMAGE EXCLUSION

| Named Insured<br>Golden Corral Corporation | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>FS | Policy Number<br>D4226555A 001 | Policy Period<br>03/31/2019 **to** 03/31/2020 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**PROPERTY COVERAGE PART**

**INLAND MARINE COVERAGE PART**

This policy excludes any loss or damage directly or indirectly caused by, resulting from or contributed to by any pre-existing property damage at the time of loss.

 ©Chubb. 2016. All rights reserved.



# ASBESTOS MATERIAL EXCLUSION
## (Named Peril Exception)

| Named Insured | Endorsement Number |
|---|---|
| **Golden Corral Corporation** | |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| **FS** | **D4226555A 001** | 03/31/2019 to 03/31/2020 | |

| Issued By (Name of Insurance Company) |
|---|
| Illinois Union Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**COMMERCIAL PROPERTY COVERAGE PART**

**COMMERCIAL INLAND MARINE COVERAGE PART**

The following exclusion is added to this policy; supersedes any term, provision or endorsement to the contrary in this policy; and applies notwithstanding such term, provision or endorsement:

A. This policy excludes loss or damage to asbestos, asbestos-containing product, or asbestos-containing material.

B. This policy does not provide insurance against any loss, damage, cost, expense, fine or penalty resulting from or arising out of:

   1. remediation of any kind, including but not limited to removal or modification, of any asbestos, asbestos-containing product, or asbestos-containing material from a building or structure of any kind, whether damaged or undamaged, and regardless of the reason such removal is undertaken, whether voluntary or compelled by government directive; or

   2. the demolition or increased cost of reconstruction of property, the repair of property, the removal of debris, or the loss of use of property when caused by, arising out of, or undertaken due to the enforcement of any law, regulation, rule or ordinance that in any manner regulates asbestos, asbestos-containing product, or asbestos-containing material, except to the extent that coverage is provided by the Demolition and Increased Cost of Construction Additional Coverage; or

   3. any fault in the design, manufacture, or installation of asbestos, asbestos-containing product, or asbestos-containing material.

C. Notwithstanding the exclusions set forth above, this Policy covers direct physical loss or damage to asbestos, asbestos-containing product, and asbestos-containing material which is physically incorporated into an insured building or structure, including the necessary costs to remove or remediate such damaged asbestos, but only when such damage occurring during the policy period is directly and solely caused by the following perils, and then only that part of such asbestos which incurs direct physical loss or damage:

   fire, lightning, explosion, windstorm, hail, smoke, aircraft or vehicle impact, riot or civil commotion, vandalism, malicious mischief or accidental discharge of fire protective equipment.

All other terms and conditions remain unchanged.

# CLAIMS ADJUSTMENT

| Named Insured<br>Golden Corral Corporation | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>FS | Policy Number<br>D4226555A 001 | Policy Period<br>03/31/2019 **to** 03/31/2020 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**COMMERCIAL PROPERTY COVERAGE PART**

**COMMERCIAL INLAND MARINE COVERAGE PART**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**COMMERCIAL BOILER & MACHINERY COVERAGE PART**

It is a condition of this policy that the Company reserves the right to engage its own adjusters, investigators and experts at its sole discretion and expense.

The designated claims adjuster for this policy is:

Name of Firm:                     Cunningham International

| | |
|---|---|
| Street Address: | 11000 Richmond Ave., Suite 250 |
| City, State or Province, and Zip/Postal Code: | Houston, TX 77042 |
| Country: | United States |
| Telephone Number: | 713-272-3365 office<br>713-206-9162 cell |
| Facsimile Number: | 713-774-1628 |
| Assigned Adjuster: | Roger Sawyer<br>E-mail: RSawyer@cl-na.com |

All other terms and conditions remain unchanged.

©Chubb. 2016. All rights reserved.

**FLOOD EXCLUSION**

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Golden Corral Corporation | | | |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| FS | D4226555A 001 | 03/31/2019 **to** 03/31/2020 | |
| Issued By (Name of Insurance Company) | | | |
| Illinois Union Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**COMMERCIAL PROPERTY COVERAGE PART**
**COMMERCIAL INLAND MARINE COVERAGE PART**

This insurance does not cover loss or damage to Personal Property or Stock stored outside a building or structure caused by or resulting from Flood.

"Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

All other terms and conditions remain unchanged.



## LOSS CONTROL INSPECTION COMPLIANCE CONDITION

| Named Insured | Endorsement Number |
|---|---|
| **Golden Corral Corporation** | |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| **FS** | **D4226555A 001** | 03/31/2019 to 03/31/2020 | |

| Issued By (Name of Insurance Company) |
|---|
| Illinois Union Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**COMMERCIAL PROPERTY COVERAGE PART**

**COMMERCIAL INLAND MARINE COVERAGE PART**

It is agreed and understood that the following Condition is added:

**LOSS CONTROL INSPECTION COMPLIANCE**

The Insured shall complete all recommended changes required by the Company within the timeframe required by the Company, arising out of inspections or surveys conducted by the Company.

All other terms and conditions remain unchanged.

Case 5:20-cv-00349-D   Document 17-1   Filed 09/11/20   Page 99 of 117
JA188

# ELECTRONIC DATA AMENDMENT ENDORSEMENT

| Named Insured<br>Golden Corral Corporation | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>FS | Policy Number<br>D4226555A 001 | Policy Period<br>03/31/2019 **to** 03/31/2020 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

**BOILER AND MACHINERY COVERAGE PART**
**COMMERCIAL INLAND MARINE COVERAGE PART**
**COMMERCIAL PROPERTY COVERAGE PART**
**CRIME AND FIDELITY COVERAGE PART**

The following terms and provisions are added to the Policy; supersede any term, provision or endorsement to the contrary in this Policy; and apply notwithstanding any such term, provision or endorsement in this Policy or in any underlying, contributing or followed policy:

1.  This Policy excludes loss, damage, destruction, distortion, erasure, corruption, alteration, diminishment in value, or loss of use or usefulness of:

    a.  "Electronic Data" by any cause whatsoever (including but not limited to "Computer Virus");

    b.  "Electronic Data Processing Equipment" caused by or resulting from the loss, damage, destruction, distortion, erasure, corruption, alteration, diminishment in value, or loss of use or usefulness of "Electronic Data"; regardless of any other cause or event that contributes concurrently or in any sequence to the loss, damage, destruction, distortion, erasure, corruption, alteration, diminishment in value, or loss of use or usefulness of "Electronic Data", "Electronic Data Processing Equipment", or "Electronic Media"; and/or

    c.  "Electronic Media" caused by or resulting from the loss, damage, destruction, distortion, erasure, corruption, alteration, diminishment in value, or loss of use or usefulness of "Electronic Data"; regardless of any other cause or event that contributes concurrently or in any sequence to the loss, damage, destruction, distortion, erasure, corruption, alteration, diminishment in value, or loss of use or usefulness of "Electronic Data", "Electronic Data Processing Equipment", or "Electronic Media".

    This exclusion does not apply to loss or damage to "Electronic Data", "Electronic Data Processing Equipment", and "Electronic Media" caused by or resulting from a "Named Peril", if and to the extent such Named Peril is already covered by this or by any underlying policy.

2.  This Policy excludes loss, damage, cost or expense resulting from or arising out of any failure, malfunction, deficiency, deletion, fault, Computer Virus or corruption of computer code that results from or arises out of any authorized or unauthorized access by any means and for any purpose, whether intentional or inadvertent, in, of or to any "Electronic Data", "Electronic Data Processing Equipment", or "Electronic Media" and similar data, media, devices, and equipment in the ownership, possession, or control of a third party.

Definitions

1.  "Electronic Data" means information, facts or "Computer Programs" stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hardware, computer memory, hard or floppy disks, zip drives, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment.

 ©Chubb. 2016. All rights reserved.

2. "Computer Programs" means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to send, receive, process, store, retrieve, erase, or destroy data, and "Electronic Data" which is integrated in and operates or controls the building's elevator, lighting, plumbing, electricity, heating, ventilation, air conditioning, security system, safety system, and fire protection system, but does not include prepackaged software held in storage.

3. "Electronic Data Processing Equipment" means "Computers", computer servers and similar equipment and component parts thereof, the purpose of which is to process Electronic Data.

4. "Electronic Media" means any physical device the purpose of which is to hold, store, contain or transfer "Electronic Data", and includes but is not limited to disks, drives, films, tapes, records, drums, or cells.

5. "Computers" includes but is not limited to mainframes, servers, workstations and portable computing devices, personal information managers, wide and local area network hardware, electronic and electromechanical equipment, data processing equipment, electronic controls for machinery, electronically programmed memory chips, and electronically controlled communication equipment.

6. "Computer Virus" means instructions, code, files, applications or any software program that has the ability or is suspected to have the ability to damage, destroy, erase, corrupt, alter, impede, or prevent access to "Electronic Data", "Electronic Media" or "Computers", or to disrupt or interfere with the operations of "Computers", or to disrupt or interfere with the operation of any software or the reliability of any "Electronic Data", including but not limited to malicious codes, malware, Trojan Horses, worms and time or logic bombs.

7. "Named Peril" means the perils of Fire; Lightning; Explosion; Windstorm or Hail; Smoke; Aircraft or Vehicles; Riot and Civil Commotion; Willful or malicious physical loss or damage by a means other than "Computer Virus" and/or an authorized or unauthorized access in, of or to any "Electronic Data", "Electronic Data Processing Equipment" and/or "Electronic Media"; Leakage from fire extinguishing equipment; Sinkhole Collapse; Volcanic Action; Building glass breakage; Falling Objects, Weight of snow, ice or sleet, Water Damage; Sonic Boom; Theft; Flood, Earthquake or Earth Movement.

All other terms and conditions remain unchanged.

©Chubb. 2016. All rights reserved.

# TERRORISM EXCLUSION ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Golden Corral Corporation | | | |
| **Policy Symbol** | **Policy Number** | **Policy Period** | **Effective Date of Endorsement** |
| FS | D4226555A 001 | 03/31/2019 **to** 03/31/2020 | |
| Issued By (Name of Insurance Company) | | | |
| Illinois Union Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**BOILER AND MACHINERY COVERAGE PART**
**BUSINESS AUTO COVERAGE FORM**
**GARAGE COVERAGE FORM**
**MOTOR CARRIER COVERAGE FORM**
**TRUCKERS COVERAGE FORM**
**BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM**
**COMMERCIAL INLAND MARINE COVERAGE PART**
**COMMERCIAL PROPERTY COVERAGE FORM**
**COMMERCIAL PROPERTY COVERAGE PART**
**STANDARD PROPERTY POLICY**

The following exclusion is added to this policy and applies to all coverages, additional coverages, and coverage extensions, notwithstanding any provision to the contrary in this policy or any other endorsement hereto:

A.   This insurance does not cover loss, damage, injury, expense, cost, or legal obligation directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event, whether or not insured under this policy, contributing concurrently or in any other sequence thereto:

1.   "Act of Terrorism"; or

2.   Actions taken by or on behalf of any government or any branch or division thereof (including, without limitation, the uniformed armed forces, militia, police, state security, and anti-terrorism agencies) in responding to, preventing, combating, defending or retaliating against any "Act of Terrorism; or

3.   dispersal, application, or release of any actual or alleged pathogen, poison, biologic or chemical product, material, waste or substance as a result of an Act of Terrorism, and it reasonably appears that one purpose of the Act of Terrorism was to release such product, material, waste or substance.

This exclusion applies whether or not the "Act of Terrorism" was committed in concert with or on behalf of any organization or government.

The terms and limitations of this exclusion do not serve to create coverage for any loss which would otherwise be excluded under this Policy, such as, but not limited to, losses excluded by the "Nuclear Exclusion" or the "War Exclusion" or similar provision.

B.   As used in this endorsement:

1.   "Act of Terrorism" means any act against persons, organizations or property of any nature that involves the following or preparation for the following:

a.   Use or threat of force or violence; or

b.   Commission or threat of a dangerous act; or

c.   Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

2. Appears to be intended, in whole or in part, to:

   a. Intimidate or coerce a government or the civilian population; or

   b. Disrupt any segment of a nation's economy; or

   c. Influence the policy of a government by intimidation or coercion; or

   d. Affect the conduct of a government by mass destruction, assassination, kidnapping or hostage-taking; or

   e. Further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology; or

   f. Respond to governmental action or policy.

   "Act of Terrorism" shall also include any incident determined to be such by an official, department or agency that has been specifically authorized by federal statute to make such a determination.

C. Exception Covering Certain Fire Losses

   If an Act of Terrorism results in a fire and the direct physical loss or damage to property insured hereunder located in any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, each of the United States Virgin Islands and any territory or possession of the United States, that, either pursuant to the Standard Fire Policy or otherwise, prohibits exclusions for acts of terrorism that result in fire, this Company will pay for the loss or damage caused by that fire. Such coverage for fire applies only to direct loss or damage to property insured hereunder and may be limited, in accordance with the Standard Fire Policy, to the lesser of the actual cash value of the property at the time of the loss or the amount which it would cost to repair or replace the property, without allowance for any increased cost of repair or replacement by reason of any ordinance or law, and without any compensation for business interruption, extra expense to continue business activities, or any other coverage for loss or damage other than direct physical loss or damage to the property insured hereunder.

   All other terms and conditions remain unchanged.

©Chubb. 2016. All rights reserved.

# SERVICE OF SUIT ENDORSEMENT

| Named Insured<br>Golden Corral Corporation | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>FS | Policy Number<br>D4226555A 001 | Policy Period<br>03/31/2019 **to** 03/31/2020 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Information about service of suits upon the company is given below. Service of process of suits against the company may be made upon the following person, or another person the company may designate:

> Mr. Paul Bech, Esq., Associate General Counsel
> Chubb
> 436 Walnut Street
> Philadelphia, PA 19106-3703

The person named above is authorized and directed to accept service of process on the company's behalf in any action, suit or proceeding instituted against the company. If the insured requests, the company will give the insured a written promise that a general appearance will be entered on the company's behalf if a suit is brought.

If the insured requests, the company will submit to the jurisdiction of any court of competent jurisdiction. The company will accept the final decision of that court or any Appellate Court in the event of an appeal.  However, nothing in this endorsement constitutes a waiver of the company's right to: remove an action to a United States District Court, seek a transfer of a case to another court, or to enforce policy provisions governing choice of law or venue selection, as may be permitted by the laws of the United States, or of any state in the United States.

The law of some jurisdictions of the United States of America requires that the Superintendent, Commissioner or Director of Insurance (or their successor in office) be designated as the company's agent for service of process. In these jurisdictions, the company designates the Director of Insurance as the company's true and lawful attorney upon whom service of process on the company's behalf may be made. The company also authorizes the Director of Insurance to mail process received on the company's behalf to the company person named above.

If the insured is a resident of Canada, the insured may also serve suit upon the company by serving the government official designated by the law of the insured's province.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

_____
Authorized Representative

SL-34255a (01/16)



| | Illinois Union Insurance Company |
|---|---|
| | Insurance Company |
| | **Golden Corral Corporation** |
| | Policyholder |
| | **D4226555A 001** |
| | Policy Number |
| | **AMWINS BROKERAGE OF FLORIDA INC** |
| | Broker/Producer |

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE

You were notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism. *As defined in Section 102(1) of the Act*: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury---in consultation with the Secretary of Homeland Security, and the Attorney General of the United States---to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY YOUR POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS.  UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% FOR YEAR 2015, 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017, 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 AND 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE.  THE PREMIUM THAT WOULD BE CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.**

**YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION.  IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.**

You elected *NOT* to purchase terrorism coverage under the Act at the price indicated. ACCORDINGLY, WE WILL *NOT* PROVIDE THIS COVERAGE AND YOU DO NOT OWE THE ADDITIONAL PREMIUM FOR THAT COVERAGE INDICATED BELOW.

> Terrorism coverage described by the Act under your policy was made available to you for additional premium in the amount of ███████, however you elected to decline such coverage.

# CERTIFICATES OF INSURANCE – AUTOMATIC ADDITIONAL INSURED AND LOSS PAYEE ENDORSEMENT

| Named Insured<br>Golden Corral Corporation | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>FS | Policy Number<br>D4226555A 001 | Policy Period<br>03/31/2019 **to** 03/31/2020 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**COMMERCIAL PROPERTY COVERAGE PART**

**COMMERCIAL INLAND MARINE COVERAGE PART**

The following provisions are added to this policy and supersede and replace any conflicting provision in this Policy (including in any other endorsement hereto):

A. Any Certificate of Insurance issued in connection with this Policy will be issued solely as a matter of convenience or information for the addressee(s) or holder(s) of said certificate. Certificates of Insurance do not amend, modify or alter any term or condition of this Policy.

B. However, if, pursuant to a written agreement executed prior to a date of loss in question, the First Named Insured is required to add a person or entity to this Policy as an Additional Insured and Loss Payee, then this Policy will be deemed to have been endorsed accordingly, subject to all other terms, conditions, limits of liability and exclusions of this Policy. Loss to Covered Property in which such Additional Insured and Loss Payee has an interest will be adjusted with the First Named Insured and payable jointly to the First Named Insured and such Additional Insured and Loss Payee. No written endorsement to this Policy will be required in order for this provision to be effective as to such person or entity subject to compliance with sub-paragraph E. below.

C. Within ten (10) business days after the Company is notified of a loss which may be covered under this Policy, the First Named Insured or its authorized representative will provide the Company with the identities of all persons or entities with interests in the property that is subject to the loss as well as copies of the agreement requiring such person or entity be added to this Policy as an Additional Insured or Loss Payee. If the First Named Insured requires additional time to comply with this paragraph, the Company will provide extensions of time that are reasonable and appropriate for the circumstances, however, all such requests for extensions must be made in writing to the Company.

D. If the First Named Insured does not provide the Company with the information required in paragraph C above, the Company will assume that there are no such persons or entities and the Company will not be liable for any failure to take such person or entity's interest into account in the adjustment or payment of any loss.

E. This endorsement does not apply to persons or entities added by endorsement under the applicable Lenders Loss Payee and Mortgage Interests and Obligations provisions of this Policy. Persons or entities added as Additional Insured and Loss Payee pursuant to this endorsement do not have the same rights and obligations as the First Named Insured or Lenders Loss Payee and Mortgage Interests.

All other terms and conditions remain unchanged.

©Chubb. 2016. All rights reserved.

**PRODUCTS RECALL EXCLUSION**

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Golden Corral Corporation | | | |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| FS | D4226555A 001 | 03/31/2019 **to** 03/31/2020 | |

| Issued By (Name of Insurance Company) |
|---|
| Illinois Union Insurance Company |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**COMMERCIAL PROPERTY COVERAGE PART**

**COMMERCIAL INLAND MARINE COVERAGE PART**

The following exclusion is added to this policy; supersedes any term, provision or endorsement to the contrary in this policy; and applies notwithstanding such term, provision or endorsement:

This policy does not insure against any loss, damage, cost or expense:

1.  associated with any form of contamination of the Insured's raw stock, stock in process, or finished stock or products in the stream of commerce, all whether direct or indirect, proximate or remote, or in whole or in part caused by, contributed to or aggravated by any physical damage insured in this policy; or

2.  incurred by the Insured or by others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of the Insured's product or product of the Insured's direct or indirect customers or suppliers if such product or any portion of its withdrawn or recalled from the market or from use by any person or organization, including, but not limited to, any governmental body.

All other terms and conditions remain unchanged.



**Chubb Producer Compensation**
**Practices & Policies**

Chubb believes that policyholders should have access to information about Chubb's practices and policies related to the payment of compensation to brokers and independent agents. You can obtain that information by accessing our website at http://www.chubbproducercompensation.com or by calling the following toll-free telephone number: 1-866-512-2862.

Case 5:20-cv-00349-D   Document 17-1   Filed 09/11/20   Page 108 of 117
JA197

# TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Golden Corral Corporation | | | |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| FS | D4226555A 001 | 03/31/2019 **to** 03/31/2020 | |

| Issued By (Name of Insurance Company) | |
|---|---|
| Illinois Union Insurance Company | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, but not limited to, the payment of claims.  All other terms and conditions of policy remain unchanged.

_____
                                              Authorized Agent

ALL-21101 (11-06) Ptd. In U.S.A.

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

# HURRICANE MINIMUM EARNED PREMIUM- POLICY CANCELLATION

| Named Insured<br>Golden Corral Corporation | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>FS | Policy Number<br>D4226555A 001 | Policy Period<br>03/31/2019 **to** 03/31/2020 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**COMMERCIAL PROPERTY COVERAGE PART**
**COMMERCIAL INLAND MARINE COVERAGE PART**

The following terms and conditions will apply to this policy:

1.  If you cancel this policy and coverage existed any time during the period of June 1st to November 30th, the amount of premium we will return will be the Unearned Premium for the policy. The Unearned Premium is the annual premium for the policy multiplied by the Unearned Factor noted below.

<table>
<tr><td colspan="2" align="center">1 Year Policy</td></tr>
<tr><th>Days In-Force</th><th>Unearned Factor</th></tr>
<tr><td>1 to 180</td><td>20.0%</td></tr>
<tr><td>181 to 210</td><td>15.0%</td></tr>
<tr><td>211 to 240</td><td>10.0%</td></tr>
<tr><td>241 to 270</td><td>7.5%</td></tr>
<tr><td>271 to 300</td><td>5.0%</td></tr>
<tr><td>301 to 330</td><td>2.5%</td></tr>
<tr><td>331 to 365</td><td>0.0%</td></tr>
</table>

2.  The provisions of this endorsement replace any short rate provisions stipulated in this policy provided coverage existed any time during the period of June 1st to November 30th.

All other terms and conditions remain unchanged.

©Chubb. 2016. All rights reserved.

©Chubb. 2016. All rights reserved.

# GENERAL AMENDATORY ENDORSEMENT
## (Willis Global Property Insurance Policy)

| Named Insured<br>Golden Corral Corporation | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>FS | Policy Number<br>D4226555A 001 | Policy Period<br>03/31/2019 **to** 03/31/2020 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

### Golden Corral Corporation Property Insurance Policy Form

**A.** In Section I. **DECLARATIONS**, paragraph **10. TERRITORY** is deleted in its entirety and replaced with the following:

> This Policy applies only to "locations" located in the United States of America, including its territories and possessions.

**B.** The following are added to section **IV. PROPERTY EXCLUDED**

**15. OTHER EXCLUDED PROPERTY**
1. bridges, roadways, walks, patios or other paved surfaces, and fences; except such property that is specifically valued and identified in the Schedule of Insured Locations on file with the Company as Covered Property;
2. accounts, bills, food stamps or other evidence of debt, furs, jewelry, pearls, precious or semi-precious metals, stones or alloys. Lottery tickets held for sale are not securities and are blank Stock;
3. docks, piers, wharves, bulkheads, and pilings;
4. outdoor trees, shrubs and plants (except to the extent that coverage is provided in LAND IMPROVEMENTS);
5. property in transit, except as otherwise provided by this Policy;
6. property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers;
7. railroad rolling stock

**C.** In section **V. TIME ELEMENT**, paragraph **7. PROVISIONS APPLICABLE TO "TIME ELEMENT"**, paragraph **3. Contingent "Time Element" Coverage**, sub-paragraph b. is deleted in its entirety and replaced with the following:

> b. Property of others of the type insured by this Policy with in five (5) statute miles of a "location" of the Insured that attracts customers to the Insured's "location."

**D.** In section **V. TIME ELEMENT**, paragraph **7. PROVISIONS APPLICABLE TO "TIME ELEMENT"**, paragraphs **5. Interruption by Civil or Military Authority** and **6. Loss of Ingress or Egress** are deleted in their entirety and replaced with the following:

> #### 5. Interruption by Civil or Military Authority
>
> This Policy insures the "Time Element" loss sustained during the period of time when, as a result of direct physical loss, damage or destruction or imminent loss by a peril insured by this Policy within five (5) miles of an insured "location," normal business operations are interrupted or reduced because access to that "location" is prevented or impaired by order of civil or military authority.
>
> #### e. Loss of Ingress or Egress

This Policy insures the "Time Element" loss sustained during the period of time when, as a result of direct physical loss, damage or destruction by a peril insured by this Policy within five (5) miles of an insured "location," normal business operations are interrupted or reduced because ingress to or egress from that "location" is prevented or impaired.

E. The following are added to section **VI. EXCLUSIONS**:

S.    **OTHER EXCLUSIONS**
1. loss, damage, cost or expense caused by shrinkage or changes in color, flavor, texture or finish.
2. loss, damage, cost or expense directly or indirectly caused by extremes or changes of temperature, or extremes or changes in relative humidity, all whether atmospheric or not.
3. expropriation, seizure, appropriation, nationalization, willful destruction, condemnation, requisition, or sequestration by law, order or administrative action of any government (whether civil, military, or de facto). This exclusion does not apply to loss or damage caused by or resulting from acts of destruction ordered by any government and done at the time of a fire to prevent its spread, if the fire would be insured under this Policy.

F. In Section **VII. VALUATION**, paragraph **2. DEMOLITION AND INCREASED COST OF CONSTRUCTION** is deleted in its entirety and replaced with the following:

If as a result of direct physical loss, damage or destruction by a peril insured by this Policy, reconstruction, restoration, repair or use of property insured is regulated, including the limitation of the Insured's ability to rebuild the insured property to the current density, size, use or number of floors provided, or prohibited by the enforcement of any law, ordinance, regulation or government directive which is in force at the time of the direct physical loss, damage or destruction, this Policy shall pay for:

1. The cost of demolition and clearing the site of loss of both the damaged and the undamaged property; and
2. the proportion that the value of the undamaged part of the building bore to the full value of the entire property prior to the loss; and
3. the cost to replace any property that cannot be built to the same density, use, size, or number of floors, and
4. Such additional costs of (re)construction, restoration, or repair as may be incurred to bring both the damaged and the undamaged property into full compliance with any applicable law, ordinance, regulation or government directive;

The Insured has the option to rebuild or reconstruct on the same or another site but recovery hereunder shall be limited to the cost to rebuild or reconstruct on the original site.

If within ninety (90) days of filing Proof of Loss, the Insured elects not to repair or replace the lost or damaged real or personal property, Loss Settlement may be by Westchester Specialty Insurance Services, Inc. and elected on a replacement cost basis if the proceeds of such loss settlement are expended on other, not previously budgeted, capital expenditures.

Notwithstanding the foregoing, this Policy does not insure such costs when necessitated by the enforcement of any law or ordinance regulating asbestos material that has not sustained direct physical loss, damage or destruction by a peril insured by this Policy or by any governmental direction or request declaring that asbestos material present in or part of or utilized in any undamaged portion of the Insured's property can no longer be used for the purpose for which it was intended or installed and must be removed or modified.

G. In Section **VII. VALUATION**, the 3rd paragraph under **1. REPLACEMENT COST** is deleted in its entirety and replaced with the following:

Without penalty the Insured may expend the amount of any replacement cost recovery within the normal scope of the Insured's business subject only to the full amount of the recovery actually being expended in acquiring or constructing buildings or structures and/or in acquiring building equipment, plant equipment, machinery, machine parts, office furniture or office equipment within 2 years of the date of the loss.

**H.** Paragraph **14. FULL WAIVER** of section **VIII. GENERAL CONDITIONS** is deleted in its entirety

**I.** Paragraph **10. SUIT AGAINST THE INSURER** of section **VIII. GENERAL CONDITIONS** is deleted and replaced with the following:

No suit or action on this Policy for the recovery of any claim shall be sustainable in any court of law or equity unless the Insured has fully complied with all the requirements of this Policy. The Insurer agrees that any action or proceeding against it for recovery of any loss under this Policy shall not be barred if commenced within the longer of two years or the time prescribed in the statutes of the applicable jurisdiction.

**J.** In section **VIII. GENERAL CONDITIONS**, the following are added:

**23**. **LIBERLIZATION**

If the Company adopts any revisions that would broaden the coverage under this Policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Policy.

**24**. **NO BENEFIT TO BAILEE OR CARRIER**

No person or organization, other than the Insured, having custody of covered property will benefit from this insurance

**K.** The first paragraph of section I**X. DEFINITIONS**, **3. EARTHQUAKE AND EARTHQUAKE "OCCURRENCE"** is deleted and replaced with the following:

A quaking, trembling, vibratory or undulating movement of a portion of the earth's crust, produced by underground volcanic forces or other pressures that produce a breaking, shifting or other movement of the earth's crust.

**L.** The first paragraph of section I**X. DEFINITIONS**, **I. FLOOD AND FLOOD "OCCURRENCE"** is deleted and replaced with the following:

A general and temporary condition of partial or complete inundation of normally dry land area from (1) the overflow of inland or coastal waters including any tsunami; (2) the unusual and rapid accumulation or run off of surface waters from any source; or (3) the spray from any of them, whether driven by wind or not.

**M.** In Section **IX. DEFINITIONS**, paragraph 14. **NAMED STORM AND NAMED STORM "OCCURRENCE"** , the first paragraph is deleted in its entirety and replaced with the following:

The term "Named Storm" shall mean a weather condition that has been declared by the National Oceanic and Atmospheric Administration (NOAA), National Hurricane Center, or similar meteorological authority to be a hurricane, typhoon, cyclone, tropical storm or tropical depression that results in loss or damage to insured property directly or indirectly by:

All other terms and conditions remain unchanged.

 ©Chubb. 2016. All rights reserved.



# Claims Directory
## Property and Inland Marine
**Claims or Loss Notices related to this policy should be reported to the following:**

| Claim Office | Email and Fax | Location |
|---|---|---|
| Chubb North American Claims | First Notices Email:<br>ChubbClaimsFirstNotice@Chubb.com<br><br>First Notices Fax:<br>      (877)-395-0131 (Toll Free)<br>      (302)-476-7254 (Local)<br><br>Phone:<br>      (800)-433-0385 - Business Hours<br>      (800)-523-9254 – After Hours | P.O. Box 5122<br>Scranton, PA<br>18505-0554 |

# SIGNATURES

| Named Insured<br>Golden Corral Corporation | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>FS | Policy Number<br>D4226555A 001 | Policy Period<br>03/31/2019 **to** 03/31/2020 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**ILLINOIS UNION INSURANCE COMPANY** (A stock company)
525 W. Monroe Street, Suite 400, Chicago, Illinois 60661

**WESTCHESTER SURPLUS LINES INSURANCE COMPANY** (A stock company)
Royal Centre Two, 11575 Great Oaks Way, Suite 200, Alpharetta, GA 30022

REBECCA L. COLLINS, Secretary

JOHN J. LUPICA, President

_____
Authorized Representative

Chubb. Insured.™

LD-5S23j (03/14)

Page 1 of 1

|  |  |  |
|---|---|---|
| GOLDEN CORRAL CORP. and | ) | |
| GOLDEN CORRAL FRANCHISING | ) | |
| SYSTEMS, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | **DEFENDANT ILLINOIS UNION** |
| | ) | **INSURANCE COMPANY'S** |
| vs. | ) | **MOTION FOR JUDGMENT ON THE** |
| | ) | **PLEADINGS** |
| ILLINOIS UNION INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

NOW COMES Defendant Illinois Union Insurance Company ("Illinois Union") and respectfully requests the Court grant it judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The specific grounds for this motion are set forth in the Memorandum of Law in Support of Illinois Union's Motion for Judgment on the Pleadings, which is being filed contemporaneously herewith in accordance with Local Civil Rules 7.1 and 7.2, EDNC.

WHEREFORE, Illinois Union respectfully requests that the Court grant its Motion for Judgment on the Pleadings, dismiss Plaintiffs' claims with prejudice, and grant any further relief as the Court deems just and proper.

This the 1st day of February, 2021.


**CRANFILL SUMNER LLP**

BY: /s/ Jennifer A. Welch
JENNIFER A. WELCH
N.C. State Bar No.: 31360

BY: /s/ Theodore B. Smyth
THEODORE B. SMYTH
N.C. State Bar No.: 10045
Post Office Box 27808
Raleigh, N.C. 27611-7808
Phone: 919-828-5100
Fax: 919-828-2277
E-mail:jwelch@cshlaw.com
        tsmyth@cshlaw.com
*Local Civil Rule 83.1(d) Attorneys for Defendant*
*Illinois Union Insurance Company*

**CLYDE & CO US LLP**

ROBERT W. FISHER
*Motion for Special Appearance Pending*

JAMES M. BAUER
*Motion for Special Appearance Pending*
271 17th Street NW Suite 1720
Atlanta, G.A. 30363
Phone: 404-410-3150
Fax: 404-410-3151
E-mail: Robert.Fisher@clydeco.us
James.Bauer@clydeco.us
*Attorneys for Defendant Illinois Union*
*Insurance Company*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
NO.: 5:20-CV-349-D**

GOLDEN CORRAL CORP. and ) 
GOLDEN CORRAL FRANCHISING ) 
SYSTEMS, INC., ) 
             ) 
      Plaintiffs, ) 
             ) 
v. )       **CERTIFICATE OF SERVICE** 
             ) 
ILLINOIS UNION INSURANCE ) 
COMPANY, ) 
             ) 
      Defendant. ) 
_____ )

     I hereby certify that on February 1, 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys:

<div align="center">

Gregg McDougal, Esq.
Lawrence R. Duke, Esq.
William R. Hartzell, Esq.
McDOUGAL WORRELL LLP
316 West Edenton Street, Suite 100
Raleigh, North Carolina 27603
gregg@mcdougalworrell.com
lawrence@mcdougalworrell.com
will@mcdougalworrell.com

</div>

                  **CRANFILL SUMNER LLP**

                  */s/* Jennifer A. Welch
                  Jennifer A. Welch
                  N.C. State Bar No. 31360
                  Theodore B. Smyth
                  N.C. State Bar No. 10045
                  Post Office Box 27808
                  Raleigh, NC 276111-7808
                  Phone:  919-828-5100
                  Fax:  919-828-2277
                  Email:  jwelch@cshlaw.com
                            tsmyth@cshlaw.com

<div align="center">3</div>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## EASTERN DIVISION
## CIVIL ACTION NO.: 5:20-cv-349-D

| | | |
|---|---|---|
| GOLDEN CORRAL CORP. and GOLDEN CORRAL FRANCHISING SYSTEMS, INC. | ) ) ) ) | |
| Plaintiffs, | ) ) | **MEMORANDUM OF LAW IN SUPPORT OF ILLINOIS UNION'S MOTION FOR JUDGMENT ON THE PLEADINGS** |
| vs. | ) ) | |
| ILLINOIS UNION INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) ) | |

Defendant Illinois Union Insurance Company ("Illinois Union") respectfully submits this Memorandum of Law in Support of its Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c) and Local Civil Rule 7.1(e).

### NATURE OF THE CASE

Plaintiffs filed their Complaint in Wake County Civil Superior Court on May 14, 2020 [D.E. 1-1, p. 9], seeking a determination of insurance coverage from the defendant insurer, Illinois Union Insurance Company ("Illinois Union") for COVID-19 related claims. [D.E. 1-1; p. 15]. Pursuant to 28 U.S.C. § 1332 Illinois Union removed to this Court on July 2, 2020. [D.E. 1]. On August 10, 2020 Illinois Union filed its Answer. [D.E. 13]. On August 28, 2020 the plaintiffs filed an Amended Complaint. [D.E. 15]. On September 11, 2020 Illinois Union filed an Answer to the Amended Complaint. [D.E. 17]. Contemporaneous with the filing of this Memorandum, Illinois Union has filed a Motion for Judgment on the Pleadings ("Motion") [D.E. 24], which is now before the Court.

## SUMMARY OF THE ARGUMENT

Plaintiffs, two Golden Corral entities, allege that, under the terms of a property-insurance contract between Golden Corral Corp. and Illinois Union (the "Policy"), Illinois Union must cover their alleged business-interruption losses. Golden Corral's claims are an all too common and tragic story, as they contend that COVID-19 and related government orders have interrupted their restaurant business and caused significant financial losses. The Policy, though, applies *only* if Golden Corral can demonstrate that there has been a "physical loss, damage or destruction" to property. [D.E. 17-1, p. 42] The virus that causes COVID-19, SARS-CoV-2 ("the COVID-19 virus"), can cause heartrending harm to people but not physical, tangible loss or damage to property. Thus, no coverage exists for Golden Corral's claim, as many courts have recognized in similar suits.

Following a pleading strategy tried by many other insureds, and rejected on motions to dismiss by many other courts, Golden Corral aims to satisfy the physical loss requirement with an allegation that, because the COVID-19 virus threatens harm to people when it rests on a surface, it "physically affects and damages all with which it comes in contact." [D.E. 15, ¶ 29] This assertion, which is not entitled to a presumption of truth, is at odds not only with the straightforward policy-language requirement for a "physical" loss to *property* but also with the substantive law established by North Carolina appellate courts that requires physical harm to property as a predicate to business-interruption coverage. This alone is grounds for dismissal with prejudice.

Next, the Policy also expressly excludes coverage for any loss "caused by," "made worse by," or just "contributed to" by a virus—even "in part." [D.E. 17-1, pp. 60-61] Of course, Golden Corral's allegations have everything to do with the COVID-19 virus and the government orders that are attempting to limit its spread. Their claim falls squarely within this exclusion, which is an independent ground for dismissal.

Plaintiffs also seek a judgment for an alleged breach of the covenant of good faith and fair dealing. But, as a matter of law, no such claim can survive where there is no coverage for the

insurance claim at hand; and in any event, they have not established the applicability of such a breach claim in this case.

For these reasons and others, while Illinois Union sympathizes with the hardship of its insured, it nonetheless respectfully requests that the Court grant judgment on the pleadings and dismiss the Amended Complaint with prejudice and without leave to amend.

## STATEMENT OF THE FACTS

Golden Corral is a grill-buffet restaurant chain operating in some forty states. [D.E. 15, ¶ 11]. Some of their restaurants are corporate-owned, while others are franchise locations operated by Golden Corral Franchising Systems. *Id.* In a suit filed against Illinois Union *two days*[1] after Golden Corral first provided notice of a claim, these entities allege that various government orders relating to COVID-19 have been "impairing (and even eliminating) access to [their] restaurants," like Governor Cooper's March 17, 2020 Executive Order, which "limited access to facilities that sell food and beverage." *Id.* ¶ 32. Moreover, Plaintiffs allege, "[g]iven the presence of Covid-19, ingress to and egress from . . . [Plaintiffs'] locations has also been impaired." *Id.* ¶ 41. Plaintiffs also stress language in some of these orders that declares or implies that the orders were motivated out of a concern for protecting property, like certain orders issued by Governor Cooper. *Id.* ¶¶ 32-40. Thus, because of these interruptions, Plaintiffs allege that they are experiencing substantial losses to revenues, losses of royalties, losses of rental income, and losses of payments from equipment financing. *Id.* ¶ 44. Plaintiffs argue in the Amended Complaint that three coverage grants in the Policy—for Business Interruption, Interruption by Civil Authority, and Loss of Ingress or Egress—apply to their claim(s). *See id.* ¶¶ 62-66.[2]

---

[1] Notice of the claim was given to the defendant on May 12, 2020. [D.E. 15 ¶¶ 45-46] Suit was filed against the defendant on May 14, 2020. [D.E. 1-1, p. 9]
[2] A certified copy of the Policy, which bears policy number D4226555A 001, is attached as Exhibit A to Illinois Union's Answer to Plaintiffs' Amended Complaint. [D.E. 17-1] Specific pages in the Policy are cited herein based on the court-generated pagination along the very bottom of each page of the Policy.

3

The Policy begins by establishing that it insures only against "'all risks' of ***direct physical loss, damage or destruction*** occurring during the Policy period, except as hereinafter excluded . . . ." [D.E. 17-1, p. 42] (emphasis added). The three separate coverages sought by Plaintiffs each have this same requirement of "direct physical loss, damage or destruction" and respectively provide in relevant part:

## V.  TIME ELEMENT

### 1.  BUSINESS INTERRUPTION

**1.** This Policy insures loss resulting from the necessary interruption or reduction of business operations conducted by the Insured and ***caused by physical loss, damage or destruction, by a peril insured by this Policy***, of property insured.

<p style="text-align:center">*          *          *</p>

### 7.  PROVISIONS APPLICABLE TO "TIME ELEMENT"

1. The Period of Recovery

   a. Applicable to "Time Element" as defined in 'Business Interruption,' 'Extra Expense,' 'Rental Value' and 'Soft Costs' above:

      i. Shall not exceed such length of time required with the exercise of due diligence and dispatch to rebuild, repair, or replace lost, damaged or destroyed property and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the loss, including such time as may be required to restore or recreate lost or destroyed valuable papers and records or electronic media and electronic data. [D.E. 17-1, p. 56]

<p style="text-align:center">*  *  *</p>

### 5.  Interruption by Civil or Military Authority

This Policy insures the "Time Element" loss sustained during the period of time when, ***as a result of direct physical loss, damage or destruction or imminent loss by a peril insured by this Policy*** within five (5) miles of an insured "location," normal business operations are interrupted or reduced because access to that "location" is prevented or impaired by order of civil or military authority.

<p style="text-align:center">*          *          *</p>

### e. Loss of Ingress or Egress

This Policy insures the "Time Element" loss sustained during the period of time when, *as a result of direct physical loss, damage or destruction by a peril insured by this Policy* within five (5) miles of an insured "location," normal business operations are interrupted or reduced because ingress to or egress from that "location" is prevented or impaired.

[D.E. 17-1, pp. 52, 56, 113-114] (emphasis added) (as amended by Endorsement MS-280806]

Recognizing the element of "direct physical loss, damage or destruction" common to each coverage grant, Plaintiffs fashion this allegation:

The Centers for Disease Control and Prevention ("CDC") and studies have concluded that COVID-19 survives and remains infectious on surfaces and objects for days. Thus, a person can get COVID-19 by touching a surface or object that has the virus on it and, as such, COVID-19 physically affects and damages all with which it comes in contact.

[D.E. 15, ¶ 29] Plaintiffs add that "COVID-19 has quickly spread around the country, including areas within five miles of Golden Corral's corporate and franchise locations." *Id.* ¶ 30. There are no allegations in the Amended Complaint about the presence of the COVID-19 virus on Plaintiffs' property or about its presence on any particular property within five miles of an insured location.

Although the Amended Complaint does not acknowledge this, the Policy expressly excludes losses caused by or even contributed to by "Pollution, Contamination," which are expressly defined to include "virus." This exclusion provides:

### VI. EXCLUSIONS

This Policy does not insure:

\*        \*        \*

### G. POLLUTION, CONTAMINATION

Loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of 'contaminants or pollutants,' all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever.

5

Nevertheless if a peril insured by this Policy arises directly or indirectly from pollution or contamination any loss, damage or destruction of property insured by this Policy arising directly from that peril shall (subject to the terms, conditions and limitations of the Policy) be covered.

Notwithstanding the foregoing, this exclusion shall not apply if pollution or contamination results from direct physical loss, damage or destruction of property insured by this Policy by a peril insured by this Policy. . . .

'Contaminants or pollutants' means any material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, bacteria, *__virus__*, or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act, or as designated by the U.S. Environmental Protection Agency.

. . . [T]his Policy does not insure costs arising out of the enforcement of any law, ordinance, regulation or order by civil or judicial authority requiring the removal, disposal, replacement, cleanup, restoration or containment of property insured or costs to monitor or test for the existence or effects of pollutants.

[D.E. 17-1, pp. 60-61] (emphasis added).

Finally, Plaintiffs disagree with how Illinois Union responded to Plaintiffs' claims, contending wrongly that Illinois Union breached the covenant of good faith and fair dealing by denying that their claim(s) were covered based on their pleadings. [D.E. 15, ¶ 94].

## LEGAL ARGUMENT

Even construing the alleged facts as true and interpreting the Policy terms in favor of coverage,[3] Plaintiffs' requested relief cannot plausibly be granted. They cannot establish direct physical loss, damage or destruction from the COVID-19 virus. And, in any event, the Policy excludes losses caused by or contributed to by viruses. The relief Plaintiffs seek, therefore, does not, and cannot, "cross the line from merely conceivable to plausible," and so Illinois Union is

---

[3] The rules of construction for a Rule 12(c) motion like this one are the same as those that apply to a Rule 12(b)(6) motion. *Carter v. Fidelity Life Assoc.*, 339 F. Supp. 3d 551, 554 (E.D.N.C. 2018).

6

entitled to judgment on the pleadings. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For the same reasons, any re-pleading would inevitably encounter the same barriers, so further amendment of the Amended Complaint would be futile. Thus, leave to amend should be preemptively denied. Plaintiffs' cause of action for breach of the implied covenant of good faith and fair dealing should also be dismissed; their allegations are not covered, Illinois Union had a well-supported basis for its coverage position, and in any event the facts of this case do not support such an alleged cause of action.

## I. NORTH CAROLINA SUBSTANTIVE LAW APPLIES TO THE INTERPRETATION OF THE POLICY.

North Carolina substantive law should apply here. A federal court sitting in diversity must apply the choice of law rules of the forum state. *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013) (citing *Klaxton Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)). Under this State's choice of law rules, a North Carolina court should apply North Carolina substantive law to the construction of the Policy because the Policy was issued and delivered to a North Carolina insured and insures property in this State. N.C. Gen. Stat. § 58-3-1.[4]

## II. EACH INSURING AGREEMENT PLAINTIFFS PLACE AT ISSUE REQUIRES THEM TO SHOW PHYSICAL LOSS, DAMAGE OR DESTRUCTION TO PROPERTY, BUT THE COVID-19 VIRUS DOES NOT CAUSE A "PHYSICAL" HARM.

The burden belongs to Golden Corral to show that their claim satisfies the elements of the Policy's insuring agreements. *See Fortune Ins. Co. v. Owens*, 351 N.C. 424, 430 (2000) ("A party seeking benefits under an insurance contract has the burden of showing coverage."). In order to survive this motion, their pleading must plausibly show that their loss was "caused by" or "as a result of" "direct physical loss, damage or destruction" or as a result of "direct physical loss, damage

---

[4] The Amended Complaint alleges the Policy "was applied for signed and delivered in North Carolina." [D.E. 15 ¶ 16]

or destruction or imminent loss by a peril insured by this Policy"—the threshold requirements of the Business Interruption grant, Interruption by Civil Authority grant, and Loss of Ingress and Egress grant.[5] A "peril insured by this Policy" means "'all risks' of direct physical loss, damage or destruction occurring during the Policy period, except as hereinafter excluded . . . ." [D.E. 17-1, p. 42] The conclusory allegations Plaintiffs make about sustaining an "imminent loss from a peril insured by" the Policy still require a plausible showing of a loss caused by "direct physical loss, damage or destruction."

Plaintiffs have not alleged the actual presence of the COVID-19 virus on their properties or what property in particular was damaged within five miles of an insured location. They allege instead that "COVID-19 physically affects and damages all with which it comes in contact[,]" including locations within five miles of their property [D.E. 15, ¶¶ 29-30]—"five miles" being a requirement of the Policy's civil authority coverage grant. [D.E. 17-1, pp. 113-114]

But even if Plaintiffs mean to refer to the COVID-19 virus, they cannot create physical damage by pleading it into existence. Surviving a Rule 12 motion "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (2007); *see also Evans v. Napolitano*, 466 Fed. App'x 190, 190-91 (4th Cir. 2012) (observing that court need not "accept as true allegations that are merely conclusory . . . or unreasonable inferences"). Alleging that the presence of COVID-19 "physically affects and damages" what it contacts is belied by the obvious absence of tangible, physical damage to property on which a microscopic virus rests. Importantly, therefore, the Plaintiffs do not make out a plausible allegation about property damage when they cannot articulate any particular property that was

---

[5] It is black-letter law in this Circuit that on a motion for judgment on the pleadings, the court may consider the pleadings and any materials referenced or attached therein, like the Illinois Union Policy at issue here. *Carter*, 339 F. Supp. 3d at 553; *see also Massey v. Ojaniit*, 759 F.3d 343, 347-48, 353 (4th Cir. 2014) (approving of district court's consideration of trial transcript referenced in complaint).

damaged. Nor do they do so by emphasizing wording in some COVID-19-related civil authority orders that state or imply that they were designed even in part to protect property from damage. [D.E. 15, ¶¶ 32-40].[6]

This very pleading strategy in a COVID-19 coverage suit already has been rejected as failing to survive Rule 12 scrutiny. In *10E, LLC v. Travelers Indemnity Co. of Connecticut*, the complaint at issue "describe[d] public health restrictions as 'based on . . . evidence of physical damage to property' . . . . After describing the statewide order, [the complaint] assert[ed] without any relevant detail that 'the property that is damaged is in the immediate area of the Insured Property.'" No. 2:20-cv-04418-SVW-AS, 2020 WL 5359653 at *6 (C.D. Cal. Sept. 2, 2020) (restaurant as an insured). The civil authority coverage grant in the *10E, LLC* decision required the civil authority order to be in response to "direct physical loss of or damage to property at locations . . . that are within 100 miles of" insured premises—much more than the Policy's five-mile limit here. 2020 WL 5359653 at *1. Although the insured alleged the existence of damaged property from the virus in the "immediate area" of insured property (plainly, therefore, within 100 miles), that allegation was not enough to establish potential coverage. *Id.* at *5-*6. The Central District of California observed:

> [T]he [Complaint] does not describe particular property damage or articulate any facts connecting the alleged property damage to restrictions on in-person dining. *These allegations do no more than paraphrase the language of the Policy without specifying facts that could support recovery . . . . These allegations are thus "conclusory allegations of law" that plainly cannot survive a Rule 12(b)(6) challenge.*

*Id.* at *6 (emphasis added). Here too, Plaintiffs recite certain civil authority orders that pay lip service to supposed property damage caused by the presence of a virus, and they vaguely allege that "COVID-19 has quickly spread around the country, including areas located within five miles of [Plaintiffs'] corporate and franchise locations"—not even alleging that property *was damaged* near

---

[6] None of the orders—all of which are designed to limit the spread of the disease—were based on a factual finding that the virus caused direct physical loss, damage or destruction to any specific property.

an insured location like the Complaint in 10E, LLC, *supra*, did, let alone allege what *specific* property was damaged. [D.E. 15, ¶ 30] But Plaintiffs do not, and cannot, "describe particular property damage or articulate any facts connecting the alleged property damage" to civil-authority orders that were intended to reduce the spread of a disease. *10E*, 2020 WL 5359653 at *6. The reason is simple: no such damage exists. Plaintiffs do nothing more than stake their pleading on conclusory allegations that cannot survive a Rule 12 motion. *Id.*; *Evans*, 466 Fed. App'x at 190-91 (4th Cir. 1999) (court need not accept conclusory allegations as true). Golden Corral's pleading must be dismissed for this reason, as well as the following reasons.

### A. North Carolina Law Precludes Business-Interruption Insurance Coverage without a Loss or Damage that is Physical in Nature. Plaintiffs Have No Such Loss.

Under North Carolina law, business-interruption coverage such as Plaintiffs seek here is not available unless there has been some *physical* harm or damage giving rise to the claim. *Harry's Cadillac-Pontiac-GMC Truck Co., Inc. v. Motors Ins. Corp.*, 126 N.C. App. 698, 702 (1997). In *Harry's Cadillac*, the insured, a car dealership, sued its commercial property insurer to recover for losses caused by a snowstorm that made the dealership inaccessible for a week. 126 N.C. App. at 699. The insured sought two categories of damages: (1) the cost to repair the roof which was damaged in the snowstorm; and (2) lost business income because the snowstorm prevented access to the dealership. *Id.* Importantly, the insured did *not* claim that damage to the collapsed roof caused a loss in business income. *Id.*

The policy language at issue in *Harry's Cadillac* was similar to the key terms here. It provided coverage for lost business income sustained due to the "suspension of your 'operations' during the 'period of restoration.'" *Id.* at 700-01. "The suspension must be caused by direct physical loss of or damage to property at the premises described in the Declarations . . . caused by or resulting from any Covered Cause of Loss." *Id.* at 701. The Court of Appeals affirmed the trial court's

determination that the insured could not establish a right to coverage for business income or extra expense because

> [the insured] neither alleged nor offered proof that its lost business income was due to damage to or the destruction of the property, rather all the evidence shows that the loss was proximately caused by plaintiff's inability to access the dealership due to the snowstorm. There was no suspension of business due to the roof damage or the repairs thereto. *We hold that, under the language of the business interruption clause of the policy, coverage is provided only when loss results from suspension of operations due to damage to, or destruction of, the business property by reason of a peril insured against.*

*Id.* at 702 (emphasis added).[7]

Here, too, there is no predicate physical damage or destruction causing Golden Corral's loss of income. Even if the COVID-19 virus was on insured property or on property within five miles of it, the virus causes no more *physical alteration to property* than does a snowstorm blanketing North Carolina streets and effectively precluding access to a dealership.

Tellingly, *Harry's Cadillac* is not discussed or even cited in a recent unpublished decision from Durham County Superior Court Judge Orlando Hudson that, for the first time nationwide, granted summary judgment for an insured seeking coverage for alleged business-interruption losses associated with COVID-19. *North State Deli, LLC v. Cincinnati Ins. Co.*, No. 20-CVS-02569 (N.C. Sup. Ct., Oct. 9, 2020) (attached as Ex. A). The policy at issue there required "direct 'loss' to property . . . caused by or resulting from any Covered Cause of Loss"; "loss" was defined to mean "accidental physical loss or accidental physical damage." The insured contended that certain orders had forced them to suspend operations and that this was enough to constitute covered "accidental physical loss" and trigger coverage. Judge Hudson agreed, without any discussion of *Harry's*

---

[7] As the North Carolina Court of Appeals has also observed, events that *do* manifest a direct physical loss typically are those like fire, lightning, explosions, a windstorm, hail, or flood. *See Edwards v. Board of Trustees of Haywood Comm. College*, No. COA15–1227, 2016 WL 35843662 at *7 (N.C. App. July 5, 2016) (holding that the inability to access a college campus due to limited hours of operation did not create a risk of direct physical loss).

*Cadillac* with its holding from the Court of Appeals that "physical loss" requires some "damage to, or destruction of, the business property by reason of a peril insured against." *Harry's Cadillac*, 126 N.C. App. at 702.[8] In any event, the substantive law of North Carolina is not established by an unpublished trial court decision like *North State Deli*. *Harry's Cadillac*, a published decision from North Carolina's appellate court, is entitled to much more weight. *Compare Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 512 (4th Cir. 1999) (observing that federal court sitting in diversity "may of course consider all of the authority that the state high courts would, and . . . should give appropriate weight to the opinions of . . . intermediate appellate courts").[9]

Plaintiffs may attempt to rely on *Fountain Powerboat Industries Inc. v. Reliance Insurance Co.*, where this Court ruled that an insured could recover ingress/egress and civil authority coverage. 119 F. Supp. 2d 552 (E.D.N.C. 2000). But, crucially, the policy language at issue there did *not* require direct physical loss or damage to property. So in *Fountain*, this Court held that policy language using the phrase "caused by loss, damage or destructions" did not necessarily require a showing of damage to property. *Id.* at 557. The Policy language here *does* require direct *physical* loss, damage or destruction, as it did in *Harry's Cadillac*. *Id.* at 557 (emphasis added).

### B. Many Other Jurisdictions Endorse North Carolina's Insistence on a Physical Harm. And Many Courts Have Already Applied it to COVID-19 Cases.

North Carolina is not alone in requiring insureds to show a loss that is physical in nature when a policy requires physical loss or damage. *E.g.*, *S. Hospitality, Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1142 (10th Cir. 2004) (rejecting claim for business income loss due to absence of "direct physical loss of or damage to" insured property); *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014) ("'direct physical loss or damage'

---

[8] Judge Hudson's decision in *North State Deli* is currently on appeal to the North Carolina Court of Appeals.
[9] The *North State Deli* decision adds that "nothing in the Policies excludes coverage for Plaintiffs' losses. Notably, it is undisputed that the Policies do not exclude virus-related causes of loss." Ex. C at 7. That is not the case here. The Illinois Union Policy does exclude losses caused by a "virus." *See* Argument § 2, *supra*.

. . . unambiguously requires some form of actual, physical damage to the insured premises to trigger loss of business income"); *AFLAC Inc. v. Chubb & Sons, Inc.*, 581 S.E.2d 317, 319 (Ga. Ct. App. 2003) ("direct physical loss or damage" . . . "contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so").[10]

Following these precedents, and like the *10E* court decision addressed already, the significant majority of judges to decide property insurance-coverage suits associated with the COVID-19 virus have ruled that the virus does not amount to a physical loss of or to property nor does it physically damage property. When a restaurant owner in Washington DC sued to establish coverage for the interruption of its business caused by COVID-19-related civil-authority orders, the judge ruled that there was no coverage, rejecting the insured's claim that its restaurants suffered a "direct physical loss" because the virus was allegedly "material" and "tangible." *Rose's 1, LLC v. Erie Ins. Exch.*, No. 2020 CA 002424 B, 2020 WL 4589206 at *5 (D.C. Super. Ct. Aug. 6, 2020). The insured's alleged losses were not "physical," the judge reasoned, because the civil-authority orders "did not have any effect on the material or tangible structure of the insured properties," and neither did the virus. *Id.* at *2-3 (also rejecting that loss of restaurant's use was physical damage).

In New York City, a magazine sued for business-interruption coverage, alleging "physical damage" from "contamination of [its] premises by . . . SARS-Cov-2 in New York City." Plaintiff's Memorandum of Law in Support of Application for a Preliminary Injunction at 6, *Social Life Magazine, Inc. v. Sentinel Ins. Co.*, No. 20-cv-3311(VEC) (S.D.N.Y. May 14, 2020) (attached as Ex. B). Like Golden Corral, the insured asserted that the virus damages "whatever" it lands on

---

[10] *See also Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-cv-23362-KMM, 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018) (same); *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal. App. 4th 766, 779 (2010) (same); *accord Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002) ("In ordinary parlance and widely accepted definition, physical damage to property 'means a distinct, demonstrable, and physical alteration' of its structure.").

because when the virus "lands on something and you touch it, you could die from it." *Cf.* [D.E. 15, ¶ 29] ("person can get COVID-19 by touching a surface or object that has the virus on it and, as such, COVID-19 physically affects and damages all with which it comes in contact."). Thus, the magazine argued, a civil authority order that had the effect of interfering with the insured's business presented a covered cause of loss. *See* Transcript of Preliminary Injunction Hearing at 4–5, *Social Life Magazine, Inc. v. Sentinel Ins. Co.*, No. 20-cv-3311(VEC) (S.D.N.Y. May 14, 2020) (attached as Ex. C). Again, the court disagreed. "There is no damage to your property," the federal judge observed. "[COVID-19] damages lungs. It doesn't damage printing presses." *Id.*

There are many more decisions like this. *See* Order and Transcript of Oral Argument on Motion to Dismiss at 18-23, *Gavrilides Mgmt. Co. v. Mich. Ins. Co.*, No. 20-258-CB-C30 (Mich. Cir. Ct. July 1, 2020) (attached as Ex. D) (rejecting restaurant owners' business-interruption claim associated with COVID-19 because insured failed to allege direct physical loss or damage, decision adding that a physical-loss requirement meant that the restaurant must show "some physical alteration to or physical damage or tangible damage to the integrity" of the property to trigger coverage); Order and Transcript of Oral Argument on Motion to Dismiss, *Inns by the Sea v. Cal. Mut. Ins. Co.*, No. 20CV001274 (Cal. Super. Ct. Aug. 6, 2020) (attached as Ex. E) (sustaining demurrer without leave to amend, implying at oral argument that COVID-19 virus did not create required physical loss or damage to property because it does not create "physical destruction or physical change in usefulness"); Order and Transcript of Oral Argument on Motion to Dismiss, *It's Nice, Inc. v. State Farm Fire & Cas. Co.*, No. 20-L-547 (Cir. Ct. Ill. Sept. 29, 2020) (attached as Ex. F) (granting motion to dismiss without leave to amend, reasoning that there was no "direct physical loss to" the insured premises or other property because there was no "actual demonstrable harm" to property); Opinion, *Mac Prop. Grp. LLC v. Selective Fire & Cas. Ins. Co.*, No. L-2629-20 (N.J. Super. Nov. 5, 2020) (attached as Ex. G) (granting motion to dismiss without leave to amend on grounds that insured failed to allege direct physical loss or damage to covered property or direct physical loss or damage to property which resulted in order of

civil authority); *Diesel Barbershop, LLC v. State Farm Lloyds*, No. 20-cv-00461-DAE, 2020 WL 4724305 at *7 (W.D. Tex. Aug. 13, 2020) (dismissing without leave to amend COVID-19-related business-interruption claim on grounds that insured failed to allege direct physical loss, which court held as requiring distinct, demonstrable physical alteration of property); *Turek Enterps., Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 20-11655, 2020 WL 5258484 at *9 (E.D. Mich. Sep. 3, 2020) (dismissing complaint seeking coverage for business interruption losses due to COVID-19 based on failure to allege direct physical loss without leave to amend); *Infinity Exhibits, Inc. v. Certain Underwriters at Lloyd's, London*, No. 8:20-cv-01605, 2020 WL 5791583 at *3 (M.D. Fla. Sept. 28, 2020) (granting motion to dismiss without leave to amend and reasoning that insured had not established "direct physical loss of or damage to" insured premises or other property because there was no "actual, concrete damage," from COVID-19 virus); *Pappy's Barber Shops, Inc. v. Farmers Group, Inc.*, No. 20-cv-00907, 2020 WL 5500221 at *5 (S.D. Cal. Sept. 11, 2020) (granting motion to dismiss, reasoning that there was no "direct physical loss of or damage to property" because the property did not undergo a "distinct, demonstrable, physical alteration"), *leave to amend denied*, 2020 WL 5847570 (S.D. Cal. Oct. 1, 2020); *Mark's Engine Co. No. 28 Restaurant, LLC v. Travelers Indem. Co. of Conn.*, No. 2:20-cv-04423, 2020 WL 5938689 at *3-*5 (C.D. Cal. Oct. 2. 2020) (granting motion to dismiss without leave to amend, reasoning that there was no "direct physical loss of or damage to property" because the property did not undergo a "distinct, demonstrable, physical alteration," and observing that an interpretation of "direct physical loss" that did not require a physical change in the condition of the property would be without any "manageable bounds"), *appeal docketed*, No. 20-56031 (9th Cir. Oct. 6, 2020); *Travelers Cas. Ins. Co. of Am. v. Geragos*, No. 2:20-cv-03619-PSG-E, 2020 WL 6156584 at *4-*5 (C.D. Cal. Oct. 19, 2020) (granting motion to dismiss without leave to amend upon finding no physical damage plausibly alleged); *Malaube, LLC v. Greenwich Ins. Co.*, No. 20-22615-Civ, 2020 WL 5051581 at *8-*9 (S.D. Fla. Aug. 26, 2020) (dismissing restaurant's complaint seeking coverage for business interruption losses due to COVID-19 on grounds that it did not allege direct physical loss,

which court held as requiring tangible, actual or physical loss); *Plan Check Downtown III, LLC v. AmGuard Ins. Co.*, No. 2:20-cv-06954, 2020 WL 5742712 at \*4-\*7 (C.D. Cal. Sept. 10, 2020) (granting motion to dismiss with prejudice finding no "direct physical loss of or damage to" property because there was no "tangible alteration"), *appeal docketed*, No. 20-56020 (9th Cir. Oct. 2, 2020); *Sandy Point Dental, PC v. Cincinnati Ins. Co.*, No. 1:20-cv-02160, 2020 WL 5630465 at \*2 (N.D. Ill. Sept. 21, 2020) (granting motion to dismiss and reasoning that there was no "direct physical loss" because there was no "physical alteration or structural degradation of the property"); *Henry's Louisiana Grill, Inc. v. Allied Ins. Co. of Am.*, No. 1:20-cv-02939, 2020 WL 5938755 at \*5-\*6 (N.D. Ga. Oct. 6, 2020) (granting motion to dismiss, ruling that there was no civil authority coverage not only because there was no "direct physical loss of or damage to" property from the virus but also because insureds did not identify any *particular* property around their premises that was damaged); *Vandelay Hosp. Group LP v. Cincinnati Ins. Co.*, No. 3:20-cv-01348, 2020 WL 5946863 at \*1 (N.D. Tex. Oct. 7, 2020) (granting motion to dismiss insured's breach of contract claim because insured's allegations were "factually conclusory and/or legal conclusions" and therefore did not "plausibly plead a direct physical loss or damage"); *Seifert v. IMT Ins. Co.*, No. 20-cv-01102, 2020 WL 6120002 at \*3 (D. Minn. Oct. 16, 2020) (granting motion to dismiss because the court found no "direct physical loss of or damage to" property where the plaintiff alleged only that he suffered "an economic loss unrelated to an actual infiltration and contamination of the properties"); *Hillcrest Optical, Inc. v. Continental Ca. Co.*, No. 1:20-CV-275-JB-B, 2020 WL 6163142 at \*7-\*8 (S.D. Ala. Oct. 21, 2020) (granting motion to dismiss with prejudice and reasoning that the insured's loss was "purely economic"; the insured's property did not sustain a "tangible alteration" as would be required to establish a direct physical loss); *Uncork & Create LLC v. Cincinnati Ins. Co.*, No. 2:20-cv-00401, 2020 WL 6436948 at \*5 (S.D. W.V. Nov. 2, 2020) (granting insurer's motion to dismiss and noting that "even actual presence of the [COVID-19] virus would not be sufficient to trigger coverage for physical damage or physical loss to the property," because "routine cleaning . . . eliminates the virus on surfaces"); *Raymond H. Nahmad DDS PA v.*

*Hartford Cas. Ins. Co.*, No. 1:20-cv-22833-BLOOM/Louis, 2020 WL 6392841 (S.D. Fla. Nov. 2, 2020) (dismissing complaint seeking coverage for losses due to COVID-19 closures on the grounds that insured failed to allege direct physical loss of or physical damage caused by or resulting from a covered cause of loss); *Real Hospitality, LLC v. Travelers Cas. Ins. Co. of Am.*, 2020 WL 6503405 (S.D. Miss. Nov. 4, 2020) (granting motion to dismiss complaint seeking coverage for business interruption losses due to COVID-19 because insured failed to allege that insured property was damaged and because "loss of property" did not include loss of use); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, No. 4:20-cv-00222, 2020 WL 5820552 at *1 (S.D. Iowa Sept. 29, 2020) (granting motion to dismiss without leave to amend upon finding that there was no "accidental physical loss or accidental physical damage" to property from virus-related business closures, and rejecting few contrary COVID-19-related coverage decisions as "not as well analyzed as the many authorities cited by" the insurer), *appeal docketed*, No. 20-3211 (8th Cir. Oct. 21, 2020).

<p style="text-align:center">*　　*　　*</p>

Plaintiffs will urge this Court to reject the substantial weight of authority and to follow *North State Deli*, supra, and the handful of minority decisions like *Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-cv-03127-SRB, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020) and *K.C. Hopps, Ltd. v. The Cincinnati Ins. Co.*, No. 20-cv-00437- SRB (W.D. Mo. Aug. 12, 2020) (collectively, "*Studio 417*") (Order from *K.C. Hopps* attached as Ex. H), which have denied motions to dismiss in COVID-19-related coverage cases.[11] The *Studio 417* court allowed legal conclusions and other unsupported conclusions in the class-action complaint to establish a plausible entitlement to coverage—crediting, instead of scrutinizing, unsupported allegations that "customers, employees, and/or other visitors"

---

[11] Other decisions, like *Optical Services USA, et al. v. Franklin Mut. Ins. Co.*, issued by a state court judge in New Jersey, declined to rule for the insurer because of the "early stage of the litigation." No. BER-L-3681-20 (N.J. Super. Ct. Aug. 13, 2020) (attached as Ex. I). That is not a valid reason to deny a Rule 12 motion.

likely "were infected with COVID-19 and thereby infected the insured properties," and that COVID-19 "attached to" the plaintiffs' property. 2020 WL 4692385 at *2, *6. Golden Corral makes no such allegations. That court also concluded that the COVID-19 virus, if present on the insured properties, could plausibly cause physical loss sufficient to trigger business interruption coverage. *Id*. This outlier decision is contrary to the weight of authority requiring tangible, physical damage to property. Most importantly, under North Carolina law, a "direct physical loss or damage" exists only when property is physically altered. *Harry's Cadillac-Pontiac-GMC Truck Co., Inc. v. Motors Ins. Corp.*, 126 N.C. App. 698, 702 (1997).[12] Even if a cloud of virus came to rest five miles away from a Golden Corral restaurant, the property the virus rested on would not be physically altered. The impact would be intangible. *See also* 10A *Couch On Insurance* § 148.46 (3d ed. 2019) ("The requirement that the loss be 'physical' . . . is widely held to exclude losses that are intangible or incorporeal, and, thereby to preclude any claim . . . when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property."); *see also* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "physical" as "[o]f, relating to, or involving material things; pertaining to real, tangible objects").

C.      **The Period of Recovery Requirement for Business Interruption Coverage Supports the Requirement that the Loss or Damage Must Be Physical.**

That the Policy requires tangible physical loss or damage to trigger coverage finds further support in the fact that the Policy only allows recovery of lost business income for the "period of recovery." [D.E. 17-1, pp. 52, 56, 113-114] The period of recovery is limited to "such length of time required with the exercise of due diligence and dispatch to *rebuild, repair or replace lost, damaged or destroyed property* ready for operations under the same or equivalent *physical* and operating conditions

---

[12] Missouri law, which was the basis for the *Studio 417* ruling, is different in important ways from North Carolina law. *See* Memorandum and Order at 2, *Mehl v. Travelers Home & Marine Ins. Co.*, No. 4:16 CV 1325 CDP (E.D. Mo. May 2, 2018) (attached as Ex. J) (applying Missouri law and ruling that mere presence of spiders in home was sufficient to satisfy requirement of "direct physical loss" in homeowners' policy).

Case 5:20-cv-00349-D   Document 25   Filed 02/01/21   Page 18 of 31

that existed prior to the loss . . ." [D.E. 17-1, p. 56] (emphasis added).  The Policy's restriction of coverage to the period for rebuilding or replacing of property supports the requirement of physical harm to trigger coverage and demonstrates that, without that physical harm, there is no coverage at all. *See Harry's Cadillac*, 126 N.C. App. at 702, 486 S.E.2d at 251 ("the business interruption clause does not cover all business interruption losses, but only those losses requiring repair, rebuilding, or replacement." ); *United Airlines, Inc. v. Ins. Co. of State of Pa.*, 385 F. Supp. 2d 343, 349 (S.D.N.Y. 2005), aff'd 439 F.3d 128 (2d Cir. 2006) (determining policy language limiting coverage to "the length of time [needed] to rebuild, repair or replace such part of the Insured Location(s) as has been damaged or destroyed" supports a "requirement of physical damage") (alteration in original); *Roundabout Theatre Co.*, 302 A.D.2d 1, 7–8, 9 (including "rebuild, repair, or replace" supports the conclusion coverage "is limited to instances where the insured's property suffered direct physical damage" and denying coverage based on the same).[13]

> D.  **Case Law Addressing Physical Harm to Property from Odors, Ammonia, or Contamination is Not Analogous Here, as Other Courts Have Recognized. And, the Need to Clean Property Also Does Not Amount to a Physical Loss.**

Illinois Union anticipates that Golden Corral may also argue for not following the North Carolina Court of Appeals' precedent in *Harry's Cadillac*, *supra*, by reliance on cases finding physical loss when buildings were rendered uninhabitable by ammonia releases and high levels of lead dust or asbestos. *Gregory Packaging, Inc. v. Travelers Property Cas. Co.*, No. 2:12–cv–04418, 2014 WL 6675934 (D. N.J. November 25, 2014) (toxic ammonia release inside building); *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) ("large quantities of asbestos in the air of a building"); *Widder v. Louisiana Citizens Property Ins. Corp.*, 82 So. 3d

---

[13] *See also Hillcrest*, 2020 WL 6163142, at *8 (holding "period of restoration", when read in context with "direct physical loss of property", required a "repairable, rebuildable, or replaceable physical alteration of covered property"); *Malaube,* 2020 WL 5051581, at *9 ("[I]f there was any lingering doubt on whether a loss of use for pure economic reasons could be recoverable under the policy, the ["period of restoration" provision] put[s] that uncertainty to bed.").

294, 296 (La. App. 2011) (excessive levels of lead dust that migrated through the house and contaminated contents). Those cases, though, involved situations where the insured premises were rendered uninhabitable by something inherently *within* the physical structure of the insured property.

The COVID-19 pandemic, on the other hand, presents an external or extrinsic condition that has precipitated a reduction in Plaintiffs' business, including through prophylactic government orders designed to impede the virus's spread. And in such cases, where there is no physical alteration of property, business-interruption coverage is precluded. This is, after all, the holding in *Harry's Cadillac*, where a snowstorm extrinsic to the insured car dealership limited access to the insured's premises. *Harry's Cadillac*, 126 N.C. App. at 702 (holding no direct physical loss and no business-interruption coverage); *see Roundabout Theatre Co., Inc. v. Cont'l Cas. Co.*, 302 A.D. 2d 1, 3 (N.Y. App. Div. 2002) (no direct physical loss when the city closed an area following a large scaffolding collapse, which made an undamaged Broadway theatre inaccessible to the public, forcing it to cancel performances).

Another federal court has offered an instructive distinction between the cases Plaintiffs likely will rely on and those that, like here, involve extrinsic forces impeding the insured's business. In *Newman Myers Kreines Gross Harris, P.C. v. Great Northern Insurance Co.*, a law firm sued its insurer after its office building lost power and closed to tenants because the power company preemptively cut power as Superstorm Sandy neared New York City. 17 F. Supp. 3d 323, 325 (S.D.N.Y. 2014). The law firm, claiming business-interruption coverage under a policy that required physical loss or damage, argued that the physical loss component was met by the "preemptive closure of its building . . . because the property at issue was rendered unusable or unsatisfactory for its intended purpose." *Id.* at 329.

Rejecting that argument, the court distinguished cases involving issues like asbestos or ammonia infiltration by recognizing that they implicate "some compromise to the physical integrity

of the workplace." *Id.* But in that case, the power company's actions were external and did not directly or physically compromise the law firm's office, even though the power was out. *Id.* at 331. The court went on: "The words 'direct' and 'physical,' which modify the phrase 'loss or damage,' ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure." *Id.*

Plaintiffs here do not even allege that the COVID-19 virus was on their property. *See also infra* Argument § 4(A). But even if they did, that would not physically compromise the integrity of their property.

At most, what the presence of the COVID-19 virus could require is cleaning. According to CDC guidelines, "[c]oronaviruses on surfaces and objects naturally die within hours to days" and can be removed with "[n]ormal routine cleaning with soap and water" or killed with disinfectants. *See CDC Reopening Guidance for Cleaning and Disinfecting Public Spaces, Workplaces, Businesses, Schools, and Homes*, cdc.gov/coronavirus/2019-ncov/community/reopenguidance.html (last visited December 15, 2020). Plaintiffs have not alleged that any cleaning has been required. But even if they did, courts have also dismissed policyholder claims that a need to clean property amounts to a physical loss. *E.g.*, *Universal Image Prods., Inc. v. Chubb Corp.*, 703 F. Supp. 2d 705, 710 (E.D. Mich. 2010), *aff'd* 475 Fed. App'x 569 (6th Cir. 2012) (concluding that costs of remediation and cleaning were "not tangible, physical losses, but economic losses"); *Mastellone v. Lightning Rod Mut. Ins. Co.*, 884 N.E.2d 1130 (Ohio Ct. App. 2008) (mold which could be removed by cleaning was not physical damage); *Great N. Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n*, 793 F. Supp. 259, 263 (D. Or. 1990) (presence of asbestos did not cause "direct physical loss" to building because it could be remediated).

Because the Policy only covers losses associated with a tangible harm to property, Golden Corral cannot plausibly establish an entitlement to the coverage they seek. Illinois Union is entitled

to judgment on all of Plaintiffs' claims for this reason. *See New NGC, Inc. v. Ace Am. Ins. Co.*, 105 F. Supp. 3d 552, 560 (W.D.N.C.) ("[i]f the policy language is clear, courts are duty-bound to interpret it accordingly 'without rewriting the contract or disregarding the express language used.'").

## III. THE POLICY'S "POLLUTION, CONTAMINATION" EXCLUSION FOR LOSSES CAUSED BY VIRUSES ALSO PRECLUDES COVERAGE AND REQUIRES DISMISSAL.

The Policy expressly excludes:

[l]oss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of 'contaminants or pollutants,' all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever.

Ex. A, Policy § VI(G), [D.E. 17-1, pp. 60-61]. Immediately thereafter, the exclusion also defines "contaminants or pollutants" as:

any material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, . . . *virus*.

*Id.* (emphasis added).

Whether under the Policy's Business Interruption coverage, the Loss of Ingress or Egress coverage, or the Civil or Military Authority coverage, it is inarguable that Plaintiffs' alleged loss was either "caused by," "result[ed] from," was "contributed to . . . by," or was "made worse by" "actual, *alleged* or threatened" "*virus*," at least "in part." *See id.* (emphasis added). The alleged threat of the COVID-19 virus pervades the Amended Complaint and certainly "contributed to" Plaintiffs' alleged losses. The virus also was the impetus for the civil-authority orders that allegedly impaired Plaintiffs' business; as Plaintiffs acknowledge in their pleading (*see* [D.E. 15, ¶¶ 32-40]), "[v]arious civil authorities" imposed the restrictions that they did *because of* the virus and the threat COVID-19 causes to people. While it is Illinois Union's burden to show that this exclusion applies, *see Hartford Casualty Ins. Co. v. Gelshenen*, 387 F. Supp. 3d 634, 638-39 (W.D.N.C. 2019), the burden is met, as another federal court recognized recently in another COVID-19 insurance-

coverage suit. *Natty Greene's Brewing Co. v. Travelers Cas. Ins. Co. of Am.*, 1:20-cv-437-CCE-JEP (M.D.N.C. Nov. 30, 2020) (applying North Carolina law and enforcing property-insurance policies' exclusions for loss or damage caused by "virus" to restaurants' claims for coverage associated with COVID-19 and associated government orders).

It is no obstacle to the application of this exclusion that it is styled as a pollution or contamination exclusion. Courts applying North Carolina law give effect to the plain language of such exclusions, *see New NGC*, 105 F. Supp. 3d at 562-66, and have rejected arguments that a pollution exclusion may only encompass traditional, industrial contamination, *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Triangle Paving, Inc.*, 973 F. Supp. 560, 565-66 (E.D.N.C. 1996), *aff'd*, 121 F.3d 699 (4th Cir. 1997). *See generally*, *Harleysville Mut. Ins. Co. v. Buzz Off Insert Shield, LLC*, 364 N.C. 1, 9, 692 S.E.2d 605, 612 (2010) ("If the parties have defined a term in the [insurance] agreement, then we must ascribe to the term the meaning the parties intended.").

Demonstrating this, in *New NGC, Inc.*, the Western District of North Carolina held that sulfur fumes emitted from defective drywall, which also produced noxious odors, fell within an absolute pollution exclusion. The court further ruled that the sulfur fell within the definition of "pollutant," even though the definition of pollutant did not expressly mention "sulfur." 105 F. Supp. 3d at 565. Here, the Pollution, Contamination Exclusion provides an even more compelling basis for excluding Plaintiffs' claim by expressly listing "virus" within its definition of "contaminants or pollutants."

Federal courts in this State have granted Rule 12 motions several times based on insurance-policy exclusions, and this Court has good reasons to do so here. *See Trialcard Inc. v. Travelers Cas. & Sur. Co. of Am.*, No. 5:19-cv-368(BO), 2020 WL 1609483 at *4 (E.D.N.C. Apr. 1, 2020) ("[c]onstruing the allegations in the complaint as true, and affording the policy terms at issue broad construction in favor of coverage" but dismissing the complaint on Rule 12(b)(6) motion based in part on policy exclusion); *Hartford Cas. Ins. Co. v. Gelshenen*, 387 F. Supp. 3d 634, 641 (W.D.N.C.

2019), *aff'd sub nom. Hartford Cas. Ins. Co. v. Davis & Gelshenen, LLP*, 801 Fed. Appx. 915 (4th Cir. 2020) (granting insurer judgment on the pleadings based on application of exclusion).

And, appropriately, other federal courts have enforced similar exclusions to this one in other COVID-19 matters. In *Mauricio Martinez, DMD, P.A. v. Allied Ins. Co. of Am.*, for example, a Florida federal court granted an insurer's motion to dismiss a complaint seeking coverage for business-interruption losses relating to COVID-19 based on an exclusion for "loss or damage caused 'directly or indirectly,' by '[a]ny virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.'" No. 2:20-cv-00401-FtM-66NPM, 2020 WL 5240218 at *2-*3 (M.D. Fla. Sep. 2, 2020). The Illinois Union Policy's "Pollution, Contamination" Exclusion is similar, as it precludes coverage for "[l]oss or damage caused by any material that after its release can cause or threaten damage to human health or human welfare . . . including, but not limited to, . . . *virus* . . . whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever." Ex. A, Policy § VI (G), [D.E. 17-1, pp. 60-61]. It should be enforced. *See also* Ex. F at 33; *Founder Institute Inc. v. Hartford Fire Ins. Co.*, No. 20-cv-04466-VC, 2020 WL 6268539 at *1-*2 (N.D. Cal. Oct. 22, 2020) (granting motion to dismiss for COVID-19 coverage case based on exclusion applying to losses caused by viruses); *Boxed Foods Co. v. Cal. Capital Ins. Co.*, No. 20-cv-04571-CRB, 2020 WL 6271021 at *7 (N.D. Cal. Oct. 26, 2020) (same); *Travelers Cas. Ins. Co. of Am. v. Geragos*, No. 2:20-cv-03619-PSG-E, 2020 WL 6156584 at *4-*5 (C.D. Cal. Oct. 19, 2020) (same); *Mark's Engine Co. No. 28 Restaurant, LLC v. Travelers Indem. Co. of Conn.*, No. 2:20-cv-04423, 2020 WL 5938689 at *3-*5 (C.D. Cal. Oct. 2. 2020) (same). For these reasons, to *not* enforce the exclusion here would effectively write for Golden Corral a much better contract than the one it paid for. *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 364 N.C. 1, 10 (2010) (courts may not remake an insurance contract and impose liability for which the policyholder did not pay).

## IV. THE IMPLAUSIBILITY OF PLAINTIFFS SHOWING PHYSICAL LOSS, DAMAGE OR DESTRUCTION FROM THE VIRUS OR OVERCOMING THE POLLUTION, CONTAMINATION EXCLUSION MEANS PLAINTIFFS SHOULD BE DENIED LEAVE TO AMEND THEIR COMPLAINT.

The Court "may deny leave if amending the complaint would be futile," meaning an amended complaint could not successfully state a claim upon which relief can be granted. *U.S. ex. rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008); *see Joyner v. Abbot Labs.*, 674 F. Supp. 185, 190 (E.D.N.C. 1987) (observing that where any amendment would be legally insufficient on its face, the motion to amend must be denied). Plaintiffs cannot amend the Amended Complaint to allege all of the requirements for any of the Policy's coverages, each of which require physical loss, damage, or destruction. The COVID-19 virus will never present such physical harm to property, and even if it did, the Pollution, Contaminants Exclusion would bar coverage, no matter what Plaintiffs allege about the causal relationship between the virus and their alleged losses. Inevitably, the virus will have at least contributed in part to whatever COVID-19-harm Plaintiffs allegedly sustained.

## V. ONLY IF THE COURT DOES NOT AGREE THAT ILLINOIS UNION IS ENTITLED TO JUDGMENT FOR THE REASONS ALREADY ADDRESSED, THERE ARE ADDITIONAL REASONS TO GRANT ILLINOIS UNION JUDGMENT IN WHOLE OR IN PART.

### A. Plaintiffs Do Not Plead Sufficient Facts to Satisfy All the Elements of the Business Interruption Coverage Grant.

Under the Business Interruption coverage grant, coverage applies only if Plaintiffs can show that their claim was "caused by physical loss, damage or destruction, by a peril insured by this Policy, *of property insured*." Ex. A, Policy § V(1.1), [D.E. 17-1, p. 52] (emphasis added). The Amended Complaint does not allege any facts establishing that the COVID-19 virus was on any of *Plaintiffs' property*, merely alleging instead that COVID-19 was present within five miles of their property. [D.E. 15, ¶ 30]. This is not sufficient to meet their pleading burden. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (to avoid dismissal "a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."). Thus, Illinois Union is entitled to judgment on Plaintiffs' claim under the Business Interruption coverage grant.

**B.      Plaintiffs Fail to Plead the Necessary Causal Link Between an Alleged Interruption from a Civil Authority Order or Interruption from Loss of Ingress or Egress on the One Hand, and Physical Loss or Damage on the Other.**

Plaintiffs allege that "[v]arious civil authorities have . . . issued orders impairing (and even eliminating) access to restaurants, including Golden Corral corporate-owned and franchise locations." [D.E. 15, ¶ 32] Plaintiffs claim that certain of those orders were based on supposed property damage, and they contend that "COVID-19 has quickly spread . . . including areas located within five miles of Golden Corral's" locations. *Id*. at ¶ 30.[14] But, as Illinois Union has already addressed, Plaintiffs do *not* allege that any of the "various" civil authority orders were issued *as a result of* direct physical loss, damage or destruction or imminent loss by a peril insured by the Policy within five miles of an insured location. Nor do they allege that normal operations were interrupted because ingress to or egress from an insured location was impaired *as a result of* direct physical loss or damage. This omission is important. Under both the Civil or Military Authority coverage and the Loss of Ingress or Egress coverage, the Policy requires that the impairment of access be "as a result of" physical loss or damage.[15] Ex. A, Policy § V(7.5) (civil authority coverage); § V(7.6) (ingress/egress coverage) (as amended by § D, General Amendatory Endorsement MS-280806 (06/19)), [D.E. 17-1, 113-14]. Once again, Plaintiffs have failed to allege sufficient facts to establish a plausible claim for relief.

---

[14] Both of these allegations are vague and conclusory, and so they need not be accepted as true. Plaintiffs do not allege any particular property within five miles of any of its properties that sustained the requisite damage. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 258 (4th Cir. 2009) (citing *Iqbal*, 129 S. Ct. at 1949) ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and sweeping, vague, or conclusory allegations need not be accepted as true).

[15] While the Civil or Military Authority coverage also includes "imminent loss" in its definition, it is subject to and part of the requirement of a "direct" and "physical" loss.  [D.E. 17-1, p. 56].

26

Appropriately, courts have put insureds to their burden to establish such a causal connection between an impairment of access and physical loss when policies like Illinois Union's require it. Indeed, in the context of claims for civil authority coverage, even if an insured alleges nearby property damage, that is insufficient to establish the necessary causal link. In *Syufy Enterprises v. Home Insurance Company of Indiana*, for example, the court held that civil authority coverage was not triggered where local governments imposed curfews in response to citywide rioting and looting that had not impacted the insured's property. No. 94-0756 FMS, 1995 WL 129229, at *1-2 (N.D. Cal. Mar. 21, 1995). Moreover, courts have routinely held that an action of civil authority must be in response to damage to other property that has already taken place and not simply in response to the threat of, or the anticipation of, future property damage. *Dickie Brennan v. Lexington Ins. Co.*, 636 F.3d 683, 686 (5th Cir. 2011) (holding that civil authority coverage was not triggered when New Orleans mayor issued evacuation order in response to approaching hurricane, even though the hurricane had already damaged two Caribbean islands; order was not issued because of foreign property damage but to proactively protect New Orleans); *United Air Lines, Inc. v. Ins. Co. of Pa.*, 439 F.3d 128, 130 (2d Cir. 2006) (holding airline not entitled to coverage when a civil authority halted flights due to the September 11 terrorist attacks because the closure was for preemptive prevention of terrorism, not the "result of" a dangerous condition of the physical damage to the nearby Pentagon, or the authority's need to access it); *Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP v. Chubb Corp.*, No. 09-6057, 2010 WL 4026375 at *3 (E.D. La. Oct. 12, 2010) (holding that mayor's evacuation order, issued in advance of Hurricane Gustav, did not trigger civil authority coverage because order was issued in anticipation of possible harm and did not prohibit access to the insured's premises based on existing property damage).

The actions of governors and mayors across the United States in response to COVID-19 have been prophylactic, motivated by an urgent need to limit the spread of disease. This is quite different from a civil-authority coverage scenario where, for example, a civil authority restricts

27

access to businesses in an area recently struck by a hurricane or tornado *because of* the damage already caused.

For these reasons, Plaintiffs' alleged entitlement to the Policy's Civil Authority coverage or Loss of Ingress or Egress coverage is insufficiently pleaded. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (to avoid dismissal "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."); *Consumeraffairs.com, Inc.*, 591 F.3d 250 at 255 ("bare assertions devoid of further factual enhancements fail to constitute well-pled facts" for Rule 12 purposes.); *see also Fortune Ins. Co. v. Owens*, 351 N.C. 424, 430 (2000) (policyholder has the initial burden to show that a claim triggers coverage). Therefore, Illinois Union is entitled to judgment on Plaintiffs' claim for coverage under those insuring agreements.

## VI.   PLAINTIFFS' CLAIM ALLEGING BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING FAILS BECAUSE, AMONG OTHER REASONS, THERE IS NO COVERAGE FOR PLAINTIFFS' CLAIMED LOSSES.

This Court has recognized many times before that "a claim for breach of the covenant of good faith and fair dealing requires three elements: (1) a refusal to pay after recognition of a valid claim; (2) bad faith; and (3) aggravating or outrageous conduct." *E.g.*, *Michael Borovsky Goldsmith LLC v. Jewelers Mut. Ins. Co.*, 359 F. Supp. 3d 306 (E.D. N.C. 2019) (citation and quotation omitted). Here, Plaintiffs cannot establish "a refusal to pay after recognition of a valid claim" because there is no coverage for Plaintiffs' alleged losses under the Policy. *See id.* at 314 (rejecting insured's claim against property insurer for breach of the covenant of good faith and fair dealing where no coverage existed for insured's business interruption claims).

Moreover, the fact that Illinois Union's coverage position is based on a "legitimate, good-faith" reading of the Policy means that Plaintiffs also cannot show bad faith or aggravating circumstances. *See id.* ("Because [insurer] denied coverage based on a legitimate, good-faith disagreement, [insured] also fails to show that bad faith or aggravating circumstances exist."); *Blis Day Spa, LLC v. Hartford Ins. Grp.*, 427 F. Supp. 2d 621, 631 (W.D. N.C. 2006) (dismissing insured's bad faith claim against

28

property insurer where insurer's refusal to pay was based on honest disagreement regarding insured's business interruption claim). The many judicial declarations from courts nationwide that have already borne out the legitimacy of Illinois Union's coverage position for this COVID-19 claim is more than enough to warrant the dismissal of this cause of action, even if the Court does not grant this motion on the grounds above.

Finally, Plaintiffs' claim for breach of the implied covenant fails because it is nothing more than a restatement of Plaintiffs' breach of contract claim. *See BioSignia, Inc. v. Life Line Screening of Am., Ltd.*, No. 1:12CV1129, 2014 WL 2968139, at *5 (M.D.N.C. July 1, 2014) (dismissing cause of action for breach of the covenant of good faith and fair dealing as duplicative of plaintiff's breach of contract claim).[16]

## CONCLUSION

Illinois Union respectfully prays the Court to grant its Motion for Judgment on the Pleadings and dismiss all of Plaintiffs' claims against it with prejudice.

This the 1st day of February, 2021.

---

[16] Remarkably, this Declaratory Judgment action was filed *just two days after giving notice of this claim to the defendant.* Plaintiffs alleged they submitted their first notice of a claim to Illinois National "on or about May 12, 2020," and received from defendant "an acknowledged receipt of the notice" and then they received notice of the assignment to a claim specialist "on or about May 13, 2020." [D.E. 15 at ¶¶ 45-46]. Plaintiffs filed this action the next day, on May 14, 2020. [D.E. 1-1, p. 9]. Nothing is pleaded in the Amended Complaint to give rise to a claim for a "lack of good faith." *See Greenwich Ins. Co. v. Med. Mut. Ins. Co. of N.C.*, 88 F.Supp.3d 512, 516 n.2 (E.D.N.C. 2015), *aff'd per curiam*, 667 Fed. Appx. 385 (2016) ("The court assumes without deciding that…a "lack of good faith" is equivalent to "bad faith".)

**CRANFILL SUMNER LLP**

BY: /s/ Jennifer A. Welch
JENNIFER A. WELCH
N.C. State Bar No.: 31360

BY: /s/ Theodore B. Smyth
THEODORE B. SMYTH
N.C. State Bar No.: 10045
Post Office Box 27808
Raleigh, N.C. 27611-7808
Phone: 919-828-5100
Fax: 919-828-2277
E-mail: jwelch@cshlaw.com
          tsmyth@cshlaw.com
*Local Civil Rule 83.1(d) Attorneys for Defendant
Illinois Union Insurance Company*

**CLYDE & CO US LLP**

ROBERT W. FISHER
*Motion for Special Appearance Pending*

JAMES M. BAUER
*Motion for Special Appearance Pending*
271 17th Street NW Suite 1720
Atlanta, G.A. 30363
Phone: 404-410-3150
Fax: 404-410-3151
E-mail: Robert.Fisher@clydeco.us
          James.Bauer@clydeco.us
*Attorneys for Defendant Illinois Union
Insurance Company*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**
**NO.: 5:20-CV-349-D**

| | |
|---|---|
| GOLDEN CORRAL CORP. and<br>GOLDEN CORRAL FRANCHISING<br>SYSTEMS, INC., | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )       **CERTIFICATE OF SERVICE** |
| | ) |
| ILLINOIS UNION INSURANCE<br>COMPANY, | )<br>)<br>) |
| Defendant. | )<br>) |
| _____ | ) |

      I hereby certify that on February 1, 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys:

<div align="center">

Gregg McDougal, Esq.
Lawrence R. Duke, Esq.
William R. Hartzell, Esq.
McDOUGAL WORRELL LLP
316 West Edenton Street, Suite 100
Raleigh, North Carolina 27603
gregg@mcdougalworrell.com
lawrence@mcdougalworrell.com
will@mcdougalworrell.com

</div>

                                          **CRANFILL SUMNER LLP**

                                          */s/* Jennifer A. Welch
                                          Jennifer A. Welch
                                          N.C. State Bar No. 31360
                                          Theodore B. Smyth
                                          N.C. State Bar No. 10045
                                          Post Office Box 27808
                                          Raleigh, NC 276111-7808
                                          Phone: 919-828-5100
                                          Fax: 919-828-2277
                                          Email: jwelch@cshlaw.com
                                                            tsmyth@cshlaw.com

<div align="center">31</div>

**EXHIBIT A**

STATE OF NORTH CAROLINA

COUNTY OF DURHAM

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CASE NO. 20-CVS-02569

2020 OCT -9 P 3: 14

_____ C., C.S.C.

NORTH STATE DELI, LLC d/b/a LUCKY'S
DELICATESSEN, MOTHERS & SONS, LLC
d/b/a MOTHERS & SONS TRATTORIA,
MATEO TAPAS, L.L.C. d/b/a MATEO BAR
DE TAPAS, SAINT JAMES SHELLFISH LLC
d/b/a SAINT JAMES SEAFOOD, CALAMARI
ENTERPRISES, INC. d/b/a PARIZADE, BIN
54, LLC d/b/a BIN 54, ARYA, INC. d/b/a
CITY KITCHEN and VILLAGE BURGER,
GRASSHOPPER LLC d/b/a NASHER CAFE,
VERDE CAFE INCORPORATED d/b/a
LOCAL 22, FLOGA, INC. d/b/a KIPOS
GREEK TAVERNA, KUZINA, LLC d/b/a
GOLDEN FLEECE, VIN ROUGE, INC. d/b/a
VIN ROUGE, KIPOS ROSE GARDEN CLUB
LLC d/b/a ROSEWATER, and GIRA SOLE,
INC. d/b/a FARM TABLE and GATEHOUSE
TAVERN,

               *Plaintiffs,*

       v.

THE CINCINNATI INSURANCE
COMPANY; THE CINCINNATI CASUALTY
COMPANY; MORRIS INSURANCE
AGENCY INC.; and DOES 1 THROUGH 20,
INCLUSIVE,

               *Defendants.*

**ORDER GRANTING PLAINTIFFS'
RULE 56 MOTION FOR PARTIAL
SUMMARY JUDGMENT**

THIS MATTER was heard on September 23, 2020, before Senior Resident Superior

Court Judge Orlando F. Hudson, Jr., with Gagan Gupta appearing for the plaintiff-restaurants

(including Vin Rouge, Parizade, Mateo Bar de Tapas, Rosewater, Mothers & Sons Trattoria,

Saint James Seafood, Lucky's Delicatessen, Bin 54, City Kitchen, Village Burger, Nasher Cafe,

Local 22, Kipos Greek Taverna, Golden Fleece, Farm Table, and Gatehouse Tavern[1]), and Brian Reid and Drew Vanore appearing for defendant-insurers The Cincinnati Insurance Company and The Cincinnati Casualty Company (collectively, "Cincinnati"). Plaintiffs brought a Motion for Partial Summary Judgment ("Motion") with respect to Count I of their Second Amended Complaint, seeking a declaratory judgment that Cincinnati must replace Plaintiffs' lost business income and extra expenses under insurance policy contracts entered into between the parties.[2]

THE COURT, having considered the pleadings, the Motion, the briefs filed in support of and in opposition to the Motion, the oral arguments of counsel at the hearing on the Motion, the declaration of Gagan Gupta, the affidavit testimony of the Plaintiffs and their supporting affidavits of Giorgios Nikolaos Bakatsias, Matthew Raymond Kelly, and Djafar "Jay" Mehdian, the applicable law, and other appropriate matters of record, GRANTS Plaintiffs' Motion.

Upon a review of the entire record, the Court holds there are no genuine issues as to any material fact and Plaintiffs are entitled to partial summary judgment against Cincinnati as a matter of law on the issue of liability under Count I of the Second Amended Complaint. To that end, the Court sets forth its primary reasoning herein.

---

[1] The parent companies of these restaurants, and the entities bringing this lawsuit, are Vin Rouge, Inc. d/b/a Vin Rouge; Calamari Enterprises, Inc. d/b/a Parizade; Mateo Tapas, L.L.C. d/b/a Mateo Bar de Tapas; Kipos Rose Garden Club LLC d/b/a Rosewater; Mothers & Sons, LLC d/b/a Mothers & Sons Trattoria; Saint James Shellfish LLC d/b/a Saint James Seafood; North State Deli, LLC d/b/a Lucky's Delicatessen; Bin 54, LLC d/b/a Bin 54; Arya, Inc. d/b/a City Kitchen and Village Burger; Grasshopper LLC d/b/a Nasher Cafe; Verde Cafe Incorporated d/b/a Local 22; Floga, Inc. d/b/a Kipos Greek Taverna; Kuzina, LLC d/b/a Golden Fleece; and Gira Sole, Inc. d/b/a Farm Table and Gatehouse Tavern (collectively, "Plaintiffs").
[2] The operative pleading to which this Order applies is the Second Amended Complaint.

2

## I.    BACKGROUND[3]

Plaintiffs, which operate sixteen restaurants in the North Carolina counties of Durham, Wake, Orange, Chatham, and Buncombe, purchased "all risk" property insurance policies ("Policies") from Cincinnati to cover their restaurants. All risk policies cover all risks of loss unless those risks are expressly excluded or limited. Plaintiffs' Policies were effective during all relevant time periods and contain the same relevant language.

The Policies include a Building and Personal Property Coverage Form and a Business Income (and Extra Expense) Coverage Form. These forms provide that Cincinnati will pay for business interruption coverage as follows:

> (1) **Business Income**
> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss.
>
> . . .
>
> (2) **Extra Expense**
> We will pay Extra Expense you sustain during the "period of restoration". Extra Expense means necessary expenses you sustain . . . during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

Under the Policies, "Covered Cause of Loss" means "direct 'loss' unless the 'loss' is excluded or limited" therein. The Policies define "loss" to mean "accidental physical loss or accidental physical damage." Therefore, absent an exclusion or limitation, the Policies provide

---

[3] The Court has not resolved any disputed issues of fact, as findings of fact are unnecessary for adjudicating Plaintiffs' Motion for Partial Summary Judgment. Rather, the Court offers an overview of key undisputed facts underlying the ultimate disposition.

3

coverage under these provisions where the policyholder shows (i) direct "accidental physical loss" to property, *or* (ii) direct "accidental physical damage" to property. The Policies do not define "direct," "accidental," "physical loss," or "physical damage."

Plaintiffs seek coverage under the Policies for losses arising out of the response to the SARS-CoV-2 ("COVID-19") pandemic. Beginning in March 2020, governmental authorities across North Carolina entered civil authority orders mandating the suspension of business operations at various establishments, including Plaintiffs' restaurants (hereafter, "Government Orders"). The orders also prohibited, via stay-at-home mandates and travel restrictions, all non-essential movement by all residents.

On August 3, 2020, Plaintiffs filed their Motion for Partial Summary Judgment ("Motion"), seeking a declaratory judgment against Cincinnati under Count I that the Government Orders constitute covered perils under the Policies that caused "direct 'loss' to property" at the described premises, and that therefore Cincinnati must pay for the resulting lost Business Income and Extra Expenses as defined by the Policies. Plaintiffs' primary contention is that the Government Orders forced Plaintiffs to lose the physical use of and access to their restaurant property and premises, which constitutes a non-excluded "direct physical loss."

## II.    STANDARDS OF INTERPRETATION FOR INSURANCE POLICIES

The meaning of an insurance policy is a question of law, *Accardi v. Hartford Underwriters Ins. Co.*, 373 N.C. 292, 295, 838 S.E.2d 454, 456 (2020), and it is black-letter law that an undefined policy term is to be given its "ordinary meaning"; in doing so, North Carolina courts have determined that it is "appropriate to consult a standard dictionary." *Allstate Ins. Co. v. Chatterton*, 135 N.C. App. 92, 94-95, 518 S.E.2d 814, 817 (N.C. Ct. App. 1999). If the term is nevertheless "reasonably susceptible to more than one interpretation," then it is ambiguous and

4

only then is the contract subject to judicial construction. *Id.*; *see also Joyner v. Nationwide Ins.*, 46 N.C. App. 807, 809, 266 S.E.2d 30, 31 (1980) ("[I]n deciding whether the language is plain or ambiguous, the test is what a reasonable person in the position of the insured would have understood it to mean, and not what the insurer intended."). "[A]ny ambiguity or uncertainty as to the words used in the policy should be construed against the insurance company and in favor of the policyholder or beneficiary." *Accardi*, 373 N.C. at 295, 838 S.E.2d at 456.

## III.    DISCUSSION

As an initial matter, the Policies do not define the terms "direct," "physical loss," or "physical damage."[4] The Court must therefore turn first to the ordinary meaning of those terms. Merriam-Webster defines "direct," when used as an adjective, as "characterized by close logical, causal, or consequential relationship," as "stemming immediately from a source," or as "proceeding from one point to another in time or space without deviation or interruption." *Direct*, Merriam-Webster (Online ed. 2020). Merriam-Webster defines "physical" as relating to "material things" that are "perceptible especially through the senses." *Physical*, Merriam-Webster (Online ed. 2020). The term is also defined in a way that is tied to the body: "of or relating to the body." *Id.* Webster's Third New International Dictionary defines physical as "of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary." *Physical*, Webster's Third New International Dictionary (2020). The definition from Black's Law Dictionary comports: "Of, relating to, or involving material things; pertaining to real, tangible objects." *Physical*, Black's Law Dictionary (11th ed. 2019). Finally, "loss" is defined as "the act of losing possession," "the harm of privation resulting from loss or separation," or the "failure to gain, win, obtain, or utilize." *Loss*, Merriam-Webster (Online ed.

---

[4] Cincinnati does not contest whether Plaintiffs' losses were "accidental."

5

2020). Another dictionary defines the term as "the state of being deprived of or of being without something that one has had." *Loss*, Random House Unabridged Dictionary (Online ed. 2020).

Applying these definitions reveals that the ordinary meaning of the phrase "direct physical loss" includes the inability to utilize or possess something in the real, material, or bodily world, resulting from a given cause without the intervention of other conditions. In the context of the Policies, therefore, "direct physical loss" describes the scenario where businessowners and their employees, customers, vendors, suppliers, and others lose the full range of rights and advantages of using or accessing their business property. This is precisely the loss caused by the Government Orders. Plaintiffs were expressly forbidden by government decree from accessing and putting their property to use for the income-generating purposes for which the property was insured. These decrees resulted in the immediate loss of use and access without any intervening conditions. In ordinary terms, this loss is unambiguously a "direct physical loss," and the Policies afford coverage.

The parties sharply dispute the meaning of the phrase "direct physical loss." Cincinnati argues that "the policies do not provide coverage for pure economic harm in the absence of direct physical loss to property, which requires some form of physical alteration to property." Even if Cincinnati's proffered ordinary meaning is reasonable, the ordinary meaning set forth above is also reasonable, rendering the Policies at least ambiguous. Accordingly, in giving the ambiguous terms the reasonable definition which favors coverage, the phrase "direct physical loss" includes the loss of use or access to covered property even where that property has not been structurally altered. *See Accardi*, 373 N.C. at 295, 838 S.E.2d at 456 ("[A]ny ambiguity or uncertainty as to the words used in the policy should be construed against the insurance company and in favor of the policyholder or beneficiary.").

6

Moreover, it is well-accepted that "[t]he various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect." *See C. D. Spangler Constr. Co. v. Industrial Crankshaft & Engineering Co.*, 326 N.C. 133, 142, 388 S.E.2d 557, 563 (1990). Here, the Policies provide coverage for "accidental physical loss *or* accidental physical damage." Cincinnati's argument that the Policies require physical alteration conflates "physical loss" and "physical damage." The use of the conjunction "or" means—at the very least—that a reasonable insured could understand the terms "physical loss" and "physical damage" to have distinct and separate meanings. The term "physical damage" reasonably requires alteration to property. *See Damage*, Merriam-Webster (Online ed. 2020) ("loss or harm resulting from injury to person, property, or reputation"). Under Cincinnati's argument, however, if "physical loss" also requires structural alteration to property, then the term "physical damage" would be rendered meaningless. But the Court must give meaning to both terms.

Finally, nothing in the Policies excludes coverage for Plaintiffs' losses. Notably, it is undisputed that the Policies do not exclude virus-related causes of loss. Cincinnati instead contends that three other exclusions apply: the "Ordinance or Law" exclusion, the "Acts or Decisions" exclusion, and the "Delay or Loss of Use" exclusion. Upon a review of the entire record, the Court concludes that these exclusions, based on their terms and the undisputed facts, do not apply to Plaintiffs' losses as a matter of law.

For these primary reasons, the Court concludes that the Policies provide coverage for Business Income and Extra Expenses for Plaintiffs' loss of use and access to covered property mandated by the Government Orders as a matter of law.

7

## IV.    CONCLUSION

Accordingly, Plaintiffs' Motion for Partial Summary Judgment is GRANTED. This Court certifies, pursuant to Rule 54(b) of the North Carolina Rules of Civil Procedure, that this Order represents a final judgment as to Count I of the Second Amended Complaint and is immediately appealable as there is no just reason for delay of any such appeal. **IT IS THEREFORE ORDERED, ADJUDGED AND DECREED AS FOLLOWS**: That partial summary judgment is hereby granted in favor of Plaintiffs and against Cincinnati, jointly and severally, on Count I (Declaratory Judgment).

This the 7th day of October, 2020.

ORLANDO F. HUDSON, JR.
SENIOR RESIDENT SUPERIOR COURT JUDGE

8

JA249

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day served the foregoing Order in the above captioned action on all parties by depositing a copy hereof in a postpaid wrapper in a post office depository under the exclusive care and custody of the United Postal Service, addressed as follows:

STUART M. PAYNTER
GAGAN GUPTA
106 S. Churton Street, Suite 200
Hillsborough, NC 27278
*Counsel for Plaintiffs*

ANDREW A. VANORE III
Post Office Box 1729
Raleigh, NC 27602-1729
*Counsel for Defendant, The Cincinnati Insurance Company*

KENDRA STARK
JUSTIN M. PULEO
421 Fayetteville Street, Suite 330
Raleigh, NC 27601
*Counsel for Defendant Morris Insurance Agency, Inc.*

This the 9th day of October, 2020.

ASSISTANT CLERK OF COURT
DURHAM COUNTY

**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------X    Case No. 20-cv-3311
SOCIAL LIFE MAGAZINE, INC.,

        Plaintiff,
v.

SENTINEL INSURANCE COMPANY
LIMITED,

        Defendant.
-----------------------------X

PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF APPLICATION
FOR A PRELIMINARY INJUNCTION

    Plaintiff submits this reply memorandum of law in support

of its application for a preliminary injunction.

BECAUSE PLAINTIFF IS ALREADY OUT OF BUSINESS, PLAINTIFF HAS
SHOWN IRREPARABLE HARM

    Defendant argues that plaintiff will not go out of business

absent the preliminary injunction.  (Def.Mem., p.8). However, as

explained in plaintiff's motion papers, **plaintiff is already out

of business**.  (Pl.Reply Decl., para. 2). As plaintiff's business

records show, plaintiff only has $2,106.94 total in two bank

accounts.  (Pl.Decl., Ex. 16).  The business interruption caused

by the coronavirus has meant that plaintiff lost more than

$200,000 in business income in March, 2020 and April, 2020 as

shown by a comparison of plaintiff's business income for the

same period last year. (Pl.Decl., Exs. 15 & 16).

    As result, plaintiff has no money to publish any magazines

and is already out of business.  (Pl.Reply Decl., para. 2). This

1

application for preliminary injunction is the only hope for
plaintiff to survive and fulfill its contractual obligations for
which plaintiff received approximately $240,000 from advertisers
expecting their advertisements this summer. (Id.).  Those
obligations are in addition to ongoing expenses such as rent and
loan debt. (Id.).

Defendant's conjecture that plaintiff cannot fulfill its
contractual obligations this summer because some retail stores
might be closed is also off the mark.  Many retailers will still
be open in the East End of Long Island this summer including
grocery stores, gas stations, dry cleaners, drug stores, banks,
pizza places, convenience stores, farmers markets, ice cream
shops, and coffee shops.  (Pl.Reply Decl., para. 3).  In
addition, to make up any shortfall in distribution, plaintiff
can deliver its magazines directly to people's homes in the same
manner as home newspaper deliveries.  (Id.).

PLAINTIFF HAS APPLIED FOR A LOAN UNDER THE CARES ACT BUT HAS NOT
YET RECEIVED ANY MONEY EXCEPT FOR $1,000.

Defendant mentions the CARES Act apparently to imply that
plaintiff has not attempted to mitigate his damages caused by
defendant's refusal to honor the insurance claims.  (Def.Mem.,
p.8).  As set forth in plaintiff's Reply Declaration, plaintiff
has received only $1,000 under the CARES Act.  (Pl.Reply Decl.,
para. 4). Plaintiff has applied for an SBA loan but the SBA has

2

not yet responded to plaintiff's application.  (Id.). No part of the loan can be forgiven.  (Id.). As a result, the SBA loan, if it is ever even processed and then issued by the SBA, is not a substitute for the money sought in this lawsuit.  (Id.).

DEFENDANT'S ADMISSION THAT THE VIRUS IS PHYSICAL MEANS THAT PHYSICAL DAMAGES ARE THE OBVIOUS COROLLARY OF THAT.

Defendant admits that a virus is "physical" in nature by making the argument that the real issue in this case is whether a "physical" virus can cause "physical loss or physical damage." (Def.Mem., p.18).  The insurance policy already answers this question because, if mold, spores and insects can cause physical loss or physical damage under the policy, then so can a virus. (Pl.Decl., Ex. 9, p.46 of 142 of pdf file (p.17 of 25 of Special Property Coverage Form), B. Exclusions, Section 2(c)(5)).

Accordingly, defendant's attempt to escape the plain language of the policy must fail.

DEFENDANT IS NOT A STAND-IN FOR THE ENTIRE INSURANCE INDUSTRY.

Given that the defendant argues that the insurance industry's well-being as a whole is relevant to this case (Def.Mem.,p.3 & 24), plaintiff respectfully requests that the Court take judicial notice of the history of virus pandemics in the U.S. that are well known to the insurance industry.

According to the Center for Disease Control (cdc.gov/flu/pandemic-resources), the "Spanish Flu" caused by

3

the H1N1 virus killed at least 50 million people worldwide and 675,000 in the U.S. in 1918-1919.  The next pandemic was the "Asian Flu" caused by the H2N2 virus in 1957.  That pandemic killed 1.1 million people worldwide and 116,000 in the United States.

Thereafter, in 1968, the "Hong Kong Flu" caused by the H3N2 virus killed 1 million people worldwide and 100,000 in the United States.

In 1976, Congress passed the Swine Flu Act to prevent the collapse of the **commercial liability insurance market**. (Cong.Rec., Liability, E 4698-4699). See Sparks v. Wyeth Laboratories Inc., 431 F.Supp. 411, 415-416 (W.D.Okla. 1977) (discussing the intent and purpose of the Swine Flu Act resulting from the Hong Kong Flu).

In 2003, the SARS pandemic killed approximately 800 people and infected people in 26 countries.  In 2009, the "Swine Flu" caused by H1N1 virus killed 12,469 people in the U.S. and 151,700-575,400 worldwide.  See cdc.gov/flu/pandemic-resources.

Given all this history, some insurance companies have decided to issue commercial policies specifically excluding viruses (and/or the pandemics they cause) from coverage.  See, e.g., Meyer Natural Foods LLC v. Liberty Mut. Fire Ins. Co., 218 F.Supp.3d 1034, 1038 (D.Neb. 2016).

4

In issuing the policy in this case, defendant elected to have no such exclusion therein.  Accordingly, defendant is not a stand-in for the insurance industry as a whole.  Because defendant made a deliberate business decision not to exclude viruses and/or the pandemics they cause from coverage in the policy at issue, defendant cannot conflate the insurance policy at issue with all other policies issued by other insurance companies that provide business interruption insurance during this time that the SARS-Cov-2 virus is infecting the United States.

It is quite likely that defendant's insurance policy in this case is merely an outlier in the commercial insurance industry because many insurance companies like Liberty Mutual exclude viruses from coverage.  As a result, a decision in this case will not have an impact on the insurance industry, let alone the "economy as a whole."  (Def.Mem., p.3).

DEFENDANT IMPROPERLY CONFLATES THE CORONAVIRUS WITH COVID-19 DISEASE.

Throughout defendant's Memorandum of Law, defendant conflates the coronavirus designated as SARS-Cov-2 with the disease caused in humans by the virus known as COVID-19.  The Complaint is clear that it is the virus that has caused the business interruption and physical loss and damage to plaintiff's property.  COVID-19 is mentioned in the Complaint

5

only as the disease resulting from an infection by the SARS-Cov-2 virus.  All the relevant Executive Orders are clear that their purpose is prevent the spread of the SARS-Cov-2 <u>virus</u> that causes the COVID-19 disease.  See, e.g., Pl.Decl., Ex. 2, E.O. No. 202, referring to World Health Organization designation of the novel corona<u>virus</u>; Ex. 10, WHO website referring to "<u>virus</u> that causes COVID-19"); Ex. 17, EO No. 202.17 requiring face-covering in a public place to prevent "<u>transmission</u>" of COVID-19.

Accordingly, defendant's attempt to minimize the purpose of the relevant Executive Orders to involve only "social distancing" is untenable.  (Def.Mem., p.14).  The obvious purpose of the Executive Orders is combat the virus itself, not the disease caused by the virus which is combated by medical treatment and/or quarantining.

<u>PLAINTIFF WAS SPECIFICALLY PROHIBITED FROM ACCESSING ITS</u>
<u>PREMISES BY CIVIL AUTHORITY</u>

Defendant incorrectly argues that plaintiff was not specifically prohibited from accessing its premises by any Civil Authority. (Def.Mem., p.22). As explained in plaintiff's motion papers, on March 20, 2020, New York Governor Andrew M. Cuomo issued Executive Order 202.8 that continued and modified Executive Order 202 by requiring each employer providing non-essential services or functions to reduce the in-person

6

workforce at all work locations by **100%** by March 22, 2020 at
8pm. (Pl.Decl., Ex. 3).  As set forth in Executive Order 202.6
dated March 20, 2020 that defined essential services and
functions, plaintiff's magazine business does not provide
essential services excluding it from complying with Executive
Order 202.8.  (Pl.Decl., Ex. 4).

Accordingly, the "100%" in Executive Order 202.8 means that
plaintiff was specifically prohibited from accessing its
premises.

Defendant, like plaintiff, has been unable to find or cite
to any cases that involve a denial of insurance coverage
relating to a claim based on a virus pandemic.  Thus, it appears
that the parties agree that this case will be a matter of first
impression for the Court.

With respect to the three cases cited by defendant on pages
22-23 of its Memorandum of Law, those cases are inapposite
because they involve Orders of civil authority merely based on
"fears" of a _future_ terrorist attack or a _future_ hurricane.  The
Executive Orders at issue herein involve a current danger (the
SARS-Cov-2 virus) that (1) currently exists in New York City,
(2) is carried around by a large percentage of humans in New
York City and (3) is deposited on surfaces everywhere whenever
those carriers breathe, talk, sing, cough or sneeze.  The virus
is not a future fear, but a real and current danger that has

7

killed more than 24,000 New York City residents in the last 2
months and is continuing to infect and kill people daily.

BECAUSE PLAINTIFF IS INSOLVENT, PLAINTIFF IS NOT REQUIRED TO
PROVIDE SECURITY FOR THE PRELIMINARY INJUNCTION UNDER
FED.R.CIV.PROC. 65(c)

     Contrary to defendant's argument that plaintiff must post
security in return for preliminary injunctive relief (Def.Mem.,
p.25), a District Court has "wide discretion" in setting the
amount of such security.  Doctor's Assocs., Inc. v. Stuart, 85
F.3d 975, 985 (2d Cir. 1996)). "[B]ecause, under Fed. R. Civ. P.
65(c), the amount of any bond to be given upon the issuance of a
preliminary injunction rests within the sound discretion of the
trial court, the district court may dispense with the filing of
a bond." Id.

     A security bond under under Fed.R.Civ.Proc. 65(c) is not
required where the party seeking the security is insolvent. Doe
by Doe v. Perales, 782, F.Supp. 201, 206 (W.D.N.Y. 1991), citing
LaPlaza Defense League v. Kemp, 742 F.Supp. 792, 807, n.13
(S.D.N.Y. 1990) (no security bond required under Fed.R.Civ.Proc.
65(c) where plaintiff did not have sufficient resources to post
one). See also Golden Goose Deluxe Brand v. Aierbushe, 19-cv-
2518, (S.D.N.Y. 2019) Order dated 6/14/2019 by Judge Valerie E.
Caproni (only $5,000 security bond required upon granting
preliminary injunction in trademark infringement case involving
$4 million in statutory damages); Trustees of the 1199SEIU Nat'l

Benefit Fund for Health & Human Serv.Emp.s v. Cotto, 18-cv-7123 (E.D.N.Y. 2019), Order dated 1/3/2019 (no bond required upon granting preliminary injunction imposing constructive trust on settlement funds); Lighting & Supplies, Inc. v. Sunlite U.S.Corp., 14-cv-4344 (E.D.N.Y. 2015), Order filed 6/17/2015, p.6 (no bond required under Fed.R..Civ.Proc. 65(c) "where likelihood of success on the merits is overwhelming"); Kermani v. NY State Bd. Of Elections, 487 F.Supp.2d 101, 115-116 (N.D.N.Y. 2006) (no bond required under Fed.R..Civ.Proc. 65(c) "given the important constitutional and public policy issues arising in the matter").

In this case, as shown in plaintiff's motion papers, plaintiff has (1) only $2,106.94 total in its 2 bank accounts and (2) approximately $240,000 in liabilities owed to more than 17 advertisers if it does publish its magazines this summer. Because plaintiff does not have sufficient resources to post a security bond, no security bond should be required.

<u>CONCLUSION</u>

For all the foregoing reasons, plaintiff respectfully requests that its application be granted in its entirety.

Dated:    New York, New York
          May 13, 2020              _____/s/_____
                                    Gabriel Fischbarg, Esq,
                                    230 Park Avenue, #904
                                    New York, New York 10169
                                    917-514-6261
                                    Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X   Case No. 20-cv-3311
SOCIAL LIFE MAGAZINE, INC.,

         Plaintiff,
v.

SENTINEL INSURANCE COMPANY
LIMITED,

         Defendant.
------------------------------X

<u>PLAINTIFF'S REPLY DECLARATION OF JUSTIN MITCHELL IN SUPPORT OF
APPLICATION FOR A PRELIMINARY INJUNCTION</u>

     I, declare, under the penalty of perjury under the laws of
the United States of America, that the following is true and
correct:

     1.   I am the President of the plaintiff Social Life
Magazine Inc. and am fully familiar with the facts and
circumstances relating to this action.  I submit this reply
declaration in support of plaintiff's s application for a
preliminary injunction.

     2.   As explained in plaintiff's motion papers, plaintiff
is already out of business.  The business interruption caused by
the coronavirus has meant that plaintiff lost more than $200,000
in business income in March, 2020 and April, 2020 as shown by a
comparison of plaintiff's business income for the same period
last year.  (Pl.Decl., Exs. 15 & 16).  As result, plaintiff has
no money to publish any magazines and is already out of

1

business.  This application for preliminary injunction is the only hope for plaintiff to survive and fulfill its contractual obligations for which plaintiff received approximately $240,000 from advertisers expecting their advertisements this summer. Those obligations are in addition to ongoing expenses such as rent and loan debt.

3.   Defendant's conjecture that plaintiff cannot fulfill its contractual obligations this summer because some retail stores might be closed is also off the mark.  Many retailers will still be open in the East End of Long Island this summer including grocery stores, gas stations, dry cleaners, drug stores, banks, pizza places, convenience stores, farmers markets, ice cream shops, and coffee shops.  In addition, to make up any shortfall in distribution, plaintiff can deliver its magazines directly to people's homes in the same manner as home newspaper deliveries.

4.   Plaintiff has received only $1,000 under the CARES Act.  On April 3, 2020, plaintiff applied for an SBA loan and was given a loan application number (3302586995).  The SBA has not yet responded to plaintiff's application.  No part of the loan can be forgiven.  As a result, the SBA loan, if it is ever even processed and then issued by the SBA, is not a substitute for the money sought in this lawsuit.

Dated: New York, New York
May 13, 2020

_____
Justin Mitchell

**EXHIBIT C**

k5e2SocH

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  SOCIAL LIFE MAGAZINE, INC.,

4                  Plaintiff,              New York, N.Y.

5          v.                              20 Civ. 3311(VEC)

6  SENTINEL INSURANCE COMPANY
   LIMITED,
7
                  Defendant.
8
   ------------------------------x        Teleconference
9                                          Order to Show Cause

10
                                           May 14, 2020
11                                         10:00 a.m.

12 Before:

13                  HON. VALERIE E. CAPRONI,

14                                         District Judge

15

16                        APPEARANCES
17

18 GABRIEL J. FISCHBARG
        Attorney for Plaintiff
19

20 STEPTOE & JOHNSON, LLP
        Attorneys for Defendant
21 BY:  CHARLES A. MICHAEL
        SARAH D. GORDON
22

23

24

25

k5e2SocH

```
 1            THE COURT:  Good morning, everybody.
 2            Do I have a court reporter on the line?
 3            THE COURT REPORTER:  Good morning, your Honor.
 4    Kristen Carannante.
 5            THE COURT:  Good morning.
 6            Okay.  Do I have Mr. Fischbarg for the plaintiff?
 7            MR. FISCHBARG:  Yes, Judge.  Hi.
 8            THE COURT:  Mr. Fischbarg, is anyone else on the line
 9    for the plaintiff?
10            MR. FISCHBARG:  Yes.  The plaintiff is on a separate
11    phone available if you need evidence or --
12            THE COURT:  The principal of Social Life?
13            MR. FISCHBARG:  Yes.  He is in my office, you know,
14    more than six feet away, and --
15            THE COURT:  Okay.
16            And who do I have for the defendant?
17            MR. MICHAEL:  Good morning, your Honor.  This is
18    Charles Michael, from Steptoe & Johnson, for the defendant.
19    With me is my partner Sarah Gordon, who was just admitted *pro*
20    *hac vice*, and who will be doing the presentation today.
21            THE COURT:  Terrific.
22            All right --
23            MS. GORDON:  Good morning, your Honor.
24            THE COURT:  Good morning.
25            Only people who are speaking need to note their
```

k5e2SocH

1   appearances, and I have got those, Mr. Fischbarg and

2   Ms. Gordon.  Everybody else, please mute your telephone.

3        Also, if you hear that sound that sounds like someone

4   has dropped off the line once we get started, I need you to

5   stop talking so that I can make sure that I have still got the

6   court reporter and your adversary on the line.

7        So, Mr. Fischbarg, this is your motion, so you get to

8   go first.

9        MR. FISCHBARG:  Yes.  So I submitted a reply

10  memorandum, you know, in the afternoon yesterday.  I was just

11  wondering if --

12       THE COURT:  Yes.  I saw that.  Thank you.

13       MR. FISCHBARG:  Okay, so you were also able to read

14  it, I suppose?

15       THE COURT:  Yes, yes.

16       MR. FISCHBARG:  Okay.

17       So I guess the only other thing I want to add that's

18  not in the papers, and then I don't know if your Honor has any

19  issues that you want to talk about, is I mentioned that Liberty

20  Mutual had this exclusion for viruses and it is also evident

21  that other insurance companies have the same exclusion,

22  including Travelers Insurance Company, and they filed the --

23  they actually filed a federal lawsuit for declaratory judgment

24  in California, Docket No. 20 Civ. 3619, to preempt such claims,

25  I guess to enforce their exclusion for viruses.  So to the

1   extent that the defendant is claiming some kind of overreach by

2   the plaintiff here, I don't think it is proper.  There are

3   several insurance companies who are capable of putting in a

4   virus exclusion in their policies, and in this case there is

5   none.  So --

6           THE COURT:  Let me ask you something.  First off, I

7   want to start with basics.  Do you agree that New York law

8   applies?

9           MR. FISCHBARG:  Yes.

10          THE COURT:  All right.  So the -- is it the *Roundabout*

11  *Theatre* case?

12          MS. GORDON:  Yes, your Honor.

13          THE COURT:  First Department case?

14          MS. GORDON:  Yes, your Honor.  This is Ms. Gordon on

15  behalf of Sentinel.

16          THE COURT:  Thank you.

17          Mr. Fischbarg, it would seem to me that the *Roundabout*

18  case is a real problem for your position.

19          Would you like to explain to me why it doesn't

20  preclude your claim?

21          MR. FISCHBARG:  Yes.  That case applies to off-site

22  property damage rendering the premises at issue inaccessible.

23  So in this case, you don't have off-site property damage.  You

24  have on-site property damage.

25          THE COURT:  What is the damage?  There is no damage to

1   your property.

2           MR. FISCHBARG:  Well, the virus exists everywhere.

3           THE COURT:  It damages lungs.  It doesn't damage

4   printing presses.

5           MR. FISCHBARG:  Right.  Well, that's a different

6   issue, whether or not -- that's a different issue than the

7   *Roundabout* case that had to do with accessibility.  Now we are

8   jumping to the topic of whether a virus can cause physical

9   damage to a printing press, as your Honor mentioned.  So that's

10  a separate issue, and there are a lot of cases that we have

11  cited where this type of material, a virus, does cause physical

12  damage.

13          THE COURT:  What's your best case?  What do you think

14  is your best case under New York law?

15          MR. FISCHBARG:  Well, the problem is, under New York

16  law, there isn't much law.  The New Jersey federal court, in

17  *TRAVCO*, citing other cases, including from other circuits,

18  where physical damage had a broader interpretation that

19  includes loss of use and not just, you know, something where

20  you take a hammer and break an item.

21          THE COURT:  With loss of use, I mean, loss of use from

22  things like mold is different from you not being able to,

23  quote, use your premises because there is a virus that is

24  running amuck in the community.

25          MR. FISCHBARG:  Okay.  I would disagree with that.  I

1    would say virus and mold are equivalent.  They are both

2    physical items which, if they land on a surface or are on a

3    surface, just like spores that are also listed in the policy,

4    mold is also listed in the policy.  I would say that the virus,

5    mold spores --

6              THE COURT:  Hang on --

7              MR. FISCHBARG:  -- anything --

8              THE COURT:  A second.

9              Do I still have the court reporter?

10             THE COURT REPORTER:  Yes, your Honor.

11             THE COURT:  Do I have I still have, Ms. Gordon?

12             MS. GORDON:  Yes, your Honor.

13             THE COURT:  All right.  Go ahead.

14             MR. FISCHBARG:  Mold spores, bacteria, virus, all

15   those are physical items which damage whatever they are on,

16   whatever they land on.  And in this case, the virus, when it

17   lands on something and you touch it, you could die from it.

18   So --

19             THE COURT:  That damages you.  It doesn't damage the

20   property.

21             MR. FISCHBARG:  But you are not able to use the

22   property because it damages you.  So it's a corollary.  In

23   other words, this policy, by the way, mentions the word "virus"

24   and "bacteria" in it in two places.

25             THE COURT:  Where does it mention it?

k5e2SocH

1          MR. FISCHBARG:  It mentions it in the PDF as well as

2     Exhibit 9, page 36 and 37, which is page 7 of 25 of the special

3     property coverage form under additional coverages, section

4     5(j), where the insured would cover certain law enforcement

5     orders requiring you to -- requiring remediation.  But it

6     contains an exclusion for bacteria and viruses, and it uses the

7     word "bacteria" and it uses the word "virus."

8          So what this is really referring to is the *Legionella*

9     bacteria, which is causes Legionnaires' disease typically.

10    That's the bacteria.  Virus is obviously something else.  So

11    this is obviously referring to when there is a Legionnaires'

12    outbreak in a building, which could happen in New York pretty

13    often, every few years, and then the building gets shut down

14    and they have to do remediation.  Either they -- at least as a

15    bacteria*, Legionella* bacteria only occurs in water or pipes or

16    in mist.  So the building is shut down, and then you might have

17    to -- and now there is a new code where the buildings have to

18    test their cooling systems for *Legionella* bacteria.  So that's

19    an example where a bacteria causes property loss, or loss of

20    use, or damage, physical damage to property.  And I would say

21    the virus is equivalent to that bacteria.  So --

22          THE COURT:  But it's not.  This is different.  The

23    virus is not specifically in your property that is causing

24    damage.  It is everywhere.  The Legionnaire example is very

25    different.  Because it's not like Legionnaire is running

1    rampant throughout the city, and therefore your office building

2    can get closed.  It is that the Legionnaire bacteria is in that

3    building causing --

4            MR. FISCHBARG:  Yes.

5            THE COURT:  -- that building to be shut down.

6            MR. FISCHBARG:  Yes.  Yes.

7            So this virus is everywhere, including this office in

8    particular, this office.  In other words, they just did a

9    random survey of people going into a grocery store in New York,

10   and 20 percent tested positive.  So, Judge, that's just a

11   one-sample test.  So if the infection rate in New York City is

12   20 percent, then the virus is literally everywhere.  So if

13   it --

14           THE COURT:  That's what --

15           MR. FISCHBARG:  -- is --

16           THE COURT:  That is what has caused the damage is that

17   the governor has said you need to stay home.  It is not that

18   there is any particular damage to your specific property.

19           MR. FISCHBARG:  Well, okay, that's --

20           THE COURT:  You may not even have the virus in your

21   property.

22           MR. FISCHBARG:  Well, okay, that's -- I would

23   disagree.  The virus not just causes -- it lands on equipment,

24   it lands everywhere.  That's why all of these -- all of the

25   health guidelines from the World Health Organization and

1  elsewhere talk about wearing gloves, talk about wiping things

2  down, because it lands on surfaces.  It doesn't just get

3  transmitted through the air.  Another way of getting it is

4  through contact --

5          THE COURT:  Right, but what --

6          MR. FISCHBARG:  -- when it touches your --

7          THE COURT:  What evidence do you have that your

8  premises are infected with the COVID bug.

9          MR. FISCHBARG:  Well, the plaintiff is here.  He got

10  COVID.  So that's evidence there.

11          THE COURT:  Well, it's not evidence that he got it in

12  his office.

13          MR. FISCHBARG:  Yes, but, okay, it's not -- we're

14  not -- I don't know what burden of proof we are looking at,

15  whether it is beyond a reasonable doubt --

16          THE COURT:  No, it's --

17          MR. FISCHBARG:  -- or more likely than not, more

18  likely than not, he can testify where he was and more likely

19  than not he either got it from his office or he got it from his

20  home.  So that's a different burden of proof.  If you are

21  looking for some kind of burden of proof to show that he got it

22  from his office, I mean, that's an evidentiary question, and we

23  can get an epidemiologist to testify and get an expert to

24  testify on that, which I understand is going to happen in the

25  other lawsuits that have been filed across the country

1    regarding --

2              THE COURT:  Okay.

3              MR. FISCHBARG:  -- this issue.

4              THE COURT:  Okay.

5              MR. FISCHBARG:  So . . .

6              THE COURT:  Anything further, Mr. Fischbarg?

7              MR. FISCHBARG:  No, I guess that's all for now.  Thank

8    you.

9              THE COURT:  Okay.  Thanks.

10             Ms. Gordon.

11             MS. GORDON:  Thank you, your Honor.  This is Sarah

12   Gordon on behalf of Sentinel, and we agree with your Honor's

13   thoughts here.

14             The property policy has two distinct requirements

15   here.  There has to be direct physical loss or physical damage

16   to the property and the cause of the business interruption

17   damages they are seeking has to be direct physical loss or

18   damage, and the cause here is not physical damage.

19             We think, you know, as your Honor rightly pointed out,

20   *Roundabout* controls.  It is under New York law.  It's a First

21   Department case from 2002.  There are no subsequent decisions

22   that have disagreed or overturned it here in New York; and, if

23   anything, it has been confirmed by this . . .

24             THE COURT:  Hang on.  Did I lose my court reporter?

25             THE COURT REPORTER:  No, Judge.  I'm here.

k5e2SocH

1        THE COURT:  Did I lose Mr. Fischbarg?

2        MR. FISCHBARG:  No, I'm here.

3        THE COURT:  Okay.

4        MS. GORDON:  This court, your Honor, in *Newman Myers*,

5    adopted the exact same rationale for a law firm that was trying

6    to assert damages where there were no -- business interruption

7    damages, where there was no physical harm to the property.

8    And, you know --

9        THE COURT:  Let me interrupt you for a second.

10       So Judge Engelmayer in *Newman* went out of his way to

11   talk about a case where there was a bunch of -- there was a

12   rock slide which didn't actually hit the house or the premises,

13   and yet they got coverage and coverage for the invasion of

14   fumes.

15       MS. GORDON:  Yes, your Honor.

16       So for most of the cases, there are a number of them,

17   there is -- what has happened is something physically has

18   happened to the property that prevents people from being on the

19   property.  So, for example, in *Gregory Packaging*, in New

20   Jersey, there was ammonia leaked out and they couldn't be on

21   the property, so something physically happened.  You couldn't

22   necessarily see it or touch it, but there were fumes and it was

23   unsafe to be there.  The same thing with *Motorists*, where there

24   was *E. coli* in the well.  You couldn't be in that house because

25   you were exposed to other things that had the *E. coli*.

k5e2SocH

1          The property has to be entirely unusable or

2     uninhabitable for physical loss or damage to constitute a loss

3     of use.  We don't think that's the law in New York in any

4     circumstance, but even in those other cases, there is nothing

5     equivalent here.  Mr. Fischbarg's client can go to his

6     premises.  There is no ammonia or mold or anything in the air

7     that's not going to allow him on to the property.  In fact, the

8     governor's orders explicitly allow him to go to the property

9     and get his mail or do routine business functions.  The only

10    rule is that he has to stay six feet apart from other people.

11    So those cases are entirely distinguishable.

12          And when a business, a property is allowed to remain

13    open or people can still occupy the premises, there is no

14    direct physical loss or damage.  That was the case -- that's

15    what the court said in *Port Authority*, that's what happened in

16    *Mama Jo's*, where the restaurant was allowed to be open.  The

17    cases where there is direct physical loss or damage, you

18    literally cannot be on the premises because there is something

19    there that is making it uninhabitable, and here that just isn't

20    true.

21          THE COURT:  Okay.  Mr. Fischbarg I will give you the

22    last word.

23          MR. FISCHBARG:  All right.  So I would disagree that

24    he is allowed to go to the premises.  In fact, the opposite is

25    true.  The executive order 202.8 says it requires 100 percent

1    reduction.  So he can't go there, and he is not allowed to go

2    there, and that is a separate claim.  It is the civil authority

3    claim besides the breach of contract claim.

4         THE COURT:  Doesn't the executive order say -- I'm

5    sorry, which executive order are you talking about?

6         MR. FISCHBARG:  It is . . .

7         It is Exhibit 3 of the declaration, and then on page

8    2, "Each employer shall reduce the in-person workforce at any

9    work locations by 100 percent no later than March 22 at 8p.m."

10   And then it says --

11        THE COURT:  Right, but that doesn't mean the boss

12   can't go to the work location.

13        MR. FISCHBARG:  I would say he is -- he is an employee

14   and he can't go.  I think it does.  In my building here in New

15   York, there is nobody here.  I'm the only one.  There is no

16   bosses in any of the offices.

17        THE COURT:  There is nothing about the governor's

18   order that prohibits a small businessperson or a big

19   businessperson from going into their office to pick up mail, to

20   water the plants, to do anything like --

21        MR. FISCHBARG:  Your Honor --

22        THE COURT:  -- that, including employees that are

23   working.

24        MR. FISCHBARG:  Sorry.

25        MS. GORDON:  Your Honor, this is Sarah Gordon.  Oh, go

1    ahead, Mr. Fischbarg.

2            MR. FISCHBARG:  Okay.

3            Again, I would disagree.  I think the order is pretty

4    clear that 100 percent means that you are not supposed to go to

5    work, and that's what people have been doing in New York.  They

6    are not going into the office.  And to the extent they are

7    getting mail, I mean, there is work-arounds where the workers

8    in the building have been leaving it downstairs for people to

9    pick up, but the way it's been implemented is that 100 percent

10   means no one is going to any office.

11           THE COURT:  You are in your office.

12           MR. FISCHBARG:  Yeah, I'm not -- I'm considered, by

13   the way -- lawyers are considered essential, and if you are a

14   sole practitioner, you are considered essential.  So I have the

15   exclusion, and that's why I am here, but otherwise I wouldn't

16   be here.  So . . .

17           MS. GORDON:  Your Honor, if I may?  We submitted with

18   Mr. Michael's affidavit, Exhibit D, a printout from the Empire

19   State Development website.  And on question 13, it addresses

20   exactly this issue.  It says, "What if my business is not

21   essential but a person must pick up mail or perform a similar

22   routine function each day?"  And the answer provided by the

23   Empire State is, "A single person attending a nonessential

24   closed business temporarily to perform a specific task is

25   permitted so long as they will not be in contact with other

k5e2SocH

1    people."

2           THE COURT:  I thought I had read that somewhere.

3           MS. GORDON:  Yes.  It is in Mr. Michael's declaration,

4    and I think it's ECF 18-4, page 304.

5           THE COURT:  Okay.

6           MR. FISCHBARG:  Right, but I think the executive order

7    supersedes that is what I would argue.

8           THE COURT:  Okay.

9           Mr. Fischbarg, you have got to demonstrate a

10   probability of success on the merits.  I feel bad for your

11   client.  I feel bad for every small business that is having

12   difficulties during this period of time.  But New York law is

13   clear that this kind of business interruption needs some damage

14   to the property to prohibit you from going.  You get an A for

15   effort, you get a gold star for creativity, but this is just

16   not what's covered under these insurance policies.

17          So I will have a more complete order later, but your

18   motion for preliminary injunction is going to be denied.

19          Anything further for the plaintiff?

20          MR. FISCHBARG:  I guess just a housekeeping thing.  We

21   filed an amended complaint.  Are we going to deem it served or

22   does it have to be re-served?

23          THE COURT:  Has the defendant -- does the defendant

24   want to be reserved or will you take the amended complaint?

25          MR. MICHAEL:  Your Honor, this is Charles Michael.

k5e2SocH

1       We have entered a notice of appearance, and so I think

2    once they filed it on ECF, that service, we are happy to

3    consider it served.  That's fine.  And he does have one

4    amendment as of right.

5        THE COURT:  Correct.

6        MR. MICHAEL:  That was within his right to file it.

7        THE COURT:  Does defendant plan to move or answer?

8        MR. MICHAEL:  Probably to move.  We would have to

9    discuss it with our client, but I believe so.

10       THE COURT:  Okay.  What are the parties' position on

11   discovery while the motion to dismiss is pending?

12      MR. FISCHBARG:  Well, I would say there are two

13   motions filed -- there is one in the Eastern District of

14   Pennsylvania and one in, I think, the Northern District of

15   Illinois -- for an MDL, multi-district litigation, involving a

16   lot of lawsuits combining, so I think this might be happening

17   in each state until that motion is decided, and I think the

18   briefing schedule is in June --

19      MS. GORDON:  We -- your Honor --

20      MR. FISCHBARG:  -- so I think --

21      MS. GORDON:  Sorry, Mr. Fischbarg.

22      MR. FISCHBARG:  So I would say that this case might be

23   transferred to the multi-district panel at some point.

24      THE COURT:  Okay.  So, Mr. Fischbarg, what I am

25   hearing you say is that you are perfectly happy to have the

k5e2SocH

1  defendants not move until we find out whether or not your case

2  is going to get scooped up into the MDL?

3          MR. FISCHBARG:  Yes, correct.

4          THE COURT:  All right.  I presume that the defendants

5  are perfectly happy to do nothing until you hear back from the

6  MDL.

7          MS. GORDON:  Your Honor, I need to consult with my

8  client on that.  I'm not sure that that's true.  We don't think

9  these cases are appropriate for consolidation in the MDL for

10  many of the reasons which were evident today, given the

11  different states' conclusions on these laws.  So I need to

12  consult with my client on the motion practice.  We may intend

13  to want to move in any event.

14          THE COURT:  Okay.  Well, you could move, but if there

15  is a likely -- if there is some likelihood that they are going

16  to get scooped into the MDL, I'm not likely to decide it until

17  that decision is made.  So it is entirely -- I guess from my

18  perspective I don't really care, but from your client's

19  perspective, they may be making a motion to dismiss that's

20  unnecessary.  If you are right, and you may well be right, that

21  they are not going to MDL these kinds of cases, then all that's

22  happening is this is just being delayed into the summer for you

23  to incur fees making a motion to dismiss.

24          So why don't you talk to your client, figure out what

25  you want to do.  One way or the other, it does not seem to me

1    to make sense to proceed with discovery in this matter,

2    certainly under the circumstances that everyone is in, and

3    particularly the plaintiff is in, strapped for revenue, until

4    we figure out whether a lawsuit is going to go forward.

5           So talk to your client, figure out whether -- the

6    defendant should talk to Sentinel.  Figure out whether you are

7    happy staying this case pending a decision on the MDL or not,

8    and just write me a letter and let me know.

9           MS. GORDON:  Yes, your Honor.  Thank you.

10          MR. MICHAEL:  Your Honor --

11          THE COURT:  Anything further from the plaintiff?

12          MR. MICHAEL:  Just one housekeeping matter.  This is

13   Charles Michael, again, for the defendant.

14          THE COURT:  Okay.

15          MR. MICHAEL:  I just wondered if there was any special

16   procedures for ordering the transcript or if we go just through

17   the normal Southern District website?  I didn't know, under the

18   COVID circumstances, if there is something different we should

19   do.

20          THE COURT:  I don't think there is anything different,

21   but we have got the court reporter on.

22          So, Madam Court Reporter, is there anything different

23   they need to do?

24          THE COURT REPORTER:  At the end of this proceeding, I

25   am going to email the parties with their instructions.

k5e2SocH

1        THE COURT:  Okay.

2        MR. MICHAEL:  Terrific.  Thank you so much.

3        THE COURT:  Anything further from the plaintiff,

4   Mr. Fischbarg?

5        MR. FISCHBARG:  No.  Thank you, Judge.

6        THE COURT:  Anything further from the insurance

7   company?  Ms. Gordon?

8        MS. GORDON:  No.  Thank you, your Honor.

9        THE COURT:  All right.  Thank you, all.

10        MR. FISCHBARG:  Okay.  Bye, Judge.

11        MR. MICHAEL:  Thank you, your Honor.

12                        oOo

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT D**

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

_____

GAVRILIDES MANAGEMENT COMPANY
LLC, GAVRILIDES PROPERTY
MANAGEMENT LLC, & GAVRILIDES
MANAGEMENT WILLIAMSTON LLC,

        Plaintiffs,

v

MICHIGAN INSURANCE COMPANY,

        Defendant.

Case No. 20-258-CB

HON. JOYCE DRAGANCHUK

| | |
|---|---|
| Matthew J. Heos (P73786) | Henry S. Emrich (P29948) |
| THE NICHOLS LAW FIRM, PLLC | SECREST WARDLE |
| Attorney for Plaintiffs | Attorneys for Defendant |
| 3452 E. Lake Lansing Road | 2025 East Beltline Ave SE, Suite 600 |
| East Lansing, MI 48823 | Grand Rapids, MI 49546 |
| 517-256-4240 | 616-285-0143 |
| mheos@nicholslaw.net | hemrich@secrestwardle.com |

## ORDER GRANTING DEFENDANT MICHIGAN INSURANCE COMPANY'S MOTION FOR SUMMARY DISPOSITION

At a session of said Court, held in the
City of Mason, County of Ingham,
State of Michigan, on July 21, 2020

PRESENT:   Hon. JOYCE DRAGANCHUK
                  CIRCUIT COURT JUDGE

This matter having come before the Court on Defendant Michigan Insurance Company's

Motion for Summary Disposition, and the Court having reviewed the briefs from both parties

and heard oral argument from both parties in open court, and the Court being otherwise fully

advised in the premises:

Defendant Michigan Insurance Company's Motion for Summary Disposition has been

GRANTED for the reasons stated from the bench on the record.

3

**IT IS SO ORDERED** that the judgment in favor of Defendant is entered as a matter of law pursuant to MCR 2.116(c)(8), and that this matter is dismissed with full prejudice.

This Order resolves the last pending claim and closes the case.

Hon. JOYCE DRAGANCHUK
CIRCUIT COURT JUDGE    P-39417

6146558_1

SECREST WARDLE

4

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

_____

GAVRILIDES MANAGEMENT COMPANY,

                    Plaintiff,

vs.                                  File No. 20-258-CB

MICHIGAN INSURANCE COMPANY,

        Defendant.

_____/


        DEFENDANTS MOTION FOR SUMMARY DISPOSITION

  BEFORE THE HONORABLE JOYCE DRAGANCHUK, CIRCUIT COURT JUDGE

       LANSING, MICHIGAN – WEDNESDAY, JULY 01, 2020



APPEARANCES:

For the Plaintiff:          Matthew J. Heos-P73786
                              3452 East Lake Lansing Road
                              East Lansing, Michigan 48823
                              517-256-4240


For the Defendant:         Henry Emrich-P29948
                              2025 East Beltline Avenue SE-#600
                              Grand Rapids, Michigan 49546
                              616-285-0143


Recorded/transcribed by:    Susan C. Melton, CER 7548
                              Certified Electronic Reporter
                              (517) 483-6500 x6703

Case 5:20-cv-00349-D   Document 25-4   Filed 02/01/21   Page 4 of 27

```
                          TABLE OF CONTENTS


WITNESSES                                      PAGE

None.




EXHIBITS

None admitted.
```

2

Case 5:20-cv-00349-D   Document 25-4   Filed 02/01/21   Page 5 of 27

JA288

```
 1              Lansing, Michigan

 2              Wednesday, July 01, 2020

 3              2:58:57 PM

 4              THE COURT: This is, pardon me if I massacre

 5      this, Gavri--, Gavrilides Management Company, et al versus

 6      Michigan Insurance Company, docket number 20-258-CB. And

 7      this is the time set for Defendant Michigan Insurance

 8      Company's Motion for Summary Disposition. And just for the

 9      record, could I have your appearances, please?

10              MR. HEOS: Yes, your Honor. Matthew Heos and Nick

11      Gavrilides is here in the courtroom also with me. He is

12      the owner of the immediate plaintiff company's.

13              MR EMRICH: Henry Emrich on behalf of Michigan

14      Insurance Company, your Honor and my assistant Chenney

15      Ward.

16              THE COURT: Okay, thank you. And your motion, Mr.

17      Emrich, if you wish to go ahead.

18              MR. EMRICH: Thank you, your Honor. I am going to

19      assume that the Court has read all of the pleadings in

20      this case, so I'll try not to belabor some of the points.

21      I think the, the key fact that we need to focus on is that

22      as we've argued is that there's no question here but the

23      policies that insure Mr. Gavrilides properties against,

24      against direct physical loss or damage to the property and

25      contrary, any claim with the policy benefits in question
```

3

1    this business income coverage is illusory, the policy in
2    question here clearly provides that for the business
3    coverage, the business income coverage to apply and, and
4    most of the other primary coverages under their policy,
5    there must be a direct physical loss of or damage to the
6    insured property in order for it to apply.
7            And I think it's important as we'll discuss
8    later in our argument depending on what Mr. Heos has to
9    say, why this is important, we must focus on the fact that
10   there must be direct physical loss or damage to the
11   insured property and not direct physical loss of use of or
12   damage to the property as has been suggested by Mr.
13   Gavrilides and his attorney in order for the coverage at
14   issue to apply.
15           While I acknowledge, your Honor, that this is a
16   somewhat unique, extraordinary if you will, matter to be
17   filing at this point in the proceedings as our initial
18   pleading; I think it's important to understand that when
19   we look at Mr. Gavrilides complaint, it does not contain
20   one single allegation that this insured property has in
21   any way been damaged or lost.  To the contrary, the
22   allegations in the complaint affirmatively allege that the
23   plaintiff business interruption claim is based on the
24   "Stay at Home" orders of Governor Whitmer. There is no
25   allegation of any kind that the property in question has

4

1   in any way been damaged, lost or anything of the sort.

2          Given that this motion has been brought under

3   2.116(c)(10), plaintiff must produce some evidence to

4   contradict the uncontroverted facts that have been alleged

5   not only in the complaint, but in the affidavit submitted

6   Mr. Gavrilides and in any of the other materials that Mr.

7   Heos has attached to his response as, as indicated, most

8   importantly, the affidavit of Mr. Gavrilides that

9   reiterates the admissions in the complaint that there has

10  not been any loss of or damage to either of the properties

11  for which they seek coverage.

12         The insureds property today exists in the very

13  same condition as it existed the day prior to the

14  effective date of the "Stay at Home" order.  They have not

15  been lost, they have not been damaged, they have not

16  required any repairs because of any damage to those

17  properties. The business operation, its, its operation as

18  a restaurant today is, is the same as the day prior to the

19  effective date of the order, albeit with some modifi-

20  cations that had been required to avoid grouping and to

21  maintain social distancing in, in a sense improvements to

22  the real estate.  Not repairs, you know, and, and it's

23  been maintained as a take-out, take-out operation at least

24  until recently when they resumed the dining operation.

25  There has been no loss of or damage to either building

5

that has prevented the plaintiff from operating as a
restaurant or entering it for that matter if--, as they
have. If plaintiffs wanted to sell either building today,
they could do so. And while plaintiffs have provided some
speculative evidence about the decreased value of that
property, although, as I read Mr.--, as I read the
materials that Mr. Heos kindly attached to his response,
the fact of the matter is it pointed out in that article
was that while they operation of a commercial property may
get harder, it's not impossible to operate it in the
future under our new normal.

Because plaintiffs complaint, the affidavit, the
other information that has been provided to your Honor
provides no evidence of any damage to that property.
Plaintiffs could never prove that either property suffered
any direct physical loss from the imposition of Governor
Whitmer's emergency order.  And thus, could never recover
business interruption coverage under this policy based on
the facts that have been presented to the Court. The same
holds true under the business cover, income coverage, if a
civil authority prevents or prohibits access to either
property because of direct physical damage to an adjacent
or nearby property for the very same reason.  There has
been no direct physical loss or damage to any adjacent
property that has been alleged, that has been provided to

6

the Court in Mr. Heos response. And frankly, when you look at the order that they have, that is at issue in this case, there's nothing there that prevents access to Mr. Gavrilides properties whatsoever.

In summary, your Honor, there are no facts alleged in the complaint or in any of the materials that I've looked at, including Mr. Gavrilides affidavit, that shows there has been direct physical loss of or damage to the insured property. And for those reasons, your Honor, we believe that our motion--, for those reasons alone, we believe our motion for summary disposition should be granted.

I'd just like to make a couple of additional points before I shut up. I really believe summary disposition is warranted on this basis alone and I would turn the Court to the case that we've discussed in our, in our brief, your Honor, that's referred to Universal Insurance Production versus Chubb. And that's the decision of the Eastern District of Michigan involving a claim that involved insured property. It was damaged by a pervasive odor that developed in the property as a result of mold that grew in the property because of some water seepage. And why that case is important is because it discusses the Michigan Rules of Contract Interpretation, that still apply today, policy language is clear and unambiguous on

its face, which we believe is clearly the case here that
states that the words and the terms of the policy should
be enforced utilizing plain and commonly understood
meanings.

   And when I said earlier that that's important
when we talk about what direct physical loss of or damage
to property means, it means we look at those words. We
don't add words such as loss of use, that Mr. Heos and Mr.
Gavrilides have added in order to understand what we're
talking about here. We look at the language in the policy.
Every case that Mr. Heos produced your Honor, says the
very same thing. In Univer--, Universal, like here, the
policy was an 'all-risk' policy that required, like here,
direct physical loss or damage to the insured property in
order to trigger coverage unless that coverage was
excluded.

   As Universal pointed out, applying a dictionary
meaning of direct and physical as meaning something
immediate or proximate as a premise to something that is
distant or incidental and physical meaning something that
has a material existence meant in the context of a loss
involving a contaminant that, unlike here, per the uncon-
troverted allegations of the complaint and other evidence
produced by plaintiff in response to this motion. That in
order for direct physical loss of the property in this

```
 1    context, the contaminant must actually alter the structure
 2    integrity of the property in order to trigger coverage
 3    under language that is at issue in this case.  And it
 4    didn't happen in Universal, as the Court denied coverage
 5    there, granted affirmed summary disposition. And
 6    importantly your Honor, it hasn't even been alleged in
 7    this case. Regardless of any authority to the contrary,
 8    anywhere else in the country, this remains the law in our
 9    courts when interpreting policy terms at issue. There is a
10    requirement that there be direct physical loss of or
11    damage to property. And the allegations produced here in
12    the complaint and the evidence that's been attached have
13    specifically acknowledged no such contamination and no
14    such damage to the property as a result of that contami-
15    nation.
16           As in Universal, your Honor, the mere presence
17    of odor or even mold was not any evidence of structural or
18    tangible damage to the insured property. And as such, no
19    direct physical loss or damage to the property had-, was
20    occurred. Here, your Honor, we have the very same thing
21    except that we have not even had any allegations of any
22    damage to the property caused by this unfortunate, this
23    horrible virus.
24           Finally, and although we do not believe the
25    Court even has to get to this point, even if we assume for
```

9

1    purposes of this motion that contamination occurred on
2    each premises and that somehow effected the structural
3    integrity of either building, again, neither scenario is
4    alleged. And even if it were, we do not believe under the
5    circumstances and the science that exists that it would
6    necessarily constitute direct physical loss over damage to
7    the property. The buyer's exclusion of the policy, which
8    clearly and unequivocally states that it applies to all
9    coverages and endorsement and that the company will not
10   pay for loss or damages caused by or resulting from any
11   virus, bacteria or other microorganism that induces or is,
12   is capable of inducing physical distress, illness or
13   disease. And Lord knows, that that has certainly been the
14   case with what's happened with Covid-19 throughout our
15   country.

16        Clearly, your Honor, that exclusion, again, I
17   don't believe you even have to get there, but that
18   exclusion would clearly exclude any claim here even if
19   plaintiff's could prove direct physical loss of or damage
20   to the insured property or any nearby property that
21   resulted in a civil authority issuing an order prohibiting
22   access to the property.  As of eight days ago, your Honor,
23   they have only been few jurisdictions in this country,
24   Florida and Pennsylvania, that have discussed and applied
25   this, a similar exclusion as at issue in this case and in

every one of those cases, the Court has enforced that

exclusion as written because it's clear and unambiguous.

Again, your Honor, for all the reasons that we've set

forth here today and the brief that we filed and our

reply, we request that the Court grant our Motion for

Summary Disposition at this time. Thank you.

THE COURT:  Thank you. Mr. Heos?

MR. HEOS: Thank you, your Honor and may it

please the Court. And obviously Mr. Emrich and I have a

different interpretation of direct physical loss of or

damage to covered properties because here the loss comes

from the issue of the executive order restricting use of

property. Physically you cannot use for, for dine-in

services any of the interior of the building for a period

of time. And a complete prohibition isn't contemplated by

the language of the contract, I think a limited

restriction also falls within the coverage. And I think

that if you're gonna accept the defendants argument you

would have to limit the meaning to destruction of the

physical building itself, but we know that the coverage

extends to non-destructive loss, civil authority being

one.

I put in example in the brief subterranean

pollution, you can look at asbestos or a computer virus is

something that would occur that there would be no physical

1   destruction to the property itself. The fact of the matter
2   is that Mr. Gavrilides can't use the covered properties
3   because of or he's lost rather the use of those properties
4   because of the order and it looks like that will continue
5   in some form for a while. So, I think that counsel is
6   wrong in trying to limit the scope even with the case law
7   he cited, most of which is persuasive and not binding.
8   That's number one, Judge.

9       And as for the virus exclusion itself, the only
10  case law we have relates to person to person transmission
11  of a virus at the covered property.  And I think that fits
12  more with what's going on. We see in the news that Harpers
13  in East Lansing and even the Hotcat in Kalamazoo is making
14  headlines of people contracting Covid there. But, the
15  impetus of the order was to protect public health and
16  welfare, which is the governor's duty. It's not caused by
17  a virus. It would be the same order as with the damn in
18  Midland being issued to protect public health and welfare.
19  It wasn't caused by a flood.  It was caused by the
20  Governor's duty to act and protect the people she's
21  charged with protecting and I think that's what happening.

22      Or it's distinguishable from the case and I
23  think it's Bowler, the case cited regarding the virus. And
24  I think that if you go further in accepting defendant's
25  position, then we get into the illusory promise of well if

```
1    the government issues an order, we're not gonna cover it
2    because any decision of a government body or group of
3    people is excluded. And so then, you get into the circle
4    in the contract where if you're going to buy into counsels
5    logic, it would make that provision illusory. And for
6    those reasons, I think that the motion should actually
7    roll back on the defendants because the language to
8    support the claim, to the extent that the Court thinks
9    there's a deficiency in my pleading and is gonna grant
10   defendants motion, I'd like Leave to Amend the Complaint.
11   But, I don't think that's the case here. And with that,
12   I'll leave it, if the Court would like to ask any
13   questions, I'm happy to take them.
14          THE COURT: I don't have any. Thank you. I'll
15   give Mr. Emrich rebuttal time.
16          MR. EMRICH: Thank you, your Honor. Your Honor,
17   what I would say is that when we talk about these cases
18   that Mr. Heos has mentioned that might provide coverage in
19   certain situations, I read those cases a little while ago
20   and I'm kind of tired reading some of these cases about
21   insurance coverage. But, the point in every one of those
22   cases is that the condition she referred to actually
23   caused damage to the property.
24          In this case, there has not been any such
25   damage. And if we look at what the coverage for business
```

13

1    loss or business--, the business income loss that they're

2    seeking says, it says that if the business, the coverage

3    would apply if the business operation is suspended

4    provided the suspension must be caused by the direct

5    physical loss of or damage to property. In this case, that

6    hasn't occurred. Nothing prevents Mr. Gavrilides from

7    using that property. It has been used as such. The fact

8    that there may be other coverages that may provide some

9    limited coverage, they're against what Mr. Heos is arguing

10   because clearly, if those coverages were covered under

11   this language, then why have a special coverage that

12   provides certain conditions for its application.

13        The point is, in each of those civil authority

14   cases that he talked about, the property actually

15   sustained damage. Here it didn't sustain damage. As to his

16   claim in this case, that he wants an opportunity to amend

17   his complaint if the Court feels compelled to grant my

18   motion, what is that going to accomplish? He's already

19   alleged in his complaint and his client has already signed

20   an affidavit where he no doubt put his hand up and swore

21   to the contents of that affidavit in which he said there

22   has been no damage to that property.

23        We don't create coverage by-, because somebody

24   thinks they ought to have coverage. But, that, that, that

25   whole line of cases Roy versus Continental Insurance and

some of the other cases in our, in our brief that we
cited, clearly supports the notion that the reasonable
expectation concept doesn't apply in Michigan. It just
doesn't cut it. There is no coverage here, your Honor.
That exclusion is clear. If the Court feels that there may
be or that there may be a situation that would give rise
to, but again, you have to come forward at the time that
you, that you respond to this motion with some evidence
that suggests that. That hasn't happened here. I mean even
when you look at the response that he's filed, he talks
about scenario's that have absolutely no bearing to this
case.

And you know, I'll just make one last point,
your Honor, you know, when I was a young Prosecutor, I had
the benefit of being able to argue a number of cases to
juries that required me to prove the defendant's guilt
beyond a reasonable doubt. And in those cases, I was
trained to listen closely to the defendant's argument and
had been the case where the facts were particularly
egregious, a defense attorney would often not even talk
about those facts and talk about the law. And he talked
about how that law was somehow created this reasonable
doubt in hopes of creating some confusion on the part of
one juror who might then find in his clients favor because
reasonable doubt existed. And, and in those cases, I would

Case 5:20-cv-00349-D   Document 25-4   Filed 02/01/21   Page 18 of 27

1  make sure that when I got up in rebuttal, just as I have
2  been given the opportunity to here, I would point that out
3  to the jury and indicate to them that there's a reason for
4  that. And that's because they didn't want you to talk
5  about the facts that clearly supported conviction.

6       On the other hand, if it was a case where the
7  law, you know, or the facts may have been murky, but the
8  law was clear, the defense attorney would only focus on,
9  you know, on those facts and not talk about the law. And
10 again, I point that out to the jury there.  But, in this
11 case, you know, and there were cases back then to, like
12 our case here that were neither supported by the facts or
13 the law. Which I believe is clearly the case in this case.
14 And the defense attorney would get up and argue something
15 that to the jury that had absolutely nothing to do with
16 the case in hopes of confusing them. Just like Mr. Heos
17 has suggested by talking about these asbestos cases or
18 some of these other cases that have nothing to do with
19 this.

20      Well in this case, when you look at his
21 responsive pleading, he talks about an accident situation
22 that has absolutely no application here. Nothing to do
23 with this case. While in his argument, he starts out
24 talking about a discussion of the virus of racism and as
25 there, as there, we would point out, if we were in front

of a jury, just like I'd point out to them and I'm
pointing out to you, it hasn't got anything to do with
this case. Your Honor, the reason for that and the reason
for the topic of that is that he knows that neither the
facts or the law support his claim and nothing he could
file as an amendment would change that.

He is hoping to somehow create this little bit
of possibility, some scintilla that some evidence is gonna
pop up that shows that the property has been damaged in
hopes that he could trigger coverage. And as this Court
knows under the cases we've discussed in our brief, that
is not sufficient to deny summary disposition in a case
that clearly warrants it even at this early stage.

Thank you your Honor for your patience. Thank
you Mr. Heos, we've never met. I've heard a lot of good
things about you. Mr. Gavrilides, nice to have met you,
very sorry for the situation you're in. It's just crazy
all the way around. And just like having to argue this
case on TV is really just disconcerting for me. But, in
any event, thank you your Honor for your patience.

THE COURT: Thank you. You're on Youtube not TV.
But--

MR. EMRICH: I meant screen. Yeah, whatever.

THE COURT: Right.

MR. EMRICH: The screen.

```
 1              THE COURT: I, I did read the briefs. I studied
 2        them very carefully and I've listened to the argument of
 3        counsel today. And taking all the-, that together I, I
 4        note that the plaintiff speaks of and focuses on arguments
 5        about access to the property, use of the property and
 6        definitions of loss and damage. But, the first inquiry has
 7        to start with a full look, not just isolating some words
 8        or phrases from the policy. But, a full look at the
 9        coverage that's provided under the policy.
10              Coverage is provided for actual loss of business
11        income sustained during a suspension of operations. The
12        policy goes on to provide the 'suspension must be caused
13        by direct physical loss of or damage to property.' And it
14        also provides 'the loss or damage must be caused by or
15        result from a covered cause of loss. The causes of loss
16        special form provides that a covered cause of loss means
17        risks of direct physical loss.'
18              So, whether we're talking about the cause for
19        the suspension of the business or the cause for the loss
20        or the damage, it is clear from the policy coverage
21        provision only direct physical loss is covered. Under
22        their common meanings and under federal case law as well,
23        that the plaintiff has cited that interprets this standard
24        form of insurance, direct physical loss of or damage to
25        the property has to be something with material existence.
```

Case 5:20-cv-00349-D   Document 25-4   Filed 02/01/21   Page 21 of 27

1     Something that is tangible. Something according to the one
2     case that the plaintiff has cited from the Eastern
3     District, that alters the physical integrity of the
4     property.  The complaint here does not allege any physical
5     loss of or damage to the property. The complaint alleges a
6     loss of business due to executive orders shutting down the
7     restaurants for dining, for dining in the restaurant due
8     to the Covid-19 threat.
9           But, the complaint also states that a no time
10    has Covid-19 entered the Soup Spoon or the Bistro through
11    any employee or customer and in fact, states that it has
12    never been present in either location. So, there simply
13    are no allegations of direct physical loss of or damage to
14    either property. The plaintiff seems to make in the
15    briefing, at least, two arguments about the language in
16    the coverage provision and what it means.
17          The first argument is that the plaintiff says
18    coverage applies to "direct physical loss or damage to
19    property."  Even if that were the wording of the coverage
20    provision, it wouldn't save the plaintiff from the
21    requirement that the loss or damage must be physical and
22    the analysis could end right there. But, I have to go on
23    to say that this is not even the wording of the coverage
24    provision. Coverage according to the policy applies to a
25    suspension caused by "direct physical loss of or damage to

19

1 property." So, I'm not going to get into a detailed
2 analysis of the rules of grammar. But, common rules of
3 grammar would apply to make that phrase a short-cut way of
4 saying "direct physical loss of property or direct
5 physical damage to property." So, again, the plaintiff
6 just can't avoid the requirement that there has to be
7 something that physically alters the integrity of the
8 property. There has to be some tangible, i.e., physical
9 damage to the property.
10     Then the plaintiff in the briefing, at least,
11 seems to make a second argument that and this is not 100%
12 clear, but, it seems like the plaintiff is saying that the
13 physical requirement is met because people were physically
14 restricted from dine-in services. But, that argument is
15 just simply nonsense. And it comes nowhere close to
16 meeting the requirement that there's some, there has to be
17 some physical alteration to or physical damage or tangible
18 damage to the integrity of the building.
19     So, the next argument that the plaintiff makes
20 is that the virus and bacteria exclusion is vague and
21 can't apply here.  The plaintiff has not adequately
22 explained how the term virus is vague. And in fact,
23 supplies a completely workable, understandable, usable
24 definition of the word virus. The argument in this regard
25 really seems to be more that the virus exclusion doesn't

```
1    apply. And it goes something like this as far as I can
2    tell, first, a virus can't cause physical loss or damage
3    to property because virus' harm people, not property.
4    Second, the damage caused here was really caused by
5    actions of the civil authority to protect public health.
6    And then third, therefore, coverage for acts of any
7    person, group, organization or governmental body applies.
8    But, that argument bring us right back to the direct
9    physical loss or damage requirement. Again, going back to
10   the cause of loss special form B, as in boy, exclusions
11   provides that acts of government are only covered when
12   they result in a covered cause of loss. A covered cause
13   of loss, again, is direct physical loss. So, even if the
14   virus exclusion did not apply, which the plaintiff has not
15   supported that it doesn't apply, I only argue that it's
16   vague, which I reject. But, even if it did not apply, it
17   could only be coverage for governmental actions that
18   resulted in direct physical loss or damage.
19           And then, finally, the plaintiff argues that the
20   policy has a contradiction in it that renders it illusory.
21   So, the plaintiff says that the policy extends coverage
22   for governmental acts. But, then, it takes it away in the
23   causes of loss special form. But, that's simply not true.
24   Coverage is provided for actual loss of business income
25   sustained during the suspension of operations. However,
```

21

according to the coverage provision, the suspension must
be caused by direct physical loss of or damage to
property. And governmental acts are likewise covered if
it results in a covered cause of loss, which is again, a
direct physical loss. There is no granting of coverage
and then excluding the same coverage in the policy. As a
matter of fact, the policy is consistent throughout and
consistent with federal law cited by the plaintiff. It
requires physical loss or damage.

There is a virus exclusion even if plaintiff was
alleging, was alleging, even if there were allegations in
the complaint alleging actual physical loss or damage,
which the complaint does not do. But, there is a virus
exclusion that would also apply. And governmental action
that results in direct physical loss is covered. But
again, there is no direct physical loss alleged here.

Now, I have to address a little bit this, that
it was brought as a (c)(10) motion. The actually the
defendant hasn't provided any support by way of factual
support, depositions, affidavits, et cetera, for a (c)(10)
motion. So, if the defendant doesn't do that, then the
plaintiff has no burden under Maiden versus Rosewood. So,
there's no shifting burden until the moving party first
does it. But, I don't think it properly is labeled a
(c)(10) motion. I think it's a (c)(8) motion. Because this

22

| | |
|---|---|
| 1 | is the motion that can be decided as a matter of law. Take |
| 2 | all the allegations in the complaint as true and examine |
| 3 | nothing more than the contract upon which the complaint is |
| 4 | based, the policy of insurance and as a matter of law, the |
| 5 | plaintiffs complaint cannot be sustained. And although the |
| 6 | plaintiff has requested a chance to amend without any |
| 7 | indication of how they would do that, there actually is no |
| 8 | factual development that could change the fact that the |
| 9 | complaint is complaining about the loss of access or use |
| 10 | of the premised due to executive orders and the Covid-19 |
| 11 | virus crisis. So, there's no factual development that |
| 12 | could possibly change that or amendment to the complaint |
| 13 | that could possibly change that those things do not |
| 14 | constitute the direct physical damage or injury that's |
| 15 | required under the policy as I've outlined. |
| 16 | So, for those reasons, I am granting the |
| 17 | Defendant's Motion for Summary Disposition. I'm doing it |
| 18 | under MCR 2.116 (c)(8). And Mr.— |
| 19 | MR. EMRICH: Thank you, your Honor. |
| 20 | THE COURT: Mr. Emrich, will you submit an order? |
| 21 | MR. EMRICH: Certainly will, your Honor. |
| 22 | THE COURT: Okay. |
| 23 | MR. EMRICH: Thank you. |
| 24 | THE COURT: Thank you. |
| 25 | MR. HEOS: Thank you very much. |

Case 5:20-cv-00349-D   Document 25-4   Filed 02/01/21   Page 26 of 27

```
 1                    THE COURT: That will conclude our hearing.

 2                    (Hearing concludes at 3:32:35 PM.)

 3

 4

 5

 6

 7

 8

 9

10       STATE OF MICHIGAN)

11                      )

12       COUNTY OF INGHAM)

13

14

15

16       I certify that that this transcript, consisting of 24

17  pages, is a complete, true, and correct transcript of the

18  proceedings and testimony taken in this case on Wednesday,

19  July 01, 2020.

20

21

22  July 09, 2020              _____
23                            Susan C. Melton-CER 7548
24                            30th Circuit Court
25                            313 West Kalamazoo Avenue
26                            Lansing, Michigan 48901
27                            517-483-6500 ext. 6703

28
```

24

**EXHIBIT E**

ELECTRONICALLY FILED BY
Superior Court of California,
County of Monterey
On 8/06/2020
By Deputy: Cummings, Lorielle

1 STEPHEN M. HAYES (SBN 83583)
RYAN Z. KELLER (SBN 249193)
2 HAYES SCOTT BONINO & ELLINGSON
GUSLANI SIMONSON & CLAUSE, LLP
3 999 Skyway Road, Suite 310
San Carlos, California 94070
4 Telephone: (650) 637-9100
Facsimile: (650) 637-8071
5

6 Attorneys for Defendant,
CALIFORNIA MUTUAL INSURANCE COMPANY
7

8             SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 IN AND FOR THE COUNTY OF MONTEREY

10 THE INNS BY THE SEA, a California        **CASE NO. 20CV001274**
   Corporation,
11
            Plaintiff,
12
                                           [~~PROPOSED~~] **ORDER GRANTING**
13      v.                                 **DEFENDANT CALIFORNIA MUTUAL**
                                           **INSURANCE COMPANY'S DEMURRER**
14 CALIFORNIA MUTUAL INSURANCE             **TO PLAINTIFF'S COMPLAINT**
   COMPANY, a California Corporation, and
15 DOES 1 through 25, Inclusive,           **MATTER DEEMED COMPLEX, and**
                                           **assigned for All Purposes to Judge Lydia M.**
16          Defendants.                    **Villareal**

17                                         **Hearing Date:    August 4, 2020**
                                           **Time:            8:30 a.m.**
18                                         **Dept.:           13**

19                                         **Action Filed:    April 20, 2020**
                                           **Trial:           None Set**
20

21

22

23

24

25

26

27

28
   1138634

[PROPOSED] ORDER GRANTING DEFENDANT CALIFORNIA MUTUAL INSURANCE COMPANY'S
DEMURRER TO PLAINTIFF'S COMPLAINT – Monterey County Action No.: 20CV001274

Case 8:20-cv-01036-JLS Document 29-3 Filed 02/01/21 Page 2 of 29

JA312

1        Defendant CALIFORNIA MUTUAL INSURANCE COMPANY's ("California Mutual")

2  Demurrer to the Complaint filed by Plaintiff The Inns by the Sea ("Plaintiff") came before the

3  Honorable Lydia M. Villarreal in Department 13 on <u>August 4</u>, 2020. The Court, having

4  reviewed the papers filed in support of and in opposition to, and good cause appearing therefor, the

5  Court hereby makes the following orders:

6       1.    IT IS HEREBY ORDERED that the California Mutual's Demurrer to Plaintiff's

7  <u>entire Complaint</u> is sustained without leave to amend on the grounds that the allegations fail to state

8  facts sufficient to constitute a cause of action.

9

10     **IT IS SO ORDERED**.

11  Dated: **August 6, 2020**, 2020                                          

12                              Judge Lydia M. Villarreal
                               Judge of the Superior Court of Monterey

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING DEFENDANT CALIFORNIA MUTUAL INSURANCE COMPANY'S
DEMURRER TO PLAINTIFF'S COMPLAINT – Monterey County Action No.: 20CV001274

JA313

CASE NAME: **The Inns by the Sea v. California Mutual Insurance Company, et al.**
CASE NO.: **Monterey County Action No.: 20CV001274**

## PROOF OF SERVICE

I am a resident of the State of California. My business address is 999 Skyway Road, Suite 310, San Carlos 94070. I am employed in the County of San Mateo where this service occurs. I am over the age of 18 years, and not a party to the within cause. I am readily familiar with my employer's normal business practice for collection and processing of correspondence for mailing with the U.S. Postal Service, and that practice is that correspondence is deposited with the U.S. Postal Service the same day as the day of collection in the ordinary course of business.

On the date set forth below, following ordinary business practice, I served a true copy of the foregoing document(s) described as:

**[PROPOSED] ORDER GRANTING DEFENDANT CALIFORNIA MUTUAL INSURANCE COMPANY'S DEMURRER TO PLAINTIFF'S COMPLAINT**

☒ (BY EMAIL) [WITH PRIOR APPROVAL] by transmitting via email the document(s) listed above to the corresponding email address(es), or as stated on the attached service list, on this date before 5:00 p.m.

| | |
|---|---|
| Tyler Roberts Meade | Michael Joseph Reiser, Esq. |
| The Meade Firm, P.C. | Reiser Law |
| 12 Funston Avenue, Suite A | 1475 N Broadway, Suite 300 |
| San Francisco, California 94129 | Walnut Creek, California 94596-4643 |
| Telephone: 415.724.9600 | Telephone: 925.256.0400 |
| Facsimile: Not Available | Facsimile: 925.476.0304 |
| Email: tyler@meadefirm.com | Email: michael@reiserlaw.com |
| cc Email: sam@meadefirm.com; and | cc Email: michaeljr@reiserlaw.com; |
| seena@meadefirm.com; | matthew@reiserlaw.com; |
| | isabella@reiserlaw.com; and |
| *Attorneys for Plaintiff The Inns by the Sea* | debbie@reiserlaw.com |

*Attorneys for Plaintiff The Inns by the Sea*

☒ *(State)* I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 18, 2020 at San Carlos, California.

*Dolores A. Mayorga*
Dolores A Mayorga

-1-
PROOF OF SERVICE – CASE NO. 20CV001274

1    THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF MONTEREY

3    _____
                                        CERTIFIED COPY
4    The Inns by the Sea          )
                                  )
5    vs.                          ) CASE NO. 20CV001274
                                  )
6    California Mutual Insurance  )
     Company                      )
7    _____)

8              REPORTER'S TRANSCRIPT OF PROCEEDINGS

9               MONDAY, AUGUST 4, 2020

10       BEFORE THE HONORABLE LYDIA M. VILLARREAL, JUDGE

11

12

13   APPEARANCES:

14   FOR PLAINTIFF:          SAM FERGUSON
     (APPEARING ON COURT CALL)  ATTORNEY AT LAW
15
                            MICHAEL J. REISER
16                          ATTORNEY AT LAW

17

18   FOR DEFENDANT:          RYAN Z. KELLER
     (APPEARING ON COURT CALL)  ATTORNEY AT LAW
19
                            STEVEN HAYES
20                          ATTORNEY AT LAW

21

22

23

24   REPORTED BY:   JAMIE L. SETTERQUIST CSR 13362
                    OFFICIAL COURT REPORTER
25                  MONTEREY COUNTY SUPERIOR COURT

                                                        1

```
 1        MONTEREY, CA; Monday, August 6, 2020; 9:24 A.M.

 2

 3                    P R O C E E D I N G S

 4              THE COURT:  Inns by the Sea versus California

 5    Mutual Insurance Company.

 6              MR. KELLER:  Good morning Your Honor.  Ryan

 7    Keller on the phone for Defendant, California Mutual

 8    Insurance Company.  I also have Steven Hayes from my

 9    office on the phone.

10              THE COURT:  I appreciate you doing it, but

11    it's easier for me if I do it.  Sam Ferguson for Inns by

12    the Sea?

13              MR. FERGUSON:  Good morning.  Sam Ferguson for

14    Inns by the Sea.

15              THE COURT:  Thank you very much.  Steven Hayes

16    for California Mutual?

17              MR. HAYES:  Good morning, your Honor.

18              THE COURT:  And who is going to be speaking on

19    behalf of California Mutual?  Will it be Mr. Hayes or

20    Mr. Keller?

21              MR. KELLER:  Mr. Keller, your Honor.

22              THE COURT:  Thank you very much.  Mr. Keller

23    on behalf of The Inns by the Sea.

24              MR. REISER:  Good morning, your Honor.

25    Michael Reiser.
```

Case 5:20-cv-00349-DE Document 25-5 Filed 02/01/21 Page 6 of 25

```
 1            THE COURT:  And who will be speaking on behalf
 2     of plaintiffs?
 3            MR. FERGUSON:  Sam Ferguson of the Meade Law
 4     Firm will be speaking on behalf of Inns by the Sea as
 5     plaintiffs.
 6            THE COURT:  All right.  Thank you so much.  So
 7     I have gone over what you filed, and let me just start
 8     by saying the economic damage caused by COVID is just
 9     heartbreaking, and this case is yet one more of the
10     heartbreak.
11            There are two things that are of concern to
12     me.  It seems to me that the language of the policy
13     supported the defendant's position that it talks about
14     the business suspension must be caused by direct
15     physical loss of or damage to property at the premises,
16     and it seems that the cases for the most part are --
17     seek to address some sort of physical destruction or
18     physical change in usefulness, and I am not sure that
19     COVID creates that physical change.
20            Now, what I think gives me pause is that I am
21     trying to understand the other cases that have been
22     referenced by the plaintiffs, and that is that smoke
23     damage is considered physical damage, persistent E. Coli
24     infestation is physical, gasoline vapors are physical,
25     carbon monoxide saturation is physical, and certainly
```

```
 1      large quantities of asbestos in the air is considered
 2      physical.
 3              So I am just wondering whether or not COVID is
 4      enough like these other things such that it should be
 5      covered.
 6              So that is sort of my thoughts, and let me
 7      just start with Mr. Ferguson.
 8              MR. FERGUSON:  Thank you, your Honor.  To
 9      directly address your concerns here, I think there is an
10      important way we can view all of the cases you mentioned
11      of smoke damage, E. Coli, gas vapors, carbon monoxide,
12      and one way to view those cases is view the atmosphere
13      in the air within the insured property as part of the
14      physical premises of the property.  I think this is
15      exactly what the Oregon Shakespeare case does, which as
16      you mentioned the case of smoke infestation of the
17      Oregon Shakespeare Festival, and one way to think about
18      coronavirus, there is actually a contamination of the
19      air within the physical spaces that results in a change
20      on the molecular level of the composition of the air and
21      space.
22              What these cases hold is that when there is a
23      physical change or when there is a physical invasion of
24      a harmful substance that renders a space functionally
25      useless, you have direct physical loss of or damage to
```

3

Case 5:20-cv-00349-MDE Document 25-5 Filed 02/01/21 Page 8 of 25

JA318

```
 1          property within insurance coverage.
 2                  And now, your Honor, I certainly sympathize
 3          with your struggle over whether coronavirus is similar
 4          enough to smoke, E. Coli, gas vapors, carbon monoxides,
 5          and asbestos, but it does seem to me that those concerns
 6          raise a factual question of what are the characteristics
 7          of coronavirus?  How present was it on this premises?
 8          How dangerous was it and what quantities?  Those are all
 9          factual questions that can be addressed in discovery.
10                  And with respect to the demurrer, the
11          defendants are making a legal point here.  They are
12          saying under no circumstances does our policy -- does
13          our insurance policy provide coverage for the insured in
14          the absence of tangible alteration to the property.
15                  Now, I think as we point out in our brief --
16          and I won't belabor the point -- that is not actually
17          consistent with the language of their own policy, and
18          one of the primary interpretative goals in looking at
19          the insurance policy is you need to make sure that every
20          word in that policy makes sense.  You can't reach an
21          interpretation of a policy that renders superfluous
22          language.
23                  To point out the obvious, defendant excludes
24          from coverage the mere presence of bacteria.  Now, that
25          exclusion only makes sense if it is against a backdrop
```

4

1    of damage that goes beyond tangible alteration of the

2    property.  There would be no reason to exclude the

3    presence of bacteria if the policy only covered tangible

4    alteration to property.

5         So, your Honor, I think that addressed your

6    concern, and I will leave it there for now.  I am happy

7    to speak more at length about other issues, but I will

8    leave it there for right now.

9         THE COURT:  Well, let me ask you another

10   question about that.  When I was struggling with the

11   smoke damage, gasoline vapors, et cetera, the

12   distinction in my mind -- and I don't know if this is

13   one that is valid or not, Mr. Ferguson -- the

14   distinction in my mind is that when California shut

15   down, when the Governor ordered us all to shelter in

16   place and businesses to close, it wasn't necessarily

17   because there was COVID at your hotels.  It was because

18   there was a fear that COVID might arrive at your hotels,

19   and there was a fear by having people move around the

20   state, that that would cause us all to infect each

21   other.

22        So even if we assume that COVID infects the

23   air, which I get your point on that, I think the science

24   supports you on that, but I guess the question I have

25   is, was that the cause?

5

```
 1            MR. FERGUSON:  So, your Honor, to address your
 2    concerns here, I think it is important to understand
 3    that there are two independent possible sources of
 4    coverage here.  The first is the business interruption
 5    insurance coverage, which would be triggered by the
 6    physical presence of coronavirus on the insured
 7    premises.  That is our property, and that is what we
 8    allege is our burden to prove that once we get into
 9    discovery.
10            But I think on the allegations, we certainly
11    have met the requirements for the complaint that we have
12    alleged that there was coronavirus on the premises,
13    which caused physical loss of or damage to the premises.
14            The other independent source coverage that we
15    have under this policy is civil authority coverage, and
16    that doesn't require that there even be coronavirus on
17    our property.  It merely requires that there is direct
18    physical loss of or damage to property somewhere else,
19    and that the civil authority take action based on the
20    presence of coronavirus on another property.
21            Now the coronavirus is widespread in both of
22    the county orders.  The San Mateo County order and
23    Monterey County order mentioned there is coronavirus
24    virus within both of the counties.  They mention
25    specific case numbers.  They mention case numbers up in
```

```
 1     the Bay Area.  It is clear in our mind that the local

 2     county authority and the Governor are responding to the

 3     physical presence of coronavirus in enacting the shelter

 4     in place order.

 5            And to underscore the point, this is about the

 6     physical presence of coronavirus.  I think those orders

 7     are designed to require people to avoid direct, physical

 8     contact with the virus.  That is the key issue here.

 9     150,000 people in this county have died because they

10     have come into physical contact with the virus.

11            I think that the virus is certainly physical,

12     and the orders are in response to the physical presence

13     of the virus that is at other locations and inside the

14     insured premises.

15            THE COURT:  Okay.  So let me make sure I am

16     understanding you.  So the business income is lost

17     because of the civil authority shutdown.  Doesn't that

18     also require a direct physical loss, and don't we still

19     come back to the same problem of whether or not COVID

20     causes a physical loss?

21            MR. FERGUSON:  Yes; that is correct, your

22     Honor.  To trigger the civil authority coverage, it is

23     our burden in discovery to show that there was

24     coronavirus on another property.

25            And what is interesting about the civil
```

7

```
1     authority coverage in this insurance policy is it is
2     written incredibly broadly.  Typically, in other civil
3     authority provisions, there is actually a proximity
4     requirement.  In our case, there actually is no such
5     proximity requirement.
6           So we believe that there was the physical
7     presence of coronavirus that caused a loss of or damage
8     to property essentially anywhere within two counties.
9     And as a result of that, the civil authority within the
10    county's order to ensure premises to be shut down.
11          So when you look at the claim for civil
12    authority in the context of this case and the context of
13    the policy that is in front of you, we think that we
14    sufficiently allege that there is direct physical loss
15    of or damage to other premises, and if we can carry that
16    burden after the demurrer in discovery, then we win this
17    case.
18          But I think all you have to do right now is
19    ask yourself, can the coronavirus cause direct physical
20    loss of or damage to any property?  And again, we would
21    submit that under the 16 cases we cited, the test is
22    whether there is a presence of a hazardous substance,
23    and whether the quantity of that substance renders the
24    property dangerous to human health and renders the
25    property unusable, we think that there is no tangible
```

1   alteration to the property required under this policy.

2      So our burden to invoke code civil authority

3   coverage is to show that somewhere within the County of

4   Monterey or the County of San Mateo that there was

5   coronavirus in such concentration that some property was

6   rendered uninhabitable or unusable because of the

7   concentration of coronavirus.  And we certainly think we

8   can meet that burden in discovery, but for now, the

9   Court has to merely analyze whether we alleged enough to

10   meet that bar.

11      THE COURT:  Thank you.  Mr. Keller?

12      MR. KELLER:  Yes, your Honor.  So I think that

13   your analysis is spot-on and exactly how you should be

14   looking at these issues.  So let me first address the

15   issue that gave you pause.

16      So the courts outside of California, as you

17   mentioned, got into issues like asbestos and carbon

18   monoxide, and those are, as you point out, ultimately

19   not just directed at losses.  It also needs to have the

20   business income loss be caused by that direct physical

21   loss.  Like the carbon monoxide situation, it's,

22   Everybody out of the building.  You are going to die

23   from carbon monoxide.

24      The asbestos, there is direct health problems.

25   There is a smell that is related to a lot of those

9

1   claims that you are referring to. And so to have
2   everybody out of the building, that causes the business
3   income loss.

4          Here, the Court need not turn a blind eye to
5   the realities of the pandemic and the business situation
6   where the businesses are open while this pandemic is
7   still ongoing, and that's a result of the fact that it
8   is designed to keep people socially distanced and reduce
9   the spread of the pandemic, and that is why the the
10  shelter is in place so they don't prohibit access of
11  civil authority coverage requires to even allow the
12  hotels to keep people there, which they couldn't in the
13  case of a carbon monoxide, asbestos situation.

14         And further, those cases, again, are outside
15  of California. The direct physical requirement as
16  prefix to the insurance agreement have to be considered
17  under the context for *MRI Healthcare*, and *MRI Healthcare*
18  says that it's excluded and accompanied by demonstrable
19  physical alteration of the property.

20         So I believe that when you follow the analysis
21  of the policy language under the California case in *MRI*
22  *Healthcare*, that it is not a business income loss caused
23  by direct physical damage to property, and the plaintiff
24  has certainly not alleged that. At most, they've
25  alleged a physical presence on the property of the virus

1    and not that that has caused the business income loss,

 2    nor can they because as I noted, they could have had

 3    people there.  They chose to cease and close down based

 4    on the counties' orders, and that was the cause of their

 5    loss.

 6              THE COURT:  Well, let me just correct you.  I

 7    don't think they chose to shut down.  They were ordered

 8    to shut down.

 9              MR. KELLER:  Yes.  They followed the shelter

10    in place orders, and they -- what I meant by that was

11    there was some level of operations that they could have

12    had under the county order such as maybe economically

13    disadvantaged individuals that they still could have

14    provided shelter to.  To completely shut down was not a

15    complete mandate by the counties.

16              But irrespective of that finer point, there is

17    no direct physical damage to property that caused the

18    business income loss.

19              THE COURT:  Well, Mr. Ferguson, I completely

20    disagree with Mr. Keller that anyone had a choice.  I

21    think we were all trying to follow the orders we were

22    given, but in spite of that issue, having looked at the

23    *MRI* case -- and I certainly agree with your

24    representation that once you get to the facts of the *MRI*

25    and the ramping up, the ramping down and all that, it

```
 1      really is not at all like our case here.

 2              However, I do think -- and help me with this,

 3      Mr. Ferguson -- I do think the *MRI* case is intended to

 4      be the framework by which we analyze these cases, and

 5      that case pretty much says that because of the need for

 6      a physical damage, that it precludes any claim in which

 7      the insured suffered a detrimental economic impact

 8      without the distinct, demonstrable physical alteration

 9      of the property.  Help me out with that, Mr. Ferguson.

10              MR. FERGUSON:  Yes.  So a couple points on

11      *MRI*, your Honor.  First, the term 'physical, as the *MRI*

12      court understands it is, losses that are intangible or

13      incorporeal.  That is what it is using to distinguish

14      against physical, and I don't think that we alleged an

15      intangible or incorporeal loss here.

16              We allege there are specific, physical

17      microbes within our property that are contaminating the

18      air that are hazardous to human health that are

19      rendering it unusable.  And I think to adopt the

20      definition of direct physical loss of or direct physical

21      damage to property, that it excludes the situation where

22      you have an invasion by a physical force into the

23      atmosphere of your property onto all the surfaces of

24      your property and says that is not direct physical loss

25      of or damage to property, it can't be the case.
```

```
 1            When an insured purchased insurance, they are
 2      expecting that when there is a physical catastrophe that
 3      shuts down their operation, the insurance coverage will
 4      kick in and cover that, and I think that to the extent
 5      that *MRI* case suggests that there has to be tangible
 6      alteration in the sense that it is perceptible to the
 7      eye or to touch, that is simply dicta in that case.
 8      This Court is not required to follow *MRI Healthcare* on
 9      that rationale.
10            *MRI Healthcare* actually could have said what
11      we are saying here.  It could have said physical damage
12      actually does include the physical invasion by hazardous
13      substances that renders a property unusable, and the
14      outcome would have been exactly the same in *MRI*
15      *Healthcare*, and I am pointing that out to say that
16      discussion of the meaning of direct physical loss of or
17      damage to property wasn't central.
18            One other point about *MRI Healthcare* is the
19      language of coverage in that case and the relevant
20      policy is actually different.  The language of coverage
21      in that policy, direct physical loss to or damage to
22      property.  In our case, it is direct physical loss
23      of...property, and we think that difference in language
24      is critical as we have suffered a direct physical loss
25      of our property because it's been invaded, contaminated,
```

```
 1    polluted by the hazardous substance that renders it
 2    unfit for human use, and the government saw the same
 3    hazard was present and ordered us to shut down our
 4    operations as a consequence of that.
 5          And, your Honor, I think you previously had
 6    characterized the shutdown orders as requiring people to
 7    distance.  And while that is part of the orders, they
 8    actually do go further than that, and this is critical.
 9    This is paragraph three of the Monterey order:  All
10    businesses within the facility in the county except
11    essential businesses are required to cease all activity
12    at facilities located within the county.  That is a
13    direct shutdown and a closure of our business that
14    prohibits access to the business, which we think is
15    enough to trigger the civil authority coverage.
16          Mr. Keller has made the point that there were
17    very specific uses that we could have made about
18    properties under these orders.  We could have sheltered
19    homeless people and possibly allowed a limited number of
20    individuals to use the hotel as a residence.
21          What he is trying to do is read into the civil
22    authority provision in our policy of requiring that
23    there be a total prohibition of access to the insured
24    premises.  Well, that word 'total' doesn't actually
25    appear in our insurance policy.  All it says is the
```

1    government prohibits access to your premises and has
2    done so as a consequence of a direct physical loss of or
3    damage to the properties elsewhere, then insurance
4    coverage kicks in.
5            I hope that addresses your concerns about *MRI*,
6    your Honor.
7            THE COURT:  It is helpful.  Thank you.
8    Mr. Keller, anything you would like to close with?
9            MR. KELLER:  Yes, your Honor.  So at the end
10   of the day, the virus, whether it is present on the
11   property or not, does not cause the business income
12   loss, which it is required to under the policy, and it
13   is not a direct physical loss as -- not a direct
14   physical damage to property as described by *MRI*
15   *Healthcare*.
16           And at the end of the day, they cannot allege
17   that there was a direct physical damage to property that
18   was, in fact, the cause of their business income loss.
19   Thank you.
20           THE COURT:  Any last words, Mr. Ferguson?
21           MR. FERGUSON:  Yes, your Honor.  Thank you.
22   One last word is, I would urge the Court to reread *Ward*,
23   which is the other case that California Mutual cites
24   with the idea that you need a tangible alteration.
25           But what is critical in the *Ward* case is that

15

JA330

1    you have to analyze the scope of coverage within the
2    context of the claims that are asserted.  And so, you
3    know, language that might appear unambiguous in the
4    context of one particular claim might eventually appear
5    ambiguous in the context of another claim.
6              So the two cases the defendant cites, *Ward* and
7    *MRI*, are in such different factual circumstances of
8    their own that I think, given the claims that we are
9    asserting, the scope of the coverage within the policy
10   has to be viewed within the lens of the claims that we
11   are asserting.
12             And given the claims that we are asserting, I
13   think that the insurance policy is, at a minimum,
14   subject to two reasonable constructions.  One is that as
15   the defendants assert that there has to be physical
16   alteration to the property.  The other is the
17   construction.
18             We think this is a reasonable interpretation,
19   and given the Court's struggle with how to resolve this
20   case, we think it's clear that reasonable minds can
21   differ on this.  If that is the case, the tie goes to
22   the plaintiff as ambiguities are construed in favor of
23   the insured.
24             And, your Honor, one last point.  California
25   Mutual actually has a virus exclusion that they include

1  in other policies.  We raised this in the complaint.  In

2  fact, in their reply, they cite the *Michigan* case where

3  the insurance policy issue in that case also had a virus

4  exclusion.  This is a well-known exclusion that is

5  included in many, many, many policies throughout the

6  country, and many of the cases in the wave of COVID

7  litigation in the last few months are going to be

8  decided on that virus exclusion angle.

9           Our client has dutifully paid almost $40,000 a

10  a year in insurance premiums to California Mutual under

11  a policy that does not have a virus exclusion.  This is

12  critical, your Honor.  The fact that California Mutual

13  and the insurance industry at large has a virus

14  exclusion very strongly suggests to us that they believe

15  a virus -- the presence of a virus can cause direct

16  physical loss of or damage to property.  That was not

17  included in this policy.

18           California Mutual very easily could have

19  tacked on the word 'virus' using a comma after the word

20  'bacteria' in the bacteria exclusion.  They could have

21  included the presence of virus from the insurance

22  policy, and they failed to do so.

23           So California Mutual having failed to define

24  the central term in this case, direct physical loss of

25  or damage to property, and having failed to include a

17

JA332

```
 1      virus exclusion, we think the Court should adopt the
 2      plaintiff's very reasonable construction of this
 3      insurance policy and find that our allegation that there
 4      is physical presence of coronavirus and hazardous
 5      concentration on our property is sufficient to trigger
 6      business income interruption insurance coverage, as well
 7      as the fact that there is coronavirus-inhabited
 8      concentration on other properties triggered the
 9      government to close our facilities.
10              Or in the alternative, we are also entitled to
11      civil authority coverage.  And I think with that, your
12      Honor, we would submit.
13              THE COURT:  All right.  The Court is going to
14      take this under submission.  It seems to me that if the
15      Court decides to sustain the demurrer, that the motion
16      to strike is moot, so I don't want to hear argument on
17      that.
18              Anyway, I just want to spend more time
19      thinking about it, and I appreciate your thoughtful
20      argument.  If for any reason I decide that I need
21      additional argument, I will let you know, but otherwise,
22      I hopefully will be able to let you know very soon.
23      Thank you.
24              MR. FERGUSON:  Thank you, your Honor.
25              MR. KELLER:  Thank you, your Honor.
```

```
 1              MR. FERGUSON:  Should there be any additional
 2      briefing or legal issues you should like us to address,
 3      we would be happy to do so.
 4              THE COURT:  This is Mr. Ferguson talking?
 5              MR. FERGUSON:  I am sorry.  Mr. Ferguson, yes,
 6      your Honor.
 7              THE COURT:  Thank you very much.
 8              (Whereupon, the proceedings adjourned at 9:55
 9              a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1    STATE OF CALIFORNIA      )

2                             ) SS.

3    COUNTY OF MONTEREY        )

4

5              I, Jamie L. Setterquist, an official reporter

6    for the Superior Court of the State of California, in

7    and for the County of Monterey, do hereby certify:

8              That, as such reporter, I reported

9    stenographically the above proceedings on Monday, August

10   4, 2020, and that the above and foregoing transcript,

11   consisting of pages numbered from 1 to 19, inclusive,

12   contain a true and correct transcript of all of said

13   proceedings.

14

15             Dated at Salinas, California, this August 7,

16   2020.

17

18

19             _____
                 JAMIE L. SETTERQUIST   CSR 13362
20                    OFFICIAL COURT REPORTER

21

22

23

24

25
```

20

**EXHIBIT F**

UNITED STATES OF AMERICA

STATE OF ILLINOIS                                                        COUNTY OF DU PAGE

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

ITS NICE INC

-VS-

2020L000547
CASE NUMBER

STATE FARM FIRE AND CASUALTY CO

**FILED**

**20 Sep 29    PM 01: 07**

*Chris Kachiroubas*

CLERK OF THE
18TH JUDICIAL CIRCUIT
DUPAGE COUNTY, ILLINOIS

ORDER

For the reasons stated on the record, Defendant State Farm's 2-615 motion to dismiss is granted, with prejudice, with respect to both Count I and Count II of Plaintiff's complaint.

Submitted by: JUDGE BRYAN CHAPMAN

DuPage Attorney Number:

Attorney for:

Address:

City/State/Zip:

Phone number:

File Date: 09/29/2020

Entered:

JUDGE BRYAN CHAPMAN
Validation ID : DP-09292020-0107-11175

Date: 09/29/2020

CHRIS KACHIROUBAS, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT ©
WHEATON, ILLINOIS 60187-0707
Visit http://www.i2file.net/dv to validate this document. Validation ID: DP-09292020-0107-11175

Page 1 of 1

JA337

```
 1        IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT
                   DU PAGE COUNTY, ILLINOIS
 2
     IT'S NICE, INC., d/b/a          )
 3   HAROLD'S CHICKEN SHACK #83, an  )
     Illinois Corporation,           )
 4                                    )
                   Plaintiff,        )
 5                                    )
          -vs-                       )   No. 20 L 547
 6                                    )      2-615 Motion
     STATE FARM FIRE AND CASUALTY    )
 7   CO.,                            )
                                      )
 8                 Defendant.        )

 9

10                REPORT OF VIDEOCONFERENCE PROCEEDINGS

11   had at the hearing of the above-entitled cause, before

12   the Honorable BRYAN S. CHAPMAN, DuPage County,

13   Illinois, recorded via Zoom and transcribed by

14   Kristin M. Barnes, Certified Shorthand Official Court

15   Reporter, commencing on the 29th day of September,

16   2020.

17

18

19

20

21

22

23   Kristin M. Barnes, CSR
     Official Court Reporter
24   CSR No. 084-004026
```

```
1    PRESENT:

2         FRANKLIN LAW GROUP, by
          MR. RYAN ENDSLEY,
3
               appeared on behalf of the Plaintiff;
4

5         SUDEKUM, CASSIDY & SHULRUFF, CHTD., by
          MS. FLORENCE M. SCHUMACHER and
6         MR. FREDERICK J. SUDEKUM, III,

7              appeared on behalf of the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1              THE COURT:  All right.  Good morning, Counsel.
2         MR. ENDSLEY:  Good morning, your Honor.
3              THE COURT:  All right.  This is 20 L 547, It's
4    Nice, Inc. versus State Farm Fire and Casualty.
5              We come on for a 2-615 motion in connection
6    with It's Nice's claim for coverage under the policy.
7              I've had a chance to read the motion, the
8    corresponding briefing, and I know there had been some
9    motions for leave to file supplemental authority.  I
10   have had a chance to look at those motions.
11             I assume both parties are okay with each side
12   submitting their respective -- their respective briefs
13   in support of their -- their respective authority in
14   support of their positions.
15             Is that a fair characterization?
16        MR. ENDSLEY:  Yes, your Honor.  For It's Nice, at
17   least.
18        THE COURT:  Sure.
19        MS. SCHUMACHER:  State Farm as well, your Honor,
20   there's no objection.
21        THE COURT:  All right.  Why don't we go ahead and
22   have the parties state their names for the record.
23        MS. SCHUMACHER:  Sure.
24             Florence Schumacher and Rick Sudekum here on
```

1    behalf of State Farm.

2         THE COURT:  Uh-huh.

3         MR. ENDSLEY:  Ryan Endsley on behalf of It's Nice,

4    Inc.

5         THE COURT:  Okay.  What I'd like to do here, guys,

6    I have spent considerable time with the -- with the

7    courtesy copies.  I've got my tabs.  Like I said, I've

8    read the authority.  I've read the additional authority

9    submitted.

10         I don't necessarily need a regurgitation of

11    the positions already taken in the briefs.  I feel like

12    I have adequately familiarized myself with the parties'

13    positions.

14         I do want to give the parties a chance to

15    make their record here.  I appreciate the issue and

16    that it's kind of a fastly moving issue through the

17    courts right now, and, as a result, I want to give the

18    parties a chance a make their record.

19         That said, I don't necessarily need, you

20    know, sort of, your Honor, this is how insurance

21    policies work.  I mean, tell me whatever you want to

22    tell me.  I may have a question or two for the parties,

23    but I'll let you make your record first.

24         State Farm, it's your motion.  I'll let you

1    go ahead if there's anything you want to add.

2         MS. SCHUMACHER:  Sure, your Honor.

3              I am going to briefly run through our

4    argument again, trying to sort of work in some of those

5    cases that have come in more recently.

6              I understand that the court is familiar with

7    insurance policies in general, so we won't -- hopefully

8    won't belabor you with too much elementary insurance

9    law here.

10             Obviously, the plaintiffs know -- or the

11   court knows that the plaintiff is seeking to recover

12   for a business interruption loss resulting from the

13   COVID-19 pandemic and the executive orders.

14             In our view, there are basically two main

15   barriers to plaintiffs being able to state a cause of

16   action.  The first is the lack of accidental direct

17   physical loss and the second is the virus exclusion.

18             The way I look at these, your Honor, it's

19   sort of like -- the lack of accidental direct physical

20   loss is like a 10-foot hurdle and the virus exclusion

21   is like a brick wall.  So even if the plaintiffs could

22   plead accidental direct physical loss, which they

23   can't, they're going to run right into the virus

24   exclusion and there's not going to be any coverage for

1    that reason either.

2        THE COURT:  That was my -- that was the one thing

3    I wondered a little bit about in reading your briefing,

4    more the structure of your brief.

5        MS. SCHUMACHER:  Right.

6        THE COURT:  You led with the virus exclusion, and,

7    to my mind, there's an insuring agreement here as a

8    preliminary matter and we only get to the virus

9    exclusion if the court finds that there is, in fact,

10   accidental direct physical loss to the property in the

11   first instance.

12           You would agree with that?

13       MS. SCHUMACHER:  I would, your Honor.

14       THE COURT:  Okay.

15       MS. SCHUMACHER:  You know, the court is

16   familiar -- it's the trigger of coverage.  I mean, just

17   like in a life insurance policy, until you have the

18   death of the insured, there's no coverage to begin

19   with.

20           It's the same for these policies.  They're

21   property policies, so their triggering coverage is

22   accidental direct physical loss.  You know, you can't

23   just skip this part.  It's the trigger of coverage.

24   It's something that the plaintiff has the burden of

1    proof on.

2          So, in this case, the covered property is the

3    restaurant property, so the first question is, where is

4    the accidental direct physical loss pleaded, and our

5    response, obviously, is that it isn't.

6          So, you know, just looking briefly at the

7    complaint, you know, they allege that there was no

8    virus on the property and their accidental direct

9    physical loss argument is based on loss and use.

10          But, you know, my first point is, it has to

11    be accidental direct physical loss, and I think it's

12    undisputed that there was no difference to this

13    property physically on the day before these executive

14    orders were issued than there was on the day after, so

15    physically the property was exactly the same.

16          So where's the loss?  Where's the loss

17    they're arguing?  They're saying that loss of use is

18    sufficient, that they couldn't use the property in the

19    same way, and that somehow that constitutes accidental

20    direct physical loss to the property, and we disagree

21    with that position.

22          So we believe that the Illinois law and all

23    these cases that have recently come out correctly hold

24    that loss of use of property without any physical

```
 1    change to that property cannot constitute accidental
 2    direct physical loss.
 3         THE COURT:  Mr. Endsley, at the risk of stealing
 4    your thunder, I'm going to ask Ms. Schumacher
 5    why don't you go ahead and respond to the western
 6    district of Missouri cases that were cited by It's Nice
 7    where it looks like some district courts in the western
 8    district have found, you know, sort of a lack of
 9    definition in the policy for physical damage or loss
10    of -- you know, what are the factual distinctions in
11    those cases, if any --
12         MS. SCHUMACHER:  Right, right.
13         THE COURT:  -- as to why the court should not find
14    those cases persuasive here as opposed to some of the
15    cases you've cited?
16         MS. SCHUMACHER:  Sure.
17              So the first thing I would say, the court
18    says there are courts in the western district of
19    Missouri.  What we actually have is one court -- it's
20    the same judge in the two cases -- who has gone
21    essentially the other way on this accidental direct
22    physical loss question.
23              Those cases are factually distinguishable on
24    two main grounds.  The first is that the plaintiffs in
```

1   those cases argue that they had virus on the premises.

2   So the plaintiff in this case has not even alleged that

3   there was any virus present.

4           The second distinction is in the policy

5   language.  So the trigger of coverage in those

6   policies, in the Studio 417 and the other case, were --

7   I think I've got the exact language here -- accidental

8   direct -- or accidental physical loss or accidental

9   physical damage.

10          And so the court in Studio 417 felt that it

11  had to somehow -- you know, focusing on that

12  disjunctive *or*, the court found that it had to give

13  separate meaning to physical loss and physical damage.

14          That's not the case in our policy.  There's

15  one trigger of coverage, which is accidental direct

16  physical loss to property.

17          We also have a virus exclusion, which wasn't

18  present in those cases, but I know the court is asking

19  me about physical loss.

20          So I would say the first and the most

21  important distinguishing factor is, obviously, the

22  pleading in this case -- I think it's in paragraphs, I

23  think, 25 and 36 of the complaint where the plaintiffs

24  specifically deny that they had any virus present on

1  premises.

2  And, again, I would disagree with Studio 417.

3  I'm not sure even in their presence a virus is enough.

4  Other courts have disagreed with that opinion as well,

5  but I think for our purposes in our compliant we have a

6  complaint that alleges the absence of the virus.  And

7  then, obviously, we have a policy that doesn't have

8  that *or* in there that the Studio 417 court seemed to

9  think was determinative.

10  THE COURT:  All right.  Anything else you want to

11  add?

12  MS. SCHUMACHER:  Just jumping briefly into the

13  virus exclusion, your Honor, in case we get there, we

14  have that anti-concurrent causation language which

15  broadly excludes coverage when a loss would not have

16  occurred in the absence of a virus.

17  That language, that anti-concurrent causation

18  language, has been upheld in Illinois.  The virus

19  exclusion clearly applies in this case.  There is no

20  requirement in that policy language that the virus be

21  physically present on the property, like plaintiff

22  alleges.  They're just adding language to the exclusion

23  which isn't present.  The exclusion needs to be applied

24  as written.  It unambiguously excludes a broad range of

1    losses.  Virus is one of them.

2            Oh, the argument about, you know, the

3    proliferation issue, that somehow those two

4    subparagraphs of the virus exclusion need to be read

5    together, that's just not correct.  The virus portion

6    of that exclusion is separate.  It says that loss is

7    excluded, current virus, bacteria, or other

8    microorganism.

9            So, again, I think it's -- I don't see how it

10   could possibly be ambiguous:  I mean, this -- clearly

11   we have a too late chain of causation here.  The virus

12   caused the executive orders which caused the loss and

13   it's excluded under the virus exclusion.

14       THE COURT:  Okay.  Mr. Endsley, do you want to

15   respond to anything that's -- do you want to respond

16   with anything that's not in your brief?  Or if there's

17   a point or two you want to emphasize, I'm happy to give

18   you a chance to do so.

19       MR. ENDSLEY:  Thank you, your Honor.

20           So I just wanted to highlight a couple of

21   things.  In particular, we -- you know, the Studio 417

22   case, we have the same situation where State Farm

23   elected not to define physical loss or damage.  And, in

24   this case, while counsel has pointed out that this

policy only says physical loss, that's really the
broader of the two.  Physical damage is what's probably
more in line with what State Farm's position is, which
is that a physical loss or damage must be a structural
alteration.

            And the fact is that I think the Illinois
courts have not limited themselves quite so much to
structural physical alteration as State Farm would like
the court to believe.  In particular, it's sort of an
all squares are rectangles argument.  They cite cases
which are saying, you know, a change in color or shape
or appearance to the property is a physical loss or
damage, which is true, but that's not the only type of
physical loss.

            And I think sort of looking at the asbestos
cases really sort of points that out, and State Farm's
position really throughout the briefs has been that
Illinois law requires a physical alteration to the
structure, and that's just not really what Illinois
case law actually says.

            The other thing I'd sort of like to
highlight -- and this impinges a little bit on both the
virus exclusion and the physical loss or damage -- and
that's sort of the nature of an exclusion.  And I know

that this is, you know, kind of a basic insurance
issue, but the fact is that an exclusion exists to
exclude coverage which would otherwise be present.

A virus cannot cause physical alteration to
the building, as far as I'm aware.  If there's a way
that it can be done, State Farm certainly hasn't
articulated it.  So at least this policy, as written,
clearly seems to contemplate nonphysical alterations
which would otherwise be covered causes of loss.

And that's a problem for the policy in a
couple -- for State Farm in a couple of ways in that
State Farm wants to apply the virus exclusion where it
was not present.  Even in the absence of a virus
exclusion, if the governor had never closed the
building, It's Nice could never have made a claim
for -- under this policy because the coronavirus
existed somewhere.  You know, even if there is
absolutely no virus exclusion in a different policy
like that, there just wasn't anything affecting It's
Nice's property.

And separately, with the physical loss or
use, when you're reading the policy, a number of these
exclusions, including, you know, both the virus
exclusion itself as well as the government closure

exclusion, really does contemplate under the policy
exclusions for nonphysical, nonstructural altering
causes of loss.

            And that, to me, reads -- particularly when
State Farm has elected not to define loss or -- you
know, physical loss, that's a problem for them because
the policies seem to exclude things which wouldn't be
covered anyway under State Farm's interpretation, and
yet there they are.

            Reading the policy as a whole and
constructing the ambiguities in favor of coverage,
certainly at this point dismissal seems premature.

      THE COURT:  Counsel, do you have a response to the
virus exclusion argument that the -- as I understand
counsel's argument, it's that the virus -- if we were
to take State Farm's proffered definition of physical
as understood in insurance contracts, the virus
exclusion would never fit that definition because it's
never going to alter a physical structure.

            I'm going to go to paragraph 23 of your
motion, page 10, where State Farm says, In cases
interpreting the word *physical* in insurance contracts,
*physical* is widely held to exclude alleged losses that
are intangible or incorporeal, such as detrimental

1   economic impact, unaccompanied by distinct demonstrable
2   physical alteration of property.
3         So how is the virus exclusion consistent with
4   that proffered definition of *physical*?
5       MS. SCHUMACHER:  Well, my first response, your
6   Honor, is I'm not sure we should assume that a virus
7   could never alter a structure.  We're not familiar with
8   every --
9       THE COURT:  Fair enough.
10      MS. SCHUMACHER:  -- virus in the world, so I think
11  that the exclusion -- you know, I look at it as sort of
12  a belt and suspenders approach.  I mean, surely I think
13  this virus is not causing physical damage, but that
14  certainly doesn't mean that there's no virus that could
15  ever develop that doesn't cause physical damage and
16  bodily injury.  We don't know that.  So I think, in a
17  sense, that the insurer clearly wanted to exclude this
18  kind of loss.
19        I think in the event that there is some
20  unexpected virus that comes up in the future that could
21  cause physical damage, I think the insurer is well
22  within its right to, you know, exclude that in the
23  event that that might happen some day.
24        It's clearly in the policy.  The insured was

1  aware of it.  It's a broad exclusion.  And, again, I

2  think their whole question is just based on the

3  assumption that all viruses are going to be like this

4  virus, and I just don't think that that's the case.

5       THE COURT:  Counsel, Mr. Endsley, let me ask you a

6  question.

7            One of the things, as I've thought about this

8  case a little bit, I'm worried a little bit or I'm

9  concerned at least about, were the court to accept your

10  argument as to loss of use, I'm concerned about a

11  limiting principle or lack thereof in terms of what is

12  the underwritten risk here.

13            And there appears to be, to my mind,

14  different types of coverage available for loss of use,

15  whether it is, in fact, civil authority when you think

16  about the cases right after 9/11 around the World Trade

17  Center.  There's a lot of case law coming down in the

18  southern district of New York in the second circuit

19  involving business interruption where civil authority

20  has retail shops shut down but you've got physical

21  damage to other property, ingress/egress sorts of

22  issues.

23            Without the loss of use, sort of, well,

24  there's physical accidental physical loss to property

1    if I can't access it, that strikes me, when I look at

2    the policy in its entirety, to be potentially a very

3    different risk than what may have been contemplated

4    here.

5            Is that a fair concern?

6    MR. ENDSLEY:  So I think that is something of a

7    concern.  But to alleviate that a little bit, we're

8    dealing with a fairly unique set of circumstances and I

9    think there sort of still is a principle here.

10           If the governor's orders hadn't actually

11   required closure, if they, you know, had limited how

12   many patrons you could have in the restaurant or if

13   the -- you know, the effect of the general governor's

14   orders to shelter at home had been to reduce income,

15   you know, if we were talking about loss of income,

16   that's not a covered cause of loss.

17           And, in fact, I think some of the cases cited

18   by State Farm sort of indicate what the -- what the

19   difference is -- and those would be the Anchor

20   [phonetic] and Keach [phonetic] cases.  And,

21   particularly, those focused on the difference between

22   when something is actually completely closed down and

23   when it's merely suffered, you know, a loss of business

24   income, and there really is a significant difference

1  here.

2  And the other thing I would sort of add, as

3  far as a policy situation, is I think the tremendous

4  number of lawsuits we've seen from this is sort of an

5  indication that a lot of these insureds thought that

6  this would have been covered, something like this, and

7  learned only late in the game that it wasn't or at

8  least the insurance company thought it wasn't.

9  And I'd just sort of articulate again, you

10 know, the basic principle that ambiguities in the

11 policy are construed against the drafter.  State Farm

12 was the one who got to say what this policy looked

13 like, State Farm was the one who got to draft the

14 language of the policy, and, frankly, had put a lot

15 more thought into it than any of their insureds.

16 So I think to say that, you know, this wasn't

17 in the contemplation of the parties, it was at least a

18 little bit.  State Farm has a number of exclusions

19 which nearly but do not quite apply.  They were able to

20 draft around this.

21 And, frankly, exclusions exist in certain

22 policies which do address this specific concern.  We've

23 reviewed a couple of them from client -- from potential

24 clients who wanted coverage and actually saying that if

1    there's a government closure order because of a

2    pandemic, no coverage.

3         So there are ways for the insurer to protect

4    themselves from this, but in this case it's the insured

5    who really had this dropped on them unexpectedly and is

6    now having to litigate.

7         THE COURT:  Well, certainly, obviously, companies

8    and businesses around the world and certainly the

9    country and certainly Illinois are faced with a

10   remarkable predicament through largely no cause of

11   their own, if at all, as a result the pandemic.

12        Let me be very clear.  I am not -- when I ask

13   the question about the limiting principle, I am not

14   suggesting that the court is trying to ascertain the

15   intent of the parties at this point.  I'm simply trying

16   to ascertain whether or not there's a reasonable

17   interpretation on the other side.

18        But wouldn't your argument, Mr. Endsley, be a

19   bit stronger if the definition or if the insuring

20   agreement language said insure for all accidental

21   direct physical loss of covered property as opposed to

22   to?

23        In other words, it's talking about -- I'm

24   concerned that we're reading direct physical to

```
 1   property.  We're kind of just pretending that it
 2   doesn't say what it -- what it clearly says and we're
 3   kind of saying, well, loss of property or loss to
 4   property, same thing, whatever.
 5            Wouldn't you have a stronger argument if it
 6   said loss of property?
 7       MR. ENDSLEY:  In this case, I'm actually not sure
 8   that we would, your Honor.
 9            It's Nice still has the property, but the
10   property suffered a loss of use and that was a loss to
11   the property.  It's Nice hasn't -- you know, the
12   property isn't gone.  It's Nice has, in fact, recently
13   resumed business operations --
14       THE COURT:  So let me ask you a question.
15            If I said, when I think loss to the property,
16   I think the roof is blown off; okay?  That's what I
17   think of just -- at the very least, at a superficial
18   level.
19            If you're telling me a closing of the doors
20   by executive order is a loss to the property, help me
21   understand why that's the same thing.
22       MR. ENDSLEY:  Well, I think you're certainly
23   correct that, you know, when we think of -- that is
24   classic losses.
```

1          THE COURT:  That is, to my mind, closer to a loss

2     of property.  It's a functional loss of property, not

3     to property.

4          MR. ENDSLEY:  I guess the best argument I can sort

5     of think of, just off the spur of the moment, relates

6     to the fact that the type of property it is is what

7     affected the loss and that's -- because it's a

8     restaurant, this was a different type of loss.  If this

9     was just being used as residential housing, there is no

10    loss to the property.

11          So State Farm insured a particular type of

12    business and a particular -- that particular type was a

13    restaurant which was affected, and that impacted this

14    property.  That was a loss to this specific property

15    rather than a removal.

16          So to some extent, you know, if it said *loss*

17    *of property*, that, to me, almost suggests that

18    something -- a little more of the structural alteration

19    argument State Farm prefers, which is almost that

20    something was removed from the property or just ceased

21    to exist on the property -- because it was burned up or

22    something -- whereas I think *to property* sort of

23    suggests that it's anything that affects, you know,

24    that business property.  It wasn't just the -- you

know, this wasn't just a title policy or something like that.  This was a business coverage policy.

THE COURT:  It doesn't say anything is physical; right?

MR. ENDSLEY:  It does say physical.

THE COURT:  I mean, it's not any conceivable way you're unable to use the property in the way you see fit.  It's got to be direct physical loss.  And, I guess, your view is loss of use, there's a physical displacement; right?  That's --

MR. ENDSLEY:  Yes.

THE COURT:  -- your position?

Okay.  Ms. Schumacher, if there's anything you want to respond to, I'll give you the last word.

MS. SCHUMACHER:  Sure.  There are many things. I'm going to try to stick to a couple.

I think the Turek court actually discussed that *physical loss to* concept and I think it held that *to* implies contact and *physical* implies physical contact, direct physical loss to property.

And I looked in the dictionary.  They gave examples like a right uppercut to the jaw or applying varnish to a surface.  Whatever theory they have about their loss not being able to use the property, that

1    simply is not physical loss to that property.

2              And I just want to briefly touch on -- the

3    court is concerned about the breadth of their

4    interpretation.  So the first thing they said is, well,

5    this is a different situation because the restaurant

6    was required to be closed.

7              I would point out that in the executive

8    orders they did not close restaurants.  Restaurants

9    were permitted to stay open for takeout or delivery.

10   So regardless of whether they chose to close the

11   restaurant, even under their complaint, they weren't

12   required to.  So this is not a situation where

13   restaurants were closed.

14             The second and more broad point I would make,

15   your Honor, is that under their theory of accidental

16   direct physical loss, let's just say after COVID is

17   over the restaurant is open until 1:00 a.m.  There's an

18   ordinance that says restaurants have to close at

19   midnight now.  According to their theory, they now have

20   a loss of income claim because the restaurant has to

21   close an hour early because, according to them, there

22   doesn't have to be any physical impact; it just has to

23   affect the use of their property.

24             So, again, I agree with the court's concern

1     that their interpretation is way too broad and it

2     brings many more things into coverage than are intended

3     under a property policy which covers accidental direct

4     physical loss and then loss of income once that's

5     happened.  But you just can't skip that step.

6              And I think that's all I have.  I know the

7     court is familiar with all of this and there was a lot

8     that was said, but I'd like to keep it as brief as I

9     can.  So I think unless the court has any additional

10    questions, I think we've made our point.

11        THE COURT:  I think we -- I just want to make sure

12    all the parties agree that regardless of the coverage

13    form under the all risk policy, everyone agrees that

14    direct physical loss is required; right?

15        MR. ENDSLEY:  Yes.

16        THE COURT:  That phrase, that is an insuring

17    agreement that attaches to all.  You know, sometimes

18    these all risk policies, there's all these amendments,

19    you know, there's the general exclusions and then

20    there's the exclusions within the broad form coverage

21    and there's exclusions within that and those don't

22    apply to the general -- you know, so that was my review

23    of the policy, that there was no separate insuring

24    agreement, everything goes back to Section 1 property

```
 1   insuring agreements, direct physical loss requirement.
 2        MS. SCHUMACHER:  Yes.
 3        THE COURT:  Okay.
 4        MR. ENDSLEY:  Yeah, I believe there was a little
 5   bit of confusion that we were maybe trying to get
 6   coverage under the civil -- civil authority provision,
 7   but that was --
 8        THE COURT:  Well, as I understand your argument,
 9   you'll take coverage wherever you can find it; right?
10        MR. ENDSLEY:  Yes, that's correct.
11             And that all relates back to the all risk
12   direct physical loss.
13        THE COURT:  Right.  Okay.  Very good.  Thank you.
14             Okay.  The court is in a position to rule on
15   this today.  The question presented by a 2-615 motion
16   to dismiss is whether sufficient facts are contained in
17   the pleadings that, if proved, would entitle the
18   plaintiff to relief.  That's Evers versus Edwards
19   Hospital, 247 Ill. App. 3d 717.
20             A motion to dismiss under Section 615 admits
21   all well-pleaded facts but does not admit conclusions
22   of law or conclusions of fact not supported by
23   allegations of specific fact.
24             Exhibits -- I assume the policy was, in fact,
```

1 attached to the complaint?

2     MS. SCHUMACHER:  It was -- your Honor, it was

3 either attached or filed by agreement.

4          I have two different cases.  One they

5 attached a partial policy and then --

6     MR. ENDSLEY:  Yeah, I --

7     MS. SCHUMACHER:  Was yours the partial policy?

8     MR. ENDSLEY:  Yeah, I believe it was attached by

9 agreement.

10     MS. SCHUMACHER:  Okay.

11     THE COURT:  The court is --

12     MR. ENDSLEY:  There was --

13     THE COURT:  The parties are asking the court to

14 consider the policy, right --

15     MR. ENDSLEY:  Yes.

16     MS. SCHUMACHER:  Yes, your Honor.

17     THE COURT:  -- for purposes of this motion?

18          All right.  So the policy is an exhibit to

19 the complaint for purposes of this motion.

20          Exhibits are part of the complaint to which

21 they are attached and the factual allegations contained

22 within an exhibit attached to a complaint serve to

23 negate inconsistent allegations of fact contained

24 within the body of the complaint.

1          I say that because, in some ways, this

2     operates almost more like a 12(b)(6) than -- most 615's

3     are sort of, if you haven't pled this element, you

4     haven't pled that element, and this operates more sort

5     of a -- whether or not there is a claim upon which

6     relief can be granted based on the complaint itself.

7          And, for that reason, I point out simply that

8     the exhibits to the complaint, which, in this case,

9     includes the policy, the parties have asked the court

10    to consider that as well.

11         Okay.  Having said all of that, the critical

12    language here, first, is the direct physical loss

13    language, and the court finds that direct physical loss

14    unambiguously requires some form of actual physical

15    damage to the insured premises to trigger coverage.

16         The words *direct* and *physical*, which modify

17    the word *loss*, ordinarily connote actual demonstrable

18    harm of some form to the premises itself rather than

19    force the closure of the premises for reasons

20    extraneous to the premises itself or adverse business

21    consequences that flow from such closure.

22         Defense counsel -- I'm sorry, the insurance

23    counsel points out here that Illinois courts have not

24    squarely addressed direct physical loss in this

```
 1    context, but I do want to note in cases interpreting
 2    the word *physical* in insurance contracts, *physical* is
 3    widely held to exclude alleged losses that are
 4    intangible or incorporeal in Illinois, such as
 5    detrimental economic impact unaccompanied by a distinct
 6    demonstrable physical alteration of the property.
 7              That's One Place Condo, LLC, versus
 8    Travelers, 2015 Westlaw, Northern District of Illinois,
 9    applying Illinois law.
10              The other case here that, I think, is
11    particularly useful is, in fact, Judge Gettleman's
12    decision in the northern district of -- I want to get
13    this right -- Sandy Point Dental v. Cincinnati
14    Insurance.  This is 2020 Westlaw 5360465 dealing with
15    very similar facts and similar policy language.
16              In this case, the court finds, just as in
17    that case, plaintiff simply cannot show any such loss
18    as a result of either inability to access its own
19    office or the presence of the virus on its physical
20    surface, the latter of which here plaintiff fails to
21    allege in its complaint.
22              I don't think that's in dispute.  There's no
23    argument that the coronavirus was, in fact, on the
24    surface of the property.  The plaintiff has not pled
```

1     any facts showing physical alteration or structural

2     degradation of the property, which is required to

3     trigger coverage under this all risks policy.

4           The court wants to note that in addressing

5     this insuring agreement argument, this holding is

6     consistent with other courts that have evaluated

7     whether the coronavirus causes property damage

8     warranting insurance coverage.

9           Again, I want to reference 20 L -- I'm sorry,

10    not 20 L. 2020 Westlaw 5360465. That's Sandy Point

11    Dental versus Cincinnati Insurance.

12          I want to further note that Social Life

13    Magazine versus Sentinel Insurance Company, denying a

14    motion for preliminary injunction because the

15    coronavirus does not cause direct physical loss;

16    therefore, no coverage was required. The coronavirus,

17    quote, damages lungs. It doesn't damage printing

18    presses, close quote.

19          Diesel Barbershop versus State Farm Lloyds,

20    2020 Westlaw 4724305, Western District of Texas,

21    August 13, 2020, granting a motion to dismiss because

22    the coronavirus did not cause a direct physical loss

23    and, quote, the loss needs to have been a distinct

24    demonstrable physical alteration of the property, close

1  quote.

2      I further want to direct the parties'

3  attention to Gavrilides Management versus Michigan

4  Insurance Company. This is a state court of Michigan

5  handing down a decision last month that was cited by

6  State Farm in this case explaining that direct physical

7  loss to property requires tangible alteration or damage

8  that impacts the integrity of the property and

9  dismissing the case because plaintiff failed to allege

10  that the coronavirus had any impact to the premises.

11      I want to point out that these are not

12  controlling cases for purposes of an Illinois state

13  court; however, the court finds that these cases just

14  cited are, in fact, consistent with Illinois courts

15  treating of physical damage under insurance policies.

16      And, of course, there are meaningful

17  differences at times between first and third party

18  policies and first and third policy claims; however,

19  the court finds that there is a consistent line of

20  reasoning by Illinois courts as far as what physical

21  damage must mean for purposes of insurance coverage in

22  this case.

23      In essence, to quote Judge Gettleman in the

24  Sandy Point Dental Case, plaintiff here seeks coverage

1    for financial losses as a result of closure orders.

2    And I don't think anybody really disagrees with that

3    here.

4            The coronavirus has not physically altered

5    the appearance, shape, color, structure, or other

6    material dimension of the property and, as a result, it

7    doesn't come within the insuring agreement and, as a

8    result, plaintiff has failed to plead a direct physical

9    loss, which is a prerequisite for coverage.

10           However, I do want to point out here that

11   even if, even if, plaintiff had, in fact, been able to

12   plead within the insuring agreement -- that this claim

13   comes within the insuring agreement, the court does

14   find that the virus exclusion applies.

15           Now, the virus exclusion, which is Exclusion

16   J under Section 1 of the policy, states as follows --

17   and there's important, what we'll call, lead-in

18   language that I want to direct the parties' attention

19   to.  The lead-in language under Section 1 exclusions,

20   which applies to all coverage forms under this all

21   risks policy, all coverage forms incorporate Section 1,

22   the lead-in language states as follows:  We do not

23   insure under any coverage for any loss which would not

24   have occurred in the absence of one or more of the

1    following excluded events.

2            We do not insure for such loss regardless of,

3    A, the cause of the excluded event; or, B, other causes

4    of loss; or, C, whether other causes acted concurrently

5    or in any sequence with the excluded event to produce

6    the loss; or, D, whether the event occurred suddenly or

7    gradually, involves isolated or widespread damage,

8    arises from natural or external forces, or occurs as a

9    result of any combination of these, and it begins to

10    list the exclusions.

11            So the virus exclusion is Exclusion J.  The

12    heading, which does not control, says fungi, virus, or

13    bacteria.  Paragraph 1 states, Growth, proliferation,

14    spread, or presence of fungi or wet or dry rot or, new

15    paragraph, 2, Virus, bacteria, or other microorganism

16    that induces or is capable of inducing physical

17    distress, illness, and disease.

18            For our purposes, those are the relevant

19    provisions of the virus exclusion that needs to be

20    addressed here.  First, the court finds that the

21    growth, proliferation, spread, or presence is not

22    required for purposes of applying the virus exclusion

23    because that is in a separate paragraph designed to

24    address fungus or fungi.  There are not just one but

1  two disjunctive *or's* in between fungus and virus

2  because it goes fungus -- or states fungus or wet or

3  dry rot or and then a new paragraph starting with the

4  word *virus* enumerated as number two.

5          So the court finds that it doesn't have to

6  establish a growth of a virus, just simply the idea of

7  a virus, the fact that a virus that is capable of

8  inducing physical distress, illness, or disease.

9          Even if -- if, in fact, this was some kind of

10  physical -- accidental physical damage, physical loss

11  coming within the insuring agreement, the virus

12  exclusion applies because Subsection C of the lead-in

13  language says this virus exclusion applies whether

14  other causes, executive orders, acted concurrently or

15  in any sequence with the excluded event to produce the

16  loss.

17          Here, I think everyone would agree absent the

18  virus, absent the virus, there would be no executive

19  orders, and so because C says this exclusion would

20  apply even where the sequence of the ordering with

21  other causes isn't entirely known or isn't entirely

22  clear or happens one two or two one, it still applies.

23          Furthermore, whether or not a virus could, in

24  fact, alter the physical structure, I think that's a

much -- that's not entirely clear at all that a virus
could.

And that's plaintiff's -- or I'm sorry,
insured's argument is the virus exclusion doesn't make
any sense for a sort of physical alteration requirement
of physical damage -- or a loss of, I should say --
physical loss because a virus would never alter the
physical structure.

The court doesn't agree with that. Virus,
bacteria, and microorganisms can exist in, in fact, a
meaningful way, and I think there's a strain of thought
out there that at one time was dominant -- it still may
be true to a certain extent -- that this virus can
exist on surfaces.

So even if the loss of use because of
coronavirus could constitute, the virus exclusion would
still apply -- could constitute physical -- accidental
physical loss, direct physical loss, I should say --
the virus exclusion applies.

And so for those reasons, the court is going
to grant the motion to dismiss.

I want to point out -- or I do want to
address the authority provided by Harold's Chicken --
It's Nice, Inc., d/b/a Harold's Chicken. A couple

1    things, I think, are worth pointing out.

2         One is the State Farm language here -- not

3    only are those cases from the western district and, as

4    a result, they're not controlling, the court believes

5    or is of the opinion that the cases relied upon for its

6    ruling today are more consistent with Illinois law as

7    it exists with respect to this issue.

8         Furthermore, the policy language was

9    different in those western district cases.  And that's

10   not to say that the result would be different if you

11   had identical language, but I do think that's different

12   language.

13        And, moreover, and perhaps importantly, the

14   court was evaluating a 12(b)(6) motion in which the

15   insureds in that case allege the presence of COVID on

16   the property.  And, to the court's mind, that is a --

17   that's a meaningful distinction here.

18        And, again, there's no virus exclusion in

19   that policy that the court would have had to have

20   considered as well and we don't know what the court

21   would have done in that case.

22        But I do think, at least for purposes of the

23   insuring agreement argument, those cases are

24   distinguishable without regarding -- without, you know,

1    advising as to what the result would be in this court.

2    But I do think those are different cases and they need

3    to be treated differently as such.

4            And so, for those reasons, the court is going

5    to go ahead and grant the motion both with respect to

6    the insuring agreement argument as well as with respect

7    to the virus exclusion.

8            I do want to point out, for the record, the

9    insured does not seem to argue -- kind of seems to have

10   one foot in and one foot out on civil authority.

11   They're happy to find civil authority coverage if it

12   exists, but they're not specifically asking for it.

13           But I want to point out, for the record,

14   that, as noted above, the policy's civil authority

15   coverage applies only if there is a covered cause of

16   loss, meaning direct physical loss, again, going back

17   to direct physical loss to property other than the

18   plaintiff's property.

19           Just as the coronavirus did not cause direct

20   physical loss to plaintiff's property here, the

21   complaint has not and likely could not allege that the

22   coronavirus caused direct physical loss to other

23   property.  By the policy's own terms, the civil

24   authority coverage then does not apply.

1          So with that having been said, I'm granting

2     the motion.  You know, I'm kind of -- do the parties

3     want a dismissal with prejudice?

4          MS. SCHUMACHER:  Your Honor, we are asking for a

5     dismissal with prejudice, the reason being their claim

6     is for the loss of income due to the executive orders

7     which is caused by the virus, and without alleging a

8     completely different kind of claim, there's no set of

9     facts that they're going to be able to allege that's

10    going to avoid that result.

11         The executive orders are full of references

12    to the virus.  The chain of causation is strong.  The

13    virus exclusion is present.  And, again, the same thing

14    with the physical damage issue.  There's no claim that

15    there was any structural alteration to the property.

16         So I think in this case, your Honor, on that

17    basis, I don't think there's any way they're going to

18    be able to plead around either of those issues, and so

19    we are asking for a dismissal with prejudice.

20         THE COURT:  Mr. Endsley, any response to that or

21    are you in agreement that this is time for other minds

22    to evaluate this claim?

23         MR. ENDSLEY:  Yeah, your Honor, that's probably

24    correct.  I don't think we can change the pleading such

1    that -- to get around the issues that you're finding

2    are insurmountable.

3        THE COURT:  I don't disagree.  It is a 615, and so

4    I do want to just at least give the parties the

5    opportunity to request without -- whether or not I give

6    that is a different issue, but it sounds like the

7    parties are of one mind and the court is in agreement

8    that this dismissal for this type of a 615 motion is

9    and should be with prejudice, and the court will enter

10   such an order.

11       MS. SCHUMACHER:  Thank you, your Honor.

12       THE COURT:  Okay.

13       MR. ENDSLEY:  Thank you, your Honor.

14       THE COURT:  Thank you, guys.  Thank you very much

15   for your time and energy on this.  I want to commend

16   the parties.  I know this is a very interesting issue

17   under very -- a very unique set of facts.

18       MS. SCHUMACHER:  Thank you, your Honor.

19       MR. ENDSLEY:  Thank you, your Honor.

20       THE COURT:  Thank you.

21                   (Which were all the proceedings had at

22                   the hearing of the above-entitled

23                   cause, this date.)

24

```
 1        IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT

 2                    DU PAGE COUNTY, ILLINOIS

 3

 4

 5            I, KRISTIN M. BARNES, do hereby certify that

 6    the foregoing Report of Proceedings, consisting of

 7    Pages 1 to 39, inclusive, was reported in shorthand by

 8    me via Zoom videoconferencing, and the said Report of

 9    Proceedings is a true, correct and complete transcript

10    of my shorthand notes so taken at the time and place

11    hereinabove set forth.

12

13

14

15        _____

16                 Official Court Reporter
             Eighteenth Judicial Circuit of Illinois
17                      DuPage County
                 CSR License No. 084-004026
18

19

20

21

22

23

24
```

**EXHIBIT G**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE COMMITTEE ON OPINIONS

| | |
|---|---|
| MAC PROPERTY GROUP LLC & THE CAKE BOUTIQUE LLC,<br><br>Plaintiff,<br><br>v.<br><br>SELECTIVE FIRE AND CASUALTY INSURANCE COMPANY, JOHN DOES (1-10) and ABC COMPANIES (1-10),<br><br>Defendant(s). | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: CAMDEN COUNTY<br>DOCKET NO. L-2629-20<br><br>**Civil Action**<br><br>**OPINION** |

Decided: November 5, 2020

Robert W. Williams, Esquire, Mattleman, Weinroth & Miller, P.C., on behalf of Plaintiffs, Mac Property Group, LLC and The Cake Boutique, LLC

Joseph K. Scully, Esquire (Pro Hac Vice) and Elizabeth J. Sher, Esquire, Day Pitney, LLP, on behalf of Defendant, Selective Fire and Casualty Insurance Company

HON. STEVEN J. POLANSKY, P.J.Cv.

Defendant moves to dismiss plaintiff's Complaint in this matter pursuant to Rule 4:6-2.

## **BACKGROUND**

The Complaint filed by Plaintiffs Mac Property Group, LLC and the Cake Boutique seeks recovery from defendant Selective Fire and Casualty Insurance Company under a policy of insurance issued by Selective Fire and Casualty Insurance Company bearing Policy No. S 1982947. The policy at issue covered the period April 28, 2019 to April 28, 2020. That policy was subsequently renewed for the period April 28, 2020 to April 28, 2021.

1

The policy provides coverage for the insured location at 115 Swedesboro Road, Mullica Hill, New Jersey. The Complaint asserts that the policy provides coverage for both action of civil authority and business income and extra expense losses.

Plaintiffs allege that they sustained a loss of business income and incurred extra expense as a result of the following four events:

1. Executive Order 103 issued by New Jersey Governor Philip D. Murphy on March 9, 2020;

2. The World Health Organization Declaration of a Global Pandemic on March 11, 2020 related to COVID-19;

3. President Donald Trump's Declaration of a National Emergency as a Result of COVID-19 on March 13, 2020; and

4. Executive Order 107 issued by New Jersey Governor Philip D. Murphy on March 21, 2020.

Plaintiffs assert that they suffered direct physical loss and damage to property as a result of being unable to use their property for its intended purpose. As a result of the actions identified above, it is asserted that plaintiffs were required to suspend business operations. Plaintiffs allege causes of action for breach of contract and for declaratory judgment pursuant to N.J.S.A. 2A:16-50 et seq.

## EXECUTIVE ORDER 103

The Governor, under Executive Order 103, declared a public health emergency, finding that the spread of COVID-19 within New Jersey constituted an imminent public health hazard. The Order authorized and empowered the State Director of Emergency Management, in conjunction with the Commissioner of the Department of Health, to take any emergency measures they deemed necessary.

This Executive Order however did not order the closure of any business or other commercial establishment.

2

## WORLD HEALTH ORGANIZATION MARCH 11, 2020
## VIDEO PRESS CONFERENCE

The World Health Organization declared a public health emergency of international concern on January 30, 2020. https://www.who.int/dg/speeches/detail/who-director-general-s-statement-on-ihr-emergency-committee-on-novel-coronavirus-(2019-ncov) (viewed October 12, 2020).

On March 11, 2020, the World Health Organization declared the COVID-19 outbreak as a pandemic. https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-COVID-19---11-march-2020 (viewed October 12, 2020).

## PRESIDENTIAL DECLARATION

On March 13, 2020, the President of the United States declared a national emergency as a result of the COVID-19 outbreak. Federal Register Volume 85, #53, Wednesday, March 28, 2020, Proclamation 9994.

Under the terms of the Declaration, the Secretary of Health and Human Services was authorized to exercise authority under Section 1135 of the Social Security Act to temporarily waive or modify certain requirements of the Medicare, Medicaid and State Children's Health Insurance Programs and the Health Insurance Portability and Accountability Act Privacy Rules through the duration of the public health emergency.

## EXECUTIVE ORDER 107

On March 21, 2020, Governor Philip Murphy issued Executive Order 107 instituting emergency measures in accordance with the public health emergency and state of emergency declared in Executive Order 103. That Order required that all New Jersey residents remain at home or at their place of residence unless they fell within one of nine enumerated exceptions set forth in the Order. That Order further prohibited gatherings of individuals at parties, celebrations or social events. The premises of all non-essential retail businesses were ordered

to close to the public. Only essential retail businesses were permitted to remain open.

## INSURANCE COVERAGE

Defendant Selective Fire and Casualty Insurance Company issued a policy of insurance to MAC Property Group, LLC & The Cake Boutique, LLC c/o George Benas bearing Policy No. S 1982947 for the period April 28, 2019 to April 28, 2020. This policy was a renewal of a prior policy. The package policy provided both first party coverage as well as liability coverage for the insureds.

Business income/extra expense coverage is provided for a period of twelve months. Business interruption coverage is provided initially under the business owner's coverage form, BP 00 03 (Edition 07/13). This provision provides in part:

> f. Business Income
>
> (a) We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

This language is replaced under the Business Owner's Property Enhancement Endorsement, Form BP 72 46 (Edition 09/18). This endorsement modifies the business interruption coverage as follows:

4

Business Income

1. Direct Damage

We will pay for the actual loss of Business Income
you sustain due to the necessary suspension of your
"operations" during the "period of restoration". The
suspension must be caused by direct physical loss
of or damage to property at the described premises.
The loss or damage must be caused by or result
from a Covered Cause of Loss. With respect to loss
of or damage to personal property in the open or
personal property in a vehicle, the described
premises includes the area within 1,000 feet of the
site at which the described premises are located.

Plaintiff also seeks coverage under the civil authority coverage. Policy
form BP00 03 (Edition 07/13) provides coverage as follows:

i. Civil Authority

When a Covered Cause of Loss causes damage to
property other than property at the described
premises, we will pay for the actual loss of
Business Income you sustain and necessary Extra
Expense caused by action of civil authority that
prohibits access to the described premises, provided
that both of the following apply:

(1) Access to the area immediately
surrounding the damaged property is
prohibited by civil authority as a result of the
damage, and the described premises are within
that area but are not more than one mile from
the damaged property; and

(2) The action of civil authority is taken in
response to dangerous physical conditions
resulting from the damage or continuation of

5

JA382

the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for necessary Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

(1) Four consecutive weeks after the date of that action; or

(2) When your Civil Authority Coverage for Business Income ends; whichever is later.

The definitions of Business Income and Extra Expense contained in the Business Income and Extra Expense Additional Coverages also apply to this Civil Authority Additional Coverage. The Civil Authority Additional Coverage is not subject to the Limits of Insurance of Section I – Property.

This coverage is modified by the Business Property Enhancement Endorsement, Form BP 72 46 (Edition 09/18) which reads as follows:

3. Civil Authority

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that

6

prohibits access to the described premises, provided that both of the following apply:

    a. Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage and the described premises are within that area but are not more than five miles from the damaged property; and

    b. The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

For Business Income, this Additional Coverage will begin immediately after the time of the first action of civil authority that prohibits access to the described premises, unless one of the optional waiting period endorsements is attached to this policy and will apply for a period of up to 30 consecutive days from the date on which such coverage begins.

For Extra Expense, this Additional Coverage will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

    a. Four consecutive weeks after the date of that action; or

    b. When your Civil Authority Coverage for Business Income ends; whichever is later.

7

Plaintiff at oral argument could not state whether it was asserting
coverage under the original BP 0003 policy, or the endorsement BP 72
76 which modifies the provisions of the base business owner's policy
form. The policy provisions cited in plaintiff's brief are from the BP 00
03 form. Defendant, at oral argument, stated that it was relying upon the
modified policy provisions in the business owner's property
enhancement endorsement.

For purposes of this decision, the Court finds that the businessowner's
property enhancement endorsement, BP 72 46, is the proper language to
be considered. That form specifically provides on the first page that it
modifies the insurance provided under the businessowner's coverage
form, which is BP 0003. The Court further notes that regardless of
which provision is considered, the determination on this motion would
not change irrespective of which language was found to be applicable
under the circumstances presented.

The policy under Form BP 0003 (07/13) provides coverage for the
following property:

> SECTION I – PROPERTY
>
> A. Coverage
>
>> We will pay for direct physical loss of or damage
>> to Covered Property at the premises described in
>> the Declarations caused by or resulting from any
>> Covered Cause of Loss.
>>
>> 1. Covered Property
>>
>>> Covered Property includes Buildings as
>>> described under Paragraph a. below, Business
>>> Personal Property as described under
>>> Paragraph b. below, or both, depending on
>>> whether a Limit Of Insurance is shown in the
>>> Declarations for that type of property.
>>> Regardless of whether coverage is shown in
>>> the Declarations for Buildings, Business
>>> Personal Property, or both, there is no

coverage for property described under
Paragraph 2. Property Not Covered.

    a. Buildings, meaning the buildings and
       structures at the premises described in the
       Declarations, including:

       (1) Completed additions;

       (2) Fixtures, including outdoor fixtures;

       (3) Permanently installed:
           (a) Machinery; and
           (b) Equipment;

       (4) Your personal property in apartments,
       rooms or common areas furnished by you
       as landlord;

       (5) Personal property owned by you that is
       used to maintain or service the buildings
       or structures or the premises, including:…

This form also specifically contains the following relevant exclusion
from coverage for virus or bacteria:

    B. Exclusions

       1. We will not pay for loss or damage caused
       directly or indirectly by any of the following.
       Such loss or damage is excluded regardless of
       any other cause or event that contributes
       concurrently or in any sequence to the loss.
       These exclusions apply whether or not the loss
       event results in widespread damage or affects
       a substantial area.

       …j. Virus Or Bacteria

(1) Any virus, bacterium or other micro-
organism that induces or is capable of
inducing physical distress, illness or
disease.

(2) However, the exclusion in Paragraph
(1) does not apply to loss or damage
caused by or resulting from "fungi", wet
rot or dry rot. Such loss or damage is
addressed in Exclusion i.

(3) With respect to any loss or damage
subject to the exclusion in Paragraph (1),
such exclusion supersedes any exclusion
relating to "pollutants".

## ANALYSIS

The test for determining the adequacy of the pleading is whether a cause
of action is suggested by the facts.  Velantzas v. Colgate-Palmolive
Corp., 109 N.J. 189 (1998).  The court must search in depth and with
liberality to determine if a cause of action can be gleaned even from an
obscure statement, particularly if further discovery is conducted.
Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 772
(1989).  The court in Printing Mart cautioned that a Rule 4:6-2(e)
motion to dismiss "should be granted in only the rarest of instances."
Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 772
(1989); see also Lieberman v. Port Auth. of N.Y. & N.J., 132 N.J. 76,
79 (1993). The Rule requires that plaintiffs must receive "every
reasonable inference of fact ["and a reviewing court must search the
complaint "in depth and with liberality to ascertain whether the
fundament of a cause of action may be gleaned even from an obscure
statement of claim, opportunity being given to amend if necessary."]
Printing Mart, supra, 116 N.J. at 746 (quoting DiCristofaro v. Laurel
Grove Mem'l Park, 43 N.J. Super. 244, 252 (App. Div. 1957)).  Every
reasonable inference is therefore accorded to the plaintiff. Banco
Popular North America v. Gandi, 184 N.J. 161, 165-166 (2005).

10

Policies of insurance are generally interpreted in favor of the insured and against the insurer. Salem Group v. Oliver, 128 N.J. 1 (1992). This in part is based upon the public policy of interpreting the insurance policy against the drafter. Werner Industries, Inc. v. First State Insurance Company, 112 N.J. 30 (1988). All ambiguities and uncertainties in the insurance policy are resolved in favor of the insured and against the insurer. Sparks v. St. Paul Insurance Company, 100 N.J. 325 (1985); Killeen Trucking, Inc. v. Great American Surplus Lines Insurance Company, 211 N.J. Super. 712 (App. Div. 1986).

The court must enforce the clear and unambiguous terms of the policy of insurance. Erdo v. Torcon Construction Company, 275 N.J. Super. 117 (App. Div. 1994). The test for determining whether an ambiguity exists is whether the phrasing of the policy of insurance is sufficiently confusing such that the average policy-holder cannot make out the boundaries of coverage. Nunn v. Franklin Mutual Insurance Company, 274 N.J. Super. 543 (App. Div. 1994); Ryan v. State Health Benefits Commission, 260 N.J. Super. 359 (App. Div. 1992). A disagreement between the insurer and the insured concerning interpretation of the language of an insurance policy does not alone create an ambiguity. Aviation Charters, Inc. v. Avemco Insurance Co., 335 N.J. Super. 591 (App. Div. 2000), affirmed as modified 170 N.J. 76 (2000). A policy of insurance is ambiguous only where reasonably intelligent persons would differ regarding its meaning. Id. Where the insurance policy language is clear and unambiguous, the Court need not consider the claimed reasonable expectations of the insured. Katchen v. Government Employer's Ins. Co., 457 N.J. Super. 600, 607 (App. Div. 2019), appeal dismissed 241 N.J. 354 (2020); see Passaic Valley Sewerage Commissioners v. St. Paul Fire & Marine Ins. Co., 206 N.J. 596, 608 (2011).

Words utilized in the insurance policy are interpreted in accordance with their plain and ordinary meaning. Voorhees v. Preferred Mutual Insurance Company, 128 N.J. 165 (1992); Daus v. Marble, 270 N.J. Super. 241 (App. Div. 1994). Where the policy language will support two interpretations, only one of which will support a finding of coverage, the court will choose the interpretation favoring the insured and find that coverage exists. Meeker Sharkey Associates, Inc. v. National Union Fire Insurance Company of Pittsburgh, 208 N.J. Super. 354 (App. Div. 1986).

11

Defendant first argues that business interruption coverage does not apply because plaintiff does not allege direct physical loss or damage to covered property. They assert this is a pre-condition to any coverage under the insurance policy.

Defendant asserts that the virus exclusion bars coverage for the losses claimed. They further argue that there was no covered loss by order of civil authority, since the complaint does not allege governmental action taken as a result of damage to nearby property as a result of a covered cause of loss.

Plaintiffs argue in response that because they were unable to use their property for its intended purpose, they suffered direct physical loss or damage to property. Plaintiffs further assert they are entitled to coverage for order of civil authority because they were denied access to their property as a result of property damage. This property damage allegedly results from Executive Orders 103 and 107.

Plaintiffs claim that because the virus exclusion is an affirmative defense, it may not be considered by the court on a Rule 4:6-2 motion. Finally, plaintiffs argue that their reasonable expectations were that losses such as that which occurred would be covered.

Both parties cite to a litany of unreported decisions reaching conclusions either in their favor, or finding that motions to dismiss were premature. Both parties rely upon the New Jersey Appellate Division decision in Wakefern Food Corp. v. Liberty Mutual Fire Ins. Co., 406 N.J. Super. 524 (App. Div.), certif. denied 200 N.J. 209 (2009) to support their position.

In the Wakefern Food Corp. case, the claim arose out of a failure in the North American electrical grid which caused a four-day electrical blackout over portions of the Northeastern United States and Eastern Canada. Wakefern suffered losses due to food spoilage during the power outage. The insurance policy issued by Liberty Mutual Fire Insurance Company contained a specific endorsement providing coverage for damage due to the loss of electrical power. The policy required that the interruption of coverage be caused by physical damage from a covered peril to any power house, generating plant, substation,

12

power switching station, gas compressor station, transformer, telephone exchange, transmission lines, connections or supply pipes which furnish electricity to a covered location.

The parties disputed whether the interruption of electrical power resulted in physical damage to the specified electrical equipment and property. The court there concluded that despite the differing explanations by experts as to why the power went out and why it remained out, ultimately the entire electrical system was incapable of producing electrical power for several days. The court's decision was based upon the specific language contained in the "Services Away Extension" which provided coverage for interruption of electrical service.

The Appellate Division in <u>Arthur Anderson LLP v. Federal Ins. Co.</u>, 416 N.J. Super. 334 (App. Div. 2010) rejected a claim for business interruption losses alleged to have resulted from the September 11, 2001 attacks on the World Trade Center and the Pentagon. The insured asserted that it suffered a loss of earnings in excess of $200,000,000 as a result of these events. The court rejected the claim, finding that the insured could show no loss or damage to its real or personal property described in the policy, and concluded that the insured had no insurable interest in the World Trade Center property or the Pentagon. Based upon this analysis, the court rejected the business interruption claim.

Other decisions reflect the need to examine the specific language in the policy at issue when evaluating coverage. Where an insured's automobile dealership was inaccessible for a week due to a snow storm, the court concluded that even though the property itself sustained some roof damage which did not require a suspension of business, the language of the policy precluded coverage where it was the storm and road conditions which caused the closure of the business. <u>Harry's Cadillac-Pontiac-GMC Truck Co., v. Motors Insurance Corp.</u>, 126 N.C. App. 698, 699-702; 486 S.E.2d 249, 251-252 (1997). A Federal District Court concluded that no covered loss of business income occurred as a result of a power outage without direct physical loss to insured property caused by a covered peril, but did find covered loss due to direct physical damage to the computer system of the insured. <u>Southeast Mental Health Center, Inc. v. Pacific Ins. Co.</u>, 439 F.Supp. 2d 831, 836-839 (W.D. Tenn 2006). The Oregon Court in <u>Protection Mutual Ins. Co.</u>

13

v. Mitsubishi Silicon America Corp., 164 Ore.App. 385, 992 P.2d 479 (1999), review denied 330 Ore. 331, 6 P.3d 1100 (2000) found no business interruption coverage because flood was not a covered cause of loss for business interruption.

Neither party cites to any reported New Jersey case specifically addressing a virus exclusion. Other courts have upheld exclusions barring coverage for losses caused by hazardous substances. See Certain Underwriters at Lloyd's of London v. Creagh, 563 F.Appx. 209, 211 (3d Cir. 2014) (finding loss allegedly caused by bacteria excluded); Sentinel Ins. Co. v. Monarch Med Spa, Inc., 105 F.Supp. 3d 464 (E.D.Pa. 215) (enforcing exclusion for loss resulting from presence of or exposure to fungi, bacteria and viruses).

The virus exclusion in the Selective policy contains what is commonly referred to as an anti-concurrent causation provision. This is evidenced in part by the policy language preceding the virus or bacteria exclusion which excludes coverage "regardless of any other cause or event that contributes concurrently or in any sequence to the loss".

New Jersey Courts have enforced anti-concurrent causation provisions in first party property insurance cases where the policy contains clear and unambiguous language. Simonetti v. Selective Ins. Co., 372 N.J. Super. 421, 431 (App. Div. 2004) (finding that anti-sequential concurrent causation clause in the earth movement exclusion evidenced a clear intention to bar coverage for earth movement regardless of any other contributing cause). The Appellate Division in a case involving third party coverage applied the same doctrine to find coverage excluded for a claim involving the shooting of a patron at a nightclub where the policy excluded coverage for injury or damage arising out of or caused in whole or in part by an assault and/or battery. Stafford v. T.H.E. Ins. Co., 309 N.J. Super. 97, 104-105 (App. Div. 1998). That policy further excluded coverage where the underlying operative facts alleged constituted an assault or battery, regardless of the theory of liability asserted. Id.

Plaintiff argues in its brief that it is improper for defendants to rely upon an exclusion from coverage on a Rule 4:6-2 motion. They cite no

14

caselaw in support of that assertion. At oral argument plaintiff refused to acknowledge that COVID-19 is a virus[1].

This argument ignores the fact that it is the plaintiff's Complaint itself which introduces a loss caused by virus as part of the allegations of the complaint. Paragraph 16 of plaintiff's Complaint asserts that on March 9, 2020, Governor Philip Murphy signed Executive Order 103 declaring both a public health hazard and state of emergency in New Jersey. Executive Order 103 starts with the following introductory paragraph:

> WHEREAS, Coronavirus disease 2019 ("COVID-19") is a contagious, and at times fatal, respiratory disease caused by the SARS-CoV-2 virus....

Paragraph 18 of the Complaint asserts that the President on March 13, 2020 declared a national emergency as a result of COVID-19. That declaration by the President reads in part as follows:

> In December 2019, a novel (new) coronavirus known as SARS-CoV-2 ("the virus") was first detected in Wuhan, Hubei Province, People's Republic of China, causing outbreaks of the coronavirus disease COVID-19 that has now spread globally.

Paragraph 19 of the Complaint discusses the March 21, 2020 Executive Order 107 issued by Governor Murphy requesting residents to remain at home. The language of the order reflects that the restrictions are being imposed to prevent or reduce the spread of COVID-19, a highly contagious virus.

The Complaint itself places the involvement of a virus at issue. Governor Murphy's Executive Orders 103 and 107, the World Health Organization Declaration of a Global Pandemic and the President's Declaration of a National Emergency all reference the coronavirus

---

[1] This Court could take judicial notice pursuant to New Jersey Rule of Evidence 201(b) that COVID-19 is a virus. That however is unnecessary since the governmental orders and declarations referenced in the complaint specifically identify COVID-19 as a virus, and because the exclusion is broader than suggested by plaintiff. The policy excludes losses caused by "any virus, bacterium or other micro-organism that induces or is capable of inducing physical distress, illness or disease".

15

specifically identified as COVID-19. Plaintiff's Complaint in paragraph 21 alleges that as a result of these governmental actions, it was forced to suspend operations.

Plaintiff cannot ignore that its Complaint identifies the coronavirus as the cause of the government actions requiring the suspension of business operations. The allegations of the Complaint itself essentially are that a virus, specifically COVID-19, was the cause of the governmental action. Since the virus is alleged to be the cause of the governmental action, and the governmental action is asserted to be the cause of the loss, plaintiff cannot avoid the clear and unmistakable conclusion that the coronavirus was the cause of the alleged damage or loss. Under the anti-concurrent causation provision of the insurance policy, "such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."

It therefore does not matter whether the closure of plaintiff's business as a result of governmental orders to prevent the spread of the coronavirus constitutes direct physical damage to covered property, nor whether civil authority coverage can be triggered, since the reason for the exercise of that civil authority was the virus.

Ultimately the decision here is specific to the policy language and facts at issue. Plaintiff points to no direct physical loss or damage to covered property. There is no direct physical loss or damage to property which resulted in the order of civil authority. The direct physical damage to the electrical grid present in <u>Wakefern Food Corp</u>. is absent in this case.

Plaintiff points to no language in the insurance policy or declarations which created any reasonable expectation of coverage for the claimed loss. Reasonable expectations must be based upon the insurance contract itself, and not on an insured's subjective belief about what insurance should cover. Because the court finds the policy language, the virus exclusion, to be clear and unambiguous, any expectation of coverage by the insureds is not reasonable.

16

## **CONCLUSION**

For these reasons, the Court concludes that defendant is entitled to dismissal of plaintiff's claims with prejudice. Amendment of the Complaint will not change the conclusion that plaintiff's claims based upon actions taken to slow or stop the spread of the coronavirus fall within the virus or bacteria exclusion. For that reason, the Court will not grant leave to amend, and the dismissal will be with prejudice.

JA394

**DAY PITNEY LLP**             <u>ORDER MODIFIED BY COURT</u>
Elizabeth J. Sher, Esq.
Attorney I.D. No. 030601983
Day Pitney LLP
One Jefferson Road
Parsippany, NJ 07054
(973) 966-6300
**ATTORNEYS FOR** Defendant
Selective Fire and Casualty Insurance Company

---

| | |
|---|---|
| MAC PROPERTY GROUP LLC & THE CAKE BOUTIQUE LLC, | :   SUPERIOR COURT OF NEW JERSEY <br>    LAW DIVISION: CAMDEN COUNTY <br> :   DOCKET NO. L-002629-20 |
|        Plaintiff, | : |
| v. | :         **Civil Action** |
| | : |
| SELECTIVE FIRE AND CASUALTY INSURANCE COMPANY, JOHN DOES (1-10) and ABC COMPANIES (1-10), | :   **ORDER TO DISMISS PLAINTIFF'S COMPLAINT AGAINST DEFENDANT SELECTIVE FIRE AND CASUALTY INSURANCE COMPANY** <br> : |
|        Defendant(s). | |

---

     **THIS MATTER** having been opened to the Court by Day Pitney

LLP, attorneys Defendant Selective Fire and Casualty Insurance

Company ("Selective"), upon notice to Mattleman, Weinroth &

Miller, P.C., attorneys for Plaintiff Mac Property Group LLC &

The Cake Boutique LLC ("Plaintiff"), for an order dismissing the

Complaint pursuant to *R.* 4:6-2(e) for failure to state a claim;

and the Court having considered the moving papers and the papers

filed in opposition, and having heard the argument of counsel on

October 30, 2020, and for the reasons set forth in the written opinion of the Court;

**IT IS** on this 5th day of November, 2020, **ORDERED** as follows:

1.    Plaintiff's Complaint be and the same is hereby dismissed, with prejudice.

2.    A true copy of this Order shall be served upon all counsel of record via regular mail within 7 days of receipt of this order.

HON. STEVEN J. POLANSKY, P.J.Cv.

[   ]  Unopposed
[ X ]  Opposed

106395768.3

JA396

# EXHIBIT H

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

K.C. HOPPS, LTD.,            )
                          )
        Plaintiff,         )
                          )
      v.                  )      Case No. 20-cv-00437-SRB
                          )
THE CINCINNATI INSURANCE COMPANY,  )
INC.,                         )
                          )
        Defendant.      )

## ORDER

Before the Court is Defendant The Cincinnati Insurance Company's ("Defendant")

Motion to Dismiss.  (Doc. #8.)  For the reasons set forth below, the motion is DENIED.

In this case, Plaintiff K.C. Hopps, Ltd. ("Plaintiff") seeks insurance coverage related to

COVID-19 under an all-risk property insurance policy it purchased from Defendant.  On June

22, 2020, Defendant filed the pending motion to dismiss under Federal Rule of Civil Procedure

12(b)(6).  On July 22, 2020, this case was transferred from Judge Roseann Ketchmark to the

undersigned.  (Doc. #22.)

The undersigned is also presiding over a case captioned *Studio 417, Inc., et al. v. The

Cincinnati Insurance Company*, Case No. 20-cv-03127-SRB.  *Studio 417* involves the same

Defendant, similar insurance provisions, and similar factual allegations as those asserted in this

case.  Defendant also moved to dismiss *Studio 417* under Rule 12(b)(6) based on similar legal

arguments that it presents in this case.  On August 12, 2020, the Court denied Defendant's

motion to dismiss in *Studio 417*.

For substantially the same reasons as those in the *Studio 417* Order, the Court finds that

Plaintiff's claims against Defendant are adequately stated.  Consequently, Defendant's Motion to

Case 5:20-cv-00437-SRB Document 25 Filed 08/12/20 Page 1 of 2
Case 4:20-cv-00437-SRB Document 2529 Filed 08/11/20 Page 2 of 2

JA398

Dismiss (Doc. #8) is DENIED.  It is further ORDERED that Defendant's Motion to Stay

Discovery pending a ruling on its Motion to Dismiss (Doc. #26) is DENIED AS MOOT.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated:  August 12, 2020

2

**EXHIBIT I**

```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION: CIVIL PART
                              BERGEN COUNTY
                              (HEARD VIA ZOOM)
                              DOCKET NO: BER-L-3681-20
                              A.D. #_____
```

```
OPTICAL SERVICES USA/     )
JC1, OPTICAL SERVICES     )
USA, LLC, OPTICAL         )          TRANSCRIPT
SERVICES USA-WO, RE & LE  )
HOLDINGS, LLC, STONG OD   )             OF
EWING NJ, LLC,            )
                          )          MOTION
          Plaintiffs,     )
                          )
        vs.               )
                          )
FRANKLIN MUTUAL           )
INSURANCE COMPANY,        )
                          )
          Defendant.      )
```

```
                    Place: Bergen County Justice Center
                           10 Main Street
                           Hackensack, New Jersey 07601

                    Date: August 13, 2020
```

BEFORE:

    HONORABLE MICHAEL N. BEUKAS, J.S.C.

TRANSCRIPT ORDERED BY:

    AMINA RANA, (Paul Weiss Rifkind Wharton Garrison)

APPEARANCES:

    SEAN E. ROSE, ESQ. (Olender Feldman, LLP)
    Attorney for Plaintiffs

    ERIC L. HARRISON, ESQ. (Methfessel & Werbel)
    Attorney for Defendant

```
                    Transcriber: Laura Scicutella
                    Phoenix Transcription, LLC
                    796 Macopin Rd.
                    West Milford, NJ  07480
                    (862)248-0670

                    Audio Recorded
                    Recording Opr: Alexa D'Angelo
```

I N D E X

|                               | PAGE     |
|-------------------------------|----------|
| Colloquy re: Housekeeping     | 3,7,30   |
| ARGUMENTS:                    |          |
| BY: Mr. Harrison              | 5,7,15   |
| BY: Mr. Rose                  | 13       |
| THE COURT:                    |          |
| Decision                      | 18       |

```
 1              (Proceeding commenced at 9:30:49 a.m.)

 2              THE COURT:  Superior Court of the State of

 3      New Jersey, Bergen County Vicinage, clerk recording,

 4      Alexa D'Angelo law clerk, docket number BER-L-3681-20,

 5      caption is Optical Services USA/JCI (sic), Optical

 6      Services USA, LLC, Optical Services USA-WO, and Re and

 7      Le Holdings, LLC, Stong OD Ewing NJ, LLC versus

 8      Franklin Mutual Insurance Company.  Judge Michael N.

 9      Beukas, chambers 453.  The time is approximately 9:32

10      a.m.  May I have the appearances of counsel for the

11      record, please, starting with the plaintiff?

12              MR. ROSE:  Good morning, Your Honor.  Sean

13      Rose from the law firm of Olender Feldman on behalf of

14      plaintiff, Optical Services USA/JC1, Optical Services

15      USA, LLC, Optical Services USA-WO, Re and Le Holdings,

16      LLC, and Stong OD Ewing NJ, LLC, collectively

17      plaintiffs, Your Honor.

18              THE COURT:  Good morning, Counsel.

19              MR. ROSE:  Good morning.

20              MR. HARRISON:  Good morning, Judge.  Eric

21      Harrison, Methfessel and Werbel, on behalf of Franklin

22      Mutual Insurance Company.

23              THE COURT:  Good morning, Counsel.  Okay,

24      gentlemen, just a -- a couple of --

25              RECORDING:  (Indiscernible) --
```

1           THE COURT:  -- reminders before we --

2           RECORDING:  -- is now in the conference.

3           MR. HARRISON:  Your Honor, this is Eric

4    Harrison speaking.  As a courtesy, I should let the

5    Court know I do have a few folks dialing in.  They've

6    all been instructed to keep their phones on mute.

7    Various FMI representatives and a colleague of mine

8    will be listening in but will not be participating.

9           THE COURT:  Okay, very good.

10          For purposes of our established record here

11   today, gentlemen, when you do speak at oral argument, I

12   do need you to identify yourself in between oral

13   arguments so that the transcription service can clearly

14   identify which attorney is speaking.

15          When you are referencing an oral argument to

16   any specific controlling case, I need you to identify

17   that case for the record and pursuant to Rule 1:36-3, I

18   need you to identify for the record whether that is a

19   published opinion in the State of New Jersey versus an

20   unpublished opinion and whether or not you are citing

21   to any law of any other jurisdiction including the US

22   Supreme Court so that I can identify for the record as

23   to whether or not any of the law is controlling in this

24   case for purposes of oral argument.

25          In addition, we are on a Polycom speaker

1    today and at times it may be difficult for you to hear

2    me and I may need to interject to pose a question to

3    either attorney so I may have to elevate my voice so

4    that you can hear me clearly.  So please don't

5    misconstrue me elevating my --

6              RECORDING:  (Indiscernible) --

7              THE COURT:  -- voice --

8              RECORDING:  -- is now in the conference.

9              THE COURT:  Okay, gentlemen, I -- if I need

10   to elevate my voice, it's for purposes of the Polycom

11   picking up my voice so that you can hear it, okay.

12             So I have before me a Motion to Dismiss the

13   Complaint for failure to state a claim upon which

14   relief can be granted pursuant to Rule 4:6-2(e) filed

15   by the defendant, Franklin Mutual Insurance Company.

16   So, Mr. Harrison, this is your Motion.  You may

17   proceed.

18             MR. HARRISON:  Yes, sir.  Thank you, Your

19   Honor.  We are all aware, I know plaintiffs' counsel is

20   aware, certainly my firm as an insurance defense firm

21   is well aware of the fast-moving nature of developments

22   in insurance litigation and other litigation over

23   Covid-19.  Two significant events happened yesterday

24   and they're both worthy of mention.  The first is, and

25   this is not within the record, but the Court -- it's

1    not important to the Court's decision on the policy

2    language, but it's -- it's significant background.  The

3    multi-district litigation panel of the United States

4    District Court denied a nation-wide Motion to

5    Consolidate these business interruption litigations

6    that are venued in various Federal Courts around the

7    country essentially on the basis that the policy

8    language differs from policy to policy.  Even though a

9    lot of insurers use (indiscernible) income and would

10   other insurers, there is still significant differences

11   between those forms and the facts of particular cases

12   also can determine whether there would be coverage and

13   to what extent.

14        The second significant thing to happen

15   yesterday was the issuance of the decision that Mr.

16   Rose brought to the Court's attention, and I don't have

17   any objection to his filing it yesterday because it

18   didn't come out until yesterday and I have had ample

19   time to review it.  It's the Studio 417 case from U.S.

20   District Court, Western District of Missouri, Southern

21   Division.  This opinion, which I'm not going to

22   significantly disagree with, demonstrates the wisdom of

23   the MDO panel in refusing to consolidate because the

24   denial of the Motion to Dismiss based on the

25   allegations in that complaint bespeaks the importance

1       of policy language differing from policy to policy and

2       alleged facts differing from complaint to complaint.

3               I should ask as a courtesy whether the Court

4       has any objection to me talking about this case that

5       Mr. Rose sent yesterday.

6               THE COURT:  What I would like you to do,

7       Counsel, is argue your Motion to Dismiss.  This Court

8       is bound by the implications of Rule 1:36-3.  While the

9       parties felt compelled to cite to numerous other

10      jurisdictions with respect to their arguments, their

11      respective arguments both on the Motion and in the

12      Opposition, this Court is bound by legal precedent

13      within the State of New Jersey, namely the Appellate

14      Division, and the New Jersey Supreme Court.  With

15      respect to the US Supreme Court, this -- this Court

16      also takes precedent from the US Supreme Court for

17      controlling decisions.  So this Court will give

18      whatever weight is necessary to whatever arguments

19      reflect in the controlling legal precedent set forth in

20      this state as opposed to other states.  So you may

21      proceed with the argument.

22              MR. HARRISON:  Okay, thank you, Your Honor.

23      I just -- I just wanted to make sure that the Court

24      didn't want me to completely disregard this decision.

25      But I'm going to highlight it simply to contrast it

1    with a case we're looking at in order to argue my

2    position under New Jersey law.

3            The Studio 417 decision describes a policy

4    which defines a covered cause of loss, and that's at

5    page 2 of the opinion, as follows, "Accidental direct

6    physical loss or accidental direct physical damage."

7    It goes on to say on the same page, "The policies do

8    not include and are not subject to any exclusion for

9    losses caused by viruses or communicable diseases."

10           Now, I want to be clear about something.  I

11   want to be clear about a point of agreement that

12   Franklin Mutual has with the plaintiffs in this case.

13   At paragraph 36 of the Complaint filed in this case,

14   plaintiffs recite as follows, "There is no known

15   instance of Covid-19 transmission or contamination

16   within the premises of plaintiffs' businesses."  Now,

17   the declamation of coverage letter that FMI issued

18   prior to the Complaint being filed in this case because

19   the Complaint challenges that declamation of coverage

20   find it among relevant policy provisions the exclusion

21   of 12(c) for contamination by any virus, et cetera.

22   Because the complaint expressly asserts that there was

23   no contamination and because it is our universal duty

24   to read as accurate all facts alleged in the complaint

25   and I agree that the contamination exclusion would not

1    apply to this case.  If the complaint had alleged that

2    there was contamination on the premises, then there

3    probably would be direct physical loss, but there would

4    also be exclusion of coverage under that virus

5    exclusion.  So what we're really focused on is the

6    policy language.  In Studio 417, the definition of loss

7    there was physical loss or physical damage.

8              THE COURT:  Okay, but we're concerned about

9    New Jersey.  We're not concerned about the Western

10   District of Missouri; correct?

11             MR. HARRISON:  That is true, Your Honor, but

12   we are concerned about policy language defining direct

13   physical loss, --

14             THE COURT:  Okay, but the --

15             MR. HARRISON:  -- but I'm -- I'm happy to

16   take it --

17             THE COURT:  -- definition (indiscernible) --

18             MR. HARRISON:  -- to our policy language.

19             THE COURT:  -- definition has not been

20   established by any court in this state with the

21   exception of the Wakefern case; correct?

22             MR. HARRISON:  I think that is absolutely

23   correct.

24             THE COURT:  Okay, I just want to establish

25   that for purposes of the record.

1           MR. HARRISON:  Okay, so back to our policy.

2      The business interruption loss that -- of which

3      plaintiffs seek to avail themselves governs loss of

4      income resulting from direct covered loss.  We go to

5      page 9 of the policy form which expressly defines

6      direct covered loss as follows, "The fortuitous direct

7      physical loss as described in Part 1(c), General Cause

8      of Lost Conditions, Coverages A, B, C, which occurs at

9      described premises occupied by you."  Now, the

10     definition is (indiscernible) if it didn't refer -- if

11     it didn't cross-reference another definition, then we'd

12     be fighting over whether the closure of a business

13     because of a risk of virus spread would constitute a

14     fortuitous direct physical loss.

15          However, because it cross-references the

16     description of direct covered loss that's also in the

17     policy at page 8.  We go to the more detailed

18     definition.  Covered loss, "Means fortuitous direct

19     physical damage to or destruction of covered property

20     by a covered cause of loss."  The requirement of direct

21     physical damage to or destruction of (indiscernible) --

22          RECORDING:  (Indiscernible).

23          MR. HARRISON:  -- requirement of direct

24     physical damage to or destruction of covered property

25     distinguishes this case from the Studio 417 case in

1    that there is the physical damage or destruction

2    requirement that was absent in that case which also had

3    --

4         RECORDING:  (Indiscernible) is now in the

5    conference.

6         MR. HARRISON:  -- I apologize -- which also

7    had the open-ended concept of loss which was not

8    defined.  Our policy defines loss as requiring that

9    physical impact.

10        The Court has reviewed Wakefern I know and

11   the -- the cases -- the New Jersey cases discussed in

12   our brief I agree that there is no case directly on

13   point construing the -- this precise policy language in

14   the context a claim where there was a closure of a

15   business because of the risk of contamination by a

16   virus.  But I think that the application of loss that's

17   set forth in New Jersey and in the other jurisdictions

18   we've cited as persuasive, although not binding,

19   compels the conclusion that this did not meet the

20   policy definition of direct covered loss to satisfy

21   coverage.

22        THE COURT:  Counsel, let me pose -- let me

23   pose one question to you.  Why didn't the policy then

24   have specific exclusions for an event such as this?

25   Meaning for virus proliferation.

1          MR. HARRISON:  Well, it -- it precisely has

2     an exclusion for virus proliferation.  It does not have

3     an exclusion for a closure of business based on the

4     risk of virus proliferation.  I can't speak to the

5     drafters of the policy other than to say this is an

6     unprecedented event.  First in my lifetime.  First in

7     my parents and our parents.  So, yeah, in -- in an

8     ideal world all potential cataclysmic risks could be

9     underwritten and determined in advance as to what we're

10    going to cover and to what extent or whether there

11    should be any coverage at all, but before we get to the

12    absence of an exclusion, and I agree there is no

13    exclusion that would apply on the facts as alleged in

14    this Complaint, we have to satisfy the coverage

15    definition first.

16         THE COURT:  You can proceed, Counsel.  Thank

17    you.

18         MR. HARRISON:  I -- Your Honor, to -- to be

19    candid, I know you've reviewed the papers.  I'm happy

20    to address any further questions the Court may have or

21    simply reserve an opportunity to respond to my

22    colleague.  I -- I think between our papers and what

23    I've had to say this morning that I've stated our case.

24         THE COURT:  Thank you, Counsel.  Okay, Mr.

25    Rose, your response?

1          MR. ROSE:  Thank you, Your Honor.  And just

2     to try to make sure that there's a clean record

3     virtually, this is again Sean Rose, Olender Feldman, on

4     behalf of plaintiff.

5          So contrary to the insurance industry's well

6     rehearsed talking points and -- and Mr. Harrison has a

7     very good brief and very good argument, the simple fact

8     is that plaintiff and the many other in the -- and

9     (indiscernible) plaintiffs purchased business owners

10    policies to insure against, among other things,

11    unexpected business interruptions.  And what happened

12    back in March, as we all know because we all lived

13    through it, that's about as unexpected as you get.

14    Plaintiffs were forced to close their businesses

15    because the executive order issued by the State --

16    well, the State pertinent to here, but issued across

17    the country in emergency response to the pandemic found

18    that there is a dangerous condition on plaintiffs'

19    property.  As a result of those orders, the plaintiffs

20    closed.  All residents were told to stay at home and

21    (indiscernible) claims (indiscernible).

22          Now, as Mr. Harrison pointed out, the

23    briefing reflects that there are really two main points

24    of argument that -- that I'll hit quickly because they

25    are recited at length in the brief is the first

1   (indiscernible) on the direct physical loss issue.  We
2   know from, and just to again bide by Your Honor's
3   directive, we know that under the Gregory Packaging,
4   Inc. versus Travelers Property Casualty Company of
5   America case, which is an unpublished case, but from
6   the District of New Jersey and cited in both Mr.
7   Harrison's and our brief, we know that a dangerous
8   condition on the property can constitute a physical
9   loss.  Now, here, we have an executive order that found
10  that plaintiffs' businesses were deemed unfit and
11  unsafe because of a dangerous condition.  Plaintiffs'
12  loss of income caused by the closure orders concluding
13  that there was a dangerous condition on the property is
14  a direct physical loss.  Alternatively, if we wanted to
15  get into the legal standard, at a minimum, it is
16  plausible the plaintiffs have alleged a direct physical
17  loss here which should defeat a (indiscernible) Motion
18  and allow plaintiffs to pursue discovery, among other
19  things, to discern the true intent behind policy terms
20  which, in some cases, points to coverage but in other
21  cases it may be ambiguous.
22          The second point would be the civil authority
23  coverage and I -- I think here, the Western District of
24  Missouri case has instructed, and I'll get to that in a
25  second, here we -- we, again, we know what happened.

1    We all lived through it.  The closure orders forced

2    plaintiffs to close and banned occupancy of all non-

3    essential businesses.  In doing so, the closure orders

4    necessarily not only affected plaintiffs' businesses,

5    but they affected all -- all properties around

6    plaintiffs.  It was a stay-at-home order.  Unless it

7    was an essential business, everything was closed.  It's

8    alleged -- it -- it's in the Motion and, you know,

9    beyond that, Your Honor, we all lived through it.  We

10   were all there.  So, again, at a minimum, it is

11   plausible that plaintiffs are entitled to

12   (indiscernible) coverage here.  And unless Your Honor

13   has any questions, I know the briefing was fairly

14   detailed.

15            THE COURT:  Thank you, Mr. Rose.  You know,

16   at the outset, gentlemen, I do commend the both of you

17   with respect to a very, very difficult topic and

18   concept in the State of New Jersey with regard to the

19   interpretation of insurance law.  I did find that the

20   respective briefs were very well drafted.

21            Mr. Harrison, do you have a reply at this

22   point?

23            MR. HARRISON:  Briefly, Your Honor, yes.  Mr.

24   Rose says the executive order for -- forced closure

25   based on a finding that there was a dangerous condition

1    on plaintiffs' property.  That's -- that's simply not

2    the case.  The -- the Complaint does not allege that.

3    I understand what he's saying.  It -- it's a -- it's a

4    directive closing down non-essential businesses based

5    on the risk that putting people in proximity to each

6    other indoors could result in transmission of the

7    virus, could -- it could result in the virus sitting on

8    a piece of equipment in one of the plaintiffs'

9    examining rooms, but the Complaint in this case

10   expressly alleges that there has been no known instance

11   of Covid-19 transmission or contamination.

12          I -- I get it that this is business

13   interruption insurance and to quote one of the judges I

14   appeared before in my first year arguing coverage

15   motion, he said, Mr. Harrison, before we turn to the

16   policy terms, everybody knows that when an insured buys

17   insurance for something, their reasonable expectation

18   is that they're going to be covered for whatever might

19   befall them, but then we got to go to the policy

20   language and if indeed coverage was determined by the

21   name of the coverage, business interruption, well, then

22   the insurance industry loses and FMI loses this case

23   because we're not disputing that there was business

24   interruption.  Although if we were to have to dig

25   deeper, we would probably have a dispute over whether

1    plaintiffs were non-essential businesses, but that's

2    not what this Motion is about.  The law requires that

3    we look carefully at the policy language.  And with

4    reference to <u>Gregory Packaging</u>, we're talking about the

5    release of ammonia into the air, talking about

6    something physically occurring and I think it's -- it's

7    clear from the plain policy language and the meaning of

8    the terms, which are precisely defined in the policy,

9    that in this instance under this policy based on these

10   allegations there is no direct covered loss.

11          In -- in asking for discovery to determine

12   the true intent behind policy terms, right, that's

13   something you need to speak about briefly.  When policy

14   language is clear, I am not aware of any precedent

15   which would support denial of a Motion to Dismiss on

16   the basis that the plaintiff is entitled to conduct

17   discovery to see what the drafter of the document, who

18   I can tell the Court was not -- is not an employee of

19   FMI, had in mind when defining direct covered loss or

20   covered loss.

21          There -- there is -- in New Jersey we do have

22   a -- a big case called <u>Morton International</u> which has

23   to do with pollution exclusions and that's where our

24   courts created this -- the concept of regulatory

25   estoppel where essentially the insurance industry

1    lobbied to insert a particular form of coverage within

2    a policy with an exclusion for -- that applied to

3    environmental losses and essentially the courts found,

4    hey, you came to the Department of Banking and

5    Insurance putting forth this policy language suggesting

6    it would do something and then you went to court and

7    suggested otherwise.  There is no such allegation in

8    this case.  I haven't seen any such allegation even

9    made in the press or -- or by the various

10   (indiscernible) or -- or in any case that's being

11   litigated that I'm aware of.  When the plain policy

12   terms apply plainly and directly to the facts asserted,

13   I'm not aware of any legitimate basis for denying a

14   Motion based on the facts accepted as true in the

15   pleading on the basis that plaintiff wishes to take

16   discovery to see what the defendant meant by policy

17   language that somebody else wrote which the defendant

18   adopted if the plain language controls and is

19   unambiguous and I submit that it does control and it is

20   unambiguous here.

21              THE COURT:  Thank you.  Gentlemen, thank you,

22   very much.  I'm prepared to rule on this Motion.

23              This matter comes before the Court on a

24   Motion Seeking Dismissal of the plaintiffs' Complaint

25   with prejudice pursuant to Rule 4:6-2(e).  The Court

1    begins with a few general observations concerning the

2    standards governing dismissal motions under Rule 4:6-

3    2(e) by citing <u>Flinn v.</u> -- <u>Flinn v. Amboy National</u>

4    <u>Bank</u>, 40 -- 436 <u>N.J.Super</u>. 274 (App. Div. 2014), "In

5    reviewing a complaint dismissed under Rule 4:6-2(e),

6    the inquiry is limited to examining the legal

7    sufficiency of the facts alleged on the face of the

8    complaint," citing <u>Printing Mart-Morristown versus</u>

9    <u>Sharp Electronics Corp.</u>, 116 <u>N.J.</u> 739 at page 746

10   (1989) and <u>Rieder versus Department of Transportation</u>,

11   221 <u>N.J.Super</u>. 547 at page 552 (App. Div. 1987).

12       The essential test as set forth in <u>Green</u>

13   <u>versus Morgan Properties</u>, 215 <u>N.J.</u> 431 at page 451

14   (Sup. Ct. 2013) is, "Whether a cause of action is

15   'suggested' by the facts," citing <u>Printing Mart-</u>

16   <u>Morristown versus Sharp Electronics Corp.</u>, 116 <u>N.J.</u> at

17   746 quoting <u>Velantzas versus Colgate-Palmolive Co.</u>, 109

18   <u>N.J.</u> 189 at page 192 (1988).

19       "A reviewing court searches the complaint in

20   depth and with liberality to ascertain whether the

21   fundamental of a cause of action may be gleaned, even

22   from an obscure statement of claim, opportunity being

23   given to amend if necessary," citing <u>Di Cristofaro</u>

24   <u>versus Laurel Grove Memorial Park</u>, 43 <u>N.J.Super</u>. 244 at

25   page 252 (App. Div. 1957).

1             In the case of Rule 4:6-2(e), Dismissals,

2    "The Court is not concerned with the ability of the

3    plaintiffs to prove the allegation contained in the

4    complaint," citing <u>Somers Construction Co. versus Board</u>

5    <u>of Education</u>, 198 <u>F.Supp.</u> 732, 734 (Dis. NJ. 1961).

6    Instead,

7             "The plaintiffs are entitled to every

8    reasonable inference of fact and the examination of a

9    complaint's allegations of fact required by the

10    aforestated principle should be one that is at once

11    painstaking and undertaken with a generous and

12    hospitable approach,"

13             citing <u>Green versus Morgan Properties</u>, 215

14    <u>N.J.</u> 431 at page 452 quoting <u>Printing Mart-Morristown</u>

15    <u>versus Sharp Electronics Corp.</u>, 116 <u>N.J.</u> at 746.

16             Notwithstanding this indulgent standard, "A

17    pleading should be dismissed if it states no basis for

18    relief and discovery would not provide one," citing

19    <u>Rezem Family Associates, LP versus Borough of</u>

20    <u>Millstone</u>, 423 <u>N.J.Super</u>. 103 at page 113 (App. Div.

21    2011), cert. denied and the appeal was dismissed at 208

22    <u>N.J.</u> 366 (2011). See also <u>Sickles versus Cabot Corp.</u>

23    379 <u>N.J.Super</u>. 100 at page 106 (App. Div. 2005) cert.

24    denied at 185 <u>N.J.</u> 297 (2005).

25             In those rare instances, as cited in <u>Smith</u>

1     versus SBC Communications, Inc., 178 N.J. 265 at page

2     282 (2004), a motion to dismiss pursuant to Rule 4:6-

3     2(e) ordinarily is granted without prejudice.  See

4     Hoffman versus Hampshire Labs Incorporated, 405

5     N.J.Super. 105, 116 (App. Div. 2009).

6               The defendant, Franklin Mutual Insurance

7     Company, hereinafter FMI, issued a business owners

8     policy to plaintiff, Optical Services USA/JC1 under

9     policy number SBP2598006 with effective dates of

10    October 5, 2019 to October 5, 2020.  FMI issued the

11    business owners policy to the plaintiff, Stong OD Ewing

12    NJ, LLC, hereinafter Stong OD, bearing policy number

13    SBP2613680 with effective dates of April 1, 2020 to

14    April 1, 2021.  Optical Services USA/JC1 and Stong OD

15    filed separate claims seeking loss of business income

16    caused by the closure mandated by Governor Murphy's

17    March 21, 2020 Executive Order Number 107 suspending

18    the operation of non-essential retail businesses on the

19    account of the Covid-19 pandemic.  Plaintiffs closed

20    their businesses on March 20, 2020 and have not

21    reopened to date.  Plaintiffs allege that Executive

22    Order Number 107 mandated the closure of their

23    businesses.  FMI issued letters dated April 6, 2020 and

24    April 14, 2020 to Optical Services USA/JC1 and Stong OD

25    denying their claims for business income and related

1    expenses.  Plaintiffs, Optical Services USA, LLC,

2    Optical Services USA-WO, Re and Le Holdings, LLC were

3    not named insureds on either policy.

4         Both policies contained the BU04010110

5    Business Owners Policy Form.  The plaintiffs allege

6    that the -- the plaintiffs allege that Optical Services

7    USA/JC1, Optical Services USA, LLC, Optical Services

8    USA-WO, Re and La -- and Le Holding, LLC and Stong OD

9    Ewing NJ, LLC purchased business interruption insurance

10   from insurers to protect their business from an -- an

11   unanticipated crisis.  The plaintiffs further allege

12   that the policies issued by FMI provide coverage for

13   loss of income resulting from a necessary interruption

14   of plaintiffs' businesses caused by direct covered

15   losses and temporary closures required by orders of a

16   civil authority.

17        A Complaint for a Declaratory Judgment in

18   this action was filed on June 25, 2020.  The Complaint

19   also included a Demand for Trial by Jury.  No answer

20   has been filed by the defendant, FMI.  Therefore, the

21   discovery end date has not been established in this

22   case.

23        On July 15, 2020, the defendant, FMI, filed a

24   Motion Seeking Dismissal of the Complaint pursuant to

25   Rule 4:6-2(e).  Within days of filing the Complaint,

1    the defendant, FMI, filed the within Motion to Dismiss.

2    It is clear that there is no established record in this

3    case and there has been no discovery presented to the

4    Court for consideration with respect to the arguments

5    and events by respective legal counsel.

6    Notwithstanding same, the defendants argued three

7    points before this Court.  The first legal argument is

8    that the Court should dismiss the complaint for failure

9    to state a legally cognizable claim.  The second legal

10   argument is that the plaintiffs did not sustain direct

11   physical loss or direct physical damage to or

12   destruction of covered property precluding coverage for

13   business income or extra expenses under the FMI policy.

14   Lastly, the defendants argue that the plaintiffs

15   occupancy of their respective properties was not

16   prohibited by civil authorities because of a loss at a

17   local premises not owned or occupied by the plaintiffs

18   precluding civil authority coverage under the FMI

19   policies.

20            The plaintiffs argue before this Court that

21   they state claims for coverage under the policies

22   because they suffered a direct covered loss and were

23   forced to close their business by order of a civil

24   authority.  Plaintiffs further allege that they state

25   claims for loss of income coverage because they

1    suffered a direct covered loss under the policy and

2    they state claims for civil coverage because the

3    closure order prohibited the plaintiffs from accessing

4    their business.

5         Naturally, each of the respective arguments

6    advanced by the parties requires a fact-sensitive

7    analysis wherein the respective parties have failed to

8    present a sufficient record before this Court for a

9    legal determination of their respective positions.

10   There has been no discovery produced to the Court for

11   consideration, no affidavits, no certifications, or

12   sworn testimony derived from depositions.  In fact,

13   discovery has not been undertaken by the parties with

14   respect to the declaratory relief sought in the

15   Complaint.  Notwithstanding these deficiencies, the

16   Court will endeavor to address the legal arguments

17   advanced by the respective parties on the extremely

18   limited record provided to the Court.

19        The defendant, FMI, concedes that the

20   plaintiffs' business operations were interrupted by an

21   executive order based on the risk of the Covid-19 virus

22   transmission throughout the State of New Jersey.  The

23   pivotal issue before this Court is the parties'

24   interpretation of the subject policy language and FMI's

25   claim denial premised on a narrow interpretation of the

1    terms of the subject policies.  The issue before this

2    Court is the interpretation of a direct covered loss

3    under the policy and whether or not there was physical

4    damage to the plaintiffs' business.

5          The plaintiffs argue that the loss of

6    physical functionality and the use of their business

7    constitutes a covered loss under the policies.  The

8    plaintiffs argue that Governor Murphy's executive order

9    prohibited access to the plaintiffs' premises.

10         FMI argues that the plaintiffs failed to

11   state a claim for civil authority coverage because the

12   complaint does not allege that property damage occurred

13   elsewhere leading to the loss of access to plaintiffs'

14   business.  The defendant acknowledged in their moving

15   papers that presumably the plaintiffs will argue that

16   while their properties were not physically damaged,

17   they sustained a physical loss by operation of the

18   Governor's executive order.  FMI argues that the

19   plaintiffs' loss of use of their respective properties

20   does not constitute a direct physical loss and

21   therefore is not a direct covered loss defined by the

22   policies.

23         A simple review of the moving papers

24   indicates that the defendant has not provided this

25   Court with any controlling legal authority to support

1    their version of the interpretation of the defined

2    terms in the policy.  In fact, there is limited legal

3    authority in the State of New Jersey addressing this

4    issue.  This is not surprising to the Court as the

5    State of New Jersey was recently faced with a historic

6    event which was unprecedented with respect to the

7    losses sustained by businesses across the State of New

8    Jersey due to the proliferation of the Covid-19

9    pandemic.  The defendant argues that there is a plain

10   meaning of "direct physical loss" and the closure of

11   the plaintiffs' business does not qualify for business

12   -- I'm sorry, qualify for purposes of coverage.  This

13   is a blanket statement unsupported by any common law in

14   the State of New Jersey or by a blanket review of the

15   policy language.  Moreover, there has been no discovery

16   taken in this matter which would provide guidance to

17   the Court with respect to a Motion to Dismiss filed

18   under Rule 4:6-2(e).

19        Pursuant to the legal authority recited by

20   this Court with regard to the standards associated with

21   filing such a motion, the plaintiff should be permitted

22   to engage in issue-oriented discovery and also be

23   permitted to amend its complaint accordingly prior to

24   an adjudication on the merits of any policy language.

25   Such a motion is premature at best.

1          It is noteworthy to mention that the

2     plaintiffs' argument set forth to this Court that the

3     loss of use of their business because the State of New

4     Jersey deemed all non-essential businesses unsafe

5     constitutes a direct covered loss under the policy is

6     the pivotal issue in the absence of any issue-oriented

7     discovery on this topic is whether direct physical loss

8     and direct physical damage encompasses closure for

9     businesses that bears no specific -- relationship to a

10    specific condition on the property pursuant to an

11    executive order.  The plaintiffs counter that argument

12    by alleging that the executive order of the Governor

13    deemed all non-essential businesses unsafe given the

14    risk of transmission of Covid-19 thus the closure order

15    had a specific relationship to a specific condition

16    within the plaintiffs' business.

17          The plaintiffs provide a citation from

18    Wakefern Food Corp. versus Liberty Mutual Fire

19    Insurance Company, 406 N.J.Super. 524 (App. Div. 2019)

20    to support their argument.  Their argument based on the

21    holding of Wakefern is that there was a finding of

22    coverage for a grocery store that lost power when an

23    electrical grid and transmission lines were physically

24    incapable of performing their essential function of

25    providing electricity even though they were not

1    necessarily damaged.  The Court in <u>Wakefern</u> did hold

2    that,

3         "Since the term "physical" can mean more than

4    material alteration or damage, it is incumbent on the

5    insurer to clearly and specifically rule out coverage

6    in the circumstances where it was not to be provided."

7         Citing <u>Wakefern versus Liberty Mutual</u>

8    <u>Insurance Company</u>, 406 <u>N.J.Super</u>. at 542.  Also citing

9    <u>Customized Distribution Services versus Zurich</u>

10   <u>Insurance Co.</u>, 373 <u>N.J.Super</u>. 480 at page 491 (App.

11   Div. 2004), cert. denied at 183 <u>N.J.</u> 214 (2005).

12        The Court finds such an argument compelling

13   for purposes of surviving a Motion to Dismiss pursuant

14   to Rule 4:6-2(e) in the absence of any complete record

15   for disposition.  Again, the Court notes in the absence

16   of the legal precedent set forth in <u>Wakefern</u>, there is

17   a lack of controlling legal authority presented to the

18   Court for consideration in this regard.

19        "When interpreting insurance contracts, the

20   intention of the parties must be determined from the

21   language of the policy," citing <u>Stone v. Royal</u>

22   <u>Insurance Company</u>, 211 <u>N.J.Super</u>. 246 at page 248 (App.

23   Div. 1986).  "When the terms of the contract are clear

24   and unambiguous, the Court must enforce the contract as

25   written."  That is an incitation at page 248.

1          The language which forms the basis of the

2     complaint and the filing of a Motion to Dismiss is

3     subject to further analysis and interpretation.  By

4     operation of the distinct and opposite interpretations

5     of the language set forth before the Court by the

6     parties with no other clarity from the record having

7     been established to date, which the Court notes is

8     largely non-existent, this Court reaches the inevitable

9     conclusion solely for purposes of disposition of this

10    Motion that the plaintiff should be afforded the

11    opportunity to develop their case and prove before this

12    Court that the event of the Covid-19 closure may be a

13    covered event under the Coverage C, Loss of Income,

14    when occupancy of the described premises is prohibited

15    by civil authorities.  There is an interesting argument

16    made before this Court that physical damage occurs

17    where a policy holder loses functionality of their

18    property and by operation of civil authority such as

19    the entry of an executive order results in a change to

20    the property.

21         The plaintiffs are offering in advancing in a

22    novel theory of insurance coverage in this matter that

23    warrants a denial of the Motion to Dismiss at this

24    early stage of the litigation.  As such, this Court

25    must afford the plaintiffs an opportunity to engage in

1    issue-oriented discovery with FMI in order to fully

2    establish the record with respect to direct covered

3    losses and to amend the Complaint accordingly if

4    required.  To that end, the Motion to Dismiss is

5    denied.

6            Gentlemen, I will have an order prepared and

7    most likely uploaded by this afternoon.  Again, I want

8    to thank you for your briefs and I thank you for your

9    legal arguments here today.

10           MR. HARRISON:  Thank you, Your Honor.  Have a

11   good weekend.

12           THE COURT:  Thank you, gentlemen.

13           (Proceeding concluded at 10:08:29 a.m.)

14                   * * * * *

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

I, Laura Scicutella, the assigned transcriber, do hereby certify the foregoing transcript of proceedings on CourtSmart, Index No. from <u>9:30:49</u> to <u>10:08:29</u>, is prepared to the best of my ability and in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings, as recorded.

| /s/ Laura Scicutella | AD/T 685 |
|---|---|
| Laura Scicutella | AOC Number |

| Phoenix Transcription LLC | 8/18/2020 |
|---|---|
| Agency Name | Date |

**EXHIBIT J**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER MEHL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16 CV 1325 CDP |
| | ) | |
| THE TRAVELERS HOME AND | ) | |
| MARINE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Christopher Mehl and his wife closed on the purchase of their house

on February 10, 2012.  When they moved in a month later, they discovered brown

recluse spiders in the home.  After unsuccessful efforts to eradicate the poisonous

spiders, Mrs. Mehl moved from the home in May 2012.  Plaintiff left the home in

June 2012.  After continued unsuccessful efforts to eradicate the spiders, plaintiff

considered the property uninhabitable and filed a claim under his homeowners

insurance policy for loss of use of the property.  Defendant Travelers Home and

Marine Insurance Company denied the claim, and this action for breach of contract

and vexatious refusal to pay followed.  Travelers moves for summary judgment,

arguing that Mehl's claim is not covered under the policy and that, regardless, any

claim arose before the policy period.  I will deny the motion.

The insurance policy at issue covers the period from February 10, 2012, to February 10, 2013, and insures against "direct physical loss" to Mehl's property. Travelers argues that "direct physical loss" means actual physical damage and that because there is no dispute that the insured residence suffered no "physical damage" on account of the spiders, Mehl's claim for coverage fails. I disagree.

"Direct physical loss" is not defined in the policy, and Travelers points to no language in the policy that would lead a reasonable insured to believe that actual physical damage is required for coverage. Notably, however, the policy defines "property damage" as "physical injury to, damage of, *or loss of use* of tangible property," and the policy explicitly provides coverage for "loss of use." In view of this definition and the policy's express coverage for loss of use, to construe the term "direct physical loss" as requiring damage not defined in the policy leads to an ambiguity in the policy. *See Cincinnati Ins. Co. v. German St. Vincent Orphan Ass'n, Inc.*, 54 S.W.3d 661, 668 (Mo. Ct. App. 2001) (language is ambiguous if it is reasonably open to different constructions). I therefore must adopt construction of the policy that is most favorable to the insured. *Id.* at 667-68. Mehl filed a claim for loss of use of tangible property, which is property damage as defined under the policy and for which the policy provides coverage. I construe the policy so as to provide coverage for such a claim.

Travelers also argues, however, that because the spiders were present before

- 2 -

Mehl purchased the home and before the policy period began, any claimed loss

purportedly caused by the spiders is not covered by the policy.  Upon review of the

evidence submitted on the motion, I find there to be genuine issues of material fact

as to when the spiders were present in the home; if their presence in the home

arose to such a level so as to cause a "loss of use"; and, if so, when such condition

occurred.[1]

Accordingly, on the evidence and information before the Court, and viewing

all facts and inferences in the light most favorable to the non-moving party,

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986),

I cannot say that Travelers has established its right to judgment with such clarity as

to leave room for no controversy and that Mehl is not entitled to prevail on his

claims under any discernable circumstances.  *Vette Co. v. Aetna Cas. & Sur. Co.,*

612 F.2d 1076, 1077 (8th Cir.1980).  I will therefore deny Travelers' motion for

summary judgment.

Therefore,

**IT IS HEREBY ORDERED** that defendant Travelers Home and Marine

Insurance Company's Motion for Summary Judgment [21] is **DENIED.**

---

[1] The policy defines an "occurrence" as an "accident, including continuous or repeated exposure
to substantially the same general harmful conditions, which results during the policy period, in . .
. 'property damage[.]'"  As  noted above, "property damage"  includes loss of use of tangible
property.

- 3 -

This matter remains set for a jury trial on the two-week docket beginning **June 18, 2018**.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of May, 2018.

- 4 -

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-00349-D

| | | |
|---|---|---|
| GOLDEN CORRAL CORP. and GOLDEN CORRAL FRANCHISING SYSTEMS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | **RESPONSE IN OPPOSITION TO MOTION TO STAY DISCOVERY** |
| v. | ) ) | |
| ILLINOIS UNION INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) | |

NOW COMES Golden Corral Corp. and Golden Corral Franchising Systems, Inc. (collectively, "Plaintiffs"), by and through undersigned counsel and pursuant to Rule 26 of the Federal Rules of Civil Procedure and Rule 7.2 of the Local Rules of Practice and Procedure for the United States District Court for the Eastern District of North Carolina, hereby submit this Brief in response to Illinois Union Insurance Company's ("Defendant") Motion to Stay Discovery (D.E. 26) and Supporting Memorandum of Law (D.E. 28).

## <u>NATURE OF THE CASE</u>

This is a civil action by Plaintiffs for declaratory judgment, breach of contract, and other relief arising from the COVID-19 outbreak and its detrimental effects on Plaintiffs' business. Plaintiffs timely submitted a claim for business interruption losses related to COVID-19 seeking to recover damages under its insurance policy issued by Defendant. Though the insurance policy provides coverage for Plaintiffs' claims, Defendant has

1

wrongfully denied coverage, violating its policy obligations, legal duties, and applicable law.

<p style="text-align:center"><strong><u>FACTS</u></strong></p>

Golden Corral Corp. ("Golden Corral") is the nation's largest grill-buffet restaurant chain, with restaurants operating in forty states. (D.E. 15 ¶ 11.) Golden Corral Corp. has granted Golden Corral Franchising Systems, Inc. a non-exclusive right to franchise others to operate restaurants using systems developed and owned by Golden Corral. (D.E. 15 ¶ 12.)

On or about March 31, 2019, Defendant issued Golden Corral a commercial insurance policy, number D4226555A 001 (the "Policy"), for the period of March 31, 2019 to March 31, 2020. (D.E. 15 ¶ 16.) The Policy provides a maximum Limit of Liability of Fifty Million Dollars and 00/100 ($50,000,000.00), and states that, should an occurrence commence prior to the expiration of the Policy and extend beyond the expiration date of the Policy, the Policy will pay for the losses occurring during such period as if they fell entirely within the term of the Policy. (D.E. 15 ¶ 18.) The Policy is an "all-risks" policy, insofar as it provides that a peril insured under the Policy means loss or damage not otherwise excluded. (D.E. 15 ¶ 19.) Notably, the Policy includes an Endorsement for "Interruption by Civil or Military Authority," which covers the actual loss of business income sustained when, as a result of "direct physical loss, damage or destruction **<u>or imminent loss</u>**" (emphasis added) within five miles of an insured location, the insured's business operations are "interrupted or reduced" because "access" is "impaired by order of civil or military authority." (D.E. 15 ¶ 20.)

<p style="text-align:center">2</p>

On or about January 21, 2020, the United States experienced its first reported case of the virus COVID-19. (D.E. 15 ¶ 28.) Since then, outbreak of the virus has reached the level of a global pandemic. (Id.) As a result of the COVID-19 pandemic, multiple civil authorities have issued various orders, which have interrupted access to Plaintiffs' business locations by ordering individuals to stay at home and closing in-dining restaurants. (D.E. 15 ¶¶ 32-40.) In North Carolina, Governor Cooper has, for example, issued civil authority orders in response to COVID-19 "to assure adequate protection of lives and property of North Carolinians" and due to "an immediate threat of serious physical injury". (D.E. 15 ¶¶ 35, 38.) As another example of a civil authority order, Mecklenburg County, North Carolina issued an order restricting access and travel on public roadways. (D.E. 15 ¶ 39.)

As a result of these orders, Plaintiffs' have experienced and are experiencing substantial losses to revenues from its corporate-owned locations, losses of royalties from its franchise locations, and losses of rental income from leases and losses of payments from equipment financing from certain of its franchise locations, all of which are insured and covered under the Policy. (D.E. 15 ¶ 44.) Plaintiffs continue to experience losses of business income, reducing cashflow and furthering the risk that additional employees will be laid off and businesses may be shuttered.

## ARGUMENT

While a court is afforded broad discretion to limit discovery, "[t]he right to proceed in court should not be denied except under the most extreme circumstances." Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d 1477, 1484 (10th Cir. 1983) (quoting Klein v. Adams & Peck, 436 F.2d 337, 339 (2d Cir. 1971)). Motions to

3

stay discovery "are not favored …." See Simpson v. Specialty Retail Concepts, Inc., 121 F.R.D. 261, 263 (M.D.N.C. 1988) (citation omitted). Therefore, when determining whether to stay proceedings, a district court generally considers "(1) the interests of judicial economy; (2) hardship and inequity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party." Williford v. Armstrong World Indus., Inc., 715 F.2d 124, 127 (4th Cir. 1983). Ultimately, "[t]he party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." Id.

I.  **Delay will result in great harm to Plaintiffs.**

Here, delaying discovery will result in great harm to Plaintiffs. As a result of the COVID-19 outbreak, Plaintiffs have been forced (and continue to be forced) to substantially reduce their operations and temporarily lay off numerous employees. Despite the economic harm suffered by Plaintiffs and their entitlement to insurance proceeds, Defendant has refused to pay what is owed under the Policy. If this matter is stayed, Plaintiffs are left without its bargained-for benefit under the Policy, Plaintiffs' business operations are further harmed and losses continue to mount, making it more likely that Plaintiffs will have to permanently shutter more locations and conduct further lay-offs. While Plaintiffs have yet to issue discovery in this matter, Plaintiffs' discovery needs are limited, but its interest in quickly reaching resolution (which requires the continuation of discovery) is great.

Conversely, Defendant has not articulated what hardship or inequity it will face if discovery is not stayed. Defendant bears the burden of showing what hardships or

4

inequities will result if discovery is not stayed, and Defendant has failed to meet that burden. Defendant has not presented any facts or discussed any hardship whatsoever. Furthermore, Defendant has not discussed the potential prejudice to Plaintiffs even though it knows this is a business interruption claim, which affects business operations, cashflow, payroll, etc. Despite being served with Plaintiffs' amended complaint on August 28, 2020, Defendant now seeks judgment on the pleadings and seeks to stay discovery. If proceeding with this matter constitutes such a great harm to Defendant, it makes little sense to wait roughly five months before filing a motion seeking to effectively dismiss Plaintiffs' amended complaint.

## II. Defendant's Motion for Judgment on the Pleadings Lacks Merit.

Furthermore, Defendant's Motion to Dismiss will fail on the merits.[1] When ruling on a motion for judgment on the pleadings, a court is required to "take the facts in the light most favorable to the plaintiff …." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008).

Defendant ignores the fact that North Carolina's rules of construction for insurance policies are more advantageous than basic contract interpretation principles employed by most states. In this regard, when interpreting insurance policies under North Carolina law, "wherever possible, the policy will be interpreted in a manner 'which gives, but never takes away, coverage.' " Wash. Hous. Auth. v. N.C. Hous. Auths. Risk Retention Pool, 130 N.C.

---

[1] The arguments noted below represent just some, but not all, of the arguments that Plaintiffs will raise in its forthcoming response to Defendant's Motion for Judgment on the Pleadings.

App. 279, 281, 502 S.E.2d 626, 628 (1998) (citation omitted).  Similarly, if "a word has more than one meaning in its ordinary usage . . . it is to be given the meaning most favorable to the policyholder, or beneficiary, since the insurance company selected the word for use." Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970).  Furthermore, "[e]xclusions . . . are to be strictly construed against the insurer[; . . . ] the apparent conflict between coverage and exclusion must be resolved in favor of the insured."  Se. Airmotive Corp. v. U.S. Fire Ins. Co., 78 N.C. App. 418, 420, 337 S.E.2d 167, 169 (1985).

     A.  <u>Plaintiffs' Allegations Trigger the Interruption by Civil or Military Authority Provision.</u>

The Policy's Interruption by Civil or Military Authority provision provides that the Policy insures losses when "normal business operations are interrupted or reduced because access to that 'location' is prevented or impaired by order of civil or military authority" as a result of "direct physical loss, damage or destruction or <u>imminent loss</u> by a peril insured". (D.E. 17-1 p. 113 (emphasis added).)

When insurance policies contain requirements to trigger coverage within an insuring provision separated by the conjunction "or", North Carolina courts interpret the individual requirements to trigger coverage as alternative avenues of achieving coverage.  See e.g Fountain Powerboat Indus., Inc. v. Reliance Ins. Co., 119 F. Supp. 2d 552, 557 (E.D.N.C. 2000).  For example, in Fountain Powerboat, the United States District Court for the Eastern District of North Carolina was tasked with interpreting policy language that covered business interruption "caused by loss, damage, or destruction by any of the perils

6

not excluded ….” Id. The court reasoned that the use of the conjunction “or” signified that “ ‘loss’ is not predicated on physical damage, but is one category of recovery along with damage and destruction as indicated by the use of the alternative coordinating conjunction ‘or’.” Id. Thus, the court properly noted that when an insuring provision lists multiple avenues of triggering coverage, the inclusion of the conjunction “or” signifies that each avenue is sufficient to separately trigger the insuring provision: coverage could be achieved by demonstrating either loss, damage, or destruction.

Here, the Interruption by Civil or Military Authority provision provides at least two separate avenues of triggering coverage: (1) “direct physical loss, damage or destruction” and (2) “imminent loss”. “Imminent loss” is undefined. An undefined term in an insurance policy receives its “ordinary meaning”, which is established by consulting “standard dictionar[ies].” Allstate Ins. Co. v. Chatterton, 135 N.C. App. 92, 94-95, 518 S.E.2d 814, 817 (N.C. App. 1999). “Loss” is defined to mean “the act of losing possession”, “the harm of privation resulting from loss or separation”, or the “failure to gain, win, obtain, or utilize.” Loss, Meriam-Webster (Online ed. 2021); North State Deli, LLC et al. v. The Cincinnati Insurance Company et al., Case No. 20-CVS-02569 (N.C. Super. Oct. 9, 2020) (D.E. 15-1 pp. 6-7). “Imminent” is defined as “ready to take place” or “happening soon”. Imminent, Meriam-Webster (Online ed. 2021). Thus, the Interruption by Civil or Military Authority provision broadly covers business losses caused when access is limited by civil authorities due to a depravation that is ready to take place.

Numerous civil authorities issued orders limiting access to Golden Corral locations in order to protect both lives and property from damage caused by COVID-19. (See e.g.

7

D.E. 15 ¶¶ 35, 38, 39.)  In other words, civil authority orders were issued to prevent a deprivation that was about to happen.  Accordingly, civil authority orders were issued in response to "imminent loss".  Therefore, business income losses caused by these civil authority orders are covered under the plain terms of the Interruption by Civil or Military Authority provision.

Defendant seeks to overcome the plain language of the Interruption by Civil Authority provision by pointing to the provision's reference of "peril insured" as a way of attaching a requirement of "direct physical loss, damage or destruction" to "imminent loss".  (D.E. 25 p. 8.)  However, this argument ignores the fact that the Policy otherwise uses the term "direct physical" in the Policy roughly 20 times, yet fails to specify in the Interruption by Civil or Military Authority provision that "imminent loss" must actually be "imminent direct physical loss".  (D.E. 17-1 pp. 43-45, 61, 67, 77-78, 96, 103, 113, 114.) By failing to specifically link "imminent loss" to the term "direct physical", the Policy only requires a broad "imminent loss", not a "imminent direct physical loss".

Accordingly, Plaintiffs have sufficiently alleged coverage under the Policy and Defendant's Motion for Judgment on the Pleadings must fail.

B.  The Pollution, Contamination Exclusion Does Not Apply.

Defendant also seeks judgment on the pleadings on the basis that all losses are excluded by the Policy's Pollution, Contamination exclusion.  (D.E. 25 pp. 22-24.)  The Policy's Pollution, Contamination exclusion excludes coverage for the following:

> Loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of

8

'contaminants or pollutants,' all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever.

(D.E. 17-1 p. 60.) The Pollution, Contamination exclusion further defines "contaminants or pollutants" as follows:

'Contaminants or pollutants' means any material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, bacteria, virus, or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act, or as designated by the U.S. Environmental Protection Agency.

(D.E. 17-1 p. 61.) Defendant points to the inclusion of the term "virus" in the definition of "contaminants or pollutants" as evidence that losses related to COVID-19 are excluded. (D.E. 25 p. 22.)

However, Defendant fails to give credence to the other language used in the Pollution, Contamination exclusion. When used in a pollution exclusion, the terms "discharge", "dispersal", "release", and "escape" are environmental terms of art. W. Am. Ins. Co. v. Tufco Flooring E., Inc., 104 N.C. App. 312, 324, 409 S.E.2d 692, 699 (1991), overruled on other grounds by Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 524 S.E.2d 558 (2000). Because these terms are environmental terms of art, a pollution exclusion that contains them must be interpreted to only exclude claims for "traditional environmental damage". Auto-Owners Ins. Co. v. Potter, 105 F. App'x 484, 497 (4th Cir. 2004).

Here, the Pollution, Contamination exclusion contains the terms "release", "discharge", "escape", and "dispersal". (D.E. 17-1 p. 60.) These are the very terms that

9

North Carolina deems to be environmental terms of art that must be interpreted as applying only to traditional environmental damage. Thus, the Pollution, Contamination exclusion only excludes coverage for traditional environmental damage. This conclusion is strengthened by the fact that the Pollution, Contamination exclusion itself references the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act, as well as the U.S. Environmental Protection Agency. (D.E. 17-1 p. 61.) Thus, the Pollution, Contamination exclusion only precludes coverage for traditional environmental damage.

Plaintiffs are not seeking coverage for business interruption losses caused by traditional environmental damage, but are rather seeking coverage for losses caused by the COVID-19 pandemic. Accordingly, the Pollution, Contamination Exclusion does not apply, and Defendant's Motion for Judgment on the Pleadings will fail.

## <u>CONCLUSION</u>

For the reasons set forth herein, Defendant's Motion to Stay Discovery should be denied.

[SIGNATURE PAGE TO FOLLOW]

10

This the 16th day of February, 2021

THE MCDOUGAL LAW FIRM, PLLC

___ /s/ William R Hartzell ___
Gregg E. McDougal NCSB # 27290
Lawrence R. Duke, NCSB #49726
William R. Hartzell, NCSB #50762
316 W. Edenton Street, Suite 100
Raleigh, North Carolina 27603
Telephone: (919) 893-9500
Facsimile: (919) 893-9510
gregg@themcdougallawfirm.com
lawrence@themcdougallawfirm.com
will@themcdougallawfirm.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-00349-D

| | |
|---|---|
| GOLDEN CORRAL CORP. and GOLDEN CORRAL FRANCHISING SYSTEMS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ILLINOIS UNION INSURANCE COMPANY, <br><br> Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiffs Golden Corral Corp. ("Golden Corral") and Golden Corral Franchising

Systems, Inc. (collectively, "Plaintiffs"), by and through undersigned counsel, in Response

to Illinois Union Insurance Company's ("Defendant") Motion for Judgment on the

Pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, hereby submit

the following Response and Brief in Opposition to Defendant's Motion, pursuant to Rules

7.1 and 7.2 of the Local Rules of Civil Procedure for the Eastern District of North Carolina.

## NATURE OF THE CASE

Plaintiffs have filed an Amended Complaint (D.E. 15) asserting three claims for

relief: for a declaratory judgment concerning an insurance policy issued by Defendant to

Golden Corral; breach of contract; and breach of the implied covenant of good faith and

1

fair dealing. The latter claim is based on Defendant's handling of Plaintiffs' claim for insurance coverage.

<div align="center">

**FACTS**

</div>

I.      **GOLDEN CORRAL AND COVID-19**

Golden Corral is the nation's largest grill-buffet chain, with restaurants operating in forty states. (D.E. 15 ¶ 11). On or about March 31, 2019, Defendant issued Golden Corral an "all-risks" insurance policy[1], number D4226555A 001 (the "Policy"), which provides coverage for, including but not limited to, business interruption losses, as well as coverage for losses stemming from orders of civil authority that prevent or impair access to insured properties and business interruption losses stemming from a prevention or impairment of ingress and egress, with a maximum Limit of Liability of Fifty Million Dollars and 00/100 ($50,000,000.00). (D.E. 15 ¶¶ 16-19).

On or about January 21, 2020, the United States experienced its first reported case of the virus COVID-19. (D.E. 15 ¶ 28.) Since then, the virus has now reached the level of a global pandemic. (D.E. 15 ¶ 28.) The Centers for Disease Control and Prevention ("CDC") and studies have concluded that COVID-19 survives and remains infectious on surfaces and objects for days and, therefore, a person can get COVID-19 by touching a surface or object that has the virus on it and, as such, COVID-19 physically affects and

---

[1]      Under an "all-risk" policy, any losses caused by fortuitous peril are covered unless the policy contains an express provision excluding the losses. <u>Dalton v. Harleysville Worcester Mut. Ins. Co.</u>, 557 F.3d 88 (2d Cir. 2009). By contrast, a "named-peril" policy only provides coverage for specifically enumerated risks of loss or damage. E.M<u>.M.I. Inc. v. Zurich American Ins. Co.</u>, 32 Cal. 4th 465, 9 Cal. Rptr. 3d 701, 84 P.3d 385 (2004).

<div align="center">

2

</div>

damages all with which it comes in contact.  (D.E. 15 ¶ 29.)  COVID-19 has quickly spread around the country, including areas located within five miles of Golden Corral's corporate and franchise locations.  (D.E. 15 ¶ 30.)  The CDC has established a database that provides up-to-date information showing COVID-19 cases and locations.  (D.E. 15 ¶ 31.)

As a result of COVID-19 and the civil authority orders issued in response to COVID-19 (discussed below), Golden Corral was forced to suspend operations for all of its corporate-owned locations on March 20, 2020.  (D.E. 15 ¶ 42.)  Golden Corral franchises have similarly been forced to limit or suspend operations, reducing or eliminating royalties paid to Golden Corral, as well as other sources of income.  (D.E. 15 ¶ 43.)

## II.    CIVIL AUTHORITY PROVISION AND CIVIL AUTHORITY ORDERS

The Policy includes multiple "endorsements", which are amendments that modify the existing insurance policy.  Relevant here, the Policy includes a "General Amendatory Endorsement" that "changes the policy" and "modifies insurance provided under the … Golden Corral Corporation Property Insurance Policy Form".  (D.E. 17-1 p. 113.)  The General Amendatory Endorsement further provides coverage for "Interruption by Civil or Military Authority":

**5.  Interruption by Civil or Military Authority**

This Policy insures the "Time Element" loss sustained during the period of time when, as a result of direct physical loss, damage or destruction or **imminent loss** by a peril insured by this Policy within five (5) miles of an insured "location," normal business operations are interrupted or reduced because access to that "location" is prevented or impaired by order of civil or military authority.

(D.E. 15 ¶ 20; D.E. 17-1 p. 113.)

3

Various civil authorities have recognized the presence and loss or damage to property and people by COVID-19 and the life-threatening dangers it has caused and have issued orders impairing (and even eliminating) access to restaurants, including Golden Corral corporate-owned and franchise locations. (D.E. 15 ¶ 32.) For example, in North Carolina, the Governor issued an executive order declaring that COVID-19 had caused a "State of Emergency," which is defined as "an occurrence or **immediate threat** of severe damage, injury, or loss of life or property". (D.E. 15 ¶ 33.) Governor Cooper issued an executive order regarding COVID-19 to, *inter alia*, "limit access to facilities that sell food and beverage," N.C. Exec. Order No. 118 (Mar. 17, 2020), and that closed in-dining restaurants. (D.E. 15 ¶ 34.) Executive Order No. 118 states that it was issued in part due to "an **immediate threat** of serious physical injury" due to COVID-19, and that, if an "**imminent hazard**" exists, the Secretary for the North Carolina Department of Health and Human Services ("NCDHHS") may "order the owner, lessee, operator, or other person in control of property abate the imminent hazard." (D.E. 15 ¶ 35.) The NCDHHS issued an "Order" that classified the COVID-19 outbreak and its effects on restaurants as an "**imminent hazard**," and directed that "[a]ll owners, lessees, operators, or other persons in control of a restaurant shall close all restaurant seating areas immediately," which included "cafeterias" and "food halls". (D.E. 15 ¶ 36.) Furthermore, North Carolina Governor Cooper issued Executive Order No. 121, which states that, in response to "documented 763 cases of COVID-19 across 60 counties," it was issued "to assure adequate protection of lives and property of North Carolinians" and requires individuals to stay home. (D.E. 15 ¶¶ 37-38.)

4

## III.   PROVISIONS REQUIRING PHYSICAL LOSS

In contrast to the Interruption by Civil or Military Authority provision (which requires "imminent loss"), the Policy contains two provisions requiring "physical loss" in order to provide coverage.  The Policy's main coverage form provides coverage for the following:

**1.  BUSINESS INTERRUPTION**

> 1. This Policy insures loss resulting from the necessary interruption or reduction of business operations conducted by the Insured and caused by physical loss, damage or destruction, by a peril insured by this Policy, of property insured.

(D.E. 15 ¶ 22; D.E. 17-1 p. 52.)  The Policy also contains an endorsement which provides coverage for "Loss of Ingress or Egress":

> **e.[sic]  Loss of Ingress or Egress**
>
> This Policy insures the "Time Element" loss sustained during the period of time when, as a result of direct physical loss, damage or destruction by a peril insured by this Policy within (5) miles of an insured "location," normal business operations are interrupted or reduced because ingress to or egress from that "location" is prevented or impaired.

(D.E. 15 ¶ 21; D.E. 17-1 pp. 113-14.)  As a result of COVID-19 and the civil authority orders issued in response to COVID-19, Golden Corral was forced to suspend operations for all of its corporate-owned locations on March 20, 2020.  (D.E. 15 ¶ 42.)

In addition to the civil authority orders stated above, Mecklenburg County, North Carolina issued a "Joint Order and Declaration," effective on March 26, 2020, that "restricted access and travel upon public streets, alley, roadway or upon any other public property" in order to "protect" "property."  (D.E. 15 ¶ 39.)

5

## <u>ARGUMENT</u>

The Policy is unique.  It is not a standard policy.  It is a specialized policy containing specialized provisions.  It provides coverage for "imminent loss": the Policy's Interruption by Civil or Military Authority provision only requires a civil authority order issued due to a "loss" (undefined) that has yet to occur but is only "imminent" (undefined).  Plaintiffs have been unable to find any COVID-19 business interruption case interpreting the language "imminent loss".  Defendant glosses over this fact.  Instead, Defendant points to case law from other jurisdictions interpreting completely different policy language in an attempt to distort the plain meaning of the Policy.

Defendant also points to a Pollution, Contamination exclusion that, under well-established North Carolina law, only applies to traditional environmental pollution (i.e., chemical spills that would require massive and costly environmental cleanups under federal environmental laws).  Defendant seeks to recast this Pollution, Contamination exclusion as a virus exclusion, which it cannot now do.

Defendant drafted the Policy, issued the Policy to Plaintiffs, and accepted premiums in exchange for that Policy.  The Policy, like all insurance policies, provides protection against financial uncertainty and makes unforeseen losses more manageable.  Plaintiffs have suffered an unforeseen loss covered by the Policy.  This Court should not permit

6

Defendant to shirk its responsibilities under the Policy simply because a contingency which it bargained for has come to pass.

## I. FAVORABLE NORTH CAROLINA INSURANCE LAW APPLIES

Defendant acknowledges, as it must, that this case is to be decided under North Carolina law. (D.E. 25 p. 7); see also N.C. Gen. Stat. § 58-3-1; Collins & Aikman Corp. v. Hartford Acc. & Indem. Co., 335 N.C. 91, 95, 436 S.E.2d 243, 246 (1993) ("North Carolina has a close connection with the interests insured in this case. N.C.G.S. § 58-3-1 clearly means that the law of North Carolina applies and we do not believe the United States Constitution prohibits it.").

Under Erie, North Carolina law means what the North Carolina Supreme Court says it means:

> "It is axiomatic that in determining state law a federal court must look first and foremost to the law of the state's highest court, giving appropriate effect to all its implications." Assicurazioni Generali, S.p.A. v. Neil, 160 F.3d 997, 1002 (4th Cir. 1998). If, as here, the state's highest court has not directly addressed the issue, a federal court "must anticipate how it would rule." Liberty Univ., Inc. v. Citizens Ins. Co. of Am., 792 F.3d 520, 528 (4th Cir. 2015).

Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016) (footnote omitted).[2] In anticipating how North Carolina's highest court would rule, federal courts should follow decisions by

---

[2]   In the footnote appended to the foregoing excerpt the Fourth Circuit noted:

A lack of controlling precedent on a state rule of decision might merit certification of the issue to that state's highest court. However, North Carolina has no certification procedure in place for federal courts to certify questions to its courts. See AGI Assocs., LLC v. City of Hickory, N.C., 773 F.3d 576, 579 n. 4 (4th Cir. 2014).

817 F.3d at 100, n. 2.

the North Carolina Court of Appeals "in the absence of <u>convincing</u> evidence that the highest court of the state would decide <u>differently</u>." <u>Hart v. Louisiana-Pac. Corp.</u>, 2013 WL 4749499, at *1 (E.D.N.C. Sept. 3, 2013), <u>affirmed</u>, 641 Fed. Appx. 222 (4th Cir. 2016) (citations omitted) (emphasis added).

The North Carolina Supreme Court has recently emphasized that "decisions from other jurisdictions" do not much matter in insurance coverage disputes: "Decisions from other jurisdictions, however, provide little guidance to this Court because the policy language in each case differs meaningfully, as <u>do the insurance laws of each state</u>." <u>Accardi v. Hartford Underwriters Ins. Co.</u>, 373 N.C. 292, 296, 838 S.E.2d 454, 457 (2020) (emphasis added). Accordingly, this argument focuses primarily on North Carolina law and on the language of the Policy itself.

North Carolina's rules of construction for insurance policies go far beyond the basic contract interpretation principles employed by most states and are extremely favorable to policyholders:

- **"[W]herever possible, the policy will be interpreted in a manner 'which gives, but never takes away, coverage.'"** <u>Wash. Hous. Auth. v. N.C. Hous. Auths. Risk Retention Pool</u>, 130 N.C. App. 279, 281, 502 S.E.2d 626, 628 (1998) (quoting <u>Nationwide Mut. Fire Ins. Co. v. Allen</u>, 68 N.C. App. 184, 190, 314 S.E.2d 552, 555) (1984).

- **Provisions extending coverage "must be construed liberally so as to provide coverage, whenever possible by reasonable construction."** <u>State Capital Ins. Co. v. Nationwide Mut. Ins. Co.</u>, 318 N.C. 534, 538, 350 S.E.2d 66, 68 (1986).

- **The proper test is "what a reasonable person in the position of the insured would have understood [the language of a policy] to mean, and not what the**

8

**insurer intended**." <u>Joyner v. Nationwide Ins.</u>, 46 N.C. App. 807, 809, 266 S.E.2d 30, 31 (1980).

- **"Exclusions . . . are to be strictly construed against the insurer[; . . . ] the apparent conflict between coverage and exclusion must be resolved in favor of the insured**." <u>Se. Airmotive Corp. v. U.S. Fire Ins. Co.</u>, 78 N.C. App. 418, 420, 337 S.E.2d 167, 169 (1985).

- "**If such a word has more than one meaning in its ordinary usage . . . it is to be given the meaning most favorable to the policyholder**, or beneficiary, since the insurance company selected the word for use." <u>Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.</u>, 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970).

- **"It must be remembered that the policy of insurance was written by the [insurance] company's lawyers . . . filled with conditions inserted by persons skilled in the learning of insurance law and acting in the exclusive interest of the insurance company." Therefore, policies "must be construed liberally in respect to the persons insured."** <u>Barker v. Iowa Mut. Ins. Co.</u>, 241 N.C. 397, 400, 85 S.E.2d 305, 307 (1955) (internal quotation marks omitted) (citing <u>Roberts v. Am. All. Ins. Co.</u>, 212 N.C. 1, 192 S.E. 873, 875-76 (1937)).

- **"[I]f the language used in the policy is reasonably susceptible of different constructions, it must be given the construction most favorable to the insured, since the company prepared the policy and chose the language."** <u>Grant v. Emmco Ins. Co.</u>, 295 N.C. 39, 43, 243 S.E.2d 894, 897 (1978) (citation omitted).

- **"If any ambiguity exists in an insurance contract, then, the fault lies with the insurance company and not with the insured. . . . If the insurance company uses slippery words in its policy, it is not the function of this Court to sprinkle sand upon the ice by strict construction to assist the insurance company."** <u>Mazza v. Med. Mut. Ins. Co. of N.C.</u>, 311 N.C. 621, 630, 319 S.E.2d 217, 223 (1984) (internal quotations removed) (quoting <u>Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.</u>, 266 N.C. 430, 437-38, 146 S.E.2d 410, 416 (1966)).

Therefore, under North Carolina law, the Policy will be interpreted in a manner to provide coverage whenever possible and any ambiguity in the Policy will be interpreted in a manner that is the most favorable to Plaintiffs.

9

## II.  PLAINTIFFS HAVE ALLEGED "IMMINENT LOSS" DUE TO CIVIL AUTHORITY ORDERS

This Policy is unique in the context of COVID-19.  **It contains language that differs from all COVID-19 business interruption cases**.  Rather than only insuring against loss related to "direct physical loss, damage, or destruction", the Policy's Interruption by Civil or Military Authority provision insures against "**imminent loss**":

> This Policy insures the "Time Element" loss sustained during the period of time when, as a result of direct physical loss, damage or destruction or **imminent loss** by a peril insured by this Policy within five (5) miles of an insured "location," normal business operations are interrupted or reduced because access to that "location" is prevented or impaired by order of civil or military authority.

(D.E. 17-1 (emphasis added).)  Defendant glosses over this unique language that it chose to include in the Policy.

A.  "Imminent loss" means a harm resulting from separation or failure to utilize that may possibly occur in the future.

As noted above, the Policy's Interruption by Civil or Military Authority provision only requires a civil authority order issued due to a "loss" (undefined) that has yet to occur but is only "imminent" (undefined).  The Policy does not define either "imminent" or "loss".

"Where a policy defines a term, that definition is to be used."  Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 524 S.E.2d 558 (2000).  However,  "any undefined, nontechnical word is given a meaning consistent with the sense in which it is used in ordinary speech." State v. Philip Morris USA, Inc., 363 N.C. 623, 632–33, 685 S.E.2d 85 (2009).  To ascertain the ordinary meaning of undefined terms, North Carolina

10

courts consult standard, nonlegal dictionaries.  C.D. Spangler Const. Co. v. Industrial Crankshaft & Engineering Co., Inc., 326 N.C. 133, 152, 388 S.E.2d 557 (1990).

The Policy does not define either "imminent" or "loss".  Turning to standard dictionaries, the term "imminent" is defined as "looming" and "threatening".  *Imminent*, Merriam-Webster (Online ed. 2021).  The term "loss" is defined as "the act of losing possession", "the harm of privation resulting from loss or separation", or the "failure to gain, win, obtain, or utilize".  *Loss*, Merriam-Webster (Online ed. 2021).  Taking these common definitions together, the phrase "imminent loss" means a harm resulting from separation or failure to utilize that may possibly occur in the future.  Thus, in order for Plaintiffs to trigger coverage under the Civil or Military Authority provision, Plaintiffs must only show that a business interruption occurred due to a civil authority order that interrupted access to an insured location due to "loss" to a property within five miles that may occur in the future.

> B.  Multiple jurisdictions have issued orders limiting access to insured locations due to the threat presented by COVID-19.

Here, multiple jurisdictions issued orders limiting access to Plaintiffs' locations due to the threat that COVID-19 presented to property.  As noted above, various civil authorities have issued orders prohibiting unfettered access to both corporate-owned and franchise locations due to the imminent threat of a loss presented by COVID-19.  For example, in North Carolina, the Governor issued an executive order declaring that COVID-19 had caused a "State of Emergency," which is defined as "an occurrence or **immediate threat** of severe damage, injury, or loss of life or property".  See N.C. Exec. Order No. 116

11

(Mar. 10, 2020) (emphasis added) (citing N.C. Gen. Stat. § 166A-19.3(6) (2019)). (D.E. 15 ¶ 33.) Governor Cooper issued an executive order regarding COVID-19 to, *inter alia*, "limit access to facilities that sell food and beverage," N.C. Exec. Order No. 118 (Mar. 17, 2020), and that closed in-dining restaurants. (D.E. 15 ¶ 34.) Executive Order No. 118 states that it was issued in part due to "an **immediate threat** of serious physical injury" due to COVID-19, and, that, if an "**imminent hazard**" exists, the Secretary for the North Carolina Department of Health and Human Services ("NCDHHS") may "order the owner, lessee, operator, or other person in control of property abate the imminent hazard." (D.E. 15 ¶ 35.) The NCDHHS issued an "Order" that classified the COVID-19 outbreak and its effects on restaurants as an "**imminent hazard**," and directed that "[a]ll owners, lessees, operators, or other persons in control of a restaurant shall close all restaurant seating areas immediately," which included "cafeterias" and "food halls". Order, NCDHHS (Mar. 17, 2020). (D.E. 15 ¶ 36.) Thus, multiple jurisdictions issued orders limiting access to restaurants in order to prevent the loss to property. In other words, multiple jurisdictions limited access to Plaintiffs' business locations to prevent **imminent loss**.

    C.    <u>Plaintiffs' allegations of civil authority orders issued in response to the threat posed by COVID-19 and resulting interruption to the access of Golden Corral locations satisfies the federal pleading requirement.</u>

Plaintiffs have alleged that "[v]arious civil authorities have recognized the presence and loss or damage to property and people by COVID-19 …." (D.E. 15 ¶ 32.) Plaintiffs have alleged numerous examples of civil authority orders that were expressly issued, at least in part, to prevent an "imminent loss". (<u>See</u> D.E. 15 ¶¶ 35-40.) Thus, Plaintiffs have not merely "offer[ed] labels and conclusions or a formulaic recitation of the elements of a

12

cause of action", nor have they made "naked assertions devoid of further factual enhancements." Mendenhall v. Hanesbrands, Inc., 856 F. Supp. 2d 717, 723-24 (M.D.N.C. 2012) (quoting Ashcroft v. Iqbal, 556 U.S. 662 (2009)). Accordingly, Defendant's Motion for Judgment on the Pleadings should de denied.

D. <u>Defendant seeks to add language to the Interruption by Civil or Military Authority provision which it chose not to include.</u>

Defendant chose to insure business interruption losses caused by civil authorities issued to prevent "imminent loss". Plaintiffs paid premiums in exchange for that coverage. Now that various civil authorities have severely limited access to Plaintiffs' corporate-owned and franchise locations, Defendant is seeking to escape its responsibility under the Policy by effectively redrafting the Interruption by Civil or Military Authority provision.

Under North Carolina law, the use of the conjunction "or" in an insuring grant signifies multiple, separate avenues of achieving coverage. Great Am. Ins. Co. v. Mesh Cafe, Inc., 158 N.C. App. 312, 580 S.E.2d 431, 2003 WL 21267942 (2003) (unpublished) (Wynn, J.) In Mesh Café, the court analyzed the following phrase: "[t]he interruption must result from direct physical loss or damage by a Covered Cause of Loss to the property". Id. at *2. The court reasoned that, because the phrase used the term "or", direct physical loss could be read as an alternative to damage by a covered cause of loss. Id. at *2. Specifically, the court stated that "[w]hereas a reasonable person could understand the language 'by a Covered Cause of Loss' to be a prepositional phrase modifying 'direct physical loss or damage,' another reasonable person could understand 'direct

13

physical loss' to be an alternative to 'damage by a Covered Cause of Loss' because of the conjunction 'or.'" Id.[3]

The Eastern District of North Carolina has taken a similar approach. In <u>Fountain Powerboat Industries, Inc v. Reliance Insurance Company</u>, Judge Howard analyzed policy language that provided coverage for "loss resulting from the necessary interruption or reduction of business operations conducted by the insured and caused by loss, damage, or destruction by any of the perils not excluded …." 119 F. Supp. 2d 552, 557 (E.D.N.C. 2000) (ellipses in original). Judge Howard noted that the policy provided coverage for "loss, damage <u>or</u> destruction", which meant that "'loss is not predicated on physical damage but is one category of recovery along with damage and destruction as indicated by the use of the alternative coordinating conjunction 'or.'" <u>Id.</u> Thus, the court reasoned that, when multiple categories of recovery are separated by the conjunction "or", each category constitutes a separate and distinct way to trigger the policy.

The Interruption by Civil or Military Authority provision insures against business interruption losses due to the issuance of civil authority orders prohibiting access due to "direct physical loss, damage or destruction or imminent loss …." (D.E. 17-1 p. 113.) "Imminent loss" is separated from the phrase "direct physical loss, damage or destruction"

---

[3]   While <u>Mesh Café</u> is an unpublished decision, it is only unpublished because it addresses legal issues that are well established. *See* Rule 35(e)(1), North Carolina Rules of Appellate Procedure ("If the panel that hears the case determines that the appeal involves no new legal principles and that an opinion, if published, would have no value as a precedent, it may direct that no opinion be published."). In other words, because unpublished opinions involve "no new legal principles," <u>Mesh Café</u> is simply an application of well-established North Carolina law.

14

by Defendant's use of the conjunction "or". Thus, "imminent loss" is separate and distinct from "direct physical loss, damage, or destruction".

Defendant remarkably attempts to sidestep the conspicuous omission of the terms "direct physical" in conjunction with "imminent loss" by referring to a different section of the Policy, which does not reference the Interruption by Civil or Military Authority provision, and concluding that the separate section somehow changes the meaning of "imminent loss", which Defendant specifically chose to add by a General Amendatory Endorsement that specifically "changes the policy". (D.E. 25 p. 8.) Defendant essentially argues that the reference to "peril covered" adds in a requirement of "direct physical loss, damage, or destruction" to the broad phrase "imminent loss" when such a requirement is not stated, which would make the phrase "imminent loss" completely meaningless.

This argument is undermined by the Policy itself. The Policy's insuring agreement provides that the Policy insures, "to the extent more fully described in this Policy, against 'all risks' of direct physical loss, damage or destruction …." (D.E. 17-1 p. 42.) However, Defendant failed to state the very provision that modifies the language to which Defendant cites. Thus, the very provision which Defendant seemingly suggests usurps and alters the plain requirement of "imminent loss", explicitly states that other language in the Policy modifies the language cited by Defendant.

Furthermore, Defendant's argument would make multiple provisions in the Policy read in a ridiculous manner. For example, the Policy contains the phrase "direct physical loss, damage or destruction by a peril insured" in five different areas. (D.E. 17-1 pp. 67, 114.) According to Defendant's argument, this phrase would now read "direct physical

15

loss, damage or destruction" by "direct physical loss, damage or destruction." This Court should not interpret the Policy in a manner that would render it nonsensical.

Lastly, Defendant points to the Policy's Period of Recovery requirement to support its argument that all business interruption losses must be physical in nature. (D.E. 25 pp. 18-19.) However, the Period of Recovery provision does not apply to the Interruption by Civil or Military Authority provision (or the Ingress and Egress provision discussed below). We note that the Period of Recovery provision does apply to the Business Interruption provision. But, as noted below, the language in the Period of Recovery provision differs from prior North Carolina precedent.

In sum, Plaintiffs have sufficiently alleged coverage under the Interruption by Civil or Military Authority provision, and Defendant's Motion for Judgment on the Pleadings should be denied.

## III.   PLAINTIFFS' HAVE ALLEGED PHYSICAL LOSS AND, THEREFORE, HAVE TRIGGERED THE INTERRUPTION BY CIVIL OR MILITARY AUTHORITY, LOSS OF INGRESS OR EGRESS, AND BUSINESS INTERRUPTION PROVISIONS

While Plaintiffs have alleged "imminent loss", Plaintiffs have also alleged "physical loss" and, therefore, have separately triggered the Interruption by Civil or Military Authority provision, as well as Business Interruption and Loss of Ingress or Egress provisions. The Policy's Business Interruption provision provides coverage for "loss resulting from the necessary interruption or reduction of business operations conducted by the Insured and caused by physical loss, damage or destruction, by a peril insured by this Policy, of property insured." (D.E. 17-1 p. 52.)

16

The Policy's Loss of Ingress and Egress provision provides coverage for "loss sustained during the period of time when, as a result of direct physical loss, damage or destruction by a peril insured by this Policy within five (5) miles of an insured 'location,' normal business operations are interrupted or reduced because ingress to or egress from that 'location' is prevented or impaired."  (D.E. 17-1 pp. 113-14.)

Contrary to Defendant's assertions, North Carolina law does not require a loss that is physical in nature when the policy insures against "physical loss, damage, or destruction".  In Fountain Powerboat Indus. v. Reliance Ins. Co. , 119 F. Supp. 2d 552 (E.D.N.C. 2000), this Court found that when analyzing a provision that covered business interruptions "caused by loss, damage, or destruction by any of the perils not excluded," the use of the "conjunction 'or' " required that "loss" be given separate meaning from "damage," as noted above.  These terms must be interpreted to have different meaning.  At a minimum, this creates an ambiguity in the Policy that should be interpreted in favor of coverage.

Defendant's argument that Harry's Cadillac requires a loss that is physical in nature in unavailing.  The North Carolina Court of Appeals specifically limited its holding to specific language in the relevant policy, which limited damages to those incurred during the "period of restoration", which was defined as "the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss and the described premises" and the date "when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality." Harry's Cadillac-Pontiac-GMC Truck Co. v. Motors Ins. Corp., 126 N.C. App. 698, 701,

17

486 S.E.2d 249, 251 (1997). As the court noted, this specific definition of "period of restoration" indicated that the policy only covered those business interruption losses "requiring repair, rebuilding, or replacement." Id. at 702.

Here, in contrast, the Policy does not define the period of restoration as exclusively ending at the time when the property can be repaired, rebuilt, or replaced. Rather, the Policy defines the "period of recovery" as such time that would not exceed the time required to rebuild, repair, or replace lost or damaged property, and make the property "ready for operations under the same or equivalent physical and operating conditions that existed prior to the loss." (D.E. 17-1 p. 56.) Thus, the Policy's definition of "period of recovery" is broader and more encompassing than the definition of "period of restoration" in Harry's Cadillac, making the case distinguishable.

In seeming recognition of the limited holding of Harry's Cadillac, six years later, the North Carolina Court of Appeals analyzed different policy language in Great Am. Ins. Co. v. Mesh Café, Inc. and gave credence to every word in an insuring provision. No. COA02-840, 2003 N.C. App. LEXIS 1095, at *5 (Ct. App. June 3, 2003). There the North Carolina Court of Appeals found coverage under a business interruption provision requiring "direct, physical loss or damage by a Covered Cause of Loss". Id. The court reasoned that a "reasonable person could understand 'direct physical loss' to be an alternative to 'damage by a Covered Cause of Loss'" because the two phrases were separated by the conjunction "or". Id. Furthermore, when tasked with interpreting Harry's Cadillac, this Court noted the unique language at play in that policy and elected not to follow its holding. Fountain Powerboat Indus., 19 F. Supp.2d at 556. This Court, in

18

Fountain Powerboat, specifically noted the Policy in Harry's Cadillac, did not contain an "ingress/egress" clause and, therefore, was distinguishable.  Id.

Following these cases, as Defendant noted, Judge Orlando Hudson, a North Carolina Superior Court judge, has found that the phrase "direct physical loss" "includes the inability to utilize or possess something in the real, material, or bodily world, resulting from a given cause without the intervention of other conditions."  North State Deli, LLC et al. v. The Cincinnati Insurance Company et al., Case No. 20-CVS-02569 (N.C. Super. Ct. Oct. 9, 2020) (D.E. 25-1).  The court further reasoned that the phrase, in the context of an insurance policy, "describes the scenario where businessowners and their employees, customers, vendors, suppliers, and others lose the full range of rights and advantages of using or accessing their business property."  Id.; see also Henderson Rd. Rest. Sys., Inc. v. Zurich Am. INS. Co., No. 1:20 CV 1239, 2021 WL 168422, at *12 (N.D. Ohio Jan. 19, 2021) (favorably citing North State Deli).

These precedents comport with numerous cases nationwide finding that physical damage to property is not necessary where the property has been rendered uninhabitable or unusable for its intended purpose. See e.g. Port Auth. v. Affiliated FM Ins. Co., 311 F.3d 226, 236 (3d Cir. 2002) (holding that "an imminent threat of the release of a quantity of asbestos fibers that would cause . . . loss of utility" constitutes "physical loss or damage" to property, even if that threat never materializes); Or. Shakespeare Festival Ass'n v. Great Am. Ins. Co., 2016 U.S. Dist. LEXIS 74450, *17 (D. Or. June 7, 2016) ("The Court finds that defendant's interpretation, which would add the word 'structural,' . . . is not a plausible plain meaning of the term 'direct physical loss of or damage to property.'" ); Gregory

19

Packaging, Inc. v. Travelers Prop. Cas. Co. of Am., No. 2:12-cv-04418, 2014 WL 6675934, at *5 (D.N.J. Nov. 25, 2014) ("While structural alteration provides the most obvious sign of physical damage, [courts] have also found that property can sustain physical loss or damage without experiencing structural alteration."); Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co., 406 N.J. Super. 524, 543, 968 A.2d 724, 736 (App. Div. 2009) (holding that property can be physically damaged without undergoing structural alteration when it loses its essential functionality); Motorist Mut. Ins. Co. v. Hardinger, 131 F. App'x 823, 826 (3d Cir. 2005) (holding that bacterial contamination in a well that supplied water to an insured house could constitute physical loss if it made the house useless or uninhabitable); Three Palms Pointe, Inc. v. State Farm Fire & Cas. Co., 250 F. Supp. 2d 1357, 1364 (M.D. Fla. 2003) ("[U]nder Florida law 'direct physical loss' includes more than losses that harm the structure of the covered property."); Matzner v. Seaco Ins. Co., No. 96-0498-B, 1998 WL 566658, at *3 (Mass. Super. Aug. 12, 1998) (holding that loss of use of an apartment due to buildup of carbon monoxide in the building was covered because "the phrase 'direct physical loss or damage' is ambiguous [and can include more than] tangible damage to structure or property."); Sentinel Mgmt. Co. v. NH     Ins. Co., 563 N. W.2d 296, 300 (Minn. Ct. App. 1997) ("Direct physical loss also may exist in the absence of structural damage to the insured property."); W. Fire Ins. Co. v. First Presbyterian Church, 165 Colo. 34, 38, 437 P.2d 52, 55 (1968) (rejecting insurer' s argument that mere "loss of use" to insured church premises occasioned by local fire department's shutdown order did not constitute "direct physical loss"); Mellin v. N Sec. Ins. Co., 167 N.H. 544,550, 115 A.3d 799, 805 (2015) (finding that the loss of use of a condo due to cat urine odor coming from

20

a neighboring property was covered because "physical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell and that exist in the absence of structural damage."); <u>Nautilus Grp., Inc. v. Allianz Glob. Risks US</u>, No. C11-5281BHS, 2012 U.S. Dist. LEXIS 30857, at *18-19 (W.D. Wash. Mar. 8, 2012) ("[I]f 'physical loss' was interpreted to mean 'damage,' then one or the other would be superfluous. The fact that they are both included in the grant of coverage evidences an understanding that physical loss means something other than damage."); <u>Mehl v. Travelers Home & Marine Ins. Co.</u>, No. 4:16 CV 1325 CDP, 2018 U.S. Dist. LEXIS 74552, at *2 (E.D. Mo. May 2, 2018) ("'Direct physical loss' is not defined in the policy, and [the insurer] points to no language in the policy that would lead a reasonable insured to believe that actual physical damage is required for coverage."); <u>Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts</u>, No. CV-01-136 2-ST, 2002 U.S. Dist. LEXIS 20387, at *26 (D. Or. June 18, 2002) (citing case law from Massachusetts and Colorado for the proposition that "the inability to inhabit a building [is] a 'direct, physical loss' covered by insurance."); <u>Gen. Mills, Inc. v. Gold Medal Ins. Co.</u>, 622 N.W.2d 147, 152 (Minn. Ct. App. 2001) (finding coverage where certain General Mills food products were fit for human consumption but nevertheless unable to be sold or used due to government regulations, given that "direct physical loss can exist without actual destruction of property or structural damage to property; it is sufficient to show that insured property is injured in some way."); <u>TRAVCO Ins. Co. v. Ward</u>, 715 F. Supp. 2d 699, 708 (E.D. Va. 2010), <u>aff'd</u>, 504 F. App'x 251 (4th Cir. 2013) ("The majority of cases appear to support [the] position

21

that physical damage to the property is not necessary, at least where the building in question has been rendered unusable by physical forces.").

Here, Plaintiffs have alleged that COVID-19 has spread rapidly around the country, including areas located within five miles of Golden Corral's corporate and franchise locations, and specifically referenced a database maintained by the Centers for Disease Control and Prevention that provides a running tally of COVID-19 cases by county. (D.E. 15 ¶¶ 30-31.) Plaintiffs have further alleged that North Carolina Governor Cooper issued Executive Order No. 121, which states that, in response to "documented 763 cases of COVID-19 across 60 counties," it was issued "to assure adequate protection of lives and property of North Carolinians" and requires individuals to stay home. (D.E. 15 ¶¶ 37-38.) As another example, Mecklenburg County, North Carolina issued a "Joint Order and Declaration," effective on March 26, 2020, that "restricted access and travel upon public streets, alley, roadway or upon any other public property" in order to "protect" "property." (D.E. 15 ¶ 39.) Defendant admits "that COVID-19 has spread across major portions of the U.S." (D.E. 17 ¶ 30.) Defendant further admits that the Centers for Disease Control and Prevention database "speaks for itself." (D.E. 17 ¶ 31.)

Thus, Plaintiffs have alleged facts demonstrating the widespread presence of COVID-19 (which Defendant has admitted), referenced a governmental database containing data demonstrating the ubiquitous spread of COVID-19 (which Defendant admits speaks for itself), and have referenced multiple exemplar civil authority orders specifically stating they are enacted to protect property (which Defendant admits speak for themselves). Plaintiffs have further alleged damages as a result of these orders. These are

22

not mere conclusory allegations but are facts and reasonable inferences that demonstrate that Plaintiffs are entitled to the relief they seek. Accordingly, Defendant's Motion for Judgment on the Pleadings should be denied.

## IV. THE POLLUTION, CONTAMINATION EXCLUSION ONLY APPLIES TO TRADITIONAL ENVIRONMENTAL DAMAGE AND, THEREFORE, DOES NOT EXCLUDE COVERAGE FOR DAMAGES RELATED TO COVID-19

North Carolina limits the applicability of pollution exclusions that contain the words "discharge", "dispersal", "release", and "escape" to traditional environmental damage. Auto-Owners Ins. Co. v. Potter, 105 Fed. Appx. 484, 496 (4th Cir. 2004). The Policy contains a pollution exclusion with these very terms. (D.E. 17-1 p. 60.) "Traditional environmental damage" or "traditional environmental pollution" refers to "chemical spills that would require massive and costly environmental cleanups under federal environmental laws …." See Amerisure Mut. Ins. Co. v. Paul Howard Constr. Co., No. 1:06CV202, 2007 WL 9747637, at *6 (M.D.N.C. Mar. 27, 2007) (citing MacKinnon v. Truck Ins. Exch., 73 P.3d 1205, 1208-09 (Cal. 2003)); see also Bituminous Cas. Corp. v. Sand Livestock Sys., Inc., No. C04-4028-PAZ, 2005 WL 1476441, at *7 (N.D. Iowa June 22, 2005). Despite clear North Carolina law limiting the Policy's pollution exclusion to traditional environmental pollutants, Defendant urges this court to find that the pollution exclusion precludes coverage for COVID-19-related business interruption losses.

The Policy's Pollution, Contamination Exclusion excludes coverage for the following:

23

[l]oss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened **release, discharge, escape** or **dispersal** of 'contaminants or pollutants,' all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever.

(D.E. 17-1 p. 60.)  The Policy defines "contaminants or pollutants" as follows:

any material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, bacteria, virus, or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Acy of 1976, and Toxic Substances Control Act, or as designated by the U.S. Environmental Protection Agency.

(D.E. 17-1 p. 61.)  The Policy then states that the Pollution, Contamination Exclusion specifically excludes coverage for the enforcement of laws that compel environmental cleanup:

Except as provided in "Decontamination Costs" in PROPERTY INSURED, this Policy does not insure costs arising out of the enforcement of any law, ordinance, regulation or order by civil or judicial authority requiring the removal, disposal, replacement, cleanup, restoration or containment of property insured or costs to monitor or test for the existence or effects of pollutants.

(D.E. 17-1 p. 61.)

Defendant asserts that the Pollution, Contamination Exclusion precludes coverage for COVID-19 damages simply because the Pollution, Contamination Exclusion includes the word "virus".  However, Defendant has failed to analyze the Pollution, Contamination Exclusion in its entirety, and has failed to give credence to the environmental terms of art used in the Pollution, Contamination Exclusion.

24

Remarkably, while Defendant advances the argument, Defendant has concomitantly argued that COVID-19 does not constitute traditional environmental damage in federal court in Arizona. Defendant has argued that pollution provisions that contain environmental terms of art (i.e. discharge, escape, etc.) **do not apply to allegations related to COVID-19 damages**. In an action filed in the United States District Court for the District of Arizona, Defendant argued that a policy providing coverage for pollution-related business interruption losses did not apply to COVID-19 related losses. Defendant Illinois Union Insurance Company's Motion to Dismiss Plaintiff's Complaint Pursuant to FRCP 12(B)(6), <u>London Bridge Resort, LLC v. Illinois Union Insurance Company, Inc.</u>, Case No. 3:20-cv-08109 (D. Az. July 2, 2020) (attached hereto as "Exhibit A"). In <u>London Bridge</u>, Defendant issued a policy to an Arizona business that provided coverage for losses arising from first-party claims arising out of a "pollution condition". Ex. A p. 1. The "pollution condition" contained environmental terms of art, such as "discharge, dispersal, release, escape, migration, or seepage". Ex. A p. 4. In arguing that the above "pollution condition" did not provide coverage for COVID-19 related business interruption losses, Defendant argued that "the unambiguous terms 'discharge,' 'dispersal,' 'release,' 'escape' and similar terms contained in the definition of 'pollution condition' in the [p]olicy relate solely to traditional environmental contamination, **and do not cover a virus such as COVID-19**."[4] Ex. A p. 10 (emphasis added).

---

[4] The United States District Court for the District of Arizona granted Defendant's motion to dismiss, finding that the "pollution condition" only applied to traditional environmental pollution. <u>London Bridge Resort LLC v. Illinois Union Insurance Company</u>, __ F. Supp. 3d __, 2020 WL 7123024 (D. Az. Dec. 4, 2020). Because a court in a prior proceeding has accepted Defendant's

25

Limiting the application of the Pollution, Contamination exclusion to traditional environmental pollutants (and, therefore, not to the application of COVID-19), does not render the use of the term "virus" meaningless. The Environmental Protection Agency ("EPA") sets effluent limitations for viruses in point-source pollution, which constitutes limitations on contaminants contained in wastewater discharged from a pipe or other source. See e.g. 33 U.S.C.A. § 1362 (West) (defining "effluent limitation" as a restriction on the concentration of "biological" constituents); see also Hawaii's Thousand Friends v. City & Cty. of Honolulu, 821 F. Supp. 1368, 1370 (D. Haw. 1993) (analyzing whether failure to sanitize point source pollution, including both bacteria and viruses, violated the Clean Water Act). Thus, viruses can constitute traditional environmental pollution, such as instances when they are discharged in effluent as a form of point-source pollution, i.e. smoke stacks and drain pipes.

When used in pollution exclusions, the terms "discharge", "dispersal", "release", and "escape" require that the pollution exclusion be limited to "traditional environmental damage". Auto-Owners Ins. Co. v. Potter, 105 Fed. Appx. 484, 496 (4th Cir. 2004); see also W. Am. Ins. Co. v. Tufco Flooring E., Inc., 104 N.C. App. 312, 324, 409 S.E.2d 692,

---

argument, Defendant should be judicially estopped from pursuing a contradictory legal theory in this proceeding. "Where a party assumes a certain position in a legal proceeding, and succeeds in maintain that position, he may not thereafter, simply because his interests have changed, assume a contrary position …." New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (citation omitted). Because Arizona and North Carolina law both find that the use of environmental terms of art such as "discharge", "dispersal", "release", and "escape" limit the application of a pollution provision to traditional environmental pollution, the Court should estop Defendant from taking a position that is contradictory to its prior position that a pollution provision does not apply to COVID-19.

26

699 (1991), overruled on other grounds by Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 524 S.E.2d 558 (2000).

Here, the Pollution, Contamination Exclusion includes the very environmental terms of art that were analyzed in both Potter and Tufco Flooring. Furthermore, the Pollution, Contamination Exclusion specifically references multiple instances of environmental legislation and the U.S. Environmental Protection Agency. Therefore, state and federal case law, as well as the language of the exclusion itself, all dictate the terms "release, discharge, escape, or dispersal" are environmental terms of art and should be interpreted accordingly.

Defendant cites New NGC, Inc. v. Ace Am. Ins. Co., 105 F. Supp. 3d 552 (W.D.N.C. 2015), to incorrectly show that North Carolina does not limit pollution exclusions to traditional environmental pollution. (D.E. 25 p. 23.) New NGC stands for the exact opposite. According to New NGC, a pollution exclusion is not limited to traditional environmental pollution when it does not contain "[e]nvironmental terms of art such as discharge or dispersal …" Id. at 556. Here, the Pollution, Contamination exclusion contains environmental terms of art: "release, discharge, escape, or dispersal". Thus, under the reasoning of New NGC, the Pollution, Contamination exclusion is limited to traditional environmental pollution.

In sum, the Policy's Pollution, Contamination exclusion is limited to traditional environmental pollution. Defendant has not argued that the COVID-19 outbreak constitutes traditional pollution. In fact, Defendant agrees that COVID-19 is not a traditional environmental pollutant.

27

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings should be denied.


This the <u>22nd</u> day of February 2021

<div align="right">

**THE McDOUGAL LAW FIRM, PLLC**

By: <u>*/s/ William R. Hartzell*</u>
   Gregg E. McDougal NCSB # 27290
   Lawrence R. Duke, NCSB # 49726
   William R. Hartzell, NCSB # 50762
   316 W. Edenton Street, Suite 100
   Raleigh, North Carolina 27603
   Telephone: (919) 893-9500
   Facsimile: (919) 893-9510
   gregg@themcdougallawfirm.com
   lawrence@themcdougallawfirm.com
   will@themcdougallawfirm.com

   *Attorneys for Plaintiffs*

</div>

# EXHIBIT "A"

1
2   Amy M. Samberg (#013874)
    Amy L. Stein (#026113)
3   FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
    One Arizona Center
4   400 E. Van Buren Street, Suite 550
    Phoenix, AZ 85004
5   Telephone: (602) 926-9880
    Facsimile: (312) 863-5099
6   E-Mail: asamberg@fgppr.com
              astein@fgppr.com
7   Attorneys for Defendant Illinois Union Insurance Company,
    Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| London Bridge Resort, LLC, an Arizona limited liability company, | No. 3:20-cv-08109-GMS |
| Plaintiff, | **DEFENDANT ILLINOIS UNION INSURANCE COMPANY'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FRCP 12(B)(6)** |
| v. | |
| Illinois Union Insurance Company, Inc., an Illinois corporation, | |
| Defendant. | |

Defendant Illinois Union Insurance Company ("Illinois Union"), hereby moves to dismiss Plaintiff London Bridge Resort, LLC's ("London Bridge") Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6). In support of its Motion, Illinois Union states the following.

**PRELIMINARY STATEMENT**

In this Action, London Bridge seeks insurance coverage from Illinois Union for business income losses London Bridge has allegedly sustained as a result of the COVID-19 pandemic. At issue is a Premises Pollution Liability Policy issued to London Bridge by Illinois Union. London Bridge seeks coverage under the insuring agreement of the Policy which, subject to all of its terms and conditions, provides coverage for "loss" resulting from "first-party claims" arising out of a "pollution condition" on, at, under or migrating from a

JA477

1  "covered location."  London Bridge's Complaint fails to state a viable claim for coverage

2  for two distinct reasons.

3      First, COVID-19 does not constitute a "pollution condition" under the Illinois Union

4  policy.  The term "pollution condition," as defined by the policy, is limited to traditional

5  environmental pollution, and does not include a communicable disease caused by a virus,

6  like COVID-19.  Because there is no "pollution condition," London Bridge's Complaint

7  fails to state a claim upon which relief can be granted under FRCP 12(b)(6).

8      Second, even if COVID-19 did constitute a "pollution condition," there still must be

9  "loss" resulting from "first-party claims" arising out of a "pollution condition" on, at, under

10  or migrating from a "covered location" in order for the insuring agreement to be triggered.

11  London Bridge's Complaint does not contain an allegation that COVID-19 was on, at, under

12  or migrating from the "covered location" identified by the Illinois Union policy as the resort

13  owned and operated by London Bridge in Lake Havasu City, Arizona.  Because London

14  Bridge has not claimed or alleged that COVID-19 was located at the London Bridge resort,

15  it cannot satisfy the insuring agreement of the Illinois Union policy irrespective of whether

16  COVID-19 is a "pollution condition."  The Complaint fails to state a claim upon which

17  relief can be granted for this reason as well.

18      Because London Bridge does not and cannot state a viable claim upon which relief

19  can be granted against Illinois Union, pursuant to FRCP 12(b)(6) its Complaint must be

20  dismissed with prejudice.

21                       **BACKGROUND**

22      A.    **Allegations of the Complaint**

23      In its Complaint, London Bridge alleges that it is a destination resort in Arizona (the

24  "Resort") and that due to the COVID-19 pandemic, its guests have either canceled prior

25  reservations at the Resort or have elected not to travel there, severely impacting London

26  Bridge's revenue.  Complaint at ¶¶ 9-10.

27      The Complaint alleges that Illinois Union issued Premises Pollution Liability

28  Insurance Policy number PPL G71205162 002 (the "Policy") to London Bridge for the

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1    policy period of November 15, 2019 to November 15, 2020, providing coverage in relevant

2    part for "business interruption loss" up to $1 million arising out of a "pollution condition."

3    *Id.* at ¶¶ 11-12.   The Complaint further alleges that the Policy provides coverage for

4    "business interruption loss" resulting from certain acts of civil authority arising out of a

5    "pollution condition," which the Policy identifies as "government action" and

6    "environmental law."   *Id.* at ¶ 13.   London Bridge alleges that COVID-19 constitutes a

7    "pollution condition" under the Policy, and that certain acts by various governmental

8    agencies with respect to COVID-19 constitute a "claim" under the Policy, which has caused

9    London Bridge to suffer approximately $2 million in "business interruption losses."   *Id.* at

10    ¶¶ 14-16, 18-162.

11        Count I of the Complaint alleges breach of contract.   London Bridge alleges that the

12    COVID-19 pandemic has caused a covered "pollution condition" under the Policy for which

13    coverage should be afforded.   *Id.* at ¶¶ 164-172.   Count II is for declaratory relief, seeking

14    a declaration of coverage under the Policy.   *Id.* at ¶¶ 174-177.

15       **B.**     **The Policy**

16        Illinois Union issued the Policy, designated as Premises Pollution Liability Insurance

17    Policy number PPL G71205162 002, to London Bridge, providing claims made and

18    reported coverage with a "policy period" from November 15, 2019 through November 15,

19    2020.  (A true and correct copy of the Policy is attached hereto as Exhibit "A" bates labeled

20    IUIC000001-42).   As is relevant to this case, [1] the Policy has a limit of liability of

21    $1,000,000 per "pollution condition" and a $1,000,000 total policy and program aggregate

22    for all "pollution conditions", subject to a self-insured retention of $100,000 per "pollution

23    condition."   *Id.* at IUIC000002.

24        Coverage A of the Policy provides, in pertinent part, that it will pay "loss" in excess

25    of the "self-insured retention" for:

26

27

28    _____

[1] Subject to all of its terms and conditions, the Policy also provides coverage for an "indoor environmental condition," which is not at issue in the Claim or the Complaint.

"Claims" and "first-party claims" arising out of:  **1)** a "pollution condition" on, at, under or migrating from a "covered location"… provided the "claim" is first made, or the "insured" first discovers the "pollution condition" … that is the subject of such "first-party claim", during the "policy period".  Any such "claim" or "first-party claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period", or during any applicable "extended reporting period".

*Id.* at IUIC000006.  Importantly, the Insuring Agreement not only requires the discovery during the policy period of a "pollution condition" as that term is defined, the "pollution condition must be "*on, at, under or migrating from a 'covered location.'*"  (Emphasis added).  *Id.*  There is one "covered location," which is the Resort located at 1477 Queens Bay, Lake Havasu City, Arizona.  *Id.* at IUIC000002.

A "pollution condition" is defined as:

The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level" radioactive waste", "mixed waste" and medical, red bag, infectious or pathological wastes, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.

*Id.* at IUIC000014-15.

If the requirements of the Insuring Agreement and all other terms and conditions have been met, the Policy will pay covered "loss."  "Loss" includes "remediation costs" "emergency response costs", and, as is relevant to this case, "business interruption loss." *Id.* at IUIC000013.  The Policy defines "business interruption" as:

[T]he necessary partial or complete suspension of the "insured's" operations at a "covered location" for a period of time, which is directly attributable to a "pollution condition" or "indoor environmental condition" to which Coverage **A.** of this Policy applies.  Such period of time shall extend from the period of time that the operations are necessarily suspended and end when such "pollution condition" or "indoor environmental condition" has been remediated to the point at which the "insured's" normal operations could reasonably be restored.

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1    *Id.* at IUIC000009. "Business interruption loss" includes (1) "business income"; (2)

2    "extra expense"; and (3) "delay expense", as those terms are defined in the Policy. *Id.*

<div align="center">

**ARGUMENT**

</div>

**A.**    **Standard on Motion to Dismiss**

     Under FRCP 12(b)(6), a court must dismiss a complaint if it fails to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). Although the court must accept the plaintiff's well-pled factual allegations as true and in a light most favorable to the plaintiff, *North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 580 (9th Cir. 1983), dismissal is warranted where it appears the plaintiff cannot prove any "set of facts in support of the claim that would entitle it to relief." *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir. 2000). The Court "[is] not bound to accept as true a legal conclusion couched as a factual allegation" in the plaintiff's complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). In addition, mere "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).

     "A court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). In addition, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Tunac v. United States*, 897 F.3d 1197, 1207 (9th Cir. 2018) (alteration in original). The Policy qualifies as a document whose contents are alleged in the Complaint and whose authenticity is not in question. Accordingly, the Court may consider the Policy on Illinois Union's Motion to Dismiss.

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

B.   **Arizona Law Applies**

A federal court sitting in diversity will apply the choice of law rules of the forum. *Nelson v. Int'l Paint Co.*, 716 F.2d 640, 643 (9th Cir. 1983). Arizona applies the most significant relationship test under the Restatement (Second) of Conflict of Laws, absent a contractual choice-of-law provision. *Cardon v. Cotton Lane Holdings, Inc.*, 173 Ariz. 203, 207 (1992). "[T]he location of the insured risk should be given the greatest weight when determining which state's law applies, so long as the risk can be located, at least principally, in a single state." *Labertew v. Chartis Prop. Cas. Co.*, 363 F. Supp.3d 1031, 1036 (D. Ariz. 2019). In addition, "Arizona has a strong interest in applying Arizona law." *Beckler v. State Farm Mut. Auto. Ins. Co.*, 195 Ariz. 282, 289 (Ct. App. 1999).

The Policy does not contain a choice of law provision, so the Restatement's most significant relationship will apply to determine choice of law. London Bridge is headquartered in Arizona and the Resort is located there. In addition, the Policy was issued to London Bridge in Arizona. Since the most significant relationship is with Arizona, Arizona law applies to the determination of coverage and whether London Bridge's Complaint states a viable claim for relief under FRCP 12(b)(6).

C.   **Arizona Rules of Insurance Policy Interpretation**

Under Arizona rules of insurance policy interpretation, London Bridge has the burden to establish that it is entitled to coverage under Insuring Agreement A of the Policy. *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 199 Ariz. 43, 46 (Ct. App. 2000) ("Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion."); *757BD LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 330 F. Supp. 3d 1143, 1149 (D. Ariz. 2018) (same).

Arizona courts "interpret an insurance policy according to its plain and ordinary meaning, examining it from the viewpoint of an individual untrained in law or business." *Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 225 Ariz. 194, 200 (Ct. App. 2010). Any ambiguities are construed against the insurer. *Id.* "Undefined terms of an insurance policy ... must be construed in their plain, ordinary and everyday sense and the

1   parameters of the definition should reflect the legal characteristics most frequently

2   attributed to the word." *Fall v. First Mercury Ins. Co.*, 225 F. Supp.3d 842, 847 (D. Ariz.

3   2016) (alteration in original).  When interpreting an insurance contract, Arizona courts must

4   "harmonize all parts of the contract ... by a reasonable interpretation in view of the entire

5   instrument." *Aztar Corp. v. U.S. Fire Ins. Co.*, 223 Ariz. 463, 475 (Ct. App. 2010) (alteration

6   in original).

7          **D.      The Complaint Fails To Allege a "Pollution Condition" Under the Policy**

8          A "pollution condition" under the Policy is defined as the "***discharge, dispersal,***

9   ***release, escape, migration, or seepage*** of any solid, liquid, gaseous or thermal irritant,

10  contaminant, or pollutant… on, in, into, or upon land and structures thereupon, the

11  atmosphere, surface water, or groundwater."  (Ex. A at IUIC000014-15) (emphasis added).

12         While no Arizona court has addressed coverage under a premises pollution liability

13  policy like the Policy at issue here, the terms contained in the Policy's definition of

14  "pollution condition" have been addressed by Arizona courts in the context of an absolute

15  pollution exclusion in a commercial general liability policy and have been found to be

16  unambiguous.  In *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 786-87 (Ariz.

17  Ct. App. 2000), which involved application of such an absolute pollution exclusion, the

18  insured, a mixed-use residential and golf community, sought coverage under a commercial

19  general liability policy for a lawsuit brought by a golfer who became ill after ingesting

20  bacteria-contaminated water.  In relevant part, the policy excluded coverage for bodily

21  injury "arising out of the actual, alleged or threatened discharge, dispersal, seepage,

22  migration, release or escape of pollutants."  *Id*. at 788.  The policy defined "pollutants" as

23  "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot,

24  fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled,

25  reconditioned or reclaimed."  *Id*. at 789.  The court recognized that terms such as

26  "discharge," "dispersal," "release," and "escape," are *"terms of art in environmental law*

27  *which generally are used with reference to damage or injury caused by improper disposal*

28  *or containment of hazardous waste." Id*. at 790 (emphasis added).  The court also

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

**EXHIBIT A**
7

JA483

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1    recognized the historical purpose of the absolute pollution exclusion, which was to

2    eliminate coverage for traditional environmental pollution.  *Id*. at 791.  As such, the court

3    found that the policy's pollution exclusion did not apply to exclude coverage for bacteria,

4    since bacteria was not a "pollutant."  *Id*. at 792.

5        Similarly, in *Starr Surplus Lines Ins. Co. v. Star Roofing, Inc.*, 2019 WL 5617575

6    (Ariz. Ct. App. Oct. 31, 2019), the court recognized that "the terms used in the [pollution]

7    exclusion clause, such as 'discharge,' 'dispersal,' 'release' and 'escape,' *are terms of art in*

8    *environmental law and are generally used to refer to damage or injury resulting from*

9    *environmental pollution*.") (Emphasis added).  As such, the court held the policy's pollution

10   exclusion did not exclude coverage for injuries sustained due to inhalation of fumes from

11   roofing materials.  *Id*. at *3.  See also, *Nat'l Fire Ins. Co. of Hartford v. James River Ins.*,

12   162 F. Supp. 3d 898, 908 (D. Ariz. 2016) (with respect to pollution exclusion, the terms

13   "must be read in light of the historical purpose of the pollution exclusionary clause—as

14   interpreted by the Arizona Court of Appeals—to preclude coverage for 'traditional

15   environmental pollution.'");  *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1216 (Cal.

16   2003) (court held that the pollution exclusion's scope was limited to "environmental

17   pollution … consistent with the choice of terms 'discharge, dispersal, release or escape.'");

18   *Am. States. Ins. Co. v. Koloms*, 687 N.E.2d 72, 81 (Ill. 1997) (Illinois Supreme Court limited

19   the scope of the absolute pollution exclusion to traditional environmental pollution); *Nav-*

20   *Its, Inc. v. Selective Ins. Co. of Am.*, 183 N.J. 110 (2005) (absolute pollution exclusion

21   applies to traditional environmentally related damages; *Belt Painting Corp. v. TIG Ins. Co.*,

22   100 N.Y.2d 377 (2003) (same); *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27 (1st Cir. 1999)

23   (same).

24       In fact, insurance policies such as environmental impairment and pollution liability

25   policies, that are specifically issued to cover environmental contamination, were intended

26   to fill coverage gaps created by the absolute pollution exclusion's exclusion of coverage for

27   traditional environmental pollution.  See *Masonite Corp. v. Great Am. Surplus Lines Ins.*

28   *Co.*, 224 Cal. App. 3d 912, 916–17 (Ct. App. 1990) (environmental impairment liability

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona  85004
(602) 926-9880

1    policy filled the gap in coverage resulting from the pollution exclusion in general liability

2    policy to protect insured for damage caused by gradual pollution); *Viacom Int'l, Inc. v.*

3    *Admiral Ins. Co.*, No. L-1739-99, 2006 WL 1060504, at *2 (N.J. Super. Ct. App. Div. Apr.

4    21, 2006). ("Environmental Impairment Liability (EIL) policies respond to loss arising from

5    pollution. EIL policies are often viewed as filling the coverage gap created by the pollution

6    exclusion clauses in CGL policies."); *Olin Corp. v. Ins. Co. of N. Am.*, 986 F. Supp. 841,

7    844 (S.D.N.Y. 1997) ("a substitute form of insurance appeared in the marketplace

8    specifically designed to fill in the gap created by the pollution exclusions in the CGL

9    policies. This new form of insurance was environmental impairment liability (EIL)

10   insurance.")  While no Arizona court has addressed coverage under an environmental

11   impairment or premises pollution liability policy, a court in the neighboring state of

12   California has considered the question.  In *Essex Walnut Owner L.P. v. Aspen Specialty Ins.*

13   *Co.*, 335 F. Supp. 3d 1146 (N.D. Cal. 2018), the U.S. District Court for the Northern District

14   of California analyzed the term "pollutant" within the context of a coverage grant in an

15   environmental legal liability policy. The insured sought coverage under the policy for costs

16   incurred to remove debris buried in the insured's excavation site where it intended to build

17   a mixed-use development.  *Id.* at 1149.  "The debris consisted of wood, concrete, glass,

18   metal, tires, and large, buried tree trunks." *Id.*  However, the court found that pollution

19   coverage was limited to "environmental pollution."   The policy at issue contained the

20   following relevant definitions:

21        Pollution condition means the discharge, emission, seepage, migration, dispersal,
22        misdelivery, release or escape, or illicit abandonment by a third-party without the
          insured's consent of any pollutant into or upon land, or any structure on land, the
23        atmosphere or any watercourse or body of water including groundwater, provided
          such pollutant is not naturally present in the environment in the concentration or
24        amounts discovered.

25        Pollutant means any solid, liquid, gaseous or thermal irritant or contaminant,
26        including without limitation smoke, vapors, soot, silt, sediment, fumes, acids, alkalis,
          chemicals, hazardous substances, petroleum hydrocarbons, low level radioactive
27        matter or waste, microbial matter, legionella pneumophila, medical, infectious or

28

- 9 -

1
2

> pathological waste or waste materials, methamphetamines, electromagnetic fields, biological agent or nanotechnology matter

3
4
5
6

> Clean-up cost means reasonable and necessary expense incurred with the insurer's prior written consent, including legal expense and restoration cost, to investigate, abate, contain, treat, remove, remediate, monitor, neutralize or dispose of contaminated soil, surface water or groundwater or other contamination caused by a pollution condition but only: (i) to the extent required by environmental law ....

7

*Id.* at 1148-49.

8
9

The court found the same general principles from *MacKinnon*, *supra*, 73 P.3d at 1205, applied to limit pollution coverage to "environmental pollution":

10
11
12
13
14
15
16
17

> [T]he basic teaching of *MacKinnon*—namely, that "pollutant" should be understood to mean something that is commonly thought of as pollution, i.e., environmental pollution—logically applies even in the context of the case at bar. *MacKinnon's* interpretation comports fully with the title of the insurance policy here— "Environmental Legal Liability Policy". It is also consistent with the examples of "pollutant" provided in the policy (e.g., smoke, hazardous substances) and with other policy provisions; in particular, the policy provides that Aspen will pay for "clean-up cost" which the policy defines as an expense incurred to, e.g., address contamination caused by a pollution condition "to the extent required by *environmental* law" or "as determined reasonable and necessary by an *environmental* professional." Since Aspen's liability under the policy is tied to "environmental" matters, it is only logical that "pollutant" likewise be defined as relating to environmental matters.

18
19
20
21
22

*Id.* at 1152-53 (citations omitted).  Accordingly, although the dispositive issue before the court on summary judgment was whether "clean-up costs" were incurred, the court nevertheless posited: "The question is thus whether the kind of debris allegedly found here in the soil is commonly thought of as environmental pollution." *Id*. at 1153.

23
24
25
26
27
28

Arizona law is clear that the unambiguous terms "discharge," "dispersal," "release," "escape" and similar terms contained in the definition of "pollution condition" in the Policy relate solely to traditional environmental contamination, and do not cover a virus such as COVID-19.  This is wholly consistent with the evolution of pollution liability coverage. This interpretation also gives effect to the definition of "pollution condition" in its plain, ordinary and everyday sense, with "the parameters of the definition ... reflect[ing] the legal

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1    characteristics most frequently attributed to the word[s]." *Fall v. First Mercury Ins. Co.*,
2    225 F. Supp.3d at 847.

3          Moreover, this interpretation is also consistent with the Arizona rule of insurance
4    policy interpretation requiring the court to give effect to all provisions of the Policy. *Aztar*
5    *Corp. v. U.S. Fire Ins. Co.*, *supra*, 223 Ariz. at 475.  Similar to the pollution policy at issue
6    in *Essex Walnut*, *supra*, 335 F. Supp. 3d 1146, the Policy's other terms and definitions
7    demonstrate that coverage is limited to environmental contamination, and there is no
8    coverage for a virus like COVID-19.  For example, the Policy defines "remediation costs"
9    as "expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize,
10   or immobilize 'pollution conditions' … to the extent required by 'environmental law'".
11   "Environmental law" is in turn defined as "any Federal, state, commonwealth, municipal or
12   other local law, statute, ordinance, rule, guidance document, regulation, and all amendments
13   thereto (collectively Laws), including voluntary cleanup or risk-based corrective action
14   guidance, or the direction of an 'environmental professional' acting pursuant to the
15   authority provided by any such Laws, along with any governmental, judicial or
16   administrative order or directive, governing the liability or responsibilities of the 'insured'
17   with respect to a 'pollution condition'".   These definitions relate to traditional
18   environmental pollution and do not encompass a virus like COVID-19.   Accordingly,
19   London Bridge has not met its burden to show that there is a "pollution condition" under
20   the Policy's insuring agreement, and its Complaint must be dismissed with prejudice under
21   FRCP 12(b)(6).

22       **E.**    **The Complaint Fails To Allege A Pollution Condition On, At, Under or**
23              **Migrating From a "Covered Location"**

24         Notwithstanding that COVID-19 is not a "pollution condition," the Complaint does
25   not allege a cognizable claim for coverage under the Policy.  Separate and apart from the
26   requirement that there be a "pollution condition," the "pollution condition" must be ***on, at,***
27   ***under or migrating from a 'covered location.'*** (Ex. A at IUIC000014-15) (Emphasis
28

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1   added).  This requirement that the "pollution condition" be tied to the "covered location" is

2   an essential part of the coverage afforded by a pollution liability policy.  See *Jane St.*

3   *Holding, LLC v. Aspen Am. Ins. Co.*, 2014 WL 28600, at *7 (S.D.N.Y. Jan. 2, 2014), *aff'd*,

4   581 F. App'x 49 (2d Cir. 2014) (no business personal property coverage for flood damage

5   done to electric generator located in basement when policy's Schedule Location

6   Endorsement limited coverage to 33rd floor of building); *Dilmar Oil Co. v. Federated Mut.*

7   *Ins. Co.*, 986 F. Supp. 959, 978 (D.S.C. 1997) (no coverage for "voluntary clean-up costs"

8   because they were not incurred at the "insured site", as required by the insuring agreement);

9   accord *Penton Media, Inc. v. Affiliated FM Ins. Co.*, 245 F. App'x 495, 500 (6th Cir. 2007)

10  (civil authority provision of business interruption policy, which covered loss due to

11  prohibition of access to "described locations," did not cover losses arising from insured's

12  postponement of trade show at Javits Center; the court found that the Javits Center, a

13  property not owned by the insured, was not a "described location" contemplated by the civil

14  authority provision).

15      However, the Complaint does not contain a single allegation that COVID-19 was

16  discovered "on, at, under, or migrating from" the "covered location," which is the Resort in

17  Arizona.  Instead, the Complaint alleges that London Bridge's business has suffered as a

18  result of various governmental actions in Arizona and throughout the United States in

19  response to the pandemic that have affected travel to the Resort.

20      Specifically as to Arizona, the Complaint alleges that the Governor of Arizona issued

21  Executive Order 2020-09 on March 19, 2020 in response to the global pandemic, the State

22  of Emergency declared by President Trump, and updated guidance from the United States

23  Centers for Disease Control and Prevention ("CDC") and Arizona Department of Health

24  Services ("ADHS") regarding social gatherings and in-person restaurant dining.

25  (Complaint at ¶ 19).  The Complaint alleges that Executive Order 2020-09 required that, by

26  the close of business on March 20, 2020, all restaurants, bars, and indoor gyms and fitness

27  clubs in counties within Arizona with confirmed cases of COVID-19 to close access to in-

28  person dining.  *Id.* at ¶ 20.

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1    The Complaint also alleges that by Executive Order 2020-18 dated March 30, 2020,

2 the Governor of Arizona issued another executive order instituting a "stay at home" policy

3 for Arizona and requiring businesses that remained open to implement rules and procedures

4 to facilitate social distancing. *Id.* at ¶ 23.  London Bridge alleges that, "[a]s a consequence

5 of the Pandemic (including specifically damage to property caused by the coronavirus),

6 Executive Order 2020-09, Executive Order 2020-18, and "Closure Orders" (defined below)

7 in other states, London Bridge has suffered Covered Losses under the Policy." *Id.* at ¶ 23.

8    The Complaint fails to allege that COVID-19 was discovered on, at, under or

9 migrating from the Resort.  The general presence of COVID-19 in the same county where

10 the Resort is located, in Arizona, or elsewhere in the United States does not meet the

11 Insuring Agreement's requirement of a "pollution condition" *at, on, under or migrating*

12 *from a "covered location.*".   As such, London Bridge cannot satisfy its burden of

13 establishing coverage under Insuring Agreement A of the Policy, which is fatal to its

14 Complaint.  *Aztar Corp. v. U.S. Fire Ins. Co.*, *supra*, 223 Ariz. at 475.

15    Even more, giving effect to all provisions of the Policy as required by Arizona law,

16 *Aztar Corp. v. U.S. Fire Ins. Co.*, *supra*, 223 Ariz. at 475, there is no coverage for London

17 Bridge's alleged "business interruption" loss.  "Business interruption" coverage is afforded

18 under the Policy for "the necessary partial or complete suspension of the 'insured's'

19 operations at a 'covered location' for a period of time, which is *directly attributable to a*

20 *'pollution condition' … to which Coverage A. of this Policy applies."* (Ex. A at

21 IUIC000009) (Emphasis added).  The "business interruption" period under the Policy

22 extends from the "time that the operations are necessarily suspended and end *when such*

23 *"pollution condition" … has been remediated* to the point at which the "insured's" normal

24 operations could reasonably be restored." *Id.* (Emphasis added).  Coverage A is confined to

25 the discovery of "a 'pollution condition' *on, at, under or migrating from a 'covered*

26 *location.*'"  The Complaint identifies no discovery of COVID-19 on, at, under or migrating

27 from a "covered location," absent which Coverage A does not apply.  Nor does the

28 Complaint identify any "remediation costs", absent which there can be no covered "business

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1   interruption," because coverage for "business interruption" is confined to the period of time

2   during which the insured's normal business operations are suspended because a "pollution

3   condition" on, at, under or migrating from a "covered location" must be remediated.

4          Accordingly, the Complaint fails to state a claim upon which relief can be granted

5   for this reason as well.

6                                    **<u>CONCLUSION</u>**

7          For all of the foregoing reasons, Illinois Union requests that its Motion to Dismiss

8   Plaintiff's Complaint for failure to state a claim upon which relief can be granted under

9   FRCP 12(b)(6) be granted, and that Plaintiff's Complaint be dismissed with prejudice.

10         DATED this 2nd day of July, 2020.

11                                      FORAN GLENNON PALANDECH
                                        PONZI & RUDLOFF PC
12

13

14                                      By: s/ *Amy M. Samberg*
                                           Amy M. Samberg
15                                         Amy L. Stein
                                           400 E. Van Buren Street, Suite 550
16                                         Phoenix, AZ  85004
                                           Attorneys for Defendant Illinois Union
17                                         Insurance Company, Inc.

18

19

20

21

22

23

24

25

26

27

28

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF CONFERAL**

The undersigned hereby certifies that, pursuant to D. Ariz. L.R.Civ. 12.1(c), that prior to filing this Motion, counsel for Illinois Union Insurance Company, Inc. notified Plaintiff of the issues asserted in the foregoing motion and that the parties were unable to agree that the pleading was curable in any part by an amended pleading.

FORAN GLENNON PALANDECH
PONZI & RUDLOFF PC


By: s/ *Amy M. Samberg*
Amy M. Samberg
Amy L. Stein
400 E. Van Buren Street, Suite 550
Phoenix, AZ 85004
Attorneys for Defendant Illinois
Union Insurance Company, Inc.


**CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2020, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Matt Anderson, Esq.
MATT ANDERSON LAW, PLLC
2633 E. Indian School Road, Suite 370
Phoenix, AZ 85016
matt@mattandersonlaw.com
*Attorneys for Plaintiff*


/s/    *Brenda Uran*

| | |
|---|---|
| GOLDEN CORRAL CORP. and | ) |
| GOLDEN CORRAL FRANCHISING | ) |
| SYSTEMS, INC. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| ILLINOIS UNION INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
## ILLINOIS UNION'S MOTION FOR JUDGMENT ON THE PLEADINGS

Defendant Illinois Union Insurance Company respectfully submits this Reply Memorandum of Law in support of its Motion for Judgment on the Pleadings under Fed. R. Civ. P. 12(c) and L.R. 7.1(e).

## NATURE OF THE CASE & STATEMENT OF FACTS

Illinois Union respectfully refers the Court to the Nature of the Case and Statement of Facts set forth in its affirmative brief, which are incorporated herein by reference. [D.E. 25.]

## REPLY ARGUMENT

## I. PLAINTIFFS' CLAIM DOES NOT SATISFY ANY COVERAGE GRANT.

On March 4, 2021, The Honorable Judge Terrence W. Boyle of the Eastern District of North Carolina dismissed a policyholder's complaint seeking coverage for business-interruption losses associated with the COVID-19 virus. Like here, that insured failed to satisfy the coverage grants at issue there because, among other things, the grants were "expressly triggered by physical loss or damage to property." Like Golden Corral does here, what the insured there argued for would mean "allow[ing] for intangible damage to trigger coverage," a result which neither the policy or North Carolina law allowed. *Summit Hospitality Grp. v. Cincinnati Insurance Co.*, No. 5:20-cv-254, 2021 WL 831013 (E.D.N.C. Mar. 4, 2021) (relying on *Harry's Cadillac-Pontiac v. Motors Ins. Corp.*, 126 N.C. App. 698 (1997)). The Illinois Union Policy here requires the same types of physical loss, damage or destruction. The result here should be the same—there is no coverage.

### A. Plaintiffs' construction of the Civil Authority coverage grant is incorrect.

Plaintiffs argue that in order to trigger coverage under the Civil or Military Authority provision, they "must only show that a business interruption occurred due to a civil authority order that interrupted access to an insured location due to 'loss' to a property within five miles that may occur in the future." [Pls.' Opp., D.E. 31 ("Opp. Br."), p. 11.] This is a complete misreading of the Civil or Military Authority provision, which requires (1) damage or destruction or imminent loss (2) by a peril insured by the Policy (3) within five miles of an insured location, (4) which prevents or impairs access to that insured location

by order of civil or military authority, (5) resulting in the interruption or reduction of the insured's normal business operations. [D.E. 17-1, p. 113.]

**First**, Plaintiffs' reading of the word "imminent" as "may possibly occur in the future" is entirely unreasonable and inconsistent with the ordinary understanding of that term, even according to the dictionary definitions Plaintiffs themselves cite ("looming" and "threatening"). [Opp. Br., p. 11.] Plaintiffs' proposed definition of loss fails to consider the context in which it appears in the Policy. As the North Carolina Supreme Court has recognized, "[w]e construe all clauses of an insurance policy together, if possible, so as to bring them into harmony." *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 364 N.C. 1, 9 (2010). The word "loss" appears directly after the terms damage and destruction. Read in context, the proper definition is "a situation in which property is damaged, lost, or stolen, and an insurance company must pay to replace it." *Loss*, *Cambridge Dictionary* (online ed. 2021); *see also Loss*, *Macmillan Dictionary*, (online ed. 2021) (defining loss as "no longer having something"). Plaintiffs have alleged no imminent loss at a specific property within five miles of an insured location.

**Second**, the interpretation Plaintiffs urge this Court to adopt reads out of the Civil Authority coverage grant the requirement that the imminent loss must be caused by an insured peril, which is defined as "'all risks' of direct physical loss, damage or destruction occurring during the Policy period, except as hereinafter excluded, of the property described . . . ." [D.E. 17-1, p. 42.] Each word in a policy is to be given effect. *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 355 (1970). Contrary to Plaintiffs' assertion, the physicality requirement is in the Civil Authority coverage grant itself, in the phrase "as a result of direct physical loss, damage or destruction or imminent loss by a *peril insured* by this Policy." [D.E. 17-1, p. 113 (emphasis added).] *See Zwillo V, Corp. v. Lexington Ins. Co.*, No. 4:20-00339-CV, 2020 WL 7137110, at *3, *4 n.2 (W.D. Mo. Dec. 2, 2020) (finding Sue and Labor clause providing coverage in case of imminent loss "by a peril insured against" required direct physical loss of or damage to property because "peril insured against" was defined as "all risks of direct physical loss of or damage to property described herein"). The Policy clearly instructs that "*[w]herever* used in this Policy, 'peril insured' refers to this INSURING AGREEMENT," and the INSURING AGREEMENT states that

the Policy insures against all risks of direct physical loss, damage or destruction of property.[1] [D.E. 17-1, p. 42 (emphasis added).] Plaintiffs argue that Illinois Union's reading is nonsensical because it requires "direct physical loss, damage or destruction" by "direct physical loss, damage or destruction." This is neither nonsensical nor unusual. For example, the policy in *Harry's Cadillac* read, "The suspension must be caused by direct physical loss of or damage to property . . . caused by or resulting from any Covered Cause of Loss," which was defined as "RISKS OF DIRECT PHYSICAL LOSS." *Harry's Cadillac-Pontiac-GMC Truck Co. v. Motors Ins. Corp.*, 126 N.C. App. 698, 700-01 (1997). In other words, the policy there, like the Policy here, emphasizes throughout that a claim can only be covered if it is caused by direct physical loss, damage or destruction. Emphasizing this repeatedly does not render the Policy nonsensical; it reinforces the purpose to provide coverage only for those damages and losses that are physical in nature.

Plaintiffs cite *Great Am. Ins. Co. v. Mesh Cafe, Inc.*, 158 N.C. App. 312 (2003), which actually undermines Plaintiffs' argument. In that unpublished decision, the court held that there were two ways of reading the phrase, "The interruption must result from direct physical loss or damage by a Covered Cause of Loss to the property:" either "by a Covered Cause of Loss" was a prepositional phrase modifying "direct physical loss or damage" or "direct physical loss was an alternative to "damage by a Covered Cause of Loss." *Mesh Café*, 2003 WL 21267942, at *2. Without suggesting that Illinois Union agrees with that analysis, if the same reasoning were applied here, there would be two possible readings of the Civil Authority coverage: either "by a peril insured" is a prepositional phrase modifying "direct physical loss, damage or destruction or imminent loss" or "direct physical loss, damage or destruction" is an alternative to "imminent loss by a peril insured." But either way, no reasonable reading of the Policy could divorce the phrase "imminent loss" from the defined term "perils insured" that follows it.

---

[1] Plaintiffs seem to suggest that the Civil Authority coverage grant somehow nullifies the Insuring Agreement. To the contrary, these terms are not inconsistent and should be read to harmonize with each other. *See Wachovia*, 276 N.C. at 355. The Insuring Agreement is incorporated into the Civil Authority provision through the phrase "perils insured."

Plaintiffs also cite *Fountain Powerboat Industries v. Reliance Insurance*, which involved critically different language than the Policy here. 119 F. Supp. 2d 552, 557 (E.D.N.C. 2000). There, the policy stated "loss, damage or destruction," whereas here the Policy states "*physical* loss, damage or destruction." [D.E. 17-1, *passim* (emphasis added).] The Court's holding was simply that under the policy language in *Fountain*, "loss" was not predicated on physical damage. That case does not stand for Plaintiffs' broad proposition that loss can never be predicated on physical damage in any policy. Indeed, here, it is.

**Third**, Plaintiff cannot establish that any of the civil-authority orders cited in the Complaint actually prevented or impaired access to any insured location. Executive Order 116 did not enact any restrictions on businesses. [N.C. Exec. Order 116.] Executive Order 118 only limited the sale of food and beverages to carry-out, drive-through, delivery, and outdoor seating. [N.C. Exec. Order 118 § 1.(a)(vi).] Similarly, Executive Order 121 and the March 26, 2020 Revised Joint Proclamation of the Chairman of the Mecklenburg County Board of Commissioners, the Mayor of the City of Charlotte, and the Mayors of the Towns in Conjunction with the Emergency Management Coordinator and in Consultation with the Mecklenburg County Public Health Director both designated restaurants for consumption off-premises as an Essential Business and Operation, which was permitted to remain open. [N.C. Exec. Order 121 § C.19; Joint Proclamation § 12.] Courts across the country have concluded that similar orders did not prevent or impair access to the businesses they affected. *E.g.*, *Cafe La Trova LLC v. Aspen Specialty Ins. Co.*, No. 20-22055-CIV, 2021 WL 602585, at *11 (S.D. Fla. Feb. 16, 2021) (rejecting insured's argument that access to restaurant was prohibited because customers were unable to enter the premises, sit at the table, etc. due to emergency directives that prohibited indoor dining because orders permitted restaurants to offer food for delivery, pick-up, etc.).

Plaintiffs focus on certain language from these orders referring to an imminent hazard or threat, and then attempt to twist that into an argument that the orders were issued to prevent loss to property.[2] [Opp.

---

[2] For example, Plaintiffs splice the language from the Mecklenburg County Proclamation, "any other activities or conditions whereby the control of which maybe [sic] be reasonably necessary to maintain order and protect lives or property during the state of emergency . . ." [Joint Proclamation, p. 2] to read, "in order to 'protect' 'property'" [Opp. Br., pp. 5, 22].

4

JA496

Br., p. 11.] That is incorrect. They were issued to prevent loss of life and slow the spread of the virus. *Mena Catering, Inc. v. Scottsdale Ins. Co.*, No. 1:20-CV-23661, 2021 WL 86777, at *7 (S.D. Fla. Jan. 11, 2021) ("civil orders were issued in response to slow the global pandemic, not because of actual damage to any specific property near the premises" (citations omitted)). Moreover, as explained in the Memorandum of Law in Support of Illinois Union's Motion for Judgment on the Pleadings, a civil authority order issued to prevent property damage does not satisfy the coverage grant. [Def.'s Mem., D.E. 25, p. 27 (citing numerous cases for the proposition that courts have routinely held that an action of civil authority must be in response to damage to other property that has already taken place and not simply in response to the threat of, or the anticipation of, future property damage).] Plaintiffs ignore this case law, resting instead on the argument that their conclusory allegations satisfy the federal pleading requirement. [Opp. Br., p. 12.] Not so. Plaintiffs have not identified a single property within five miles of any insured location that faced an imminent loss by an insured peril, which caused any of the cited orders to issue. The Complaint falls far short of carrying *Plaintiffs' burden* to show that Civil Authority coverage grant is satisfied. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 258 (4th Cir. 2009).

### B. Plaintiffs Do Not Plausibly Allege Facts That Satisfy the Civil Authority, Business Interruption, or Loss of Ingress or Egress Coverage Grants.

Plaintiffs acknowledge that physical loss, damage or destruction is required under the Business Interruption and Loss of Ingress or Egress coverage grants, but half-heartedly argue that physical loss "does not require a loss that is physical in nature," relying on *Fountain*, which, as discussed above, involved a policy that specifically omitted the word "physical" before "loss" and is therefore readily distinguishable. 119 F. Supp. 2d at 557. Plaintiffs cite a number of non-North Carolina cases purportedly holding damage to property is not necessary where the property has been rendered uninhabitable or unusable for its intended purpose. *Cf. Summit Hospitality Grp.,* 2021 WL 831013 (rejecting insured's arguments that would allow coverage for mere intangible damage). Plaintiffs' cases are easily distinguishable. For example, Plaintiffs cited *Three Palms Pointe, Inc. v. State Farm Fire & Cas. Co.*, 250 F. Supp. 2d 1357, 1364 (M.D. Fla. 2003) with the parenthetical, "[U]nder Florida law 'direct physical

loss' includes more than losses that harm the structure of the covered property." However, Florida law is clear that loss from COVID-19 is not direct physical loss. *E.g.*, *Prime Time Sports Grill v. Dtw 1991 Underwriting Ltd.,* No. 8:20-CV-771-T-36JSS, 2020 WL 7398646, at *6 (M.D. Fla. Dec. 17, 2020) ("Plaintiff specifically alleges that it was ordered closed in response to the Covid-19 pandemic and as a result, it lost [profit and incurred operating expenses]. It suffered an economic loss that did not result from tangible damage. This is not the type of loss that [insurer] undertook to pay for based on the plain . . . language in the policy."); *Infinity Exhibits, Inc. v. Lloyd's London*, No. 8:20-cv-1605-T-30AEP, 2020 WL 5791583, at *3 (M.D. Fla. Sept. 28, 2020) (citing *Mama Jo's Inc. v. Sparta Ins. Co.,* No. 18-12887, 2020 WL 4782369, at *8 (11th Cir. Aug. 18, 2020), for the proposition that Florida law and the plain language of the policy require "actual, concrete damage"). Similarly, the court in *Promotional Headwear International v. Cincinnati Insurance*, a COVID-19 case, distinguished two of the cases on which Golden Corral relies, *TRAVCO Insurance Co. v. Ward*, 715 F. Supp. 2d 699 (E.D. Va. 2010) and *Western Fire Insurance Co. v. First Presbyterian Church*, 437 P.2d 52 (Colo. 1968), noting, "These cases all found that a physical force rendered the property unfit for use. Here, there is no such physical force rendering the property unusable." No. 20-CV-2211-JAR-GEB, 2020 WL 7078735, at *6 (D. Kan. Dec. 3, 2020). COVID-19 does not alter property so that it becomes uninhabitable. The orders Plaintiffs cite permitted restaurants to be inhabited and used for various purposes, just not indoor dining. Plaintiffs have not even alleged COVID-19 existed at their premises.

And notwithstanding their argument that physical loss is not required under the Civil Authority coverage grant, Plaintiffs argue that is also satisfied because they have alleged physical loss. [Opp. Br. p. 16.] Then Plaintiffs argue they have adequately pleaded coverage under all of these coverage grants by alleging COVID-19 is widespread and pointing to a CDC database and executive orders, which Plaintiffs claim (incorrectly) were issued to protect unspecified property. [Opp. Br., pp. 16, 22.] Plaintiffs' allegations fall far short of establishing coverage. The Business Interruption coverage grant is triggered by the "necessary interruption or reduction of business operations . . . caused by physical loss, damage or destruction, by a peril insured by this Policy, of property insured." [D.E. 17-1, p. 52.] Plaintiffs do not

6

allege their own property was lost, damaged or destroyed, nor that any such loss, damage or destruction necessarily interrupted or reduced their business operations. Similarly, the Loss of Ingress or Egress coverage grant is triggered only when "as a result of direct physical loss, damage or destruction by a peril insured by this Policy within five (5) miles of an insured 'location,' normal business operations are interrupted or reduced because ingress to or egress from that 'location' is prevented or impaired." [D.E. 17-1, p.114.] As in *Summit Hospitality Grp.,* 2021 WL 831013 at \*5, Plaintiffs do not plausibly allege that ingress to or egress from any of the insured locations was prevented or impaired, let alone that such prevention of ingress/egress was the result of direct physical loss, damage or destruction by an insured peril within five miles. *See also Promotional*, 2020 WL 7078735, at \*10 (holding stay-at-home orders did not cause loss of ingress or egress because premises were still accessible). And as explained above, Plaintiffs have not alleged access to insured property was prevented or impaired by order of civil authority due to damage or destruction or imminent loss by a peril insured by the Policy within five miles of an insured location.

In sum, the COVID-19 virus is not a direct physical loss, damage or destruction of property, as numerous courts have recognized. Indeed,

> a growing number of state and federal courts . . . around the country have considered the issue and have almost uniformly held that economic losses resulting from state and local government orders closing businesses to slow the spread of COVID-19 are not covered under 'all risk' policy language identical to that in this case because such losses were not caused by direct physical loss of or damage to the insured property.

*Emerald Coast Rests., Inc. d/b/a O'Quigley's Seafood Steamer & Oyster Sports Bar v. Aspen Specialty Ins. Co.,* No. 3:20CV5898-TKW-HTC, 2020 WL 7889061, at \*2 (N.D. Fla. Dec. 18, 2020). Accordingly, Plaintiffs have not met their burden to establish coverage under any of these coverage grants.

## II. THE POLLUTION, CONTAMINATION EXCLUSION BARS COVERAGE.

This State's Supreme Court requires that "[w]here a policy defines a term, that definition is to be used." *Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293, 299 (2000); [Opp. Br., p. 10]. The Illinois Union Policy defines "Contaminants or pollutants" as "any material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration,

loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, . . . virus." Policy § VI(G), [D.E. 17-1, pp. 60-61]. Contrast this with the definitions of "pollutant" or "contaminant" in the liability-policy cases Golden Corral relies on to urge that the Pollution, Contamination exclusion should be set aside, and this distinction is crucial: in *Tufco*, *Potter*, *Paul Howard Construction*, and *Sand Livestock System*, the key definition of either contamination or pollutant did not include "virus" or even a definition that embraced materials that threatened harm to human health.[3] *W. Am. Ins. Co. v. Tufco Flooring E., Inc.*, 104 N.C. App. 312 (1991); *Auto-Owners Ins. Co. v. Potter*, 105 Fed. App'x 484 (4th Cir. 2004); *Amerisure Mut. Ins. Co. v. Paul Howard Constr. Co.*, No. 1:06CV202, 2007 WL 9747637 (M.D.N.C. Mar. 27, 2007); *Bituminous Cas. Corp. v. Sand Livestock Sys.*, No. C04-4028-PAZ, 2005 WL 1476441, at *7 (N.D. Iowa June 22, 2005).

Recent decisions from other federal courts, however, *have* applied *property* insurance policy exclusions for pollution or contamination to claims seeking coverage for COVID-19-related losses. The Western District of Missouri, for example, enforced a pollution exclusion for business interruption losses due to COVID-19 because the exclusion expressly included "virus" as a part of its definition. *Zwillo V, Corp. v. Lexington Ins. Co.*, No. 4:20-00339-CV, 2020 WL 7137110, at *6 (W.D. Mo. Dec. 2, 2020).

The U.S. District Court for the District of Nevada did the same, interpreting virtually the same exclusion and same definition of "Contaminants or pollutants" to conclude that claimed business-interruption losses associated with COVID-19 fell within the scope of the exclusion. *Circus Circus LV, LP v. AIG Specialty Ins. Co.*, No. 2:20-cv-01240, 2021 WL 769660 *2, *5 (D. Nev. Feb. 26, 2021). The *Circus Circus* court ruled this way despite arguments from the insured that this same exclusion applied only to "traditional environmental pollution"—the very contention Golden Corral offers here. *Id.* *5. The court was unpersuaded, distinguishing other Nevada authorities constraining pollution exclusions to so-called traditional environmental pollution because the exclusion there—virtually the same as the exclusion here—"broadly limit[s] liability for health-harming contaminants *and* environmental pollutants." *Id.* (emphasis in original). The court continued, explaining that it "*must determine whether the*

---

[3] None of those cases involved complaints seeking coverage for losses arising from a virus.

*virus that causes COVID-19 falls within the definition of a "virus" that has been 'releas[ed]' 'dispers[ed],' or 'discharg[ed],' or has 'escape[d],' causing damage to health and human welfare.*" *Id.* at 12 (emphasis added). The judge concluded that it "squarely" did. *Id.* *6.

The same issue presented to the *Circus Circus* court is presented here. Golden Corral advances cases such as *Tufco*, *Potter*, and *Paul Howard* that each turn on definitions of "pollutant" that encompass only "any solid, liquid, gaseous or thermal irritant or contaminant*, including smoke, vapor, soot, fumes, acids, alkalis, chemical and waste.*" *E.g.*, *Potter*, 105 Fed. Appx. at 493 (4th Cir. 2004); *cf. Seifert v. IMT Ins. Co.*, No. 20-1102, —— F.Supp.3d ——, n.6, 2020 WL 6120002, at *4 n.6 (D. Minn. Oct. 16, 2020) (finding a party's attempt "to place [COVID-19] in the same category of pollutants as 'smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste' " to be "unavailing"). The Illinois Union Policy, however, defines "Contaminants or Pollutants" as "any material that after its release can cause or threaten damage to human health or human welfare . . . . including . . . [a] virus." [D.E. 17-1, pp. 60-61]. The exclusion "broadly limit[s] liability for health-harming contaminants[,]" including a "virus," *see Circus Circus*, 2021 WL 769660, *5, and by the plain language of the Policy's exclusion, it does not warrant the restriction Golden Corral would have this Court impose.[4] *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 364 N.C. 1, 10 (2010) (courts may not impose liability for which the insured did not pay).

Golden Corral also finds it "remarkabl[e]" that Illinois Union would interpret two different types of insurance policies that use different language in different ways. There is nothing remarkable about this. In *London Bridge Resort, LLC*, Illinois Union argued successfully that, under Arizona law, a pollution liability insurance policy that covered certain "pollution conditions" did not apply to a COVID-19 claim. *London Bridge Resort LLC v. Illinois Union Ins. Co.*, — F. Supp. 3d —, 2020 WL 7123024 (D. Az. Dec. 4, 2020). The policy at issue there defined a "pollution condition" without reference to harms to human health or virus. *Id.* *2. Illinois Union stressed there that, under applicable law, "the term 'pollution

---

[4] Golden Corral also underscores the language that follows the Pollution, Contamination exclusion's definition, which addresses limitations on coverage for costs arising out of enforcement of laws for things like cleanup and restoration of property—most likely to further suggest that the exclusion is constrained to environmental-type harms. Opp. Br., p. 24. Again, this unduly restricts what the exclusion provides; it embraces environmental harms *and* those to human health from contaminants like a virus.

9

condition,' as defined by the policy at issue, is limited to traditional environmental pollution, *and does not include a communicable disease caused by a virus, like COVID-19*." Opp. Br. Ex. A, at 2 of 15 (emphasis added). Illinois Union also argued there, as Golden Corral emphasizes, that under Arizona law, the terms "discharge," "dispersal," "release," and "escape" "*and similar terms contained in the definition of 'pollution condition'* . . . relate solely to traditional environmental contamination, and do not cover a virus such as COVID-19." *Id.* at 10 of 15 (emphasis added). Indeed, they do not apply to a virus such as COVID-19 because the "pollution conditions" definition there gave no indication that it did.

Applying Arizona law, the District of Arizona analyzed the definition of "pollution condition" and observed that "the question is whether COVID-19, a type of virus, can constitute traditional environmental pollution. The Court has little trouble concluding that no plausible interpretation of 'traditional environmental pollution' includes a virus outbreak." *London Bridge*, 2020 WL 7123024, *3.

Illinois Union's position here is not inconsistent with its position in *London Bridge* because of significant differences in the policies: (1) the Policy at issue here expressly defines "Contaminants or pollutants" to include both environmental harms *and* harms to human health, and (2) that same definition expressly encompasses a "virus." Thus, Illinois Union's Policy and position are different, and so should this Court's analysis be different. There is no basis to judicially estop Illinois Union from applying reasoned distinctions between distinct provisions.

In sum, the Policy excludes coverage for any loss "caused by" or just "contributed to" by a virus— even "in part." [D.E. 17-1, p. 61.] North Carolina law does not prohibit such an exclusion from applying merely because it is a "pollution, contamination" exclusion, while other COVID-19 cases show why this same exclusion should be enforced. The Court should enforce the exclusion.[5]

---

[5] Additionally, Illinois Union previously argued why Plaintiffs' Third Cause of Action [DE 25 at p. 30] should be dismissed. Plaintiffs have not briefed any opposition to this. Thus, that cause of action should be dismissed for the reasons set forth in defendant's Memorandum of Law. *See, e.g., Al-Deen v. Trustees of Univ. of N. Carolina, Wilmington,* 102 F.Supp.3d 758, 768 (E.D.N.C. 2015).

10

This the 8th day of March, 2021.

**CRANFILL SUMNER LLP**

BY: /s/ Jennifer A. Welch
JENNIFER A. WELCH
N.C. State Bar No.: 31360

BY: /s/ Theodore B. Smyth
THEODORE B. SMYTH
N.C. State Bar No.: 10045
Post Office Box 27808
Raleigh, N.C. 27611-7808
Phone: 919-828-5100
Fax: 919-828-2277
E-mail: jwelch@cshlaw.com
        tsmyth@chslaw.com
*Attorneys for Defendant Illinois Union
Insurance Company*

**CLYDE & CO US LLP**

ROBERT W. FISHER
*Motion for Special Appearance Pending*

JAMES M. BAUER
*Motion for Special Appearance Pending*
271 17th Street NW Suite 1720
Atlanta, G.A. 30363
Phone: 404-410-3150
Fax: 404-410-3151
E-mail: Robert.Fisher@clydeco.us
James.Bauer@clydeco.us
*Attorneys for Defendant Illinois Union
Insurance Company*

4824-0589-8719, v. 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
NO.: 5:20-CV-349-D**

GOLDEN CORRAL CORP. and )
GOLDEN CORRAL FRANCHISING )
SYSTEMS, INC., )
                             )
      Plaintiffs, )
                             )
v. )          **CERTIFICATE OF SERVICE**
                             )
ILLINOIS UNION INSURANCE )
COMPANY, )
                             )
      Defendant. )
_____ )

      I hereby certify that on March 8, 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys:

<div align="center">

Gregg McDougal, Esq.
Lawrence R. Duke, Esq.
William R. Hartzell, Esq.
McDOUGAL WORRELL LLP
316 West Edenton Street, Suite 100
Raleigh, North Carolina 27603
gregg@mcdougalworrell.com
lawrence@mcdougalworrell.com
will@mcdougalworrell.com

</div>

                        **CRANFILL SUMNER LLP**

                        */s/* Jennifer A. Welch_____
                        Jennifer A. Welch
                        N.C. State Bar No. 31360
                        Theodore B. Smyth
                        N.C. State Bar No. 10045
                        Post Office Box 27808
                        Raleigh, NC 276111-7808
                        Phone: 919-828-5100
                        Fax: 919-828-2277
                        Email: jwelch@cshlaw.com
                                    tsmyth@cshlaw.com

4824-0589-8719, v. 1

Case 5:20-cv-00349-D   Document 32   Filed 03/08/21   Page 13 of 13

JA504

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-349-D

| | | |
|---|---|---|
| GOLDEN CORRAL CORP., and | ) | |
| GOLDEN CORRAL FRANCHISING | ) | |
| SYSTEMS, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| ILLINOIS UNION INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

On May 14, 2020, Golden Corral Corporation and Golden Corral Franchising Systems (collectively, "Golden Corral" or "plaintiffs") filed a complaint against Illinois Union Insurance Company ("Illinois Union" or "defendant") in Wake County Superior Court seeking to recover for financial losses arising from the COVID-19 pandemic's effect on plaintiffs' business operations [D.E. 1-1]. On July 2, 2020, Illinois Union removed the case to this court based on diversity jurisdiction [D.E. 1]. On August 28, 2020, Golden Corral filed an amended complaint [D.E. 15]. On February 1, 2021, Illinois Union moved for judgment on the pleadings [D.E. 24] and filed a memorandum in support and exhibits [D.E. 25]. On February 22, 2021, Golden Corral responded in opposition [D.E. 31]. On March 8, 2021, Illinois Union replied [D.E. 32]. As explained below, the court grants Illinois Union's motion for judgment on the pleadings.

I.

Golden Corral Corporation is a North Carolina corporation with a principal place of business in Raleigh, North Carolina. See Am. Compl. [D.E. 15] ¶ 2. Golden Corral Franchising Systems is

JA505

a Delaware corporation that does business in North Carolina and has its principal place of business in Raleigh, North Carolina. See id. ¶ 3. The two entities together own or franchise approximately 483 restaurants across the United States. See id. ¶¶ 11–15. The franchisee restaurants pay royalties to Golden Corral, some have leases with Golden Corral, and some have financed equipment through Golden Corral. See id. ¶¶ 12, 14–15. Illinois Union is an insurance company organized under Illinois law, with a principal place of business in Philadelphia, Pennsylvania. See id. ¶ 4; [D.E. 17] ¶ 4. It is authorized to do business in North Carolina. See Am. Compl. ¶ 5; [D.E. 17] ¶ 5.

In March 2019, Illinois Union issued to Golden Corral a commercial property insurance policy that Golden Corral applied for, executed, and received in North Carolina. See Am. Compl. ¶ 16; [D.E. 17-1]. The policy covered the period from March 31, 2019, to March 31, 2020. See [D.E. 17-1] 27. The policy contains an "Insuring Agreement." See id. at 42. The policy insures Golden Corral against "'all risks' of direct physical loss, damage or destruction, occurring during the Policy period," except as otherwise excluded. Id. Whenever the policy uses the term "peril insured," it is referring to the Insuring Agreement plus any exclusions in the policy. See id. The policy includes numerous endorsements, including a General Amendatory Endorsement containing provisions at issue here, that affect the terms and scope of the policy. See, e.g., id. at 113–15. The policy's choice-of-law provision specifies that "[a]ny dispute concerning or related to this insurance shall be determined in accordance with the laws of the United States of America in the Jurisdiction of North Carolina, without regard to its conflict of laws principles." Id. at 40.

The COVID-19 pandemic began in early 2020 in the United States. See Am. Compl. ¶¶ 28–31. In order to address the COVID-19 pandemic, many state and local governments issued orders restricting access to restaurants, including restaurants owned or franchised by Golden Corral. See id. ¶¶ 32–35, 37–38.

2

In March 2020, Golden Corral and its franchisees suspended the operations of their restaurants in response to the government-issued orders. See id. ¶¶ 42–43. These closures disrupted Golden Corral's normal business operations, resulting in "substantial losses to revenues from its corporate-owned locations, losses of royalties from its franchise locations, and losses of rental income from leases and losses of payments from equipment financing from certain of its franchise locations." Id. ¶ 44.[1]

Golden Corral believes these financial losses are insured under its policy with Illinois Union. See id. ¶ 44. On May 12, 2020, Golden Corral filed insurance claims with Illinois Union. See id. ¶ 45. On May 13, 2020, Illinois Union acknowledged it received the claims and notified Golden Corral that it assigned the claims to the company's catastrophic claims specialist for the Pacific Region. See id. ¶ 46; [D.E. 17] ¶ 46.

On May 14, 2020, Golden Corral instituted this lawsuit in Wake County Superior Court. See [D.E. 1-1]. After suing Illinois Union, Golden Corral repeatedly attempted to contact the claims specialist about its insurance claims. See Am. Compl. ¶¶ 47–56. On August 10, 2020, Illinois Union denied Golden Corral's claims. See id. ¶ 57. On August 28, 2020, Golden Corral filed an amended complaint reflecting the denial. See [D.E. 15]. On September 11, 2020, Illinois Union answered Golden Corral's amended complaint. See [D.E. 17].

Golden Corral bases its claims on three parts of the insurance policy. First, the policy includes an endorsement for "Interruption by Civil or Military Authority." [D.E. 17-1] 113 (emphasis omitted). That endorsement states:

This Policy insures the "Time Element" loss sustained during the period of time

---

[1] The parties agree these financial losses exceed $75,000. See Am. Compl. ¶ 79; [D.E. 17] ¶ 79.

3

JA507

when, as a result of direct physical loss, damage or destruction or imminent loss by a peril insured by this Policy within five (5) miles of an insured "location," normal business operations are interrupted or reduced because access to that "location" is prevented or impaired by order of civil or military authority.

Id.; see Am. Compl. ¶¶ 62, 76. Second, the policy includes an endorsement for "Loss of Ingress or Egress." [D.E. 17] 113 (emphasis omitted). That endorsement states:

This Policy insures the "Time Element" loss sustained during the period when, as a result of direct physical loss, damage or destruction by a peril insured by this Policy within five (5) miles of an insured "location," normal business operations are interrupted or reduced because ingress to or egress from that "location" is prevented or impaired.

Id. at 113–14; see Am. Compl. ¶¶ 63, 77. Finally, the policy covers losses from "Business Interruption." The coverage provision states:

This Policy insures loss resulting from the necessary interruption or reduction of business operations conducted by the Insured and caused by physical loss, damage or destruction, by a peril insured by this Policy, of property insured.

[D.E. 17-1] 52; see Am. Compl. ¶¶ 64, 78. In its amended complaint, Golden Corral seeks a declaratory judgment that these provisions cover the financial losses it incurred from suspending its business operations and seeks damages for breach of a contract. See Am. Compl. ¶¶ 58–79. Golden Corral also seeks damages because Illinois Union allegedly breached the implied contractual covenant of good faith and fair dealing. See id. ¶¶ 80–94.

Illinois Union denies that these policy provisions cover Golden Corral's losses and denies it has breached any contractual obligations. See [D.E. 17] ¶¶ 70, 79, 90–94. Alternatively, Illinois Union argues that the "Pollution, Contamination" exclusion in the policy excludes any covered losses. See id. at 24–25. In relevant part, the exclusion states:

Loss or damages caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of 'contaminants or pollutants,' all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever.

4

[D.E. 17-1] 60. The exclusion then defines the phrase "contaminants or pollutants" to mean:

> [A]ny material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, bacteria, virus, or hazardous substances . . . .

Id. at 61.

On February 1, 2021, Illinois Union moved for judgment on the pleadings. See [D.E. 24]. Golden Corral opposes the motion. See [D.E. 31].

## II.

A party may move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A court should grant the motion if "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, 442 F.3d 1239, 1244 (10th Cir. 2006) (quotation omitted), abrogated on other grounds by Magnus, Inc. v. Diamond State Ins. Co., 545 F. App'x 750 (10th Cir. 2013) (unpublished); see Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 375 (4th Cir. 2012); Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405–06 (4th Cir. 2002). A court may consider the pleadings and any materials referenced in or attached to the pleadings, which are incorporated by reference. See Fed. R. Civ. P. 10(c); Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). A court also may consider "matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).

The same standard applies under Rule 12(c) and Rule 12(b)(6). See Mayfield, 674 F.3d at 375; Burbach Broad. Co., 278 F.3d at 405–06. Thus, a motion under Rule 12(c) tests the legal and factual sufficiency of the claim. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 677–80, 684 (2009); Bell

5

Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(c) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences in the "light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 347, 352–53 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015); Burbach Broad. Co., 278 F.3d at 406. A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's allegations must nudge[] [its] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

This court has subject-matter jurisdiction based on diversity. See 28 U.S.C. § 1332. Thus, the court applies state substantive law and federal procedural rules. See Erie R.R. v. Tompkins, 304 U.S. 64, 78–80 (1938); Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002).

In resolving the dispute, this court applies North Carolina substantive law. See [D.E. 17-1] 40; see also N.C. Gen. Stat. § 58-3-1; Collins & Aikman Corp. v. Hartford Accident & Indem. Co., 335 N.C. 91, 94, 436 S.E.2d 243, 245 (1993). Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100

6

(4th Cir. 2016). If there are no governing opinions from the Supreme Court of North Carolina, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[2] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

This action requires the court to interpret an insurance policy. In North Carolina, the "party seeking benefits under an insurance contract has the burden of showing coverage." Fortune Ins. Co. v. Owens, 351 N.C. 424, 430, 526 S.E.2d 463, 467 (2000); see Integon Nat'l Ins. Co. v. Villafranco, 228 N.C. App. 390, 393, 745 S.E.2d 922, 925 (2013). Moreover, interpreting a contract is a question of law for the court. See Briggs v. Am. & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960); N.C. Farm. Bureau Mut. Ins. Co. v. Mizell, 138 N.C. App. 530, 532, 530 S.E.2d 93, 95 (2000). When interpreting a written insurance policy:

> [T]he goal of construction is to arrive at the intent of the parties when the policy was issued. Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the policy are to be harmoniously construed, and if possible, every word and every

---

[2] North Carolina has no mechanism for certifying questions of state law to the Supreme Court of North Carolina. See Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013).

Case 5:20-cv-00349-D   Document 39   Filed 09/08/21   Page 7 of 23

JA511

provision is to be given effect . . . .

Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 299–300, 524 S.E.2d 558, 563 (2000) (quotation omitted); see Plum Props., LCC v. N.C. Farm Bureau Mut. Ins. Co., 254 N.C. App. 741, 744–45, 802 S.E.2d 173, 175 (2017); Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. A court may only construe the policy language when the language used in the policy is ambiguous. See Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. Courts construe ambiguity against the insurer and in favor of the insured. See id., 520 S.E.2d at 95. Similarly, courts interpret coverage clauses broadly and exclusionary clauses narrowly. See Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175–76; Se. Airmotive Corp. v. U.S. Fire Ins. Co., 78 N.C. App. 418, 420, 337 S.E.2d 167, 169 (1985). Language is not ambiguous, however, "simply because the parties contend for differing meanings to be given to the language." Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. The court "must enforce the [policy] as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the [policy] and impose liability upon the company which it did not assume and for which the policyholder did not pay." Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970); see Plum Props., 254 N.C. App. at 744, 802 S.E.2d at 175.

III.

Golden Corral claims that three provisions of the insurance policy cover its losses: (1) the "Loss of Ingress or Egress" endorsement, (2) the "Business Interruption" provision, and (3) the "Interruption by Civil or Military Authority" endorsement. Illinois Union seeks judgment on the pleadings and argues that Golden Corral has failed to plausibly allege that the policy covers its financial losses. See [D.E. 25] 7–10. The court addresses the "Loss of Ingress or Egress" and "Business Interruption" provisions together given their operative language is similar, and it addresses

8

the "Interruption by Civil or Military Authority" endorsement separately because it has additional language covering "imminent loss."

<div align="center">A.</div>

Illinois Union argues the "Loss of Ingress or Egress" and "Business Interruption" provisions do not cover Golden Corral's claims. It argues that both provisions require Golden Corral to show physical loss or damage to insured property or to property within five miles of an insured location. See id. at 7–9, 18–19. Illinois Union defines "physical damage or loss" as requiring "tangible, physical damage." Id. at 8. According to Illinois Union, the presence of COVID-19 on tangible surfaces in Golden Corral's restaurants or nearby property does not meet this definition. See id. at 8–10. Illinois Union also contends that North Carolina law prohibits business-interruption insurance that does not require physical damage or loss. See id. at 10–12.

Golden Corral disagrees and contends that physical damage and loss includes situations where "the property has been rendered uninhabitable or unusable for its intended purpose." [D.E. 31] 16–22. According to Golden Corral, the presence of COVID-19 in its restaurants makes the restaurants unusable and thereby limits ingress or egress from the restaurants and interrupts Golden Corral's normal business operations. Accordingly, Golden Corral contends that these provisions cover the resulting financial losses. See id. at 16–23. Golden Corral also disagrees with Illinois Union's argument that North Carolina law requires physical, tangible damage in business-interruption provisions. See id. at 16–22.

The plain language of the "Loss of Ingress or Egress" and "Business Interruption" provisions controls. See Gaston Cnty. Dyeing Mach. Co., 351 N.C. at 299–300, 524 S.E.2d at 563; Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175; Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. The "Loss of Ingress or Egress" provision requires the covered loss to be "a result of direct

<div align="center">9</div>

physical loss, damage or destruction by a peril insured." [D.E. 17-1] 113–14. Similarly, the "Business Interruption" provision requires the covered loss to be "resulting from the necessary interruption or reduction of business" that is "caused by physical loss, damage or destruction, by a peril insured by this Policy." Id. at 52. The only difference is that the "Loss of Ingress or Egress" provision requires <u>direct</u> physical loss or damage. The "peril[s] insured" are "'all risks' of direct physical loss, damage or destruction," unless otherwise excluded. Id. at 42.

When an insurance policy does not define terms, courts give the terms their ordinary, every-day meaning. See <u>Gaston Cnty. Dyeing Mach. Co.</u>, 351 N.C. at 299–300, 524 S.E.2d at 563; <u>Plum Props.</u>, 254 N.C. App. at 744–45, 802 S.E.2d at 175; <u>Mizell</u>, 138 N.C. App. at 532, 530 S.E.2d at 95. The policy does not define the words "direct," "physical," "loss," "damage," and "destruction." <u>Cf.</u> [D.E. 17-1] 77–82. According to the Oxford English Dictionary, "direct" means "without intermediation or intervening agency; immediate." <u>Direct</u>, Oxford English Dictionary (online ed.). "Physical" means "relating to natural phenomena perceived through the senses (as opposed to the mind) . . . ; tangible; concrete." <u>Physical</u>, Oxford English Dictionary (online ed.). "Physical" alternatively means "having a material existence," and "physical harm" means "any physical impairment." See <u>M Consulting & Exp., LLC v. Travelers Cas. Ins. Co. of Am.</u>, 2 F. Supp. 3d 730, 736 (D. Md. 2014) (quotations and alteration omitted) (relying on Merriam-Webster Online Dictionary and Black's Law Dictionary to conclude that "inclusion of the term 'physical' clearly indicates that the damage must affect the good itself, rather than the Plaintiff's use of that good").

"Loss" means "[p]erdition, ruin, destruction; the condition or fact of being 'lost,' destroyed, or ruined." <u>Loss</u>, Oxford English Dictionary (online ed.). Or, similarly, it means "destruction, ruin" or "the act or fact of being unable to keep or maintain something or someone." <u>Loss</u>, Merriam-Webster Dictionary (online ed.). "Damage" means "injury, harm; esp[ecially] physical injury to a

10

thing, such as impairs its value or usefulness." Damage, Oxford English Dictionary (online ed.) (emphasis omitted). "Destruction" means "[t]he action of destroying; the fact or condition of being destroyed: the opposite of construction." Destruction, Oxford English Dictionary (online ed.) (emphasis omitted).

Putting the definitions together, the phrases "direct physical loss, damage or destruction" and "physical loss, damage or destruction" require tangible, physical harm or destruction to covered property or tangibly losing covered property as a result of a peril insured. See Harry's Cadillac-Pontiac-GMC Truck Co. v. Motors Ins. Corp., 126 N.C. App. 698, 702, 486 S.E.2d 249, 251–52 (1997) (interpreting a materially indistinguishable business-interruption provision to require "damage to, or destruction of, the business property" and holding that "inability to access the property" was insufficient)[3]; see also Summit Hosp. Grp., Ltd. v. Cincinnati Ins. Co., No: 5:20-CV-254-BO, 2021 WL 831013, at *3–4 (E.D.N.C. Mar. 4, 2021) (unpublished) (holding Harry's Cadillac "dictated" the "same result" in a case involving similar insurance provisions), appeal docketed, No. 21-1362 (4th Cir. Apr. 2, 2021); Bel Air Auto Auction, Inc. v. Great N. Ins. Co., No. RBD-20-2892, 2021 WL 1400891, at *7–8 (D. Md. Apr. 14, 2021), appeal docketed, No. 21-1493 (4th Cir. Apr. 29, 2021). In the "Loss of Ingress or Egress" provision, the physical harm, destruction, or loss can also be to property within five miles of an insured location that causes a loss of ingress or egress to the insured location. The "Loss of Ingress or Engress" provision also requires that harm

---

[3] Harry's Cadillac interpreted specific language within a specific insurance policy. See Harry's Cadillac, 126 N.C. App at 702, 486 S.E.2d at 252 (stating its holding as to "the language of the business interruption clause of the policy" (emphasis added)). Thus, the court rejects Illinois Union's argument that, in Harry's Cadillac, the North Carolina Court of Appeals held, as a categorical matter, that North Carolina law precludes all business-interruption provisions that cover more than physical loss or damage. See [D.E. 25] 10–12. Nevertheless, because the provisions at issue in Harry's Cadillac are materially indistinguishable to those here, Harry's Cadillac governs.

11

or loss be without any intervening factors or intermediaries (i.e., that it be direct).

The "Period of Recovery" provision, which applies to the "Business Interruption" provision, bolsters the court's reading of the "Loss of Ingress or Egress" and "Business Interruption" provisions. The "Period of Recovery" provision states:

> [The] "Time Element" as defined in 'Business Interruption,' . . . [s]hall not exceed such length of time required with the exercise of due diligence and dispatch to rebuild, repair, or replace lost, damaged or destroyed property and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the loss . . . .

[D.E. 17-1] 56. This provision limits the length of recovery for business interruptions to that period of time necessary to rebuild, repair, or replace damaged or lost property so that the property is restored to the "same . . . operating conditions that existed prior to the loss." Id. This language presupposes a direct, tangible alteration to property requiring repair or replacement before the property is usable again. See Summit Hosp., 2021 WL 831013, at *4 (interpreting similarly a provision for time to "rebuild, repair, or replace"). The "Period of Recovery" provision comports with a reading of the "Loss of Ingress and Egress" and "Business Interruption" clauses that requires a showing of tangible, physical loss, damage, or destruction. The court "harmoniously construe[s]" these policy provisions consistently with each other. Gaston Cnty. Dyeing Mach. Co., 351 N.C. at 299–300, 524 S.E.2d at 563; see Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175; Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. In contrast, adopting Golden Corral's reading would undermine the "Period of Recovery" clause and render it "ineffective, which is something the Court cannot do." Summit Hosp., 2021 WL 831013, at *4 (explaining the effect of the plaintiff's reading on a similar period-of-recovery provision).

The North Carolina Court of Appeals' decision in Great American Insurance Co. v. Mesh Café, Inc., 158 N.C. App. 312, 580 S.E.2d 431, 2003 WL 21267942 (2003) (unpublished table

decision), does not help Golden Corral. In Mesh Café, the relevant language covered business-interruption losses "result[ing] from direct physical loss or damage by a Covered Cause of Loss." Id. at *1 (quotation omitted and emphasis omitted). The court construed the conjunction "or" as separating "direct physical loss" from "damage by a Covered Cause of Loss," so that "damage by a Covered Cause of Loss" need not be direct or physical. See id. at *2. The insured's financial losses in that case flowed from electricity and water shut-offs after a hurricane. See id. at *1. Notably, the policy expressly enumerated damage to water and electricity supplies as covered causes of loss. See id. In contrast, the provisions at issue here do not contain an analogous "or." Moreover, because the policy does not define physical loss, damage, and destruction, there is no specific, enumerated list of covered causes to consider. Thus, the plain meaning controls. Moreover, the phrase "by a peril insured" qualifies the "physical loss, damage or destruction" language. The policy specifically defines that phrase to include all risks pertaining to direct physical loss, damage, and destruction. See [D.E. 17-1] 42. Accordingly, the policy provisions are confined to tangible, physical harms and losses.[4]

Golden Corral failed to plausibly allege tangible, physical harm to covered property or a tangible loss of covered property. And it has failed to plausibly allege such harm to or loss of property within five miles of an insured location that prevents ingress or egress to that location. At most, Golden Corral has alleged that "COVID-19 physically affects and damages all with which it comes in[to] contact." Am. Compl. ¶ 29. This contention amounts to a threadbare legal conclusion of what the policy allegedly covers. See Iqbal, 556 U.S. at 678. Moreover, Golden Corral does not

_____

[4] Even if Mesh Café did conflict with this court's interpretation of the policy in this case, it is an unpublished decision. In contrast, the North Carolina Court of Appeals' decision in Harry's Cadillac is a published decision that applies to this case. Sitting in diversity, this court must follow Harry's Cadillac. See Toloczko, 728 F.3d at 398.

13

Case 5:20-cv-00349-D   Document 39   Filed 09/08/21   Page 13 of 23

plausibly allege the COVID-19 virus damaged physical property in its restaurants or that Golden Corral lost any covered property due to COVID-19. Golden Corral also does not plausibly allege that physical harm to or loss of nearby property prevented ingress or egress to its insured locations. Furthermore, although virus particles may have landed on some of Golden Corral's covered property or nearby property, Golden Corral still has its property and COVID-19 has not caused the property to need rebuilding, repair, or replacement. Simply put, the virus did not change the physical condition of the property.

As for the "Business Interruption" provision specifically, Golden Corral has not plausibly alleged a time period when the property needed rebuilding, repair, or replacement. Although Golden Corral alleges it had to suspend its business operations "on or about March 20, 2020," it has not alleged when that period ended. Assuming the period is ongoing, Golden Corral has not plausibly alleged what rebuilding, repairs, or replacements were needed. In fact, Golden Corral has not alleged that its covered property even needed cleaning due to COVID-19. See [D.E. 25] 21; cf. Am. Compl. As for the "Loss of Ingress or Egress" provision, because Golden Corral has not plausibly alleged tangible physical damage to or loss of covered property or property within five miles of an insured location, any loss of ingress or egress Golden Corral has experienced at its restaurants is not "a result of" physical damage or loss.

Golden Corral has failed to plead facts showing claims covered under either the "Loss of Ingress or Egress" or "Business Interruption" provisions. Thus, the court grants Illinois Union's motion for judgment on the pleadings as to Golden Corral's claims arising under those two provisions.

## B.

Illinois Union argues that Golden Corral has not plausibly alleged that the "Interruption by

14

Civil or Military Authority" clause covers its financial losses. In relevant part, that clause insures against a "'Time Element' loss sustained during the period of time when, as a result of direct physical loss, damage or destruction or imminent loss by a peril insured by this Policy . . . normal business operations are interrupted or reduced because access . . . is prevented or impaired by order of civil or military authority." [D.E. 17-1] 113. Golden Corral responds that because the phrase "imminent loss" is separated from the phrase "direct physical loss, damage or destruction," the court must construe it separately from the latter phrase. See [D.E. 31] 13–16.

The court agrees to construe these phrases separately. See Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175–76; Se. Airmotive Corp., 78 N.C. App. at 420, 337 S.E.2d at 169; see also Mesh Café, 2003 WL 21267942, at *2. However, the meaning of "direct physical loss, damage or destruction," taken separately from "imminent loss," has the same meaning as the similar language in the "Loss of Ingress or Egress" and "Business Interruption" provisions. Accordingly, Golden Corral has similarly failed to plead facts that would warrant relief under the physical-loss-and-damage clause of the "Interruption by Civil or Military Authority" provision.

As for the "imminent loss" language, the parties dispute whether Golden Corral has pleaded facts sufficient to state a claim for relief under the "imminent loss" language. Illinois Union argues that the policy qualifies "imminent loss" with the phrase "from a peril insured," and therefore "still require[s] a plausible showing of a loss caused by 'direct physical loss, damage or destruction.'" [D.E. 25] 8; see [D.E. 32] 2–3. Golden Corral disagrees, urging the court to focus on the term "imminent loss," which it contends means "harm resulting from separation or failure to utilize that may possibly occur in the future." [D.E. 31] 11. Golden Corral bolsters this argument by noting that the Insuring Agreement qualifies its definition of the perils insured with the phrase "to the extent more fully described in this Policy." Id. at 15 (quotation omitted); see [D.E. 17-1] 42. Golden

15

Corral then argues that the plain meaning of "imminent loss" more fully describes what the policy insures against. See [D.E. 31] 15.

The policy does not define the terms "imminent" or "loss." "Imminent" means "impending threateningly" or "close at hand in its incidence." Imminent, Oxford English Dictionary (online ed.). The court rejects Golden Corral's argument that "imminent loss" means a loss that "may possibly occur in the future." [D.E. 31] 11. Definitions such as "impending threateningly" and "close at hand" connote more than mere possibility. Rather, they suggest something that is near and about to happen. Moreover, as discussed, "loss" means "[p]erdition, ruin, destruction; the condition or fact of being 'lost', destroyed, or ruined." Loss, Oxford English Dictionary (online ed.). Or it can mean "destruction, ruin" or "the act or fact of being unable to keep or maintain something or someone." Loss, Merriam-Webster Dictionary (online ed.). Accordingly, the policy covers a time element during which "normal business operations are interrupted or reduced" because of an "order of civil or military authority" promulgated as a result of an impending destruction or factual inability to keep something. [D.E. 17-1] 113.

In opposition, Golden Corral emphasizes Merriam-Webster's fourth definition of "loss": a "failure to gain, win, obtain, or utilize." [D.E. 31] 11 (quotation omitted). Although Golden Corral cites and uses this definition, Golden Corral provides no persuasive argument for why the court should use this definition in this context. See Accardi v. Hartford Underwriters Ins. Co., 373 N.C. 292, 295, 838 S.E.2d 454, 457 (2020) ("[I]f the [insurance] policy fails to define a term, the court must define the term in a manner that is consistent with the context in which the term is used, and the meaning accorded to it in ordinary speech." (emphasis added)); Wachovia Bank & Tr., 276 N.C. at 354, 172 S.E.2d at 522. Using Golden Corral's definition to define "imminent loss" would require the court also to use it to define "physical loss" and "direct physical loss" because the court must

16

construe terms harmoniously.  See Gaston Cnty. Dyeing Mach. Co., 351 N.C. at 299–300, 524

S.E.2d at 563; Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175; Mizell, 138 N.C. App. at

532, 530 S.E.2d at 95.  The policy, however, lists "direct physical loss" and "physical loss" alongside

"damage" and "destruction."  [D.E. 17-1] 52, 113–14.[5]  Generally, the principle that "associated

words explain and limit each other" applies "to all written instruments."  Jeffries v. Cnty. of Harnett,

259 N.C. App. 473, 493, 817 S.E.2d 36, 50 (2018) (quotations and citation omitted).  Defining "loss"

as a "failure to . . . utilize" does not comport with "damage" and "destruction."  "Damage" indicates

"injury, harm; esp[ecially] physical injury to a thing, such as impairs its value or usefulness."

Damage, Oxford English Dictionary (online ed.) (emphasis omitted).  And "destruction" means

"[t]he action of destroying; the fact or condition of being destroyed: the opposite of construction."

Destruction, Oxford English Dictionary (online ed.) (emphasis omitted).  Given these definitions,

this court's understanding of "loss" as "perdition, ruin, destruction" and "the act or fact of being

unable to keep or maintain something" is more apt in this context than the "failure to . . . utilize"

something.  And to construe the policy terms harmoniously, "loss" should have the same semantic

meaning in "imminent loss" as it does in "direct physical loss" and "physical loss."

     Even interpreting "imminent loss" independently of the preceding phrase "direct physical

loss, damage or destruction," the court cannot divorce the phrase "imminent loss" from the

qualifying phrase immediately following it.  That phrase specifies that covered imminent losses are

those resulting from "a peril insured by this Policy."  [D.E. 17-1] 113.  The Insuring Agreement

defines insured perils as "'all risks' of direct physical loss, damage or destruction."  Id. at 42.  Thus,

---

[5] Again, the "Interruption by Civil or Military Authority" and "Loss of Ingress and Egress"
clauses specify "direct physical loss."  The "Business Interruption" provision specifies "physical
loss."  [D.E. 17-1] 52, 113–14.

interruptions in normal business operations attributable to a civil order must be the result of imminent loss arising from a risk of direct physical loss, damage, or destruction. Stated differently, imminent loss is inextricably connected to risks of tangible, physical harm to and loss of property. Moreover, this construction does not deprive of meaning the Insuring Agreement's specification that the "all risks" language is qualified "to the extent more fully described in this Policy." Rather, "imminent loss" adds a temporal component to the "all risks" language. The language specifies a loss that is in the future but is looming and impending. This construction also does not change the requirement that the covered risk creating the future loss must be one "of direct physical loss, damage or destruction."

In contrast, adopting Golden Corral's definition of "loss" and interpreting it alongside the qualifying phrase "by a peril insured" inverts the causal chain in the "Interruption by Civil or Military Authority" provision. The provision covers a time period when (1) "normal business operations are interrupted or reduced," (2) "because access to that [insured] 'location' is prevented or impaired," (3) "by order of civil or military authority," (4) "as a result of . . . imminent loss by a peril insured by this Policy." Id. at 113. The provision contemplates that the civil order responds to the imminent loss created by a peril insured under the policy. Defining "loss" as a "failure to . . . utilize" makes little sense in this context because it is unclear how Golden Corral's inability to use its properties creates the need for a civil order restricting access. Rather, Golden Corral's inability to use its property is a consequence of the civil order. See Compl. ¶¶ 32–38.

To survive Illinois Union's motion for judgment on the pleadings, Golden Corral must have plausibly alleged that the civil orders causing its restaurant closures were responding to an impending threat of physical, tangible loss. Golden Corral must also have plausibly alleged that this impending threat of loss came from a type of risk that would create direct physical loss, damage, or

18

destruction. Golden Corral's pleadings, however, fall short. Golden Corral pleaded facts showing its normal business operations were disrupted due to orders promulgated by civil authorities. See id. But Golden Corral has not pleaded facts showing that civil authorities promulgated the orders in response to an impending threat of physical, tangible loss to covered property or property within five miles of an insured location that has disrupted Golden Corral's business operations. Accordingly, the court grants Illinois Union's motion for judgment on the pleadings as to all claims under the "Interruption by Civil or Military Authority" provision.

## C.

Many courts have grappled with whether policies covering physical loss and damage cover financial losses occasioned by disruptions caused by COVID-19. "The great weight of decisions recently considering this issue in the midst of the current pandemic" have defined "physical loss" to "apply to property destroyed by some force" and "physical damage" to mean "a lesser extent of harm short of destruction or ruin." Bluegrass Oral Health Ctr., PLLC v. Cincinnati Ins. Co., No. 1:20-CV-00120-GNS, 2021 WL 1069038, at *4 (W.D. Ky. Mar. 18, 2021) (unpublished) (collecting cases); see Kingray Inc. v. Farmers Grp. Inc., No. EDCV 20-963 JGB (SPx), 2021 WL 837622, at *1–2 (C.D. Cal. Mar. 4, 2021) (collecting cases); see also [D.E. 25] 14–17 (collecting cases).

Other courts have held that language similar to the provisions here does not require physical damage so long as the property has "been rendered uninhabitable or unusable for its intended purpose." [D.E. 31] 19–22 (collecting cases); see Kingray, 2021 WL 837622, at *2–3 (collecting cases); Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co., 506 F. Supp. 3d 360, 372–76 (E.D. Va. 2020) (collecting cases).[6]

---

[6] The North Carolina Superior Court's decision in North Deli, LLC v. Cincinnati Ins. Co., No. 20-CVS-02569 (N.C. Super. Ct. Oct. 9, 2020) (unpublished) [D.E. 25-1], is not binding. See King

After considering these divergent views, the court agrees with those courts holding that provisions requiring "direct physical loss, damage or destruction" and "physical loss, damage or destruction" require a showing of actual, tangible harm or loss. The plain meaning of these provisions supports this interpretation. Although ambiguity is construed to favor the insured, ambiguity does not arise merely because the parties disagree on the meaning. See Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. Consistent with the majority of other courts to have considered the issue, the court holds that the disputed provisions are not ambiguous.[7]

## IV.

Illinois Union argues that Golden Corral has not plausibly alleged that Illinois Union breached its implied covenant of good faith and fair dealing. See [D.E. 25] 28–29. Golden Corral did not respond to Illinois Union's arguments, except to remind the court that it alleged the claim. See [D.E. 31] 1–2.

Contracts contain in their implied terms "the basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform [its] obligations under the agreement." Maglione v. Aegis Fam. Health Ctrs., 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005); see Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228–29, 333 S.E.2d 299, 305 (1985). Where parties have executed a written contract, an action for "breach of the covenant of good faith and fair dealing is part and parcel of a claim for breach of contract."

---

v. Ord. of United Com. Travelers of Am., 333 U.S. 153, 161 (1948); Twin City Ins. Co., 433 F.3d at 370. Moreover, North Deli is not persuasive given the Superior Court's failure to cite, much less follow, Harry's Cadillac.

[7] In light of this conclusion, the court need not resolve the parties' dispute about the "Pollution, Contamination" exclusion. Even if the court adopted Golden Corral's position on that exclusion, Illinois Union would still be entitled to judgment on the pleadings.

20

McKinney v. Nationstar Mortg., LLC, No. 5:15-CV-637-FL, 2016 WL 3659898, at *8 (E.D.N.C. July 1, 2016) (unpublished) (quotation and alteration omitted); see Murray v. Nationwide Mut. Ins. Co., 123 N.C. App. 1, 19, 472 S.E.2d 358, 368 (1996). Accordingly, when a court rejects a breach of contract claim, it generally rejects any claim for breach of the covenant of good faith and fair dealing contained in the contract. See Florez v. Freedom Mortg. Corp., No. 5:18-CV-22-BO, 2018 WL 3978171, at *2 (E.D.N.C. Aug. 20, 2018) (unpublished), aff'd, 776 F. App'x 185 (4th Cir. 2019) (per curiam) (unpublished); SunTrust Bank v. Bryant/Sutphin Props., LLC, 222 N.C. App. 821, 833, 732 S.E.2d 594, 603 (2012); Maglione, 168 N.C. App. at 56, 607 S.E.2d at 291.

North Carolina law recognizes a "separate claim for breach of an implied covenant of good faith and fair dealing only in limited circumstances involving special relationships between parties, [such as] cases involving contracts for funeral services and insurance." Ada Liss Grp. (2003) v. Sara Lee Corp., No. 1:06CV610, 2009 WL 3241821, at *13 n.10 (M.D.N.C. Sept. 30, 2009) (unpublished) (quotation omitted), report and recommendation adopted, 2010 WL 3910433 (M.D.N.C. Apr. 27, 2010) (unpublished). In the insurance context, a claim for breach of the covenant of good faith and fair dealing requires three elements: "1) a refusal to pay after recognition of a valid claim; 2) bad faith; and 3) aggravating or outrageous conduct." LRP Hotels of Carolina, LLC v. Westfield Ins. Co., No. 4:13-CV-94-D, 2014 WL 5581049, at *4 (E.D.N.C. Oct. 31, 2014) (unpublished) (quotations omitted); see Michael Borovsky Goldsmith LLC v. Jewelers Mut. Ins. Co., 359 F. Supp. 3d 306, 314 (E.D.N.C. 2019); Gandecha v. Metro. Prop. & Cas. Ins. Co., No. 5:13-CV-688-F, 2014 WL 4243797, at *5 (E.D.N.C. Aug. 26, 2014) (unpublished). "Bad faith means not based on honest disagreement or innocent mistake. Aggravated conduct is defined to include fraud, malice, gross negligence, insult . . . willfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights." Topsail Reef

21

Homeowners Ass'n v. Zurich Specialities London, Ltd., 11 F. App'x 225, 239 (4th Cir. 2001) (per curiam) (unpublished) (quotations and citation omitted); see Blis Day Spa, LLC v. Hartford Ins. Grp., 427 F. Supp. 2d 621, 631 (W.D.N.C. 2006); Michael Borovsky, 359 F. Supp. 3d at 314.

Golden Corral has failed to plausibly allege a claim for breach of the covenant of good faith and fair dealing. First, Golden Corral does not have valid breach of contract claims under this policy. Thus, although Golden Corral pleaded Illinois Union's denial of its claims, see Am. Compl. ¶ 66, it was not denial of valid claims creating a breach of contract. Accordingly, Golden Corral failed to plead facts supporting the first element. Second, Golden Corral has not plausibly alleged bad faith as a result of an illegitimate disagreement between it and Illinois Union over Golden Corral's claims. Cf. id. ¶¶ 80–94. Rather, the disagreement was both legitimate and merited. Thus, Golden Corral failed to plead the second element.

Finally, Golden Corral has not plausibly alleged aggravating or outrageous conduct. Of course, Golden Corral alleges that Illinois Union failed to communicate promptly about Golden Corral's claims, failed to seek investigatory information, and failed to provide a sufficient explanation for its denial. See id. ¶¶ 86–90. Nonetheless, accepting these allegations as true, Illinois Union's silence was not outrageous or otherwise aggravating given that Golden Corral filed this lawsuit just two days after submitting its claims to Illinois Union. See [D.E. 25] 29 n.16. As a matter of law, Illinois Union's alleged failures were not aggravating or outrageous conduct. Accordingly, the court grants Illinois Union's motion for judgment on the pleadings concerning Golden Corral's claim for breach of the implied covenant of good faith and fair dealing.

## V.

In sum, the court GRANTS Illinois Union's motion for judgment on the pleadings [D.E. 24] and DISMISSES WITH PREJUDICE Golden Corral's amended complaint [D.E. 15]. Additional

22

JA526

amendments would be futile. The court DENIES as moot defendant's motion to stay discovery [D.E.

26]. The clerk shall close the case.

SO ORDERED. This _8_ day of September, 2021.

JAMES C. DEVER III
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

GOLDEN CORRAL CORP., and GOLDEN    )
CORRAL FRANCHISING SYSTEMS, INC.,  )
                                   )
                    Plaintiffs,    )
                                   )                    **JUDGMENT IN A**
v.                                 )                    **CIVIL CASE**
                                   )                    **CASE NO. 5:20-CV-349-D**
ILLINOIS UNION INSURANCE COMPANY,  )
                                   )
                    Defendant.     )

**Decision by Court.** This action came before this Court for ruling as follows.

**IT IS ORDERED, ADJUDGED, AND DECREED** that the court GRANTS Illinois Union's motion for judgment on the pleadings [D.E. 24] and DISMISSES WITH PREJUDICE Golden Corral's amended complaint [D.E. 15]. Additional amendments would be futile. The court DENIES as moot defendant's motion to stay discovery [D.E. 26].

**This Judgment Filed and Entered on September 8, 2021, and Copies To:**

| | |
|---|---|
| Gregg E. McDougal | (via CM/ECF electronic notification) |
| James B. Gillespie, Jr. | (via CM/ECF electronic notification) |
| Lawrence Russell Duke | (via CM/ECF electronic notification) |
| William R. Hartzell | (via CM/ECF electronic notification) |
| James M. Bauer | (via CM/ECF electronic notification) |
| Robert W. Fisher | (via CM/ECF electronic notification) |
| Jennifer A. Welch | (via CM/ECF electronic notification) |
| Theodore B. Smyth | (via CM/ECF electronic notification) |

DATE:                              PETER A. MOORE, JR., CLERK

September 8, 2021                  (By) /s/ Nicole Sellers

                                  Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No.: 5:20-CV-00349-D

| | |
|---|---|
| GOLDEN CORRAL CORP. and GOLDEN CORRAL FRANCHISING SYSTEMS, INC., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ILLINOIS UNION INSURANCE COMPANY, | ) ) ) |
| Defendant. | ) ) ) |

## NOTICE OF APPEAL

Notice is hereby given that Golden Corral Corp. and Golden Corral Franchising Systems, Inc., plaintiffs in the above-captioned case, hereby appeal to the United States Court of Appeals for the Fourth Circuit from the Judgment of the United States District Court for the Eastern District of North Carolina, entered in this case on September 8, 2021 [D.E. 40], and from any and all orders, rulings, findings, and conclusions underlying and related to the judgment.

[SIGNATURE PAGE TO FOLLOW]

1

This the 6th day of October 2021.

THE MCDOUGAL LAW FIRM, PLLC

By:    /s/ *William R. Hartzell* _____
       Gregg E. McDougal NCSB # 27290
       Lawrence R. Duke NCSB # 49726
       William R. Hartzell, NCSB # 50762
       316 W. Edenton Street, Suite 100
       Raleigh, North Carolina 27603
       Telephone: (919) 893-9500
       Facsimile: (919) 893-9510
       gregg@themcdougallawfirm.com
       lawrence@themcdougallawfirm.com
       will@themcdougallawfirm.com

       *Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No.: 5:20-cv-349-D

| | |
|---|---|
| GOLDEN CORRAL CORP. and COLDEN CORRAL FRANCHISING SYSTEMS, INC. | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ILLINOIS UNION INSURANCE COMPANY, | ) ) ) |
| Defendant. | ) ) |

## <u>PLAINTIFFS' RULE 60(B)(6) MOTION</u>

NOW COMES, Plaintiffs Golden Corral Corp. and Golden Corral Franchising Systems, Inc. (collectively, "Plaintiffs"), who move this court, pursuant to Federal Rule of Civil Procedure 60(b)(6) for relief from the judgment entered against them on September 8, 2021 (D.E. 40). On December 13, 2024, the Supreme Court of North Carolina unanimously decided *North State Deli, LLC et al. v. Cincinnati Ins. Co. et al.*, 908 S.E.2d 802 (N.C. 2024), and provided controlling authority that an insured suffers "direct physical loss" when an insured lost its use of its properties due to government orders issued in response to the COVID-19 pandemic, in direct contradiction of this Courts' ruling. *North State Deli* case became effective when the mandate was issued twenty days later, on January 2, 2025. Due to the opinion in *North State Deli*, parties bringing similar claims under the same transaction or occurrence are receiving different treatment in state and federal court, violating a core tenant of *Erie*. For this reason and those set forth more fully in the

attached supporting memorandum of law, Plaintiffs respectfully request that this Court vacate the

judgment entered against it pursuant to Federal Rule of Civil Procedure 60(b)(6).

This the 31st day of January 2025.

                                    **MCDOUGAL HARTZELL, PLLC**

                          By:    /s/ William R. Hartzell
                                 Gregg E. McDougal NCSB # 27290
                                 William R. Hartzell, NCSB # 50762
                                 3737 Glenwood Ave, Suite 170
                                 Raleigh, North Carolina 27612
                                 Telephone: (919) 893-9500
                                 Facsimile: (919) 893-9510
                                 gregg@themcdougallawfirm.com
                                 will@themcdougallawfirm.com

                                 *Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No.: 5:20-cv-349-D

GOLDEN CORRAL CORP. and )
COLDEN CORRAL FRANCHISING )
SYSTEMS, INC. )
                         )
           Plaintiffs, )
                         )
      v. )
                         )
ILLINOIS UNION INSURANCE )
COMPANY, )
                         )
           Defendant. )
                         )

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF ITS RULE 60(B)(6) MOTION

Pursuant to Federal Rule of Civil Procedure 60(b)(6), Plaintiffs Golden Corral Corp. ("Golden Corral") and Golden Corral Franchising Systems, Inc. (collectively, "Plaintiffs") have moved this Court for relief from the judgment entered against Plaintiffs on September 8, 2021 (DE. 40).

## NATURE OF THE CASE

On December 13, 2024, the Supreme Court of North Carolina unanimously decided *North State Deli, LLC et al. v. Cincinnati Ins. Co. et al.*, 908 SE2d 8 02 (NC. 2024), and provided controlling authority that an insured suffers "direct physical loss" when an insured lost its use of its properties due to government orders issued in response to the COVID-19 pandemic. The case became effective when the mandate was issued twenty days later, on January 2, 2025. *North State Deli* involved the materially same policy language ("direct physical loss"), the same type of government orders arising out of the COVID-19 pandemic, and the same occurrence of loss as in

1

this matter. Notably, Illinois Union has admitted to the Fourth Circuit that the policy language in *North State Deli* is "materially identical to that at issue here." Illinois Union's Citation of Supplemental Authorities (attached hereto as "Exhibit A"). While not every development in law justifies Rule 60 relief, this matter involves extraordinary circumstances as related cases are resulting in divergent judgments in state and federal court.

## STATEMENT OF THE FACTS

Golden Corral is the nation's largest grill-buffet chain with restaurants operating in forty states. D.E. 15 ¶ 11. On or about March 31, 2019, Illinois Union issued Golden Corral an "all-risks" insurance policy, number D4226555A 001 (the "Policy"), which provides coverage for business interruption and for the losses to gross revenues, royalties, rental income, and extra expenses related thereto with a maximum Limit of Liability of Fifty Million Dollars and 00/100 ($50,000,00000). D.E. 15 ¶¶ 16-19.

The Policy includes the following applicable provisions:

**II.   INSURING AGREEMENT**

> … [T]he Insurer … does insure the interest of the Insured named in the Declarations and its legal representatives, to the extent more fully described in this Policy, against 'all risks' of direct physical loss, damage or destruction, occurring during the Policy period, except hereinafter excluded, of the property described and insured in this Policy.

<p style="text-align:center">* * *</p>

**V.   TIME ELEMENT**

**1.   BUSINESS INTERRUPTION**

> 1.   This Policy insures loss resulting from the necessary interruption or reduction of business operations conducted by the Insured and caused by physical loss, damage or destruction, by a peril insured by this Policy, of property insured.

2

D E. 17-1 pp. 42, 52.

On May 14, 2020, Plaintiffs filed suit in North Carolina state court seeking a declaration that these coverages applied to losses it suffered when Plaintiffs' business operations were impaired by the COVID-19 viral pandemic and by civil authorities' measures to limit the pandemic's spread. D E. 1-1. Illinois Union then removed the action to federal court. D E. 1. On August 28, 2020, after Illinois Union denied coverage for Plaintiffs claims, Plaintiffs filed an Amended Complaint adding additional causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. D E. 15. Illinois Union answered the Amended Complaint and then filed a Motion for Judgment on the Pleadings. D E. 24.

This Court granted Illinois Union's Motion for Judgment on the Pleadings. D E. 38. In granting the motion, this Court concluded that "the policy provisions are confined to tangible, physical harms and losses." D E. 39 p. 13. In reaching this conclusion, the Court analyzed the plain meaning of various terms and determined that "the phrases 'direct physical loss, damage or destruction' and 'physical loss, damage or destruction' require tangible, physical harm or destruction to covered property or tangibly losing covered property as a result of a peril insured." D E. 39 pp. 10-11. The Court further relied upon the Policy's "Period of Recovery" provision and reasoned that the provision "presupposes a direct, tangible alteration to property requiring repair or replacement before the property is useable again." D E. 39 p. 12. The Court further reasoned that this provision "comports with a reading of the … 'Business Interruption' clause[] that requires a showing of tangible, physical loss, damage, or destruction." D E. 39 p. 12. Thus, this Court held that Plaintiffs failed to allege the needed tangible, physical harms and losses needed to trigger the Business Interruption provision. D E. 39 p. 13.

3

On October 6, 2021, Plaintiffs appealed to the Fourth Circuit. D.E. 41. During the appeal, Illinois Union submitted a Federal Rule of Appellate Procedure 28 (j) letter "to bring to the panel's attention four recent decisions that directly address the issues pending" on appeal. Exhibit A. Illinois Union specifically brought the panel's attention to the *North State Deli et al.* North Carolina Court of Appeals decision:

> In ***North State Deli et al. v. Cincinnati Insurance Company***, -- SE2d --, 2022 WL 2432157 (NC. Ct. App. 2022), the North Carolina Court of Appeals reversed a trial court determination cited by Appellants. The Court held that policy language materially identical to that at issue here did not provide "coverage for business interruption losses due to COVID-19 governmental orders because there is no direct physical loss or damage to the insured property." *Id.* at *2. Allegations of "a general 'loss of use'" did not suffice. *Id.*

Exhibit A p. 1. Most notably, Illinois Union admitted that the policy language in *North State Deli* is "materially identical to that at issue here." Exhibit A p. 1. The Fourth Circuit entered a per curiam opinion affirming. *Golden Corral Corp. v. Illinois Union Ins. Co.*, No. 21-2119, 2022 WL 3278938 ,at *1 (4th Cir. Aug. 11, 2022). Plaintiffs sought en banc review, which was denied.

On December 13, 2024, the North Carolina Supreme Court unanimously decided that a restaurant has alleged "direct physical loss" for purposes of an insurance policy when they alleged loss of use. *N. State Deli, LLC v. Cincinnati Ins. Co.*, 908 SE2d 802, 810 (NC. 2024). Specifically, the North Carolina Supreme Court held that "[p]roperty 'loss' surely occurs when it is no longer usable for its insured purpose, as a policyholder would reasonably expect. Thus[,] when the restaurants lost physical use of their properties as restaurants due to the pandemic orders, they experienced a direct physical loss." *Id.* The mandate for *North State Deli* was issued on January 2, 2025. *See* NC. R. App. P. 32. The related case of *North State Deli* was originally filed on May 9, 2020 and began at roughly the same time as this matter.

4

**ARGUMENT**

Federal Rule of Civil Procedure 60(b) enables a court to provide relief from a final judgment under six different sets of circumstances. Rule 60(b)'s "whole purpose is to make an exception to finality." *Gonzalez v. Crosby*, 545 US. 524, 529 (2005). Further, Rule 60(b) "should be broadly construed to do 'substantial justice.'" *Nemaizer v. Baker*, 793 F2d 58, 61 (2d Cir. 1986) (citations omitted). As explained below, the judgment in this case should be vacated under Rule 60(b)(6).

### I. THE JUDGMENT MUST BE VACATED UNDER RULE 60(b)(6).

Pursuant to Rule 60(b)(6), "[o]n motion and just terms, the court may relieve a party … from a final judgment, order, or proceeding for the following reasons: … (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Rule 60(b)(6) "has been described as the 'catch-all' clause because it provides the court with 'a grand reservoir of equitable power to do justice in a particular case' and 'vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice' where relief might not be available under any other clause in 60(b)." *Compton v. Alton S.S. Co., Inc.*, 608 F2d 96, 106-07 (4th Cir. 1979) (citations omitted); *Harman v. Pauley*, 678 F2d 479, 480 (4th Cir. 1982)("[Rule 60(b)(6)] gives the court such authority to accomplish justice and leaves such determinations to its discretion."). Rule 60(b) is to be given "liberal and remedial construction." *Nisson v. Lundy*, 975 F2d 802, 807 (11th Cir. 1992). Accordingly, Rule 60(b) "should be liberally construed when substantial justice will be thus served." *Pierce v. Cook & Co.*, 518 F2d 720, 722 (10th Cir. 1975) (quoting *Radack v. Norwegian America Line Agency, Inc.*, 318 F2d 538, 542 (2nd Cir. 1963)).

To be entitled to Rule 60(b)(6) relief, a movant must demonstrate (1) timeliness, (2) a meritorious defense, (3) lack of unfair prejudice to the opposing party, and (4) entitlement to relief

5

under one of the six categories listed in Rule 60(b). *Dowell v. State Farm Fire & Cas. Auto Ins. Co.*, 993 F2d 46, 48 (4th Cir. 1993). The Fourth Circuit will grant Rule 60(b)(6) motions when the movant establishes "extraordinary circumstances." *Aikens v. Ingram*, 652 F3d 496, 500 (4th Cir. 2011). Each of these four factors are addressed in turn below.

### a.   Plaintiffs' Motion Is Timely.

The timeliness of a Rule 60(b)(6) motion premised on developments in related cases is measured against the point in time when the party has grounds to make a Rule 60(b)(6) motion, not the amount of time since the entry of the judgment. *See Byone v. Baca*, 966 F3d 972, 980 (9th Cir. 2020). Here, the North Carolina Supreme Court opinion in *North State Deli* was issued on December 13, 2024, with the mandate becoming effective on January 2, 2025. Accordingly, this motion is timely as it came soon after the issuance of the *North State Deli* mandate.

### b.   Plaintiffs' Possess a Meritorious Defense to Illinois Union's Motion to for Judgment on the Pleadings.

Rule 60(b) relief requires a meritorious defense. A "Rule 60(b) motion will not be granted unless the movant 'can demonstrate a meritorious claim or defense' to the motion upon which the district court dismissed the complaint." *Murray v. D.C.*, 52 F3d 353, 355 (DC. Cir. 1995) (quoting *Lepowski v. U.S. Dep't of Treasury*, 804 F2d 1310, 1314 (DC. Cir. 1986)).

Illinois Union filed a motion for judgment on the pleadings and argued that "[u]nder North Carolina law, business-interruption coverage such as Plaintiffs seek here is not available unless there has been some *physical* harm or damage giving rise to the claim." DE. 25 p. 10 (emphasis in original). Illinois Union further clarifies that "[T]he Policy only covers losses associated with a tangible harm to property." DE. 25 p. 21. This argument has been directly contradicted by the recent unanimous opinion of the North Carolina Supreme Court: *N. State Deli, LLC v. Cincinnati Ins. Co.*, 908 SE2d 802, 808 (NC. 2024).

6

As an initial matter, North Carolina law controls this dispute.[1] Under *Erie*, federal courts must apply North Carolina law as interpreted by the North Carolina Supreme Court. *See, e.g., Stahle v. CTS Corp.*, 817 F3d 96, 100 (4th Cir. 2016).

In *North State Deli*, the North Carolina Supreme Court unanimously ruled that loss of use of property due to governmental orders in response to COVID-19 constituted "direct physical loss." *N. State Deli, LLC v. Cincinnati Ins. Co.*, 908 SE2d 802,810 (NC. 2024). In reaching this conclusion, the North Carolina Supreme Court first articulated the various North Carolina rules of contract interpretation, including the specific rules that apply to the interpretation of insurance contracts. In summarizing the rules, the court stated "[p]ut simply, because of these rules, insurance companies know they must clearly 'mark out and designate' the contours of their policy and that 'it is not the function of the court to sprinkle sand upon the ice by strict construction of the [otherwise slippery] term." *N. State Deli, LLC v. Cincinnati Ins. Co.*, 908 SE2d 802,809 (NC. 2024) (brackets in original).

Turning to the policy in *North State Deli*, the North Carolina Supreme Court consulted standard, nonlegal dictionaries and determined that the phrase "direct physical loss" occurs when a "loss …, absent an intervening factor, result[s] in the material deprivation, dispossession, or destruction of property." *N. State Deli, LLC v. Cincinnati Ins. Co.*, 908 SE2d 802,810 (NC. 2024). The North Carolina Supreme Court continues:

> Contrary to Cincinnati's arguments, though, we fail to see why the ordinary meaning of "direct physical loss" is entirely insensitive to the "use" for which a property is insured. Again, by analogy, the homeowner who cannot live in their house due to irremediable cat urine odor is not placated that their property is not "lost" because it could be used as a home for cats. *See Mellin v. N. Sec. Ins. Co.*, 167 N.H. 544, 115 A3d 799, 805 (2015) (concluding that "physical loss to property" could include loss resulting from persistent cat urine odor which rendered a property "temporarily or permanently unusable or uninhabitable"). This overlap

---

[1] Illinois Union agrees that North Carolina law applies. DE. 25 p. 7.

between property "use" and "loss" follows from a contextual and common-sense expectation that insurance should protect from threats to property that make it unusable for the purpose for which it is insured. Property "loss" surely occurs when it is no longer usable for its insured purpose, as a policyholder would reasonably expect. **<u>Thus when the restaurants lost physical use of their properties as restaurants due to the pandemic orders, they experienced a direct physical loss.</u>**

*N. State Deli, LLC v. Cincinnati Ins. Co.*, 908 SE2d 802,810 (NC. 2024) (emphasis added). The court further emphasized that the loss of use need not be a full deprivation of access, but rather a mere interference with the "income-earning power of their business." *See N. State Deli, LLC v. Cincinnati Ins. Co.*, 908 SE2d 802,812 (NC. 2024).

The court further reasoned that Cincinnati Insurance "could have provided a narrower definition of 'direct physical loss' for this business income coverage. It did not." *N. State Deli, LLC v. Cincinnati Ins. Co.*, 908 SE2d 802,812 (NC. 2024). Because Cincinnati failed to define "direct physical loss," the North Carolina Supreme Court specifically "decline[d] to do what other courts have done and affirmatively define the 'slippery' term Cincinnati chose to use in this manifestly ambiguous situation." *N. State Deli, LLC v. Cincinnati Ins. Co.*, 908 SE2d 802,812 (NC. 2024). Ultimately:

> It is the insurance company's responsibility to define essential policy terms and the North Carolina courts' responsibility to enforce those terms consistent with the parties' reasonable expectations. *See Grant*, 295 NC. at 43, 243 SE2d 894. Otherwise, insurance companies are licensed to pitch consumers on an expansive, "all-risk" policy, while hiding behind a narrower definition imposed by judicial fiat when it comes time to pay out. Such a setup contradicts our Court's holdings that the lodestar for insurance contract interpretation is the reasonable expectation of the policyholder and that ambiguities should be resolved in the insured's favor.

*N. State Deli, LLC v. Cincinnati Ins. Co.*, 908 SE2d 802,813 (NC. 2024).

8

*i.* *North State Deli's Holding Compels Coverage Under the Business Interruption Coverage Provision.*

Here, like the insurance policy issued by Cincinnati Insurance in *North State Deli*, Illinois Union issued an all-risks policy to Plaintiffs that provides coverage for all risks unless otherwise excluded. Also like the policy in *North State Deli*, the Policy contains a provision that provides coverage for business interruption losses:

**V.    TIME ELEMENT**

   **2.    BUSINESS INTERRUPTION**

   1.    This Policy insures loss resulting from the necessary interruption or reduction of business operations conducted by the Insured and caused by physical loss, damage or destruction, by a peril insured by this Policy, of property insured.

D.E. 17-1 p. 52.

As articulated by the North Carolina Supreme Court, "when restaurants lost physical use of their properties as restaurants due to the pandemic orders, they experienced a direct physical loss." Illinois Union has admitted that the language in *North State Deli* is "materially identical to that at issue here." Exhibit A. Thus, the Business Interruption Coverage provision provides coverage for the loss of use of Plaintiffs' properties.

The Policy's definition of "period of recovery," which is not an exclusion but is a provision on the duration of coverage, is not relevant given the coverage grants in the Policy. The North Carolina Supreme Court in *North State Deli* did not analyze the insurance policy's "period of restoration" before holding that "[p]roperty 'loss' surely occurs when it is no longer useable for its intended purpose, as a policyholder would reasonably expect." *N. State Deli, LLC v. Cincinnati Ins. Co.*, 908 SE2d 802, 810 (NC. 2024). The court continued, "when the restaurants lost physical use of their properties as restaurants due to the pandemic orders, they experienced a direct

9

physical loss." *Id.* Three paragraphs later, in response to an argument made by Cincinnati Insurance, the court then characterizes the "period of restoration" as a mere provision on the "duration of coverage." In responding to an argument made by Cincinnati Insurance, the court "[a]ssum[ed] without deciding that a reasonable insured would look to a provision on the duration of coverage to understand the scope of coverage." *Id.* at 811. Thus, the court explicitly did not decide that a reasonable insured would ever look to the "period of recovery" provision in determining the scope of a coverage grant.

Therefore, the North Carolina Supreme Court did not analyze the policy's definition of "period of recovery" (and thus did not think it was relevant) as it had already determined that loss of use constitutes "direct physical loss." W He Illinois Union has argued that the Policy's definition of "period of recovery" is relevant, and the Trial Court relied on that definition in dismissing this action, the North Carolina Supreme Court has made it clear that the definition of "restoration period" or "period of recovery" (a provision regarding duration of coverage) is not relevant in determining the meaning of "physical loss."

The court in *North State Deli* rejected the approach of courts that relied upon the definition of a "period of restoration" or "restoration period" to hold that physical damage was required. *N. State Deli, LLC v. Cincinnati Ins. Co.*, 908 SE2d 8 02,812 (NC. 2024). Specifically, the North Carolina Supreme Court rejected that approach taken in the following cases: *Ungarean v. CNA & Valley Forge Ins. Co.*, 323 A3d 593, 608 (Pa. 2024) (reasoning that similar period of restoration definition dictates physical damage); *Huntington Ingalls Indus., Inc. v. Ace Am. Ins. Co.*, 2022 V T 45, ¶ 27, 217 Vt. 195, 213, 28 7A3d 515, 528 (2022) (reasoning that identical period of restoration definition is consistent with requirement of physical alteration); *Starr Surplus Lines Ins. Co. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 139 Nev. Adv. Op. 32, 535 P3d 254, 265 (2023)

10

(analyzing that definition of period of restoration does not support loss of use as trigger of coverage); *Cajun Conti LLC v. Certain Underwriters at Lloyd's, London*, 2022-01349 (La. 3/17/23), 359 So. 3d 922, 929 (holding that period of restoration required physical alteration to trigger policy); *Connecticut Dermatology Grp., PC v. Twin City Fire Ins. Co.*, 346 Conn. 33, 50, 28 8A3d 18 7,198 (2023) (reasoning that the definition of period of restoration implies that direct physical loss must involve a physical alteration); *Another Planet Ent., LLC v. Vigilant Ins. Co.*, 15 Cal. 5th 1106, 1136, 548 P3d 303, 322 (2024) (analyzing that the definition of period of restoration is consistent with the requirement of a physical alteration to trigger a covered loss). Therefore, not only did the North Carolina Supreme Court fail to rely on the definition of "period of restoration" in holding that loss of use constitutes "direct physical loss," but it also specifically rejected the approach of numerous other state supreme courts that relied upon that "period of restoration" definition.

          *ii.*      *Pollution Exclusion Does Not Apply.*

W He the Trial Court did not reach the applicability of the Pollution Exclusion, it does not apply. The Policy's Pollution Exclusion excludes coverage for the following:

> [l]oss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of 'contaminants or pollutants,' all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever.

D E. 17-1 p. 60. The Policy then defines "contaminants or pollutants" broadly as follows:

> any material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, bacteria, virus, or hazardous substances as listed in the Federal W ter Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Acy of 1976, and Toxic Substances Control Act, or as designated by the US. Environmental Protection Agency.

D E. 17-1 p. 61. The Pollution Exclusion, however, contains an exception:

11

Nevertheless if a peril insured by this Policy arises directly or indirectly from pollution or contamination any loss, damage or destruction of property insured by this Policy arising directly from that peril shall (subject to the terms, conditions and limitations of the Policy) be covered.

D.E. 17-1 p. 61.

First, North Carolina law limits the applicability of pollution exclusions that contain the words "discharge", "dispersal", "release", and "escape" to "traditional environmental pollution." *Auto-Owners Ins. Co. v. Potter*, 105 Fed. Appx. 484, 496 (4th Cir. 2004). The Policy contains a pollution exclusion with these very terms. D.E. 17-1 p. 60. Despite clear North Carolina law limiting the Policy's pollution exclusion to traditional environmental pollution, Illinois Union urged this court to find that the Pollution Exclusion precludes coverage for COVID-19-related business interruption losses despite admitting that "COVID-19, a communicable disease caused by a virus, does not constitute traditional environmental pollution in any sense of the term." Defendant Illinois Union Insurance Company's Reply in Support of Defendant Illinois Union Insurance Company's Motion to Dismiss Complaint, *London Bridge Resort, LLC v. Illinois Union Insurance Company, Inc.*, Case No. 3:20-cv-08109 (D.Az. August 21, 2020) (attached hereto as "Exhibit B").

Illinois Union asserted that the Pollution Exclusion precludes coverage for COVID-19 damages simply because the Pollution Exclusion includes the word "virus." However, Illinois Union failed to analyze the Pollution Exclusion in its entirety, and has failed to give credence to the environmental terms of art used in the Pollution Exclusion.

When used in pollution exclusions, the terms "discharge," "dispersal," "release," and "escape" are "environmental terms of art" that must be given their technical meaning. *Auto-Owners Ins. Co. v. Potter*, 105 Fed. Appx. 484, 496 (4th Cir. 2004); *see also W. Am. Ins. Co. v. Tufco Flooring E., Inc.*, 104 NC. App. 312, 324, 409 SE2d 692, 699 (1991), *overruled on other*

12

*grounds by Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 NC. 293, 524 SE2d 558 (2000). As environmental terms of art, the terms "release, discharge, escape or dispersal" require a discharge "into or upon land, the atmosphere or any water course or body of water." *Auto-Owners Ins. Co. v. Potter*, 105 F. App'x 484, 497 (4th Cir. 2004) (*quoting W. Am. Ins. Co. v. Tufco Flooring E., Inc.*, 104 NC. App. 312, 323, 409 SE2d 692, 699 (1991), *overruled on other grounds by Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 NC. 293, 524 SE2d 558 (2000)). Accordingly, when a pollution exclusion includes environmental terms of art such as "discharge," "dispersal," "release," and "escape," the application of the pollution exclusion is limited to "traditional environmental damage" or "traditional environmental pollution." *Id.* at 494-95.

Illinois Union has acknowledged that pollution provisions that contain environmental terms of art do not apply to allegations related to COVID-19 damages. In an action filed in the United States District Court for the District of Arizona, Illinois Union argued that a policy providing coverage for pollution-related business interruption losses did not apply to COVID-19 related losses. Defendant Illinois Union Insurance Company's Motion to Dismiss Plaintiff's Complaint Pursuant to FRCP 12(B)(6), *London Bridge Resort, LLC v. Illinois Union Insurance Company, Inc.*, Case No. 3:20-cv-08109 (D. Az. July 2, 2020) (attached hereto as "Exhibit C"). In London Bridge, Illinois Union issued a policy to an Arizona business that provided coverage for losses arising from first-party claims arising out of a "pollution condition". Exhibit C p. 1. The "pollution condition" contained environmental terms of art, such "discharge, dispersal, release, escape, migration, or seepage". Exhibit C p. 4. In arguing that the above "pollution condition" did not provide coverage for COVID-19 related business interruption losses, Illinois Union argued that "Arizona law is clear that the unambiguous terms 'discharge,' 'dispersal,' 'release,' 'escape' and similar terms contained in the definition of 'pollution condition' in the

13

[p]olicy relate solely to traditional environmental contamination." Exhibit B p. 10. Here, Arizona and North Carolina law are identical: they both interpret the terms "discharge", "dispersal", "release", and "escape" to be environmental terms of art when used in a pollution exclusion. *Compare Starr Surplus Lines Ins. Co. v. Star Roofing, Inc.*, 2019 WL5617575 (Ariz. Ct. App. Oct. 31, 2019) *with W. Am. Ins. Co. v. Tufco Flooring E., Inc.*, 104 NC. App. 312, 324, 409 SE2d 692, 699 (1991), *overruled on other grounds by Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 NC. 293, 524 SE2d 558 (2000). Just as Illinois Union argued that a pollution provision with environmental terms of art did not apply to COVID-19 losses in Arizona, a pollution provision with environmental terms of art does not apply to COVID-19 losses in North Carolina.[2]

Here, the Pollution Exclusion includes the very environmental terms of art that were analyzed in both *Potter* and *Tufco Flooring*. Furthermore, the Pollution Exclusion specifically references multiple instances of environmental legislation and the US. Environmental Protection Agency. Therefore, state and federal case law, as well as the language of the exclusion itself, all dictate the terms "release, discharge, escape, or dispersal" are environmental terms of art and should be interpreted accordingly.

---

[2]     The United States District Court for the District of Arizona granted Defendant's motion to dismiss, finding that the "pollution condition" only applied to traditional environmental pollution. *London Bridge Resort LLC v. Illinois Union Insurance Company*, 505 F. Supp. 3d 956 (D. Az. Dec. 4, 2020). Because a court in a prior proceeding has accepted Defendant's argument, Defendant should be judicially estopped from pursuing a contradictory legal theory in this proceeding. "Whee a party assumes a certain position in a legal proceeding, and succeeds in maintain that position, he may not thereafter, simply because his interests have changed, assume a contrary position ...." *New Hampshire v. Maine*, 532 US. 742, 749-50 (2001) (citation omitted). Because Arizona and North Carolina law both find that the use of environmental terms of art such as "discharge", "dispersal", "release", and "escape" limit the application of a pollution provision to traditional environmental pollution, the Court should estop Defendant from taking a position that is contradictory to its prior position that a pollution provision does not apply to COVID-19.

14

JA546

The inclusion of "virus" in the definition of "contaminants or pollutants" does not change the judicially-established meaning of "release, discharge, escape or dispersal." Under North Carolina law, terms of an insurance contract must be given their "acquired ... technical meaning in the field of insurance." *Auto-Owners Ins. Co. v. Potter*, 105 F. App'x 484, 494 (4th Cir. 2004). *Tufco Flooring* was decided in 1991. *Potter* was decided in 2004. The Policy was issued in 2019. D.E. 17-1. Despite these clear judicial opinions limiting pollution exclusions that contain release discharge, escape, or dispersal (and similar terms) to traditional environmental pollution, Illinois Union chose to issue a policy with terms with acquired technical meaning.

Viral pandemics do not constitute traditional environmental pollution. Examples of traditional environmental pollution include "hazardous waste dumping." *W. Am. Ins. Co. v. Tufco Flooring E., Inc.*, 104 NC. App. 312, 325, 409 SE2d 692, 700 (1991), *overruled on other grounds by Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 NC. 293, 524 SE2d 558 (2000). The Fourth Circuit noted that a pollution exclusion is generally intended to protect against "prototypical environmental harms" such as "a traditional response scenario where the insured is remediating a spill or toxic release, or monitoring such work." *Auto-Owners Ins. Co. v. Potter*, 105 F. App'x 484, 496 (4th Cir. 2004). Accordingly, "no plausible interpretation of 'traditional environmental pollution' includes a viral outbreak." *London Bridge Resort LLC v. Illinois Union Ins. Co. Inc.*, 505 F. Supp. 3d 956, 959 (D. Ariz 2020). Illinois Union agrees: **"COVID-19, a communicable disease caused by a virus, does not constitute traditional environmental pollution in any sense of the term."** Exhibit B. Thus, the COVID-19 pandemic is not traditional environmental pollution, and the Policy's Pollution Exclusion does not apply.

Illinois Union cited *New NGC, Inc. v. Ace Am. Ins. Co.*, 105 F. Supp. 3d 552 (W DNC. 2015), to incorrectly show that North Carolina does not limit pollution exclusions to traditional

15

environmental pollution. (D.E. 25 p. 23) New NGC stands for the exact opposite. According to New NGC, a pollution exclusion is not limited to traditional environmental pollution when it does not contain "[e]nvironmental terms of art such as discharge or dispersal …" *Id.* at 556. Here, the Pollution Exclusion contains environmental terms of art: "release, discharge, escape, or dispersal". Thus, under the reasoning of *New NGC*, the Pollution Exclusion is limited to traditional environmental pollution.

Limiting the application of the Pollution, Contamination Exclusion to traditional environmental pollutants (and, therefore, not to the application of COVID-19), does not render the use of the term "virus" meaningless. The Environmental Protection Agency ("EPA") sets effluent limitations for viruses in point-source pollution.[3] *See e.g.* 33 U.S.C.A. § 1362 (W.st) (defining "effluent limitation" as a restriction on the concentration of "biological" constituents); see also *Hawaii's Thousand Friends v. City & Cty. of Honolulu*, 821 F. Supp. 1368, 1370 (D. Haw. 1993) (analyzing whether failure to sanitize point-source pollution, including both bacteria and viruses, violated Clean Water Act). Thus, viruses can constitute traditional environmental pollution, such as instances when they are discharged in effluent as a form of point-source pollution.

Lastly, in the event this Court determines that the Pollution Exclusion does apply to COVID-19, the Pollution Exclusion contains an exception that specifies that coverage is provided if a "peril insured by this Policy arises directly or indirectly from pollution or contamination." D.E. 17-1 p. 61. Pursuant to *North State Deli*, the Policy's Business Interruption Provision provides coverage for business interruption losses caused by governmental orders made in

---

[3]     Under the Federal Water Pollution Control Act, "point source" is defined as "'any discernible, confined and discrete conveyance . from which pollutants are or may be discharged,' including, for example, any 'container,' 'pipe, ditch, channel, tunnel, conduit,' or 'well.'" *Cnty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 590 U.S. 165, 170–71 (2020) (citations omitted).

16

response to the COVID-19 pandemic. Accordingly, a peril insured by this Policy has arisen directly or indirectly from "pollution or contamination," which would then be defined to include a virus, such as COVID-19. Accordingly, the Pollution Exclusion does not apply under the terms of the Pollution Exclusion's own exception.

In sum, the Policy's Pollution Exclusion is limited to traditional environmental pollution, not a viral pandemic. Illinois Union has not argued that the COVID-19 outbreak constitutes traditional environmental pollution. In fact, Illinois Union has agreed: "COVID-19, a communicable disease caused by a virus, does not constitute traditional environmental pollution in any sense of that term." Exhibit B. Accordingly, the Pollution Exclusion does not apply.

### c.     Illinois Union Will Not Suffer Unfair Prejudice if Plaintiffs' Rule 60(b)(6) Motion is Granted.

The "type of prejudice contemplated by Rule 60(b)" does not include the normal inconveniences parties suffer when "any judgment is vacated." *Werner v. Carbo*, 731 F2d 204, 207 (4th Cir. 1984). Accordingly, there is no "unfair prejudice" when the only prejudice would be, for example, "the protraction of proceedings, the time and expense of a new trial, the loss of post-judgment interest[, and a]ny loss of leverage in settlement discussions." *Id.* Rather, the type of prejudice contemplated by Rule 60(b) involves the "rights of third parties." *Id.* Thus, the mere fact that a judgment may be vacated is not prejudice. *See id.*

Here, the judgment in this matter only dismissed this action. If the judgment is vacated, Illinois Union would only be compelled to restart litigation in this matter, which is not the type of prejudice contemplated by Rule 60(b). Accordingly, vacating the judgment dismissing this matter would not result in unfair prejudice to Illinois Union, as set forth in *Werner*.

### d.     Extraordinary Circumstances Warrant Vacating the Judgment

17

"Intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6)." *Federal Trade Commission v. Ross*, 74 F.4th 186, 194 (4th Cir. 2023) (emphasis added) (quoting *Agostini v. Felton*, 521 U.S. 203, 239 (1997)). Therefore, in order for a development in the law to constitute extraordinary circumstances, a movant must demonstrate additional circumstances warranting relief. As explained in detail below, developments in law coupled with divergent results in state and federal courts in related cases constitute extraordinary circumstances that warrant relief under Rule 60(b)(6).

       *i.   Divergent Results in State and Federal Court Constitute Extraordinary Circumstances Under Rule 60(b).*

The "twin aims" of the *Erie* doctrine are the "discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer*, 38 0U.S. 460, 468 (1965). Accordingly, "[i]n diversity jurisdiction cases, the results in federal court should be substantially the same as in state court litigation arising out of the same transaction or occurrence." *Pierce v. Cook & Co., Inc.*, 518 F.2d 720 (10th Cir. 1975); *First Am. Nat. Bank of Nashville v. Bonded Elevator, Inc.*, 111 F.R.D. 74, 75 (W.D. Ky. 1986) ("Like the court in *Pierce*, this court finds that the federal and state actions arising out of Bonded's grain elevator problems should render substantially the same results."). Further, when divergent results in state and federal courts "stem[] from a choice of federal rather than a state forum," Rule 60(b) relief is appropriate. *See Blue Diamond Coal Co. v. Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 525-26 (6th Cir. 2001).

In *Pierce v. Cook & Co., Inc.*, the Tenth Circuit analyzed whether a trial court properly denied a Rule 60(b) motion when different plaintiffs both injured in the same vehicular accident achieved different outcomes in state and federal court. 518 F.2d 720, 721 (10th Cir. 1975). There,

a car collided with a tractor trailer. *Id.* The driver of the car was killed, and his passengers were injured. *Id.* A survivor of the driver filed suit in state court. *Id.* While the passengers also filed suit in state court, their case was removed due to diversity jurisdiction. *Id.* The passengers' suit was ultimately dismissed by a federal court, while the suit filed by the driver's survivors in state court was ultimately successful in the Oklahoma Supreme Court. *Id.* Thereafter, the passengers sought Rule 60(b) relief, which the trial court denied. The passengers appealed. On appeal, the Tenth Circuit reasoned that the passengers were forced into federal court by the defendant's removal. The court further reasoned that "[w]e are concerned with an action in which federal jurisdiction depends on diversity. In diversity jurisdiction cases[,] the results in federal court should be substantially the same as those in state court litigation arising out of the same transaction or occurrence." *Id.* at 723 (citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 74-75 (1938)). The Tenth Circuit further held:

> The unusual combination of events which have occurred make the situation extraordinary. The federal courts in which plaintiffs were forced to litigate have given them substantially different treatment than that received in state court by another injured in the same accident. The outcome determination principle mandated by Erie v. Tompkins has been violated.

*Id.*

Many circuit courts have positively cited *Pierce*. *See e.g. Blue Diamond Coal Co. v. Trustees of UMWA Combined Ben. Fund*, 249 F.3d 519, 525 (6th Cir. 2001); *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 748 (5th Cir. 1995); *Ritter v. Smith*, 811 F.2d 1398, 1402-03 (11th Cir. 1987). While the Fourth Circuit has not analyzed *Pierce* like many of its sister courts, the Seventh Circuit has noted that *Pierce* is compatible with the approach taken by the Fourth Circuit in analyzing Rule 60(b)(6) motions. *See McGeshick v. Choucair*, 72 F.3d 62, 65 (7th Cir. 1995). The Seventh Circuit noted that the *Pierce* court distinguished mere changes in law in unrelated

19

JA551

cases to changes in law coupled with an "unusual combination of events," including the fact that parallel, related litigation in state and federal court achieved different results, resulted in extraordinary circumstances under Rule 60(b)(6).

Even without a violation of *Erie*, courts have been willing to grant relief to remedy divergent results. Plaintiffs suing based on related claims arising out of the same incident under the same set of laws should be treated identically. *See In re Terrorist Attacks on Sept. 11, 2001*, 741 F3d 353, 356 (2d Cir. 2013). In *In re Terrorist Attacks on Sept. 11, 2001*, the Second Circuit Court of Appeals was tasked with analyzing whether Rule 60(b)(6) relief was appropriate when two separate cases arising out of the September 11th terrorist attacks resulted in "inconsistent results between two sets of plaintiffs suing for damages based on the same incident." *In re Terrorist Attacks on Sept. 11, 2001*, 741 F3d 353, 357 (2d Cir. 2013) ("[T]he plaintiffs 'are persons who incurred losses in the September 11, 2001 terrorist attacks: those who suffered personal injuries, the families and 13 representatives of those who died, insurers, and property owners.'"). The Second Circuit reasoned that interests in finality of judgments are outweighed by serving the ends of justice when different plaintiffs who are victims of a related incident are treated differently by the courts. *Id.* (citing *Gondeck v. Pan American World Airways, Inc.*, 382 US. 25, 26-27 (1965)). "[I]nconsistent results for victims of the same incident poses a unique problem of unfairness." *Id.* at 359. Other courts have similarly noted Rule 60(b)(6) is appropriate to rectify inconsistent results in related cases. *See also Celestine v. Petroleos De Venezuela SA*, 108 Fed. Appx. 180 (5th Cir. 2004) ("Where two cases arise out of the same transaction result in conflicting judgments, relief is warranted."); *Van Skiver v. U.S.*, 952 F2d 1241, 1245 (10th Cir. 1991) (noting that a "post-judgment change in the law" that arises in a "related case" is sufficient for Rule

60(b)(6) relief); *Ritter v. Smith*, 811 F2d 1398 ,1403 (11th Cir. 198 7)(stating that extraordinary circumstances exist under Rule 60(b)(6) when closely related cases reach divergent results).

Here, lik e that in *Pierce*, the command of *Erie* has been violated. Cases arising out of the same transaction or occurrence have achieved different results based on whether defendants were able to remove cases to federal court. This case and *North State Deli* arise out of the same transaction and occurrence. Both cases were filed in May of 2020, just six days apart. Both cases deal with "materially identical" policy provisions, Exhibit A, that both depend on whether the insured has suffered "direct physical loss" for coverage. These provisions both require the application of the same North Carolina law. Both cases deal with loss of use of property due to executive orders issued in response to the CO V D-19 pandemic. Both cases seek the same type of damages for the same type of harm.

*North State Deli* proceeded in state court, with the North Carolina Supreme Court ultimately finding coverage. D espite filing its action in state court, Plaintiffs' lawsuit was removed to federal court by Illinois Union and resulted in a finding of no coverage. Unlik e all other states, North Carolina lacks a certified question procedure. *United States v. Kelly*, 917 F. Supp. 2d 553, 560 (W D NC. 2013). Accordingly, by removing the case to federal court, Illinois Union deprived the North Carolina state court system of any opportunity to review this dispute. By removing this case to federal court, Illinois Union caused this action to achieve different results than similar cases proceeding in state court. Thus, similar cases arising out of the same transaction or occurrence are achieving different results in state in federal courts. This violates the command of *Erie*. Accordingly, extraordinary circumstances exist that warrant relief under Rule 60(b)(6).

## CONCLUSION

Accordingly, this court should grant Plaintiffs' Rule 60(b)(6) motion.

21

JA553

This the 31st day of January 2025.

**MCDOUGAL HARTZELL, PLLC**

By:    /s/ William R. Hartzell
        Gregg E. McDougal NCSB # 27290
        William R. Hartzell, NCSB # 50762
        3737 Glenwood Ave, Suite 170
        Raleigh, North Carolina 27612
        Telephone: (919) 893-9500
        Facsimile: (919) 893-9510
        gregg@themcdougallawfirm.com
        will@themcdougallawfirm.com

        *Attorneys for Plaintiffs*

22

# Exhibit A

**O'Melveny**

O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006-4061

T: +1 202 383 5300
F: +1 202 383 5414
omm.com

July 22, 2022

**Jonathan Hacker**
D: +1 202 383 5285
jhacker@omm.com

Patricia S. Connor, Clerk of Court
U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, Virginia 23219

Re:     *Golden Corral Corp. et al. v. Illinois Union Insurance Co., No. 21-2119*

Dear Ms. Connor:

Pursuant to ~~FRAP 28~~(j), I write on behalf of Appellee to bring to the panel's attention four recent decisions that directly address the issues pending in the above-captioned case.

In *North State Deli et al. v. Cincinnati Insurance Company*, -- S.E.2d--, 2022 WL 2432157 (N.C. Ct. App. 2022), the North Carolina Court of Appeals reversed a trial court determination cited by Appellants.  The Court held that policy language materially identical to that at issue here did not provide "coverage for business interruption losses due to COVID-19 governmental orders because there is no direct physical loss or damage to the insured property." *Id.* at *2.  Allegations of "a general 'loss of use'" did not suffice.  *Id.*

Similarly, in *Four Roses LLC v. First Protective Insurance Company*, 2022 WL 2813270 (N.C. Ct. App. 2022), the North Carolina Court of Appeals rejected coverage under a residential property policy with similar language, reasoning that "economic losses incurred" due to COVID-19 related governmental orders did not constitute "direct physical loss" and that such orders neither "rendered [insured] property itself not fit" for use nor "prohibited Plaintiff from using its property," let alone "as the result of any direct damage to any neighboring premises." *Id.* at *3-4.

These decisions confirm that this Court's recent decisions correctly applied North Carolina law.  In both *Summit Hospitality Group, Ltd. v. Cincinnati Insurance Co*., 2022 WL 2072759 (4th Cir. 2022) and *National Coatings & Supplies, Inc. v. Valley Forge Insurance Co*., 2022 WL 2045334 (4th Cir. 2022), this Court affirmed the dismissal of COVID-19 coverage claims under North Carolina law on grounds legally and factually indistinguishable from those warranting dismissal here.  Both decisions reiterated that an "insurance policy's coverage for business income loss and other expenses" does not apply to "claim[s] for financial losses caused by the COVID-19 pandemic in the absence of any material destruction or material harm to its covered premises."  *Summit Hospitality*, 2022 WL 2072759, at *1 (alterations omitted); *National Coatings*, 2022 WL 2045334, at *1 (alterations omitted).  The decisions in *Summit Hospitality* and *National Coatings* are unpublished, but their analysis applies fully to this case.

Austin · Century City · Dallas · Los Angeles · Newport Beach · New York · San Francisco · Silicon Valley · Washington, DC
Beijing · Brussels · Hong Kong · London · Seoul · Shanghai · Singapore · Tokyo

O'Melveny

Respectfully submitted,

/s/ Jonathan D. Hacker

Jonathan D. Hacker

Cc: All counsel (via ECF)

# Exhibit B

1   Amy M. Samberg (#013874)
    Amy L. Stein (#026113)
2   FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
    One Arizona Center
3   400 E. Van Buren Street, Suite 550
    Phoenix, AZ  85004
4   Telephone:  (602) 926-9880
    Facsimile:  (312) 863-5099
5   E-Mail: asamberg@fgppr.com
            astein@fgppr.com
6   Attorneys for Defendant Illinois Union Insurance Company,
    Inc.
7

8                   IN THE UNITED STATES DISTRICT COURT

9                        FOR THE DISTRICT OF ARIZONA

10
    London Bridge Resort, LLC, an Arizona      No. 3:20-cv-08109-GMS
11  limited liability company,
                                                **REPLY IN SUPPORT OF**
12              Plaintiff,                       **DEFENDANT ILLINOIS UNION**
                                                **INSURANCE COMPANY'S**
13       v.                                     **MOTION TO DISMISS**
                                                **COMPLAINT**
14  Illinois Union Insurance Company, Inc.,
    an Illinois corporation,
15
                Defendant.
16

17       Defendant Illinois Union Insurance Company ("Illinois Union"), by and through its

18  counsel, Foran Glennon Palandech Ponzi & Rudloff, P.C., hereby submits this Reply in

19  Support of its Motion to Dismiss Plaintiff London Bridge Resort, LLC's ("London Bridge")

20  Complaint ("Motion") pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6).

21                        <u>**PRELIMINARY STATEMENT**</u>

22       In its Motion to Dismiss, Illinois Union has set forth the fatal deficiencies in London

23  Bridge's Complaint, namely: (1) that COVID-19, an infectious disease caused by a virus,

24  is not a "pollution condition" as defined in Policy No. PPL G71205162 002 (the "Policy);

25  and (2) even if COVID-19 were a "pollution condition," which it is not, the Complaint fails

26  to allege the presence of the virus at London Bridge's "covered location" as required by the

27  Policy.  In its Opposition, London Bridge attempts to avoid dismissal of its Complaint by

28

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1  arguing that ordinary and commonly understood words such as "contaminant" and

2  "pollutant" are ambiguous solely because they are undefined in the Policy.  London Bridge

3  also attempts to distinguish the instant matter from well-established Arizona law as to what

4  constitutes a "pollutant" in the context of an insurance policy. London Bridge instead relies

5  upon cases from outside Arizona which are inapposite to this matter.

6        Then, in an admission that its Complaint does not, in fact, allege the presence of

7  COVID-19 "on, at, or migrating from" a "covered location," London Bridge supplies an

8  affidavit asserting that a few of its employees tested positive for COVID-19 in June 2020,

9  although its claim is based on purported losses stemming from various civil authority orders

10  in March 2020.  Even so, this does not cure the fatal defects in its Complaint because: (1)

11  COVID-19 is not a "pollution condition;" (2) London Bridge does not allege that it has

12  undertaken any remediation or incurred any "first party remediation costs;" and (3)

13  accordingly, there is no "business interruption loss" under the Policy.  Therefore, an

14  amended complaint will be futile, and Illinois Union's Motion to Dismiss the Complaint

15  with prejudice should be granted.[1]

16                            **BACKGROUND**

17        In its Complaint, London Bridge alleges that, due to the COVID-19 pandemic, it has

18  suffered from a decline in guests at its Resort.  Compl ¶¶ 9-10.  The Complaint does not

19  allege the presence of COVID-19 at the Resort, but instead cites civil authority orders

20  beginning in March 2020.  Compl. ¶¶ 18-162.  In its Opposition, London Bridge argues

21  that, "[s]ince March and April 2020," it allegedly "experience[d] decreased occupancy by

22  a figure of 80-90% and business interruption losses of at least $2,000,000.00."  ECF No.

23  15, at 2:21-23.  Attached to London Bridge's Opposition is an Affidavit from its Vice

24  President and General Manager, Cal Sheehy, which alleges that: (1) from June 15 to June

25

26  [1] In its opposition papers, London Bridge argues that Illinois Union fails to attack the
    sufficiency of its Complaint for failure to state a claim. This assertion is incorrect, since
27  Illinois Union has alleged and continues to allege that London Bridge failed to plead
    sufficient facts showing that Illinois Union breached the insurance policy, namely that
28  London Bridge cannot show it is entitled to any coverage under the subject policy under its
    unambiguous terms.

1    25, 2020, five London Bridge employees had confirmed cases of COVID-19; (2) on June

2    21, 2020, while working on the premises, one employee exhibited COVID-19 symptoms

3    and was later confirmed positive; and (3) on June 25, 2020, a second employee exhibited

4    symptoms of COVID-19, and was later confirmed positive.  Sheehy Aff. ¶¶ 8-10.

5        The Policy provides a limit of $1 million per "pollution condition" above a $100,000

6    self-insured retention per "pollution condition," and a policy aggregate limit of $1 million.

7    Subject to all of its terms, conditions, definitions, exclusions and the $100,000 SIR, the

8    Policy covers, in relevant part, "loss" for "first-party claims" arising out of a "pollution

9    condition" on, at, under or migrating from a "covered location."  Notably, as it relates to

10   this case, "loss" under the Policy consists of "first-party remediation costs" and "emergency

11   response costs," which require the existence of a "pollution condition."

12       In addition to the failure to allege a "pollution condition" under the Policy, neither

13   the Complaint nor the Opposition papers allege that London Bridge has incurred any "first-

14   party remediation costs" or "emergency response costs" under the Policy.  Moreover, while

15   "loss" under the Policy also includes "business interruption loss," there can be no "business

16   interruption loss"  in the absence of: (a) a "pollution condition;" and (2) remediation of the

17   same, because "business interruption"  is defined as:

18       [T]he necessary partial or complete suspension of the "insured's" operations at a
         "covered location" for a period of time, which is directly attributable to a "pollution
19       condition" or "indoor environmental condition" to which Coverage A. of this Policy
         applies. Such period of time shall extend from the date that the operations are
20       necessarily suspended and end when such "pollution condition" or "indoor
         environmental condition" has been ***remediated*** to the point at which the "insured's"
21       normal operations could reasonably be restored.   (Emphasis added).

22   As such, London Bridge has not alleged any "business interruption loss" under the Policy.

23                                    <u>ARGUMENT</u>

24   **A.    <u>Plaintiff's Complaint Should Be Dismissed Pursuant to the Clear, Plain,
             Unambiguous Terms of the Policy</u>**

25

26       **1.    The Terms "Pollutant" and "Contaminant" are Unambiguous, and They
                 Do Not Include a Virus Such as COVID-19**

27

28

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1    London Bridge first argues that the terms "contaminant" and "pollutant" are

2    ambiguous, and that discovery will somehow ascertain the parties' intent.  However,

3    discovery is unnecessary and dismissal is appropriate because the Policy is clear and

4    unambiguous.

5    Where "the intent of the parties is expressed in clear and unambiguous language,

6    there is no need or room for construction or interpretation and a court may not resort

7    thereto." *Roe v. Austin*, 433 P.3d 569, 574 (Ariz. Ct. App. 2018).[2]  Courts have a "duty" to

8    read an insurance policy so as to "harmonize all parts of the contract … by a reasonable

9    interpretation in view of the entire instrument." *Aztar Corp. v. U.S. Fire Ins. Co.*, 224 P.3d

10   960, 972 (Ariz. Ct. App. 2010).  A provision is ambiguous only if it is "unclear and can be

11   reasonably construed in more than one sense." *Potter v. U.S. Specialty Ins. Co.*, 98 P.3d

12   557, 559 (Ariz. Ct. App. 2004).  When interpreting an insurance policy, "[c]ourts should

13   use common sense and not create ambiguity where none exists," *Wilshire Ins. Co. v. Yager*,

14   348 F. Supp. 3d 931, 936 (D. Ariz. 2018), "even though the insured may suffer harsh

15   results." *Pfd. Risk Mut. Ins. Co. v. Lewallen*, 703 P.2d 1232, 1234 (Ariz. Ct. App. 1985).

16   "If a reasonable interpretation favors the insurer and any other interpretation would be

17   strained, no compulsion exists to torture or twist the language of the policy." *Simkins v.*

18   *NevadaCare, Inc.*, 229 F.3d 729, 735 (9th Cir. 2000).

19   Accordingly, courts in the Ninth Circuit have dismissed insurance coverage actions

20   upon a finding of no coverage under the clear and unambiguous terms of an insurance

21   policy.  *See, e.g.*, *Everest & Jennings, Inc. v. Am. Motorists Ins. Co.*, 23 F.3d 226, 228-29

22   (9th Cir. 1994) (dismissal of coverage action affirmed due to claim falling outside the

23   policy's coverage grant); *X2 Biosystems, Inc. v. Fed. Ins. Co.*, 656 F. App'x 864, 866 (9th

24   Cir. 2016) (dismissal on the basis of policy's contractual liability exclusion).  Illinois Union

25   respectfully asks that this Court do the same here.

26

27   _____

28   [2] As such, the authorities cited by London Bridge are irrelevant unless there is an
     ambiguity.  As explained *infra*, there is no such ambiguity.

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona  85004
(602) 926-9880

      a.     *Undefined Terms in an Insurance Policy Do Not Create an Ambiguity, and the Policy, Construed as a Whole, Limits the Term "Pollution Condition" to Traditional Environmental Pollution*

Contrary to London Bridge's contention, undefined terms in a Policy do not render it ambiguous. An insurer's decision not to define each and every word that appears in the Policy does not create an ambiguity.  *See Farmers Ins. Exch. v. Loesche*, 498 P.2d 495, 497 (Ariz. Ct. App. 1972).

To find a term ambiguous simply because it is undefined would essentially render every insurance policy ambiguous.  That is not the law in Arizona, where courts "have a duty" to interpret an insurance policy so as to give effect to all provisions and to avoid rendering other provisions in the policy "meaningless." *Aztar*, 224 P.3d at 972-73. Moreover, "because specific contract provisions express the parties' intent more precisely than general provisions, specific provisions qualify the meaning of general provisions." *ELM Ret. Ctr., LP v. Callaway*, 246 P.3d 938, 942 (Ariz. Ct. App. 2010); *see also Aztar*, 224 P.3d at 972 (applying this reasoning to an insurance contract).

Here, the meaning of the words "contaminant" and "pollutant" is resolved by looking at the Policy as a whole, which clearly limits such terms to traditional environmental pollution. For instance, the Policy defines "remediation costs" in relevant part as "expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize, or immobilize 'pollution conditions' … to the extent required by 'environmental law'…." "Environmental law" in pertinent part "include[es] voluntary cleanup or risk-based corrective action guidance, or the direction of an 'environmental professional' acting pursuant to the authority provided by any such Laws …."  Additionally, the terms nested within the definition of "pollution condition"—"discharge," "dispersal," "release," and "escape"—are recognized in Arizona as "terms of art in environmental law." *Keggi v. Northbrook Prop. & Cas. Co.*, 13 P.3d 785, 790 (Ariz. Ct. App. 2000).  Clearly, the Policy only provides coverage for traditional environmental pollution. Applying London Bridge's limitless

1  definition of "pollution condition" would "result in an absurd contract and make [the

2  aforementioned Policy provisions] meaningless." *Aztar*, 224 P.3d at 973.

3      Accordingly, Illinois Union respectfully requests that this Court dismiss the

4  Complaint with prejudice.

5      *b.    The EPA And Other Governmental Authorities Relied Upon By London Bridge Are Inapposite*

6

7      In an attempt to qualify COVID-19, a human communicable disease caused by a

8  virus, as traditional environmental pollution, London Bridge relies upon disparate

9  publications by the Environmental Protection Agency ("EPA") and Centers for Disease

10  Control and Prevention ("CDC"), as well as the Safe Drinking Water Act, 42 U.S.C. §300f

11  *et seq*., and the Clean Air Act, 42 U.S.C. § 7401 *et seq*.  London Bridge's reliance on these

12  materials is misplaced as they are inapposite.

13      Under Arizona law, traditional environmental pollution is industrial pollution, the

14  likes of which caused the "environmental catastrophes that occurred during the 1960s[,]"

15  and led to the creation of pollution exclusion clauses in CGL policies in the 1970s.  *Keggi*,

16  13 P.3d at 791.  COVID-19, a communicable disease caused by a virus, does not constitute

17  traditional environmental pollution in any sense of that term.

18      Moreover, this claim is not about water or air pollution.  Therefore, the Safe Drinking

19  Water Act and Clean Air Act do not apply.  *See* 42 U.S.C. § 300g (purpose of Safe Drinking

20  Water Act is to establish national primary drinking water regulations); 42 U.S.C. § 7401(a)

21  (Clean Air Act enacted to combat "air pollution brought about by urbanization, industrial

22  development, and the increasing use of motor vehicles").  To employ these inapplicable

23  statutes in an effort to shoehorn a human communicable disease caused by a virus, like

24  COVID-19, into a "pollution condition" is misguided at best.  London Bridge's citation to

25  the EPA's report on private well water contaminants is similarly misplaced because this

26  claim has nothing to do with the contamination of private water wells.  Whether a particular

27  substance may be considered harmful to drinking water has no bearing on whether a

28

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1    communicable disease that may have been transmitted among Resort employees constitutes

2    a "pollution condition."

3          Additionally, the CDC's Healthy Housing Report is irrelevant to the question of

4    whether COVID-19 constitutes a "pollution condition." Therein, the CDC uses the term

5    "biologic pollutants" to describe substances affecting indoor air quality such as animal

6    dander, cat saliva, dust mites, cockroaches and pollen. *See* Centers for Disease Control and

7    Prevention and United States Department of Housing and Urban Development, Health

8    Housing        Reference        Manual        at        5-1,        *available        at*

9    https://www.cdc.gov/nceh/publications/books/housing/ housing_ref_manual_2012.

10   pdf. These terms clearly do not describe traditional environmental pollution.

11         In fact, the EPA and other governmental authorities treat COVID-19 differently than

12   environmental pollution. The EPA advises the use of "disinfectants" for COVID-19. *See*

13   *Disinfectant        Use        and        Coronavirus        (COVID-19)*,        EPA,

14   https://www.epa.gov/coronavirus/disinfectant-use-and-coronavirus-covid-19 (last visited

15   June 22, 2020). In contrast, the EPA utilizes terms such as "remediation" when discussing

16   pollutants. *See, e.g.*, *Managing Remediation Waste From Polychlorinated Biphenyls*

17   *(PCBs) Cleanups*, EPA, https://www.epa.gov/pcbs/managing-remediation-waste-

18   polychlorinated-biphenyls-pcbs-cleanups (last visited June 22, 2020). The distinct

19   differences in treatment between COVID-19, as a virus to be disinfected, and pollutants, to

20   be remediated, further shows how COVID-19 cannot qualify as a "pollution condition"

21   under the Policy.

22         **2.    Illinois Union Properly Relies Upon Established and Applicable Case
              Law from Arizona and the Ninth Circuit**
23

24         Despite London Bridge's assertion to the contrary, Illinois Union properly relies

25   upon the seminal Arizona case, *Keggi v. Northbrook Property and Casualty Insurance Co*.,

26   13 P.3d 785 (Ariz. Ct. App. 2000). London Bridge's attempt to distinguish *Keggi* on the

27   grounds that it involved: 1) a general liability policy instead of a pollution liability policy;

28

1    2) an exclusion instead of a coverage grant; and 3) bacteria instead of a virus, completely

2    misses the mark.

3        This Court cannot ignore the overarching principles of *Keggi*, which are highly

4    instructive to the instant matter.  *See Ticknor v. Choice Hotels Int'l, Inc*., 265 F.3d 931, 939

5    (9th Cir. 2001) (where a state's highest court has yet to rule on an issue, a federal court must

6    predict how that state's court would rule based upon existing state law).  The policy in *Keggi*

7    excluded coverage for bodily injury "arising out of the actual, alleged or threatened

8    discharge, dispersal, seepage, migration, release or escape of pollutants."  13 P.3d at 788.

9    Similar to the subject Policy's definition of "pollution condition", the policy in *Keggi*

10   defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant,

11   including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes

12   materials to be recycled, reconditioned or reclaimed."  *Id*. at 789.  The court recognized that

13   terms such as "discharge," "dispersal," "release," and "escape," are ***terms of art in***

14   ***environmental law which generally are used with reference to damage or injury caused***

15   ***by improper disposal or containment of hazardous waste.*"  *Id*. at 790 (emphasis added).

16   The court also recognized the historical purpose of the absolute pollution exclusion, which

17   was to eliminate coverage for traditional environmental pollution.  *Id*. at 791.  As such, the

18   court found that the policy's pollution exclusion did not apply to exclude coverage for

19   bacteria, since bacteria was not a "pollutant."  *Id*. at 792.

20       *Keggi* is recognized as a "definitive interpretation of the scope and purpose of the

21   standard absolute pollution exclusionary clause."  *Nat'l Fire Ins. Co. of Hartford v. James*

22   *River Ins*., 162 F. Supp. 3d 898, 910 (D. Ariz. 2016).  This exclusionary clause created a

23   coverage gap—a gap that pollution liability policies such as the subject Policy were

24   intended to fill.  *See, e.g*., *Masonite Corp. v. Great Am. Surplus Lines Ins. Co.*, 224 Cal.

25   App. 3d 912, 916–17 (Ct. App. 1990).  Thus, it follows that the overarching principle of

26   *Keggi*—that the pollution exclusion in a general liability policy is limited to traditional

27   environmental pollution—applies to preclude coverage here.

28

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1    Moreover, as noted in Illinois Union's opening brief, this Court's sister court within

2    the Ninth Circuit, in *Essex Walnut Owner L.P. v. Aspen Specialty Ins. Co.*, 335 F. Supp. 3d

3    1146, 1153 (N.D. Cal 2018), limited coverage under a pollution liability policy to traditional

4    environmental pollution.  This limitation was based on well-established California law on

5    the interpretation of a pollution exclusion.  *Id.* at 1152-53 (citing *MacKinnon v. Truck Ins.*

6    *Exch.*, 73 P.3d 1205 (Cal. 2003)).

7    Further, London Bridge's attempt to distinguish *Keggi* on the basis that it involved

8    bacteria instead of a virus is a red herring, as neither would constitute traditional

9    environmental pollution.  Equally unavailing is London Bridge's assertion that non-living

10   matter such as viruses can be irritants or contaminants simply because the court in *Keggi*

11   noted that bacteria "are *living, organic* irritants or contaminants which defy description

12   under the policy as 'solid,' 'liquid,' 'gaseous,' or 'thermal pollutants." *Keggi*, 13 P.3d at

13   789.  Rather, the rationale for the court's decision in *Keggi* was simply that bacteria is not

14   traditional environmental pollution.

15   London Bridge's attempt to distinguish *Essex Walnut* because that case did not

16   specifically address whether a virus is a "contaminant" or a "pollutant" is similarly without

17   merit.  As with *Keggi*, London Bridge ignores the overall message of *Essex Walnut*: "[T]he

18   basic teaching … that 'pollutant' should be understood to mean something that is commonly

19   thought of as pollution, i.e. environmental pollution—logically applies even in the context

20   of the case at bar [and] …. comports fully with the [pollution] insurance policy here …."

21   *Essex Walnut*, 335 F. Supp.3d at 1152.

22   London Bridge attempts to classify COVID-19 as a contaminant under two cases

23   from Florida and Wisconsin: *Nova Casualty Co. v. Waserstein*, 424 F. Supp.2d 1325 (S.D.

24   Fla. 2006) and *Landshire Fast Foods of Milwaukee, Inc. v. Employers Mutual Casualty Co.*,

25   676 N.W.2d 528 (Wis. Ct. App. 2004), neither of which are binding precedent.  Even more,

26   the Southern District of Florida's sister court found *Waserstein*'s overly-broad definition of

27   "pollutant" unworkable.  *See Westport Ins. Corp. v. VN Hotel Grp., LLC*, 761 F. Supp.2d

28   1337, 1344 (M.D. Fla. 2010) ("[T]he explication of 'pollutants' in *Waserstein* would permit

- 9 -

1   any living organism with a contaminating effect—including bacteria, insects, rodents, and
2   the like—to be "pollutants" triggering the Pollution Exclusion.  The broad realm of
3   "pollutants" under *Waserstein* is too far afield from the enumerated examples of
4   "pollutants"—smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste—to support
5   adoption of *Waserstein*'s reasoning. Accordingly, Legionella bacteria are not "pollutants,"
6   and the Pollution Exclusion is inapplicable.") (citations omitted).

7       With the aforementioned principles in mind, the Arizona Supreme Court, when
8   faced with the instant issue, would limit a "pollution condition" under a pollution liability
9   policy to traditional environmental pollution, which does not include a virus such as
10  COVID-19.  Illinois Union respectfully requests that this Court hold the same.

11  **B.    An Amended Complaint will be Futile**

12       Attached to London Bridge's Opposition papers is a newly-minted claim that several
13  London Bridge employees were exposed to COVID-19 on London Bridge's property
14  beginning on or about June 15, 2020.  Sheehy Aff. ¶¶ 8-10.  Amending the Complaint to
15  include these allegations, however, will be futile.  A court may consider "whether an
16  amendment would be futile, and '[f]utility of amendment can, by itself, justify the denial of
17  a motion for leave to amend.'" *Gilmore v. DJO Inc*., 663 F. Supp. 2d 856, 862 (D. Ariz.
18  2009) (quoting *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir.1995) (alteration in original).
19  Amendment is futile unless an amended complaint could successfully state a claim upon
20  which relief may be granted.  *Bellanger v. Health Plan of Nevada*, Inc., 814 F. Supp. 914,
21  916 (D. Nev. 1992).

22       An amendment would be futile in this case for several reasons, the preeminent one
23  being that London Bridge cannot allege a "pollution condition" under the Policy.  However,
24  even if COVID-19 were a "pollution condition," which is it is not, London Bridge still
25  cannot make a viable claim for coverage under the Policy.  First, it has acknowledged that
26  there was no COVID-19 at the Resort prior to June, 2020.  As such, any alleged losses
27  predating that time cannot be covered because there could be no "pollution condition" that
28  was "on, at or migrating from" the Resort, which is an essential coverage requirement.

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1    Second, London Bridge has not alleged any "first-party remediation costs" or "emergency

2    response costs" in excess of the $100,000 SIR in response to these diagnoses.[3]  Indeed, it

3    has not alleged any such costs at all.  Third, any coverage for "business interruption loss"

4    requires there to be remediation, which there is not, and is limited to the period of time that

5    the insured's business was interrupted due to remediation.  (See Definition of "business

6    interruption," *supra*).  London Bridge has not made any allegations that: (a) it undertook

7    any remediation; and (b) that they sustained a suspension of business as a result of such

8    remediation.  Because of this, any amendment would be futile.  *See Bell Atl. Corp. v.*

9    *Twombly*, 550 U.S. 544, 555 (2007); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699

10   (9th Cir. 1988).  Accordingly, not only should this Court dismiss the Complaint, it should

11   do so with prejudice and without leave to amend.

12                              <u>**CONCLUSION**</u>

13        For all of the foregoing reasons, Illinois Union requests that its Motion to Dismiss

14   Plaintiff's Complaint for failure to state a claim upon which relief can be granted under

15   FRCP 12(b)(6) be granted, and that Plaintiff's Complaint be dismissed with prejudice.

16        DATED this 21st day of August, 2020.

17                                        FORAN GLENNON PALANDECH
                                          PONZI & RUDLOFF PC
18

19

20                              By: <u>s/  Amy M. Samberg</u>
                                          Amy M. Samberg
21                                        Amy L. Stein
                                          400 E. Van Buren Street, Suite 550
22                                        Phoenix, AZ  85004
                                          Attorneys for Defendant Illinois Union
23                                        Insurance Company, Inc.

24

25

26   [3] It is unlikely that London Bridge could make any such allegation.  As of April, 2020,
     CDC Guidelines indicated that COVID-19 on a surface is extremely fragile and just
27   needed soap and water.  CDC, *Guidance for Cleaning and Disinfecting Public Spaces,*
     *Workplaces, Businesses, Schools, and Homes* (2020), *available at*
28   https://www.cdc.gov/coronavirus/2019-
     ncov/community/pdf/Reopening_America_Guidance.pdf.

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona  85004
(602) 926-9880

1

2                                **CERTIFICATE OF SERVICE**

3            I hereby certify that on August 21, 2020, I electronically transmitted the foregoing

4    document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

5    Notice of Electronic Filing to the following CM/ECF registrants:

6    Matt Anderson, Esq.
     MATT ANDERSON LAW, PLLC
7    2633 E. Indian School Road, Suite 370
     Phoenix, AZ  85016
8    matt@mattandersonlaw.com
     *Attorneys for Plaintiff*
9
     /s/      *Brenda Uran*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit C

1   Amy M. Samberg (#013874)
    Amy L. Stein (#026113)
2   FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
    One Arizona Center
3   400 E. Van Buren Street, Suite 550
    Phoenix, AZ 85004
4   Telephone: (602) 926-9880
    Facsimile: (312) 863-5099
5   E-Mail: asamberg@fgppr.com
            astein@fgppr.com
6   Attorneys for Defendant Illinois Union Insurance Company,
    Inc.
7
                    IN THE UNITED STATES DISTRICT COURT
8
9                      FOR THE DISTRICT OF ARIZONA
10
11  London Bridge Resort, LLC, an Arizona    No. 3:20-cv-08109-GMS
    limited liability company,
12                                           **DEFENDANT ILLINOIS UNION**
              Plaintiff,                     **INSURANCE COMPANY'S**
13                                           **MOTION TO DISMISS**
         v.                                  **PLAINTIFF'S COMPLAINT**
14                                           **PURSUANT TO FRCP 12(B)(6)**
    Illinois Union Insurance Company, Inc.,
    an Illinois corporation,
15
              Defendant.
16
17          Defendant Illinois Union Insurance Company ("Illinois Union"), hereby moves to

18  dismiss Plaintiff London Bridge Resort, LLC's ("London Bridge") Complaint for failure to

19  state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure

20  ("FRCP") 12(b)(6). In support of its Motion, Illinois Union states the following.

21                       **PRELIMINARY STATEMENT**

22          In this Action, London Bridge seeks insurance coverage from Illinois Union for

23  business income losses London Bridge has allegedly sustained as a result of the COVID-19

24  pandemic. At issue is a Premises Pollution Liability Policy issued to London Bridge by

25  Illinois Union. London Bridge seeks coverage under the insuring agreement of the Policy

26  which, subject to all of its terms and conditions, provides coverage for "loss" resulting from

27  "first-party claims" arising out of a "pollution condition" on, at, under or migrating from a

28

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1   "covered location."  London Bridge's Complaint fails to state a viable claim for coverage

2   for two distinct reasons.

3       First, COVID-19 does not constitute a "pollution condition" under the Illinois Union

4   policy.  The term "pollution condition," as defined by the policy, is limited to traditional

5   environmental pollution, and does not include a communicable disease caused by a virus,

6   like COVID-19.  Because there is no "pollution condition," London Bridge's Complaint

7   fails to state a claim upon which relief can be granted under FRCP 12(b)(6).

8       Second, even if COVID-19 did constitute a "pollution condition," there still must be

9   "loss" resulting from "first-party claims" arising out of a "pollution condition" on, at, under

10  or migrating from a "covered location" in order for the insuring agreement to be triggered.

11  London Bridge's Complaint does not contain an allegation that COVID-19 was on, at, under

12  or migrating from the "covered location" identified by the Illinois Union policy as the resort

13  owned and operated by London Bridge in Lake Havasu City, Arizona.  Because London

14  Bridge has not claimed or alleged that COVID-19 was located at the London Bridge resort,

15  it cannot satisfy the insuring agreement of the Illinois Union policy irrespective of whether

16  COVID-19 is a "pollution condition."  The Complaint fails to state a claim upon which

17  relief can be granted for this reason as well.

18      Because London Bridge does not and cannot state a viable claim upon which relief

19  can be granted against Illinois Union, pursuant to FRCP 12(b)(6) its Complaint must be

20  dismissed with prejudice.

21                          **BACKGROUND**

22  A.    **Allegations of the Complaint**

23      In its Complaint, London Bridge alleges that it is a destination resort in Arizona (the

24  "Resort") and that due to the COVID-19 pandemic, its guests have either canceled prior

25  reservations at the Resort or have elected not to travel there, severely impacting London

26  Bridge's revenue.  Complaint at ¶¶ 9-10.

27      The Complaint alleges that Illinois Union issued Premises Pollution Liability

28  Insurance Policy number PPL G71205162 002 (the "Policy") to London Bridge for the

policy period of November 15, 2019 to November 15, 2020, providing coverage in relevant part for "business interruption loss" up to $1 million arising out of a "pollution condition." *Id.* at ¶¶ 11-12. The Complaint further alleges that the Policy provides coverage for "business interruption loss" resulting from certain acts of civil authority arising out of a "pollution condition," which the Policy identifies as "government action" and "environmental law." *Id.* at ¶ 13. London Bridge alleges that COVID-19 constitutes a "pollution condition" under the Policy, and that certain acts by various governmental agencies with respect to COVID-19 constitute a "claim" under the Policy, which has caused London Bridge to suffer approximately $2 million in "business interruption losses." *Id.* at ¶¶ 14-16, 18-162.

Count I of the Complaint alleges breach of contract. London Bridge alleges that the COVID-19 pandemic has caused a covered "pollution condition" under the Policy for which coverage should be afforded. *Id.* at ¶¶ 164-172. Count II is for declaratory relief, seeking a declaration of coverage under the Policy. *Id.* at ¶¶ 174-177.

**B.    The Policy**

Illinois Union issued the Policy, designated as Premises Pollution Liability Insurance Policy number PPL G71205162 002, to London Bridge, providing claims made and reported coverage with a "policy period" from November 15, 2019 through November 15, 2020. (A true and correct copy of the Policy is attached hereto as Exhibit "A" bates labeled IUIC000001-42). As is relevant to this case,[1] the Policy has a limit of liability of $1,000,000 per "pollution condition" and a $1,000,000 total policy and program aggregate for all "pollution conditions", subject to a self-insured retention of $100,000 per "pollution condition." *Id.* at IUIC000002.

Coverage A of the Policy provides, in pertinent part, that it will pay "loss" in excess of the "self-insured retention" for:

---

[1] Subject to all of its terms and conditions, the Policy also provides coverage for an "indoor environmental condition," which is not at issue in the Claim or the Complaint.

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

"Claims" and "first-party claims" arising out of:  **1)** a "pollution condition" on, at, under or migrating from a "covered location"… provided the "claim" is first made, or the "insured" first discovers the "pollution condition" … that is the subject of such "first-party claim", during the "policy period".  Any such "claim" or "first-party claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period", or during any applicable "extended reporting period".

*Id.*at IUIC000006.  Importantly, the Insuring Agreement not only requires the discovery during the policy period of a "pollution condition" as that term is defined, the "pollution condition must be "*on, at, under or migrating from a 'covered location.'*"  (Emphasis added).  *Id.*  There is one "covered location," which is the Resort located at 1477 Queens Bay, Lake Havasu City, Arizona.  *Id.* at IUIC000002.

A "pollution condition" is defined as:

The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level" radioactive waste", "mixed waste" and medical, red bag, infectious or pathological wastes, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.

*Id.* at IUIC000014-15.

If the requirements of the Insuring Agreement and all other terms and conditions have been met, the Policy will pay covered "loss."  "Loss" includes "remediation costs" "emergency response costs", and, as is relevant to this case, "business interruption loss." *Id.* at IUIC000013.  The Policy defines "business interruption" as:

[T]he necessary partial or complete suspension of the "insured's" operations at a "covered location" for a period of time, which is directly attributable to a "pollution condition" or "indoor environmental condition" to which Coverage **A.** of this Policy applies.  Such period of time shall extend from the period of time that the operations are necessarily suspended and end when such "pollution condition" or "indoor environmental condition" has been remediated to the point at which the "insured's" normal operations could reasonably be restored.

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1    *Id.* at IUIC000009.  "Business interruption loss" includes (1) "business income"; (2)

2    "extra expense"; and (3) "delay expense", as those terms are defined in the Policy.  *Id.*

3    <u>ARGUMENT</u>

4    A.    <u>Standard on Motion to Dismiss</u>

5    Under FRCP 12(b)(6), a court must dismiss a complaint if it fails to "raise a right to

6    relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

7    Dismissal "can be based on the lack of a cognizable legal theory or the absence of sufficient

8    facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d

9    696, 699 (9th Cir. 1988).  Although the court must accept the plaintiff's well-pled factual

10    allegations as true and in a light most favorable to the plaintiff, *North Star Int'l v. Arizona*

11    *Corp. Comm'n*, 720 F.2d 578, 580 (9th Cir. 1983), dismissal is warranted where it appears

12    the plaintiff cannot prove any "set of facts in support of the claim that would entitle it to

13    relief."  *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir. 2000).  The

14    Court "[is] not bound to accept as true a legal conclusion couched as a factual allegation"

15    in the plaintiff's complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).  In addition, mere

16    "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a

17    motion to dismiss."  *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).

18    "A court may take judicial notice of 'matters of public record' without converting a

19    motion to dismiss into a motion for summary judgment."  *Lee v. City of Los Angeles*, 250

20    F.3d 668, 689 (9th Cir. 2001).  In addition, "documents whose contents are alleged in a

21    complaint and whose authenticity no party questions, but which are not physically attached

22    to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss."  *Tunac*

23    *v. United States*, 897 F.3d 1197, 1207 (9th Cir. 2018) (alteration in original).  The Policy

24    qualifies as a document whose contents are alleged in the Complaint and whose authenticity

25    is not in question.  Accordingly, the Court may consider the Policy on Illinois Union's

26    Motion to Dismiss.

27

28

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

**B.**   <u>**Arizona Law Applies**</u>

A federal court sitting in diversity will apply the choice of law rules of the forum. *Nelson v. Int'l Paint Co.*, 716 F.2d 640, 643 (9th Cir. 1983). Arizona applies the most significant relationship test under the Restatement (Second) of Conflict of Laws, absent a contractual choice-of-law provision. *Cardon v. Cotton Lane Holdings, Inc.*, 173 Ariz. 203, 207 (1992). "[T]he location of the insured risk should be given the greatest weight when determining which state's law applies, so long as the risk can be located, at least principally, in a single state." *Labertew v. Chartis Prop. Cas. Co.*, 363 F. Supp.3d 1031, 1036 (D. Ariz. 2019). In addition, "Arizona has a strong interest in applying Arizona law." *Beckler v. State Farm Mut. Auto. Ins. Co.*, 195 Ariz. 282, 289 (Ct. App. 1999).

The Policy does not contain a choice of law provision, so the Restatement's most significant relationship will apply to determine choice of law. London Bridge is headquartered in Arizona and the Resort is located there. In addition, the Policy was issued to London Bridge in Arizona. Since the most significant relationship is with Arizona, Arizona law applies to the determination of coverage and whether London Bridge's Complaint states a viable claim for relief under FRCP 12(b)(6).

**C.**   <u>**Arizona Rules of Insurance Policy Interpretation**</u>

Under Arizona rules of insurance policy interpretation, London Bridge has the burden to establish that it is entitled to coverage under Insuring Agreement A of the Policy. *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 199 Ariz. 43, 46 (Ct. App. 2000) ("Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion."); *757BD LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 330 F. Supp. 3d 1143, 1149 (D. Ariz. 2018) (same).

Arizona courts "interpret an insurance policy according to its plain and ordinary meaning, examining it from the viewpoint of an individual untrained in law or business." *Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 225 Ariz. 194, 200 (Ct. App. 2010). Any ambiguities are construed against the insurer. *Id.* "Undefined terms of an insurance policy ... must be construed in their plain, ordinary and everyday sense and the

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1    parameters of the definition should reflect the legal characteristics most frequently
2    attributed to the word." *Fall v. First Mercury Ins. Co.*, 225 F. Supp.3d 842, 847 (D. Ariz.
3    2016) (alteration in original).  When interpreting an insurance contract, Arizona courts must
4    "harmonize all parts of the contract ... by a reasonable interpretation in view of the entire
5    instrument." *Aztar Corp. v. U.S. Fire Ins. Co.*, 223 Ariz. 463, 475 (Ct. App. 2010) (alteration
6    in original).

7    **D.      The Complaint Fails To Allege a "Pollution Condition" Under the Policy**

8    A "pollution condition" under the Policy is defined as the "***discharge, dispersal,***
9    ***release, escape, migration, or seepage*** of any solid, liquid, gaseous or thermal irritant,
10   contaminant, or pollutant… on, in, into, or upon land and structures thereupon, the
11   atmosphere, surface water, or groundwater."  (Ex. A at IUIC000014-15) (emphasis added).

12   While no Arizona court has addressed coverage under a premises pollution liability
13   policy like the Policy at issue here, the terms contained in the Policy's definition of
14   "pollution condition" have been addressed by Arizona courts in the context of an absolute
15   pollution exclusion in a commercial general liability policy and have been found to be
16   unambiguous.  In *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 786-87 (Ariz.
17   Ct. App. 2000), which involved application of such an absolute pollution exclusion, the
18   insured, a mixed-use residential and golf community, sought coverage under a commercial
19   general liability policy for a lawsuit brought by a golfer who became ill after ingesting
20   bacteria-contaminated water.  In relevant part, the policy excluded coverage for bodily
21   injury "arising out of the actual, alleged or threatened discharge, dispersal, seepage,
22   migration, release or escape of pollutants."  *Id*. at 788.  The policy defined "pollutants" as
23   "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot,
24   fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled,
25   reconditioned or reclaimed."  *Id*. at 789.  The court recognized that terms such as
26   "discharge," "dispersal," "release," and "escape," are *"terms of art in environmental law*
27   *which generally are used with reference to damage or injury caused by improper disposal*
28   *or containment of hazardous waste."  Id*. at 790 (emphasis added).  The court also

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1    recognized the historical purpose of the absolute pollution exclusion, which was to

2    eliminate coverage for traditional environmental pollution.  *Id*. at 791.  As such, the court

3    found that the policy's pollution exclusion did not apply to exclude coverage for bacteria,

4    since bacteria was not a "pollutant."  *Id*. at 792.

5         Similarly, in *Starr Surplus Lines Ins. Co. v. Star Roofing, Inc.*, 2019 WL 5617575

6    (Ariz. Ct. App. Oct. 31, 2019), the court recognized that "the terms used in the [pollution]

7    exclusion clause, such as 'discharge,' 'dispersal,' 'release' and 'escape,' *are terms of art in*

8    *environmental law and are generally used to refer to damage or injury resulting from*

9    *environmental pollution*.") (Emphasis added).  As such, the court held the policy's pollution

10   exclusion did not exclude coverage for injuries sustained due to inhalation of fumes from

11   roofing materials.  *Id*. at *3.  See also, *Nat'l Fire Ins. Co. of Hartford v. James River Ins.*,

12   162 F. Supp. 3d 898, 908 (D. Ariz. 2016) (with respect to pollution exclusion, the terms

13   "must be read in light of the historical purpose of the pollution exclusionary clause—as

14   interpreted by the Arizona Court of Appeals—to preclude coverage for 'traditional

15   environmental pollution.'"); *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1216 (Cal.

16   2003) (court held that the pollution exclusion's scope was limited to "environmental

17   pollution … consistent with the choice of terms 'discharge, dispersal, release or escape.'");

18   *Am. States. Ins. Co. v. Koloms*, 687 N.E.2d 72, 81 (Ill. 1997) (Illinois Supreme Court limited

19   the scope of the absolute pollution exclusion to traditional environmental pollution); *Nav-*

20   *Its, Inc. v. Selective Ins. Co. of Am.*, 183 N.J. 110 (2005) (absolute pollution exclusion

21   applies to traditional environmentally related damages; *Belt Painting Corp. v. TIG Ins. Co.*,

22   100 N.Y.2d 377 (2003) (same); *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27 (1st Cir. 1999)

23   (same).

24        In fact, insurance policies such as environmental impairment and pollution liability

25   policies, that are specifically issued to cover environmental contamination, were intended

26   to fill coverage gaps created by the absolute pollution exclusion's exclusion of coverage for

27   traditional environmental pollution.  See *Masonite Corp. v. Great Am. Surplus Lines Ins.*

28   *Co.*, 224 Cal. App. 3d 912, 916–17 (Ct. App. 1990) (environmental impairment liability

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1   policy filled the gap in coverage resulting from the pollution exclusion in general liability

2   policy to protect insured for damage caused by gradual pollution); *Viacom Int'l, Inc. v.*

3   *Admiral Ins. Co.*, No. L-1739-99, 2006 WL 1060504, at *2 (N.J. Super. Ct. App. Div. Apr.

4   21, 2006). ("Environmental Impairment Liability (EIL) policies respond to loss arising from

5   pollution. EIL policies are often viewed as filling the coverage gap created by the pollution

6   exclusion clauses in CGL policies."); *Olin Corp. v. Ins. Co. of N. Am.*, 986 F. Supp. 841,

7   844 (S.D.N.Y. 1997) ("a substitute form of insurance appeared in the marketplace

8   specifically designed to fill in the gap created by the pollution exclusions in the CGL

9   policies. This new form of insurance was environmental impairment liability (EIL)

10  insurance.")  While no Arizona court has addressed coverage under an environmental

11  impairment or premises pollution liability policy, a court in the neighboring state of

12  California has considered the question.  In *Essex Walnut Owner L.P. v. Aspen Specialty Ins.*

13  *Co.*, 335 F. Supp. 3d 1146 (N.D. Cal. 2018), the U.S. District Court for the Northern District

14  of California analyzed the term "pollutant" within the context of a coverage grant in an

15  environmental legal liability policy. The insured sought coverage under the policy for costs

16  incurred to remove debris buried in the insured's excavation site where it intended to build

17  a mixed-use development.  *Id.* at 1149.  "The debris consisted of wood, concrete, glass,

18  metal, tires, and large, buried tree trunks." *Id.*  However, the court found that pollution

19  coverage was limited to "environmental pollution."  The policy at issue contained the

20  following relevant definitions:

21      Pollution condition means the discharge, emission, seepage, migration, dispersal,
22      misdelivery, release or escape, or illicit abandonment by a third-party without the
        insured's consent of any pollutant into or upon land, or any structure on land, the
23      atmosphere or any watercourse or body of water including groundwater, provided
        such pollutant is not naturally present in the environment in the concentration or
24      amounts discovered.

25      Pollutant means any solid, liquid, gaseous or thermal irritant or contaminant,
26      including without limitation smoke, vapors, soot, silt, sediment, fumes, acids, alkalis,
        chemicals, hazardous substances, petroleum hydrocarbons, low level radioactive
27      matter or waste, microbial matter, legionella pneumophila, medical, infectious or

28

pathological waste or waste materials, methamphetamines, electromagnetic fields, biological agent or nanotechnology matter

Clean-up cost means reasonable and necessary expense incurred with the insurer's prior written consent, including legal expense and restoration cost, to investigate, abate, contain, treat, remove, remediate, monitor, neutralize or dispose of contaminated soil, surface water or groundwater or other contamination caused by a pollution condition but only: (i) to the extent required by environmental law ....

*Id.* at 1148-49.

The court found the same general principles from *MacKinnon*, *supra*, 73 P.3d at 1205, applied to limit pollution coverage to "environmental pollution":

[T]he basic teaching of *MacKinnon*—namely, that "pollutant" should be understood to mean something that is commonly thought of as pollution, i.e., environmental pollution—logically applies even in the context of the case at bar. *MacKinnon's* interpretation comports fully with the title of the insurance policy here— "Environmental Legal Liability Policy". It is also consistent with the examples of "pollutant" provided in the policy (e.g., smoke, hazardous substances) and with other policy provisions; in particular, the policy provides that Aspen will pay for "clean-up cost" which the policy defines as an expense incurred to, e.g., address contamination caused by a pollution condition "to the extent required by *environmental* law" or "as determined reasonable and necessary by an *environmental* professional." Since Aspen's liability under the policy is tied to "environmental" matters, it is only logical that "pollutant" likewise be defined as relating to environmental matters.

*Id.* at 1152-53 (citations omitted).  Accordingly, although the dispositive issue before the court on summary judgment was whether "clean-up costs" were incurred, the court nevertheless posited: "The question is thus whether the kind of debris allegedly found here in the soil is commonly thought of as environmental pollution." *Id*. at 1153.

Arizona law is clear that the unambiguous terms "discharge," "dispersal," "release," "escape" and similar terms contained in the definition of "pollution condition" in the Policy relate solely to traditional environmental contamination, and do not cover a virus such as COVID-19.  This is wholly consistent with the evolution of pollution liability coverage.  This interpretation also gives effect to the definition of "pollution condition" in its plain, ordinary and everyday sense, with "the parameters of the definition ... reflect[ing] the legal

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9800

1    characteristics most frequently attributed to the word[s]." *Fall v. First Mercury Ins. Co.*,
2    225 F. Supp.3d at 847.

3        Moreover, this interpretation is also consistent with the Arizona rule of insurance
4    policy interpretation requiring the court to give effect to all provisions of the Policy. *Aztar*
5    *Corp. v. U.S. Fire Ins. Co.*, *supra*, 223 Ariz. at 475. Similar to the pollution policy at issue
6    in *Essex Walnut*, *supra*, 335 F. Supp. 3d 1146, the Policy's other terms and definitions
7    demonstrate that coverage is limited to environmental contamination, and there is no
8    coverage for a virus like COVID-19. For example, the Policy defines "remediation costs"
9    as "expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize,
10    or immobilize 'pollution conditions' … to the extent required by 'environmental law'".
11    "Environmental law" is in turn defined as "any Federal, state, commonwealth, municipal or
12    other local law, statute, ordinance, rule, guidance document, regulation, and all amendments
13    thereto (collectively Laws), including voluntary cleanup or risk-based corrective action
14    guidance, or the direction of an 'environmental professional' acting pursuant to the
15    authority provided by any such Laws, along with any governmental, judicial or
16    administrative order or directive, governing the liability or responsibilities of the 'insured'
17    with respect to a 'pollution condition'". These definitions relate to traditional
18    environmental pollution and do not encompass a virus like COVID-19. Accordingly,
19    London Bridge has not met its burden to show that there is a "pollution condition" under
20    the Policy's insuring agreement, and its Complaint must be dismissed with prejudice under
21    FRCP 12(b)(6).

22    **E.    The Complaint Fails To Allege A Pollution Condition On, At, Under or**
23    **Migrating From a "Covered Location"**

24        Notwithstanding that COVID-19 is not a "pollution condition," the Complaint does
25    not allege a cognizable claim for coverage under the Policy. Separate and apart from the
26    requirement that there be a "pollution condition," the "pollution condition" must be *on, at,*
27    *under or migrating from a 'covered location.'* (Ex. A at IUIC000014-15) (Emphasis
28

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1   added).  This requirement that the "pollution condition" be tied to the "covered location" is

2   an essential part of the coverage afforded by a pollution liability policy.  See *Jane St.*

3   *Holding, LLC v. Aspen Am. Ins. Co.*, 2014 WL 28600, at *7 (S.D.N.Y. Jan. 2, 2014), *aff'd*,

4   581 F. App'x 49 (2d Cir. 2014) (no business personal property coverage for flood damage

5   done to electric generator located in basement when policy's Schedule Location

6   Endorsement limited coverage to 33rd floor of building); *Dilmar Oil Co. v. Federated Mut.*

7   *Ins. Co.*, 986 F. Supp. 959, 978 (D.S.C. 1997) (no coverage for "voluntary clean-up costs"

8   because they were not incurred at the "insured site", as required by the insuring agreement);

9   accord *Penton Media, Inc. v. Affiliated FM Ins. Co.*, 245 F. App'x 495, 500 (6th Cir. 2007)

10  (civil authority provision of business interruption policy, which covered loss due to

11  prohibition of access to "described locations," did not cover losses arising from insured's

12  postponement of trade show at Javits Center; the court found that the Javits Center, a

13  property not owned by the insured, was not a "described location" contemplated by the civil

14  authority provision).

15      However, the Complaint does not contain a single allegation that COVID-19 was

16  discovered "on, at, under, or migrating from" the "covered location," which is the Resort in

17  Arizona.  Instead, the Complaint alleges that London Bridge's business has suffered as a

18  result of various governmental actions in Arizona and throughout the United States in

19  response to the pandemic that have affected travel to the Resort.

20      Specifically as to Arizona, the Complaint alleges that the Governor of Arizona issued

21  Executive Order 2020-09 on March 19, 2020 in response to the global pandemic, the State

22  of Emergency declared by President Trump, and updated guidance from the United States

23  Centers for Disease Control and Prevention ("CDC") and Arizona Department of Health

24  Services ("ADHS") regarding social gatherings and in-person restaurant dining.

25  (Complaint at ¶ 19).  The Complaint alleges that Executive Order 2020-09 required that, by

26  the close of business on March 20, 2020, all restaurants, bars, and indoor gyms and fitness

27  clubs in counties within Arizona with confirmed cases of COVID-19 to close access to in-

28  person dining.  *Id.* at ¶ 20.

The Complaint also alleges that by Executive Order 2020-18 dated March 30, 2020, the Governor of Arizona issued another executive order instituting a "stay at home" policy for Arizona and requiring businesses that remained open to implement rules and procedures to facilitate social distancing. *Id.* at ¶ 23. London Bridge alleges that, "[a]s a consequence of the Pandemic (including specifically damage to property caused by the coronavirus), Executive Order 2020-09, Executive Order 2020-18, and "Closure Orders" (defined below) in other states, London Bridge has suffered Covered Losses under the Policy." *Id.* at ¶ 23.

The Complaint fails to allege that COVID-19 was discovered on, at, under or migrating from the Resort. The general presence of COVID-19 in the same county where the Resort is located, in Arizona, or elsewhere in the United States does not meet the Insuring Agreement's requirement of a "pollution condition" *at, on, under or migrating from a "covered location.*". As such, London Bridge cannot satisfy its burden of establishing coverage under Insuring Agreement A of the Policy, which is fatal to its Complaint. *Aztar Corp. v. U.S. Fire Ins. Co.*, *supra*, 223 Ariz. at 475.

Even more, giving effect to all provisions of the Policy as required by Arizona law, *Aztar Corp. v. U.S. Fire Ins. Co.*, *supra*, 223 Ariz. at 475, there is no coverage for London Bridge's alleged "business interruption" loss. "Business interruption" coverage is afforded under the Policy for "the necessary partial or complete suspension of the 'insured's' operations at a 'covered location' for a period of time, which is *directly attributable to a 'pollution condition' ... to which Coverage A. of this Policy applies."* (Ex. A at IUIC000009) (Emphasis added). The "business interruption" period under the Policy extends from the "time that the operations are necessarily suspended and end *when such "pollution condition" ... has been remediated* to the point at which the "insured's" normal operations could reasonably be restored." *Id.* (Emphasis added). Coverage A is confined to the discovery of "a 'pollution condition' *on, at, under or migrating from a 'covered location.*'" The Complaint identifies no discovery of COVID-19 on, at, under or migrating from a "covered location," absent which Coverage A does not apply. Nor does the Complaint identify any "remediation costs", absent which there can be no covered "business

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

1  interruption," because coverage for "business interruption" is confined to the period of time

2  during which the insured's normal business operations are suspended because a "pollution

3  condition" on, at, under or migrating from a "covered location" must be remediated.

4      Accordingly, the Complaint fails to state a claim upon which relief can be granted

5  for this reason as well.

6                              **CONCLUSION**

7      For all of the foregoing reasons, Illinois Union requests that its Motion to Dismiss

8  Plaintiff's Complaint for failure to state a claim upon which relief can be granted under

9  FRCP 12(b)(6) be granted, and that Plaintiff's Complaint be dismissed with prejudice.

10      DATED this 2nd day of July, 2020.

11                              FORAN GLENNON PALANDECH
                                PONZI & RUDLOFF PC
12

13

14                              By: s/ *Amy M. Samberg*
                                    Amy M. Samberg
15                                  Amy L. Stein
                                    400 E. Van Buren Street, Suite 550
16                                  Phoenix, AZ  85004
                                    Attorneys for Defendant Illinois Union
17                                  Insurance Company, Inc.

18

19

20

21

22

23

24

25

26

27

28

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona  85004
(602) 926-9880

FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
400 E. Van Buren Street, Suite 550
Phoenix, Arizona 85004
(602) 926-9880

**CERTIFICATE OF CONFERAL**

The undersigned hereby certifies that, pursuant to D. Ariz. L.R.Civ. 12.1(c), that prior to filing this Motion, counsel for Illinois Union Insurance Company, Inc. notified Plaintiff of the issues asserted in the foregoing motion and that the parties were unable to agree that the pleading was curable in any part by an amended pleading.

FORAN GLENNON PALANDECH
PONZI & RUDLOFF PC


By: s/ *Amy M. Samberg*
Amy M. Samberg
Amy L. Stein
400 E. Van Buren Street, Suite 550
Phoenix, AZ 85004
Attorneys for Defendant Illinois
Union Insurance Company, Inc.


**CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2020, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Matt Anderson, Esq.
MATT ANDERSON LAW, PLLC
2633 E. Indian School Road, Suite 370
Phoenix, AZ 85016
matt@mattandersonlaw.com
*Attorneys for Plaintiff*


/s/    *Brenda Uran*

# Exhibit A

CERTIFICATION OF POLICY

The undersigned, as an authorized representative of Illinois Union Insurance Company confirms that the attached is a true and correct copy of Policy number PPL G71205162 002, issued by the Insurer, including all endorsements and notices thereto as of 06/30/2020

Authorized Representative:

_____

Name: Mo Arellanes

Title: Vice President

# CHUBB®

**Premises Pollution Liability Insurance Policy**

**Illinois Union Insurance Company**
**Chicago, Illinois**

## *Declarations*

This Policy is issued by the stock insurance company identified above (hereinafter *the Insurer*).

THIS POLICY PROVIDES LIABILITY COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS, WHICH COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD OR WITHIN THIRTY DAYS THEREAFTER, UNLESS AN EXTENDED REPORTING PERIOD APPLIES. THIS POLICY ALSO PROVIDES FIRST-PARTY COVERAGES ON A DISCOVERED AND REPORTED BASIS, WHICH COVERS ONLY POLLUTION CONDITIONS AND INDOOR ENVIRONMENTAL CONDITIONS, AS APPLICABLE, FIRST DISCOVERED DURING THE POLICY PERIOD AND FOR WHICH A FIRST-PARTY CLAIM IS REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD OR WITHIN THIRTY DAYS THEREAFTER. FINALLY, THIS POLICY PROVIDES COVERAGE FOR EMERGENCY RESPONSE COSTS THAT IS LIMITED BY MORE SPECIFIC REPORTING CRITERIA AND COVERS ONLY EMERGENCY RESPONSE COSTS INCURRED, AND REPORTED TO THE INSURER, IN WRITING, WITHIN THE SPECIFIC TIMING REQUIREMENTS IDENTIFIED IN THIS POLICY. PLEASE READ THIS POLICY CAREFULLY. SOME OF THE PROVISIONS CONTAINED IN THIS POLICY RESTRICT COVERAGE, SPECIFY WHAT IS AND IS NOT COVERED AND DESIGNATE YOUR RIGHTS AND DUTIES. LEGAL DEFENSE EXPENSES ARE SUBJECT TO AND SHALL ERODE THE LIMITS OF LIABILITY AND ANY APPLICABLE SELF-INSURED RETENTION.

THE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION, THIS POLICY, AND ANY ENDORSEMENTS OR SCHEDULES ATTACHED HERETO, CONSTITUTE THE INSURANCE POLICY.

| Policy No.: PPL G71205162 002 | Renewal of: PPL G71205162 001 |
|---|---|
| **Item 1.** **First Named Insured:** London Bridge Resort LLC | |
| **Address:** 1477 Queens Bay<br>Lake Havasu City, Arizona 86403-0965 | |

**Coverages Purchased: Coverage A. -** [X] **Coverage B. -** [X] **Coverage C. -** [X]
("X" Indicates Coverage Purchased)

| Item 2. | **Policy Period:**<br>(Local Time of the Address Shown in Item 1., above.) | **Policy Inception Date:**<br>11/15/2019 12:01 A.M. | **Policy Expiration Date:**<br>11/15/2020 12:01 A.M. |
|---|---|---|---|
| Item 3. | **Limits of Liability:**<br>In U.S. Dollars | **a.** $1,000,000 | Per Pollution Condition or Indoor Environmental Condition Limit of Liability |
| | | **b.** $1,000,000 | Total Policy and Program Aggregate Limit of Liability for all Pollution Conditions and Indoor Environmental Conditions |
| Item 4. | **Self-Insured Retention / Deductible Period:**<br>In U.S. Dollars | **a.** $100,000 | Per Pollution Condition or Indoor Environmental Condition |
| | | **b.** 5 | Days Per Pollution Condition or Indoor Environmental Condition |

| Item 5. | Retroactive Dates: | ☐ if checked  Exposure-Specific  Retroactive Dates are designated via endorsement.<br><br>**Coverage A**<br>   Premises Pollution Condition Liability: **11/15/2018**<br>   Premises Indoor Environmental Condition Liability: **11/15/2018**<br>   Premises Pollution Condition First-Party Claims: **11/15/2018**<br>   Premises Indoor Environmental Condition First-Party Claims:  **11/15/2018**<br><br>**Coverage B**<br>   Transportation Liability: **11/15/2018**<br>   Transportation First-Party Claims: **11/15/2018**<br><br>**Coverage C**<br>   Non-Owned Disposal Sites Liability : **11/15/2018**<br><br>If **"FULL RETRO"** is indicated in the Retroactive Date column above, then retroactive coverage is afforded pursuant to this Policy for that specific exposure, subject to any other corresponding exposure-specific Retroactive Date added to this Policy by endorsement. |
|---|---|---|
| **Item 6.** | **Premium:**<br>In U.S. Dollars<br><br><br>**Total Premium:** | $17,019<br><br><br><br>$17,019<br><br>(The entire amount of this premium shall be **25%** minimum earned as of the first day of the Policy Period indicated in Item **2.**, above) |
| **Item 7.** | **Producer:**<br>Name & Address | Brown & Brown Insurance Of Arizona Inc.<br>2800 North Central Avenue<br>Suite 1100<br>Phoenix, Arizona 85002 |

| Item 8. | **a. Notice of Claim or Pollution Condition** | **b. All other Notices** |
|---|---|---|
| **Notices** | CHUBB Environmental Risk Claims Manager<br>CHUBB USA Claims<br>P.O. Box 5103<br>Scranton, PA 18505-0510<br>Fax:  (866) 635-5687<br><br>First Notice Fax:  (800) 951-4119<br>First Notice Email:<br>CasualtyRiskEnvironmentalFirstNotice@chubb.com | Environmental Risk Underwriting Officer<br>CHUBB Environmental Risk<br>P.O. Box 1000<br>436 Walnut Street – WA 07A<br>Philadelphia,  PA 19106 |
|  | **Environmental Incident Alert - 24 Hour Emergency Response Hotline** | **1-888-310-9553** |

| Item 9. | Covered Locations: | As per PF- 44913 |
|---------|-------------------|------------------|
| | | [X] if checked here, schedule of Covered Locations is designated via endorsement. |

**Policy Form No.** <u>PF-44887b (08/18) Premises Pollution Liability Insurance Policy</u>

**Endorsements and Notices Attached at Policy Issuance:**

| Endorsement Number: | Form Number: | Form Name: |
|---|---|---|
| 001 | PF-44891 (09/14) | Schedule of Additional Insureds (Broad) Endorsement |
| 002 | PF-48605 (01/17) | Asbestos and/or Lead-Based Paint Coverage (Inadvertent Disturbance) Endorsement |
| 003 | PF-44917 (09/14) | Dedicated Defense Aggregate Limit Endorsement |
| 004 | PF-44936 (09/14) | Fungi Or Legionella Management Plan Exclusionary Endorsement |
| 005 | PF-44957 (09/14) | Notice of Cancellation Amendatory (Generic Time Frame) Endorsement |
| 006 | PF-44963 (09/14) | Other Insurance (Primary) Endorsement |
| 007 | PF-48655 (01/17) | Remediation Costs Exclusionary (Premises Pollution And Indoor Environmental Conditions) Endorsement |
| 008 | PF-44913 (09/14) | Schedule of Covered Locations Schedule Endorsement |
| 009 | PF-48666 (01/17) | Supplementary Payments Amendatory Endorsement |
| 010 | PF-44999 (09/14) | Waiver of Subrogation (By Contract) Endorsement |
| 011 | SL-34255a (01/16) | Service of Suit Endorsement |
| 012 | ALL-21101 (11/06) | Trade Or Economic Sanctions Endorsement |
| 013 | LD-5S23j (03/14) | Signatures |
| | SL-17887 (08/04) | Arizona Surplus Lines Notification |
| | TRIA24 (01/15) | Policyholder Disclosure Notice of Terrorism Insurance Coverage |
| | ALL-20887a (03/16) | Chubb Producer Compensation Practices & Policies |
| | ILP 001 01 04 | U. S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders |

**IN WITNESS WHEREOF, the Insurer has caused this Policy to be countersigned by a duly authorized representative of the Insurer.**

**DATE:**  _____11/15/2019_____
MO/DAY/YR

_____
JOHN J. LUPICA, President
AUTHORIZED REPRESENTATIVE



# Premises Pollution Liability Insurance Policy

**This Policy is issued by the stock insurance company identified in the Declarations (hereinafter *the Insurer*).**

**THIS POLICY PROVIDES LIABILITY COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS, WHICH COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD OR WITHIN THIRTY DAYS THEREAFTER, UNLESS AN EXTENDED REPORTING PERIOD APPLIES. THIS POLICY ALSO PROVIDES FIRST-PARTY COVERAGES ON A DISCOVERED AND REPORTED BASIS, WHICH COVERS ONLY POLLUTION CONDITIONS AND INDOOR ENVIRONMENTAL CONDITIONS, AS APPLICABLE, FIRST DISCOVERED DURING THE POLICY PERIOD AND FOR WHICH A FIRST-PARTY CLAIM IS REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD OR WITHIN THIRTY DAYS THEREAFTER. FINALLY, THIS POLICY PROVIDES COVERAGE FOR EMERGENCY RESPONSE COSTS THAT IS LIMITED BY MORE SPECIFIC REPORTING CRITERIA AND COVERS ONLY EMERGENCY RESPONSE COSTS INCURRED, AND REPORTED TO THE INSURER, IN WRITING, WITHIN THE SPECIFIC TIMING REQUIREMENTS IDENTIFIED IN THIS POLICY. PLEASE READ THIS POLICY CAREFULLY. SOME OF THE PROVISIONS CONTAINED IN THIS POLICY RESTRICT COVERAGE, SPECIFY WHAT IS AND IS NOT COVERED AND DESIGNATE YOUR RIGHTS AND DUTIES. LEGAL DEFENSE EXPENSES ARE SUBJECT TO AND SHALL ERODE THE LIMITS OF LIABILITY AND ANY APPLICABLE SELF-INSURED RETENTION.**

Throughout this Policy the words *the Insurer* shall refer to the company providing this insurance. Other words and phrases that appear in quotation marks have special meanings and are defined in Section **V., DEFINITIONS**.

In consideration of the payment of the premium and in reliance upon all statements made in the Application to this Policy, including the information furnished in connection therewith, and subject to all terms, definitions, conditions, exclusions and limitations of this Policy, the Insurer agrees to provide insurance coverage to the "insured" as described herein.

## I. INSURING AGREEMENTS

Solely to the extent that the coverages below are identified on the Declarations to this Policy as being underwritten by the Insurer, the Insurer agrees to pay on behalf of the "insured" for "loss", in excess of the "self-insured retention" or deductible period (as applicable), resulting from:

**A. POLLUTION CONDITIONS OR INDOOR ENVIRONMENTAL CONDITIONS COVERAGE (Coverage A.)**

"Claims" and "first-party claims" arising out of: **1)** a "pollution condition" on, at, under or migrating from a "covered location"; or **2)** an "indoor environmental condition" at a "covered location", provided the "claim" is first made, or the "insured" first discovers the "pollution condition" or "indoor environmental condition" that is the subject of such "first-party claim", during the "policy period". Any such "claim" or "first-party claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period", or during any applicable "extended reporting period".

The coverage afforded pursuant to this Coverage **A.** only applies to "pollution conditions" or "indoor environmental conditions" that first commence, in their entirety, on or after the retroactive date identified in Item **5.** of the Declarations, if applicable, and prior to the expiration of the "policy period".

**B. TRANSPORTATION COVERAGE (Coverage B.)**

"Claims" and "first-party claims" arising out of a "pollution condition" resulting from "transportation", provided the "claim" is first made, or the "insured" first discovers the "pollution condition" that is the subject of such "first-party claim", during the "policy period". Any such "claim" or "first-party claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period", or during any applicable "extended reporting period".

The coverage afforded pursuant to this Coverage **B.** only applies to "pollution conditions" that first commence, in their entirety, on or after the retroactive date identified in Item **5.** of the Declarations, if applicable, and prior to the expiration of the "policy period".

**C.**  NON-OWNED DISPOSAL SITE COVERAGE (Coverage **C.**)

"Claims" arising out of a "pollution condition" on, at, under or migrating from a "non-owned disposal site", provided the "claim" is first made during the "policy period". Any such "claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period", or during any applicable "extended reporting period".

The coverage afforded pursuant to this Coverage **C.** only applies to "pollution conditions" that are attributable to a "named insured's" waste generated at a "covered location" and received at the "non-owned disposal site", in its entirety, on or after the retroactive date identified in Item **5.** of the Declarations, if applicable, and prior to the expiration of the "policy period".

## II.  LIMITS OF LIABILITY AND SELF-INSURED RETENTION

**A.**  It is expressly agreed that the Insurer's obligation to pay for any covered "loss" (exclusive of "business interruption loss") pursuant to this Policy shall attach to the Insurer only after the "first named insured" has paid, or has provided evidence to the Insurer that another "named insured" has paid, the full amount of the "self-insured retention" with respect to any covered "pollution condition" or "indoor environmental condition". Under no circumstances, including, but not limited to, an "insured's" insolvency and/or bankruptcy, shall the Insurer be liable to pay any amount within the "self-insured retention". In the event that the "first named insured" cannot provide satisfactory evidence that a "named insured" has paid the full amount of the "self-insured retention" with respect to any covered "pollution condition" or "indoor environmental condition", the "first named insured" shall remain responsible to pay the "self-insured retention" before the Insurer's payment obligation pursuant to this Policy shall attach with respect to coverage sought by any "insured".

Notwithstanding the foregoing, if the "insured" agrees with the Insurer to use "mediation" to successfully resolve any "claim" for which "legal defense expenses" have been incurred, then the "self-insured retention" applicable to the "pollution condition" or "indoor environmental condition" that corresponds to such "claim" shall be reduced by fifty percent (50%), subject to a maximum reduction in the "self-insured retention" of twenty-five thousand dollars ($25,000).

In addition to the foregoing, it is expressly agreed that the Insurer's obligation to pay for any covered "business interruption loss" pursuant to this Policy shall attach to the Insurer only after the relevant "insured" has also borne the full amount of the "business interruption loss" within the deductible period identified in Item **4.** of the Declarations to this Policy.

**B.**  One "self-insured retention" shall apply to all "loss" (exclusive of "business interruption loss") arising out of the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition". If the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" triggers coverage pursuant to multiple coverage parts, or otherwise involves multiple exposures that have been assigned exposure-specific "self-insured retention" amounts by endorsement to this Policy, the single largest of the associated "self-insured retention" amounts identified in: **1)** Item **4.** of the Declarations; **2)** any Supplemental Coverage added by endorsement to this Policy; or **3)** any exposure-specific "self-insured retention" endorsement identified as part of this Policy, shall apply to all "loss" and other covered exposures arising out of such "pollution condition" or "indoor environmental condition", except for any "catastrophe management costs" that are assigned an exposure-specific "self-insured retention" by endorsement to this Policy, if any (hereinafter Catastrophe Management-Specific SIR Obligation).  Amounts within any such Catastrophe Management-Specific SIR Obligation shall be independent of, and shall not otherwise erode, the single largest "self-insured retention" applicable to all other covered exposures arising out of the same "pollution condition" or "indoor environmental condition" as contemplated herein.

**C.**  One deductible period shall apply to all "business interruption loss" arising out of the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition".

**D.**  Subject to Subsections **E.** and **F.,** below, the most the Insurer shall pay for all "loss" arising out of the same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" is the Per Pollution Condition or Indoor Environmental Condition Limit of Liability identified in Item **3.a.** of the Declarations to this Policy.

**CHUBB®**

**Premises Pollution Liability**
**Insurance Policy**

**E.**  Subject to Subsection **D.**, above, and Subsection **F.**, below, **$250,000** shall be the maximum amount the Insurer shall pay for all "catastrophe management costs" arising out of all "pollution conditions" and "indoor environmental conditions".

**F.**  Subject to Subsections **D.** and **E.**, above, the Total Policy and Program Aggregate Limit of Liability identified in Item **3.b.** of the Declarations shall be the maximum liability of the Insurer pursuant to this Policy with respect to all "loss".

**G.**  If the Insurer or an affiliate has issued pollution liability coverage afforded on a discovered and reported basis or claims-made and reported basis consistent with coverage afforded pursuant to this Policy in one or more policy periods, and a "pollution condition" or "indoor environmental condition" is first discovered and reported to the Insurer, or a "claim" is first made and reported to the Insurer with respect to a "pollution condition" or "indoor environmental condition", in accordance with the terms and conditions of this Policy, then:

    **1.**  Any continuous, repeated, or related "pollution condition" or "indoor environmental condition" that is subsequently reported to the Insurer during later policy periods shall be deemed to be one "pollution condition" or "indoor environmental condition" discovered during this "policy period"; and

    **2.**  All "claims" arising out of:

        **a.**  The same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" that was discovered during this "policy period"; or

        **b.**  The same, continuous, repeated, or related "pollution condition" or "indoor environmental condition" that was the subject of a "claim" first made and reported in accordance with the terms and conditions of this Policy,

shall be deemed to have been first made and reported during this "policy period" and no other policy shall respond.

## III. DEFENSE AND SETTLEMENT

**A.**  The Insurer shall have the right and, subject to the "self-insured retention" obligation, the duty to defend the "insured" against a "claim" to which this insurance applies.  The Insurer shall have no duty to defend the "insured" against any "claim" to which this insurance does not apply.  The Insurer's duty to defend the "insured" ends once the Limits of Liability are exhausted or are tendered into a court of applicable jurisdiction, or once the "insured" refuses a settlement offer as provided in Subsection **E.,** below.

**B.**  The Insurer shall have the right to select legal counsel to: **1)** represent the "insured" for the investigation, adjustment, and defense of any "claims" covered pursuant to this Policy; and **2)** assist the "insured" with clarifying the extent of, and to help minimize, any "first-party remediation costs".  Selection of legal counsel by the Insurer shall not be done without the consent of the "insured"; such consent shall not be unreasonably withheld.

In the event the "insured" is entitled by law to select independent counsel to defend itself at the Insurer's expense, the attorney fees and all other litigation expenses the Insurer shall pay to that counsel are limited to the rates the Insurer actually pays to counsel that the Insurer normally retains in the ordinary course of business when defending "claims" or lawsuits of similar complexity in the jurisdiction where the "claim" arose or is being defended.  In addition, the "insured" and the Insurer agree that the Insurer may exercise the right to require that such counsel: **1)** have certain minimum qualifications with respect to their competency, including experience in defending "claims" similar to those being asserted against the "insured"; **2)** maintain suitable errors and omissions insurance coverage; **3)** be located within a reasonable proximity to the jurisdiction of the "claim"; and **4)** agree in writing to respond in a timely manner to the Insurer's requests for information regarding the "claim".  The "insured" may at any time, by its signed consent, freely and fully waive its right to select independent counsel.

**C.**  The "insured" shall have the right and the duty to retain a qualified environmental consultant or "catastrophe management firm" to: **1)** perform any investigation and/or remediation of any "pollution condition" or "indoor environmental condition" covered pursuant to this Policy; or **2)** perform "catastrophe management services" covered pursuant to this Policy, respectively.  The "insured" must

 **CHUBB**®

**Premises Pollution Liability
Insurance Policy**

receive the consent of the Insurer prior to the selection and retention of such consultant or "catastrophe management firm", except in the event of a "first-party claim" that results in "emergency response costs".

D.   "Legal defense expenses" reduce the Limits of Liability identified in the Declarations to this Policy, and, unless specifically stated otherwise herein, any applicable Limits or Sublimits of Liability identified in any endorsement hereto.  "Legal defense expenses" shall also be applied to the "self-insured retention".

E.   The Insurer shall present all settlement offers to the "insured".  If the Insurer recommends a settlement which is acceptable to a claimant, exceeds any applicable "self-insured retention", is within the Limits of Liability, and does not impose any additional unreasonable burdens on the "insured", and the "insured" refuses to consent to such settlement offer, then the Insurer's duty to defend shall end.  Thereafter, the "insured" shall defend such "claim" independently and at the "insured's" own expense. The Insurer's liability shall not exceed the amount for which the "claim" could have been settled if the Insurer's recommendation had been accepted, exclusive of the "self-insured retention".

**IV.  COVERAGE TERRITORY**

The coverage afforded pursuant to this Policy shall only apply to "pollution conditions" or "indoor environmental conditions" located, and "claims" made, within the United States of America.

**V.  DEFINITIONS**

A.   **"Additional insured"** means any person or entity specifically endorsed onto this Policy as an "additional insured", if any.  Such "additional insured" shall maintain only those rights that are specified by endorsement to this Policy.

B.   **"Adverse media coverage"** means national or regional news exposure in television, radio, print or internet media that is reasonably likely to have a negative impact on the "insured" with respect to its income, reputation, community relations, public confidence or good will.

C.   **"Bodily injury"** means physical injury, illness, disease, mental anguish, emotional distress, or shock, sustained by any person, including death resulting therefrom, and any prospective medical monitoring costs that are intended to confirm any such physical injury, illness or disease.

D.   **"Business income"** means:

   1.   Net profit or loss, before income taxes, including "rental income" from tenants, that would have been realized had there been no "business interruption";

   2.   The "insured's" continuing operating and payroll expense (excluding payroll expense of officers, executives, department managers and contract employees);

   3.   Costs incurred by the "insured" as rent for temporary premises when a portion of a "covered location" becomes untenantable due to a "pollution condition" or "indoor environmental condition" and temporary premises are required to continue the "insured's" operations.  Such rental costs cannot exceed the fair rental value of the untenantable portion of the "covered location" immediately preceding the "pollution condition" or "indoor environmental condition".

E.   **"Business interruption"** means the necessary partial or complete suspension of the "insured's" operations at a "covered location" for a period of time, which is directly attributable to a "pollution condition" or "indoor environmental condition" to which Coverage **A.** of this Policy applies.  Such period of time shall extend from the date that the operations are necessarily suspended and end when such "pollution condition" or "indoor environmental condition" has been remediated to the point at which the "insured's" normal operations could reasonably be restored.

F.   **"Business interruption loss"** means:

   1.   "Business income";

   2.   "Extra expense"; and

   3.   "Delay expense".

**CHUBB**®                              **Premises Pollution Liability**
                                                                **Insurance Policy**

G. **"Catastrophe management costs"** means reasonable and necessary expenses approved by the Insurer, in writing, except for those expenses incurred during the same seven (7) day period associated with "emergency response costs", which have been incurred by the "insured" for the following:

    **1.** Responsive consulting services rendered by a "catastrophe management firm";

    **2.** Printing, advertising, mailing of materials of public relations materials;

    **3.** Travel by directors, officers, employees or agents of the "insured", or the "catastrophe management firm", incurred at the direction of a "catastrophe management firm";

    **4.** To secure the scene of a "pollution condition" or "indoor environmental condition"; or

    **5.** Sums advanced to third-parties directly harmed by the "pollution condition" or "indoor environmental condition" for their medical costs; funeral costs; psychological counseling; travel expenses costs; temporary living costs or other necessary response costs,

but solely in those instances when, in the good faith opinion of a "key executive", the associated "pollution condition" or "indoor environmental condition" has resulted in or is reasonably likely to result in: **a)** "loss" (exclusive of "catastrophe management costs") that will exceed the applicable "self-insured retention"; and **b)** a need for "catastrophe management services" due to "adverse media coverage".

**"Catastrophe management costs"** do not include any "legal defense expense".

H. **"Catastrophe management firm"** means any firm that is approved, in writing, except for firms retained for the same seven (7) day period associated with "emergency response costs", by the Insurer to perform "catastrophe management services" in connection with a "pollution condition" or "indoor environmental condition".

I. **"Catastrophe management services"** means advising the "insured" with respect to minimizing potential harm to the "insured" from a covered "pollution condition" or "indoor environmental condition" by managing "adverse media coverage" and maintaining and restoring public confidence in the "insured", and its services or products.

J. **"Claim"** means the written assertion of a legal right received by the "insured" from a third-party, or from another "insured" that is party to an "environmental indemnity obligation", including, but not limited to, a "government action", suits or other actions alleging responsibility or liability on the part of the "insured" for "bodily injury", "property damage" or "remediation costs" arising out of "pollution conditions" or "indoor environmental conditions" to which this insurance applies.

K. **"Covered location"** means:

    **1.** Any location specifically identified in Item **9.** of the Declarations to this Policy;

    **2.** Any location that is specifically identified on a Schedule of Covered Locations attached to this Policy; and

    **3.** Any location that meets the prerequisites to coverage identified in the Automatic Acquisition and Due Diligence Endorsement attached to this Policy, if any.

L. **"Delay expense"** means, for a "covered location" under development where a "pollution condition" or "indoor environmental condition" causes a delay in the completion or development during the "business interruption", any of the following expenses:

    **1.** Additional interest on money the "insured" has borrowed to finance the construction, development, or remediation of a project at a "covered location";

    **2.** Additional realty taxes and other assessments;

    **3.** Additional advertising or promotional expense;

    **4.** Additional expenses incurred resulting from the renegotiation of leases, including associated usual and customary legal representation expense; and

    **5.** Additional engineering, architectural, and consulting fees.



**Premises Pollution Liability
Insurance Policy**

**M. "Emergency response costs"** means "first-party remediation costs" incurred within seven (7) days following the discovery of a "pollution condition" or "indoor environmental condition" by a "responsible person" in order to abate or respond to an imminent and substantial threat to human health or the environment arising out of:

    **1.** A "pollution condition" or "indoor environmental condition" on, at, under or migrating from a "covered location"; or

    **2.** A "pollution condition" resulting from "transportation",

provided such "emergency response costs" are reported to the Insurer within fourteen (14) days of when that "responsible person" first became aware of such "pollution condition" or "indoor environmental condition".

**N. "Environmental indemnity obligations"** means an "insured's" obligations to defend or indemnify a third-party with respect to a "pollution condition" or "indoor environmental condition" to which this insurance otherwise applies, provided that such defense or indemnity obligation is explicitly included within a contract identified or described on the Schedule of Insured Contracts Endorsement attached to this Policy, if any.

**O. "Environmental law"** means any Federal, state, commonwealth, municipal or other local law, statute, ordinance, rule, guidance document, regulation, and all amendments thereto (collectively Laws), including voluntary cleanup or risk-based corrective action guidance, or the direction of an "environmental professional" acting pursuant to the authority provided by any such Laws, along with any governmental, judicial or administrative order or directive, governing the liability or responsibilities of the "insured" with respect to a "pollution condition" or "indoor environmental condition".

**P. "Environmental professional"** means a licensed professional that is:

    **1.** Mutually agreed upon by the Insurer and the "insured", except with respect to "emergency response costs"; and

    **2.** Qualified by licensure, knowledge, skill, education and training to perform an assessment, prepare an investigation protocol, interpret the results and prepare a scope of work to remediate a "pollution condition" or "indoor environmental condition".

**Q. "Extended reporting period"** means the additional period of time in which to report a "claim" first made against the "insured" during or subsequent to the end of the "policy period".

**R. "Extra damages"** means punitive, exemplary or multiplied damages, and civil fines, penalties and assessments, but solely to the extent that the punitive, exemplary or multiplied damages, and civil fines, penalties and assessments:

    **1.** Are insurable under applicable law; and

    **2.** Arise out of a "pollution condition" or "indoor environmental condition" that results in "bodily injury", "property damage", "remediation costs" or "first-party remediation costs" to which this insurance otherwise applies.

**S. "Extra expense"** means costs incurred by the "insured" due to a "pollution condition" or "indoor environmental condition" that are necessary to avoid or mitigate any "business interruption". Such costs must be incurred to actually minimize the amount of foregone "business income" that would otherwise be covered pursuant to this Policy.

**T. "First named insured"** means the person or entity as identified in Item **1.** of the Declarations to this Policy. The "first named insured" is the party responsible for the payment of any premiums and the payment of, or evidencing payment of, any applicable "self-insured retention" amounts. The "first named insured" shall also serve as the sole agent on behalf of all "insureds" with respect to the provision and receipt of notices, including notice of cancellation or non-renewal, receipt and acceptance of any endorsements or any other changes to this Policy, return of any premium, assignment of any interest pursuant to this Policy, as well as the exercise of any applicable "extended reporting period", unless any such responsibilities are otherwise designated by endorsement.

**CHUBB**®                                **Premises Pollution Liability**
                                          **Insurance Policy**

**U. "First-party claim"** means the first-party discovery of a "pollution condition" or an "indoor environmental condition" during the "policy period" by an "insured" to which this insurance applies.

**V. "First-party remediation costs"** means reasonable and necessary "remediation costs" incurred by an "insured" resulting from a "first-party claim". If no applicable laws exist that govern the remediation, investigation, quantification, monitoring, removal, disposal, treatment, neutralization, or immobilization of such "pollution condition" or "indoor environmental condition" in the jurisdiction of the "covered location", necessary "remediation costs" may be established by securing the written professional recommendations of an "environmental professional".

**"First-party remediation costs"** also means reasonable and necessary expenses required to restore, repair or replace real or personal property to substantially the same condition it was in prior to being damaged during the course of responding to a "pollution condition" or "indoor environmental condition". Such expenses shall not include costs associated with betterments or improvements, except to the extent that such betterments or improvements are exclusively associated with the use of building materials which are environmentally superior to those materials which comprised the original damaged property. Any such environmentally superior material must be: **a)** certified as such by an applicable independent certifying institution, where such certification is available; or **b)** in the absence of any such certification, based solely on the judgment of the Insurer and at its sole discretion.

**W. "Fungi"** means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents, or byproducts produced or released by "fungi".

**X. "Government action"** means action taken or liability imposed by any Federal, state, commonwealth, municipal or other local government agency or body acting pursuant to the authority of "environmental law".

**Y. "Illicit abandonment"** means:

**1.** Solely with respect to coverage for "covered locations", the intentional placement or abandonment of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including contaminated soil, contaminated silt, contaminated sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, hazardous substances, hazardous materials, or waste materials, including "low-level radioactive waste", "mixed waste" and medical, red bag, infectious and pathological wastes, on, at or into a "covered location", by a person or entity that:

**a.** Is not an "insured"; and

**b.** Is not affiliated by common ownership with an "insured", and,

**2.** Solely with respect to coverage for "transportation", the intentional placement or abandonment of any waste, goods, materials or product beyond the boundaries of a "covered location" during "transportation" by a person or entity that:

**a.** Is not an "insured"; and

**b.** Is not affiliated by common ownership with an "insured".

**"Illicit abandonment"** does not mean any such placement or abandonment, above, which takes place, in whole or in part, prior to the inception date identified in Item **2.** of the Declarations of this Policy.

**Z. "Indoor environmental condition"** means:

**1.** The presence of "fungi" in a building or structure, or the ambient air within such building or structure; or

**2.** The discharge, dispersal, release, escape, migration or seepage of *legionella pneumophila* in a building or structure, or the ambient air within such building or structure,

provided that such "fungi" or *legionella pneumophila* are not naturally occurring in the environment in the amounts and concentrations found within such building or structure.

**CHUBB**®
<div align="right">

**Premises Pollution Liability
Insurance Policy**
</div>

AA. **"Insured"** means the "first named insured", any "named insured", any "additional insured", and any past or present director or officer of, partner in, employee of, temporary or leased worker of, or, with respect to a limited liability company, a member of, any of the foregoing while acting within the scope of his or her duties as such.

BB. **"Key executive"** means the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, General Counsel, general partner or managing partner (if the "insured" is a partnership), managing member (if the "insured" is a limited liability company) or sole proprietor (if the "insured" is a sole proprietorship) of the "insured". A "key executive" also means any other person holding a title designated by the "first named insured", approved by the Insurer, and identified by endorsement to this Policy.

CC. **"Legal defense expense"** means reasonable legal costs, charges, and expenses, including expert charges, incurred by the "insured":

1. In the investigation, adjustment or defense of "claims"; or,

2. Solely with respect to those instances where the "insured" has secured the prior consent of the Insurer, except in the event of a "first-party claim" that results in "emergency response costs", in order to clarify the extent of, minimize, and effect resolution of, any obligation to incur "first-party remediation costs".

DD. **"Loss"** means:

Coverage **A.**

1. A monetary judgment, award or settlement of compensatory damages arising from "bodily injury", "property damage" or "remediation costs", including associated "extra damages";

2. "Legal defense expense";

3. "First-party remediation costs";

4. "Emergency response costs";

5. "Business interruption loss"; and

6. "Catastrophe management costs".

Coverage **B.**

7. A monetary judgment, award or settlement of compensatory damages arising from "bodily injury", "property damage" or "remediation costs", including associated "extra damages";

8. "Legal defense expense";

9. "First-party remediation costs";

10. "Emergency response costs"; and

11. "Catastrophe management costs".

Coverage **C.**

12. A monetary judgment, award or settlement of compensatory damages arising from "bodily injury", "property damage" or "remediation costs", including associated "extra damages" and "legal defense expense"; and

13. "Catastrophe management costs".

Supplemental Coverages

Any other liability or first-party exposure insured pursuant to any Supplemental Coverage added by endorsement to this Policy.

EE. **"Low-level radioactive waste"** means waste that is radioactive but not classified as the following: high-level waste (spent nuclear fuel or the highly radioactive waste produced if spent fuel is reprocessed),



**Premises Pollution Liability
Insurance Policy**

uranium milling residues, and waste with greater than specified quantities of elements heavier than uranium.

FF. **"Mediation"** means a conciliatory, non-binding attempt to resolve a "claim" using a neutral, third-party facilitator.

GG. **"Mixed waste"** means waste containing both radioactive and hazardous components as defined pursuant to United States law within the Atomic Energy Act and the Resource Conservation and Recovery Act, as either may be amended.

HH. **"Named insured"** means the "first named insured" and any other person or entity specifically endorsed onto this Policy as a "named insured", if any. "Named insureds" shall maintain the same rights pursuant to this Policy as the "first named insured", except for those rights specifically: **1)** reserved to the "first named insured" as defined herein; or **2)** limited by endorsement to this Policy.

II. **"Natural resource damage"** means injury to, destruction of, or loss of, including the resulting loss of value of, fish, wildlife, biota, land, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States of America (including the resources of the fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. § 1801 et. seq.)), any state, commonwealth or local government, or any Native American Tribe, or, if such resources are subject to a trust restriction on alienation, any members of any Native American Tribe, including the reasonable costs of assessing such injury, destruction or loss resulting therefrom.

JJ. **"Non-owned disposal site"** means:

    **1.** Any treatment, storage, transfer, disposal or recycling site or facility located within the United States of America that has not at any time been owned or operated, in whole or in part, by any "insured", which receives, or has historically received, a "named insured's" waste for disposal; provided that such treatment, storage, transfer, disposal or recycling site or facility:

        **a.** Was properly permitted and licensed pursuant to "environmental law" to accept the "named insured's" waste at the time of such disposal by the Federal, state, commonwealth, municipal or other local government agencies or bodies with applicable jurisdiction;

        **b.** Was not owned or operated by any person, corporation or unincorporated association that was in bankruptcy at the time the "named insured's" waste was received for disposal; and

        **c.** Has not, prior to the time the "named insured's" waste was received for disposal, been identified on the United States EPA (CERCLA) National Priorities List or pursuant to any functional equivalent of that list made by Federal, state, commonwealth, municipal or other local government agency or body with applicable jurisdiction pursuant to "environmental law", or

    **2.** Any treatment, storage, transfer, disposal or recycling site or facility specifically identified on a Schedule of Non-Owned Disposal Sites Endorsement attached to this Policy, if any.

KK. **"Policy period"** means:

    **1.** The period of time specifically identified in Item **2.** of the Declarations to this Policy; or,

    **2.** Solely with respect to "covered locations" added to this Policy during the period of time specifically identified in Item **2.** of the Declarations to the Policy, if any, the period of time following the effective date of such addition through the expiration date of the Policy identified in Item **2.** of the Declarations to this Policy; or

    **3.** Any shorter period of time resulting from the cancellation of this Policy.

LL. **"Pollution condition"** means:

    **1.** "Illicit abandonment"; or

    **2.** The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including soil, silt, sedimentation, smoke, soot, vapors,

 **Premises Pollution Liability**
**Insurance Policy**

fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level radioactive waste", "mixed waste" and medical, red bag, infectious or pathological wastes, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.

MM. **"Property damage"** means:

   **1.** Physical injury to, or destruction of, tangible property of a third-party, including all resulting loss of use of that property;

   **2.** Loss of use of tangible property of a third-party, that is not physically injured or destroyed;

   **3.** Diminished value of tangible property owned by a third-party; or

   **4.** "Natural resource damages".

   **"Property damage"** does not mean "remediation costs".

NN. **"Remediation costs"** means expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize, or immobilize "pollution conditions" or "indoor environmental conditions" to the extent required by "environmental law" in the jurisdiction of such "pollution conditions" or "indoor environmental conditions".

OO. **"Rental income"** means the actual rental fees lost as a result of a "suspension" of a rented "covered location".

PP. **"Responsible person"** means any employee of an "insured" responsible for environmental affairs, control, or compliance at a "covered location", or any "key executive" of, officer or director of, or partner in, an "insured".

QQ. **"Self-insured retention"** means the largest applicable dollar amount among triggered coverage parts identified in Item **4.** of the Declarations to this Policy, or as otherwise designated by endorsement to this Policy, if any.

RR. **"Suspension"** means that part of, or all of, a rented "covered location" is rendered untenantable for the purposes identified to the Insurer prior to the inception date of this Policy due to a "pollution condition" or "indoor environmental condition".

SS. **"Terrorism"** means activities against persons, organizations or property of any nature:

   **1.** That involve the following or preparation for the following:

      **a.** Use or threat of force or violence; or

      **b.** Commission or threat of a dangerous act; or

      **c.** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

   **2.** When one or both of the following applies:

      **a.** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

      **b.** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology**.**

TT. **"Transportation"** means the movement of an "insured's" waste, materials, goods or products to or from a "covered location" by automobile, aircraft, watercraft, railcar or other conveyance, including any associated loading or unloading thereof, by an "insured", or any third-party vendor engaged by an "insured" in the business of transporting property for hire, provided that any such movement, and associated loading and unloading activities, are performed beyond the boundaries of a "covered location".

UU. **"Underground storage tank"** means any tank and associated piping and appurtenances connected thereto which tank has more than ten percent (10%) of its volume below ground.



**Premises Pollution Liability
Insurance Policy**

"**Underground storage tank**" does not mean:

1. Any flow-through process tank, including, but not limited to, a septic tank, oil/water separator, sump, or any stormwater or wastewater collection/treatment vessel or system; or

2. Any tank that is located below ground, provided that such tank is located on or above the floor of a basement of a building or on or above the floor of any shaft or tunnel.

VV. "**War**" means war, whether or not declared, civil war, martial law, insurrection, revolution, invasion, bombardment or any use of military force, usurped power or confiscation, nationalization or damage of property by any government, military or other authority.

## VI. EXCLUSIONS

This insurance shall not apply to:

### A. Asbestos

"Loss" arising out of or related to asbestos or asbestos-containing materials.

This exclusion shall not apply to:

1. Monetary judgments, awards or settlements of compensatory damages resulting from "bodily injury" or "property damage", or any associated "extra damages" or "legal defense expenses";

2. Monetary judgments, awards or settlements of compensatory damages resulting from "remediation costs", or any associated "extra damages" or "legal defense expense", arising out of asbestos or asbestos-containing materials discovered in soil or groundwater; and

3. "First-party remediation costs", "emergency response costs", "catastrophe management costs" or "business interruption loss", or any associated "legal defense expense", resulting from "first-party claims" arising out of asbestos or asbestos-containing materials discovered in soil or groundwater.

### B. Contractual Liability

"Loss" arising out of or related to liability of others assumed by any "insured" through contract or agreement, except if the liability would have attached to the "insured" in the absence of such contract or agreement.

This exclusion shall not apply to "environmental indemnity obligations".

### C. Criminal Fines and Criminal Penalties

"Loss" arising out of or related to criminal fines, criminal penalties or criminal assessments.

### D. Divested Property

"Loss" arising out of or related to a "pollution condition" on, at, under or migrating from, or "indoor environmental condition" at, any "covered location":

1. That had been sold, abandoned, or given away by any "insured", or was condemned (collectively hereinafter Divested), prior to the "policy period"; or

2. When such "pollution condition" or "indoor environmental condition" first commenced after the "covered location" had been Divested.

This exclusion shall not apply to any "pollution conditions" or "indoor environmental conditions" that first commenced, in whole or in part, prior to the effective date that any such "covered location" was Divested as identified on the Divested Properties Coverage Endorsement attached to this Policy, if any.

### E. Employers Liability

"Claims" arising out of or related to "bodily injury" to:

1. Any "insured" or any employee of its parent corporation, subsidiary or affiliate:

    a. Arising out of, or in the course of, employment by any "insured", its parent corporation, subsidiary or affiliate; or



**Premises Pollution Liability Insurance Policy**

    **b.**  Performing duties related to the conduct of the business of any "insured", its parent corporation, subsidiary or affiliate.

  **2.**  The spouse, child, parent, brother or sister of any "insured" or employee of its parent corporation, subsidiary or affiliate as a consequence of Paragraph **1.,** above.

This exclusion applies:

  **1.**  Whether any "insured" may be liable as an employer or in any other capacity; and

  **2.**  To any obligation to share damages with or repay someone else who must pay damages because of such "bodily injury".

**F.**  **First-Party Property Damage**

"Loss" arising out of or related to damage to real or personal property owned by, leased to, loaned to, or rented by any "insured", or otherwise in the care, custody, or control of any "insured".

This exclusion shall not apply to "first-party remediation costs", "emergency response costs", "business interruption loss" and "catastrophe management costs".

**G.**  **Fraud or Misrepresentation**

"Loss" arising out of or related to:

  **1.**  Fraudulent acts or material misrepresentations on the part of the "first named insured" made:

    **a.**  Within an Application to this Policy; or

    **b.**  During the Application or underwriting process prior to the inception date of this Policy,

    which would have affected the Insurer's decision to either issue this Policy, or issue this Policy and its endorsements pursuant to the financial terms identified in the Declarations to this Policy; or

  **2.**  Fraudulent acts or material misrepresentations on the part of any "responsible person" during the "policy period".

**H.**  **Insured's Internal Expenses**

"Loss" arising out of or related to expenses incurred by any "insured" for services performed by its salaried staff and any employees.

This exclusion shall not apply to:

  **1.**  "Emergency response costs", along with any associated "catastrophe management costs" incurred during that same seven (7) day period; or

  **2.**  Any other costs, charges or expenses incurred with the prior approval of the Insurer at its sole discretion.

**I.**  **Insured vs. Insured**

"Claims" made by any "insured" against any other "insured".

This exclusion shall not apply to:

  **1.**  "Claims" initiated by third-parties, including cross claims, counterclaims or claims for contribution by such parties against any "insured"; or

  **2.**  "Claims" that arise out of an indemnification provided by one "insured" to another "insured" in an "environmental indemnity obligation".

**J.**  **Intentional Non-Compliance**

"Loss" arising out of or related to the intentional disregard of, or knowing, willful, or deliberate non-compliance with, any law, statute, regulation, administrative complaint, notice of violation, notice letter, instruction of any governmental agency or body, or any executive, judicial or administrative order, by, or at the direction of, any "responsible person".



**Premises Pollution Liability
Insurance Policy**

**K.  Known Conditions**

"Loss" arising out of or related to "pollution conditions" or "indoor environmental conditions" in existence and reported to a "responsible person":

**1.**  Prior to the "policy period"; or,

**2.**  Solely with respect to "covered locations" added to this Policy during the period of time specifically identified in Item **2.** of the Declarations to the Policy, if any, prior to the effective date of coverage for such "covered location",

and not affirmatively disclosed to the Insurer in an Application or supplemental underwriting materials provided to the Insurer to secure coverage for such "covered location" pursuant to this Policy.

**L.  Lead-Based Paint**

"Loss" arising out of or related to lead-based paint.

This exclusion shall not apply to:

**1.**  Monetary judgments, awards or settlements of compensatory damages resulting from "bodily injury" or "property damage", or any associated "extra damages" or "legal defense expenses";

**2.**  Monetary judgments, awards or settlements of compensatory damages resulting from "remediation costs", or any associated "extra damages" or "legal defense expenses", arising out of lead-based paint discovered in soil or groundwater; and

**3.**  "First-party remediation costs", "emergency response costs", "catastrophe management costs" or "business interruption loss", or any associated "legal defense expense", resulting from "first-party claims" arising out of lead-based paint discovered in soil or groundwater.

**M.  Material Change in Risk**

"Loss" arising out of or related to a change in the use or operations at a "covered location" that materially increases the likelihood or severity of a "pollution condition", "indoor environmental condition", "claim" or "first-party claim" from the intended uses or operations identified:

**1.**  By the "first named insured" for the Insurer in an Application or supplemental underwriting materials provided prior to the effective date of coverage for such "covered location", if any; or

**2.**  Solely with respect to "covered locations" added to the Policy pursuant to an Automatic Acquisition and Due Diligence Endorsement attached to this Policy, if any, as part of the due diligence materials and supplemental underwriting materials provided to the Insurer as part of the notice required pursuant to that endorsement, if any.

This exclusion shall only apply to the "covered location" associated with the change in use or operations and shall not limit coverage for other "covered locations" to which this insurance applies.

**N.  Non-Owned Disposal Sites**

"Loss" arising out of or related to "pollution conditions" on, at, under or migrating from any treatment, storage, disposal, transfer or recycling site or facility that is not a "non-owned disposal site".

**O.  Underground Storage Tanks**

"Loss" arising out of or related to "pollution conditions" emanating from an "underground storage tank" located at a "covered location", when the existence of such "underground storage tank" was known to a "responsible person":

**1.**  Prior to the "policy period"; or,

**2.**  Solely with respect to "underground storage tanks" situated at "covered locations" added to this Policy during the "policy period", prior to the effective date of coverage for such "covered location".

This exclusion shall not apply to any "underground storage tank" that:



**Premises Pollution Liability
Insurance Policy**

    **1.** Is identified on the Schedule of Underground Storage Tanks Endorsement or Schedule of Covered Storage Tanks (Financial Responsibility) Endorsement attached to this Policy, if any; or

    **2.** Has been removed or closed-in-place prior to the inception date of this Policy and such removal or closure was conducted in accordance with "environmental law".

**P. Vehicle Damage**

"Claims" or associated "legal defense expense" for "property damage" to any automobile, aircraft, watercraft, railcar or other conveyance utilized for "transportation".

**Q. War or Terrorism**

"Loss" arising out of or related to "pollution conditions" or "indoor environmental conditions" attributable, whether directly or indirectly, to any acts that involve, or that involve preparation for, "war" or "terrorism" regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

**R. Workers' Compensation**

"Loss" arising out of or related to any obligation of any "insured" pursuant to the Jones Act or any workers' compensation, unemployment compensation, or disability benefits law or related laws.

**VII.REPORTING AND COOPERATION**

  **A.** Without limiting the specific requirements contained in any Insuring Agreement or any other exposure-specific reporting requirements contained within this Policy, the "insured" shall also see to it that the Insurer receives notice of any "claim" or "first-party claim", as soon as practicable, by one or more of the following:

    **1.** Provide written notice to the address, fax number, or email address identified in Item **8.a.** of the Declarations to this Policy; or

    **2.** Provide verbal or electronic notice utilizing the **Environmental Incident Alert 24-hour Emergency Response and Incident Reporting System** by calling the telephone number identified in Item **8.** of the Declarations to this Policy or by using the associated telephone web application, respectively.

    Such notice should include reasonably detailed information as to:

    **1.** The identity of the "insured", including contact information for an appropriate person to contact regarding the handling of the "claim" or "first-party claim";

    **2.** The identity of the "covered location";

    **3.** The nature of the "claim" or "first-party claim"; and

    **4.** Any steps undertaken by the "insured" to respond to the "claim" or "first-party claim".

  **B.** The "insured" must:

    **1.** As soon as practicable, send the Insurer copies of any demands, notices, summonses or legal papers received in connection with any "claim";

    **2.** Authorize the Insurer to obtain records and other information;

    **3.** Cooperate with the Insurer in the investigation, settlement or defense of the "claim";

    **4.** Assist the Insurer, upon the Insurer's request, in the enforcement of any right against any person or organization which may be liable to the "insured" because of "loss" to which this Policy may apply; and

    **5.** Provide the Insurer with such information and cooperation as it may reasonably require.

  **C.** No "insured" shall make or authorize an admission of liability or attempt to settle or otherwise dispose of any "claim", without the written consent of the Insurer. Nor shall any "insured" retain any consultants or



**Premises Pollution Liability
Insurance Policy**

"catastrophe management firms", or incur any "first-party remediation costs" or "catastrophe management costs" with respect to a "first-party claim", without the prior consent of the Insurer, except for "emergency response costs".

**D.** Upon the discovery of a "pollution condition" or "indoor environmental condition", the "insured" shall make every attempt to mitigate any loss and comply with applicable "environmental law". The Insurer shall have the right, but not the duty, to mitigate such "pollution conditions" or "indoor environmental condition" if, in the sole judgment of the Insurer, the "insured" fails to take reasonable steps to do so. In that event, any "remediation costs" or "catastrophe management costs" incurred by the Insurer shall be deemed incurred by the "insured", and shall be subject to the "self-insured retention" and Limits of Liability identified in the Declarations to this Policy.

For the purposes of fulfilling the notice requirements contained in the Insuring Agreements to this Policy, notice supplied pursuant to one or more of the verbal or electronic notice mechanisms specifically contemplated in Subsection **A.**, above, or on the Declarations, shall constitute written notice to the Insurer.

**VIII. EXTENDED REPORTING PERIOD**

**A.** Provided the "first named insured" has not purchased any other insurance to replace this Policy, the "first named insured" shall be entitled to a basic "extended reporting period", and may purchase an optional supplemental "extended reporting period", following Cancellation, as described in Subsection **A.**, Paragraph **1.** of Section **IX., GENERAL CONDITIONS**, or nonrenewal of this Policy, in accordance with the terms and conditions described in Subsections **B.** through **D.**, below.

**B.** "Extended reporting periods" shall not reinstate or increase any of the Limits of Liability. "Extended reporting periods" shall not extend the "policy period" or change the scope of coverage provided. A "claim" first made against an "insured" and reported to the Insurer within the basic "extended reporting period" or supplemental "extended reporting period", whichever is applicable, shall be deemed to have been made and reported on the last day of the "policy period". In addition, if an "insured" first discovers a "pollution condition" or "indoor environmental condition" during the "policy period" and reports such "first-party claim" to the Insurer within the basic "extended reporting period" or supplemental "extended reporting period", whichever is applicable, then such "first-party claim" shall also be deemed to have been first discovered and reported on the last day of the "policy period".

**C.** The "first named insured" shall have a ninety (90) day basic "extended reporting period" without additional charge.

**D.** The "first named insured" shall also be entitled to purchase a supplemental "extended reporting period" of up to thirty-three (33) months for not more than two hundred percent (200%) of the full premium identified in Item **6.** of the Declarations to this Policy, and any additional premiums resulting from coverage added during the "policy period". Such supplemental "extended reporting period" starts when the basic "extended reporting period" ends. The Insurer shall issue an endorsement providing a supplemental "extended reporting period" provided that the "first named insured":

    **1.** Makes a written request, to the address identified in Item **8.b.** of the Declarations to this Policy, for such endorsement which the Insurer receives prior to the expiration of the "policy period"; and

    **2.** Pays the additional premium when due. If that additional premium is paid when due, the supplemental "extended reporting period" may not be cancelled, provided that all other terms and conditions of the Policy are met.

**IX. GENERAL CONDITIONS**

  **A. Cancellation**

    **1.** This Policy may be cancelled only by the "first named insured", or through the "first named insured's" agent, by mailing to the Insurer at the address identified in Item **8.b.** of the Declarations to this Policy, written notice stating when such cancellation shall be effective.

    **2.** This Policy may be cancelled by the Insurer for the following reasons:

      **a.** Non-payment of premium; or

**CHUBB**®

<div align="right">

**Premises Pollution Liability
Insurance Policy**

</div>

    **b.**   Fraud or material misrepresentation on the part of any "insured",

by mailing to the "first named insured" at the "first named insured's" last known address, written notice stating when, not less than sixty (60) days thereafter, fifteen (15) days if cancellation is for non-payment of any unpaid portion of the premium, such cancellation shall be effective. The mailing of notice shall be sufficient proof of notice. The effective date and hour of cancellation stated in the notice shall be the end of the "policy period".

Subparagraph **2.b.**, herein, shall apply only to that "insured" that engages in the fraud or misrepresentation. This exception shall not apply to any "insured" that is a parent corporation, subsidiary, employer of, or otherwise affiliated by ownership with, such "insured".

    **3.**   In the event of cancellation, the premium percentage identified in Item **6.** of the Declarations to this Policy shall be the minimum-earned premium upon the inception date of this Policy. Thereafter, the remaining unearned premium, if any, shall be deemed earned by the Insurer on a *pro rata* basis over the remainder of the "policy period". Any unearned premium amounts due the "first named insured" upon cancellation of this Policy shall be calculated on a *pro rata* basis and refunded within thirty (30) days of the effective date of cancellation.

**B.**  **Inspection and Audit**

To the extent of the "insured's" ability to provide such access, and with reasonable notice to the "insured", the Insurer shall be permitted, but not obligated, to inspect and sample the "covered locations". The "insured" shall have the concurrent right to collect split samples. Neither the Insurer's right to make inspections, the making of said inspections, nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the "insured" or others, to determine or warrant that such property or operations are safe or in compliance with "environmental law", or any other law.

The Insurer may examine and audit the "insured's" books and records during this "policy period" and extensions thereof and within three (3) years after the final termination of this Policy.

**C.**  **Legal Action Against the Insurer**

No person or organization other than an "insured" has a right pursuant to this Policy:

    **1.**   To join the Insurer as a party or otherwise bring the Insurer into a suit against any "insured"; or

    **2.**   To sue the Insurer in connection with this insurance unless all of the Policy terms have been fully complied with.

A person or organization may sue the Insurer to recover after an agreed settlement or on a final judgment against an "insured". However, the Insurer shall not be liable for amounts that are not payable pursuant to the terms of this Policy or that are in excess of the applicable Limit of Liability. An agreed settlement means a settlement and release of liability signed by the Insurer, the "insured", and the claimant or the claimant's legal representative.

**D.**  **Bankruptcy**

The insolvency or bankruptcy of any "insured", or any "insured's" estate, shall not relieve the Insurer of its obligations pursuant to this Policy. However, any such insolvency or bankruptcy of the "insured", or the "insured's" estate, shall not relieve the "insured" of its "self-insured retention" or deductible period obligations pursuant to this Policy. This insurance shall not replace any other insurance to which this Policy is excess, nor shall this Policy drop down to be primary, in the event of the insolvency or bankruptcy of any underlying insurer.

**E.**  **Subrogation**

In the event of any payment pursuant to this Policy by the Insurer, the Insurer shall be subrogated to all of the rights of recovery against any person or organization, and the "insured" shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. All "insureds" shall do nothing to prejudice such rights. Any recovery as a result of subrogation proceedings arising pursuant to this Policy shall accrue first to the "insureds" to the extent of any payments in excess of the limit of coverage; then to the Insurer to the extent of its payment pursuant to the Policy; and then to the "insured"



**Premises Pollution Liability
Insurance Policy**

to the extent of the "self-insured retention". Expenses incurred in such subrogation proceedings shall be apportioned among the interested parties in the recovery in the proportion that each interested party's share in the recovery bears to the total recovery.

**F. Representations**

By accepting this Policy, the "first named insured" agrees that:

**1.** The statements in the Declarations, schedules and endorsements to, and Application for, this Policy are accurate and complete;

**2.** Those statements and representations constitute warranties that the "first named insured" made to the Insurer; and

**3.** This Policy has been issued in reliance upon the "first named insured's" warranties.

**G. Separation of Insureds**

Except with respect to the Limits of Liability, Cancellation condition **2.a.,** and any applicable exclusions, this Policy applies:

**1.** As if each "named insured" were the only "insured"; and

**2.** Separately to each "named insured" against whom a "claim" is made,

and any fraud, misrepresentation, breach of a condition or violation of any duty (hereinafter Breach) by an "insured" shall not prejudice coverage for any "named insured" pursuant to this Policy, provided that: **1)** such "named insured' did not participate in, know of or assist in such Breach; and **2)** such "named insured" is not a parent, subsidiary, partner, member, director, officer of, employer of or otherwise affiliated with, the "insured" that committed such Breach.

**H. Other Insurance**

If other valid and collectible insurance is available to any "insured" covering "loss" also covered by this Policy, other than a policy that is specifically written to apply in excess of this Policy, the insurance afforded by this Policy shall apply in excess of and shall not contribute with such other insurance.

**I. Changes and Assignment**

Notice to or knowledge possessed by any person shall not effect waiver or change in any part of this Policy or estop the Insurer from asserting any right pursuant to the terms of this Policy. The terms, definitions, conditions, exclusions and limitations of this Policy shall not be waived or changed, and no assignment of any interest in this Policy shall bind the Insurer, except as provided by endorsement and attached to this Policy.

**J. Headings**

The descriptions in the headings and sub-headings of this Policy are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

**K. Consent**

Where the consent of the Insurer, or an "insured", is required pursuant to this Policy, such consent shall not be unreasonably withheld, delayed, conditioned, or denied.

## SCHEDULE OF ADDITIONAL INSUREDS (BROAD) ENDORSEMENT

| Named Insured<br>London Bridge Resort LLC | | | Endorsement Number<br>001 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71205162 002 | Policy Period<br>11/15/2019 to 11/15/2020 | Effective Date of Endorsement<br>11/15/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

The persons or entities within the scope of the description contained in the Schedule of Additional Insureds, below, are "additional insureds" pursuant to this Policy, but solely with respect to their vicarious liability arising out of any "named insured's" direct liability for a "pollution condition" on, at, under or migrating from, or an "indoor environmental condition" at, a "covered location" to which this insurance applies.

#### Schedule of Additional Insureds

1.  All corporations, limited partnerships, limited liability partnerships, limited liability companies or other business entities or associations, other than joint ventures and general partnerships, as now or may hereinafter exist during the "policy period", in which a "named insured" maintains an ownership interest; and

2.  All joint ventures or general partnerships, as now or may hereafter exist during the "policy period", to which a "named insured" is a party, but solely to the extent of the "named insured's" legal responsibility for the vicarious liability of such joint venture or general partnership.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

PF-44891 (09/14)                                                                 Page 1 of 1

## ASBESTOS AND/OR LEAD-BASED PAINT COVERAGE (INADVERTENT DISTURBANCE) ENDORSEMENT

| Named Insured | Endorsement Number |
|---|---|
| London Bridge Resort LLC | 002 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| PPL | G71205162 002 | 11/15/2019 to 11/15/2020 | 11/15/2019 |

| Issued By (Name of Insurance Company) |
|---|
| Illinois Union Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

<u>Solely to the extent that there is an **X** indicated in either Section **I.** or Section **II.** of this Endorsement, below,</u> the "insured" and the Insurer hereby agree to the following corresponding changes to this Policy:

**I.**  **X**  Section **VI.**, **EXCLUSIONS**, Subsection **A.**, **Asbestos**, of this Policy is hereby deleted in its entirety and replaced with the following:

**A. Asbestos**

"Loss" arising out of or related to asbestos or asbestos-containing materials.

This exclusion shall not apply to:

**1.** Monetary judgments, awards or settlements of compensatory damages resulting from "bodily injury" or "property damage", or any associated "extra damages" or "legal defense expenses";

**2.** Monetary judgments, awards or settlements of compensatory damages resulting from "remediation costs", or any associated "extra damages" or "legal defense expense", arising out of asbestos or asbestos-containing materials discovered in soil or groundwater;

**3.** "First-party remediation costs", "emergency response costs", "catastrophe management costs" or "business interruption loss", or any associated "legal defense expense", resulting from "first-party claims" arising out of asbestos or asbestos-containing materials discovered in soil or groundwater; and

**4.** "First-party remediation costs" and "emergency response costs", arising out of asbestos or asbestos-containing material, provided such "remediation costs" are the result of a "pollution condition" that:

**a.** First commence, in their entirety, during the "policy period" or within <u>six</u> (6) calendar days preceding the "policy period";

**b.** Do not arise out of or relate to any "pollution conditions" which existed, in whole or in part, prior to **11/09/2019** ;

**c.** Are unintended and unexpected from the standpoint of the "insured";

**d.** Are sudden, direct, and immediate;

**e.** Are first discovered by the "insured" within <u>seven</u> (7) calendar days of commencement and during the "policy period"; and

**f.** Are reported to the Insurer within <u>twenty-one</u> (21) calendar days following the discovery of such "pollution conditions" by the "insured".

<u>Notwithstanding any reporting obligations contained in Section **I.**, **INSURING AGREEMENTS**, or Section **VII.**, **REPORTING AND COOPERATION**, of this Policy, generally, it is a condition precedent to coverage pursuant to this Exception **4.** that the "insured" also provide conclusive documentation of strict compliance with requirements **a.** through **f.**,</u>

above, regardless of whether the Insurer was prejudiced by the failure to meet these requirements.

Notwithstanding anything stated in this Exception **4.**, above, coverage is not afforded pursuant to this Policy for any "first-party remediation costs" arising out of or related to asbestos or asbestos-containing material abatement, removal, or disposal, resulting from, in whole or in part, the maintenance, renovation, or physical improvement of a "covered location" where asbestos or asbestos-containing material was known to be present by a "responsible person".

**II.** $\boxed{\text{X}}$  Section **VI.**, **EXCLUSIONS**, Subsection **L.**, **Lead-Based Paint**, of this Policy is hereby deleted in its entirety and replaced with the following:

**L.  Lead-Based Paint**

"Loss" arising out of or related to lead-based paint.

This exclusion shall not apply to:

**1.**  Monetary judgments, awards or settlements of compensatory damages resulting from "bodily injury" or "property damage", or any associated "extra damages" or "legal defense

**2.**  Monetary judgments, awards or settlements of compensatory damages resulting from "remediation costs", or any associated "extra damages" or "legal defense expense", arising out of lead-based paint materials discovered in soil or groundwater;

**3.**  "First-party remediation costs", "emergency response costs", "catastrophe management costs" or "business interruption loss", or any associated "legal defense expense", resulting from "first-party claims" arising out of lead-based paint discovered in soil or groundwater; and

**4.**  "First-party remediation costs" and "emergency response costs", arising out of lead-based paint, provided such "remediation costs" are the result of a "pollution condition" that:

    **a.**  First commence, in their entirety, during the "policy period" or within <u>six</u> (6) calendar days preceding the "policy period";

    **b.**  Do not arise out of or relate to any "pollution conditions" which existed, in whole or in part, prior to **11/09/2019** ;

    **c.**  Are unintended and unexpected from the standpoint of the "insured";

    **d.**  Are sudden, direct, and immediate;

    **e.**  Are first discovered by the "insured" within <u>seven</u> (7) calendar days of commencement and during the "policy period"; and

    **f.**  Are reported to the Insurer within <u>twenty-one</u> (21) calendar days following the discovery of such "pollution conditions" by the "insured".

    <u>Notwithstanding any reporting obligations contained in Section **I., INSURING AGREEMENTS**, or Section **VII., REPORTING AND COOPERATION**, of this Policy, generally, it is a condition precedent to coverage pursuant to this Exception **4.** that the "insured" also provide conclusive documentation of strict compliance with requirements **a.** through **f.**, above, regardless of whether the Insurer was prejudiced by the failure to meet these requirements.</u>

Notwithstanding anything stated in this Exception **4.**, above, coverage is not afforded pursuant to this Policy for any "first-party remediation costs" arising out of or related to lead-based paint abatement, removal, or disposal, resulting from, in whole or in part, the maintenance, renovation, or physical improvement of a "covered location" where lead-based paint was known to be present by a "responsible person".

**III.** <u>Sublimits of Liability</u> ( ☒ Not applicable if **X** indicated herein)

   **Per Asbestos/Lead Condition Sublimit of Liability: $**

   **Aggregate Asbestos/Lead Conditions Sublimit of Liability:  $**

   The amount that the Insurer shall pay pursuant to this Policy for the coverage afforded pursuant to Exception **4.**, of each exclusion above (as applicable) is subject to the Per Asbestos/Lead Condition Sublimit of Liability and Aggregate Asbestos/Lead Conditions Sublimit of Liability identified above.  These Sublimits of Liability shall be subject to, and payments made within these Sublimits of Liability shall erode, the Limits of Liability identified in Item **3.** of the Declarations to this Policy, along with any other applicable exposure-specific Limits or Sublimits of Liability added by endorsement hereto.  Under no circumstance shall the Insurer be liable to pay any amount in excess of any applicable Limit or Sublimit of Liability.


All other terms and conditions of this Policy remain unchanged.


_____
                              Authorized Representative

## DEDICATED DEFENSE AGGREGATE LIMIT ENDORSEMENT

| Named Insured<br>London Bridge Resort LLC | | | Endorsement Number<br>003 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71205162 002 | Policy Period<br>11/15/2019  to  11/15/2020 | Effective Date of Endorsement<br>11/15/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

**I.**  Dedicated Defense Aggregate Limit of Liability

**$ 250,000**  shall be the Dedicated Defense Aggregate Limit of Liability applicable to "legal defense expense" covered pursuant to this Policy. Therefore, subject to the exhaustion and further indemnity limit erosion scenario contemplated in Sections **II.** and **III.** of this Endorsement, this Dedicated Defense Aggregate Limit of Liability shall be the maximum amount the Insurer shall pay for all "legal defense expense" arising out of "claims" to which this insurance applies.

**II.**  Section **III., DEFENSE AND SETTLEMENT,** Subsection **D.,** of this Policy is hereby deleted in its entirety and replaced with the following:

**D.**  "Legal defense expenses" reduce the Dedicated Defense Aggregate Limit of Liability identified in the Dedicated Defense Aggregate Limit Endorsement and, with respect to additional "legal defense expense" incurred following exhaustion thereof, if any, the Limits of Liability identified in Item **3.** of the Declarations of this Policy, along with any applicable Limits or Sublimits of Liability identified in any endorsement hereto.  "Legal defense expense" shall also be applied to the "self-insured retention".

**III.**  Section **III., DEFENSE AND SETTLEMENT,** of this Policy is hereby amended by addition of the following:

**F.**  In the event that the Dedicated Defense Aggregate Limit of Liability identified in the Dedicated Defense Aggregate Limit Endorsement is exhausted, the Insurer shall retain the right and, subject to Subsections **A.** and **E.**, above, the duty to defend the insured" against all ongoing and future "claims" to which this insurance applies.  Following such exhaustion event, any "legal defense expense" incurred by the Insurer shall reduce the Limits of Liability identified in Item **3.** of the Declarations to this Policy, along with any applicable Limits or Sublimits of Liability identified in any endorsement hereto.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

PF-44917 (09/14)                                                                                                       Page 1 of 1

## FUNGI OR LEGIONELLA MANAGEMENT PLAN EXCLUSIONARY ENDORSEMENT

| Named Insured<br>London Bridge Resort LLC | | | Endorsement Number<br>004 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71205162 002 | Policy Period<br>11/15/2019  to  11/15/2020 | Effective Date of Endorsement<br>11/15/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **VI., EXCLUSIONS**, of this Policy is hereby amended by addition of the following:

**Failure to Follow Fungi and/or Legionella Management Plans**

"Loss" arising out of or related to an "indoor environmental condition" and an "insured's" failure to properly maintain or manage any building or structure situated on the "covered locations", or any system, fixture or personal property contained therein, in conformance with the water intrusion plans, and "fungi" or *legionella pneumophila* management plans, provided to the Insurer prior to the inception date identified in Item **2.** of the Declarations to this Policy, as applicable, or any water intrusion plans, and "fungi" or *legionella pneumophila* management plans, approved, in writing, by the Insurer during the "policy period".

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## NOTICE OF CANCELLATION AMENDATORY (GENERIC TIME FRAME) ENDORSEMENT

| Named Insured<br>London Bridge Resort LLC | | | Endorsement Number<br>005 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71205162 002 | Policy Period<br>11/15/2019  to  11/15/2020 | Effective Date of Endorsement<br>11/15/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX.**, **GENERAL CONDITIONS**, Subsection **A.**, **Cancellation**, Paragraph **2.**, of this Policy is hereby deleted in its entirety and replaced with the following:

**2.**   This Policy may be cancelled by the Insurer for the following reasons:

**a.**   Non-payment of premium; or

**b.**   Fraud or material misrepresentation on the part of any "insured",

by mailing to the "first named insured" at the "first named insured's" last known address, written notice stating when, not less than **ninety** (**90**) days thereafter, fifteen (15) days if cancellation is for non-payment of any unpaid portion of the premium, such cancellation shall be effective. The mailing of notice shall be sufficient proof of notice. The effective date and hour of cancellation stated in the notice shall be the end of the "policy period".

Subparagraph **2.b.**, herein, shall apply only to that "insured" that engages in the fraud or misrepresentation.   This exception shall not apply to any "insured" who is a parent corporation, subsidiary, employer of, or otherwise affiliated by ownership with, such "insured".

All other terms and conditions of the Policy remain unchanged.

_____
                              Authorized Representative

PF-44957 (09/14)                                                                                                                   Page 1 of 1

## OTHER INSURANCE (PRIMARY) ENDORSEMENT

| Named Insured London Bridge Resort LLC | | | Endorsement Number 006 |
|---|---|---|---|
| Policy Symbol PPL | Policy Number G71205162 002 | Policy Period 11/15/2019  to  11/15/2020 | Effective Date of Endorsement 11/15/2019 |
| Issued By (Name of Insurance Company) Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX.**, **GENERAL CONDITIONS**, Subsection **H.**, **Other Insurance**, of this Policy is hereby deleted in its entirety and replaced with the following:

**H.  Other Insurance**

If other valid and collectible insurance is available to the "insured" covering any exposure also covered by this Policy, the insurance afforded by this Policy shall apply as primary insurance.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**REMEDIATION COSTS EXCLUSIONARY (PREMISES POLLUTION AND INDOOR ENVIRONMENTAL CONDITIONS) ENDORSEMENT**

| Named Insured<br>London Bridge Resort LLC | | | Endorsement Number<br>007 |
|---|---|---|---|
| Policy Symbol<br>**PPL** | Policy Number<br>G71205162 002 | Policy Period<br>11/15/2019 to 11/15/2020 | Effective Date of Endorsement<br>11/15/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

**I.** Solely with respect to coverage afforded pursuant to Coverage **A.** of this Policy, Section **V.**, **DEFINITIONS**, Subsection **DD.**, of this Policy is hereby deleted in its entirety and replaced with the following:

**DD.** **"Loss"** means

**1.** A monetary judgment, award or settlement of compensatory damages arising from "bodily injury" or "property damage", including associated "extra damages" and "legal defense expense";

**2.** "Emergency response costs" and associated "legal defense expense"; and

**3.** "Catastrophe management costs".

**II.** Section **VI.**, **EXCLUSIONS**, of this Policy is hereby amended to include the addition of the following:

**Remediation Costs and Interruption**

**1.** Monetary judgments, awards or settlements of compensatory damages for "remediation costs", including associated "extra damages" or "legal defense expense"; and

**2.** "First-party remediation costs", exclusive of "emergency response costs", along with any associated "legal defense expense" or "business interruption loss",

arising out of or related to a "pollution condition" on, at, under or migrating from or onto, or an "indoor environmental condition" at, a "covered location".

**III.** ☐ **Pre-Existing Conditions Endorsement Application**

Solely to the extent that there is an **X** indicated in this Section **III.**, above, the "insured" and the Insurer hereby agree that the modifications identified in Sections **I.** and **II.** of this Endorsement only apply to "pollution conditions" or "indoor environmental conditions" that first commence, in whole or in part, prior to .

**IV.** ☐ **Location-Specific Endorsement Application**

Solely to the extent that there is an **X** indicated in this Section **IV.**, above, the "insured" and the Insurer hereby agree that the modifications identified in Sections **I.** and **II.** of this Endorsement only apply to "pollution conditions" or "indoor environmental conditions" associated with the "covered locations" specifically identified in the Schedule of Covered Locations, below:

### Schedule of Covered Locations

**1.** N/A

PF-48655 (01/17)                                                                                          Page 1 of 2

**V.** ☒ **Specific Conditions Endorsement Application**

Solely to the extent that there is an **X** indicated in this Section **V.**, above, the "insured" and the Insurer hereby agree that the modifications identified in Sections **I.** and **II.** of this Endorsement only apply to "pollution conditions" or "indoor environmental conditions" specifically identified below:

<u>**Conditions**</u>

    **1.** "fungi"

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## SCHEDULE OF COVERED LOCATIONS ENDORSEMENT

| Named Insured | Endorsement Number |
|---|---|
| London Bridge Resort LLC | 008 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| PPL | G71205162 002 | 11/15/2019  to  11/15/2020 | 11/15/2019 |

| Issued By (Name of Insurance Company) |
|---|
| Illinois Union Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

The locations identified in the Schedule of Covered Locations, below, are hereby added to this Policy as additional "covered locations".

### SCHEDULE OF COVERED LOCATIONS

| *Location* | *Retroactive Date* |
|---|---|
| **1.**   1477 Queens Bay, Lake Havasu City, AZ 86403 | 11/15/2018 |

If a "covered location", above, is identified with a corresponding Retroactive Date, then that date shall supersede the general Retroactive Date identified for premises coverage afforded pursuant to Coverage **A.** within Item **5.** of the Declarations to this Policy for "pollution conditions" on, at under or migrating from, or "indoor environmental conditions" at, that specific "covered location".  Also, if a "covered location", above, is identified with the phrase **"FULL RETRO"**, then full retroactive coverage is afforded pursuant to this Policy for "pollution conditions" on, at under or migrating from, or "indoor environmental conditions" at, that specific "covered location".  Notwithstanding the foregoing, any retroactive coverage indicated herein is subject to any other exposure-specific Retroactive Date added to this Policy by endorsement.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

PF-44913 (09/14)                                                                                             Page 1 of 1

## SUPPLEMENTARY PAYMENTS AMENDATORY ENDORSEMENT

| Named Insured<br>London Bridge Resort LLC | | | | Endorsement Number<br>009 |
|---|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71205162 002 | | Policy Period<br>11/15/2019  to  11/15/2020 | Effective Date of Endorsement<br>11/15/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX., GENERAL CONDITIONS**, of this Policy is hereby amended by addition of the following:

**Supplementary Payments**

With respect to any covered "claim" or "first-party claim" that the Insurer investigates, settles or defends pursuant to this Policy, the insurer shall pay for:

1. All internal expenses incurred by the Insurer;
2. All reasonable expenses incurred by an "insured" at our request to assist us in the investigation, settlement or defense of any "claim" or "first-party claim" including loss of earnings up to the aggregate amount of **five thousand dollars ($5,000)** per "pollution condition" or "indoor environmental condition' because of time off from work; and
3. All court costs taxed against the "insured" in a suit, but such costs shall not include attorneys' fees or attorneys' expenses taxed against the "insured"; and

The Supplementary Payments identified above shall not be subject to the "self-insured retention" of this Policy, but shall, with the exception of internal expenses incurred by the Insurer in Paragraph **1.**, above, reduce and erode the Limits of Liability discussed in Section **II., LIMITS OF LIABILITY AND SELF-INSURED RETENTION**, Subsections **D., E.** and **F.**, of this Policy.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

PF-48666 (01/17)                                                                      Page 1 of 1

## WAIVER OF SUBROGATION (BY CONTRACT) ENDORSEMENT

| Named Insured<br>London Bridge Resort LLC | | | Endorsement Number<br>010 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71205162 002 | Policy Period<br>11/15/2019  to  11/15/2020 | Effective Date of Endorsement<br>11/15/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX.**, **GENERAL CONDITIONS**, Subsection **E.**, **Subrogation**, of this Policy is hereby amended by addition of the following:

Notwithstanding the foregoing, the Insurer hereby waives its rights to subrogate against all counterparties of a "named insured" where such waiver is required by written contract executed between a "named insured" and such counterparty prior to the relevant "claim" or discovery of a "pollution condition" or "indoor environmental condition" to which this insurance applies.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

PF-44999 (09/14)                                                                                   Page 1 of 1

## SERVICE OF SUIT ENDORSEMENT

| Named Insured London Bridge Resort LLC | | | Endorsement Number 011 |
|---|---|---|---|
| Policy Symbol PPL | Policy Number G71205162 002 | Policy Period 11/15/2019  to  11/15/2020 | Effective Date of Endorsement 11/15/2019 |
| Issued By (Name of Insurance Company) Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Information about service of suits upon the company is given below. Service of process of suits against the company may be made upon the following person, or another person the company may designate:

> Mr. Paul Bech, Esq., Assistant General Counsel
> Chubb
> 436 Walnut Street
> Philadelphia, PA 19106-3703

The person named above is authorized and directed to accept service of process on the company's behalf in any action, suit or proceeding instituted against the company. If the insured requests, the company will give the insured a written promise that a general appearance will be entered on the company's behalf if a suit is brought.

If the insured requests, the company will submit to the jurisdiction of any court of competent jurisdiction. The company will accept the final decision of that court or any Appellate Court in the event of an appeal. However, nothing in this endorsement constitutes a waiver of the company's right to: remove an action to a United States District Court, seek a transfer of a case to another court, or to enforce policy provisions governing choice of law or venue selection, as may be permitted by the laws of the United States, or of any state in the United States.

The law of some jurisdictions of the United States of America requires that the Superintendent, Commissioner or Director of Insurance (or their successor in office) be designated as the company's agent for service of process. In these jurisdictions, the company designates the Director of Insurance as the company's true and lawful attorney upon whom service of process on the company's behalf may be made. The company also authorizes the Director of Insurance to mail process received on the company's behalf to the company person named above.

If the insured is a resident of Canada, the insured may also serve suit upon the company by serving the government official designated by the law of the insured's province.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

_____
Authorized Representative

## TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

| Named Insured<br>London Bridge Resort LLC | | | Endorsement Number<br>012 |
|---|---|---|---|
| Policy Symbol<br>PPL | Policy Number<br>G71205162 002 | Policy Period<br>11/15/2019  to  11/15/2020 | Effective Date of Endorsement<br>11/15/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims. All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative

JA624

## SIGNATURES

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| London Bridge Resort LLC | | | 013 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| PPL | G71205162 002 | 11/15/2019 to 11/15/2020 | 11/15/2019 |

| Issued By (Name of Insurance Company) |
|---|
| Illinois Union Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**ILLINOIS UNION INSURANCE COMPANY** (A stock company)

525 W. Monroe Street, Suite 400, Chicago, Illinois 60661

**WESTCHESTER SURPLUS LINES INSURANCE COMPANY** (A stock company)

Royal Centre Two, 11575 Great Oaks Way, Suite 200, Alpharetta, GA 30022

REBECCA L. COLLINS, Secretary

JOHN J. LUPICA, President

Authorized Representative

Chubb. Insured.™

LD-5S23j (03/14)

Page 1 of 1

**CHUBB**®

[X] **Illinois Union Insurance Company**
[ ] **INA Surplus Insurance Company**
[ ] **Westchester Surplus Lines Insurance Company**
[ ] -

Insured:                                    Attached To Policy No.:  PPL G71205162 002
London Bridge Resort LLC

                                            Effective Date:  11/15/2019

---

## ARIZONA SURPLUS LINES NOTIFICATION

**Pursuant to Arizona Revised Statutes section 20-401.01, subsection b, paragraph 1, this policy is issued by an insurer that does not possess a certificate of authority from the director of the Arizona Department of Insurance. If the insurer that issued this policy becomes insolvent, insureds or claimants will not be eligible for insurance guaranty fund protection pursuant to Arizona Revised Statutes Title 20.**

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS NOTICE IS ATTACHED OTHER THAN AS STATED ABOVE.

SL-17887  (Ed. 08/04)                                                          Page 1 of 1



CHUBB®

Illinois Union Insurance Company
Insurance Company

London Bridge Resort LLC
Policyholder

PPL G71205162 002
Policy Number

Brown & Brown Insurance Of Arizona Inc.
Broker/Producer

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE

You were notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism. *As defined in Section 102(1) of the Act*: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury---in consultation with the Secretary of Homeland Security, and the Attorney General of the United States---to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY YOUR POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% FOR YEAR 2015, 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017, 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 AND 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM THAT WOULD BE CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.**

**YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.**

You elected **NOT** to purchase terrorism coverage under the Act at the price indicated. ACCORDINGLY, WE WILL **NOT** PROVIDE THIS COVERAGE AND YOU DO NOT OWE THE ADDITIONAL PREMIUM FOR THAT COVERAGE INDICATED BELOW.

> Terrorism coverage described by the Act under your policy was made available to you for additional premium in the amount of $<u>851</u>, however you elected to decline such coverage.

TRIA24 (01/15)                                                                                     Page 1 of 1

JA627



**Chubb Producer Compensation
Practices & Policies**

Chubb believes that policyholders should have access to information about Chubb's practices and policies related to the payment of compensation to brokers and independent agents.  You can obtain that information by accessing our website at http://www.chubbproducercompensation.com or by calling the following toll-free telephone number: 1-866-512-2862.

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

© ISO Properties, Inc., 2004

JA629

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:20-cv-349-D

| | | |
|---|---|---|
| GOLDEN CORRAL CORP. and GOLDEN CORRAL FRANCHISING SYSTEMS. INC., | ) ) ) ) | **RESPONSE OF DEFENDANT ILLINOIS UNION INSURANCE COMPANY TO PLAINTIFFS' RULE 60(b)(6) MOTION** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ILLINOIS UNION INSURANCE COMPANY, | ) ) | |
| Defendant. | ) ) | |

## I.  NATURE OF THE CASE

In this action, Plaintiffs Golden Corral Corp. and Golden Corral Franchising Systems, Inc. (collectively "Golden Corral"), sought property insurance coverage for first-party claims arising out of the COVID-19 pandemic, as well as recovery for an alleged breach of the implied covenant of good faith and fair dealing related to the handling of the claim, from Defendant Illinois Union Insurance Company ("Illinois Union"). [D.E. 15]

## II.  STATEMENT OF FACTS

The Complaint in this action was originally filed in Wake County Civil Superior Court on May 14, 2020. [D.E. 1-10] It was removed to this Court on July 2, 2020, based on diversity of citizenship. [D.E. 1] On August 10, 2020, Illinois Union filed its Answer. [D.E. 13] On August 28, 2020, Golden Corral filed an Amended

Complaint. [D.E. 15] On September 11, 2020, Illinois Union filed its Answer to the Amended Complaint. [D.E. 17][1]

On February 2, 2021, Illinois Union filed a Motion for Judgment on the Pleadings pursuant to Rule 12(c), with an accompanying Memorandum of Law. [D.E. 24; 25] On February 22, 2021, Golden Corral filed its Response in Opposition to the Motion for Judgment on the Pleadings. [D.E. 31] On March 8, 2021, National Union filed its Reply to Golden Corral's Response. [D.E. 32]

Illinois Union's Motion for a Judgment on the Pleadings sought dismissal of Golden Corral's claims for failure to establish "direct physical damage or loss" arising from the COVID-19 pandemic, and also through application of the "pollution, contamination" exclusion, which applies to "viruses." [D.E. 39, pp. 9, 20 n.7]

The Court ruled by Order filed September 8, 2021, that Golden Corral did not plausibly establish that "direct physical loss damage or destruction" or "physical loss, damage or destruction," was present in this case, pursuant to the Policy language. [D.E. 39, p. 20] 559 F.Supp.3d 476, 490 (E.D.N.C. 2021). The Court also dismissed Golden Corral's claim for breach of an implied covenant of good faith and fair dealing, ruling that Golden Corral failed to plausibly allege facts supporting such a claim. [D.E. 39, p. 492] 559 F.Supp.3d at 492.[2] The Court did not rule on the applicability of the "pollution, contamination" exclusion, as the Court had already concluded there

---

[1] Both the Answer and the Amended Answer included as an Exhibit, a copy of the applicable policy, Policy No. D4226555A 002. [D.E. 13-1; D.E. 17-1]

[2] In its Rule 60(b)(6) Motion, Golden Corral asserts no legal argument as to reversal of this portion of the Judgment and addresses only the threshold requirement of coverage for "physical harm or damage" and the potential application of the contamination exclusion. [D.E. 51, pp. 6-17]

2

4923-4631-6574, v. 1

JA631

was no plausible showing of coverage afforded for the alleged COVID-19 damages as covered damages. [D.E. 51, p. 20 n.7] 559 F.Supp.3d at 491, n.7. The Court's Judgment, entered the same day, dismissed Golden Corral's Amended Complaint with prejudice. [D.E. 40]

Golden Corral appealed the Order and Judgment, and the district court's ruling was affirmed by the Fourth Circuit on August 11, 2022. [D.E. 45] 2022 WL 3278938 (4th Cir. Aug. 11, 2022).

Over three years after the district court granted Illinois Union's motion and dismissed the case with prejudice, the North Carolina Supreme Court decided two cases involving claims for COVID-19 related coverage through commercial "all risk" property insurance policies. These decisions were rendered in *North State Deli, LLC v. Cincinnati Ins. Co.*, 908 S.E.2d 802 (2024) and in *Cato Corp. v. Zurich Am. Ins. Co.*, 909 S.E.2d 144 (2024).

Based on the holding of the North Carolina Supreme Court in the *North State Deli* case,[3] Golden Corral has moved for relief pursuant to Rule 60(b)(6), asking this Court to vacate its Judgment of September 8, 2021, dismissing Golden Corral's claims. [D.E. 50; 51].

---

[3] Golden Corral does not cite or reference the *Cato Corp.* decision in its Motion.

4923-4631-6574, v. 1

## III. LEGAL ARGUMENT

### A. THE APPLICABLE STANDARD FOR RELIEF PURSUANT TO FED. R. CIV. P. 60(b)(6).

Golden Corral moves for relief from this Court's Judgment of September 8, 2021, solely pursuant to subsection (6) of Fed. R. Civ. P. 60(b). [D.E. 50] That Rule provides in pertinent part:

> (b) **Grounds for Relief from a Final Judgment, Order, or Proceeding**. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> * * *
>
> (6) any other reason that justifies relief.
>
> * * *

Fed. R. Civ. P. 60(b)(6).

In order for a party to generally prevail on a Rule 60(b) motion, it "must demonstrate (1) timeliness, (2) a meritorious defense, (3) a lack of unfair prejudice to the opposing party, and (4) exceptional circumstances." *Dowell v. State Farm Fire & Cas. Auto. Ins. Co.*, 993 F.2d 46, 48 (4th Cir. 1993).

A "very strict interpretation" of Rule 60(b) is essential if the finality of judgments is to be preserved. *Aikens v. Ingram*, 652 F.3d 496, 501 (4th Cir. 2011) (en banc). Further, in addressing the public policy consideration of finality, the Fourth Circuit observed:

> [A] fundamental precept of…adjudication *is that an issue once determined by a competent court is conclusive*." This precept ensures "that there be an end of litigation; that those who have

4923-4631-6574, v. 1

contested an issue shall be bound by the result of the context, and that matters once tried shall be considered forever settled as between the parties.

*Fed. Trade Comm'n v. Ross*, 74 F.4th 186, 190 (4th Cir. 2023), *cert. denied*, 144 S.Ct. 693 (2024) (quoting *Arizona v. California*, 460 U.S. 605, 619 (1983); *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981)) (emphasis added).

### B. GOLDEN CORRAL'S MOTION DOES NOT ESTABLISH "EXTRAORDINARY CIRCUMSTANCES" AS REQUIRED PURSUANT TO RULE 60(b)(6) WHEN THE MOTION IS PREMISED SOLELY ON AN ALLEGED SUBSEQUENT CHANGE IN STATE DECISIONAL LAW.

Pursuant to Rule 60(b)(6), in order for a Court to overturn a prior final ruling under a catch-all showing of "any other reason that justifies relief," the moving party must show "extraordinary circumstances" exist. *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005); *Ross*, 74 F.4th at 194; *Moses v. Joyner*, 815 F.3d 163, 168 (4th Cir. 2016).

The entire premise of Golden Corral's Rule 60(b)(6) Motion to set aside this Court's prior judgment in this case is the issuance of a subsequent decision by the North Carolina Supreme Court in a similar but unrelated case, i.e., *North State Deli, LLC v. Cincinnati Ins. Co.*, 908 S.E.2d 802 (N.C. 2024). [D.E. 50; 51] The question presented is whether a decisional state court change subsequent to a final ruling by a federal court, should serve as the basis for an "extraordinary circumstance" pursuant to Rule 60(b)(6) sufficient to justify setting aside the prior final ruling of this Court.

The Fourth Circuit recently addressed the application of Rule 60(b)(6) to the specific circumstance of a subsequent decisional change in the law, observing:

4923-4631-6574, v. 1

JA634

"It is hardly extraordinary" when the Supreme Court arrives "at a different interpretation" of a particular issue than lower courts after a case is no longer pending. *Gonzalez,* 545 U.S. at 536, 125 S.Ct. 2641; *see also Agostini v. Felton* 521 U.S. 203, 239, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("Intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6)…."); *United States v. Salas,* 807 F. App'x 218, 229-30 (4th Cir. 2020) (applying *Gonzalez* and *Agostini* to affirm denial of vacatur under Rule 60(b)(6)). Further, "[i]t is not extraordinary for the Supreme Court to deny certiorari in a court of appeals case that it ultimately overrules in the review of a later similar case." *United States ex rel. Garibaldi v. Orleans Par. Sch. Bd.*, 397 F.3d 334, 339 (5th Cir. 2005).

*Fed. Trade Comm'n v. Ross*, 74 F.4th 186, 194 (4th Cir. 2023). *See also, Moses v. Joyner*, 815 F.3d 163, 168 (4th Cir. 2016) ("a change in decisional law subsequent to a final judgment provides no basis for relief under Rule 60(b)(6)").

In addition to being from outside the Fourth Circuit, and therefore not controlling, none of the cases cited by Golden Corral involve a subsequent insurance coverage decision by a state court allegedly at odds with a prior federal court ruling on similar policy language. [D.E. 51, pp. 18-21] However, the Fourth Circuit has addressed this exact scenario. In *Dowell v. State Farm Fire & Cas. Auto Ins. Co.*, 993 F.2d 46 (4th Cir. 1993), the Fourth Circuit specifically addressed a motion seeking relief under Fed. R. Civ. P. 60(b)(6) in a circumstance where the West Virginia Supreme Court allegedly reached a contrary construction of similar insurance policy language from a prior ruling of a federal court. *Id.* at 48. As one of its grounds for denying relief pursuant to Rule 60(b)(6), the Fourth Circuit stated

4923-4631-6574, v. 1

JA635

that "such a change in decisional law subsequent to a final judgment provides no basis for relief under Rule 60(b)(6)." *Id.*[4]

     While still inapplicable to the case at bar, the most analogous case cited by Golden Corral is *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743 (5th Cir. 1995). In *Batts*, the court addressed relief sought by a litigant pursuant to Rule 60(b)(6) because of an alleged subsequent change in Mississippi products liability law relating to an affirmative defense which was created by a decision from that State's Supreme Court after the trial and unsuccessful appeal of a plaintiff's product liability action. *Id.* at 745-46. [D.E. 51, p. 19]. Not only did the court in the *Batts* case deny the plaintiff's relief pursuant to Rule 60(b)(6), but it cited and discussed the *Dowell v. State Farm* decision from the Fourth Circuit in finding no "extraordinary circumstance," and reversed a finding by the trial court to the contrary. 66 F.3d at 750-51.

     Similarly, in *McGeshick v. Choucair*, 72 F.3d 62 (7th Cir. 1995), another tort case cited by Golden Corral, this time involving a subsequent change in the law of informed consent by the Wisconsin Supreme Court, the Seventh Circuit declined to grant the plaintiff a new trial, noting both that the matter "is one for damages between private litigants and does not implicate special interest concerns" and also that "[c]onsistent with the decisions of the other circuits, we believe that a legitimate concern for finality requires that we not disturb that judgment." *Id.* at 65. [D.E. 51, pp. 19-20].

---

[4] Remarkably Golden Corral cites the *Dowell* decision for another principle, but does not address its facts, relating to a remarkably analogous insurance coverage change in the law, a scenario quite similar to that presented in the instant case. [D.E. 51, p. 6]

Indeed, every year, the North Carolina Court of Appeals and North Carolina Supreme Court refine and add to the body of insurance law related to policies construed according to North Carolina law. If every subsequent declaration or clarification of the construction of an insurance contract provision by a North Carolina Appellate Court constituted "extraordinary circumstances" warranting relief under Rule 60(b)(6), courts would be reopening judgments almost routinely, running afoul of the strong public policy in favor of finality.

The relief Golden Corral seeks should be denied for lack of a showing of "extraordinary circumstances" as required for such relief sought here pursuant to Rule 60(b)(6).

### C. GOLDEN CORRAL'S MOTION FAILS TO ESTABLISH THE EXISTENCE OF A "MERITORIOUS CLAIM" PURSUANT TO RULE 60(b)(6) AS GOLDEN CORRAL'S CLAIMS ARE BARRED BY THE POLICY'S "POLLUTION, CONTAMINATION" EXCLUSION.

Even if Golden Corral met the requirement for "extraordinary circumstances" required, pursuant to Rule 60(b), Golden Corral must also show that they have a "meritorious claim." *See Dowell*, 993 F.2d at 48. This they cannot do, because even if there was "physical loss or damage" here, Golden Corral's insurance claim would still be barred by the policy's Pollution and Contamination exclusion.

Golden Corral's lawsuit centers on its contention that COVID-19 disrupted its operations. [*See generally* D.E. 15]. It alleges that government orders made in response to the COVID-19 pandemic "impair[ed] (and even eliminat[ed]) access to [its] restaurants." [*Id*. at ¶ 32] In particular, Golden Corral points to Governor Roy

Cooper's March 17, 2020 Executive Order, which "limited access to facilities that sell food and beverage." *Id.*

From there, Golden Corral alleges, "[g]iven the presence of Covid-19, ingress to and egress from . . . [Golden Corral] locations has also been impaired." *Id.* ¶ 41. Golden Corral alleges that these interruptions caused them to lose revenue, royalties, and rental income, as well as payments from equipment financing. *Id.* ¶ 44. Golden Corral seeks coverage under the Policy for Business Interruption, Interruption by Civil Authority, and Loss of Ingress or Egress. *See id.* ¶¶ 62-66.[5]

The Policy includes an exclusion for "Pollution, Contamination." In whole, the exclusion reads:

**VI. EXCLUSIONS**

This Policy does not insure:

<center>*     *     *</center>

**G.    POLLUTION, CONTAMINATION**

> Loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of 'contaminants or pollutants,' all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever.

> Nevertheless if a peril insured by this Policy arises directly or indirectly from pollution or contamination any loss, damage or destruction of property insured by this Policy arising directly from that peril shall (subject to the terms, conditions and limitations of the Policy) be covered.

---

[5] A certified copy of the Policy, which bears policy number D4226555A 001, is attached as Exhibit A to Illinois Union's Answer to Plaintiffs' Amended Complaint. [D.E. 17-1] Specific pages in the Policy are cited herein based on the court-generated pagination along the very bottom of each page of the Policy.

Notwithstanding the foregoing, this exclusion shall not apply if pollution or contamination results from direct physical loss, damage or destruction of property insured by this Policy by a peril insured by this Policy. . . .

'Contaminants or pollutants' means any material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, bacteria, *virus*, or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act, or as designated by the U.S. Environmental Protection Agency.

. . . [T]his Policy does not insure costs arising out of the enforcement of any law, ordinance, regulation or order by civil or judicial authority requiring the removal, disposal, replacement, cleanup, restoration or containment of property insured or costs to monitor or test for the existence or effects of pollutants.

[D.E. 17-1, pp. 60-61] (emphasis added).

    a.   <u>Golden Corral's claims fail because the "Pollution, Contamination" exclusions must be applied as written under *Cato*.</u>

In *Cato*, the North Carolina Supreme Court held that a contamination exclusion in an all-risk commercial property insurance policy excluded coverage for COVID-19 business interruption-styled claims, even if such claims pleaded enough facts to meet the coverage grant for "direct physical loss of or damage caused by a Covered Cause of Loss." 909 S.E.2d at 149-50.

The contamination exclusion in *Cato* excluded:

**Contamination**, and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.

10

909 S.E.2d at 146-47. The policy defined Contamination as "any condition of property due to the actual presence of any ... virus." *Id*. at 147.

The North Carolina Supreme Court held that the contamination exclusion defeated the plaintiff's claims. *Cato*, 909 S.E.2d at 149-50. "Viral contamination," the Court pointed out, "is essentially what [the plaintiff] alleges." *Id*. at 149. Among other things, the plaintiff alleged that COVID-19 made its businesses' space unsafe for their intended uses and that the stores "were compelled by government orders to close, severely curtail operations, and remediate and reconfigure their spaces." *Id*. at 149. The Court held that these allegations amounted to "condition[s] of property due to the actual presence of any ... virus." *Id*. at 149-50.

Golden Corral does not even mention *Cato* in its motion to this Court. And even though *N. State Deli* reflects a change in North Carolina decisional state law, *Cato* recognizes that unambiguous policy exclusions are applied as written. To that end, three further points bear mention: (1) Golden Corral's attempt to limit the "Pollution, Contaminations" exclusion to environmental pollution is misguided and unsupported; (2) the "Pollution, Contaminations" exclusion uses anti-concurrent causation language that is even broader than found in *Cato*; and (3) the ensuing loss provision does not save Golden Corral's suit.

      b.    <u>The "Pollution, Contamination," exclusion applies to more than just traditional environmental pollution, by its plain language.</u>

Golden Corral's primary argument is that the "Pollution, Contamination," exclusion only covers traditional environmental pollution. *Cato* confirms that this argument is a non-starter. The policy in *Cato* excluded "contaminants," and then

11

4923-4631-6574, v. 1

JA640

defined the term to include property conditions that exist "due to the actual presence of any ... virus." The Supreme Court had no trouble finding that the exclusion plainly included viruses, even though it was entitled "contaminants." The same is true here. Although the exclusion is titled "Pollution, Contamination," the exclusion makes clear that it covers viruses. [D.E. 17-1, pp. 60-61] (emphasis added). Indeed, long before *Cato*, federal courts applying North Carolina law have rejected arguments that a pollution exclusion may only encompass traditional, industrial contamination. *Penn. Nat'l Mut. Cas. Ins. Co. v. Triangle Paving, Inc.*, 973 F. Supp. 560, 565-66 (E.D.N.C. 1996) (holding that a pollution exclusion covered sulfur fumes from defective drywall, even though the definition of pollution did not mention sulfur), *affirmed*, 121 F.3d 699 (4th Cir. 1997).

Rather than engage North Carolina law, Golden Corral makes clear its lack of a meritorious defense that warrants relief under Rule 60(b). This is made painfully obvious by its disregard of the text of the Illinois Union Policy at issue and its reliance on *London Bridge Resort, LLC v. Illinois Union Insurance Co.*, 505 F. Supp.3d 956 (D. Ariz. 2020), which did not include the word "virus" in its applicable policy language. In *London Bridge*, the District of Arizona correctly held that the subject pollution liability policy's definition of "pollution condition" did not include a virus and thus did not provide coverage for the plaintiff's business interruption losses arising from the COVID-19 pandemic. *Id*. at 961. The court agreed with Illinois Union in that a virus did not fit within the definition of "pollution condition" based on Arizona's historical limitation of the absolute pollution exclusion to "traditional environmental pollution." *Id*. at 958-59. However, the analysis of the *London Bridge*

Policy did not end there, as the general limitation to "traditional environmental pollution" would not override the express policy language. Indeed, the court, reading the policy as a whole, reasoned:

> [A] virus outbreak does not closely resemble the enumerated examples provided in the Policy's definition [of "pollution condition," such as "soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs)"]. When general words in a contract are followed by enumerated specific terms, the meaning of the general terms is presumed to be limited to the enumerated specific terms and to include only those things of the same nature as those specifically enumerated *unless a clear manifestation of a contrary intent is apparent*.

*Id*. at 960 (citation and internal quotes omitted) (emphasis added). Illinois Union did not ask the court in *London Bridge* to ignore the policy's express language, which contained no such "clear manifestation of contrary intent." *Id*. Indeed, the limitation to "traditional environmental pollution" exists only to the extent there is no express policy language stating the contrary. To that effect, the instant dispute is clearly distinguishable from that of *London Bridge*. Again, unlike the Illinois Union Policy's definition of "contaminants or pollutants," the word "virus" was absent from the *London Bridge* Policy's definition of "pollution condition." *See id*. at 958. By summarily disregarding this profound difference in policy language, Golden Corral completely mischaracterized the holding of *London Bridge* and Illinois Union's arguments raised therein.

In blatant disregard for the express language of the Illinois Union Policy, Golden Corral states: "The inclusion of 'virus' in the definition of 'contaminants or pollutants' does not change the judicially-established meaning of 'release, discharge, escape or dispersal.'" [D.E. 51, p. 15]. The foregoing statement and Golden Corral's

13

4923-4631-6574, v. 1

reliance on *London Bridge* is fundamentally unsound because it purports to apply a blanket "traditional environmental pollution" limitation across all pollution exclusions and pollution coverage grants, notwithstanding any policy language to the contrary. Golden Corral essentially asks this Court to impermissibly strike the word "virus" from the definition of "contaminants or pollutants."

Additionally, abundant case law has confirmed that when a pollution or contaminants exclusion explicitly includes "virus," that exclusion applies to COVID-19 losses, regardless of any environmental "terms of art" in the exclusion. *See, e.g., Cent. Laundry, LLC v. Illinois Union Ins. Co.*, 578 F. Supp. 3d 781, 793 (E.D. Va. 2022) ("[T]here have been a number of district courts that have considered whether COVID-19 can be reasonably considered a pollutant for purposes of insurance policy coverage. And each of those courts has decidedly ruled that no reasonable plain reading of "pollutant" or "pollution" captures COVID-19 ***where no explicit language exists to include viruses***.") (emphasis added), *affirmed,* No. 22-1075, 2023 WL 1256580 (4th Cir. Jan. 31, 2023); *Circus Circus LV, LP v. AIG Specialty Ins. Co.*, 525 F. Supp. 3d 1269, 1278 (D. Nev. 2021) ("SARS-CoV-2 virus and resulting COVID-19 pandemic falls squarely within the policy's pollutants-or-contaminants exclusion, which expressly included the word 'virus' in the definition of 'pollutants or contaminants.'"); *Baylor Coll. of Med. v. XL Ins. Am., Inc.*, No. 14-22-00145-CV, 2024 WL 438019, at *3 (Tex. App. Feb. 6, 2024) ("...there is no ambiguity. The Exclusion identifies 'virus' as a type of pollutant or contamination for which there is no coverage.").

4923-4631-6574, v. 1

New York, another jurisdiction that has limited the pollution exclusion and pollution coverage grants to "traditional environmental pollution," *see Belt Painting Corp. v. TIG Ins. Co.*, 795 N.E. 2d 15, 100 N.Y.2d 377 (2003), has similarly held that the express policy language prevails when interpreting such policy provisions in the context of COVID-19 coverage. *See Northwell Health, Inc. v. Lexington Ins. Co.*, 550 F. Supp. 3d 108, 121 (S.D.N.Y. 2021) (citation omitted) ("[U]nlike the policy in *Belt Painting*, the Policies contain endorsements that define contaminants to include viruses. … A court may not interpret an insurance contract in a way that leaves part of the contract meaningless. The Court declines to rewrite the unambiguous provision at issue here."); *see also Crescent Land Dev. Assoc LLC v. Illinois Union Ins. Co.*, 221 A.D.3d 485, 486, 198 N.Y.S.3d 700 (N.Y. App. Div. 1st Dep't 2023) (citation omitted) ("We agree with defendant that 'pollution condition' within the context of the policy does not encompass viruses or viral material. Throughout the policy, viruses are … not specifically identified in 'pollution condition.'"); *Northwell Health, Inc. v. Illinois Union Ins. Co.*, No. 20-CV-6893-LTS-OTW, 2022 WL 912929, at *5 (S.D.N.Y. Mar. 29, 2022) (recognizing only the separately defined term "facility-borne illness event" expressly included "the presence of a certain subset of viruses, bacteria, and diseases").

Accordingly, this Court should soundly reject Golden Corral's plea to ignore the express language of the Illinois Union Policy and Golden Corral's reliance on *London Bridge* in support of the same.

4923-4631-6574, v. 1

c. The "Pollution, Contamination" exclusion broadly covers losses caused directly or indirectly by a virus.

The "Pollution, Contamination" exclusion uses anti-concurrent causation language, which makes it even broader than the exclusion that was applied in *Cato*. In particular, the Policy excludes:

> Loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of 'contaminants or pollutants,' ***all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever***

[D.E. 17-1, pp. 60-61] (emphasis added).

In *Magnolia Mfg. of N.C., Inc. v. Erie Ins. Exch.*, the North Carolina Supreme Court held that anti-concurrent causation language in policy exclusions must be applied as written. 361 N.C. 213, 639 S.E.2d 443 (2007) (*per curiam*), 179 N.C. App. 267, 633 S.E.2d 841 (2006) (adopting Tyson, J. dissenting opinion). There, the policy in question excluded coverage for damage caused "directly or indirectly" from inadequate or defective workmanship, construction or maintenance. *Id*. The loss in question occurred, at least in part, because the roof was poorly maintained and needed to be replaced. *Id*. In turn, the exclusion removed coverage.

The North Carolina Court of Appeals arrived at the same outcome in *Builders Mut. Ins. Co. v. Glascarr Props., Inc.*, 202 N.C. App. 303, 688 S.E.2d 508 (2010). There, the policy excluded coverage for a loss caused "directly or indirectly" by mold. *Id*. at 326, 688 S.E.2d at 511-12. The insured sought coverage for vandalism which included mold damage. *Id*. at 326, 688 S.E.2d at 512. The court held that the exclusion removed

16

4923-4631-6574, v. 1

JA645

coverage because "[v]andalism is an 'indirect' cause of mold, or an 'other cause or event' that contributed 'concurrently or in any sequence' to the [loss]." *Id*.

Of course, North Carolina federal courts have applied anti-concurrent causation clauses to find no coverage for business interruption claims stemming from the COVID-19 pandemic. *See e.g., Natty Greene's Brewing Co. v. Travelers Cas. Ins. Co. of Am.,* 503 F. Supp. 3d 359, 363-64 (M.D.N.C. 2020) (declining coverage because the policy "excludes coverage for loss or damage caused directly or indirectly by, or resulting from, any virus"); *Cali Fresh, LLC v. Twin City Fire Ins. Co.,* No. 1:20-CV-522, 2021 WL 3620074, (M.D.N.C. Aug. 16, 2021) (same). So here it is clear that Golden Corral's losses fall squarely within the exclusion, precluding it from establishing that it has a meritorious defense as required by Rule 60(b)(6).

> d.    <u>The ensuing loss provision does not save Golden Corral's claims.</u>

Last, Golden Corral argues the ensuing loss provision in the "Pollution, Contaminants" exclusion somehow affords coverage here. That term states that:

> Nevertheless if a peril insured by this Policy arises directly or indirectly from pollution or contamination any loss, damage or destruction of property insured by this Policy arising directly from that peril shall (subject to the terms, conditions and limitations of the Policy) be covered.

[D.E. 17-1, pp. 60-61] In North Carolina, Golden Corral has the burden of showing that an exception to an exclusion is applicable. *Hartford Cas. Ins. Co. v. Gelshenen*, 387 F. Supp. 3d 634, 640 (W.D.N.C. 2019), *affirmed,* 801 F. App'x 915 (4th Cir. 2020). Golden Corral should not be permitted to proceed under this theory for both procedural and substantive reasons.

From a procedural standpoint, Golden Corral's arguments about the ensuing loss provision do not follow a change in North Carolina decisional state law. Indeed, this is an argument Golden Corral could have made years ago, but did not.[6] They should not be allowed to revive this argument now under the auspice that they are entitled to Rule 60 relief.

From a substantive standpoint, Golden Corral's argument misreads the ensuing loss exception. By its plain terms, the exception applies only when pollution or contamination gives rise to a *separate* peril that *is* covered, and "that peril" itself "directly" causes its *own* damage. *See, e.g., Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co.*, 611 F. Supp. 3d 41, 59 (D. Md. 2020) ("ensuing loss provision does not cover loss caused by the excluded peril, but rather covers loss caused to other property wholly separate from the defective property itself"); *Taja Invs. LLC v. Peerless Ins. Co.*, 717 F. App'x 190, 192 (4th Cir. 2017) ("when a workmanship exclusion is triggered, an ensuing loss clause applies only when there is significant attenuation

---

[6] Golden Corral includes a brief one paragraph ensuing loss of argument in its Rule 60(b)(6) Memorandum of Law. [D.E. 51, pp. 16-17] This argument to allegedly bar operation of the contamination exclusion was not briefed by Golden Corral in its Reply Brief in response to the original Rule 12(c) Motion, in addressing the contamination exclusion, where Golden Corral relied on an argument that a "virus" did not constitute "traditional environmental damage or pollution." [D.E. 31, pp. 6, 23-27] While this Court did not rule on the merits of the Contamination Exclusion, it seems Golden Corral is attempting to rebuild their previous position on this issue, adding a new argument not previously raised by Golden Corral, the alleged application of the ensuing loss provision. In fact, in another of the Circuit Court cases cited by Golden Corral in this new Motion, the Tenth Circuit affirmed a denial of relief through Rule 60(b)(6), noting "advancing new arguments or supporting facts which were otherwise available for presentation when the original summary judgment motion was briefed is likewise inappropriate." *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991) [D.E. 51, pp. 20-21] *See also, Landfall Trust LLC v. Fidelity Nat. Title Ins. Co.*, No. 3:22-CV-194 (RCY), 2023 WL 8374731 at *3 (E.D.Va. 2023) (It is firmly established that "Rule 60(b) does not provide parties with an opportunity to pursue issues not previously litigated") (quoting *Hummel v. Hall*, 868 F. Supp. 2d 543, 560 (W.D. Va. 2012)).

4923-4631-6574, v. 1

between the direct result of a workmanship defect and the ultimate loss for which coverage is sought, usually due to an independent or fortuitous intervening cause"). Golden Corral does not identify any separate covered peril caused by viral contamination at its property, much less any separate peril that caused its own damage distinct from the losses Golden Corral claimed from the virus itself.

Golden Corral suggests that government orders themselves are a covered peril under *North State Deli*, but that decision does not identify the *orders* as a "peril" independent of the virus; it holds only that the inability to use property fully constitutes a "loss" of property. And that asserted loss is the same loss allegedly caused by the virus. Golden Corral cites no decision from any other court treating government closure orders as a distinct peril triggering an ensuing loss provision.

If the ensuing loss exception were interpreted as Golden Corral urges, the exception would swallow the exclusion, which by its terms broadly excludes loss or damage arising from pollutants or contaminants (including virus) "all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever." Golden Corral's interpretation would turn that language inside out—so long as the insured could identify "any cause whatsoever" that is related to the pollution and caused the same loss, Golden Corral would say the ensuing loss exception is triggered and the exclusion does not apply. That reading would functionally erase the plain terms of the exclusion, in contravention of well-established rules of construction prohibiting interpretations that render policy terms meaningless. *See Travelers Prop. Cas. Co. of Am. v. Seretta Constr. Mid-Atl., LLC*, 333 F. Supp. 3d 540, 551 (W.D.N.C. 2018) (explaining that the court "must interpret

4923-4631-6574, v. 1

policy terms coherently, so as to allow for the various terms of the policy to be consistently construed, and if possible, to permit "every word and every provision ... [t]o be given effect"). Avoiding that nonsensical result is why the provision so clearly requires a separate peril that causes its own damage, as courts have recognized. *See supra* at 18. Because no such separate peril, and no such separate damage, exists here, the ensuing loss exception does not apply.

## <u>CONCLUSION</u>

Finality is important. A decision change in North Carolina state law does not support Golden Corral's request for Rule 60 relief. More than that, Golden Corral still has not pleaded a claim for relief because its alleged losses fall within the "Pollution, Contamination," exclusion. Golden Corral's motion for relief under Rule 60(B)(6) should be denied.

This the 21st day of February 2025.

<div style="margin-left:40%">

CRANFILL SUMNER LLP

/s/ Theodore B. Smyth_____
Theodore B. Smyth
N.C. State Bar No. 10045
Email: tsmyth@cshlaw.com
Steven A. Bader
N.C. State Bar No. 55931
Email: sbader@cshlaw.com
Post Office Box 27808
Raleigh, NC 27611-7808
Phone: 919-828-5100
*Attorneys for Defendant Illinois Union Insurance Company*

CLYDE & CO US LLP

/s/ Robert W. Fisher_____
Robert W. Fisher, Esq.
Email: Robert.Fisher@clydeco.us

</div>

20

4923-4631-6574, v. 1

271 17th Street NW, Suite 1720
Atlanta, GA 30363
Phone: 404-410-3150
*Attorneys for Defendant Illinois Union*
*Insurance Company*

## CERTIFICATION OF LENGTH AND FORMAT

The undersigned certifies that this Brief is in compliance with Local Rule 7.2(f)(3) and has an applicable word count of 5,289 words pursuant to the word count feature of the word processing software used for this Brief.

This the 21st day of February 2025.

CRANFILL SUMNER LLP

/s/ Theodore B. Smyth
Theodore B. Smyth
N.C. State Bar No. 10045
Email: tsmyth@cshlaw.com
Post Office Box 27808
Raleigh, NC 27611-7808
Phone: 919-828-5100
*Attorneys for Defendant Illinois Union*
*Insurance Company*

21

4923-4631-6574, v. 1

JA650

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO.: 5:20-CV-349-D

| | | |
|---|---|---|
| GOLDEN CORRAL CORP. and GOLDEN CORRAL FRANCHISING SYSTEMS, INC., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| ILLINOIS UNION INSURANCE COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

    I hereby certify that on February 21, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys:

Gregg E. McDougal, Esq.
William R. Hartzell, Esq.
McDougal Hartzell, PLLC
3737 Glenwood Ave., Suite 170
Raleigh, North Carolina 27612
gregg@themcdougallawfirm.com
will@themcdougallawfirm.com
*Attorneys for Plaintiffs*

Robert W. Fisher, Esq.
CLYDE & CO US LLP
271 17th Street NW, Suite 1720
Atlanta, GA 30363
Robert.Fisher@clydeco.us
*Attorneys for Defendant Illinois Union Insurance Company*

CRANFILL SUMNER LLP

  /s/ Theodore B. Smyth
Theodore B. Smyth
N.C. State Bar No. 10045
Email: tsmyth@cshlaw.com
Steven A. Bader
Email: sbader@cshlaw.com
N.C. State Bar No. 55931
Post Office Box 27808
Raleigh, NC 27611-7808
Phone: 919-828-5100
*Attorneys for Defendant Illinois Union Insurance Company*

4923-4631-6574, v. 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No.: 5:20-cv-349-D

GOLDEN CORRAL CORP. and )
COLDEN CORRAL FRANCHISING )
SYSTEMS, INC. )
)
        Plaintiffs, )
)
    v. )
)
ILLINOIS UNION INSURANCE )
COMPANY, )
)
        Defendant. )
_____ )

## **PLAINTIFFS' REPLY BRIEF IN SUPPORT OF ITS RULE 60(B)(6) MOTION**

      Plaintiffs Golden Corral Corp. and Golden Corral Franchising Systems, Inc. (collectively, "Golden Corral"), by and through undersigned counsel, respectfully submits this Reply Memorandum of Law in support of its Rule 60(b)(6) Motion (D.E. 50).

### **NATURE OF THE CASE & STATEMENT OF FACTS**

      Golden Corral respectfully refers the Court to the Nature of the Case and Statement of Facts set forth in its original memorandum of law, which is incorporate by reference. D.E. 51.

      However, most pertinently, Illinois Union Insurance Company ("Illinois Union") issued Policy No. D4226555A 001 (the "Policy") to Golden Corral. D.E. 17-1. Relevant to this brief, the Policy contains a Pollution, Contamination exclusion (the "Pollution Exclusion") that provides, in pertinent part, as follows:

      This Policy does not insure:

      …

**G.    Pollution, Contamination**

Loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of 'contaminants or pollutants,' all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever.

Nevertheless if a peril insured by this Policy arises directly or indirectly from pollution or contamination any loss, damage or destruction of property insured by this Policy arising directly from that peril shall (subject to the terms, conditions and limitations of the Policy) be covered.

…

"Contaminants or pollutants" means any material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, bacteria, virus, or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act, or as designated by the U.S. Environmental Protection Agency.

…

D.E. 17-1 pp. 60-61.

**I.    This Matter and *North State Deli* Are Related as They Are Materially Identical.**

Illinois Union mischaracterizes Golden Corral's argument as a mere subsequent change in state decisional law. *See* D.E. 53 p. 5. However, that is not Golden Corral's argument. Rather, Golden Corral is arguing that extraordinary circumstances exist under Rule 60(b) because divergent results have been reached in state and federal court in closely related cases.

In apparent recognition of this argument, Illinois Union argues that extraordinary circumstances under Rule 60(b) do not exist because this is a mere subsequent decision in a "similar but unrelated case." D.E. 53 p. 5. Contrary to Illinois Union's assertions, this matter and *North State Deli*, 386 N.C. 733, 908 S.E.2d 802 (2024), are related.

Illinois Union filed with the Fourth Circuit in the appeal of this matter a citation of supplemental authorities that stated that this matter and *North State Deli* are "materially identical." D.E. 51-1 p. 2. Illinois Union cannot now claim that this matter and *North State Deli* are distinguishable as Illinois Union has already argued that these cases are "materially identical." D.E. 51-1 p. 2.

*Ritter* notes that a sufficiently "close connection" between two cases that reach divergent results constitutes extraordinary circumstances under Rule 60(b). *Ritter v. Smith*, 811 F.2d 1398, 1402 (11th Cir. 1987). In *Ritter*, the court found it significant that counsel opposing a Rule 60(b) motion, like here, "conceded that there is nothing in the record in this case to distinguish this case from [a related case] in this regard." *Ritter*, 811 F.2d at 1403 n. 7. The court further reasoned that because the two cases were "virtual legal twins," extraordinary circumstances" existed under Rule 60(b) to rectify divergent results. As stated above, Illinois Union has already argued that this matter and *North State Deli* are "materially identical." D.E. 51-1 p. 2.

This matter and *North State Deli* involve the materially identical insurance policy language, involve the same pandemic at the same time, were filed a week apart, and involve the same legal issues. Accordingly, they are "virtual legal twins."

## II.   Illinois Union miscites *Dowell v. State Farm Fire & Cas. Auto Ins. Co.*, 993 F.2d 46 (4th Cir. 1993).

Illinois Union argues that the Fourth Circuit has addressed a scenario involving "a subsequent insurance coverage decision by a state court allegedly at odds with a prior federal court ruling on similar policy language" and points to *Dowell v. State Farm Fire & Cas. Auto Ins. Co.*, 993 F.2d 46 (4th Cir. 1993). D.E. 53 p. 6. However, *Dowell* does not support Illinois Union. In *Dowell*, the Fourth Circuit did note that Rule 60(b) relief is appropriate in matters involving "extraordinary circumstances" to "accomplish justice." *Dowell*, 993 F.2d at 48. The Fourth Circuit

then noted that "extraordinary circumstances" do not exist in *Powell* because the party seeking Rule 60(b) relief "made a voluntary, deliberate, free, and untrammeled choice not to appeal" the decision from which it is now seeking relief. *Id.* (citations, quotations, and brackets omitted). The Fourth Circuit reasoned that the movant made a "considered choice not to appeal" and, therefore, the movant "cannot be relieved of a such a choice because hindsight seems to indicate to him that the decision not to appeal was probably wrong." *Id.* (citation omitted). Accordingly, the Fourth Circuit found that there were no "extraordinary circumstances" warranting Rule 60(b) relief because the movant did not appeal. Here, Golden Corral appealed the dismissal of this action to the Fourth Circuit.

### III.     Illinois Union Ignores NC Law On the Pollution Exclusion.

Under North Carolina law, an insurer has the burden of proving that an exclusion applies. *Kubit v. MAG Mut. Ins. Co.*, 210 N.C. App. 273, 283, 708 S.E.2d 138, 147 (2011). Furthermore, "[e]xclusionary clauses are interpreted narrowly while coverage clauses are interpreted broadly to provide the greatest possible protection to the insured." *State Cap. Ins. Co. v. Nationwide Mut. Ins. Co.*, 318 N.C. 534, 543, 350 S.E.2d 66, 71 (1986). Thus, Illinois Union has the burden of proving the applicability of the Pollution Exclusion, and the Pollution Exclusion must be interpreted narrowly so the Policy provides the greatest protection to Golden Corral.

Illinois Union claims that Golden Corral failed to "engage with North Carolina law" when arguing that the Pollution Exclusion does not apply. D.E. 53 p. 12. This is simply not true. In arguing that the Pollution Exclusion does not apply, Golden Corral repeatedly cites to *Auto Owners Ins. Co. v. Potter*, 105 F. App'x 484 (4th Cir. 2004), which specifically analyzes and applies North Carolina law as articulated by the North Carolina Court of Appeals in *West American Ins. Co. v. Tufco Flooring East, Inc.*, 104 N.C. App. 312, 409 S.E.2d 692 (1991). D.E. 51 pp. 12-13. Golden

Corral is not failing to engage with North Carolina law, but is rather relying on the express holding of the Fourth Circuit analyzing North Carolina law: "[W]e hold that the district court erred by failing to give 'discharge, dispersal, seepage, migration, release or escape' their technical meanings as environmental terms of art." *Auto-Owners Ins. Co. v. Potter*, 105 F. App'x 484, 496 (4th Cir. 2004).

This holding by the Fourth Circuit stands in direct conflict with Illinois Union's argument that the Pollution Exclusion "applies to more than just traditional environmental pollution, by its plain language." D.E. 53 p. 11. While it is true that, "as a general rule," terms in an insurance contract must be given their "plain" meaning, this not true when a term has been given a "technical meaning." *Auto-Owners Ins. Co. v. Potter*, 105 F. App'x 484, 494 (4th Cir. 2004). As stated by the North Carolina Supreme Court "the terms of an insurance contract must be given their plain, ordinary, and accepted meanings *unless they have acquired a technical meaning in the field of insurance* or unless it is apparent that another meaning was intended." *Cherokee Ins. Co. v. Aetna Cas. & Sur. Co.*, 46 N.C. App. 242, 245, 264 S.E.2d 913, 915 (1980) (emphasis added). Here, as articulated in *Potter*, discharge, dispersal, seepage, migration, release or escape have acquired technical meanings, and it is error for a court to not give the terms their technical meaning. *Potter*, 105 F. App'x at 496; *see also Colony Ins. Co. v. Buckeye Fire Equip. Co.*, No. 319CV00534FDWDSC, 2020 WL 6152381, at *3 (W.D.N.C. Oct. 20, 2020), *aff'd*, No. 20-2208, 2021 WL 5397595 (4th Cir. Nov. 18, 2021) ("[T]erms such as 'discharge, dispersal, seepage, migration, release, or escape' are environmental terms of art ….").

Notably, Illinois Union simply ignores this fact that discharge, dispersal, seepage, migration, release or escape have technical meanings. They do not attempt to argue otherwise. Rather, Illinois Union simply ignores *Potter*. In fact, *Potter* or *Tufco* (which *Potter* cites) are not

even cited in Illinois Union's brief. Thus, Illinois Union did not even attempt to distinguish *Potter* and *Tufco*. It simply ignored them.

Here, the Pollution Exclusion excludes coverage for:

> Loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened *release, discharge, escape or dispersal* of 'contaminants or pollutants,' all whether direct or indirect, proximate or remote or in whole or in part arising from any cause whatsoever.

D.E. 17-1 (emphasis added). The Pollution Exclusion uses the very terms that are given technical meaning under North Carolina law.

Illinois Union attempts to sidestep this by stating that the inclusion of the term "virus" in the Pollution Exclusion shows that the Pollution Exclusion is not intended to only be limited to traditional environmental damage. D.E. 53 pp. 13-14. However, "[t]here appears to be little dispute that the pollution exclusion was adopted to address the enormous potential liability resulting from anti-pollution laws enacted between 1966 and 1980." *Potter*, 105 Fed. App'x at 9 (citation omitted). Accordingly, the Pollution Exclusion contains specific references to anti-pollution laws. The Pollution Exclusion defines the term "[c]ontaminants or pollutants" with specific references to various environmental laws and an environmental agency:

> "Contaminants or pollutants" means any material that after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use of property insured by this Policy, including, but not limited to, bacteria, virus, or hazardous substances as listed in the *Federal Water Pollution Control Act*, *Clean Air Act*, *Resource Conservation and Recovery Act of 1976*, and *Toxic Substances Control Act*, or as designated by the *U.S. Environmental Protection Agency*.

D.E. 17-1 p. 61 (emphasis added). The inclusion of the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, Toxic Substances Control Act, and the U.S. Environmental Protection Agency align with the inclusion of technical terms that limit the applicability of the Pollution Exclusion to traditional environmental damage.

Even more problematic for Illinois Union, the definition of "[c]ontaminants or pollutants" specifies that the "[c]ontaminants or pollutants" is limited to "any material that after its *release* can cause or threaten damage …." D.E. 17-1 p. 61 (emphasis added). COVID-19 has not been "released." Rather, it is a naturally created disease.

Moreover, *Potter* was decided in 2004. *Tufco* was decided even earlier, in 1991. This Policy was issued in 2019. D.E. 17-1 p. 6. If Illinois Union wanted to issue a policy with a pollution exclusion that did not include terms that had technical meaning, they could have written a different pollution exclusion without those technical terms.

Furthermore, limiting the Pollution Exclusion to traditional environmental damage does not render the inclusion of "virus" meaningless. As stated in Golden Corral's brief in support of its Rule 60(b) motion, certain forms of viral discharge from a single source, such as a pipe, may constitute environmental pollution. D.E. 51 p. 16. By contrast, COVID-19 arises from humans being too close to one another and the disease is contagious. This is not traditional environmental damage.

Illinois Union does not argue anywhere in its response brief that the COVID-19 pandemic constitutes traditional environmental damage, because they cannot. Illinois Union has argued in a separate case that "COVID-19, a communicable disease caused by a virus, does not constitute traditional environmental damage in any sense of that term." D.E. 51-2 p. 7.

## IV. *Cato* Is Inapplicable Because It Does Not Use The Environmental Terms Of Art That Have Been Given Technical Meaning In North Carolina.

Illinois Union argues that *Cato Corporation v. Zurich American Insurance Company*, 386 N.C. 667, 903 S.E.2d 144 (2024), requires the Pollution Exclusion to be applied as written. However, Illinois Union fails to recognize the specific language used in *Cato*. In *Cato*, the North Carolina Supreme Court analyzed an exclusion that excluded coverage for damage caused by

"[c]ontamination, and any cost due to [c]ontamination including the inability to use or occupy property or at any cost of making property safe or suitable for use or occupancy." *Cato Corp.*, 386 N.C. at 669, 909 S.E.2d at 146. The policy in *Cato* then defined "contamination" to mean "any condition of property due to the actual presence of any … virus." *Id.* (ellipses in original). Significantly, the contamination exclusion in *Cato* does not include the technical terms that limit the applicability of the exclusion to traditional environmental damage as articulated in *Potter*. Thus, *Cato* is inapplicable because the technical terms used by Illinois Union in the Policy do not appear in *Cato*.

## CONCLUSION

Accordingly, this court should grant Plaintiffs' Rule 60(b)(6) motion.


This the 21st day of March 2025.

**MCDOUGAL HARTZELL, PLLC**

By: ___/s/ William R. Hartzell___
Gregg E. McDougal NCSB # 27290
William R. Hartzell, NCSB # 50762
3737 Glenwood Ave, Suite 170
Raleigh, North Carolina 27612
Telephone: (919) 893-9500
Facsimile: (919) 893-9510
gregg@themcdougallawfirm.com
will@themcdougallawfirm.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-349-D

GOLDEN CORRAL CORP. and )
GOLDEN CORRAL FRANCHISING )
SYSTEMS, INC., )
)
Plaintiffs, )
)
v. ) **ORDER**
)
ILLINOIS UNION INSURANCE )
COMPANY, )
)
Defendant. )

On May 14, 2020, Golden Corral Corporation and Golden Corral Franchising Systems Incorporated (collectively, "Golden Corral" or "plaintiffs") filed a complaint against Illinois Union Insurance Company ("Illinois Union" or "defendant") in Wake County Superior Court seeking to recover financial losses arising from the COVID-19 pandemic [D.E. 1-1]. On July 2, 2020, Illinois Union removed the action to this court [D.E. 1]. On August 28, 2020, Golden Corral filed an amended complaint [D.E. 15]. On February 1, 2021, Illinois Union moved for judgment on the pleadings [D.E. 24]. On September 8, 2021, the court granted Illinois Union's motion. See Golden Corral Corp. v. Illinois Union Ins., 559 F. Supp. 3d 476, 492 (E.D.N.C. 2021). On August 11, 2022, the United States Court of Appeals for the Fourth Circuit affirmed the court's order and judgment. See Golden Corral Corp. v. Illinois Union Ins., No. 21-2119, 2022 WL 3278938, at *1 (4th Cir. Aug. 11, 2022) (per curiam) (unpublished).

On January 31, 2025, Golden Corral moved for relief from judgment [D.E. 50] and filed a memorandum in support [D.E. 51]. See Fed. R. Civ. P. 60(b)(6). On February 21, 2025, Illinois

Union responded in opposition [D.E. 53]. On March 21, 2025, Golden Corral replied [D.E. 55]. As explained below, the court denies plaintiffs' motion for relief from judgment.

## I.

This case concerns an insurance coverage dispute, a change in decisional law, and the value of judicial finality. On September 8, 2021, the court decided an insurance coverage dispute in favor of Illinois Union. See Golden Corral, 559 F. Supp. 3d at 484–92. In reaching that decision, the court confronted an issue then-undecided by the Supreme Court of North Carolina: whether an insurance policy's "physical loss, damage or destruction" clause covered losses attributable to COVID-19 closure orders under North Carolina law. See id. at 484–90. When confronting an undecided issue under North Carolina law, the court must predict how the Supreme Court of North Carolina would rule. See id.; Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013); Twin City Fire Ins. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). The court predicted that the Supreme Court of North Carolina would rule that "physical loss, damage or destruction" clauses do not cover losses attributable to COVID-19 closure orders. Golden Corral, 559 F. Supp. 3d at 484–90. Accordingly, the court entered judgment for Illinois Union. See id. at 492. On August 11, 2022, the Fourth Circuit affirmed. See Golden Corral, 2022 WL 3278938, at *1.

On December 13, 2024, the Supreme Court of North Carolina decided North State Deli, LLC v. Cincinnati Insurance Co., 386 N.C. 733, 908 S.E.2d 802, 812 (2024). There, the Court applied "background principles" of North Carolina law and held that "direct physical loss" clauses cover losses attributable to COVID-19 closure orders. Id. at 746–47, 908 S.E.2d at 812. Relying on North State Deli, Golden Corral seeks relief from judgment under Federal Rule of Civil

2

Procedure 60(b)(6).  See [D.E. 51] 5–11, 17–21.  Illinois Union opposes the motion.  See [D.E. 53] 1–20.

## II.

Under Rule 60(b), a moving party must first demonstrate that (1) its motion is timely, (2) it has a meritorious claim or defense, and (3) the nonmoving party will not suffer unfair prejudice from setting aside the judgment.  See, e.g., United States v. Welsh, 879 F.3d 530, 533 (4th Cir. 2018); Robinson v. Wix Filtrate Corp., 599 F.3d 403, 412 n.12 (4th Cir. 2010); Nat'l Credit Union Admin. Bd. v. Gray, 1 F.3d 262, 264 (4th Cir. 1993); Werner v. Carbo, 731 F.2d 204, 206–07 (4th Cir. 1984).  If the moving party meets its initial burden, then it must "satisfy one of the six enumerated grounds for relief under Rule 60(b)."  Gray, 1 F.3d at 266; see Welsh, 879 F.3d at 533.

Golden Corral seeks relief under Rule 60(b)(6).  See [D.E. 51] 5–11, 17–21.  Under Rule 60(b)(6), "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . any [ ] reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).  Courts generally refer to this as the "catch-all provision."  Fed. Trade Comm'n v. Ross, 74 F.4th 186, 194 (4th Cir. 2023), cert. denied, 144 S. Ct. 693 (2024).  To justify relief under the catch-all provision, a plaintiff must demonstrate "extraordinary circumstances."  Aikens v. Ingram, 652 F.3d 496, 500 (4th Cir. 2011) (en banc).  Few circumstances are truly extraordinary under Rule 60(b)(6), including intervening legal developments under federal or state law.  See, e.g., Gonzalez v. Crosby, 545 U.S. 524, 535–38 (2005); Agostini v. Felton, 521 U.S. 203, 239 (1997); Ross, 74 F.4th at 194; Moses v. Joyner, 815 F.3d 163, 168 (4th Cir. 2016); Dowell v. State Farm Fire & Cas. Auto. Ins., 993 F.2d 46, 48 (4th Cir. 1993); Hall v. Warden, Md. Penitentiary, 364 F.2d 495, 496 (4th Cir. 1966) (en banc); see also Cincinnati Ins. v. Flanders Elec. Motor Serv., Inc., 131 F.3d 625, 631 (7th Cir.

3

1997); Biggins v. Hazen Paper Co., 111 F.3d 205, 212 (1st Cir. 1997); McGeshick v. Choucair, 72 F.3d 62, 65 (7th Cir. 1995); Batts v. Tow-Motor Forklift Co., 66 F.3d 743, 750 (5th Cir. 1995); DeWeerth v. Baldinger, 38 F.3d 1266, 1273–74 (2d Cir. 1994).

The court assumes without deciding that Golden Corral satisfies Rule 60(b)'s threshold requirements. As for extraordinary circumstances, Golden Corral argues that its unsuccessful Fourth Circuit appeal, the Supreme Court of North Carolina's subsequent decision in North State Deli, the considerations expressed in Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), and North Carolina's policy not to accept certified questions to its Supreme Court cumulatively qualify as extraordinary circumstances. See [D.E. 51] 17–21. They do not. There is nothing extraordinary about an unsuccessful appeal. Moreover, "a change in decisional law subsequent to a final judgment provides no basis for relief under Rule 60(b)(6)." Ross, 74 F.4th at 194 (cleaned up); see Gonzalez, 545 U.S. at 535–38; Agostini, 521 U.S. at 239; Moses, 815 F.3d at 168; Hall, 364 F.2d at 496. This principle applies whether the change in decisional law affects state or federal law. See, e.g., Flanders, 131 F.3d at 631; Biggins, 111 F.3d at 212; McGeshick, 72 F.3d at 65; Batts, 66 F.3d at 750; DeWeerth, 38 F.3d at 1273; Dowell, 993 F.2d at 48.

As for Erie, Golden Corral argues that divergent outcomes in state and federal court qualify as extraordinary circumstances. No. As the Fifth Circuit observed in Batts v. Tow-Motor Forklift Co., 66 F.3d 743 (5th Cir. 1995):

> The general rule that a change in decisional law will not ordinarily warrant Rule 60(b)(6) relief has greater force in an Erie case because in this context a federal court is doing no more than fulfilling its obligation scrupulously to determine how a state court would decide a question. . . . That a subsequent state court resolves the question differently does not render the federal diversity court decision invalid, or mar the proceeding as unfair.

Id. at 750 (emphasis added); see Flanders, 131 F.3d at 631; McGeshick, 72 F.3d at 65; DeWeerth, 38 F.3d at 1273; Dowell, 993 F.2d at 48. To bolster its argument, Golden Corral repeatedly cites

4

Pierce v. Cook & Co., 518 F.2d 720 (10th Cir. 1975) (en banc) See [D.E. 51] 18–21. The court acknowledges the Tenth Circuit's holding in Pierce. See id. at 723. The court, however, declines to follow Pierce and instead credits the prevailing conclusion that the circuit courts have reached in the past 50 years that a change in state decisional law generally does not justify relief under Rule 60(b)(6). See, e.g., Flanders, 131 F.3d at 631; Biggins, 111 F.3d at 212; McGeshick, 72 F.3d at 65; Batts, 66 F.3d at 750; DeWeerth, 38 F.3d at 1273; Dowell, 993 F.2d at 48. Golden Corral also analogizes its circumstances to the sui generis proceedings and decisions arising from 9/11 litigation. See [D.E. 51] 20 (citing In re Terrorist Attacks on Sept. 11, 2001, 741 F.3d 353 (2d Cir. 2013)). The court rejects Golden Corral's comparison between its mine-run insurance coverage dispute and that one-of-a-kind litigation. Thus, Erie considerations do not help Golden Corral.

Finally, the court acknowledges Golden Corral's observation that there is no mechanism to certify questions to the Supreme Court of North Carolina. See Toloczko, 728 F.3d at 398. But even with Golden Corral's other arguments, North Carolina's policy not to accept certified questions to its Supreme Court does not create extraordinary circumstances. To hold otherwise would open the floodgates for parties to relitigate long-decided cases and upset the delicate balance between "the sanctity of final judgments, expressed in the doctrine of res judicata, and the incessant command of the court's conscience that justice be done in light of all the facts." Ross, 74 F.4th at 194. Moreover, Golden Corral made a "voluntary, deliberate, free, and untrammeled choice" to be a first-mover in North Carolina COVID-19 insurance litigation. Dowell, 993 F.2d at 48 (cleaned up). Despite Golden Corral's knowledge that North State Deli was percolating through the North Carolina courts, Golden Corral never sought to stay this action. See [D.E. 31] 19 (citing earlier proceedings in North State Deli). Indeed, Golden Corral vigorously opposed any delay in this action. See [D.E. 30] 4–5. Golden Corral cannot have it both ways. Finality is a weighty

5

consideration, and Golden Corral's circumstances are not sufficiently extraordinary to ignore finality. See, e.g., Gonzalez, 545 U.S. at 535–38; Agostini, 521 U.S. at 239; Ross, 74 F.4th at 194; Moses, 815 F.3d at 168; Flanders, 131 F.3d at 631; McGeshick, 72 F.3d at 65; Batts, 66 F.3d at 750; DeWeerth, 38 F.3d at 1273; Dowell, 993 F.2d at 48; Hall, 364 F.2d at 496. "This very strict interpretation of Rule 60(b) is essential if the finality of judgments is to be preserved." Gonzalez, 545 U.S. at 535 (quotation omitted). Thus, the court denies Golden Corral's motion for relief from judgment under Rule 60(b)(6).

<div align="center">III.</div>

In sum, the court DENIES plaintiffs' motion for relief from judgment [D.E. 50].

SO ORDERED. This 14 day of May, 2025.

<div align="right">
JAMES C. DEVER III<br>
United States District Judge
</div>

<div align="center">6</div>

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| GOLDEN CORRAL CORP. and GOLDEN CORRAL FRANCHISING SYSTEMS, INC., | ) ) ) | |
| Plaintiff, | ) | |
| | ) | **JUDGMENT IN A CIVIL CASE** |
| vs. | ) | **CASE NO. 5:20-CV-349-D** |
| | ) | |
| ILLINOIS UNION INSURANCE COMPANY, | ) ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**Decision by Court.**

**IT IS ORDERED, ADJUDGED, AND DECREED** that the court DENIES plaintiffs' motion for relief from judgment [D.E. 50].

This Judgment filed and entered on May 14, 2025, and copies to:
Counsel of record for the parties      (via CM/ECF electronic notification)

May 14, 2025                                        Peter A. Moore, Jr.
                                                              Clerk of Court


                                                    By: /s/ Stephanie Mann
                                                          Deputy Clerk

GOLDEN CORRAL CORP. and )
GOLDEN CORRAL FRANCHISING )
SYSTEMS, INC., )
                            )
        Plaintiffs, )
                            )
v. )
                            )
ILLINOIS UNION INSURANCE )
COMPANY, )
                            )
        Defendant. )
_____ )

## NOTICE OF APPEAL

Notice is hereby given that Golden Corral Corp. and Golden Corral Franchising Systems,

Inc., all plaintiffs in the above-captioned case, hereby appeal to the United States Court of Appeals

for the Fourth Circuit from the Judgment of the United States District Court for the Eastern District

of North Carolina, entered in this case on May 14, 2025 [D.E. 57], and from any and all orders,

rulings, findings, and conclusions underlying and related to the judgment.

[SIGNATURE PAGE TO FOLLOW]

1

JA667

This the 11th day of June 2025.

<div style="margin-left: 40%;">

**MCDOUGAL HARTZELL, PLLC**

By:   /s/ *William R. Hartzell*
       Gregg E. McDougal NCSB # 27290
       William R. Hartzell, NCSB # 50762
       2626 Glenwood Avenue, Suite 485
       Raleigh, North Carolina 27608
       Telephone: (919) 893-9500
       Facsimile: (919) 893-9510
       gregg@themcdougallawfirm.com
       will@themcdougallawfirm.com

       *Attorneys for Plaintiffs*

</div>

2

JA668